COMPLAINT

# EXHIBIT 1

*Salvo Technologies, Inc. v.*
*Landmark American Insurance Company and Argonaut Insurance Company*
U.S. District Court, Middle District of Florida, Tampa Division

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                 Plaintiff,

        -against-                          Case No. 22-cv-06124 (JMF)

ARM OR ALLY, LLC; BLACKHAWK
MANUFACTURING GROUP, INC., A/K/A 80
PERCENT ARMS, INC. OR 80 PERCENT ARMS;
SALVO TECHNOLOGIES, INC., A/K/A 80P
BUILDER OR 80P FREEDOM CO.; BROWNELLS,
INC., A/K/A BROWNELLS OR BOB BROWNELL'S;
GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR
GSPC; INDIE GUNS, LLC; KM TACTICAL;
PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND
ROCK SLIDE USA, LLC,

                 Defendants.
-------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE .............................................................................. 3

PARTIES ................................................................................................................ 3

FACTUAL ALLEGATIONS ................................................................................ 5

I.   Hidden By Design:  Defendants Have Marketed and Sold Firearm Products
     Designed to be Easily Converted Into Working Untraceable Firearms........................ 5

     A.   The Trivial Differences Between Unfinished Frames and Finished Frames ....... 9

     B.   Defendants' Unfinished Frames to Ghost Guns In Less Than An Hour .......... 11

II.  Working Against the Safeguards: Defendants Created, Maintained, or Contributed
     to an Avoidable Crisis That New York Now Struggles to Contain............................ 16

     A.   The Avoidable Crisis That Needs to be Fixed .................................... 17

     B.   New York's Reliance on Evidence-Based Federal, State and Local Gun
          Control Laws and Effective Enforcement Strategies Which Defendants
          Actively Subverted......................................................................... 20

          1.   Federal Laws ............................................................................. 21

          2.   State & Local Laws.................................................................... 27

III. Each Defendant Has Persistently and Illegally Marketed and Sold Unfinished
     Frames and Receivers into New York. ..................................................... 29

     A.   Arm or Ally.................................................................................. 31

     B.   80 Percent Arms ........................................................................... 39

     C.   80P Builder .................................................................................. 52

     D.   Brownells ..................................................................................... 55

     E.   Glockstore .................................................................................... 70

     F.   Indie Guns .................................................................................... 79

i

G.     KM Tactical ................................................................................ 86

H.     Primary Arms............................................................................. 90

I.      Rainier Arms.............................................................................. 94

J.      Rock Slide ................................................................................ 100

IV.   The Price Paid by the State: Defendants' Ghost Gun-Making Products Have Harmed New York and Will Continue To Do So If Unabated. ............................... 102

A.     The Rise of Ghost Guns and the Damage Done ............................................. 102

B.     Defendants' Conduct Is Dangerous and Directly Harms New York .............. 105

CLAIMS FOR RELIEF ................................................................................ 109

AS AND FOR A FIRST CAUSE OF ACTION
Repeated and Persistent Illegality in Violation of N.Y. Executive Law § 63(12)
*(Against All Defendants)* ................................................................................ 109

AS AND FOR A SECOND CAUSE OF ACTION
Repeated and Persistent Fraudulent Conduct in Violation of N.Y. Executive
Law § 63(12) *(Against All Defendants)* ................................................................................ 112

AS AND FOR A THIRD CAUSE OF ACTION
Public Nuisance Pursuant to N.Y. General Business Law § 898-c *(Against All
Defendants)* ................................................................................ 113

AS AND FOR A FOURTH CAUSE OF ACTION
Violation of N.Y. General Business Law § 349 *(Against All Defendants)*............... 115

AS AND FOR A FIFTH CAUSE OF ACTION
Violation of N.Y. General Business Law § 350 *(Against All Defendants)*............... 116

AS AND FOR A SIXTH CAUSE OF ACTION
Negligence Per Se *(Against All Defendants)* ........................................................... 116

AS AND FOR A SEVENTH CAUSE OF ACTION
Negligent Entrustment *(Against All Defendants)* .................................................... 118

DEMAND FOR JURY TRIAL ................................................................................ 119

PRAYER FOR RELIEF ................................................................................ 119

ii

Plaintiff, The People of the State of New York ("New York" or "the State"), through its attorney Letitia James, Attorney General of the State of New York, alleges the following, with personal knowledge of the actions of the Office of the Attorney General and on information and belief as to the actions of others:

## PRELIMINARY STATEMENT

1.      New York State is grappling with a public health and safety crisis caused by gun violence. A significant part of that crisis is attributable to an influx of homemade, unserialized guns, commonly known as "ghost guns." These weapons are as lethal as any other handgun or rifle, but given their untraceable nature, they are far more likely to be recovered from crime scenes.

2.      Defendants have established an industry and staked out their own lucrative market shares selling ghost gun parts and kits directly to consumers' doorsteps, without a background check and without any record of their sale, as is required by federal law. They have done so by illegally marketing and falsely advertising their products, largely to consumers who want to acquire firearms but cannot legally purchase them, and by selling their products without establishing or utilizing any level of scrutiny or control to prevent their products—and the ghost guns that are made from them—from harming our communities.

3.      The ghost gun-making products that Defendants have sold for years are unquestionably illegal. Under New York State law, possession or sale of an unfinished frame or receiver is a felony. *See* N.Y. Penal Law §§ 265.01(10); 265.63-265.64. So too is the possession or sale of a ghost gun made from one. *See* N.Y. Penal Law §§ 265.01(9); 265.60-265.61. Unfinished frames and receivers are also illegal to sell or possess under the law of New York City. *See* N.Y. City

1

Admin. Code § 10-314.  The sale of these products without following statutory serialization and background check requirements also violates federal law.  *See* 18 U.S.C. § 922(t); 26 U.S.C. §§ 5842, 5861(c).  The very nature of Defendants' business model has subverted and undermined these and other laws described below, which are designed to protect New Yorkers' rights to public health and safety.[1]

4.      The purpose of this lawsuit is to stop Defendants' illegal business practices, abate the continuing harm and danger for which they are responsible, and hold Defendants accountable in law and equity for the crisis they have inflicted on the State.  Specifically, Defendants are liable to the State pursuant to (i) New York Executive Law § 63(12) on multiple theories for their persistent illegal and fraudulent conduct, (ii) New York General Business Law §§ 349 and 350 for their deceptive marketing, (iii) New York General Business Law § 898 for creating, maintaining, or contributing to a public nuisance, and (iv) for claims arising out of negligence per se and negligent entrustment.  Accordingly, the State seeks a permanent injunction prohibiting Defendants from selling unfinished frames or receivers into New York and requiring Defendants to issue public corrective statements regarding their false and misleading public statements and omissions, as well as disgorgement, restitution, damages, civil penalties, punitive damages, costs, and the joint and several endowment of an abatement fund that will allow the State to eliminate the public nuisance which Defendants contributed to, created, or maintained.

---

[1] The Penal Law sections referenced in this paragraph became effective on April 26, 2022.  The City's ban on unfinished frames and receivers became effective on February 23, 2020.

## JURISDICTION AND VENUE

5.      The Court has determined that it has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, pursuant to which "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  ECF No. 58. In particular, the Court has determined that it "must decide whether the products at issue are 'firearms' or 'component parts' thereof within the meaning of federal law," a "federal question" pursuant to which this Court possesses subject-matter jurisdiction.  *Id.* at 19.

6.      This Court has personal jurisdiction over each Defendant because each Defendant transacts business within the State of New York, contracts to supply goods in the State, has committed and continues to commit tortious acts within the State, and has committed and continues to commit tortious acts outside the State causing injury to persons or property within the State.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted occurred in the Southern District of New York, including Defendants' shipment of unfinished frames and receivers to consumers in this District, sales by certain Defendants to undercover investigators based in this district, and acts of violence committed in this District by persons using ghost guns made from Defendants' products.

## PARTIES

8.      Plaintiff, the People of the State of New York via New York State Attorney General Letitia James, brings this action in a sovereign capacity to protect the interests of the State and its citizens. This action is brought pursuant to the Attorney General's common-law and statutory authority including, *inter alia*, New York Executive Law § 63 and New York General Business Law Article

3

22-A and § 898-d.

9.      Defendant Arm or Ally, LLC ("Arm or Ally") is a North Carolina limited liability corporation with its principal place of business in Indian Trail, North Carolina.  It has a subsidiary named Arm or Ally S LLC.

10.     Defendant Blackhawk Manufacturing Group, Inc., also known as 80 Percent Arms, Inc. ("80 Percent Arms"), is a California corporation with its principal place of business in Garden Grove, California.

11.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida.

12.     Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinnell, Iowa.  Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc.

13.     Defendant GS Performance, LLC, also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, Tennessee and San Diego, California.  It is the successor of a California limited liability corporation also named GS Performance, LLC, headquartered in San Diego.

14.     Defendant Indie Guns LLC ("Indie Guns") is a Florida limited liability corporation with its headquarters in Orlando, Florida.

15.     Defendant KM Tactical, LLC ("KM Tactical") is a Missouri limited liability corporation

4

with its registered office in Independence, Missouri.

16. Defendant Primary Arms, LLC ("Primary Arms") is a Texas limited liability corporation with its headquarters in Houston, Texas. Its subsidiaries include Primary Arms Optics, Primary Arms Wholesale, Primary Arms Online and Primary Arms Government.

17. Defendant Rainier Arms, LLC ("Rainier Arms") is a Washington State limited liability corporation with its principal place of business in Auburn, Washington. It has subsidiaries including Rainier Arms Holdings LLC, Rainier Arms International, Inc., and Rainier Arms Manufacturing LLC.

18. Defendant Rock Slide USA, LLC ("Rock Slide") is a North Carolina limited liability company with its principal place of business in Broadway, North Carolina.

## FACTUAL ALLEGATIONS

I. **HIDDEN BY DESIGN: DEFENDANTS HAVE MARKETED AND SOLD FIREARM PRODUCTS DESIGNED TO BE EASILY CONVERTED INTO WORKING UNTRACEABLE FIREARMS.**

19. The unfinished frames and receivers that Defendants marketed and sold into New York State between June 2016 through today (the "Relevant Time Period")[2] are designed to subvert the federal and state statutes that prevent guns from falling into the hands of people who cannot and should not possess them.

20. As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic. It is easily convertible into the finished

---

[2] The Relevant Time Period is derived from the six-year statute of limitations for claims under N.Y. Executive Law § 63(12) and the June 29, 2022 date of this action's filing. *See* N.Y. C.P.L.R. § 213(9).

product, a deadly weapon, sometimes called a privately made firearm or a ghost gun.

21.     The term "frame" generally refers to the core part of a pistol or handgun, while the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun.

22.     Defendants' unfinished frames and receivers try to avoid the definition of a "firearm" simply by leaving a few key holes undrilled or plastic unfiled.

23.     Once completed, there is no meaningful difference between the Defendants' products and a frame or receiver one could buy at a gun store.  The "unfinished" frames and receivers sold by Defendants are designed to mimic popular weapons platforms, such as the frames of Glock pistols, or the receivers of AR-9, AR-15, or AK-47 rifles.

24.     For instance, as described more fully below, the unfinished frame that investigators purchased from Defendant Arm or Ally was designed to be identical to the frame of a Glock Third Generation G19 or G23, two of the most popular handguns on the market.  *See* below ¶¶ 126-127. Arm or Ally emphasized the connection to the Glock product in its marketing, saying that its frame kit "is everything you need to start your Glock 19/23 Gen 3 build for personal use" and that it was "[c]ompatible with Glock® 19/23 Gen3 components."

25.     Defendants Brownells and Indie Guns also touted the Glock-compatibility of their products when selling to undercover investigators, as described more fully below, with Brownells emphasizing that the unfinished frame it sold was "the next generation of Polymer 80% frames for Glock® handguns," and that it "allows Glock® 19, 23 & 32 owners to create a customized handgun, exactly suited for any application." *See* below ¶¶ 277-278.  Indie Guns similarly emphasized that its kits were designed "to build a complete G17 Gen3 lower" and that its products

6

were "[c]ompatible with Glock® 17/22 Gen3 Components." *See* below ¶ 4353.

26.     The products that Defendants' "unfinished" frames and receivers are designed to imitate are available for purchase at legitimate New York gun stores.  Of course, if someone purchased a Glock frame or an AR-9 or AR-15 receiver from a New York gun store, they would need to have a license and to undergo a background check. *See* N.Y. Penal Law §§ 265.01; 265.20(3); 400.00(1); 18 U.S.C. §§ 922(t).  There would also be a record made of the sale, and the frame would be serialized according to federal requirements so that it would be traceable if it were later recovered in connection with a crime.  N.Y. Penal Law § 265.07; N.Y. Gen. Bus. Law § 875-f; 18 U.S.C. §§ 923(g)(1)(A); 923(i).

27.     But based on the fiction that Defendants' unfinished frames or receivers fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Defendants have sold them directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime.

28.     The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so-named because they are untraceable and there is no record of their sale, or even their existence.[3]  *See* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that

---

[3] The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace.  Although 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially purchased unfinished frames and receivers, such as those sold by Defendants.  The ghost

fails to comply with tracing and serialization requirements in N.Y. Penal Law § 265.07).

29.     Because of this built-in evasion of federal and state laws, described more fully below, unfinished frames and receivers and the ghost guns made from them are naturally attractive to (and naturally marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

30.     There is little practical difference between Defendants' "unfinished" frames or receivers and "finished" frames or receivers meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

31.     Finishing a frame or receiver is, in the words of Defendant 80 Percent Arms, "ridiculously easy," and can be carried out by an amateur in under an hour with basic hand tools.  In the hands of someone with prior experience or mechanical aptitude, an unfinished frame or receiver can be converted into a working gun in under thirty minutes.

32.     These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

33.     The result is that Defendants have sold these almost-but-not-quite guns online and shipped them to New York consumers, in the full knowledge that many of these consumers cannot and should not have a deadly weapon, without applying any internal controls to verify the identity of their customer and the appropriateness of their sale.

---

guns created out of Defendants' products, which are the subject of this action, create a much higher quality firearm and are far more prevalent than the 3D printed variety.

## A.  THE TRIVIAL DIFFERENCES BETWEEN UNFINISHED FRAMES AND FINISHED FRAMES

34.     The difference between an unfinished frame and a serialized frame is negligible, as is the effort required to convert the former into the latter.

35.     Compare, for instance, the following two pictures.  On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame sold and shipped into New York by Defendant Indie Guns.  *See* below ¶ 436. On the right is a photograph of a "finished" Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm delivered to a Federal Firearms Licensee ("FFL"):



36.     The two weapons—one an "unfinished frame" that exemplifies the products that each Defendant has sold over the internet and shipped into New York without serializing or conducting a background check, the other a "finished" frame subject to the legal requirements described below—are virtually identical.

37.     The trivial differences amount to having to drill three small holes and milling down a small amount of plastic at the top of the frame.  A "finished" frame sold by Defendant Primary Arms is

9

illustrated as follows:



38.     The differences are just as minuscule in the context of an unfinished lower receiver for a rifle.  As Defendant 80 Percent Arms assures customers about building the receiver for an AR-15: "[W]hat is complete is far more than what is left for you to do, hence the term 80 percent lower." This Defendant spells out the differences in detail: [4]

---

[4] *See* https://www.80percentarms.com/blog/what-is-an-80-lower/ (last visited March 6, 2023).  The same page currently markets these products as a vehicle for evading federal and state law, particularly background checks: "When buying a completed AR-15 from your local gun shop, you must purchase from an authorized dealer with an FFL, undergo a thorough background check, fill out various forms and paperwork, endure a waiting period, then pay.  With an 80% lower, you add the piece to your cart when ordering online, then checkout.  It's shipped directly to

10

So, what are the differences between an 80 percent lower and a stripped lower? Let's take a look!

To complete an 80% lower, you must:

- Drill a hammer pinhole
- Drill a trigger pinhole
- Drill safety selector lever holes
- Machine the fire control group cavity

Here's what is already prepped for you out of the box:

- Bolt catch
- Pistol grip hole
- Magazine well
- Magazine release
- Buffer detent hole
- Trigger guard pinholes
- Upper receiver rear lug pocket
- Front and rear takedown holes
- Buffer tube threads and housing

39.     Because of these minor differences, it takes very little time, effort, or skill to convert an unfinished framer or receiver into a working ghost gun.

## B. DEFENDANTS' UNFINISHED FRAMES TO GHOST GUNS IN LESS THAN AN HOUR

40.     Defendants have made ease of conversion a key part of their marketing to both create a market for unfinished frames and receivers broadly and become industry leaders in that niche. *See e.g.* ¶¶ 170, 280, and 281.

41.     For instance, during a substantial portion of the Relevant Time Period, Defendant

---

your doorstep. Simple, right?!" *Id.* 80 Percent Arms also includes a bullet-point list of "Benefits of an 80% Lower," including, "you do not require an FFL to purchase an unfinished lower," "it ships directly to your home," "you do not require a background check," "requires no serialization," and "you are not forced to register your DIY AR-15."

Brownells published an instructional video relating to products Brownells sold, which were made by the most popular manufacturer of unfinished frames and receivers, Polymer80, Inc. ("Polymer80"). In that video, Brownells represented that these products "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[5] Likewise, Defendant 80 Percent Arms similarly explained that its jigs "make it **_ridiculously easy_** for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."[6]

42. Defendants' customers agreed. For instance, a review of an exclusive Polymer80 Glock-compatible pistol frame that Brownells sold on its website during a substantial segment of the Relevant Time Period was entitled "EASY AS CAN BE," and memorialized the ease with which the customer converted the product into a fully functioning firearm: "So I bought roughly three frames from Brownells and not one of them came to me in bad condition. I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other then what I saw on YouTube. And guess what they all go bang when I pull their trigger."[7]

43. Defendants have also taken further steps to eliminate the need for any technical skill on their customer's part by shipping the products in a "jig," a plastic setting for the frame or receiver that makes it easy for even an amateur to see and follow the steps necessary to convert the

---

[5] Formerly available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).
[6] Formerly available at https://www.80percentarms.com/80-lowers/ (last visited June 28, 2022) (emphasis added).
[7] Formerly available at https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

unfinished frame into finished form.

44.     For example, here is a picture of an unfinished Glock-compatible handgun frame purchased from Defendant Indie Guns as it was packaged inside the box it came in:



45.     As evident in the photo, the unfinished handgun frame is shipped already inside the jig, and the jig itself is clearly labeled with the simple steps the consumer needs to take to "finish" the frame.   The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic sticking up above them are the "rails" that the consumer is to mill off, along with another small piece of plastic inside the frame where the recoil spring will go.   The jig makes sure that an

13

untrained consumer will easily be able to remove the small plastic rails with precision.

46.     Similarly, Defendant Brownells explained in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

47.     Defendant 80 Percent Arms likewise stated in a marketing video that, "[w]ith our patented Easy Jig, you can do it [i.e., turn an unfinished receiver into a working assault rifle] in as little as an hour.  It's super simple.  There's no paperwork, no background checks, no registration and no database.  And best of all, it's 100 percent legal.  Even a caveman can do this."  The video is entitled "Build Your Own Gun in 1 Hour 100 Legal."

48.     Once that step is complete, all that remains is drilling the three simple holes, which are helpfully labeled as "M3" or "M4" on the jig.  These labels correspond to two drill bit sizes that are also included in the same box:



49.     All the consumer needs to do is match the drill bit to the hole location, and drill using a hand drill or a drill press, following the instructions on the jig.

50.     Each Defendant's marketing, as described below, *see e.g.* ¶¶ 115-573, celebrates that the result following this easy process is a "finished" frame that is virtually identical to a frame that would be on sale at an FFL firearms retailer and which would have required serialization and a background check if sold in that condition to a consumer.  The finished frame can accept a few commercially available parts (sometimes sold by Defendants as a kit along with the unfinished frame) in order to become a complete and working ghost gun.

51.     As 80 Percent Arms' marketing video describes the process for an assault rifle: "You start

out with this blank that we call an '80 percent lower receiver,' because about 80 percent of the work is already done for you. You take this part, snap it into an easy jig, and drill into the areas the template guides you through. And in no time, you have a military-grade AR-15 lower, that simply snaps together with the other parts contained in our AR-15 kit. You now have a fully-functional, legal AR-15."

52. Each Defendant's only purpose in selling "unfinished" frames and receivers is to offer a simple alternative to regulated "finished" frames or receivers. By the industry they have created and their individual conduct, described more fully below, *see, e.g.*, ¶¶ 115-573, each Defendant has exploited demand for unfinished frames and receivers, which is primarily from consumers who cannot legally purchase firearms, for each Defendant's own financial benefit.

53. In these ways, Defendants have shared a common business model: sell the core of a working firearm that requires just a bit of unsophisticated finishing work and pretend that they are selling something that falls meaningfully short of the legal definition of a "firearm" to avoid any oversight or controls.

## II. WORKING AGAINST THE SAFEGUARDS: DEFENDANTS CREATED, MAINTAINED, OR CONTRIBUTED TO AN AVOIDABLE CRISIS THAT NEW YORK NOW STRUGGLES TO CONTAIN.

54. The rise of gun violence in New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order. *See* N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence).

55. As described further below, *see* ¶¶ 115-573, each Defendant has created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating

16

the ongoing public health crisis.

### A. THE AVOIDABLE CRISIS THAT NEEDS TO BE FIXED

56.     New York's Penal Law establishes that the unlawful possession, sale, or use of an unfinished frame or receiver constitutes a nuisance.  *See* N.Y. Penal Law §§ 265.07, 400.05.

57.     New York law permits civil enforcement actions based on such a nuisance.  Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities." New York Sponsors Memorandum, 2021 S.B. 7196; *see also* N.Y. Gen. Bus. Law § 898-d.

58.     Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

59.     Moreover, "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2).  A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce.  *See id.* § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

60.     Here, as described more fully below, *see* ¶¶ 115-573, each Defendant has engaged in conduct prohibited by New York General Business Law § 898-b.

17

61.     For example, as detailed below, *see* ¶¶ 134-156, 179-249, 292-368, 387-4279, 469-493, 500-525, 548-559, Defendants Arm or Ally, 80 Percent Arms, Brownells, Glockstore, KM Tactical, Primary Arms, and Rainier Arms sent several shipments to individual consumers during the Relevant Time Period, making no effort to determine whether those consumers were engaged in firearms trafficking or were ineligible to legally own a firearm.  Moreover, as detailed below, *see* ¶¶ 122-128, 261-263, 276-278, 434-436, 535-541, 566-569, Defendants Arm or Ally, 80P Builder, Brownells, Indie Guns, Rainier Arms, and Rock Slide, likewise sold unfinished frames or receivers to City or State investigators, exemplifying their abject failure to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State.

62.     Defendants also engage in illegal conduct by selling ghost gun components to New Yorkers and shipping them to addresses outside the state with the foreseeability, if not knowledge, that those products would be ultimately brought into New York.  For instance, Jeru McCray, a customer of Defendants Glockstore and Brownells who received shipments from both companies at his Upper West Side address, would "order[] numerous ghost gun parts and firearms components, . . and ha[ve] those items shipped to an address in Pennsylvania, because under the New York SAFE Act of 2013 [banning assault weapons], these items could not be shipped" into New York State.[8]

63.     Rene Loyola, a Manhattan-based customer of Defendants Arm or Ally, Brownells, KM Tactical, and Primary Arms whose ghost gun manufacturing activities are discussed extensively below, likewise ordered large numbers of products that would be illegal in New York to be shipped

---

[8] *See* https://www.manhattanda.org/d-a-bragg-announces-prison-sentence-for-manufacturing-and-possessing-ghost-gun-in-uws-apartment/ (last visited March 6, 2023).

to a Pennsylvania address before foreseeably bringing them back into Manhattan.

64.     On information and belief, each and every sale of Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

65.     Each Defendant's conduct was ongoing and continuous purportedly until the commencement of this action, but the harm and public nuisance caused, maintained, or contributed to by each Defendant persists.

66.     Indeed, each Defendant's misconduct has resulted in significant ongoing harm and costs to the State. For example, in February 2020, New York City established an NYPD team dedicated exclusively to stopping the flow of ghost guns before they reach city streets.  At New York City's expense, that team, among other things, works with federal, state, and local law enforcement and prosecutors on in-depth ghost gun investigations, search warrant executions, and arrests, and conducts ghost gun-related trainings for police officers and prosecutors.  Other jurisdictions across the State have similarly had to redirect law enforcement resources to confront the growing threat posed by the proliferation of products like those sold by the Defendants.

67.     Abating the public health and safety crisis for which Defendants are liable will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy unfinished frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard-hit by gun violence and crimes.

19

68.     Some of this work has already begun.  In 2022, New York State made significant new and increased investments in gun violence prevention, including taking the following actions announced by Governor Kathy Hochul, among other things:

    a.     Staffed the New York State Intelligence Center with a team of analysts who process gun tracing data;

    b.     Increased the State Police's ability to partner with local law enforcement to combat community-specific crime problems by doubling the number of Community Stabilization Units to 16, with plans to further increase the number of such units to 25;

    c.     Increased funding for the Gun Involved Violence Elimination[9] program to $18.2 million, the largest-ever investment in the program, with plans to double this funding to $36 million;

    d.     Nearly doubled investments in New York's Crime Analysis Centers, which collect and share criminal intelligence and data with local law enforcement;

    e.     Increased investments in New York's Crime Analysis Center Network, which collects and shares gun crime data, among other criminal intelligence, with local law enforcement;

    f.     Created the Interstate Task Force on Illegal Guns, which facilitates the exchange of intelligence between localities and neighboring states; and

    g.     Tripled the State's investment in community-based prevention and response efforts that have been proven to alleviate gun violence, including expanding the State's SNUG Street Outreach program into new communities and launching the nation's first program to recruit and retain outreach workers.

69.     These expenditures are necessary due in no small part to the dangerous conditions caused by Defendants' self-serving and illegal business practices.

### B.  NEW YORK'S RELIANCE ON EVIDENCE-BASED FEDERAL, STATE AND LOCAL GUN CONTROL LAWS AND EFFECTIVE ENFORCEMENT

---

[9] The Gun Involved Violence Elimination program uses evidence-based strategies to reduce gun crimes in the State's 17 counties that account for more than 80 percent of the violent crime that occurs in the State outside of New York City.

**STRATEGIES WHICH DEFENDANTS ACTIVELY SUBVERTED.**

70.     On a federal, state, and local level, New York and its communities have relied on evidence-based gun control laws to reduce gun violence.  As described below, each Defendant has sidestepped all of these legislative measures for profit.

### 1.  FEDERAL LAWS

71.     Federal law operates to protect the public's right to safety from gun violence through a series of provisions aimed at ensuring that deadly weapons are only sold by responsible sellers to responsible buyers.

72.     For instance, any firearm must be sold through an FFL, a person or business that has gone through an extensive investigation, review, and licensing process overseen by the Department of Justice.  *See generally* 18 U.S.C. § 923.  FFLs must adhere to specific ethical and recordkeeping obligations in connection with any and all sales.

73.     Federal law attempts to keep guns out of the hands of dangerous persons by requiring that FFLs subject each customer to a background check.  The dealer will query the National Instant Criminal Background Check System, which contains records of persons who fall into one or more prohibited categories, such as persons convicted of felonies, fugitives from justice, persons who have been committed to a mental institution, or persons subject to protective orders relating to domestic violence.  *See generally* 18 U.S.C. § 922(d,t).

74.     Federal law helps to mitigate or solve crimes committed with firearms by requiring that firearm manufacturers stamp each firearm with "a serial number which may not be readily removed, obliterated, or altered." 26 U.S.C. § 5842(a), 18 U.S.C. § 923(i).  Federal law also

21

requires FFLs to keep records of the serial number of every weapon sold.  *See* 26 U.S.C. § 5843. This process ensures that when a gun is recovered in connection with a crime, law enforcement officers can query the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") eTrace database to quickly access critical information about the gun's origin and first owner.

75.    Each of Defendants Arm or Ally, 80 Percent Arms, 80P Builder, Brownells, Glockstore, Primary Arms, and Rainier Arms holds a federal firearms license and has had ready access to the National Instant Criminal Background Check System.  However, none of them employed that system in the course of their sales of unfinished framed or receivers to New York consumers.

76.    To the State's knowledge, Defendants Indie Guns, KM Tactical, and Rock Slide do not hold a federal firearms license, and thus none of them were legally permitted to "engage in the business of . . . dealing in firearms."  18 U.S.C. § 923(a).

77.    Regardless of their status as an FFL, each Defendant had access to publicly available tools that they could have used to verify whether an unfinished frame or receiver customer had been convicted of a crime, including but not limited to the public criminal history records search service provided by the New York State Office of Court Administration.[10]  But none of them utilized such a service in connection with their sales of unfinished frames or receivers to New York customers.

78.    Defendants sell unfinished frames and receivers and other ghost gun products purporting to skirt the federal definition of a "firearm" subject to these protections.

79.    That definition is a broad one, covering "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive."  18 U.S.C.

---

[10] *See* https://ww2.nycourts.gov/apps/chrs/index.shtml (last visited March 6, 2023).

§ 921(a)(3). It also explicitly covers "the frame or receiver of any such weapon." *Id.*

80.    Defendants attempt to get around this straightforward definition by marketing their frames and receivers as unfinished, and then selling to consumers directly without taking any precautionary steps.

81.    Defendants specifically market the unfinished frames and receivers as designed to evade federal gun laws.

82.    For instance, Defendant Rainier Arms has marketed the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License Required. Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[11]

83.    Defendant 80 Percent Arms has similarly emphasized that "When buying a completed AR-15 from your local gun shop, you must purchase from an authorized dealer with an FFL, undergo a thorough background check, fill out various forms and paperwork, endure a waiting period, then pay. With an 80% lower, you add the piece to your cart when ordering online, then checkout. It's shipped directly to your doorstep. Simple, right?!"[12]

84.    During a substantial portion of the Relevant Time Period, the "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit included an exchange where a customer asked, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)? I want it and will buy it

---

[11] *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited March 3, 2023).

[12] *See* https://www.80percentarms.com/blog/what-is-an-80-lower/ (last visited March 12, 2023).

if it DOES NOT…"  Brownells' staff expert answered: "Not serialized it's a 80% receiver."[13]

85.    That same Q&A page included a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."[14]

86.    Similarly, during a substantial portion of the Relevant Time Period, KM Tactical explicitly pointed to the "blank serialization plate" as a significant feature of a Polymer80 frame kit for sale on its website.[15]

87.    These marketing examples of these almost-but-not-quite guns demonstrate Defendants' illegal and dangerous marketing and sales tactics, which subvert federal law.  As stated above, the definition of a "firearm" in the United States Code is not limited to completed guns, but also encompasses "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).

88.    Prior to the Relevant Time Period, federal courts repeatedly found that items short of a completed gun qualify as a "firearm" if they can easily be made into a functional weapon.  The applicability of this long line of cases is demonstrated by Defendants' own public statements, which describe the process of converting their products to expel a projectile using phrases like

---

[13] Formerly available at https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).
[14] *Id.*
[15] Formerly available at https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black/ (last visited June 17, 2022).

"pretty simple," "ridiculously easy," or "even a caveman can do this."

89.     Even if unfinished frames and receivers were not so easy to convert to working ghost guns, they would nonetheless meet the statutory definition.  Under federal law, a weapon meets the definition of "firearm" if it is "designed" to fire a projectile, even if it cannot be readily converted to do so.  *See U.S. v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005) ("The statute was clearly written in the disjunctive.  The government need only show that the weapons were either 'designed to' or 'may readily be converted.'  It need not demonstrate both." (citation omitted)).  As described above, every unfinished frame or receiver is designed for the sole purpose of being converted into a working weapon; it serves no other function.

90.     To address the confusion that Defendants and others in the industry created through their marketing and sales tactics, the ATF issued a regulation that went into effect on August 24, 2022 clarifying that the terms "frame" and "receiver" as used above "shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  87 Fed. Reg. 24739.  The definition was clarified specifically to combat the spread of illicit ghost guns, such as the ones made from the products Defendants have sold into New York.  *See* 87 Fed. Reg. 24655-60 (discussing "the substantial increase in the number of [ghost guns] recovered from crime scenes throughout the country in recent years;" the ways in which ghost guns frustrate efforts to trace weapons used in crimes; the efforts made by federal, state, and local law enforcement to combat their proliferation; and the conclusion that "wide availability of ghost guns" is "a homeland security threat").

91.     But the ATF's August 2022 clarification demonstrates that Defendants' cumulative marketing, sales, and business conduct not only created an illicit industry, but wrongly and widely messaged that ghost guns were a legal end-run around the firearms laws—a dangerous misapprehension that the ATF worked to correct.

92.     The ATF reiterated that Defendants' products constitute firearms in a December 28, 2022 open letter to federal firearms licensees, emphasizing that "partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to those sold within parts kits . . . are 'frames' and also 'firearms'" under 18 U.S.C. § 921(a)(3) and its implementing regulations.[16]

93.     Each of the Defendants repeatedly sold these specific products, including to New York consumers.

94.     The ATF reiterated that these products constituted firearms "*even without* any associated templates, jigs, molds, equipment, tools, guides, or marketing materials."[17]

95.     As discussed above and below, Defendants did much more than simply sell unfinished frames and receivers, providing jigs and equipment to help customers convert them into ghost guns, as well as instructions, guides, and technical support, not to mention extensive marketing efforts touting their products as a way around background checks and other public safety laws. For a substantial segment of the Relevant Time Period, each Defendant operated to sell ghost gun

---

[16] *See* ATF Open Letter to All Federal Firearms Licensees (Dec. 27, 2022), available at https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download (last visited March 12, 2023).

[17] *Id.* (emphasis in original)

products to buyers who were actively trying to evade the above-summarized federal gun laws.

## 2. STATE & LOCAL LAWS

96.     Defendants' conduct in selling unfinished frames and receivers into New York is also unquestionably illegal on a state and local level.  Sections 265.63 and 265.64 of the New York Penal Law establish criminal liability for anyone who knowingly sells an unfinished frame or receiver in New York State, subject to certain exceptions not at issue here.

97.     This legislation, named the Jose Webster Untraceable Firearms Act, was enacted because "New York's law enforcement community is increasingly sounding the alarm about the need to address the proliferation of 'ghost guns,' which are guns that are unregistered and do not have serial numbers, making them extremely difficult for law enforcement to trace."  S14A Sponsor Memo (2021-22 Legislative Session).  The law went into effect on April 26, 2022.

98.     Legislative history makes clear that these statutes were enacted specifically to stop companies like Defendants from shipping the products at issue in this civil enforcement action. The bill's Sponsor Memo noted that "gun manufacturers continue to seek loopholes in both state and federal law that would allow them to evade important requirements and sell dangerous weapons to those seeking to use them to do harm."  *Id.*

99.     In particular, the Sponsor Memo noted that ghost guns "are advertised for sale as '80% finished' and come with kits and instructions allowing purchasers to make simple alterations to the firearm's frame or receiver to complete the assembly of these deadly weapons.  This allows purchasers who have criminal records or others who would not pass a required federal background check to evade those requirements and other laws requiring frames and receivers to carry serial

numbers." *Id.*

100.    Under the Penal Law, an "unfinished frame or receiver" is defined as "any unserialized material that does not constitute the frame or receiver of a firearm, rifle or shotgun but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm rifle or shotgun, and which may readily be made into a functional frame or receiver through milling, drilling, or other means," and has not been promptly registered and serialized by a New York-licensed gunsmith.  *See* N.Y. Penal Law §§ 265.00(32); 265.07.

101.    Selling one unfinished frame or receiver is a Class E felony punishable by up to four years in prison.  N.Y. Penal Law §§ 265.63; 70.00(2)(e).  Selling ten or more unfinished frames or receivers is a Class D felony punishable by up to seven years in prison.  N.Y. Penal Law §§ 265.64; 70.00(2)(d).

102.    The ghost guns that are made from the unfinished frames and receivers that Defendants sell are also illegal.  Sections 265.60 and 265.61 of the New York Penal Law establish criminal liability for anyone who knowingly "sells, exchanges, gives, or disposes of a ghost gun to another person."

103.    The punishments for trafficking in ghost guns are the same as trafficking in unfinished frames or receivers: selling one is a Class E felony, N.Y. Penal Law § 265.60, and selling ten or more is a Class D felony.  N.Y. Penal Law § 265.61.

104.    To the extent that one or more of the Defendants have sold or shipped unfinished frames or receivers into the five boroughs of New York City since February 23, 2020, the conduct is also criminal under local law.  Section 10-314 of the New York City Administrative Code states that

28

"no person shall dispose of or possess an unfinished frame or receiver,"[18] and establishes that a person commits a Class A misdemeanor for each such prohibited item.

105. As described more fully below, each Defendant engaged in marketing, sales, and business practices that violated these New York State and local laws, as well as the federal laws described above.

### III. EACH DEFENDANT HAS PERSISTENTLY AND ILLEGALLY MARKETED AND SOLD UNFINISHED FRAMES AND RECEIVERS INTO NEW YORK.

106. Despite the illegality of their conduct, each Defendant has intentionally and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York throughout the Relevant Time Period.

107. As described below, Defendants Arm or Ally, 80P Builder, Brownells, Indie Guns, Rainier Arms, and Rock Slide shipped unfinished frames or receivers directly to undercover investigators, demonstrating that their products have been available for purchase in New York without any effort on any of these Defendants' part to implement any type of controls, including verifying the identity of their customers or ascertaining eligibility to own a firearm. *See* below ¶¶ 122-128, 261-263, 276-278, 434-436, 535-541, 566-569.

108. Additionally, preliminary shipping data further demonstrates that Defendants Arm or Ally, 80 Percent Arms, Brownells, Glockstore, KM Tactical, Primary Arms, and Rainier Arms

---

[18] New York City law defines "unfinished frame or receiver" as "[a] piece of any material that does not constitute the frame or receiver of a firearm, rifle, shotgun or assault weapon but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm, rifle, shotgun or assault weapon with modification by the user and that is not engraved with a serial number" pursuant to federal standards. N.Y. City Admin. Code § 10-301(22).

frequently shipped packages directly to New York consumers' homes during the Relevant Time Period, when a large—if not central—focus of their marketing and sales efforts was on their unfinished frame and receiver products. *See* below ¶¶ 134-156, 179-249, 292-368, 387-427, 469-493, 500-525, 548-559.

109.    All the while, publicly available material from prosecutors, law enforcement, and media reports demonstrates that many of the perpetrators of the most serious and recent ghost gun-related crimes in New York were among Defendants' New York customers.

110.    A preliminary analysis of shipping records obtained by the State demonstrates that during the Relevant Time Period, Defendants have made at least 100,000 shipments to New York addresses that are not FFLs—*i.e.*, shipments directly to consumers.

111.    On information and belief, a significant portion of each Defendant's shipments into New York during the Relevant Time Period contained unfinished frames and receivers, as each Defendant has been openly and publicly known as a reliable corporate distributor of unfinished frames and/or receivers manufactured by companies that include Polymer80.  As set forth in more detail below, by each Defendant's aggressive marketing efforts, by the nature of each Defendant's stated business, by each Defendant's purported success and status as an industry leader, and by the market naturally available in New York, together with the increased prevalence of ghost guns in New York, each Defendant's direct and persistent business with New York customers for a substantial portion of the Relevant Time Period is apparent.

112.    Moreover, together, Defendants' common marketing strategies have misled New York customers into believing that unfinished frames and receivers are legal workarounds to New

30

York's gun control laws, as well as federal law.

113.    As described in more detail below, during the Relevant Time Period, each Defendant employed common marketing strategies, enabling them to not only maximize their individual market share but also to put the overall market for unfinished frames and receivers into overdrive in New York, including by publishing statements on their respective websites (including product-specific statements or blog or other postings concerning unfinished frames or receivers generally) that affirmatively represented to anyone accessing the website that such products were legal and exempt from the ordinary FFL-purchasing process.

114.    In these ways, each Defendant has caused, contributed to, or maintained the massive influx of unfinished frames and receivers in New York, and the dangerous ghost guns that were inevitably and foreseeably made from them.

## A.  ARM OR ALLY

115.    Arm or Ally is a distributor of firearms and firearm parts who repeatedly marketed and sold unfinished frames and receivers to New Yorkers, including to undercover investigators in New York as late as mid-May 2022, and failed to exercise any controls on its sales.

116.    While Arm or Ally's online business appears to focus on selling parts for AR-10 and AR-15-style rifles, as of June 29, 2022, a substantial portion of Arm or Ally's online business included selling unfinished receivers that can be used to build ghost gun versions of those rifles and unfinished handgun frames, based on their offerings.

117.    Arm or Ally's website, which, on information and belief attracts over 105,000 visits per

month, uses confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws. Consistent with its website messaging, Arm or Ally illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State.

118.    For a substantial portion of the Relevant Time Period, Arm or Ally's website expressly represented that unfinished frames or receivers are legal workarounds around the FFL-process, including in New York, provided support and instruction on how to finish the products to create ghost guns, and made no attempt to inform the public that restrictions in New York applied.

119.    For example, its webpages selling AR-15-compatible receiver kits once proclaimed, in large bold green letters, "No FFL Required!"[19]

120.    Its AR-15-compatible unfinished lower receiver page said in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," but the page contradicted itself by also linking to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle.[20]

121.    Arm or Ally has also invested meaningfully in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere and also grow the industry. Indeed, on information and belief, Arm or Ally has done a significant amount of business in New York.

122.    For example, on or around April 28, 2022, an investigator from the New York City

---

[19] Formerly available at https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3/ (last visited June 23, 2022).
[20] *Id.*

Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally.  Arm or Ally's website acknowledged that the company was shipping directly to consumers, and stated that the order of an unfinished frame was "required to ship to your credit card's billing address."  Arm or Ally accepted the order and shipped the frame into New York County.

123.    On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a G19-compatible slide, all manufactured by Arm or Ally.  The investigator also purchased a Polymer80 9mm frame parts kit.

124.    The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

125.    Arm or Ally accepted the order and shipped the parts into New York County.

126.    On or around May 27, 2022, investigators completed an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

127.    The Arm or Ally website said of the product that "[t]his system is a complete kit.  There are no additional jigs and parts to purchase.  Polymer80 Spectre system is a complete, all-inclusive

33

package including the jig and drill bits required to finish your Glock project."[21]

128.    Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License,"[22] Arm or Ally did not actually require investigators to do so. Indeed, Arm or Ally accepted the order and shipped the frame into Kings County.

129.    These sales to undercover investigators are wholly consistent with Arm or Ally's history of marketing, selling, and shipping these unlawful products to consumers in New York.[23]

130.     Arm or Ally sent at least 489 packages into New York State between January 3, 2021 and May 17, 2022.

131.    At least 37 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

132.    At least 11 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

133.    A significant portion of each group of shipments discussed in Paragraphs 130-132 contained unfinished frames and receivers.

134.    On or around July 2020, Arm or Ally sold and sent three unfinished pistol frames to a man

---

[21] Formerly available at https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit/ (last visited June 6, 2022).

[22] Formerly available at https://www.armorally.com/shop/polymer80-pf9ss-g43-pistol-frame-kit/ (last visited June 28, 2022).

[23] In an apparent response to this lawsuit and a companion lawsuit brought by the City of New York, *City of New York v. Arm or Ally, LLC et al.*, Case No. 22 Civ. 5525 (JMF) (S.D.N.Y.) (the "City Case"), Arm or Ally has updated its website to advise customers who click on the hyperlink to view "80% Frames" that Arm or Ally is no longer selling these products because of "ongoing legal issues". *See* https://www.armorally.com/product-category/for_glock/frame-parts/glock-frames/ (last visited February 17, 2023). However, Arm or Ally's placeholder on its website for these products and its note concerning "ongoing legal issues," suggests that it has only paused selling its unquestionably illegal products to consumers and that it can be immediately ready to get right back to shipping at any time.

34

named Rene Loyola in the East Village neighborhood of Manhattan.

135.    On or around November 2020, Arm or Ally sold and sent another unfinished handgun frame to Loyola.

136.    On or around July 2021, Arm or Ally sold and sent two unfinished handgun frames to Loyola, one as part of a full kit, as well as parts to complete the frames into working ghost guns.

137.    On or around October 2021, Arm or Ally sold and sent another unfinished handgun frame to Loyola.

138.    In April 2022, the NYPD executed a search warrant on the Manhattan home of Loyola, recovering over $20,000 in ghost guns and parts, including more than 30 frames and receivers.

139.    The NYPD also executed warrants on Loyola's storage locker, discovering an arsenal of unfinished frames and receivers and material used to convert them into working ghost guns.

140.    On or around May 6, 2022, Loyola was indicted in New York County on approximately 264 different counts of violations of state firearms laws, and on or around May 12, 2022, Loyola was indicted in Kings County on an additional 25 criminal violations.

141.    A portion of the ghost guns and paraphernalia recovered from the search warrants on Loyola are pictured below:



142.    As described below, Loyola had purchased at least five different unfinished frames or receivers from Defendant Brownells, one from defendant KM Tactical, and three from Defendant Primary Arms. *See* below ¶¶ 306-309, 478, and 504-505.

143.    Between approximately April 25, 2021, and June 7, 2021, Arm or Ally sent seven packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

144.    On information and belief, the packages Arm or Ally sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

145.    In October 2021, police officers searched the home and car of Queens resident Santos, recovering approximately 30 working firearms, many of them ghost guns, along with over 130 high-capacity magazines, approximately 150,000 rounds of ammunition, and various parts and

36

tools used to convert ghost guns into working weapons.[24]

146.    Santos did not have a license to possess or own firearms.

147.    A portion of the weapons recovered from Santos is pictured below:



148.    Santos was charged with 252 separate violations of New York's firearms laws.

149.    As described below, in addition to Arm or Ally, Santos also received shipments from Defendants 80 Percent Arms, Brownells, and KM Tactical. *See* below ¶¶ 182-183, 314-315, and 479-481.

150.    On or around October 7, 2021, Arm or Ally sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.

151.    On information and belief, the package Arm or Ally sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

---

[24] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns/ (last visited March 6, 2023).

152.    The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Goldberg in late-January 2022 on four felony charges, including first-degree criminal possession of a weapon (10 or more).[25]

153.    As described below, in addition to Arm or Ally, Goldberg also received shipments from Defendants Glockstore and KM Tactical. *See* below ¶¶ 415-416 and 492-493.

154.    On or around August 18, 2021, Arm or Ally sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY.

155.    On information and belief, the package Arm or Ally sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

156.    The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Lopez in late-January 2022 for second-degree criminal possession of a weapon.

157.    As described below, in addition to Arm or Ally, Lopez also received a shipment from Defendant Glockstore. *See* below ¶ 417.

158.    Arm or Ally's sales to Loyola, Santos, Goldberg, and Lopez demonstrate Arm or Ally's complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Arm or Ally's pockets at the expense

---

[25] *See* https://www.westchestergov.com/home/all-press-releases/9204-more-than-100-firearms-seized-following-lengthy-investigation-into-ghost-guns-and-other-illegal-weapons-in-westchester-and-putnam-counties (last visited March 6, 2023).

of New Yorkers' safety.

## B. 80 PERCENT ARMS

159.    80 Percent Arms is a distributor of firearms and firearm parts who marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

160.    80 Percent Arms has used its website with its confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.  On information and belief, 80 Percent Arms' website attracts over 350,000 visits per month.

161.    For example, its webpage offering 80% lowers emphasizes that "an unfinished receiver is not subject to the same regulations as any other complete firearm.  This means no RED TAPE including: NO Registering an 80% Lower, NO Transfer fees like a typical firearm, NO FFL Required, Ships right to your door."[26]

162.    Clicking on "No FFL Required" takes a consumer to a webpage explaining how the company's unfinished frames and receivers are exceptions to the Gun Control Act of 1968 and the Brady Handgun Act of 1993.  The page also explains that "80% lowers are popular for numerous reasons. For one, with an 80% lower there is no background check or registration involved; saving you time and headaches. Also, when using an FFL to transfer firearms, there is generally a fee involved. Since you obviously don't need an FFL for an 80% lower- congratulations you just saved yourself money! (a valuable selling point when telling the wife you bought more gun parts.) And

---

[26] *See* https://www.80percentarms.com/80-lowers/ (last visited February 24, 2023).

again, 80% lowers are shipped right to your door, which is convenience that can't be beat."[27]

163.     The header of 80 Percent Arms' webpage emphasizes that converting its unfinished frames and receivers into a working firearm is "ridiculously easy," explaining that its jigs "make it ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."[28]

164.     Conflicting and confusing statements persist on 80 Percent Arms' website. For example, on its landing page, 80 Percent Arms confusingly claims that the "ban" on all its products has been reversed:



165.     Additionally, 80 Percent Arms continues to represent that its customers are allowed "to purchase both jigs and lowers from us allowing us to proceed with business as usual," without mention of any state exclusions, like New York.

166.     80 Percent Arms has invested meaningfully in marketing designed to expand its market

---

[27] *See* https://www.80percentarms.com/blog/buying-guns-online-without-an-ffl/ (last visited March 12, 2023).
[28] *See id.*

share of unfinished frames and receivers in New York and elsewhere, and also grow the industry.

167.     Indeed, 80 Percent Arms has admitted before at least one other Court that it invests substantially in its marketing and that it has become a market leader:

    a.     "BLACKHAWK [aka 80 Percent Arms] has expended substantial resources into promoting and marketing its products across the entirety of the United States, and those efforts have made it the market leader for its products throughout the United States."

    b.     "Beginning in 2013, when BLACKHAWK [aka 80 Percent Arms] launched its first products, and in the years since, BLACKHAWK [aka 80 Percent Arms] has extensively developed, promoted, advertised, and marketed its families of products and its associated trademarks."[29]

168.     Using these strategies, 80 Percent Arms has become a highly successful and profitable business, with nearly all its revenue made during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

169.     For example, 80 Percent Arms aggressively markets unfinished frames or receivers across its social media accounts, marketing its products to its 25,000 Instagram followers and 18,000 Facebook followers. In doing so without any regard or mention to state-based exclusions, it causes additional confusion and misinformation on the legality of its products.

170.     80 Percent Arms likewise states in a marketing video that, "[w]ith our patented Easy Jig, you can do it [*i.e.*, turn an unfinished receiver into a working assault rifle] in as little as an hour. It's super simple.  There's no paperwork, no background checks, no registration and no database.

---

[29] *Blackhawk Manufacturing Group Inc. d/b/a 80 Percent Arms v. Tactical Gear Heads LLC d/b/a 80% Lowers, et al.*, Complaint for Federal Trademark Infringement, False Designation of Origin, Trademark Dilution, Common Law Trademark Infringement, and Unfair Competition, No. 8:19-cv-01173-DOC-JDE, Central District of California, Western Division.

And best of all, it's 100 percent legal. Even a caveman can do this." The video is entitled "Build Your Own Gun in 1 Hour 100 Legal."

171. The same marketing video describes the ease of making an untraceable assault rifle out of its products and misrepresents the products' legality: "You start out with this blank that we call an '80 percent lower receiver,' because about 80 percent of the work is already done for you. You take this part, snap it into an easy jig, and drill into the areas the template guides you through. And in no time, you have a military-grade AR-15 lower, that simply snaps together with the other parts contained in our AR-15 kit. You now have a fully-functional, legal AR-15." The caption for the video proclaims that "[b]est of all, it's completely unregistered and legal."

172. 80 Percent Arms not only persists in its sales and marketing of these dangerous products, but it also makes light of the harm its products have caused and continue to cause. For example, on Halloween 2022, 80 Percent Arms acknowledged that its unfinished frame and receiver products have only one use—to make untraceable ghost guns—by posting a photo of one of their products dressed as a "ghost gun."



42

173.    It is not surprising that individuals who are looking to get around gun control laws found 80 Percent Arms' website and became customers. 80 Percent Arms' business practices have increased the number of dangerous ghost guns present in the State.

174.    80 Percent Arms sent at least 7,248 packages into New York State between June 29, 2016 and December 12, 2022.

175.    At least 492 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

176.    At least 18 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

177.    A significant portion of each group of shipments discussed in Paragraphs 174-176 contained unfinished frames and receivers.

178.    80 Percent Arms also appears to utilize a variety of affiliates and subsidiaries to ship unfinished frames and receivers into New York, including an entity named "5D Tactical," which shares a shipping account number with 80 Percent Arms.

179.    On or around October 3, 2019, 80 Percent Arms sold and sent a Glock-compatible AR-9 lower receiver to a customer on the East Side of Manhattan.

180.    On or around July 15, 2020, 80 Percent Arms sold and sent a GST-9 pistol frame, along with a jig, toolkit, and parts to convert the frame into a ghost gun, to the same customer on the East Side of Manhattan.

181.    On information and belief, 80 Percent Arms did not make any inquiry into whether the

43

customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

182.    On or around August 27, 2020 and January 4, 2021, 80 Percent Arms sent packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

183.    On information and belief, the packages 80 Percent Arms sent to Santos contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

184.    On or around October 2, 2020 and October 30, 2020, 80 Percent Arms sent packages to Kurt Therkelsen at an address on Ward Road in Salt Point, NY.

185.    On information and belief, the packages 80 Percent Arms sent to Therkelsen contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

186.    Therkelsen was reportedly a supporter of the "Boogaloo Boys," a far-right militia-style organization with a well-documented history of political violence.[30]

187.    On information and belief, the packages 80 Percent Arms sent to Therkelsen contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

188.    On December 15, 2020, the Joint Terrorism task force and the NYPD raided an AirBnB on First Avenue in Manhattan, where Therkelsen was staying.

189.    The NYPD recovered two unserialized Polymer80 ghost guns, 11 high-capacity magazines, four additional unfinished frames and receivers, as well as various parts, gunmaking

---

[30] *See* https://nypost.com/2022/02/01/boogaloo-boys-supporter-kurt-therkelsen-gets-4-years-in-nyc-ghost-guns-case/ (last visited March 6, 2023).

tools, and other paraphernalia.

190. Investigators also recovered Kevlar body armor and a shirt that said, "Kill Cops."

191. Therkelsen pled guilty to firearms charges in December 2021 and was sentenced to four years in prison.

192. As described below, in addition to 80 Percent Arms, Therkelsen also received a shipment from Defendants Brownells. *See* below ¶ 310.

193. On or around August 24, 2021, and September 27, 2021, 80 Percent Arms sent packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.

194. On information and belief, the packages 80 Percent Arms sent to Taylor contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

195. When NYPD officers raided the Eldert Street location, they recovered four completed ghost gun assault weapons, five completed ghost gun handguns, four completed ghost gun rifles, eight unfinished receivers, five unfinished frames, eleven magazines, and various parts and tools used to convert unfinished frames and receivers into working firearms.[31]

196. Taylor was indicted on 37 counts of violations of New York's firearms laws.

197. As described below, in addition to 80 Percent Arms, Taylor also received shipments from Defendant Brownells. *See* below ¶ 311.

198. On or around July 12, 2021, and October 26, 2021, 80 Percent Arms sent packages to Chaz McMillan at an address on 162nd Street in the Flushing area of Queens, NY.

---

[31] *See* http://www.brooklynda.org/2022/04/22/bushwick-man-indicted-for-illegal-possession-of-ghost-guns/ (last visited March 12, 2023).

199.    On information and belief, the packages 80 Percent Arms sent to McMillan contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

200.    On December 8, 2021, investigators executed a search warrant on McMillan's 162nd Street address.

201.    They found 25 working ghost guns, including 19 semiautomatic pistols, 5 assault weapons, and 1 semiautomatic shotgun.  They also found four additional unfinished frames or receivers that had not yet been constructed into working weapons.[32]

202.    McMillan also had 31 large-capacity magazines, 670 rounds of ammunition, and various parts and tools used to convert unfinished frames and receivers into working ghost guns.

203.    McMillan did not have a license to possess or own firearms.

204.    McMillan was charged with 125 counts of criminal violations of New York's firearms laws.

205.    As described below, in addition to 80 Percent Arms, McMillan also received shipments from Defendants Brownells and Rainier Arms. *See* below ¶¶ 316 and 548.

206.    On or around August 24, 2020, 80 Percent Arms sent a package to Domingo Valle at an address on East Tremont Avenue in the Bronx, NY.

207.    On information and belief, the package 80 Percent Arms sent to Valle contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

208.    Valle had been previously convicted of a gun crime and served time in jail for it. He could

---

[32] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns-2/ (last visited March 12, 2023).

46

not legally purchase a firearm and would have failed a background check if he had tried to do so.[33]

209. When law enforcement agents executed a search warrant on Valle's address in the Bronx, on or around October 4, 2021, they found two "ghost gun" pistols and an AR-style "ghost gun" rifle inside a concealed shelf in the living room, as well as another AR-style "ghost gun" rifle in the master bedroom.

210. Valle was charged with having a prior felony conviction and being in possession of a firearm and ammunition in the U.S. District Court for the Southern District of New York.

211. As described below, in addition to 80 Percent Arms, Valle also received shipments from Defendant Glockstore. *See* below ¶ 398.

212. On or around August 20, 2020, and January 14, 2021, 80 Percent Arms sent packages to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway section of Nassau County.

213. On information and belief, the packages sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

214. On February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child. When police stopped Saxton, he was carrying two ghost guns, as well as additional ammunition and a plastic bag of cocaine.[34]

215. A search of Saxton's home revealed an arsenal of weapons, including seven ghost gun

---

[33] *See* https://www.justice.gov/usao-sdny/pr/bronx-man-who-possessed-five-ghost-guns-charged-possessing-firearm-and-ammunition (last visited March 13, 2023).

[34] *See* https://www.liherald.com/stories/east-rockaway-man-indicted-for-possession-of-ghost-funs,141297 (last visited March 13, 2023).

handguns, one ghost gun assault rifle, and parts to build more.[35]

216.    As described below, in addition to 80 Percent Arms, Saxton also received shipments from Defendants Glockstore, Primary Arms, and Rainier Arms. *See* below ¶¶ 401, 506, and 554.

217.    On or around October 21, 2020, 80 Percent Arms sent a package to Kai Zhao at an address on 167th Street in the Flushing area of Queens, NY.

218.    Between approximately July 20, 2021, and September 22, 2021, 80 Percent Arms sent five packages to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.

219.    On information and belief, the packages 80 Percent Arms sent to Zhao and Chung contained unfinished frames or receivers and the parts to make them into ghost guns.

220.    On or around March 1, 2022, Zhao, Chung, and two codefendants were arrested as part of an NYPD investigation into firearms trafficking.[36]

221.    Search warrants executed on Zhao, Chung, and their alleged accomplices resulted in the seizure of 27 ghost guns, including 22 semiautomatic pistols, 4 assault weapons, and 1 assault shotgun.

222.    The search warrants also resulted in the NYPD seizing 16 unfinished receivers, 78 large capacity magazines, approximately 10,000 rounds of ammunition, silencers, sites, components, and tools to assemble unfinished frames and receivers into working firearms, and more than $50,000 in cash.

---

[35] *See* https://nassauda.org/civicalerts.aspx?aid=1414 (last visited March 12, 2023).
[36] *See* https://queensda.org/four-queens-residents-charged-with-possessing-arsenals-of-illegal-ghost-guns-in-bayside-and-flushing-homes-photos/ (last visited March 12, 2023).

223.    Zhao, Chung, and their codefendants did not have licenses to own or possess firearms.

224.    Zhao was charged with approximately eight counts of violations of New York's firearms laws.  Chung was charged with approximately eight counts of violations of New York's firearms laws.

225.    As described below, in addition to 80 Percent Arms, Zhao and Chung also received shipments from Defendant Glockstore. *See* below ¶¶ 405-407.

226.    Between approximately December 12, 2021, and January 13, 2022, 80 Percent Arms sent three packages to Gregory Lopez at an address on Rosman Road in Thiells, NY.

227.    On information and belief, the packages 80 Percent Arms sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

228.    As described below, in addition to 80 Percent Arms, Lopez received shipments from Defendant Glockstore. *See* below ¶ 411.

229.    On or around April 27, 2022, police executed a search warrant on Lopez' Rosman Road address.   They discovered two loaded, unserialized AR-15-style ghost gun rifles, ammunition, magazines, and multiple unfinished frames and receivers.[37]

230.    A Rockland County grand jury indicted Lopez on twelve counts of violating New York's firearms laws.

231.    Between approximately June 3, 2016 and November 28, 2016, 80 Percent Arms sent at least three packages to Grzegorz Blachowicz in the Ridgewood neighborhood of Queens, NY.

---

[37] *See* https://hudsonvalleypost.com/historic-hudson-valley-man-arrested-under-new-yorks-new-gun-law/ (last visited March 12, 2023).

232.    On information and belief, the packages 80 Percent Arms sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

233.    Blachowicz was arrested for ghost gun trafficking in March of 2023, and was charged with 131 counts of violations of the firearms laws.[38]

234.    When executing a search warrant on the house to which 80 Percent Arms, Glockstore, and Primary Arms had sent Blachowicz packages, law enforcement officers from the NYPD and the Queens District Attorney's Detective Bureau located a fully assembled ghost gun and several ghost gun build kits, along with four unfinished frames, manuals for building firearms, tools used to manufacture ghost guns, various magazines, ammunition, and other firearms paraphernalia.

235.    A search of Mr. Blachowicz's storage facility found an additional eleven complete ghost gun assault weapon build kits, a complete assault pistol build kit, six complete ghost gun pistol build kits, twelve unfinished lower receivers, twenty-five more lower receivers, over 207 large-capacity magazines, thousands of rounds of ammunition, parts to build silencers, and a "ghost gunner" milling machine specifically designed to convert unfinished receivers into fully functioning ghost guns.

236.    Blachowicz did not have a license to own or possess firearms.

237.    As described below, in addition to 80 Percent Arms, Blachowicz also received shipments from Defendants Glockstore and Primary Arms. *See* below ¶¶ 425 and 522.

238.    Between approximately August 20, 2021, and February 14, 2022, 80 Percent Arms sent

---

[38] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-weapons/ (last visited March 12, 2023).

50

four packages to Paul Carey at an address on Riviera Drive in Massapequa, NY. 80 Percent Arms also sent two packages to a different person named Carey at the same address.

239.   On information and belief, the packages 80 Percent Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

240.   Carey was a dentist who operated a practice out of his home at that location.

241.   Carey's pistol license had been revoked in 2016 after firing shots in the neighborhood.

242.   According to news reports, Carey had a lengthy arrest history, including multiple arrests for menacing, driving while intoxicated, and reckless endangerment.[39]

243.   On February 16, 2022, police received a call from a secretary at Carey's practice, saying that he was agitated and intoxicated, and that she had heard him racking a gun. The employee feared for her safety, and ran out of the house before calling 911.

244.   Carey barricaded himself in his house, and after negotiating with law enforcement and his wife, agreed to surrender.

245.   A consent search of Carey's home revealed 30 firearms, 20 of which were assault weapons. 16 of those assault weapons were ghost guns.

246.   According to the Nassau County District Attorney, on February 18, 2022, police received a call from a neighbor saying that Carey had a large package sitting outside his home.

247.   That package was the same one sent by 80 Percent Arms on February 14, 2022.

248.   After obtaining a search warrant, Nassau County police opened the package and discovered a "drill that is typically used in the assembly of ghost guns. Police also recovered a Remington

---

[39] *See* https://www.cbsnews.com/newyork/news/dr-paul-carey-ghost-guns-arrest/ (last visited March 12, 2023).

shotgun; various rifles and handgun magazines; rifle/laser sights; various ghost gun parts; high-capacity magazines; and rifle bayonets."[40]

249.    Nassau County Police Commissioner Patrick Ryder discussed Carey's modus operandi: "[h]e's buying pieces through the mail.  He's putting them together, and making these illegal ghost guns.  He had a machine shop in his basement."

250.    As described below, in addition to 80 Percent Arms, Carey received shipments from Defendants Brownells, Primary Arms, and Rainier Arms. *See* below ¶¶ 367, 524, and 558.

251.    80 Percent Arms' sales to, Santos, Therkelsen, Taylor, McMillan, Valle, Saxton, Zhao, Chung, Lopez, Blachowicz, and Carey demonstrate its complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining 80 Percent Arms' pockets at the expense of New Yorkers' safety.

### C.  80P BUILDER

252.    80P Builder is a Florida corporation who marketed unfinished frames and receivers to New Yorkers, sold an unfinished frame to an undercover investigator as late as May 2022, and failed to exercise any controls on this sale.

253.     80P Builder's website, which, on information and belief attracts nearly 50,000 visits per month, uses confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.

254.    During a substantial portion of the Relevant Time Period, 80P Builder claimed to

---

[40] *See* https://nassauda.org/civicalerts.aspx?aid=1426 (last visited March 12, 2023).

"specialize in aftermarket parts while also offering Polymer80 frames."[41]

255. Additionally, for a substantial part of the Relevant Time Period, 80P Builder sold unfinished receivers through its website in tandem with the "lower parts kit" containing the parts necessary to make it the fully-functional lower part of a handgun.[42] On its webpage, 80P Builder touted the "Blank Serialization Plate" as one of the key features of the product, as well as the fact that a "Complete Finishing Jig and Drill bits [are] Included."[43]

256. 80P Builder successfully attracted New York business and shipped unfinished frames and receivers into New York State.

257. 80P Builder sent at least 38 packages into New York State between March 4, 2021, and June 27, 2022.

258. At least one of these shipments was sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

259. At least ten of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

260. A significant portion of each group of shipments discussed in Paragraphs 257-259 contained unfinished frames and receivers.

261. 80P Builder's sale of unfinished frames into the New York market is also evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

---

[41] Formerly available at https://80pbuilder.com/ (last visited June 23, 2022).
[42] Formerly available at https://80pbuilder.com/pf940sc-frame (last visited June 23, 2022).
[43] *Id.*

262.     On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com, along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

263.     80P Builder accepted the order and shipped the ghost gun into New York County.

264.     80P Builder's sale to the City investigators demonstrated its complete and persisting lack of controls, and exemplified just one instance of many prohibited sales of unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns, consistent with its central business purpose and model.

265.     80P Builder has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.  For example, 80P Builder utilizes its own social media accounts, including Instagram, where it regularly posts and promotes sales relating to unfinished frames and receivers to its over 16,000 followers.

266.     80P Builder has also sought to maximize its marketing reach by partnering with popular YouTube accounts, including "Braydon Price," who has 1.77 million subscribers, and his most popular video was viewed 8.9 million times. For example, in a 16-minute video, posted on December 13, 2019, Brett, the purported owner of 80P Builder, joined Braydon Price for a day of marketing his products and shooting.  In the video, Brett and Braydon Price repeatedly promote 80P Builder's unfinished frames and receivers, explaining "you can get everything right [there] to build your own pistol." The caption to the video links to 80P Builder's website, warning customers,

54

"Don't miss out on the deals!" The video has over 780,000 views to date. On information and belief, a substantial portion of those views are undoubtedly from New York active or potential customers.

267.    Using these strategies, 80P Builder has become a highly successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

### D. BROWNELLS

268.    Brownells is a distributor of firearms and firearm parts who sold an unfinished frame to an undercover investigator in New York as late as May 2022, repeatedly marketed and sold unfinished frames and receivers to New York residents, and failed to exercise any controls on its sales.

269.    Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it took to selling unfinished frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns. On information and belief, Brownells has done a significant amount of business in New York.

270.    Brownells' website, on information and belief, receives on average nearly 5 million visitors a month, and this traffic has increased over the years, signaling an increase in online sales is a powerful marketing tool to attract customers who are trying to get around gun control laws.

271.    Brownells invested in marketing designed to expand both its market share of unfinished frames and receivers and the industry, business practices that have created, maintained, or contributed to a condition that endangers the safety and health of the public. Consistent with its

efforts to expand its market share and the industry, Brownells illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State for a substantial part of the Relevant Time Period.

272.    Brownells sent at least 43,213 packages into New York State between May 17, 2017 and June 28, 2022.

273.    At least 2,480 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

274.    At least 1,070 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

275.    A significant portion of each group of shipments discussed in Paragraphs 272-274 contained unfinished frames and receivers.

276.    Brownells' routine sales of unfinished frames and receivers into the New York market is demonstrated by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

277.    On or around May 27, 2022, investigators completed an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

278.    Brownells accepted the order and shipped the unfinished frame kit into Kings County.

279.    This recent sale to an undercover investigator is wholly consistent with Brownells' history of marketing, selling, and shipping these unlawful products to consumers in New York.

280.    For a substantial part of the Relevant Time Period, Brownells featured and discussed unfinished frames and receivers prominently on its website. Although Brownells appears to have

recently modified its website in response to this lawsuit, Brownells' online materials went to great lengths to promote unfinished frames to consumers, saying that they "ha[ve] revolutionized the custom gun world.  If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[44]

281.    Brownells provided an online page with step-by-step video instructions on how to convert a nominally unfinished Polymer80 frame into a finished frame.  In the key section, entitled "How to Mill a Polymer80 Frame," Brownells wrote that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[45]

282.    The viewer could watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a "finished" version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete."  If the viewer had questions or would like assistance finishing the frame, Brownells offered a telephone "tech line" where "we'll be glad to help you out."

283.    Brownells is such a significant distributor of Polymer80 products that they are mentioned

---

[44] Formerly available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022).
[45] *Id.*

and linked by Polymer80 on its own website as a preferred dealer.

284.   For instance, in two nearly identical October 2017 press releases announcing that the company would market a set of exclusive Polymer80 unfinished frames unique to Brownells, the company said that the unfinished frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes."[46]

285.   The same press releases also advertised the legal fiction that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."[47]

286.   As mentioned above, Brownells had custom, exclusive unfinished frames and/or receivers manufactured by Polymer80 for a substantial segment of the Relevant Time Period.  More recently, as Brownells has sought to distance itself from liability in this case, on information and belief, Brownells sold its exclusive unfinished frames and/or receivers to other distributors, including Delta Team Tactical, Davidson Defense, MMC Armory, Omega Tactical, and No Quarter Innovations LLC, in full knowledge that those exclusive Brownells products could and would still be marketed and sold into New York illegally. On information and belief, Brownells profited greatly from selling its exclusive products to middlemen that maintain no controls or protections

---

[46] Press Release, "Brownells Announces Exclusive Polymer80 Frames," (Oct. 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930 (last visited February 24, 2023), and Press Release, "Brownells Announce Exclusive Polymer80 Frames for Glock-Style Pistols," (Oct. 11, 2017), available at https://www.ammoland.com/2017/10/brownells-announce-exclusive-polymer80-frames-glock-style-pistols/#axzz7tag69Cst (last visited February 24, 2023).
[47] Id.

to prevent the illegal unfinished frames and receivers from entering New York in direct violation of its obligation to maintain reasonable controls itself.

287.     By its stature and popularity in the industry, including by being a primary and early resource of information on unfinished frames and receivers broadly, Brownells has generously cashed in on its investment in developing unfinished frames and receivers as an industry, including by developing and running a support hotline; by developing exclusive Polymer80-manufactured designs; and by selling a massive number of unfinished frames and receivers into New York, many of which have been converted into ghost guns, used in crimes or fallen into the hands of persons who could not and should not legally possess a firearm, and otherwise increased the number of dangerous ghost guns present in the State.

288.     Brownells has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.  For example, among other methods, Brownells maintains social media accounts that it has used primarily for marketing purposes, including marketing of its unfinished frame and receiver products.

289.     During the Relevant Time Period, Brownells regularly posted and maintained videos marketing unfinished frames or receivers and detailing how to build them on its YouTube account, called "Brownells, Inc.," with over 300,000 subscribers. Brownells continues to offer video assistance and support to customers seeking to build unfinished frames or receivers on its YouTube channel.

290.     Using these strategies, Brownells has become an immensely successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to

sales of unfinished frames or receivers, including into New York State.

291. It is not surprising that individuals who are looking to get around gun control laws found Brownells' website and became customers. Brownells' business practices have increased the number of dangerous ghost guns present in the State.

292. Between October 2016 and May 2020, Brownells sent approximately 17 shipments to Jason Ramirez in New York County.

293. On or around September 18, 2017, Brownells sold Ramirez a Polymer80 PF940CV1-OD Glock-compatible pistol frame and shipped it to his home in New York. Brownells gave Ramirez a $10 promotional discount on the sale.

294. On or around February 20, 2018, Brownells sold Ramirez another Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun, and shipped it to his home in New York. Brownells again gave Ramirez a discount on the sale.

295. On or around December 27, 2018, Brownells sold Ramirez a Polymer80 PF940SC Glock-compatible pistol frame and shipped it to his home in New York. Brownells again gave Ramirez a discount on the sale.

296. Ramirez also purchased several sets of tools from Brownells to make unfinished frames into working ghost guns, along with accessories for the completed weapons.

297. Brownells' records indicate that the company knew that Ramirez was not an FFL.

298. On information and belief, Brownells did not make any inquiry into whether the customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

299.    Ramirez was indicted and pled guilty to violations of New York's firearms laws.

300.    On or around December 5, 2017, Brownells sent a shipment to Brandon Glaski in East Nassau, NY.

301.    Approximately six months later, law enforcement officers from the ATF and the New York State Police executed a search warrant on Glaski's residence.  In addition to dozens of other weapons, the officers found seventeen unfinished frames and receivers, all without serial numbers, including two that had been converted into working rifles.

302.    Glaski had a prior felony conviction and would not have been eligible to purchase a gun legitimately.

303.    Glaski pled guilty to federal gun charges in the Northern District of New York and was sentenced to 30 months in prison.[48]

304.    On information and belief, the shipment sent from Brownells to Glaski contained unfinished frames or receivers and the parts to make them into ghost guns.

305.    As described below, in addition to Brownells, Glaski received shipments from Defendants KM Tactical and Rainier Arms. *See* below ¶¶ 486 and 550.

306.     On or around November 2020, Brownells sold and sent two unfinished handgun frames to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

307.    On or around April 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

---

[48] *See* https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions (last visited March 12, 2023).

308.    On or around May 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

309.    On or around October 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

310.    On or around December 11, 2020, Brownells sent a package to Kurt Therkelsen at an address on Bergen Street in Brooklyn. *See* above ¶¶ 186-191.

311.    Between approximately August 5, 2021, and March 16, 2022, Brownells sent at least 28 packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.  *See* above ¶¶ 195-196.

312.    Brownells' shipments to Taylor only stopped after the NYPD executed a search warrant on his apartment on April 6, 2022.

313.    On information and belief, the packages Brownells sent to Taylor contained unfinished frames or receivers and the parts to make them into ghost guns.

314.    Between approximately November 17, 2020, and May 28, 2021, Brownells sent four packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

315.    On information and belief, the packages Brownells sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

316.    On or around August 4, 2021, Brownells sent a package to Chaz McMillan at an address on 162nd Street in the Fresh Meadows area of Queens, NY.  *See* above ¶¶ 200-204.

317.    On information and belief, the package Brownells sent to McMillan contained unfinished frames or receivers and the parts to make them into ghost guns.

318.     On or around December 28, 2020, Brownells sent a package to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

319.     On information and belief, the packages Brownells sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

320.     On October 12, 2021, police executed a search warrant on the Hook Creek Boulevard location, which Kiem shared with his partner and their ten-year-old daughter.

321.     Police found six fully assembled ghost gun pistols, three additional unfinished frames and the parts necessary to convert them into working pistols, two unfinished receivers capable of conversion to an AR-15 style rifle, an additional unfinished receiver, four large capacity magazines, approximately 650 rounds of ammunition, 23 additional pistol magazines, and various other components and parts used to convert unfinished frames and receivers into working weapons.

322.     Some of the firearms were found in the dresser drawer of the child's bedroom.

323.     Kiem did not have a license to possess or own firearms.

324.     A portion of the firearms recovered from Kiem and his partner are pictured below:



325.    Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

326.    As described below, in addition to Brownells, Kiem received shipments from Defendants Glockstore, Primary Arms, and Rainier Arms. *See* below ¶¶ 403, 508, and 552.

327.    Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

328.    On information and belief, the packages Brownells sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

329.    According to the Erie County District Attorney's Office, on or around May 26, 2020,

Gerwitz carried out a drive-by shooting, wounding a man in the stomach.[49]

330.    When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

331.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

332.    Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

333.    As described below, in addition to Brownells, Gerwitz received shipments from Defendants Glockstore and KM Tactical. *See* below ¶¶ 409 and 484.

334.    On or around May 5, 2020, Brownells sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.

335.    On information and belief, the package Brownells sent to Bubak contained unfinished frames or receivers and the parts to make them into ghost guns.

336.    On May 13, 2022, New York State Troopers responded to a report of shots fired in Franklinville.  Officers located Bubak, who was holding a "9mm polymer-based style pistol," which the Troopers described as a "ghost gun," without a serial number.  Further investigation revealed that Bubak had threatened multiple people in that area and fired at a victim but missed.

337.    Troopers arrested Bubak for attempted murder and other charges.

---

[49] *See* https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited March 12, 2023).

338.    As described below, in addition to Brownells, Bubak received a shipment from KM Tactical. *See* below ¶ 482.

339.    Between approximately June 24, 2020, and May 4, 2022, Brownells sent at least seven packages to Edison Cruz at an address on Andrews Avenue in the Bronx, NY.

340.    On information and belief, the packages Brownells sent to Cruz included unfinished frames or receivers and the parts to make them into ghost guns.

341.    Edison Cruz was not legally permitted to possess a firearm.  According to a report from NBC 4 New York, he had "a lengthy rap sheet, and was previously arrested in June 2020 after allegedly walking down the street with a flamethrower and wearing a ballistic vest, a senior law enforcement official said. Later that year, he was arrested again after throwing something at his mother's head, and police found he had an ax, a loaded ghost gun, multiple gun parts and another ballistics vest."[50]

342.    In May 2022, Cruz was arrested for a triple shooting that left one person dead and two others hospitalized.

343.    The *New York Post* reported that Cruz was "a nut for illegal 'ghost guns'" and that he "used one of the untraceable weapons in the shooting."

344.    As described below, in addition to Brownells, Cruz received shipments from Defendants Glockstore and Primary Arms. *See* below ¶¶ 413 and 510.

345.    Between approximately May 29, 2019, and December 7, 2020, Brownells sent at least

---

[50] *See* https://www.nbcnewyork.com/news/local/crime-and-courts/25-year-old-man-in-custody-after-bronx-shooting-leaves-1-dead-2-hurt/3672700/ (last visited March 12, 2023).

seven packages to Theodore Brois at an address on Tallwoods Road in Armonk, NY.

346.    On information and belief, the packages from Brownells contained unfinished frames or receivers and the parts to make them into ghost guns.

347.    The North Castle Police Department arrested Brois in late-January 2022 for first-degree criminal possession of a weapon (10 or more weapons). The Somers Daily Voice reported that about 60 guns, gun parts, and a "large amount" of ammunition were seized from Brois's home. North Castle Police Chief Peter Simonsen said the various gun parts could have been used to build additional firearms and that he was "quite surprised with the number of guns and ammunition found in the quiet neighborhood."

348.    As described below, in addition to Brownells, Brois received a shipment from Defendant Primary Arms. *See* below ¶ 512.

349.    On or around March 20, 2021, Brownells sent a package to Steven Salerna-Sanchez at an address on Claudette Court in Cheektowaga, NY.

350.    On information and belief, the package from Brownells contained unfinished frames or receivers and the parts to make them into ghost guns.

351.    On June 13, 2022, police arrested Salerna-Sanchez,[51] also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court "that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns," the Buffalo News reported.[52]

---

[52] *See* https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-

352.    "Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities," the Buffalo News reported.  Gramaglia told the newspaper "it takes about 30 minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street."

353.    "This is what feeds the everyday gun violence that we see in our community and in communities across America – not just in Buffalo," Gramiglia said.

354.    On or around December 21, 2020 and April 14, 2022, Brownells sent packages to Joshua Gotthart in Buffalo, NY.

355.    On information and belief, the packages Brownells sent to Gotthart contained unfinished frames or receivers and the parts to make them into ghost guns.

356.    On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

357.    He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

358.    "Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house," the Buffalo News reported. "Using a search warrant, they said they found three unregistered handguns in a bedroom and what the DA's office described as an 'arsenal' of rifles, shotguns, and magazines." They also found tools used to assemble ghost guns and a large

what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited March 12, 2023).

amount of ammunition in the house, the DA's office said in a statement.

359.    Gotthart was arraigned and indicted on two counts of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felonies) and one count of Unlawful Wearing of a Body Vest (Class "E" felony).  He later pled guilty to one of the weapons violations.

360.    As described below, in addition to Brownells, Gotthart received shipments from Defendant KM Tactical. *See* below ¶ 488.

361.    On or around August 4, 2020 and August 12, 2020, Brownells sent packages to Jeru McCray at an address on the Upper West Side of Manhattan.

362.    On information and belief, the packages Brownells sent to McCray contained unfinished frames or receivers and the parts to make them into ghost guns.

363.    McCray had a prior felony conviction and was ineligible to legally possess a firearm.

364.    When the NYPD executed a search warrant on McCray's apartment in 2022, they uncovered a fully assembled ghost gun from a room in which a young child lived.

365.    According to the New York District Attorney, and as admitted to in McCray's guilty plea, he had "ordered enough ghost gun parts and firearms components to assemble at least four handguns."[53]

366.    On information and belief, these four handguns correspond to the four packages McCray received from Defendants in this case: two from Brownells and two from Defendant Glockstore, as described below, *see* below ¶ 419.

---

[53] *See* https://www.manhattanda.org/d-a-bragg-announces-prison-sentence-for-manufacturing-and-possessing-ghost-gun-in-uws-apartment/ (last visited March 12, 2023).

367.    Between approximately July 1, 2021, and November 26, 2021, Brownells sent at least three packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

368.    On information and belief, the packages Brownells sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

369.    Brownells' sales to Ramirez, Glaski, Loyola, Therkelsen, Taylor, Santos, McMillan, Kiem, Gerwitz, Bubak, Cruz, Brois, Salerna-Sanchez, Gotthart, McCray, and Carey demonstrate Brownells' complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Brownells' pockets at the expense of New Yorkers' safety.

### E.  GLOCKSTORE

370.    Glockstore is a distributor of firearms and firearm parts who marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

371.    While Glockstore claims to be "the world's largest distributor of Glock parts and accessories, magazines, holsters, logo gear, apparel, concealment items, custom parts and Glock custom guns," a substantial portion of Glockstore's business during the Relevant Time Period included selling unfinished receivers that can be used to build ghost gun versions of those rifles and unfinished handgun frames.  Glockstore has done a substantial portion of that business in New York.

372.    Glockstore's website, which, on information and belief, attracts over two million visitors a month, uses confusing and inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.

70

373.    For a substantial part of the Relevant Time Period, Glockstore sold unserialized frames, including Polymer80-manufactured products, on its website. Glockstore additionally sold unfinished, unserialized build kits to allow its customers to finish their 80% builds, as well as instructional DVDs including "Building the Ultimate Glock" and "Building an AR-15 from Scratch."

374.    Glockstore has built its business and website around skirting the law.  For instance, one still-online blog post talks about how a new model of unfinished pistol frame is "one of the most talked about firearm products ever!" and goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[54]

375.    The same blog post explains that one of the main reasons a consumer might like to buy an unfinished frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference."  Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records… what's not to like?"[55]

376.    The blog post embeds a YouTube video of Glockstore CEO Lenny Magill guiding the consumer to "transform this 'not a firearm' into a fully functioning 9mm handgun."[56]  The video itself has now been removed for violating YouTube's terms of service. However, because Glockstore maintained its blog posts relating to this video, and in light of its investment in

---

[54] *See* http://community.glockstore.com/i-can-build-my-own-gun-with-this/ (last visited February 26, 2023).
[55] *Id.*
[56] *See also* http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts/ (another blog post describing the contents of Mr. Magill's video) (last visited February 26, 2023).

producing the video and the fact that makers of similar popular videos have worked around YouTube's terms of service, on information and belief, Glockstore has maintained that video on another platform that employs less stringent terms of service than YouTube.

377.    Glockstore maintains another pertinent blog post.  That post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre Polymer80."[57]  The post describes the unfinished frame in question as "[o]ne of the most exciting and fastest selling items at the GlockStore." The blog post focuses both on the frame's usefulness for evading registration requirements and on the ease of converting it into a working ghost gun, explaining that "[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning lower.  You then assemble them with readily available parts and legally own a firearm that does not have to be 'registered.'"[58]

378.    According to Glockstore, "[t]his is completely legal and acceptable based on Federal laws that have been on the record for many years that state an individual can actually make a firearm for personal use."[59]   The blog post does not acknowledge the existence of state laws, licensing requirements, or longstanding prohibitions against firearm possession by persons convicted of felonies or other dangerous persons.

379.    In this way, Glockstore continues to promote and market unfinished frames and receivers and misinform the public about the legality of these products. Glockstore's conduct is also the

---

[57] *See* http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80/ (last visited February 26, 2023) (brackets in original).
[58] *Id.* (quotation marks in original).
[59] *Id.*

subject of litigation in California.[60]

380.   Glockstore has become a highly successful and profitable business and is "constantly growing" with a current estimated annual revenue of at least $11.2 million, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

381.   Glockstore has marketed its unfinished frames and/or receivers in these ways with the cumulative effect of these marketing efforts being that Glockstore not only maximized its sales to date, but also greatly expanded the market for unfinished frames or receivers broadly.

382.   It is not surprising that individuals who are looking to get around gun control laws found Glockstore's website and became customers. Glockstore's business practices have increased the number of dangerous ghost guns present in the State. Indeed, Glockstore has shipped large numbers of its illegal products into New York.

383.   Glockstore sent at least 14,611 packages into New York State between July 1, 2016 and May 17, 2022.

384.   At least 1,494 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

385.   At least 62 of these shipments were sent into New York State after April 26, 2022, the

---

[60] *See* Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct.). California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated." *See id.* ¶¶ 106-112, 133-36. California specifically cited Glockstore's failure to inform consumers of the unfinished frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check. *Id.* ¶¶ 138-40.

effective date of the State's ban on unfinished frames and receivers.

386.    A significant portion of each group of shipments discussed in Paragraphs 383-385 contained unfinished frames and receivers.

387.    In or around September 2016, Glockstore sold and shipped an unfinished handgun frame to a customer in lower Manhattan.

388.    In or around December 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in lower Manhattan, along with all the parts necessary to convert it into a working ghost gun.

389.    In or around the Fall of 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in lower Manhattan, along with all the parts necessary to convert it into a working ghost gun.

390.    In or around December 2019, Glockstore sold and shipped two Glock-compatible unfinished handgun frames to the same customer in lower Manhattan, along with all the parts necessary to convert them into working ghost guns.

391.    On or around June 14, 2019, Glockstore sold and shipped two unfinished handgun frames to a customer on the Upper East Side of Manhattan, along with the tools and parts necessary to convert them into ghost guns.

392.    Glockstore did not make any inquiry into whether the customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

393.    In or around November 2017, Glockstore sold and shipped three Glock-compatible unfinished handgun frames to a customer in the Chinatown neighborhood of Manhattan, along

with parts to convert them into working ghost guns.

394.    In or around January 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

395.    In or around March 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown, and subsequently sent a parts kit sufficient to convert the unfinished frame to a finished firearm.

396.    In or around April 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

397.    In or around October 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

398.    On information and belief, Glockstore did not make any inquiry into whether these customers had a license to possess a firearm, or whether they had any history that would prohibit them from doing so.

399.    Between November 13, 2017, and July 2, 2020, Glockstore shipped at least five packages to Domingo Valle in Bronx County.  *See* above ¶¶ 208-210.

400.    On information and belief, the packages from Glockstore to Valle contained unfinished frames or receivers and the parts to make them into ghost guns.

401.    On or around December 14, 2021, Glockstore sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County.  Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons,

including ghost guns.  *See* above ¶¶ 214-215.

402.    On information and belief, the package sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

403.    Between approximately August 21, 2020, and March 19, 2021, Glockstore sent at least five packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.  *See* above ¶¶ 320-325.

404.    On information and belief, the packages Glockstore sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

405.    On or around August 7, 2020, and October 29, 2020, Glockstore sent packages to Kai Zhao at an address on 167th Street in the Flushing area of Queens, NY.  *See* above ¶¶ 220-224.

406.    On information and belief, the packages Glockstore sent to Zhao contained unfinished frames or receivers and the parts to make them into ghost guns.

407.    On or around August 17, 2020, Glockstore sent a package to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.  *See* above ¶¶ 220-224.

408.    On information and belief, the package Glockstore sent to Chung contained unfinished frames or receivers and the parts to make them into ghost guns.

409.    Between approximately November 26, 2018, and December 6, 2019, Glockstore sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.  *See* above ¶¶ 329-332.

410.    On information and belief, the packages Glockstore sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

411.     On or around January 12, 2022, and February 7, 2022, Glockstore sent packages to Gregory Lopez at an address on Rosman Road in Thiells, NY. *See* above ¶ 226.

412.     On information and belief, the packages Glockstore sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

413.     On or around July 10, 2020 and March 8, 2021, Glockstore sent packages to Edison Cruz at an address on Anderson Avenue in the Bronx, NY. *See* above ¶¶ 341-343.

414.     On information and belief, the shipments from Glockstore to Cruz contained unfinished frames or receivers and the parts to make them into ghost guns.

415.     On or around August 18, 2021, Glockstore sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY. *See* above ¶ 152.

416.     On information and belief, the package Glockstore sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

417.     On or around November 4, 2021, Glockstore sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY. *See* above ¶ 156.

418.     On information and belief, the package Glockstore sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

419.     On or around August 28, 2020 and September 4, 2020, Glockstore sent packages to Jeru McCray at an address on the Upper West Side of Manhattan. *See* above ¶¶ 363-366. On information and belief, the packages Glockstore sent to McCray contained unfinished frames or receivers and the parts to make them into ghost guns.

420.     Between October 17, 2018 and March 27, 2019, Glockstore sent at least three packages to

77

Joseph Maddaloni in the Whitestone area of Queens, NY.

421.    On information and belief, the packages Glockstore sent to Maddaloni contained unfinished frames or receivers and the parts to make them into ghost guns.

422.    An investigation by the Queens County District Attorney's office had identified Maddaloni "as a major purchaser of illegal polymer-based unserialized firearm components."[61]

423.    When law enforcement executed a search warrant on Maddaloni's residence, they found 42 illegal firearms, including 15 ghost gun pistols and two AR-15 ghost gun assault rifles, one of which had been modified to fire fully automatically.  Also recovered were 23 commercially manufactured weapons, two commercial assault-rifles, two silencers, 33 high capacity magazines, and thousands of rounds of ammunition.

424.    As described below, in addition to Glockstore, Maddaloni received a shipment from Defendant KM Tactical. *See* below ¶ 490.

425.    Between approximately October 17, 2018 and December 12, 2020, Glockstore sent at least eight packages to Grzegorz Blachowicz in the Ridgewood area of Queens, NY.  *See* above ¶¶ 233-236.

426.    On information and belief, the packages Glockstore sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

427.    Glockstore's sales to Valle, Saxton, Kiem, Zhao, Chung, Gerwitz, Lopez, Cruz, Goldberg, Lopez, Maddaloni, and Blachowicz demonstrate Glockstore's complete and persisting lack of

---

[61] https://queensda.org/queens-man-charged-with-67-counts-of-criminal-possession-of-a-weapon-and-other-crimes-for-cache-of-illegal-ghost-guns-and-firearms/

controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Glockstore's pockets at the expense of New Yorkers' safety.

### F. INDIE GUNS

428.    Indie Guns is a distributor of firearms and firearm parts who has marketed unfinished frames and receivers to New Yorkers, repeatedly sold unfinished frames and receivers to undercover investigators in New York as late as May 2022, and failed to exercise any controls on its sales. Indeed, as of February 2023, Indie Guns publicly estimated that it has sold "tens of thousands" of unfinished frames and/or receivers to New York customers.

429.    Indie Guns' business has long focused on selling unfinished frames and receivers and other parts used to complete a ghost gun build, and has done a substantial portion of that business in New York.  On information and belief, Indie Guns' website attracts over 11,000 visits per month.

430.    For a substantial segment of the Relevant Time Period and through the present by its own admission, Indie Guns sells unfinished frames, including those as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "every part and component (including mag)…conveniently packaged for the DIY gun hobbyist to build a complete gun,"[62] and "everything needed to build a complete pistol in a discounted bundle package."[63]

431.    Indie Guns routinely ships these LSB kits, and other illegal products, directly to the consumer, including in New York, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements.  Indie Guns knows and intends

---

[62] *See* https://indieguns.com/product/boa-17-black-cherry-lsb-kit/ (last visited February 16, 2023).
[63] Formerly available at https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3/ (last visited June 28, 2022).

that these consumers convert the LSB kits into working firearms—as Indie Guns itself explained, "When done with your build, just grab a box of rounds and you're good to go…"[64]

432.    Indie Guns' website advertises a wide variety of unfinished frames, frame kits and full build kits.  Indie Guns has highlighted the "blank serialization plate" as one of the key features of the unfinished frames it sells.

433.    During the Relevant Time Period, Indie Guns announced to its customers that it was "pleased to present the CFA-17 (COMPLETE FRAME ASSEMBLY-17)[.]  The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower." Indie Guns touted the frame's "blank serialization plate" as a major selling point.[65]

434.    Indie Guns' business practices and sales of unfinished frames into the New York market are best demonstrated by its persistent sales and shipments of unfinished frames to New York State and City investigators in response to undercover purchases.

435.    For example, on or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a trigger assembly, a magazine, and a complete slide with barrel.  Indie Guns accepted the order and shipped the product into New York County.

436.    On or around May 27, 2022, investigators conducted another undercover purchase of a

---

[64] Formerly available at https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3/ (last visited June 28, 2022).
[65] Formerly available at https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35/ (last visited June 6, 2022).

Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit. Indie Guns accepted the order and shipped the unfinished frame into Kings County.

437.    Indie Guns' sales to the undercover investigators demonstrated its complete and persisting lack of controls and exemplified just two instances of its admittedly many prohibited sales of unfinished frames into New York without conducting a background check or implementing any other controls to keep these illegal ghost gun products out of the hands of people who are prohibited from accessing firearms.

438.    These sales also demonstrate Indie Guns' practice of marketing, selling, and shipping these unlawful products to consumers in New York.

439.    Indie Guns has made no secret of its intent to deliberately distribute law-breaking products for its own maximum profit. In fact, its marketing and business practices have grown increasingly hostile. In recent months, Indie Guns has removed the ability to purchase products directly from its website, in order to obscure such purchases from law enforcement. Rather, while its products are still viewable on its site, any purchase must be made through direct communication with the company's owner, Lawrence Destefano, which Indie Guns has publicly detailed take place by telephone, text, private/direct messages over social media, or using an encrypted messaging service, specifically Signal.

440.    Consistent with this new sales process, Indie Guns' website now directs customers to

"FOLLOW OPSEC MEASURES.[66] CALL FOR PRICING CALL TO MAKE PAYMENT."

441.     Indie Guns admits that it is now using these "OPSEC" measures in place of its ordinary website ordering process because it is deliberately frustrating law enforcement's ability to discover its sales into New York, and to enable it to minimize its sales records and easily destroy them.

442.     Specifically, to assure its customers that it is operating with the greatest degree of secrecy, Indie Guns explained publicly that it altered its sales practices in order to minimize and destroy any evidence of sales, saying:

> I want all my customers to realize, everything now is offline now and off-the-books. When you order, you have to call me or we have to communicate through text…nothing is automated…because it's done this way, because everything is completely off-the-books, there is no customer data. There's no names…No customer data is digitally stored by whatever platform that we use as a business…The government has no access to data, so that's the beauty of all this.

443.     Indie Guns regularly markets and promotes itself on Instagram, where it has over 7,000 followers, and over 1,200 posts, including the video quoted in Paragraph 442-443.  On information and belief, Lawrence Destefano is the individual who personally operates and maintains Indie Guns' Instagram account, including starring in most of its video content, as well as selecting, creating, posting, and or deleting any content relating to the "indieguns" account.

444.     Indie Guns uses Instagram videos called "Reels" to communicate to its customers and keep them assured and informed, and also to taunt law enforcement, and even send messages to this Court.  In a video posted in February 2023, Indie Guns directed a message to the Honorable Jesse

---

[66] On information and belief, "OPSEC" refers to "operations security" and refers to protecting critical information from being accessed by "potential adversaries." *See* https://www.commerce.gov/osy/programs/operations-security-opsec (last accessed March 13, 2023).

Furman, as the presiding judge over this dispute, inviting Judge Furman to purchase an unfinished frame from Indie Guns without worry, assuring that Indie Guns destroys all records of such sales, and that the sale would never be discovered.

445.   In another video, Indie Guns riled up New York customers looking to purchase its illegal products by offering to ship an unfinished frame directly to the home of New York State Attorney General Letitia James, communicating that Indie Guns has no care whatsoever about the legality of its business conduct and that its products will continue to ship into New York undeterred.

446.   Indie Guns' Instagram content, website, and other marketing and sale activities admittedly done on Signal and other platforms are intended to sell as many "unserialized, untraceable, unregistered gun components" as possible. In his own words, Lawrence Destefano on behalf of Indie Guns states his mission as: "That's what we need to do is flood this damn market."

447.   Indie Guns has done just that.  As Mr. Destefano bragged on social media, "I sold thousands, tens of thousands to New York City and New York State."

448.   In another social media post, Mr. Destefano acknowledged "the tens of thousands of AR-15 80 percent lower receivers and 80 percent pistol frame kits that I had shipped to New York City and New York State."  In the same video, Mr. Destefano explained that these shipments were not the extent of his illicit sales into the State, bragging that he had "developed a client base of New Yorkers through word-of-mouth as being a DIY gun dealer that specialized in discretion," and that "when there was a hefty profit involved, I would pack my vehicle to the gills and personally deliver these full build kits to these special clients in New York."

449.   Consistent with its intent to "flood this damn market" with illegal products, Indie Guns

83

regularly purchases for resale massive quantities of Polymer80 unfinished frames and receivers. A single monthly invoice from 2021 reflects over $700,000 in Indie Gun wholesale purchases from Polymer80, including thousands of unfinished frames and receivers. For example, that month's invoice included 3,000 subcompact pistol frames alone. On information and belief, a substantial portion of Indie Guns' inventory has been sold and continues to be sold to New York customers.

450. Indie Guns also openly brags about a complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms. And while all the other Defendants also fail to employ any such controls, Indie Guns is explicit and open about why.

451. Indie Guns deliberately targets and markets its products to customers who may not be able to obtain firearms through legal means, and intentionally cultivates this customer base through its provocative anti-government messages.

452. Based on its own public admissions and active marketing, Indie Guns has sold and continues to sell and ship illegal unfinished frames and receivers into New York State, exacerbating the dangerous condition it has cause, maintained, or contributed to.

453. Indie Guns' public statements demonstrate that it—and the other Defendants who are part of the movement—have acted knowing that the sales of unfinished frames and receivers were illegal. In Mr. Destefano's words, "[t]he DIY gun movement has always been a secret society . . . we've always been a tight-knit secret society. And we didn't care, we really didn't care, what government regulations they had out there, or what the laws were, or where it was illegal to ship. We just didn't care, because it was our own secret society." Later in the same public video, Mr.

Destefano says, "Everyone knows what this society is about . . . We didn't care what the government did, we didn't care about their laws, we just didn't care."

454.     Indie Guns has also repeatedly admitted to extensive spoliation after the commencement of this litigation and contrary to the legal advice of counsel—even using the word "spoliation" to publicly describe its conduct.  Indie Guns' spoliation efforts include wiping records that may have been in the custody and control of its former e-commerce or payment platforms and which would have evidenced the number of details of all shipments of unfinished frames and receivers to New York consumers during the Relevant Time Period.

455.     In yet another video created and posted in February 2023, Indie Guns individually names each of the undersigned counsel to the State and directed a message to counsel that it will never produce any information or documents over the course of discovery in this matter "because there is none," reiterating again that Indie Guns destroyed all evidence of its conduct after the commencement of this action and aggressively encouraging its competitors to do the same.

456.     Indie Guns' Instagram account also makes specific overtures towards New York residents in order to directly market to individuals in New York who may be unable to secure an unfinished frame from other sources. For example, many of Indie Guns' recent posts have headers reading "Honoring New York's Brothers-in-Arms," advertising products that Indie Guns has apparently named after New York City's boroughs and neighborhoods. Based on these active and targeted marketing strategies, on information and belief, Indie Guns' sales of unfinished frames and receivers into New York have only increased over recent months.

457.     Indie Guns has made clear via social media its intent is to put illegal, untraceable weapons

in as many hands as possible, exclaiming in one Instagram post "Yes! These are untraceable unserialized unregistered ghost gunners! And you can't do s[***] about it!!! 😊" In another video, Indie Guns claims it "never shipped any kits out to NY residents – **that they know about**" (emphasis added).

458.     In these ways, Indie Guns has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.

459.     Using these strategies, Indie Guns has become a highly successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

460.     Ultimately, Indie Guns has marketed its unfinished frames and/or receivers in these ways, including direct marketing and marketing through encrypted and private channels, with the cumulative effect of these marketing efforts being that Indie Guns not only maximized its sales to date, but also greatly expanded the market for unfinished frames or receivers broadly while also misinforming the public about the legality of its products.

### G.  KM TACTICAL

461.     KM Tactical is an online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.  KM Tactical marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

462.     KM Tactical sells a wide variety of different firearms, parts, and paraphernalia, including an extensive selection of unfinished frames and receivers divided between AR and Glock

platforms.[67]

463. KM Tactical's website, on information and belief, sees on average of approximately 120,000 visitors per month.

464. Since its inception ten years ago, KM Tactical has seen more than 50% growth each year, with the majority of KM Tactical's business being conducted online.

465. KM Tactical is a significant dealer of Polymer80 products and is linked by Polymer80's own website as a dealer. KM Tactical's website marketed Polymer80 products, regularly featuring sales for many of its Polymer80 products, and affirmatively encouraged its customers to build their own firearms.

466. Like the other Defendants, KM Tactical has engaged in deceptive business practices by suggesting to its customers that their products are legal and benign. For instance, KM Tactical's website represented that the ghost guns made from its unfinished receivers are legal, by labeling the product "ATF Approved."

467. Like others in the industry, KM Tactical has invested in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere, as well as to grow the industry as a whole.

468. It is not surprising that individuals who are looking to get around gun control laws found KM Tactical's website and became customers. KM Tactical's business practices have increased the number of dangerous ghost guns present in the State.

---

[67] *See* https://kmtactical.net/product-category/default-category/accessories/80-lowers/ar-platform/ and https://kmtactical.net/product-category/default-category/accessories/80-lowers/glock-platform/ (last visited March 12, 2023).

469.     KM Tactical sent at least 8,544 packages into New York State between December 22, 2017 and June 28, 2022.

470.     At least 1,115 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

471.     At least 180 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

472.     A significant portion of each group of shipments discussed Paragraphs 469-471 contained unfinished frames and receivers.

473.     Beginning on November 2, 2021, KM Tactical sent at least three shipments to Victor Freeman of Grand Island, NY.

474.     The last of these shipments of which the State is aware was sent on May 6, 2022.

475.     On information and belief, the packages KM Tactical sent to Freeman contained unfinished frames or receivers and the parts to make them into ghost guns.

476.     On May 17, 2022, Freeman was driving southbound on Interstate 190 "when he brandished a handgun during a road rage incident with another driver," according to the Erie County District Attorney.[68]

477.     Troopers found a loaded ghost gun inside of Freeman's car, and a search of his home revealed "illegal weapons, which included two assault rifles, two large capacity ammunition feeding devices, and multiple 'ghost gun' kits."

---

[68]*See* https://www2.erie.gov/da/index.php?q=press/grand-island-man-indicted-gun-charges-after-state-police-seize-weapons-following-road-rage-inc (last visited March 13, 2023).

478.    On or around July 2020, KM Tactical sold and sent one unfinished pistol frame to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

479.    On or around July 29, 2021, KM Tactical sent a package to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

480.    On or around September 22, 2021, KM Tactical sent a package to Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

481.    On information and belief, the packages KM Tactical sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

482.    On or about April 10, 2020, KM Tactical sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.  *See* above ¶¶ 336-337.

483.    On information and belief, the package KM Tactical sent to Bubak contained unfinished frames or receivers and the parts to make them into ghost guns.

484.    Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY. *See* above ¶¶ 329-332.

485.    On information and belief, the packages KM Tactical sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

486.    Between approximately April 23, 2020, and April 30, 2020, KM Tactical sent two packages to Brandon Glaski at an address on Adams Crossing Road in East Nassau, NY.  *See* above ¶¶ 301-303.

487.    On information and belief, the packages sent from KM Tactical to Glaski contained

unfinished frames or receivers and the parts to make them into ghost guns.

488.     On or around November 17, 2020, and September 21, 2021, KM Tactical sent two packages to Joshua Gotthart in Buffalo, NY.  *See* above ¶¶ 356-359.

489.     On information and belief, the packages KM Tactical sent to Gotthart contained unfinished frames or receivers and the parts to make them into ghost guns.

490.     On or around September 14, 2021, KM Tactical sent a package to Joseph Maddaloni in the Whitestone neighborhood of Queens, NY.  *See* above ¶¶ 422-423.

491.     On information and belief, the packages KM Tactical sent to Maddaloni contained unfinished frames or receivers and the parts to make them into ghost guns.

492.     Between approximately September 24, 2020, and September 29, 2020, KM Tactical sent two packages to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.  *See* above ¶ 152.

493.     On information and belief, the packages KM Tactical sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

494.     KM Tactical's sales to Freeman, Loyola, Santos, Bubak, Gerwitz, Glaski, Gotthart, Maddaloni, and Goldberg demonstrate KM Tactical's complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining KM Tactical's pockets at the expense of New Yorkers' safety.

## H.  PRIMARY ARMS

495.     Primary Arms is an online retailer of firearms, parts, and paraphernalia who marketed and repeatedly sold unfinished frames and receivers to New Yorkers and failed to exercise any controls

on its sales.

496.    Primary Arms began as an optics manufacturer, but expanded to provide a broad selection of firearm products and accessories, including unfinished frames and receivers. Its business is built on its online retail, and it is one of the fastest growing e-commerce retailers. Primary Arms has "grown exponentially" since its founding in 2007 and on information and belief, Primary Arms' e-commerce net sales generated approximately $98.2 million in 2021.

497.    On information and belief, Primary Arms' website sees on average 3.9 million visitors per month. Primary Arms actively uses its website as a powerful marketing tool for its products.

498.    Primary Arms sells over 20 types of Polymer80 products on its website, including frame parts kits for customers to complete their Polymer80 buildings. For a substantial segment of the Relevant Time Period, Primary Arms shipped unfinished frames and receivers directly to New York consumers, with no serialization and no background check.

499.    It is not surprising that individuals who are looking to get around gun control laws found Primary Arms' website and became customers. Primary Arms' business practices have increased the number of dangerous ghost guns present in the State. Indeed, Primary Arms has shipped large numbers of its illegal products into New York.

500.    Primary Arms sent at least 25,428 packages into New York State between July 25, 2016, and August 9, 2022.

501.    At least 1,305 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

502.    At least 835 of these shipments were sent into New York State after April 26, 2022, the

effective date of the State's ban on unfinished frames and receivers.

503. A significant portion of each group of shipments discussed in Paragraphs 500-502 contained unfinished frames and receivers.

504. On or around September 2020, Primary Arms sold and sent two unfinished AR-15-style lower receivers to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

505. On or around December 2020, Primary Arms sold and sent another unfinished AR-15-style lower receiver to Loyola.

506. On or around November 27, 2021, Primary Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County. Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons, including ghost guns. *See* above ¶¶ 214-215.

507. On information and belief, the package sent to the address on Baisley Avenue contained unfinished frames or receivers and the parts to make them into ghost guns.

508. Between approximately March 17, 2021, and September 13, 2021, Primary Arms sent at least four packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY. *See* above ¶¶ 320-325.

509. On information and belief, the packages Primary Arms sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

510. On or around August 22, 2021, and December 28, 2021, Primary Arms sent packages to

Edison Cruz at an address on Anderson Avenue in the Bronx, NY. *See above* ¶¶ 341-343.

511.    On information and belief, the shipments from Primary Arms to Cruz contained unfinished frames or receivers and the parts to make them into ghost guns.

512.    On or around December 17, 2021, Primary Arms sent a package to Theodore Brois at an address on Tallwoods Road in Armonk, NY. *See above* ¶ 347.

513.    On information and belief, the package Primary Arms sent to the Brois residence contained unfinished frames or receivers and the parts to make them into ghost guns.

514.    On or around May 26, 2021, Primary Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.

515.    On information and belief, the package Primary Arms sent to DiMaggio contained unfinished frames or receivers and the parts to make them into ghost guns.

516.    DiMaggio did not have a license to possess or own firearms.

517.    The FBI Safe Streets Task Force and Putnam County Sheriff's Office, arrested DiMaggio in late-January 2022 for unlawful possession or receipt of a firearm or ammunition by a prohibited person.

518.    As described below, in addition to Primary Arms, DiMaggio received a shipment from Defendant Rainier Arms. *See below* ¶ 556.

519.    On or around May 15, 2018, Primary Arms sent a package to Andrew Fisk in Greenwich, NY.

520.    On information and belief, the package Primary Arms sent to Fisk contained unfinished frames or receivers and the parts to make them into ghost guns.

93

521.    In August, 2022, State Police arrested Fisk and two accomplices who were "involved in manufacturing various illegal firearms parts." A search warrant recovered six assault rifles, two fully-automatic machine guns, two ghost gun handguns, and numerous other long guns, as well as over 40 high-capacity magazines.

522.    On or around May 29, 2021, Primary Arms sent a package to Grzegorz Blachowicz in the Ridgewood neighborhood of Queens, NY. *See* above ¶¶ 233-236.

523.    On information and belief, the package Primary Arms sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

524.    On or around June 28, 2021 and July 3, 2021, Primary Arms sent two packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

525.    On information and belief, the packages Primary Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

526.    Primary Arms' sales to Loyola, Saxton, Kiem, Cruz, Brois, DiMaggio, Fisk, Blachowicz, and Carey demonstrate the complete and persisting lack of controls that Primary Arms employs in order to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Primary Arms' pockets at the expense of New Yorkers' safety.

### I.    RAINIER ARMS

527.    Rainier Arms, another online retailer, repeatedly sold unfinished frames and receivers to undercover investigators in New York as late as May 2022, repeatedly marketed and sold unfinished frames and receivers to customers in New York, and failed to exercise any controls on its sales.

528. Since Rainier Arms' inception in 2004, Rainier Arms has opened a second location in Wichita, Kansas for the specific purpose of marketing and selling more efficiently to the east coast, including New York. Specifically, Rainier Arms sought to save on increasing shipping costs and cut shipping times from the West Coast to the East Coast; it expected to save more than $10,000 monthly in such costs which, the company informed a third party, more than covers the cost of the Kansas lease. On information and belief, since its expansion, Rainier Arms has grown its New York business substantially, including its sales of unfinished frames and receivers.

529. On information and belief, Rainier Arms' website sees on average of about 530,000 visitors per month. Rainier Arms actively uses its website as a powerful marketing tool for its products.

530. As of June 29, 2022, a substantial portion Rainier Arms' business included selling unfinished frames and receivers. Rainier Arms continues to market unfinished frames and receivers as exempt from public safety laws to attract customers who are trying to get around gun control laws. For example, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government just considers them pieces of metal and/or plastic and not guns."[69]

531. During the Relevant Time Period, Rainier Arms sold unfinished handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame, which product

---

[69] *See* https://www.rainierarms.com/manufacturers/polymer80/ (last visited March 6, 2023). *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers/ (representing that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited March 12, 2023).

description continues to state "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[70]

532.    Rainier Arms also explains on its website that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government just considers them pieces of metal and/or plastic and not guns. [Polymer80's] motto is 'Reluctor Dominatus', which means 'Resist Tyranny'."[71]  Rainier Arms has actively marketed and promoted Polymer80 products by conducting flash sales of Polymer80 products that they have advertised by email, significantly discounting unfinished framed or receivers in an effort to market and sell them in large quantities, on information and belief including to New York residents.

533.    Rainier Arms has invested heavily in marketing designed to expand both its market share of unfinished frames and receivers and the industry, business practices that have created, maintained, or contributed to a condition that endangers the safety and health of the public. Consistent with its efforts to expand its market share and the industry, Rainier Arms illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State for a substantial part of the Relevant Time Period.

---

[70] *See* https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited March 6, 2023).

[71] *See* https://www.rainierarms.com/manufacturers/polymer80/ (last visited March 12, 2023).  *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers/ (representing that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited March 12, 2023).

534. According to its website, Rainier Arms is also actively marketing its business and products on Discord, YouTube, Instagram, Twitter, LinkedIn, through a private Facebook group called "Summit Club," and through an ordinary Facebook commercial account.

535. Rainier Arms' routine illegal and repeated shipping of unfinished frames and receivers directly to consumers in New York State is evidenced by the fact that it sent several unfinished frames to New York State investigators in response to undercover purchases.

536. For example, on or around April 27, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940SC Glock-compatible unfinished pistol frame from Rainier Arms.

537. Rainier Arms accepted the order and shipped the frame into New York County.

538. On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[72] and two parts kits for the Polymer80 ghost gun.

539. Rainier Arms accepted the order and shipped the parts into New York County.

540. On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Rainier Arms, along with a Glock 17-compatible slide and barrel.

541. Rainier Arms accepted the order and shipped the frame and parts into New York County.

542. These recent sales to the undercover investigators are wholly consistent with Rainier Arms'

---

[72] The large-capacity magazine Rainier Arms sold was separately illegal under New York State law. *See* N.Y. Penal Law § 265.00(23).

history of marketing, selling, and shipping these unlawful products to consumers in New York.

543.    It is not surprising that individuals who are looking to get around gun control laws found Rainier Arms' website and became customers. Rainier Arms' business practices have increased the number of dangerous ghost guns present in the State.

544.    Rainier Arms sent at least 6,428 packages into New York State between March 4, 2016, and January 5, 2023.

545.    At least 434 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

546.    At least 533 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

547.    A significant portion of each group of shipments discussed in Paragraphs 544-546 contained unfinished frames and receivers.

548.    Between approximately July 2, 2021, and September 1, 2021, Rainier Arms sent at least seven packages to Chaz McMillan at an address on 162nd Street in Queens, NY.  *See* above ¶¶ 200-204.

549.    On information and belief, the packages Rainier Arms sent to McMillan contained unfinished frames, unfinished receivers, and the parts to convert them into ghost guns.

550.    On or around March 12, 2018, Rainier Arms sent a shipment to Brandon Glaski in East Nassau, NY.  *See* above ¶¶ 301-303.

551.    On information and belief, the package Rainier Arms sent to Glaski contained unfinished frames or receivers and the parts to make them into ghost guns.

552.    Between approximately April 1, 2021, and May 22, 2021, Rainier Arms sent at least three packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.  *See* above ¶¶ 320-325.

553.    On information and belief, the packages Rainier Arms sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

554.    On or around February 1, 2022, Rainier Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County. Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons, including ghost guns.  *See* above ¶¶ 214-215.

555.    On information and belief, the package Rainier Arms sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

556.    On or around July 20, 2021, Rainier Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.  *See* above ¶¶ 516-517.

557.    On information and belief, the package Rainier Arms sent to DiMaggio contained unfinished frames or receivers and the parts to make them into ghost guns.

558.    Between approximately May 28, 2021 and November 22, 2021, Rainier Arms sent at least six packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

559.    On information and belief, the packages Rainier Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

560.    Rainier Arms' sales to McMillan, Glaski, Kiem, Saxton, DiMaggio, and Carey demonstrate

Rainier Arms' complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, while lining Rainier Arms' pockets at the expense of New Yorkers' safety.

### J. ROCK SLIDE

561.     Rock Slide, a manufacturer and distributor of firearm parts, marketed unfinished frames and receivers to New Yorkers, sold an unfinished frame to an undercover investigator as late as May 2022, and failed to exercise any controls on this sale.

562.     While Rock Slide specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame, during the Relevant Time Period, a substantial portion of Rock Slide's business included selling Polymer80 brand Glock-compatible unfinished frames. Indeed, Rock Slide touted these products' compatibility with its own "upper" products.

563.     On information and belief, Rock Slide's website sees on average about 27,500 visitors per month. Rock Slide actively uses its website as a powerful marketing tool for its products.

564.     For example, on its website, Rock Slide has described the unfinished frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available.  No license required."[73]

565.     Rock Slide has successfully attracted New York business and shipped unfinished frames and receivers into New York State.

566.     Rock Slide's sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover

---

[73] Formerly available at https://rockslideusa.com/shop/ (last visited June 28, 2022).

purchase.

567.    On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Rock Slide, along with Rock Slide-brand upper and the remaining parts necessary to convert the unfinished frame into a working ghost gun.

568.    The checkout page included the words "No license required.  Ships anywhere in the USA."

569.    Rock Slide accepted the order and shipped the frame into New York County.

570.    Rock Slide's sale to the City investigator demonstrated its complete and persisting lack of controls, and exemplified just one instance of many prohibited sales of unfinished frames into New York, without conducting a background check or implementing any other controls to prevent an improper person from turning its products into working ghost guns, consistent with its central business purpose and model.

571.    Rock Slide has worked to become a major market player and to establish unfinished frames and receivers as a major market, actively marketing its products and touting their compatibility with Polymer80 products.

572.    Using these strategies, Rock Slide has become a highly successful and profitable business, with a significant amount of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

573.    As demonstrated by the facts specific to each Defendant above, all Defendants have jointly and severally caused, contributed to, or maintained the same crisis—by following the same marketing and sales tactics, developing the unfinished frames and receivers industry, and in some

instances even by targeting and selling (and reselling) to the very same New York customers who should have never had access to firearms.

#### IV. THE PRICE PAID BY THE STATE: DEFENDANTS' GHOST GUN-MAKING PRODUCTS HAVE HARMED NEW YORK AND WILL CONTINUE TO DO SO IF UNABATED.

574. The influx of ghost guns into New York is a significant threat to public health and safety. As summarized above, *see* above ¶¶ 96-103, New York's legislature has passed laws to serve this purpose, but by the conduct described in detail above, *see* above ¶¶ 115-573, Defendants not only undermine those laws, they affirmatively harm New Yorkers by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York.

575. As a result, to date, New York has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

#### A. THE RISE OF GHOST GUNS AND THE DAMAGE DONE

576. The available data shows that ghost guns are proliferating—and are being used in crimes—at an exponential pace. According to the ATF, the number of ghost guns recovered at crime scenes nationwide increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in

102

2021.[74]  Notably, "[t]hese numbers are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that have no serial numbers or identifiable markings.[75]

577.    Researchers have confirmed this trend.  For example, a study published in 2022 analyzed data of recovered guns in a large U.S. city and concluded that there was "a 522% increase in the likelihood that a recovered gun was an untraceable PMF [privately manufactured firearm or ghost gun]" from pre-pandemic years, 2017-2019 to pandemic times, 2020-2021.[76]

578.     The number of ghost guns recovered in New York follows this disturbing trend.

579.    Specifically, New York law enforcement is recovering an increasing number of crime guns each year.  In 2018, law enforcement made 6,193 crime gun recoveries, but in 2021, that number rose to 9,861 crime guns—an increase of 59.2%.[77]  Ghost guns are an increasingly dangerous segment of this growing pool.  Throughout New York State, including New York City's five boroughs, the number of assembled ghost guns law enforcement recovered (and properly identified

---

[74] *See* 87 Fed. Reg. 24656 (citing internal figures from the ATF Office of Strategic Intelligence and Information).

[75] *See id.* at n.18.  Law enforcement officers often confuse ghost guns with "defaced" firearms.  The latter is a term of art that relates only to serialized firearms which had the serial number scraped, covered, or otherwise impeded from view.  Law enforcement agencies, including NYPD, have laboratory capabilities and processes to recover serial numbers on defaced firearms, and in some instances, a recovering officer may designate a recovered ghost gun as "defaced" so that the agency can take a closer look and determine whether a serial number may be recovered.  After subsequent review, a ghost gun initially misidentified as a defaced firearm will not be re-identified by law enforcement.  This accounts for a potentially significant undercount of recovered ghost guns.

[76] Anthony A. Braga, et al., *Privately manufactured firearms, newly purchased firearms, and the rise of urban gun violence*, Preventative Medicine, Dec. 2022.

[77] These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns with no serial number at all.

as such) increased from just 44 in 2018 to 797 in 2022—a 1,711% increase.[78]

580.    When considering the rate of ghost guns in the context of all gun recoveries across the State, the trend is deeply disturbing.  In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement.  That rate increased to 1.59% in 2019, then 4.4% in 2020, then further to 6.59% in 2021, and to 7.92% in 2022.  Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

581.    The number of assembled ghost guns in New York—including those created from Defendants' illegal products—has reached crisis levels and continues to climb.

582.    Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020.  On information and belief, Defendants' sales of unfinished frames and receivers have likewise increased exponentially over that same time period, with a significant number of those products being shipped directly into New York State or easily finding their way into New York State—leading to significant profits for Defendants from this illicit market.

583.    On information and belief, that increase in sales has coincided with a massive uptick in gun murders in the United States. In 2020, approximately 79% of murders—19,384 out of 24,576— involved a firearm. The total number of gun murders in 2020 represents a 34% increase from the number of gun murders in 2019, a 49% increase from the number of gun murders in 2015, and a

---

[78] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.  For example, these numbers do not account for the NYPD's recovery of 50 unfinished frames or receivers incident to arrests in 2020, 125 in 2021, and 100 for this calendar year through May 31.

75% increase from the number of gun murders in 2010.[79]

584.  Defendants' business practices, which at bottom increase the number of illegal operable firearms in New York, are also related to an increase in suicide deaths, as approximately half of all suicide deaths involve a firearm.  Like gun murders, gun-related suicides in the U.S. increased 10% between 2015 and 2020, and 25% when measured against 2010.[80]

### B. DEFENDANTS' CONDUCT IS DANGEROUS AND DIRECTLY HARMS NEW YORK

585.  The evidence that Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of persons convicted of felonies.

586.  A study published in 2022 concluded that, relative to traditionally manufactured and serialized firearms, ghost guns "were 51% more likely to be recovered in violent crime during the 2017 through 2021 study period."[81]  That study revealed that ghost guns may have become a "weapon of choice" for violent gun criminals, as they accounted for nearly 1 in 4 guns recovered by the local police department providing the data, even though ghost guns cannot plausibly account for that share of guns entering firearms commerce.[82]  On information and belief, New York is in the same predicament, in which ghost guns account for a proportion of recovered and/or crime

---

[79] John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (Feb. 3, 2022) https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/ (last visited March 12, 2023).
[80] *Id.*
[81] Braga, *supra* note 73, at 6.
[82] *Id.*

guns that is disproportionate to their market share.

587.    Moreover, guns recovered at crime scenes are statistically related to gun manufacturer practices in the aggregate.  Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices.  For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appeared.  The more of these practices that a manufacturer has followed, the less frequently their products were recovered from crime scenes.  By these practices, a manufacturer aligns its business practices with its responsibilities under the law and incentivizes its dealer or distributor customers to do the same.

588.    Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices.  Defendants here have done and continue to do nothing to geographically restrain the marketing of their prohibited products, and they employ policies and practices that result in sales of these illegal products directly to unknown and deliberately unchecked individuals in New York.

589.    Moreover, Defendants are aware that persons who have been convicted of felonies are an important segment of the gun industry market.  To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws.  Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York were purchased outside of New York.  By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering

our communities by providing criminals and other individuals who either know or suspect they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one that is virtually untraceable. Thus, Defendants' conduct and business practices have created a new and more easily accessible market for illegal operable firearms in New York. *See, e.g.*, above ¶¶ 115-573.

590. ATF trace data has also long-established certain dealer characteristics that indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers but can bypass any and all dealers entirely.

591. In the context of domestic violence, an intimate partner is five times more likely to be murdered when the violent partner has access to a firearm.[83] New York law addresses this very real and substantial risk by, among other ways, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she possesses or owns when certain conditions are present. *See* N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Defendants' sale of ghost gun products and their refusal to conduct background checks undermine these important protections, *increasing* the already-significant risk that a protected person or persons will be murdered.

---

[83] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. *Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations With Intimate Partner Homicide.* Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

592.    Defendants' sale of unfinished frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public.  Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[84] Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[85] Consistent with that result, permit to purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[86]

593.    But by their conduct, Defendants are nullifying those benefits.  Defendants are stripping New York's effective licensing and permit laws of their impact, and consequently the number and rate of homicides and suicides will continue to rise.

594.    Accordingly, given the nature of Defendants' business practices and products, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and crime gun outcomes, Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety.

---

[84] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States*, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.

[85] *Id.*

[86] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. *Association between Firearm Laws and Homicide in Urban Counties*. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. *Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health*. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

595. With every sale Defendants have made during the Relevant Time Period, they circumvent and undermine New York's firearms public safety measures for their own profit, and have created, maintained, or contributed to a dangerous condition.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
**REPEATED AND PERSISTENT ILLEGALITY IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)**
*(Against All Defendants)*

596. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

597. New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business.

598. Any conduct which violates state or federal law or regulation is actionable under New York Executive Law § 63(12).

599. As set forth above, Defendants have each engaged in repeated or persistent illegal conduct in the carrying on, conducting, or transaction of business, by, *inter alia*:

- *Shipping and selling unfinished frames and receivers*: Each Defendant has repeatedly sold unfinished frames or receivers and shipped them directly to New York consumers, in violation of New York State and New York City law. *See* N.Y. Penal Law §§ 265.63, 265.64; N.Y. City Admin. Code § 10-314. Additionally, because unfinished frames and receivers are "designed to" and "may readily be converted" into working firearms, 18 U.S.C. § 921(a)(3); *see also id.* (including "the frame or receiver of any such weapon" in the definition), it is illegal to sell them under federal law unless they are serialized, subject to a background check, and sold through a federal firearms licensee.

- *Aiding and abetting the possession of firearms by convicted persons*: Each Defendant knew, intended, or was willingly blind to the fact that that by selling

109

their unfinished frames and receivers without following federal serialization, background check, and recordkeeping requirements, they would be purchased by convicted persons and others who could not buy a firearm through legitimate channels. Each Defendant thereby aided and abetted convicted persons in possessing a prohibited firearm.

- *Aiding and abetting the possession of firearms by unlicensed person*: Each Defendant knew, intended, or was willfully blind to the fact that that by selling their unfinished frames and receivers without performing a background check or otherwise confirming that the buyer had a valid license, they would be purchased by unlicensed persons, including persons who could not legitimately obtain a license. Each Defendant thereby aided and abetted unlicensed persons in possessing a prohibited firearm in violation of N.Y. Penal Law §§ 265.01(1), 265.20(3).

- *Deceptive business practices*: Each Defendant has repeatedly engaged in acts and practices in the conduct of business, trade, or commerce including but not limited to misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded. Each Defendant thereby engaged in deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York in violation of New York General Business Law § 349(c). The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

- *False advertising*: Each Defendant has repeatedly engaged in acts and practices in the conduct of business, trade, or commerce including but not limited to misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded. Each Defendant thereby engaged in false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York in

110

violation of New York General Business Law § 350. The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

- *Aiding and abetting possession of unserialized firearms*: Each Defendant sold unfinished frames or receivers into New York State knowing, intending, or being willfully blind to the fact that these products would be converted into working, unserialized firearms, while marketing their products as a way around serialization requirements, and portraying serialization as optional, unnecessary, or undesirable. Each Defendant thereby aided and abetted the possession of unserialized firearms in violation of, *inter alia*, 26 U.S.C. § 5842(b), 26 U.S.C. § 5861(c), 26 U.S.C. § 5861(d), and N.Y. Penal Law § 265.07. During the pendency of this litigation several Defendants have continued to promote their unfinished frames and receivers as a way around serialization requirements.

- *Transporting firearms without a federal firearms license*: Each Defendant that does not hold a federal firearms license, on information and belief including Defendants Indie Guns, KM Tactical, and Rock Slide, has repeatedly and persistently transported unfinished frames and receivers into New York State in violation of 18 U.S.C. § 922(a)(1)(A).

- *Transporting firearms in violation of law*: Each Defendant that holds a federal firearms license, on information and belief including Defendants Arm or Ally, 80 Percent Arms, 80P Builder, Brownells, Glockstore, Primary Arms, and Rainier Arms, has repeatedly and persistently transported unfinished frames and receivers directly to persons in New York State who were not federal firearms licensees in violation of 18 U.S.C. § 922(a)(2).

- *Transporting firearms to a foreign state*: Each Defendant has repeatedly and persistently transported unfinished frames and receivers directly to persons in New York State, in violation of 18 U.S.C. § 922(a)(5) and 18 U.S.C. § 922(b)(3).

- *Sale or delivery to persons prohibited by state law*: Each Defendant holding a federal firearms license intended, or was willfully blind to the fact that that their sales of unfinished frames and receivers to New Yorkers violated multiple state laws, including but not limited to the categorical prohibition on sale and possession of unfinished frames and receivers, *see* N.Y. Penal Law §§ 265.01(10), .63, .64, the categorical prohibition on sale and possession of ghost guns, *see* N.Y. Penal Law §§ 265.01(9), .60, .61, prohibitions on possession of weapons by unlicensed persons, *see* N.Y. Penal Law §§ 265.01(1), 265.20(3), and prohibitions on possession of weapons by convicted persons, *see* N.Y. Penal Law § 265.02. Despite these state laws, each of these Defendants repeatedly and persistently transported

unfinished frames and receivers directly to persons in New York State, including to persons forbidden from possessing them under the state laws above, in violation of 18 U.S.C. § 922(b)(2).

- *Sale or delivery to persons convicted of serious crimes*: Each Defendant knew, intended, or was willingly blind to the fact that that by selling their unfinished frames and receivers without following federal serialization, background check, and recordkeeping requirements, they would be purchased by convicted persons and others who could not buy a firearm through legitimate channels, in violation of 18 U.S.C. § 922(d)(1).

- *Sale or delivery of a firearm without a background check*: Each of the Defendants holding a federal firearms licenserepeatedly and persistently transported unfinished frames and receivers directly to persons in New York State who were not federal firearms licensees, without conducting a background check in connection with any such sale or transfer, in violation of 18 U.S.C. § 922(t).

- *Dealing in firearms without a license*: Each Defendant that does not hold a federal firearms license repeatedly and persistently transported unfinished frames and receivers directly to consumers in New York State, in violation of 18 U.S.C. § 923(a).

600. By reason of the foregoing, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## AS AND FOR A SECOND CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUDULENT CONDUCT
### IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)
*(Against All Defendants)*

601. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

602. New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent fraudulent conduct.

603. New York Executive Law § 63(12) defines "fraud" or "fraudulent" to "include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression,

112

false pretense, false premise or unconscionable contractual provisions."

604.    As set forth above, each Defendant has each engaged in repeated or persistent fraudulent conduct in the carrying on, conducting, or transaction of business, by misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

605.    By reason of the foregoing, Defendants have engaged in repeated and persistent fraudulent conduct in violation of New York Executive Law § 63(12).

## AS AND FOR A THIRD CAUSE OF ACTION
### PUBLIC NUISANCE PURSUANT TO N.Y. GENERAL BUSINESS LAW § 898-C
*(Against All Defendants)*

606.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

607.    The Attorney General acts within her authority to bring an action in this Court to enjoin and restrain each Defendant from its ongoing violations and to obtain restitution and damages, pursuant to New York General Business Law § 898-d.

608.    Each Defendant constitutes a "gun industry member," subject to New York General

113

Business Law § 898-b.

609.     Each Defendant has sold and continues to sell; has manufactured and continues to manufacture; has marketed and continues to market "qualified product[s]," as defined in New York General Business Law § 898-a.

610.     By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers directly into New York State.

611.     By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers that may foreseeably make their way into New York State.

612.     These actions have created, maintained, or contributed to a condition in New York State that endangers the safety and health of the public.

613.     Under state law, Defendants' activities constitute a public nuisance.  *See* N.Y. General Business Law § 898-c(1).

614.     Moreover, each Defendant constitutes a "gun industry member," that is required to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed, or sold unlawfully."  N.Y. General Business Law § 898-b(2).

615.     These required procedures include, but are not limited to "instituting screening, security, inventory and other business practices to prevent . . . sales of qualified products to . . . traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others."  N.Y. General Business Law § 898-a(2).

616.     Each defendant fails to have any policy or procedure that constitutes adequate measures to

114

screen security or inventory, or otherwise prevent its prohibited products from being possessed, used, marketed, or sold unlawfully in New York.

617.   Each Defendant's failure to have reasonable controls and procedures has resulted and continues to result in ongoing harm to the public and constitutes a public nuisance. *See* N.Y. General Business Law § 898-c(1).

**AS AND FOR A FOURTH CAUSE OF ACTION**
**VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349**
*(Against All Defendants)*

618.   The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

619.   New York General Business Law Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

620.   As set forth above, Defendants have violated New York General Business Law § 349 by engaging in acts and practices including but not limited to:

a.   Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

b.   Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

c.   Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

115

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF N.Y. GENERAL BUSINESS LAW § 350
*(Against All Defendants)*

621.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

622.    New York General Business Law Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in the State of New York.

623.    As set forth above, Defendants have violated New York General Business Law § 350 by engaging in acts and practices including but not limited to:

    a.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York;

    b.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

    c.    Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

## AS AND FOR A SIXTH CAUSE OF ACTION
### NEGLIGENCE PER SE
*(Against All Defendants)*

116

624.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

625.    Each state and federal statute discussed above established a duty of care, which Defendants breached by violating each law's requirements, including but not limited to:

     a. N.Y. Penal Law §§ 265.63, 265.64 and N.Y. City Admin. Code § 10-314, which prohibit the sale of unfinished frames and receivers.

     b. N.Y. Penal Law § 265.07, requiring serialization of all unfinished frames and receivers.

     c. 18 U.S.C. § 922(a)(1)(A), prohibiting those Defendants without federal firearms licenses from transporting firearms in interstate commerce.

     d. 18 U.S.C. § 922(a)(2), prohibiting those Defendants with federal firearms licenses from transporting firearms directly to consumers.

     e. 18 U.S.C. § 922(b)(2), prohibiting those Defendants with federal firearms licenses from transporting firearms to persons forbidden from possessing them under State law.

     f. 18 U.S.C. § 922(d)(1), prohibiting Defendants from selling firearms to persons convicted of serious crimes.

     g. 18 U.S.C. § 922(t), prohibiting those Defendants with federal firearms licenses from transporting firearms without a background check.

     h. 18 U.S.C. § 923(a), prohibiting those Defendants without federal firearms licenses from dealing in firearms.

626.    Each of the statutes discussed above, such as prohibitions on the sale of unfinished frames and receivers, prohibitions on the possession of ghost guns, prohibitions on sale of guns to unlicensed or convicted persons, and prohibitions on the sale of unserialized weapons, are designed to protect the public from gun violence.

117

627. Each Defendant, through its sale of unfinished frames and receivers into New York, violated the duty of care imposed by these statutes, resulting in the type of harm the firearms laws were designed to prevent.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### NEGLIGENT ENTRUSTMENT
*(Against All Defendants)*

628. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

629. Each Defendant may properly be deemed an "owner or possessor of a dangerous instrument" and was accordingly under a duty to entrust that instrument to a responsible person whose use would not create an unreasonable risk of harm to others.

630. Each Defendant in this action breached that duty by entrusting their dangerous instruments, *i.e.,* unfinished frames and receivers, to persons in New York who were ineligible, unable, or unwilling to secure a firearm through the legal FFL process and thereby likely to create an unreasonable risk of harm to others.

631. Each Defendant intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training.

632. Each Defendant is a distributor who engaged with such customers and directly and deliberately did nothing to verify their identity, permit status, or fitness to own a gun.

633. Each Defendant intended to sell and knowingly sold unfinished frames and/or receivers to

118

customers intending to use them in the commission of a crime, as Defendants' workaround for serialization and recordkeeping requirements meant that the ghost guns made from their products would be untraceable and their customers could evade law enforcement. Each Defendant's intent is demonstrated by the way each Defendant has emphasized the untraceability of their products in their marketing.

634.    Each Defendant was in the best position to protect against the risk of harm.  They —and only they—had the ability to know who they were shipping their "unfinished" products to—and who would be turning them into ghost guns.

## DEMAND FOR JURY TRIAL

635.    Pursuant to Federal Rule of Civil Procedure 38(b), New York demands a trial by jury on all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the People of the State of New York, respectfully requests that the Court enter an order and judgment that:

1.    Enjoins each Defendant, pursuant to New York Executive Law § 63(12):

   a.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person or entity with a current New York State shipping or billing address;

   b.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person whom the Defendant knows or should know intends to bring, ship, sell, or otherwise transport, carry, or transfer any such unfinished frame or receiver, or an operable, unserialized firearm assembled therefrom, to New York State or to any person or entity with a current New York State shipping or billing address;

   c.    From manufacturing, distributing, selling, or marketing unserialized firearms or

119

products that are used to form or create operable, unserialized firearms within the State unless such conduct complies with heightened, independently-monitored safeguards against the recurrence of the Defendant's fraudulent, illegal, and/or unlawful practices, which are to be set forth in a compliance plan reviewed and approved by Plaintiff and the Court; and

    d.     To issue public corrective statements regarding their false and misleading public statements and omissions;

2.    Directs each Defendant, pursuant to New York Executive Law § 63(12), to:

    a.     Pay restitution and damages for its fraudulent and/or illegal practices that violated that statute and caused compensable injuries to Plaintiff or any other person; and

    b.     Disgorge all revenues it wrongfully obtained as a result of its fraudulent and/or illegal practices in violation of that statute;

3.    Directs Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

4.    Grants civil penalties pursuant to New York General Business Law § 350-d, which provides for a penalty of up to $5,000 for each violation of New York General Business Law §§ 349 or 350;

5.    Awards punitive damages, in an amount to be determined at trial;

6.    Awards Plaintiff its costs and grants statutory costs pursuant to CPLR § 8303(a)(6); and

7.    Grants such other and further relief as the Court deems just and proper.

Dated: New York, New York
       March 13, 2023

                    LETITIA JAMES
                    Attorney General of the State of New York


              By:

                    James M. Thompson
                    Monica Hanna
                        Special Counsel
                    Abigail Katowitz
                    Matthew Conrad
                        Assistant Attorneys General
                    28 Liberty Street
                    New York, New York 10005
                    (212) 416-6556
                    (212) 416-8227
                    (212) 416-8922
                    (212) 416-6352
                    james.thompson@ag.ny.gov
                    monica.hanna@ag.ny.gov
                    abigail.katowitz@ag.ny.gov
                    matthew.conrad@ag.ny.gov