UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

| | |
|---|---|
| SALVO TECHNOLOGIES, Inc., | |
| Plaintiff, | |
| v. | Case No. 8:23-CV-01016-MSS-TGW |
| LANDMARK AMERICAN INSURANCE COMPANY and ARGONAUT INSURANCE COMPANY, | |
| Defendants. | |

**DECLARATION OF STEPHEN G. FORESTA IN SUPPORT OF
PLAINTIFF SALVO TECHNOLOGIES, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Stephen G. Foresta, declare as follows:

1.      I am counsel of record for Plaintiff Salvo Technologies, Inc. ("Salvo")

and have been admitted *pro hac vice* to appear in this matter on behalf of Salvo.  I am

over twenty-one (21) years of age and am competent to testify in this matter.  I am

authorized to submit this declaration on behalf of Salvo, and through my

representation of Salvo have acquired firsthand knowledge of the following:

2.      A true and correct copy of the operative complaint filed in the lawsuit

titled *The People of the State of New York, by Letitia James, Attorney General of the*

*State of New York v. Arm or Ally, LLC, et al.,* Case No. 22-cv-06124 (JMF), United

States District Court for the Southern District of New York, is attached hereto as

Exhibit 1.

3.      A true and correct copy of the operative complaint filed in the lawsuit titled *The City of Buffalo v. Smith and Wesson Brands, Inc. et al..,* Supreme Court of the State of New York, County of Erie, is attached hereto as Exhibit 2.

4.      A true and correct copy of the operative complaint filed in the lawsuit titled *The City of Rochester v. Smith and Wesson Brands, Inc. et al..,* Supreme Court of the State of New York, County of Monroe, is attached hereto as Exhibit 3.

5.      A true and correct copy of the operative complaint filed in the lawsuit titled *The City of New York v. Arm or Ally, LLC et al..,* Case No. 22-CV-5525, United States District Court for the Southern District of New York, is attached hereto as Exhibit 4.

6.      A true and correct copy of Argonaut Private Company Directors & Officers, Employment Practices and Fiduciary Liability Insurance Policy number ML4263632-0 is attached hereto as Exhibit 5.

7.      A true and correct copy of Landmark Private Company Management Liability Policy number PP699354 is attached hereto as Exhibit 6.

8.      True and correct copies of Salvo's insurance broker's notices to Argo and Landmark of the New York Firearm Litigation are attached hereto as Exhibits 7 and 8, respectively.

9.      True and correct copies of the responses from Defendants acknowledging receipt of Salvo's notices are attached hereto as Exhibits 9 and 10, respectively.

10.      A true and correct copy of a letter sent on August 23, 2022, by Argonaut

to Salvo's parent company regarding coverage is attached hereto as Exhibit 11.

11.    A true and correct copy of a supplemental letter sent by Argonaut to Salvo's parent company regarding coverage is attached hereto as Exhibit 12.

12.    A true and correct copy of a supplemental letter sent on August 26, 2022, by Landmark's parent company, RSUI, to Salvo's parent company regarding coverage is attached hereto as Exhibit 13.

13.    A true and correct copy of a supplemental letter sent on January 17, 2023, by Landmark's parent company, RSUI, to Salvo's parent company regarding coverage is attached hereto as Exhibit 14.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This the 13th day of September 2023.

*/s/ Stephen G. Foresta*
Stephen G. Foresta (admitted pro hac vice)
McGuireWoods LLP
1251 Avenue of the Americas
20th Floor
New York, NY 10020
Telephone: 212.548.7033
Facsimile: 212.715.6295
sforesta@mcguirewoods.com

*Counsel for Plaintiff*
*Salvo Technologies, Inc.*

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                     Plaintiff,

          -against-                                Case No. 22-cv-06124 (JMF)

ARM OR ALLY, LLC; BLACKHAWK
MANUFACTURING GROUP, INC., A/K/A 80
PERCENT ARMS, INC. OR 80 PERCENT ARMS;
SALVO TECHNOLOGIES, INC., A/K/A 80P
BUILDER OR 80P FREEDOM CO.; BROWNELLS,
INC., A/K/A BROWNELLS OR BOB BROWNELL'S;
GS PERFORMANCE, LLC, A/K/A GLOCKSTORE OR
GSPC; INDIE GUNS, LLC; KM TACTICAL;
PRIMARY ARMS, LLC; RAINIER ARMS, LLC; AND
ROCK SLIDE USA, LLC,

                     Defendants.
-------------------------------------------------------------------X

**<u>SECOND AMENDED COMPLAINT</u>**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................... 1

JURISDICTION AND VENUE ..................................................... 3

PARTIES ............................................................................. 3

FACTUAL ALLEGATIONS ........................................................ 5

    I.    Hidden By Design: Defendants Have Marketed and Sold Firearm Products Designed to be Easily Converted Into Working Untraceable Firearms...................... 5

        A.    The Trivial Differences Between Unfinished Frames and Finished Frames ....... 9

        B.    Defendants' Unfinished Frames to Ghost Guns In Less Than An Hour .......... 11

    II.    Working Against the Safeguards: Defendants Created, Maintained, or Contributed to an Avoidable Crisis That New York Now Struggles to Contain. .......................... 16

        A.    The Avoidable Crisis That Needs to be Fixed .................................... 17

        B.    New York's Reliance on Evidence-Based Federal, State and Local Gun Control Laws and Effective Enforcement Strategies Which Defendants Actively Subverted........................................................................... 20

            1.    Federal Laws ................................................................... 21

            2.    State & Local Laws............................................................. 27

    III.    Each Defendant Has Persistently and Illegally Marketed and Sold Unfinished Frames and Receivers into New York. ................................................ 29

        A.    Arm or Ally.................................................................... 31

        B.    80 Percent Arms .............................................................. 39

        C.    80P Builder ................................................................... 52

        D.    Brownells ..................................................................... 55

        E.    Glockstore .................................................................... 70

        F.    Indie Guns .................................................................... 79

i

G. KM Tactical ..................................................................................... 86

H. Primary Arms................................................................................... 90

I. Rainier Arms ................................................................................... 94

J. Rock Slide ..................................................................................... 100

IV. The Price Paid by the State:  Defendants' Ghost Gun-Making Products Have Harmed New York and Will Continue To Do So If Unabated. ................................ 102

A. The Rise of Ghost Guns and the Damage Done ............................................. 102

B. Defendants' Conduct Is Dangerous and Directly Harms New York .............. 105

CLAIMS FOR RELIEF ........................................................................................ 109

AS AND FOR A FIRST CAUSE OF ACTION
Repeated and Persistent Illegality in Violation of N.Y. Executive Law § 63(12)
*(Against All Defendants)* ................................................................................ 109

AS AND FOR A SECOND CAUSE OF ACTION
Repeated and Persistent Fraudulent Conduct  in Violation of N.Y. Executive
Law § 63(12)  *(Against All Defendants)* ...................................................... 112

AS AND FOR A THIRD CAUSE OF ACTION
Public Nuisance Pursuant to N.Y. General Business Law § 898-c  *(Against All
Defendants)* ...................................................................................................... 113

AS AND FOR A FOURTH CAUSE OF ACTION
Violation of N.Y. General Business Law § 349 *(Against All Defendants)*............... 115

AS AND FOR A FIFTH CAUSE OF ACTION
Violation of N.Y. General Business Law § 350 *(Against All Defendants)*............... 116

AS AND FOR A SIXTH CAUSE OF ACTION
Negligence Per Se  *(Against All Defendants)* ........................................................ 116

AS AND FOR A SEVENTH CAUSE OF ACTION
Negligent Entrustment *(Against All Defendants)* .................................................... 118

DEMAND FOR JURY TRIAL ........................................................................................ 119

PRAYER FOR RELIEF ........................................................................................ 119

Plaintiff, The People of the State of New York ("New York" or "the State"), through its attorney Letitia James, Attorney General of the State of New York, alleges the following, with personal knowledge of the actions of the Office of the Attorney General and on information and belief as to the actions of others:

## PRELIMINARY STATEMENT

1.  New York State is grappling with a public health and safety crisis caused by gun violence. A significant part of that crisis is attributable to an influx of homemade, unserialized guns, commonly known as "ghost guns." These weapons are as lethal as any other handgun or rifle, but given their untraceable nature, they are far more likely to be recovered from crime scenes.

2.  Defendants have established an industry and staked out their own lucrative market shares selling ghost gun parts and kits directly to consumers' doorsteps, without a background check and without any record of their sale, as is required by federal law. They have done so by illegally marketing and falsely advertising their products, largely to consumers who want to acquire firearms but cannot legally purchase them, and by selling their products without establishing or utilizing any level of scrutiny or control to prevent their products—and the ghost guns that are made from them—from harming our communities.

3.  The ghost gun-making products that Defendants have sold for years are unquestionably illegal. Under New York State law, possession or sale of an unfinished frame or receiver is a felony. *See* N.Y. Penal Law §§ 265.01(10); 265.63-265.64. So too is the possession or sale of a ghost gun made from one. *See* N.Y. Penal Law §§ 265.01(9); 265.60-265.61. Unfinished frames and receivers are also illegal to sell or possess under the law of New York City. *See* N.Y. City

1

Admin. Code § 10-314. The sale of these products without following statutory serialization and background check requirements also violates federal law. *See* 18 U.S.C. § 922(t); 26 U.S.C. §§ 5842, 5861(c). The very nature of Defendants' business model has subverted and undermined these and other laws described below, which are designed to protect New Yorkers' rights to public health and safety.[1]

4.      The purpose of this lawsuit is to stop Defendants' illegal business practices, abate the continuing harm and danger for which they are responsible, and hold Defendants accountable in law and equity for the crisis they have inflicted on the State. Specifically, Defendants are liable to the State pursuant to (i) New York Executive Law § 63(12) on multiple theories for their persistent illegal and fraudulent conduct, (ii) New York General Business Law §§ 349 and 350 for their deceptive marketing, (iii) New York General Business Law § 898 for creating, maintaining, or contributing to a public nuisance, and (iv) for claims arising out of negligence per se and negligent entrustment. Accordingly, the State seeks a permanent injunction prohibiting Defendants from selling unfinished frames or receivers into New York and requiring Defendants to issue public corrective statements regarding their false and misleading public statements and omissions, as well as disgorgement, restitution, damages, civil penalties, punitive damages, costs, and the joint and several endowment of an abatement fund that will allow the State to eliminate the public nuisance which Defendants contributed to, created, or maintained.

---

[1] The Penal Law sections referenced in this paragraph became effective on April 26, 2022. The City's ban on unfinished frames and receivers became effective on February 23, 2020.

## JURISDICTION AND VENUE

5.     The Court has determined that it has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, pursuant to which "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  ECF No. 58. In particular, the Court has determined that it "must decide whether the products at issue are 'firearms' or 'component parts' thereof within the meaning of federal law," a "federal question" pursuant to which this Court possesses subject-matter jurisdiction.  *Id.* at 19.

6.     This Court has personal jurisdiction over each Defendant because each Defendant transacts business within the State of New York, contracts to supply goods in the State, has committed and continues to commit tortious acts within the State, and has committed and continues to commit tortious acts outside the State causing injury to persons or property within the State.

7.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims asserted occurred in the Southern District of New York, including Defendants' shipment of unfinished frames and receivers to consumers in this District, sales by certain Defendants to undercover investigators based in this district, and acts of violence committed in this District by persons using ghost guns made from Defendants' products.

## PARTIES

8.     Plaintiff, the People of the State of New York via New York State Attorney General Letitia James, brings this action in a sovereign capacity to protect the interests of the State and its citizens. This action is brought pursuant to the Attorney General's common-law and statutory authority including, *inter alia*, New York Executive Law § 63 and New York General Business Law Article

3

22-A and § 898-d.

9.      Defendant Arm or Ally, LLC ("Arm or Ally") is a North Carolina limited liability corporation with its principal place of business in Indian Trail, North Carolina.  It has a subsidiary named Arm or Ally S LLC.

10.     Defendant Blackhawk Manufacturing Group, Inc., also known as 80 Percent Arms, Inc. ("80 Percent Arms"), is a California corporation with its principal place of business in Garden Grove, California.

11.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida.

12.     Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinnell, Iowa.  Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc.

13.     Defendant GS Performance, LLC, also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, Tennessee and San Diego, California.  It is the successor of a California limited liability corporation also named GS Performance, LLC, headquartered in San Diego.

14.     Defendant Indie Guns LLC ("Indie Guns") is a Florida limited liability corporation with its headquarters in Orlando, Florida.

15.     Defendant KM Tactical, LLC ("KM Tactical") is a Missouri limited liability corporation

4

with its registered office in Independence, Missouri.

16.     Defendant Primary Arms, LLC ("Primary Arms") is a Texas limited liability corporation with its headquarters in Houston, Texas. Its subsidiaries include Primary Arms Optics, Primary Arms Wholesale, Primary Arms Online and Primary Arms Government.

17.     Defendant Rainier Arms, LLC ("Rainier Arms") is a Washington State limited liability corporation with its principal place of business in Auburn, Washington. It has subsidiaries including Rainier Arms Holdings LLC, Rainier Arms International, Inc., and Rainier Arms Manufacturing LLC.

18.     Defendant Rock Slide USA, LLC ("Rock Slide") is a North Carolina limited liability company with its principal place of business in Broadway, North Carolina.

## FACTUAL ALLEGATIONS

**I.      HIDDEN BY DESIGN:  DEFENDANTS HAVE MARKETED AND SOLD FIREARM PRODUCTS DESIGNED TO BE EASILY CONVERTED INTO WORKING UNTRACEABLE FIREARMS.**

19.     The unfinished frames and receivers that Defendants marketed and sold into New York State between June 2016 through today (the "Relevant Time Period")[2] are designed to subvert the federal and state statutes that prevent guns from falling into the hands of people who cannot and should not possess them.

20.     As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun, but missing a few drill holes and containing a small amount of extra plastic.  It is easily convertible into the finished

---

[2] The Relevant Time Period is derived from the six-year statute of limitations for claims under N.Y. Executive Law § 63(12) and the June 29, 2022 date of this action's filing.  *See* N.Y. C.P.L.R. § 213(9).

product, a deadly weapon, sometimes called a privately made firearm or a ghost gun.

21.    The term "frame" generally refers to the core part of a pistol or handgun, while the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun.

22.    Defendants' unfinished frames and receivers try to avoid the definition of a "firearm" simply by leaving a few key holes undrilled or plastic unfiled.

23.    Once completed, there is no meaningful difference between the Defendants' products and a frame or receiver one could buy at a gun store.  The "unfinished" frames and receivers sold by Defendants are designed to mimic popular weapons platforms, such as the frames of Glock pistols, or the receivers of AR-9, AR-15, or AK-47 rifles.

24.    For instance, as described more fully below, the unfinished frame that investigators purchased from Defendant Arm or Ally was designed to be identical to the frame of a Glock Third Generation G19 or G23, two of the most popular handguns on the market.  *See* below ¶¶ 126-127. Arm or Ally emphasized the connection to the Glock product in its marketing, saying that its frame kit "is everything you need to start your Glock 19/23 Gen 3 build for personal use" and that it was "[c]ompatible with Glock® 19/23 Gen3 components."

25.    Defendants Brownells and Indie Guns also touted the Glock-compatibility of their products when selling to undercover investigators, as described more fully below, with Brownells emphasizing that the unfinished frame it sold was "the next generation of Polymer 80% frames for Glock® handguns," and that it "allows Glock® 19, 23 & 32 owners to create a customized handgun, exactly suited for any application." *See* below ¶¶ 277-278.  Indie Guns similarly emphasized that its kits were designed "to build a complete G17 Gen3 lower" and that its products

6

were "[c]ompatible with Glock® 17/22 Gen3 Components." *See* below ¶ 4353.

26.      The products that Defendants' "unfinished" frames and receivers are designed to imitate are available for purchase at legitimate New York gun stores. Of course, if someone purchased a Glock frame or an AR-9 or AR-15 receiver from a New York gun store, they would need to have a license and to undergo a background check. *See* N.Y. Penal Law §§ 265.01; 265.20(3); 400.00(1); 18 U.S.C. §§ 922(t). There would also be a record made of the sale, and the frame would be serialized according to federal requirements so that it would be traceable if it were later recovered in connection with a crime. N.Y. Penal Law § 265.07; N.Y. Gen. Bus. Law § 875-f; 18 U.S.C. §§ 923(g)(1)(A); 923(i).

27.      But based on the fiction that Defendants' unfinished frames or receivers fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Defendants have sold them directly to consumers without following any of the federal or state laws and regulations that apply to the sale of guns, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source if used in a crime.

28.      The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so-named because they are untraceable and there is no record of their sale, or even their existence.[3] *See* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that

---

[3] The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace. Although 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially purchased unfinished frames and receivers, such as those sold by Defendants. The ghost

7

fails to comply with tracing and serialization requirements in N.Y. Penal Law § 265.07).

29.     Because of this built-in evasion of federal and state laws, described more fully below, unfinished frames and receivers and the ghost guns made from them are naturally attractive to (and naturally marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

30.     There is little practical difference between Defendants' "unfinished" frames or receivers and "finished" frames or receivers meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

31.     Finishing a frame or receiver is, in the words of Defendant 80 Percent Arms, "ridiculously easy," and can be carried out by an amateur in under an hour with basic hand tools.  In the hands of someone with prior experience or mechanical aptitude, an unfinished frame or receiver can be converted into a working gun in under thirty minutes.

32.     These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

33.     The result is that Defendants have sold these almost-but-not-quite guns online and shipped them to New York consumers, in the full knowledge that many of these consumers cannot and should not have a deadly weapon, without applying any internal controls to verify the identity of their customer and the appropriateness of their sale.

---

guns created out of Defendants' products, which are the subject of this action, create a much higher quality firearm and are far more prevalent than the 3D printed variety.

### A. The Trivial Differences Between Unfinished Frames and Finished Frames

34.     The difference between an unfinished frame and a serialized frame is negligible, as is the effort required to convert the former into the latter.

35.     Compare, for instance, the following two pictures.  On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame sold and shipped into New York by Defendant Indie Guns.  *See* below ¶ 436. On the right is a photograph of a "finished" Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm delivered to a Federal Firearms Licensee ("FFL"):



36.     The two weapons—one an "unfinished frame" that exemplifies the products that each Defendant has sold over the internet and shipped into New York without serializing or conducting a background check, the other a "finished" frame subject to the legal requirements described below—are virtually identical.

37.     The trivial differences amount to having to drill three small holes and milling down a small amount of plastic at the top of the frame.  A "finished" frame sold by Defendant Primary Arms is

9

illustrated as follows:



Locking Block Pin Hole

Plastic filed down

Trigger Pin Hole

Trigger Housing Pin Hole

38.    The differences are just as minuscule in the context of an unfinished lower receiver for a rifle.  As Defendant 80 Percent Arms assures customers about building the receiver for an AR-15: "[W]hat is complete is far more than what is left for you to do, hence the term 80 percent lower." This Defendant spells out the differences in detail: [4]

---

[4] *See* https://www.80percentarms.com/blog/what-is-an-80-lower/ (last visited March 6, 2023).  The same page currently markets these products as a vehicle for evading federal and state law, particularly background checks: "When buying a completed AR-15 from your local gun shop, you must purchase from an authorized dealer with an FFL, undergo a thorough background check, fill out various forms and paperwork, endure a waiting period, then pay.  With an 80% lower, you add the piece to your cart when ordering online, then checkout. It's shipped directly to

So, what are the differences between an 80 percent lower and a stripped lower?
Let's take a look!

To complete an 80% lower, you must:

- Drill a hammer pinhole
- Drill a trigger pinhole
- Drill safety selector lever holes
- Machine the fire control group cavity

Here's what is already prepped for you out of the box:

- Bolt catch
- Pistol grip hole
- Magazine well
- Magazine release
- Buffer detent hole
- Trigger guard pinholes
- Upper receiver rear lug pocket
- Front and rear takedown holes
- Buffer tube threads and housing

39.     Because of these minor differences, it takes very little time, effort, or skill to convert an

unfinished framer or receiver into a working ghost gun.

### B. DEFENDANTS' UNFINISHED FRAMES TO GHOST GUNS IN LESS THAN AN HOUR

40.     Defendants have made ease of conversion a key part of their marketing to both create a

market for unfinished frames and receivers broadly and become industry leaders in that niche. *See*

*e.g.* ¶¶ 170, 280, and 281.

41.     For instance, during a substantial portion of the Relevant Time Period, Defendant

---

your doorstep. Simple, right?!" *Id.* 80 Percent Arms also includes a bullet-point list of "Benefits of an 80% Lower,
including, "you do not require an FFL to purchase an unfinished lower," "it ships directly to your home," "you do
not require a background check," "requires no serialization," and "you are not forced to register your DIY AR-15."

Brownells published an instructional video relating to products Brownells sold, which were made by the most popular manufacturer of unfinished frames and receivers, Polymer80, Inc. ("Polymer80"). In that video, Brownells represented that these products "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[5] Likewise, Defendant 80 Percent Arms similarly explained that its jigs "make it **ridiculously easy** for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."[6]

42.     Defendants' customers agreed. For instance, a review of an exclusive Polymer80 Glock-compatible pistol frame that Brownells sold on its website during a substantial segment of the Relevant Time Period was entitled "EASY AS CAN BE," and memorialized the ease with which the customer converted the product into a fully functioning firearm: "So I bought roughly three frames from Brownells and not one of them came to me in bad condition. I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other then what I saw on YouTube. And guess what they all go bang when I pull their trigger."[7]

43.     Defendants have also taken further steps to eliminate the need for any technical skill on their customer's part by shipping the products in a "jig," a plastic setting for the frame or receiver that makes it easy for even an amateur to see and follow the steps necessary to convert the

---

[5] Formerly available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).
[6] Formerly available at https://www.80percentarms.com/80-lowers/ (last visited June 28, 2022) (emphasis added).
[7] Formerly available at https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

unfinished frame into finished form.

44.     For example, here is a picture of an unfinished Glock-compatible handgun frame purchased

from Defendant Indie Guns as it was packaged inside the box it came in:



45.     As evident in the photo, the unfinished handgun frame is shipped already inside the jig,

and the jig itself is clearly labeled with the simple steps the consumer needs to take to "finish" the

frame.   The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic

sticking up above them are the "rails" that the consumer is to mill off, along with another small

piece of plastic inside the frame where the recoil spring will go.   The jig makes sure that an

13

untrained consumer will easily be able to remove the small plastic rails with precision.

46.     Similarly, Defendant Brownells explained in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

47.     Defendant 80 Percent Arms likewise stated in a marketing video that, "[w]ith our patented Easy Jig, you can do it [i.e., turn an unfinished receiver into a working assault rifle] in as little as an hour.  It's super simple.  There's no paperwork, no background checks, no registration and no database.  And best of all, it's 100 percent legal.  Even a caveman can do this."  The video is entitled "Build Your Own Gun in 1 Hour 100 Legal."

48.     Once that step is complete, all that remains is drilling the three simple holes, which are helpfully labeled as "M3" or "M4" on the jig.  These labels correspond to two drill bit sizes that are also included in the same box:

14



49.     All the consumer needs to do is match the drill bit to the hole location, and drill using a hand drill or a drill press, following the instructions on the jig.

50.     Each Defendant's marketing, as described below, *see e.g.* ¶¶ 115-573, celebrates that the result following this easy process is a "finished" frame that is virtually identical to a frame that would be on sale at an FFL firearms retailer and which would have required serialization and a background check if sold in that condition to a consumer.  The finished frame can accept a few commercially available parts (sometimes sold by Defendants as a kit along with the unfinished frame) in order to become a complete and working ghost gun.

51.     As 80 Percent Arms' marketing video describes the process for an assault rifle: "You start

15

out with this blank that we call an '80 percent lower receiver,' because about 80 percent of the work is already done for you. You take this part, snap it into an easy jig, and drill into the areas the template guides you through. And in no time, you have a military-grade AR-15 lower, that simply snaps together with the other parts contained in our AR-15 kit. You now have a fully-functional, legal AR-15."

52.     Each Defendant's only purpose in selling "unfinished" frames and receivers is to offer a simple alternative to regulated "finished" frames or receivers. By the industry they have created and their individual conduct, described more fully below, *see, e.g.*, ¶¶ 115-573, each Defendant has exploited demand for unfinished frames and receivers, which is primarily from consumers who cannot legally purchase firearms, for each Defendant's own financial benefit.

53.     In these ways, Defendants have shared a common business model: sell the core of a working firearm that requires just a bit of unsophisticated finishing work and pretend that they are selling something that falls meaningfully short of the legal definition of a "firearm" to avoid any oversight or controls.

## II.     WORKING AGAINST THE SAFEGUARDS: DEFENDANTS CREATED, MAINTAINED, OR CONTRIBUTED TO AN AVOIDABLE CRISIS THAT NEW YORK NOW STRUGGLES TO CONTAIN.

54.     The rise of gun violence in New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order. *See* N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence).

55.     As described further below, *see* ¶¶ 115-573, each Defendant has created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating

16

the ongoing public health crisis.

### A. THE AVOIDABLE CRISIS THAT NEEDS TO BE FIXED

56.     New York's Penal Law establishes that the unlawful possession, sale, or use of an unfinished frame or receiver constitutes a nuisance.  *See* N.Y. Penal Law §§ 265.07, 400.05.

57.     New York law permits civil enforcement actions based on such a nuisance.  Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities." New York Sponsors Memorandum, 2021 S.B. 7196; *see also* N.Y. Gen. Bus. Law § 898-d.

58.     Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

59.     Moreover, "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." *Id.* § 898-b(2).  A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce.  *See id.* § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

60.     Here, as described more fully below, *see* ¶¶ 115-573, each Defendant has engaged in conduct prohibited by New York General Business Law § 898-b.

17

61.     For example, as detailed below, *see* ¶¶ 134-156, 179-249, 292-368, 387-4279, 469-493, 500-525, 548-559, Defendants Arm or Ally, 80 Percent Arms, Brownells, Glockstore, KM Tactical, Primary Arms, and Rainier Arms sent several shipments to individual consumers during the Relevant Time Period, making no effort to determine whether those consumers were engaged in firearms trafficking or were ineligible to legally own a firearm.  Moreover, as detailed below, *see* ¶¶ 122-128, 261-263, 276-278, 434-436, 535-541, 566-569, Defendants Arm or Ally, 80P Builder, Brownells, Indie Guns, Rainier Arms, and Rock Slide, likewise sold unfinished frames or receivers to City or State investigators, exemplifying their abject failure to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State.

62.     Defendants also engage in illegal conduct by selling ghost gun components to New Yorkers and shipping them to addresses outside the state with the foreseeability, if not knowledge, that those products would be ultimately brought into New York.  For instance, Jeru McCray, a customer of Defendants Glockstore and Brownells who received shipments from both companies at his Upper West Side address, would "order[] numerous ghost gun parts and firearms components, . . and ha[ve] those items shipped to an address in Pennsylvania, because under the New York SAFE Act of 2013 [banning assault weapons], these items could not be shipped" into New York State.[8]

63.     Rene Loyola, a Manhattan-based customer of Defendants Arm or Ally, Brownells, KM Tactical, and Primary Arms whose ghost gun manufacturing activities are discussed extensively below, likewise ordered large numbers of products that would be illegal in New York to be shipped

---

[8] *See* https://www.manhattanda.org/d-a-bragg-announces-prison-sentence-for-manufacturing-and-possessing-ghost-gun-in-uws-apartment/ (last visited March 6, 2023).

18

to a Pennsylvania address before foreseeably bringing them back into Manhattan.

64.     On information and belief, each and every sale of Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

65.     Each Defendant's conduct was ongoing and continuous purportedly until the commencement of this action, but the harm and public nuisance caused, maintained, or contributed to by each Defendant persists.

66.     Indeed, each Defendant's misconduct has resulted in significant ongoing harm and costs to the State. For example, in February 2020, New York City established an NYPD team dedicated exclusively to stopping the flow of ghost guns before they reach city streets.  At New York City's expense, that team, among other things, works with federal, state, and local law enforcement and prosecutors on in-depth ghost gun investigations, search warrant executions, and arrests, and conducts ghost gun-related trainings for police officers and prosecutors.  Other jurisdictions across the State have similarly had to redirect law enforcement resources to confront the growing threat posed by the proliferation of products like those sold by the Defendants.

67.     Abating the public health and safety crisis for which Defendants are liable will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy unfinished frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard-hit by gun violence and crimes.

19

68. Some of this work has already begun. In 2022, New York State made significant new and increased investments in gun violence prevention, including taking the following actions announced by Governor Kathy Hochul, among other things:

a. Staffed the New York State Intelligence Center with a team of analysts who process gun tracing data;

b. Increased the State Police's ability to partner with local law enforcement to combat community-specific crime problems by doubling the number of Community Stabilization Units to 16, with plans to further increase the number of such units to 25;

c. Increased funding for the Gun Involved Violence Elimination[9] program to $18.2 million, the largest-ever investment in the program, with plans to double this funding to $36 million;

d. Nearly doubled investments in New York's Crime Analysis Centers, which collect and share criminal intelligence and data with local law enforcement;

e. Increased investments in New York's Crime Analysis Center Network, which collects and shares gun crime data, among other criminal intelligence, with local law enforcement;

f. Created the Interstate Task Force on Illegal Guns, which facilitates the exchange of intelligence between localities and neighboring states; and

g. Tripled the State's investment in community-based prevention and response efforts that have been proven to alleviate gun violence, including expanding the State's SNUG Street Outreach program into new communities and launching the nation's first program to recruit and retain outreach workers.

69. These expenditures are necessary due in no small part to the dangerous conditions caused by Defendants' self-serving and illegal business practices.

## B. NEW YORK'S RELIANCE ON EVIDENCE-BASED FEDERAL, STATE AND LOCAL GUN CONTROL LAWS AND EFFECTIVE ENFORCEMENT

---

[9] The Gun Involved Violence Elimination program uses evidence-based strategies to reduce gun crimes in the State's 17 counties that account for more than 80 percent of the violent crime that occurs in the State outside of New York City.

20

### STRATEGIES WHICH DEFENDANTS ACTIVELY SUBVERTED.

70.    On a federal, state, and local level, New York and its communities have relied on evidence-based gun control laws to reduce gun violence.  As described below, each Defendant has sidestepped all of these legislative measures for profit.

### 1.    FEDERAL LAWS

71.    Federal law operates to protect the public's right to safety from gun violence through a series of provisions aimed at ensuring that deadly weapons are only sold by responsible sellers to responsible buyers.

72.    For instance, any firearm must be sold through an FFL, a person or business that has gone through an extensive investigation, review, and licensing process overseen by the Department of Justice.  *See generally* 18 U.S.C. § 923.  FFLs must adhere to specific ethical and recordkeeping obligations in connection with any and all sales.

73.    Federal law attempts to keep guns out of the hands of dangerous persons by requiring that FFLs subject each customer to a background check.  The dealer will query the National Instant Criminal Background Check System, which contains records of persons who fall into one or more prohibited categories, such as persons convicted of felonies, fugitives from justice, persons who have been committed to a mental institution, or persons subject to protective orders relating to domestic violence.  *See generally* 18 U.S.C. § 922(d,t).

74.    Federal law helps to mitigate or solve crimes committed with firearms by requiring that firearm manufacturers stamp each firearm with "a serial number which may not be readily removed, obliterated, or altered." 26 U.S.C. § 5842(a), 18 U.S.C. § 923(i).  Federal law also

21

requires FFLs to keep records of the serial number of every weapon sold. *See* 26 U.S.C. § 5843. This process ensures that when a gun is recovered in connection with a crime, law enforcement officers can query the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") eTrace database to quickly access critical information about the gun's origin and first owner.

75. Each of Defendants Arm or Ally, 80 Percent Arms, 80P Builder, Brownells, Glockstore, Primary Arms, and Rainier Arms holds a federal firearms license and has had ready access to the National Instant Criminal Background Check System. However, none of them employed that system in the course of their sales of unfinished framed or receivers to New York consumers.

76. To the State's knowledge, Defendants Indie Guns, KM Tactical, and Rock Slide do not hold a federal firearms license, and thus none of them were legally permitted to "engage in the business of . . . dealing in firearms." 18 U.S.C. § 923(a).

77. Regardless of their status as an FFL, each Defendant had access to publicly available tools that they could have used to verify whether an unfinished frame or receiver customer had been convicted of a crime, including but not limited to the public criminal history records search service provided by the New York State Office of Court Administration.[10] But none of them utilized such a service in connection with their sales of unfinished frames or receivers to New York customers.

78. Defendants sell unfinished frames and receivers and other ghost gun products purporting to skirt the federal definition of a "firearm" subject to these protections.

79. That definition is a broad one, covering "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C.

---

[10] *See* https://ww2.nycourts.gov/apps/chrs/index.shtml (last visited March 6, 2023).

§ 921(a)(3). It also explicitly covers "the frame or receiver of any such weapon." *Id.*

80. Defendants attempt to get around this straightforward definition by marketing their frames and receivers as unfinished, and then selling to consumers directly without taking any precautionary steps.

81. Defendants specifically market the unfinished frames and receivers as designed to evade federal gun laws.

82. For instance, Defendant Rainier Arms has marketed the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License Required. Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[11]

83. Defendant 80 Percent Arms has similarly emphasized that "When buying a completed AR-15 from your local gun shop, you must purchase from an authorized dealer with an FFL, undergo a thorough background check, fill out various forms and paperwork, endure a waiting period, then pay. With an 80% lower, you add the piece to your cart when ordering online, then checkout. It's shipped directly to your doorstep. Simple, right?!"[12]

84. During a substantial portion of the Relevant Time Period, the "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit included an exchange where a customer asked, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)? I want it and will buy it

---

[11] *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited March 3, 2023).
[12] *See* https://www.80percentarms.com/blog/what-is-an-80-lower/ (last visited March 12, 2023).

23

if it DOES NOT…" Brownells' staff expert answered: "Not serialized it's a 80% receiver."[13]

85.    That same Q&A page included a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."[14]

86.    Similarly, during a substantial portion of the Relevant Time Period, KM Tactical explicitly pointed to the "blank serialization plate" as a significant feature of a Polymer80 frame kit for sale on its website.[15]

87.    These marketing examples of these almost-but-not-quite guns demonstrate Defendants' illegal and dangerous marketing and sales tactics, which subvert federal law.  As stated above, the definition of a "firearm" in the United States Code is not limited to completed guns, but also encompasses "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" and "the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).

88.    Prior to the Relevant Time Period, federal courts repeatedly found that items short of a completed gun qualify as a "firearm" if they can easily be made into a functional weapon.  The applicability of this long line of cases is demonstrated by Defendants' own public statements, which describe the process of converting their products to expel a projectile using phrases like

---

[13] Formerly available at https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).
[14] *Id.*
[15] Formerly available at https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black/ (last visited June 17, 2022).

"pretty simple," "ridiculously easy," or "even a caveman can do this."

89.     Even if unfinished frames and receivers were not so easy to convert to working ghost guns, they would nonetheless meet the statutory definition.  Under federal law, a weapon meets the definition of "firearm" if it is "designed" to fire a projectile, even if it cannot be readily converted to do so.  *See U.S. v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005) ("The statute was clearly written in the disjunctive.  The government need only show that the weapons were either 'designed to' or 'may readily be converted.'  It need not demonstrate both." (citation omitted)).  As described above, every unfinished frame or receiver is designed for the sole purpose of being converted into a working weapon; it serves no other function.

90.     To address the confusion that Defendants and others in the industry created through their marketing and sales tactics, the ATF issued a regulation that went into effect on August 24, 2022 clarifying that the terms "frame" and "receiver" as used above "shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  87 Fed. Reg. 24739.  The definition was clarified specifically to combat the spread of illicit ghost guns, such as the ones made from the products Defendants have sold into New York.  *See* 87 Fed. Reg. 24655-60 (discussing "the substantial increase in the number of [ghost guns] recovered from crime scenes throughout the country in recent years;" the ways in which ghost guns frustrate efforts to trace weapons used in crimes; the efforts made by federal, state, and local law enforcement to combat their proliferation; and the conclusion that "wide availability of ghost guns" is "a homeland security threat").

25

91.     But the ATF's August 2022 clarification demonstrates that Defendants' cumulative marketing, sales, and business conduct not only created an illicit industry, but wrongly and widely messaged that ghost guns were a legal end-run around the firearms laws—a dangerous misapprehension that the ATF worked to correct.

92.     The ATF reiterated that Defendants' products constitute firearms in a December 28, 2022 open letter to federal firearms licensees, emphasizing that "partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to those sold within parts kits . . . are 'frames' and also 'firearms'" under 18 U.S.C. § 921(a)(3) and its implementing regulations.[16]

93.     Each of the Defendants repeatedly sold these specific products, including to New York consumers.

94.     The ATF reiterated that these products constituted firearms "*even without* any associated templates, jigs, molds, equipment, tools, guides, or marketing materials."[17]

95.     As discussed above and below, Defendants did much more than simply sell unfinished frames and receivers, providing jigs and equipment to help customers convert them into ghost guns, as well as instructions, guides, and technical support, not to mention extensive marketing efforts touting their products as a way around background checks and other public safety laws. For a substantial segment of the Relevant Time Period, each Defendant operated to sell ghost gun

---

[16] *See* ATF Open Letter to All Federal Firearms Licensees (Dec. 27, 2022), available at https://www.atf.gov/rules-and-regulations/docs/open-letter/all-ffls-dec2022-open-letter-impact-final-rule-2021-05f/download (last visited March 12, 2023).

[17] *Id.* (emphasis in original)

products to buyers who were actively trying to evade the above-summarized federal gun laws.

## 2. STATE & LOCAL LAWS

96.     Defendants' conduct in selling unfinished frames and receivers into New York is also unquestionably illegal on a state and local level.  Sections 265.63 and 265.64 of the New York Penal Law establish criminal liability for anyone who knowingly sells an unfinished frame or receiver in New York State, subject to certain exceptions not at issue here.

97.     This legislation, named the Jose Webster Untraceable Firearms Act, was enacted because "New York's law enforcement community is increasingly sounding the alarm about the need to address the proliferation of 'ghost guns,' which are guns that are unregistered and do not have serial numbers, making them extremely difficult for law enforcement to trace."  S14A Sponsor Memo (2021-22 Legislative Session).  The law went into effect on April 26, 2022.

98.     Legislative history makes clear that these statutes were enacted specifically to stop companies like Defendants from shipping the products at issue in this civil enforcement action. The bill's Sponsor Memo noted that "gun manufacturers continue to seek loopholes in both state and federal law that would allow them to evade important requirements and sell dangerous weapons to those seeking to use them to do harm."  *Id.*

99.     In particular, the Sponsor Memo noted that ghost guns "are advertised for sale as '80% finished' and come with kits and instructions allowing purchasers to make simple alterations to the firearm's frame or receiver to complete the assembly of these deadly weapons.  This allows purchasers who have criminal records or others who would not pass a required federal background check to evade those requirements and other laws requiring frames and receivers to carry serial

27

numbers." *Id.*

100.    Under the Penal Law, an "unfinished frame or receiver" is defined as "any unserialized material that does not constitute the frame or receiver of a firearm, rifle or shotgun but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm rifle or shotgun, and which may readily be made into a functional frame or receiver through milling, drilling, or other means," and has not been promptly registered and serialized by a New York-licensed gunsmith.  *See* N.Y. Penal Law §§ 265.00(32); 265.07.

101.    Selling one unfinished frame or receiver is a Class E felony punishable by up to four years in prison.  N.Y. Penal Law §§ 265.63; 70.00(2)(e).  Selling ten or more unfinished frames or receivers is a Class D felony punishable by up to seven years in prison.  N.Y. Penal Law §§ 265.64; 70.00(2)(d).

102.    The ghost guns that are made from the unfinished frames and receivers that Defendants sell are also illegal.  Sections 265.60 and 265.61 of the New York Penal Law establish criminal liability for anyone who knowingly "sells, exchanges, gives, or disposes of a ghost gun to another person."

103.    The punishments for trafficking in ghost guns are the same as trafficking in unfinished frames or receivers: selling one is a Class E felony, N.Y. Penal Law § 265.60, and selling ten or more is a Class D felony.  N.Y. Penal Law § 265.61.

104.    To the extent that one or more of the Defendants have sold or shipped unfinished frames or receivers into the five boroughs of New York City since February 23, 2020, the conduct is also criminal under local law.  Section 10-314 of the New York City Administrative Code states that

28

"no person shall dispose of or possess an unfinished frame or receiver,"[18] and establishes that a person commits a Class A misdemeanor for each such prohibited item.

105.    As described more fully below, each Defendant engaged in marketing, sales, and business practices that violated these New York State and local laws, as well as the federal laws described above.

### III.    EACH DEFENDANT HAS PERSISTENTLY AND ILLEGALLY MARKETED AND SOLD UNFINISHED FRAMES AND RECEIVERS INTO NEW YORK.

106.    Despite the illegality of their conduct, each Defendant has intentionally and repeatedly marketed, sold, and shipped unfinished frames and receivers into New York throughout the Relevant Time Period.

107.    As described below, Defendants Arm or Ally, 80P Builder, Brownells, Indie Guns, Rainier Arms, and Rock Slide shipped unfinished frames or receivers directly to undercover investigators, demonstrating that their products have been available for purchase in New York without any effort on any of these Defendants' part to implement any type of controls, including verifying the identity of their customers or ascertaining eligibility to own a firearm. *See* below ¶¶ 122-128, 261-263, 276-278, 434-436, 535-541, 566-569.

108.    Additionally, preliminary shipping data further demonstrates that Defendants Arm or Ally, 80 Percent Arms, Brownells, Glockstore, KM Tactical, Primary Arms, and Rainier Arms

---

[18] New York City law defines "unfinished frame or receiver" as "[a] piece of any material that does not constitute the frame or receiver of a firearm, rifle, shotgun or assault weapon but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm, rifle, shotgun or assault weapon with modification by the user and that is not engraved with a serial number" pursuant to federal standards.  N.Y. City Admin. Code § 10-301(22).

29

frequently shipped packages directly to New York consumers' homes during the Relevant Time Period, when a large—if not central—focus of their marketing and sales efforts was on their unfinished frame and receiver products. *See* below ¶¶ 134-156, 179-249, 292-368, 387-427, 469-493, 500-525, 548-559.

109.    All the while, publicly available material from prosecutors, law enforcement, and media reports demonstrates that many of the perpetrators of the most serious and recent ghost gun-related crimes in New York were among Defendants' New York customers.

110.    A preliminary analysis of shipping records obtained by the State demonstrates that during the Relevant Time Period, Defendants have made at least 100,000 shipments to New York addresses that are not FFLs—*i.e.*, shipments directly to consumers.

111.    On information and belief, a significant portion of each Defendant's shipments into New York during the Relevant Time Period contained unfinished frames and receivers, as each Defendant has been openly and publicly known as a reliable corporate distributor of unfinished frames and/or receivers manufactured by companies that include Polymer80.  As set forth in more detail below, by each Defendant's aggressive marketing efforts, by the nature of each Defendant's stated business, by each Defendant's purported success and status as an industry leader, and by the market naturally available in New York, together with the increased prevalence of ghost guns in New York, each Defendant's direct and persistent business with New York customers for a substantial portion of the Relevant Time Period is apparent.

112.    Moreover, together, Defendants' common marketing strategies have misled New York customers into believing that unfinished frames and receivers are legal workarounds to New

30

York's gun control laws, as well as federal law.

113.    As described in more detail below, during the Relevant Time Period, each Defendant employed common marketing strategies, enabling them to not only maximize their individual market share but also to put the overall market for unfinished frames and receivers into overdrive in New York, including by publishing statements on their respective websites (including product-specific statements or blog or other postings concerning unfinished frames or receivers generally) that affirmatively represented to anyone accessing the website that such products were legal and exempt from the ordinary FFL-purchasing process.

114.    In these ways, each Defendant has caused, contributed to, or maintained the massive influx of unfinished frames and receivers in New York, and the dangerous ghost guns that were inevitably and foreseeably made from them.

## A.  ARM OR ALLY

115.    Arm or Ally is a distributor of firearms and firearm parts who repeatedly marketed and sold unfinished frames and receivers to New Yorkers, including to undercover investigators in New York as late as mid-May 2022, and failed to exercise any controls on its sales.

116.    While Arm or Ally's online business appears to focus on selling parts for AR-10 and AR-15-style rifles, as of June 29, 2022, a substantial portion of Arm or Ally's online business included selling unfinished receivers that can be used to build ghost gun versions of those rifles and unfinished handgun frames, based on their offerings.

117.    Arm or Ally's website, which, on information and belief attracts over 105,000 visits per

31

month, uses confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws. Consistent with its website messaging, Arm or Ally illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State.

118.    For a substantial portion of the Relevant Time Period, Arm or Ally's website expressly represented that unfinished frames or receivers are legal workarounds around the FFL-process, including in New York, provided support and instruction on how to finish the products to create ghost guns, and made no attempt to inform the public that restrictions in New York applied.

119.    For example, its webpages selling AR-15-compatible receiver kits once proclaimed, in large bold green letters, "No FFL Required!"[19]

120.    Its AR-15-compatible unfinished lower receiver page said in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," but the page contradicted itself by also linking to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle.[20]

121.    Arm or Ally has also invested meaningfully in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere and also grow the industry. Indeed, on information and belief, Arm or Ally has done a significant amount of business in New York.

122.    For example, on or around April 28, 2022, an investigator from the New York City

---

[19] Formerly available at https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3/ (last visited June 23, 2022).
[20] *Id.*

Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally. Arm or Ally's website acknowledged that the company was shipping directly to consumers, and stated that the order of an unfinished frame was "required to ship to your credit card's billing address." Arm or Ally accepted the order and shipped the frame into New York County.

123. On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a G19-compatible slide, all manufactured by Arm or Ally. The investigator also purchased a Polymer80 9mm frame parts kit.

124. The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

125. Arm or Ally accepted the order and shipped the parts into New York County.

126. On or around May 27, 2022, investigators completed an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

127. The Arm or Ally website said of the product that "[t]his system is a complete kit. There are no additional jigs and parts to purchase. Polymer80 Spectre system is a complete, all-inclusive

33

package including the jig and drill bits required to finish your Glock project."[21]

128.    Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License,"[22] Arm or Ally did not actually require investigators to do so. Indeed, Arm or Ally accepted the order and shipped the frame into Kings County.

129.    These sales to undercover investigators are wholly consistent with Arm or Ally's history of marketing, selling, and shipping these unlawful products to consumers in New York.[23]

130.    Arm or Ally sent at least 489 packages into New York State between January 3, 2021 and May 17, 2022.

131.    At least 37 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

132.    At least 11 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

133.    A significant portion of each group of shipments discussed in Paragraphs 130-132 contained unfinished frames and receivers.

134.    On or around July 2020, Arm or Ally sold and sent three unfinished pistol frames to a man

---

[21] Formerly available at https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit/ (last visited June 6, 2022).

[22] Formerly available at https://www.armorally.com/shop/polymer80-pf9ss-g43-pistol-frame-kit/ (last visited June 28, 2022).

[23] In an apparent response to this lawsuit and a companion lawsuit brought by the City of New York, *City of New York v. Arm or Ally, LLC et al.*, Case No. 22 Civ. 5525 (JMF) (S.D.N.Y.) (the "City Case"), Arm or Ally has updated its website to advise customers who click on the hyperlink to view "80% Frames" that Arm or Ally is no longer selling these products because of "ongoing legal issues". *See* https://www.armorally.com/product-category/for_glock/frame-parts/glock-frames/ (last visited February 17, 2023). However, Arm or Ally's placeholder on its website for these products and its note concerning "ongoing legal issues," suggests that it has only paused selling its unquestionably illegal products to consumers and that it can be immediately ready to get right back to shipping at any time.

named Rene Loyola in the East Village neighborhood of Manhattan.

135.    On or around November 2020, Arm or Ally sold and sent another unfinished handgun frame to Loyola.

136.    On or around July 2021, Arm or Ally sold and sent two unfinished handgun frames to Loyola, one as part of a full kit, as well as parts to complete the frames into working ghost guns.

137.    On or around October 2021, Arm or Ally sold and sent another unfinished handgun frame to Loyola.

138.    In April 2022, the NYPD executed a search warrant on the Manhattan home of Loyola, recovering over $20,000 in ghost guns and parts, including more than 30 frames and receivers.

139.    The NYPD also executed warrants on Loyola's storage locker, discovering an arsenal of unfinished frames and receivers and material used to convert them into working ghost guns.

140.    On or around May 6, 2022, Loyola was indicted in New York County on approximately 264 different counts of violations of state firearms laws, and on or around May 12, 2022, Loyola was indicted in Kings County on an additional 25 criminal violations.

141.    A portion of the ghost guns and paraphernalia recovered from the search warrants on Loyola are pictured below:



142.    As described below, Loyola had purchased at least five different unfinished frames or receivers from Defendant Brownells, one from defendant KM Tactical, and three from Defendant Primary Arms. *See* below ¶¶ 306-309, 478, and 504-505.

143.    Between approximately April 25, 2021, and June 7, 2021, Arm or Ally sent seven packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

144.    On information and belief, the packages Arm or Ally sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

145.    In October 2021, police officers searched the home and car of Queens resident Santos, recovering approximately 30 working firearms, many of them ghost guns, along with over 130 high-capacity magazines, approximately 150,000 rounds of ammunition, and various parts and

tools used to convert ghost guns into working weapons.[24]

146.   Santos did not have a license to possess or own firearms.

147.   A portion of the weapons recovered from Santos is pictured below:



148.   Santos was charged with 252 separate violations of New York's firearms laws.

149.   As described below, in addition to Arm or Ally, Santos also received shipments from Defendants 80 Percent Arms, Brownells, and KM Tactical. *See* below ¶¶ 182-183, 314-315, and 479-481.

150.   On or around October 7, 2021, Arm or Ally sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.

151.   On information and belief, the package Arm or Ally sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

---

[24] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns/ (last visited March 6, 2023).

152.     The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Goldberg in late-January 2022 on four felony charges, including first-degree criminal possession of a weapon (10 or more).[25]

153.     As described below, in addition to Arm or Ally, Goldberg also received shipments from Defendants Glockstore and KM Tactical. *See* below ¶¶ 415-416 and 492-493.

154.     On or around August 18, 2021, Arm or Ally sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY.

155.     On information and belief, the package Arm or Ally sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

156.     The Putnam County Sheriff's Department, as part of a multi-agency investigation into ghost guns and other illegal weapons that led to more than 100 weapons seized, arrested Lopez in late-January 2022 for second-degree criminal possession of a weapon.

157.     As described below, in addition to Arm or Ally, Lopez also received a shipment from Defendant Glockstore. *See* below ¶ 417.

158.     Arm or Ally's sales to Loyola, Santos, Goldberg, and Lopez demonstrate Arm or Ally's complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Arm or Ally's pockets at the expense

---

[25] *See* https://www.westchestergov.com/home/all-press-releases/9204-more-than-100-firearms-seized-following-lengthy-investigation-into-ghost-guns-and-other-illegal-weapons-in-westchester-and-putnam-counties (last visited March 6, 2023).

38

of New Yorkers' safety.

## B. 80 PERCENT ARMS

159.    80 Percent Arms is a distributor of firearms and firearm parts who marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

160.    80 Percent Arms has used its website with its confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.  On information and belief, 80 Percent Arms' website attracts over 350,000 visits per month.

161.    For example, its webpage offering 80% lowers emphasizes that "an unfinished receiver is not subject to the same regulations as any other complete firearm.  This means no RED TAPE including: NO Registering an 80% Lower, NO Transfer fees like a typical firearm, NO FFL Required, Ships right to your door."[26]

162.    Clicking on "No FFL Required" takes a consumer to a webpage explaining how the company's unfinished frames and receivers are exceptions to the Gun Control Act of 1968 and the Brady Handgun Act of 1993.  The page also explains that "80% lowers are popular for numerous reasons. For one, with an 80% lower there is no background check or registration involved; saving you time and headaches. Also, when using an FFL to transfer firearms, there is generally a fee involved. Since you obviously don't need an FFL for an 80% lower- congratulations you just saved yourself money! (a valuable selling point when telling the wife you bought more gun parts.) And

---

[26] *See* https://www.80percentarms.com/80-lowers/ (last visited February 24, 2023).

again, 80% lowers are shipped right to your door, which is convenience that can't be beat."[27]

163.     The header of 80 Percent Arms' webpage emphasizes that converting its unfinished frames and receivers into a working firearm is "ridiculously easy," explaining that its jigs "make it ridiculously easy for a non-machinist to finish their 80% lower in under 1 hour with no drill press required."[28]

164.     Conflicting and confusing statements persist on 80 Percent Arms' website.  For example, on its landing page, 80 Percent Arms confusingly claims that the "ban" on all its products has been reversed:



165.     Additionally, 80 Percent Arms continues to represent that its customers are allowed "to purchase both jigs and lowers from us allowing us to proceed with business as usual," without mention of any state exclusions, like New York.

166.     80 Percent Arms has invested meaningfully in marketing designed to expand its market

---

[27] *See* https://www.80percentarms.com/blog/buying-guns-online-without-an-ffl/ (last visited March 12, 2023).
[28] *See id.*

40

share of unfinished frames and receivers in New York and elsewhere, and also grow the industry.

167.    Indeed, 80 Percent Arms has admitted before at least one other Court that it invests substantially in its marketing and that it has become a market leader:

> a.  "BLACKHAWK [aka 80 Percent Arms] has expended substantial resources into promoting and marketing its products across the entirety of the United States, and those efforts have made it the market leader for its products throughout the United States."
>
> b.  "Beginning in 2013, when BLACKHAWK [aka 80 Percent Arms] launched its first products, and in the years since, BLACKHAWK [aka 80 Percent Arms] has extensively developed, promoted, advertised, and marketed its families of products and its associated trademarks."[29]

168.    Using these strategies, 80 Percent Arms has become a highly successful and profitable business, with nearly all its revenue made during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

169.    For example, 80 Percent Arms aggressively markets unfinished frames or receivers across its social media accounts, marketing its products to its 25,000 Instagram followers and 18,000 Facebook followers. In doing so without any regard or mention to state-based exclusions, it causes additional confusion and misinformation on the legality of its products.

170.    80 Percent Arms likewise states in a marketing video that, "[w]ith our patented Easy Jig, you can do it [*i.e.*, turn an unfinished receiver into a working assault rifle] in as little as an hour. It's super simple.  There's no paperwork, no background checks, no registration and no database.

---

[29] *Blackhawk Manufacturing Group Inc. d/b/a 80 Percent Arms v. Tactical Gear Heads LLC d/b/a 80% Lowers, et al.*, Complaint for Federal Trademark Infringement, False Designation of Origin, Trademark Dilution, Common Law Trademark Infringement, and Unfair Competition, No. 8:19-cv-01173-DOC-JDE, Central District of California, Western Division.

41

And best of all, it's 100 percent legal.  Even a caveman can do this."  The video is entitled "Build Your Own Gun in 1 Hour 100 Legal."

171.    The same marketing video describes the ease of making an untraceable assault rifle out of its products and misrepresents the products' legality: "You start out with this blank that we call an '80 percent lower receiver,' because about 80 percent of the work is already done for you.  You take this part, snap it into an easy jig, and drill into the areas the template guides you through.  And in no time, you have a military-grade AR-15 lower, that simply snaps together with the other parts contained in our AR-15 kit.  You now have a fully-functional, legal AR-15." The caption for the video proclaims that "[b]est of all, it's completely unregistered and legal."

172.    80 Percent Arms not only persists in its sales and marketing of these dangerous products, but it also makes light of the harm its products have caused and continue to cause.  For example, on Halloween 2022, 80 Percent Arms acknowledged that its unfinished frame and receiver products have only one use—to make untraceable ghost guns—by posting a photo of one of their products dressed as a "ghost gun."



42

173.    It is not surprising that individuals who are looking to get around gun control laws found 80 Percent Arms' website and became customers. 80 Percent Arms' business practices have increased the number of dangerous ghost guns present in the State.

174.    80 Percent Arms sent at least 7,248 packages into New York State between June 29, 2016 and December 12, 2022.

175.    At least 492 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

176.    At least 18 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

177.    A significant portion of each group of shipments discussed in Paragraphs 174-176 contained unfinished frames and receivers.

178.    80 Percent Arms also appears to utilize a variety of affiliates and subsidiaries to ship unfinished frames and receivers into New York, including an entity named "5D Tactical," which shares a shipping account number with 80 Percent Arms.

179.    On or around October 3, 2019, 80 Percent Arms sold and sent a Glock-compatible AR-9 lower receiver to a customer on the East Side of Manhattan.

180.    On or around July 15, 2020, 80 Percent Arms sold and sent a GST-9 pistol frame, along with a jig, toolkit, and parts to convert the frame into a ghost gun, to the same customer on the East Side of Manhattan.

181.    On information and belief, 80 Percent Arms did not make any inquiry into whether the

43

customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

182.    On or around August 27, 2020 and January 4, 2021, 80 Percent Arms sent packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

183.    On information and belief, the packages 80 Percent Arms sent to Santos contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

184.    On or around October 2, 2020 and October 30, 2020, 80 Percent Arms sent packages to Kurt Therkelsen at an address on Ward Road in Salt Point, NY.

185.    On information and belief, the packages 80 Percent Arms sent to Therkelsen contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

186.    Therkelsen was reportedly a supporter of the "Boogaloo Boys," a far-right militia-style organization with a well-documented history of political violence.[30]

187.    On information and belief, the packages 80 Percent Arms sent to Therkelsen contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

188.    On December 15, 2020, the Joint Terrorism task force and the NYPD raided an AirBnB on First Avenue in Manhattan, where Therkelsen was staying.

189.    The NYPD recovered two unserialized Polymer80 ghost guns, 11 high-capacity magazines, four additional unfinished frames and receivers, as well as various parts, gunmaking

---

[30] *See* https://nypost.com/2022/02/01/boogaloo-boys-supporter-kurt-therkelsen-gets-4-years-in-nyc-ghost-guns-case/ (last visited March 6, 2023).

tools, and other paraphernalia.

190.    Investigators also recovered Kevlar body armor and a shirt that said, "Kill Cops."

191.    Therkelsen pled guilty to firearms charges in December 2021 and was sentenced to four years in prison.

192.    As described below, in addition to 80 Percent Arms, Therkelsen also received a shipment from Defendants Brownells. *See* below ¶ 310.

193.    On or around August 24, 2021, and September 27, 2021, 80 Percent Arms sent packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.

194.    On information and belief, the packages 80 Percent Arms sent to Taylor contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

195.    When NYPD officers raided the Eldert Street location, they recovered four completed ghost gun assault weapons, five completed ghost gun handguns, four completed ghost gun rifles, eight unfinished receivers, five unfinished frames, eleven magazines, and various parts and tools used to convert unfinished frames and receivers into working firearms.[31]

196.    Taylor was indicted on 37 counts of violations of New York's firearms laws.

197.    As described below, in addition to 80 Percent Arms, Taylor also received shipments from Defendant Brownells. *See* below ¶ 311.

198.    On or around July 12, 2021, and October 26, 2021, 80 Percent Arms sent packages to Chaz McMillan at an address on 162nd Street in the Flushing area of Queens, NY.

---

[31] *See* http://www.brooklynda.org/2022/04/22/bushwick-man-indicted-for-illegal-possession-of-ghost-guns/ (last visited March 12, 2023).

199.    On information and belief, the packages 80 Percent Arms sent to McMillan contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

200.    On December 8, 2021, investigators executed a search warrant on McMillan's 162nd Street address.

201.    They found 25 working ghost guns, including 19 semiautomatic pistols, 5 assault weapons, and 1 semiautomatic shotgun.  They also found four additional unfinished frames or receivers that had not yet been constructed into working weapons.[32]

202.    McMillan also had 31 large-capacity magazines, 670 rounds of ammunition, and various parts and tools used to convert unfinished frames and receivers into working ghost guns.

203.    McMillan did not have a license to possess or own firearms.

204.    McMillan was charged with 125 counts of criminal violations of New York's firearms laws.

205.    As described below, in addition to 80 Percent Arms, McMillan also received shipments from Defendants Brownells and Rainier Arms. *See* below ¶¶ 316 and 548.

206.    On or around August 24, 2020, 80 Percent Arms sent a package to Domingo Valle at an address on East Tremont Avenue in the Bronx, NY.

207.    On information and belief, the package 80 Percent Arms sent to Valle contained unfinished frames, unfinished receivers, and the tools to convert them into working ghost guns.

208.    Valle had been previously convicted of a gun crime and served time in jail for it. He could

---

[32] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-ghost-guns-2/ (last visited March 12, 2023).

not legally purchase a firearm and would have failed a background check if he had tried to do so.[33]

209.    When law enforcement agents executed a search warrant on Valle's address in the Bronx, on or around October 4, 2021, they found two "ghost gun" pistols and an AR-style "ghost gun" rifle inside a concealed shelf in the living room, as well as another AR-style "ghost gun" rifle in the master bedroom.

210.    Valle was charged with having a prior felony conviction and being in possession of a firearm and ammunition in the U.S. District Court for the Southern District of New York.

211.    As described below, in addition to 80 Percent Arms, Valle also received shipments from Defendant Glockstore. *See* below ¶ 398.

212.    On or around August 20, 2020, and January 14, 2021, 80 Percent Arms sent packages to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway section of Nassau County.

213.    On information and belief, the packages sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

214.    On February 19, 2022, Thomas Saxton, from the same address, was arrested after threatening to shoot his wife while she held her child.  When police stopped Saxton, he was carrying two ghost guns, as well as additional ammunition and a plastic bag of cocaine.[34]

215.    A search of Saxton's home revealed an arsenal of weapons, including seven ghost gun

---

[33] *See* https://www.justice.gov/usao-sdny/pr/bronx-man-who-possessed-five-ghost-guns-charged-possessing-firearm-and-ammunition (last visited March 13, 2023).
[34] *See* https://www.liherald.com/stories/east-rockaway-man-indicted-for-possession-of-ghost-funs,141297 (last visited March 13, 2023).

handguns, one ghost gun assault rifle, and parts to build more.[35]

216. As described below, in addition to 80 Percent Arms, Saxton also received shipments from Defendants Glockstore, Primary Arms, and Rainier Arms. *See* below ¶¶ 401, 506, and 554.

217. On or around October 21, 2020, 80 Percent Arms sent a package to Kai Zhao at an address on 167th Street in the Flushing area of Queens, NY.

218. Between approximately July 20, 2021, and September 22, 2021, 80 Percent Arms sent five packages to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.

219. On information and belief, the packages 80 Percent Arms sent to Zhao and Chung contained unfinished frames or receivers and the parts to make them into ghost guns.

220. On or around March 1, 2022, Zhao, Chung, and two codefendants were arrested as part of an NYPD investigation into firearms trafficking.[36]

221. Search warrants executed on Zhao, Chung, and their alleged accomplices resulted in the seizure of 27 ghost guns, including 22 semiautomatic pistols, 4 assault weapons, and 1 assault shotgun.

222. The search warrants also resulted in the NYPD seizing 16 unfinished receivers, 78 large capacity magazines, approximately 10,000 rounds of ammunition, silencers, sites, components, and tools to assemble unfinished frames and receivers into working firearms, and more than $50,000 in cash.

---

[35] *See* https://nassauda.org/civicalerts.aspx?aid=1414 (last visited March 12, 2023).
[36] *See* https://queensda.org/four-queens-residents-charged-with-possessing-arsenals-of-illegal-ghost-guns-in-bayside-and-flushing-homes-photos/ (last visited March 12, 2023).

223.   Zhao, Chung, and their codefendants did not have licenses to own or possess firearms.

224.   Zhao was charged with approximately eight counts of violations of New York's firearms laws.  Chung was charged with approximately eight counts of violations of New York's firearms laws.

225.   As described below, in addition to 80 Percent Arms, Zhao and Chung also received shipments from Defendant Glockstore. *See* below ¶¶ 405-407.

226.   Between approximately December 12, 2021, and January 13, 2022, 80 Percent Arms sent three packages to Gregory Lopez at an address on Rosman Road in Thiells, NY.

227.   On information and belief, the packages 80 Percent Arms sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

228.   As described below, in addition to 80 Percent Arms, Lopez received shipments from Defendant Glockstore. *See* below ¶ 411.

229.   On or around April 27, 2022, police executed a search warrant on Lopez' Rosman Road address.  They discovered two loaded, unserialized AR-15-style ghost gun rifles, ammunition, magazines, and multiple unfinished frames and receivers.[37]

230.   A Rockland County grand jury indicted Lopez on twelve counts of violating New York's firearms laws.

231.   Between approximately June 3, 2016 and November 28, 2016, 80 Percent Arms sent at least three packages to Grzegorz Blachowicz in the Ridgewood neighborhood of Queens, NY.

---

[37] *See* https://hudsonvalleypost.com/historic-hudson-valley-man-arrested-under-new-yorks-new-gun-law/ (last visited March 12, 2023).

232.    On information and belief, the packages 80 Percent Arms sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

233.    Blachowicz was arrested for ghost gun trafficking in March of 2023, and was charged with 131 counts of violations of the firearms laws.[38]

234.    When executing a search warrant on the house to which 80 Percent Arms, Glockstore, and Primary Arms had sent Blachowicz packages, law enforcement officers from the NYPD and the Queens District Attorney's Detective Bureau located a fully assembled ghost gun and several ghost gun build kits, along with four unfinished frames, manuals for building firearms, tools used to manufacture ghost guns, various magazines, ammunition, and other firearms paraphernalia.

235.    A search of Mr. Blachowicz's storage facility found an additional eleven complete ghost gun assault weapon build kits, a complete assault pistol build kit, six complete ghost gun pistol build kits, twelve unfinished lower receivers, twenty-five more lower receivers, over 207 large-capacity magazines, thousands of rounds of ammunition, parts to build silencers, and a "ghost gunner" milling machine specifically designed to convert unfinished receivers into fully functioning ghost guns.

236.    Blachowicz did not have a license to own or possess firearms.

237.    As described below, in addition to 80 Percent Arms, Blachowicz also received shipments from Defendants Glockstore and Primary Arms. *See* below ¶¶ 425 and 522.

238.    Between approximately August 20, 2021, and February 14, 2022, 80 Percent Arms sent

---

[38] *See* https://queensda.org/queens-man-charged-with-possessing-arsenal-of-illegal-weapons/ (last visited March 12, 2023).

four packages to Paul Carey at an address on Riviera Drive in Massapequa, NY.  80 Percent Arms also sent two packages to a different person named Carey at the same address.

239.    On information and belief, the packages 80 Percent Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

240.    Carey was a dentist who operated a practice out of his home at that location.

241.    Carey's pistol license had been revoked in 2016 after firing shots in the neighborhood.

242.    According to news reports, Carey had a lengthy arrest history, including multiple arrests for menacing, driving while intoxicated, and reckless endangerment.[39]

243.    On February 16, 2022, police received a call from a secretary at Carey's practice, saying that he was agitated and intoxicated, and that she had heard him racking a gun.  The employee feared for her safety, and ran out of the house before calling 911.

244.    Carey barricaded himself in his house, and after negotiating with law enforcement and his wife, agreed to surrender.

245.    A consent search of Carey's home revealed 30 firearms, 20 of which were assault weapons. 16 of those assault weapons were ghost guns.

246.    According to the Nassau County District Attorney, on February 18, 2022, police received a call from a neighbor saying that Carey had a large package sitting outside his home.

247.    That package was the same one sent by 80 Percent Arms on February 14, 2022.

248.    After obtaining a search warrant, Nassau County police opened the package and discovered a "drill that is typically used in the assembly of ghost guns.  Police also recovered a Remington

---

[39] *See* https://www.cbsnews.com/newyork/news/dr-paul-carey-ghost-guns-arrest/ (last visited March 12, 2023).

shotgun; various rifles and handgun magazines; rifle/laser sights; various ghost gun parts; high-capacity magazines; and rifle bayonets."[40]

249.    Nassau County Police Commissioner Patrick Ryder discussed Carey's modus operandi: "[h]e's buying pieces through the mail.  He's putting them together, and making these illegal ghost guns.  He had a machine shop in his basement."

250.    As described below, in addition to 80 Percent Arms, Carey received shipments from Defendants Brownells, Primary Arms, and Rainier Arms. *See* below ¶¶ 367, 524, and 558.

251.    80 Percent Arms' sales to, Santos, Therkelsen, Taylor, McMillan, Valle, Saxton, Zhao, Chung, Lopez, Blachowicz, and Carey demonstrate its complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining 80 Percent Arms' pockets at the expense of New Yorkers' safety.

### C.  80P BUILDER

252.    80P Builder is a Florida corporation who marketed unfinished frames and receivers to New Yorkers, sold an unfinished frame to an undercover investigator as late as May 2022, and failed to exercise any controls on this sale.

253.     80P Builder's website, which, on information and belief attracts nearly 50,000 visits per month, uses confusing and sometimes inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.

254.    During a substantial portion of the Relevant Time Period, 80P Builder claimed to

---

[40] *See* https://nassauda.org/civicalerts.aspx?aid=1426 (last visited March 12, 2023).

"specialize in aftermarket parts while also offering Polymer80 frames."[41]

255.    Additionally, for a substantial part of the Relevant Time Period, 80P Builder sold unfinished receivers through its website in tandem with the "lower parts kit" containing the parts necessary to make it the fully-functional lower part of a handgun.[42]  On its webpage, 80P Builder touted the "Blank Serialization Plate" as one of the key features of the product, as well as the fact that a "Complete Finishing Jig and Drill bits [are] Included."[43]

256.    80P Builder successfully attracted New York business and shipped unfinished frames and receivers into New York State.

257.    80P Builder sent at least 38 packages into New York State between March 4, 2021, and June 27, 2022.

258.    At least one of these shipments was sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

259.    At least ten of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

260.    A significant portion of each group of shipments discussed in Paragraphs 257-259 contained unfinished frames and receivers.

261.    80P Builder's sale of unfinished frames into the New York market is also evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

---

[41] Formerly available at https://80pbuilder.com/ (last visited June 23, 2022).
[42] Formerly available at https://80pbuilder.com/pf940sc-frame (last visited June 23, 2022).
[43] *Id.*

53

262.    On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com, along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

263.    80P Builder accepted the order and shipped the ghost gun into New York County.

264.    80P Builder's sale to the City investigators demonstrated its complete and persisting lack of controls, and exemplified just one instance of many prohibited sales of unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns, consistent with its central business purpose and model.

265.    80P Builder has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.  For example, 80P Builder utilizes its own social media accounts, including Instagram, where it regularly posts and promotes sales relating to unfinished frames and receivers to its over 16,000 followers.

266.    80P Builder has also sought to maximize its marketing reach by partnering with popular YouTube accounts, including "Braydon Price," who has 1.77 million subscribers, and his most popular video was viewed 8.9 million times. For example, in a 16-minute video, posted on December 13, 2019, Brett, the purported owner of 80P Builder, joined Braydon Price for a day of marketing his products and shooting.  In the video, Brett and Braydon Price repeatedly promote 80P Builder's unfinished frames and receivers, explaining "you can get everything right [there] to build your own pistol." The caption to the video links to 80P Builder's website, warning customers,

54

"Don't miss out on the deals!" The video has over 780,000 views to date. On information and belief, a substantial portion of those views are undoubtedly from New York active or potential customers.

267.    Using these strategies, 80P Builder has become a highly successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

### D. BROWNELLS

268.    Brownells is a distributor of firearms and firearm parts who sold an unfinished frame to an undercover investigator in New York as late as May 2022, repeatedly marketed and sold unfinished frames and receivers to New York residents, and failed to exercise any controls on its sales.

269.    Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it took to selling unfinished frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns. On information and belief, Brownells has done a significant amount of business in New York.

270.    Brownells' website, on information and belief, receives on average nearly 5 million visitors a month, and this traffic has increased over the years, signaling an increase in online sales is a powerful marketing tool to attract customers who are trying to get around gun control laws.

271.    Brownells invested in marketing designed to expand both its market share of unfinished frames and receivers and the industry, business practices that have created, maintained, or contributed to a condition that endangers the safety and health of the public. Consistent with its

55

efforts to expand its market share and the industry, Brownells illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State for a substantial part of the Relevant Time Period.

272.    Brownells sent at least 43,213 packages into New York State between May 17, 2017 and June 28, 2022.

273.    At least 2,480 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

274.    At least 1,070 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

275.    A significant portion of each group of shipments discussed in Paragraphs 272-274 contained unfinished frames and receivers.

276.    Brownells' routine sales of unfinished frames and receivers into the New York market is demonstrated by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

277.    On or around May 27, 2022, investigators completed an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

278.    Brownells accepted the order and shipped the unfinished frame kit into Kings County.

279.    This recent sale to an undercover investigator is wholly consistent with Brownells' history of marketing, selling, and shipping these unlawful products to consumers in New York.

280.    For a substantial part of the Relevant Time Period, Brownells featured and discussed unfinished frames and receivers prominently on its website.  Although Brownells appears to have

recently modified its website in response to this lawsuit, Brownells' online materials went to great lengths to promote unfinished frames to consumers, saying that they "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[44]

281.    Brownells provided an online page with step-by-step video instructions on how to convert a nominally unfinished Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells wrote that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[45]

282.    The viewer could watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a "finished" version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer had questions or would like assistance finishing the frame, Brownells offered a telephone "tech line" where "we'll be glad to help you out."

283.    Brownells is such a significant distributor of Polymer80 products that they are mentioned

---

[44] Formerly available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022).
[45] *Id.*

and linked by Polymer80 on its own website as a preferred dealer.

284.    For instance, in two nearly identical October 2017 press releases announcing that the company would market a set of exclusive Polymer80 unfinished frames unique to Brownells, the company said that the unfinished frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes."[46]

285.    The same press releases also advertised the legal fiction that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."[47]

286.    As mentioned above, Brownells had custom, exclusive unfinished frames and/or receivers manufactured by Polymer80 for a substantial segment of the Relevant Time Period.  More recently, as Brownells has sought to distance itself from liability in this case, on information and belief, Brownells sold its exclusive unfinished frames and/or receivers to other distributors, including Delta Team Tactical, Davidson Defense, MMC Armory, Omega Tactical, and No Quarter Innovations LLC, in full knowledge that those exclusive Brownells products could and would still be marketed and sold into New York illegally. On information and belief, Brownells profited greatly from selling its exclusive products to middlemen that maintain no controls or protections

---

[46] Press Release, "Brownells Announces Exclusive Polymer80 Frames," (Oct. 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930 (last visited February 24, 2023), and Press Release, "Brownells Announce Exclusive Polymer80 Frames for Glock-Style Pistols," (Oct. 11, 2017), available at https://www.ammoland.com/2017/10/brownells-announce-exclusive-polymer80-frames-glock-style-pistols/#axzz7tag69Cst (last visited February 24, 2023).
[47] Id.

to prevent the illegal unfinished frames and receivers from entering New York in direct violation of its obligation to maintain reasonable controls itself.

287.    By its stature and popularity in the industry, including by being a primary and early resource of information on unfinished frames and receivers broadly, Brownells has generously cashed in on its investment in developing unfinished frames and receivers as an industry, including by developing and running a support hotline; by developing exclusive Polymer80-manufactured designs; and by selling a massive number of unfinished frames and receivers into New York, many of which have been converted into ghost guns, used in crimes or fallen into the hands of persons who could not and should not legally possess a firearm, and otherwise increased the number of dangerous ghost guns present in the State.

288.    Brownells has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.  For example, among other methods, Brownells maintains social media accounts that it has used primarily for marketing purposes, including marketing of its unfinished frame and receiver products.

289.    During the Relevant Time Period, Brownells regularly posted and maintained videos marketing unfinished frames or receivers and detailing how to build them on its YouTube account, called "Brownells, Inc.," with over 300,000 subscribers. Brownells continues to offer video assistance and support to customers seeking to build unfinished frames or receivers on its YouTube channel.

290.    Using these strategies, Brownells has become an immensely successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to

sales of unfinished frames or receivers, including into New York State.

291.    It is not surprising that individuals who are looking to get around gun control laws found Brownells' website and became customers. Brownells' business practices have increased the number of dangerous ghost guns present in the State.

292.    Between October 2016 and May 2020, Brownells sent approximately 17 shipments to Jason Ramirez in New York County.

293.    On or around September 18, 2017, Brownells sold Ramirez a Polymer80 PF940CV1-OD Glock-compatible pistol frame and shipped it to his home in New York.  Brownells gave Ramirez a $10 promotional discount on the sale.

294.    On or around February 20, 2018, Brownells sold Ramirez another Polymer80 PF940CV1 Glock-compatible pistol frame, along with a part to build the gun, and shipped it to his home in New York.  Brownells again gave Ramirez a discount on the sale.

295.    On or around December 27, 2018, Brownells sold Ramirez a Polymer80 PF940SC Glock-compatible pistol frame and shipped it to his home in New York.  Brownells again gave Ramirez a discount on the sale.

296.    Ramirez also purchased several sets of tools from Brownells to make unfinished frames into working ghost guns, along with accessories for the completed weapons.

297.    Brownells' records indicate that the company knew that Ramirez was not an FFL.

298.    On information and belief, Brownells did not make any inquiry into whether the customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

60

299.    Ramirez was indicted and pled guilty to violations of New York's firearms laws.

300.    On or around December 5, 2017, Brownells sent a shipment to Brandon Glaski in East Nassau, NY.

301.    Approximately six months later, law enforcement officers from the ATF and the New York State Police executed a search warrant on Glaski's residence.  In addition to dozens of other weapons, the officers found seventeen unfinished frames and receivers, all without serial numbers, including two that had been converted into working rifles.

302.    Glaski had a prior felony conviction and would not have been eligible to purchase a gun legitimately.

303.    Glaski pled guilty to federal gun charges in the Northern District of New York and was sentenced to 30 months in prison.[48]

304.    On information and belief, the shipment sent from Brownells to Glaski contained unfinished frames or receivers and the parts to make them into ghost guns.

305.    As described below, in addition to Brownells, Glaski received shipments from Defendants KM Tactical and Rainier Arms. *See* below ¶¶ 486 and 550.

306.    On or around November 2020, Brownells sold and sent two unfinished handgun frames to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

307.    On or around April 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

---

[48] *See* https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions (last visited March 12, 2023).

308.    On or around May 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

309.    On or around October 2021, Brownells sold and sent another unfinished handgun frame to Loyola.

310.    On or around December 11, 2020, Brownells sent a package to Kurt Therkelsen at an address on Bergen Street in Brooklyn. *See* above ¶¶ 186-191.

311.    Between approximately August 5, 2021, and March 16, 2022, Brownells sent at least 28 packages to Dexter Taylor at an address on Eldert Street in Brooklyn, NY.  *See* above ¶¶ 195-196.

312.    Brownells' shipments to Taylor only stopped after the NYPD executed a search warrant on his apartment on April 6, 2022.

313.    On information and belief, the packages Brownells sent to Taylor contained unfinished frames or receivers and the parts to make them into ghost guns.

314.    Between approximately November 17, 2020, and May 28, 2021, Brownells sent four packages to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

315.    On information and belief, the packages Brownells sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

316.    On or around August 4, 2021, Brownells sent a package to Chaz McMillan at an address on 162nd Street in the Fresh Meadows area of Queens, NY.  *See* above ¶¶ 200-204.

317.    On information and belief, the package Brownells sent to McMillan contained unfinished frames or receivers and the parts to make them into ghost guns.

318.    On or around December 28, 2020, Brownells sent a package to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.

319.    On information and belief, the packages Brownells sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

320.    On October 12, 2021, police executed a search warrant on the Hook Creek Boulevard location, which Kiem shared with his partner and their ten-year-old daughter.

321.    Police found six fully assembled ghost gun pistols, three additional unfinished frames and the parts necessary to convert them into working pistols, two unfinished receivers capable of conversion to an AR-15 style rifle, an additional unfinished receiver, four large capacity magazines, approximately 650 rounds of ammunition, 23 additional pistol magazines, and various other components and parts used to convert unfinished frames and receivers into working weapons.

322.    Some of the firearms were found in the dresser drawer of the child's bedroom.

323.    Kiem did not have a license to possess or own firearms.

324.    A portion of the firearms recovered from Kiem and his partner are pictured below:

63



325.    Kiem and his partner were charged with 39 criminal counts, including violations of the firearms laws and endangering the welfare of a child.

326.    As described below, in addition to Brownells, Kiem received shipments from Defendants Glockstore, Primary Arms, and Rainier Arms. *See* below ¶¶ 403, 508, and 552.

327.    Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

328.    On information and belief, the packages Brownells sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

329.    According to the Erie County District Attorney's Office, on or around May 26, 2020,

64

Gerwitz carried out a drive-by shooting, wounding a man in the stomach.[49]

330.    When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

331.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

332.    Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

333.    As described below, in addition to Brownells, Gerwitz received shipments from Defendants Glockstore and KM Tactical. *See* below ¶¶ 409 and 484.

334.    On or around May 5, 2020, Brownells sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.

335.    On information and belief, the package Brownells sent to Bubak contained unfinished frames or receivers and the parts to make them into ghost guns.

336.    On May 13, 2022, New York State Troopers responded to a report of shots fired in Franklinville.  Officers located Bubak, who was holding a "9mm polymer-based style pistol," which the Troopers described as a "ghost gun," without a serial number.  Further investigation revealed that Bubak had threatened multiple people in that area and fired at a victim but missed.

337.    Troopers arrested Bubak for attempted murder and other charges.

---

[49] *See* https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited March 12, 2023).

338.    As described below, in addition to Brownells, Bubak received a shipment from KM Tactical. *See* below ¶ 482.

339.    Between approximately June 24, 2020, and May 4, 2022, Brownells sent at least seven packages to Edison Cruz at an address on Andrews Avenue in the Bronx, NY.

340.    On information and belief, the packages Brownells sent to Cruz included unfinished frames or receivers and the parts to make them into ghost guns.

341.    Edison Cruz was not legally permitted to possess a firearm.  According to a report from NBC 4 New York, he had "a lengthy rap sheet, and was previously arrested in June 2020 after allegedly walking down the street with a flamethrower and wearing a ballistic vest, a senior law enforcement official said. Later that year, he was arrested again after throwing something at his mother's head, and police found he had an ax, a loaded ghost gun, multiple gun parts and another ballistics vest."[50]

342.    In May 2022, Cruz was arrested for a triple shooting that left one person dead and two others hospitalized.

343.    The *New York Post* reported that Cruz was "a nut for illegal 'ghost guns'" and that he "used one of the untraceable weapons in the shooting."

344.    As described below, in addition to Brownells, Cruz received shipments from Defendants Glockstore and Primary Arms. *See* below ¶¶ 413 and 510.

345.    Between approximately May 29, 2019, and December 7, 2020, Brownells sent at least

---

[50] *See* https://www.nbcnewyork.com/news/local/crime-and-courts/25-year-old-man-in-custody-after-bronx-shooting-leaves-1-dead-2-hurt/3672700/ (last visited March 12, 2023).

66

seven packages to Theodore Brois at an address on Tallwoods Road in Armonk, NY.

346.    On information and belief, the packages from Brownells contained unfinished frames or receivers and the parts to make them into ghost guns.

347.    The North Castle Police Department arrested Brois in late-January 2022 for first-degree criminal possession of a weapon (10 or more weapons).  The Somers Daily Voice reported that about 60 guns, gun parts, and a "large amount" of ammunition were seized from Brois's home. North Castle Police Chief Peter Simonsen said the various gun parts could have been used to build additional firearms and that he was "quite surprised with the number of guns and ammunition found in the quiet neighborhood."

348.    As described below, in addition to Brownells, Brois received a shipment from Defendant Primary Arms. *See* below ¶ 512.

349.    On or around March 20, 2021, Brownells sent a package to Steven Salerna-Sanchez at an address on Claudette Court in Cheektowaga, NY.

350.    On information and belief, the package from Brownells contained unfinished frames or receivers and the parts to make them into ghost guns.

351.    On June 13, 2022, police arrested Salerna-Sanchez,[51] also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court "that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns," the Buffalo News reported.[52]

---

[52] *See* https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-

352. "Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities," the Buffalo News reported. Gramaglia told the newspaper "it takes about 30 minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street."

353. "This is what feeds the everyday gun violence that we see in our community and in communities across America – not just in Buffalo," Gramiglia said.

354. On or around December 21, 2020 and April 14, 2022, Brownells sent packages to Joshua Gotthart in Buffalo, NY.

355. On information and belief, the packages Brownells sent to Gotthart contained unfinished frames or receivers and the parts to make them into ghost guns.

356. On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

357. He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

358. "Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house," the Buffalo News reported. "Using a search warrant, they said they found three unregistered handguns in a bedroom and what the DA's office described as an 'arsenal' of rifles, shotguns, and magazines." They also found tools used to assemble ghost guns and a large

---

what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited March 12, 2023).

68

amount of ammunition in the house, the DA's office said in a statement.

359.    Gotthart was arraigned and indicted on two counts of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felonies) and one count of Unlawful Wearing of a Body Vest (Class "E" felony).  He later pled guilty to one of the weapons violations.

360.    As described below, in addition to Brownells, Gotthart received shipments from Defendant KM Tactical. *See* below ¶ 488.

361.    On or around August 4, 2020 and August 12, 2020, Brownells sent packages to Jeru McCray at an address on the Upper West Side of Manhattan.

362.    On information and belief, the packages Brownells sent to McCray contained unfinished frames or receivers and the parts to make them into ghost guns.

363.    McCray had a prior felony conviction and was ineligible to legally possess a firearm.

364.    When the NYPD executed a search warrant on McCray's apartment in 2022, they uncovered a fully assembled ghost gun from a room in which a young child lived.

365.    According to the New York District Attorney, and as admitted to in McCray's guilty plea, he had "ordered enough ghost gun parts and firearms components to assemble at least four handguns."[53]

366.    On information and belief, these four handguns correspond to the four packages McCray received from Defendants in this case: two from Brownells and two from Defendant Glockstore, as described below, *see* below ¶ 419.

---

[53] *See* https://www.manhattanda.org/d-a-bragg-announces-prison-sentence-for-manufacturing-and-possessing-ghost-gun-in-uws-apartment/ (last visited March 12, 2023).

367.    Between approximately July 1, 2021, and November 26, 2021, Brownells sent at least three packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

368.    On information and belief, the packages Brownells sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

369.    Brownells' sales to Ramirez, Glaski, Loyola, Therkelsen, Taylor, Santos, McMillan, Kiem, Gerwitz, Bubak, Cruz, Brois, Salerna-Sanchez, Gotthart, McCray, and Carey demonstrate Brownells' complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Brownells' pockets at the expense of New Yorkers' safety.

### E.  GLOCKSTORE

370.    Glockstore is a distributor of firearms and firearm parts who marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

371.    While Glockstore claims to be "the world's largest distributor of Glock parts and accessories, magazines, holsters, logo gear, apparel, concealment items, custom parts and Glock custom guns," a substantial portion of Glockstore's business during the Relevant Time Period included selling unfinished receivers that can be used to build ghost gun versions of those rifles and unfinished handgun frames.  Glockstore has done a substantial portion of that business in New York.

372.    Glockstore's website, which, on information and belief, attracts over two million visitors a month, uses confusing and inaccurate messaging as a powerful marketing tool to attract customers who are trying to get around gun control laws.

70

373.    For a substantial part of the Relevant Time Period, Glockstore sold unserialized frames, including Polymer80-manufactured products, on its website. Glockstore additionally sold unfinished, unserialized build kits to allow its customers to finish their 80% builds, as well as instructional DVDs including "Building the Ultimate Glock" and "Building an AR-15 from Scratch."

374.    Glockstore has built its business and website around skirting the law. For instance, one still-online blog post talks about how a new model of unfinished pistol frame is "one of the most talked about firearm products ever!" and goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[54]

375.    The same blog post explains that one of the main reasons a consumer might like to buy an unfinished frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference." Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records… what's not to like?"[55]

376.    The blog post embeds a YouTube video of Glockstore CEO Lenny Magill guiding the consumer to "transform this 'not a firearm' into a fully functioning 9mm handgun."[56] The video itself has now been removed for violating YouTube's terms of service. However, because Glockstore maintained its blog posts relating to this video, and in light of its investment in

---

[54] *See* http://community.glockstore.com/i-can-build-my-own-gun-with-this/ (last visited February 26, 2023).
[55] *Id.*
[56] *See also* http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts/ (another blog post describing the contents of Mr. Magill's video) (last visited February 26, 2023).

71

producing the video and the fact that makers of similar popular videos have worked around YouTube's terms of service, on information and belief, Glockstore has maintained that video on another platform that employs less stringent terms of service than YouTube.

377.   Glockstore maintains another pertinent blog post.  That post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre Polymer80."[57]  The post describes the unfinished frame in question as "[o]ne of the most exciting and fastest selling items at the GlockStore." The blog post focuses both on the frame's usefulness for evading registration requirements and on the ease of converting it into a working ghost gun, explaining that "[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning lower.  You then assemble them with readily available parts and legally own a firearm that does not have to be 'registered.'"[58]

378.   According to Glockstore, "[t]his is completely legal and acceptable based on Federal laws that have been on the record for many years that state an individual can actually make a firearm for personal use."[59]   The blog post does not acknowledge the existence of state laws, licensing requirements, or longstanding prohibitions against firearm possession by persons convicted of felonies or other dangerous persons.

379.   In this way, Glockstore continues to promote and market unfinished frames and receivers and misinform the public about the legality of these products. Glockstore's conduct is also the

---

[57] *See* http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80/ (last visited February 26, 2023) (brackets in original).
[58] *Id.* (quotation marks in original).
[59] *Id.*

subject of litigation in California.[60]

380.    Glockstore has become a highly successful and profitable business and is "constantly growing" with a current estimated annual revenue of at least $11.2 million, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

381.    Glockstore has marketed its unfinished frames and/or receivers in these ways with the cumulative effect of these marketing efforts being that Glockstore not only maximized its sales to date, but also greatly expanded the market for unfinished frames or receivers broadly.

382.    It is not surprising that individuals who are looking to get around gun control laws found Glockstore's website and became customers. Glockstore's business practices have increased the number of dangerous ghost guns present in the State. Indeed, Glockstore has shipped large numbers of its illegal products into New York.

383.    Glockstore sent at least 14,611 packages into New York State between July 1, 2016 and May 17, 2022.

384.    At least 1,494 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

385.    At least 62 of these shipments were sent into New York State after April 26, 2022, the

---

[60] *See* Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct.). California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated." *See id.* ¶¶ 106-112, 133-36. California specifically cited Glockstore's failure to inform consumers of the unfinished frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check. *Id.* ¶¶ 138-40.

effective date of the State's ban on unfinished frames and receivers.

386. A significant portion of each group of shipments discussed in Paragraphs 383-385 contained unfinished frames and receivers.

387. In or around September 2016, Glockstore sold and shipped an unfinished handgun frame to a customer in lower Manhattan.

388. In or around December 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in lower Manhattan, along with all the parts necessary to convert it into a working ghost gun.

389. In or around the Fall of 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in lower Manhattan, along with all the parts necessary to convert it into a working ghost gun.

390. In or around December 2019, Glockstore sold and shipped two Glock-compatible unfinished handgun frames to the same customer in lower Manhattan, along with all the parts necessary to convert them into working ghost guns.

391. On or around June 14, 2019, Glockstore sold and shipped two unfinished handgun frames to a customer on the Upper East Side of Manhattan, along with the tools and parts necessary to convert them into ghost guns.

392. Glockstore did not make any inquiry into whether the customer had a license to possess a firearm, or whether he had any history that would prohibit him from doing so.

393. In or around November 2017, Glockstore sold and shipped three Glock-compatible unfinished handgun frames to a customer in the Chinatown neighborhood of Manhattan, along

with parts to convert them into working ghost guns.

394.    In or around January 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

395.    In or around March 2018, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown, and subsequently sent a parts kit sufficient to convert the unfinished frame to a finished firearm.

396.    In or around April 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

397.    In or around October 2019, Glockstore sold and shipped another unfinished handgun frame to the same customer in Chinatown.

398.    On information and belief, Glockstore did not make any inquiry into whether these customers had a license to possess a firearm, or whether they had any history that would prohibit them from doing so.

399.    Between November 13, 2017, and July 2, 2020, Glockstore shipped at least five packages to Domingo Valle in Bronx County.  *See* above ¶¶ 208-210.

400.    On information and belief, the packages from Glockstore to Valle contained unfinished frames or receivers and the parts to make them into ghost guns.

401.    On or around December 14, 2021, Glockstore sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County.  Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons,

75

including ghost guns.  *See* above ¶¶ 214-215.

402.    On information and belief, the package sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

403.    Between approximately August 21, 2020, and March 19, 2021, Glockstore sent at least five packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.  *See* above ¶¶ 320-325.

404.    On information and belief, the packages Glockstore sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

405.    On or around August 7, 2020, and October 29, 2020, Glockstore sent packages to Kai Zhao at an address on 167th Street in the Flushing area of Queens, NY.  *See* above ¶¶ 220-224.

406.    On information and belief, the packages Glockstore sent to Zhao contained unfinished frames or receivers and the parts to make them into ghost guns.

407.    On or around August 17, 2020, Glockstore sent a package to Seongwoo Chung at an address on Crocheron Avenue in the Flushing area of Queens, NY.  *See* above ¶¶ 220-224.

408.    On information and belief, the package Glockstore sent to Chung contained unfinished frames or receivers and the parts to make them into ghost guns.

409.    Between approximately November 26, 2018, and December 6, 2019, Glockstore sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.  *See* above ¶¶  329-332.

410.    On information and belief, the packages Glockstore sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

411.     On or around January 12, 2022, and February 7, 2022, Glockstore sent packages to Gregory Lopez at an address on Rosman Road in Thiells, NY.  *See* above ¶ 226.

412.     On information and belief, the packages Glockstore sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

413.     On or around July 10, 2020 and March 8, 2021, Glockstore sent packages to Edison Cruz at an address on Anderson Avenue in the Bronx, NY.  *See* above ¶¶ 341-343.

414.     On information and belief, the shipments from Glockstore to Cruz contained unfinished frames or receivers and the parts to make them into ghost guns.

415.     On or around August 18, 2021, Glockstore sent a package to David Goldberg at an address on Bullet Hole Road in Mahopac, NY.  *See* above ¶ 152.

416.     On information and belief, the package Glockstore sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

417.     On or around November 4, 2021, Glockstore sent a package to Andrew Lopez at an address on Fair Street in Carmel, NY.  *See* above ¶ 156.

418.     On information and belief, the package Glockstore sent to Lopez contained unfinished frames or receivers and the parts to make them into ghost guns.

419.     On or around August 28, 2020 and September 4, 2020, Glockstore sent packages to Jeru McCray at an address on the Upper West Side of Manhattan.  *See* above ¶¶ 363-366. On information and belief, the packages Glockstore sent to McCray contained unfinished frames or receivers and the parts to make them into ghost guns.

420.     Between October 17, 2018 and March 27, 2019, Glockstore sent at least three packages to

Joseph Maddaloni in the Whitestone area of Queens, NY.

421.    On information and belief, the packages Glockstore sent to Maddaloni contained unfinished frames or receivers and the parts to make them into ghost guns.

422.    An investigation by the Queens County District Attorney's office had identified Maddaloni "as a major purchaser of illegal polymer-based unserialized firearm components."[61]

423.    When law enforcement executed a search warrant on Maddaloni's residence, they found 42 illegal firearms, including 15 ghost gun pistols and two AR-15 ghost gun assault rifles, one of which had been modified to fire fully automatically.  Also recovered were 23 commercially manufactured weapons, two commercial assault-rifles, two silencers, 33 high capacity magazines, and thousands of rounds of ammunition.

424.    As described below, in addition to Glockstore, Maddaloni received a shipment from Defendant KM Tactical. *See* below ¶ 490.

425.    Between approximately October 17, 2018 and December 12, 2020, Glockstore sent at least eight packages to Grzegorz Blachowicz in the Ridgewood area of Queens, NY.  *See* above ¶¶ 233-236.

426.    On information and belief, the packages Glockstore sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

427.    Glockstore's sales to Valle, Saxton, Kiem, Zhao, Chung, Gerwitz, Lopez, Cruz, Goldberg, Lopez, Maddaloni, and Blachowicz demonstrate Glockstore's complete and persisting lack of

---

[61] https://queensda.org/queens-man-charged-with-67-counts-of-criminal-possession-of-a-weapon-and-other-crimes-for-cache-of-illegal-ghost-guns-and-firearms/

controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Glockstore's pockets at the expense of New Yorkers' safety.

## F. INDIE GUNS

428.  Indie Guns is a distributor of firearms and firearm parts who has marketed unfinished frames and receivers to New Yorkers, repeatedly sold unfinished frames and receivers to undercover investigators in New York as late as May 2022, and failed to exercise any controls on its sales. Indeed, as of February 2023, Indie Guns publicly estimated that it has sold "tens of thousands" of unfinished frames and/or receivers to New York customers.

429.  Indie Guns' business has long focused on selling unfinished frames and receivers and other parts used to complete a ghost gun build, and has done a substantial portion of that business in New York. On information and belief, Indie Guns' website attracts over 11,000 visits per month.

430.  For a substantial segment of the Relevant Time Period and through the present by its own admission, Indie Guns sells unfinished frames, including those as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "every part and component (including mag)…conveniently packaged for the DIY gun hobbyist to build a complete gun,"[62] and "everything needed to build a complete pistol in a discounted bundle package."[63]

431.  Indie Guns routinely ships these LSB kits, and other illegal products, directly to the consumer, including in New York, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements. Indie Guns knows and intends

---

[62] *See* https://indieguns.com/product/boa-17-black-cherry-lsb-kit/ (last visited February 16, 2023).
[63] Formerly available at https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3/ (last visited June 28, 2022).

that these consumers convert the LSB kits into working firearms—as Indie Guns itself explained, "When done with your build, just grab a box of rounds and you're good to go…"[64]

432.    Indie Guns' website advertises a wide variety of unfinished frames, frame kits and full build kits.  Indie Guns has highlighted the "blank serialization plate" as one of the key features of the unfinished frames it sells.

433.    During the Relevant Time Period, Indie Guns announced to its customers that it was "pleased to present the CFA-17 (COMPLETE FRAME ASSEMBLY-17)[.]  The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower." Indie Guns touted the frame's "blank serialization plate" as a major selling point.[65]

434.    Indie Guns' business practices and sales of unfinished frames into the New York market are best demonstrated by its persistent sales and shipments of unfinished frames to New York State and City investigators in response to undercover purchases.

435.    For example, on or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a trigger assembly, a magazine, and a complete slide with barrel.  Indie Guns accepted the order and shipped the product into New York County.

436.    On or around May 27, 2022, investigators conducted another undercover purchase of a

---

[64] Formerly available at https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3/ (last visited June 28, 2022).
[65] Formerly available at https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35/ (last visited June 6, 2022).

Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit.  Indie Guns accepted the order and shipped the unfinished frame into Kings County.

437.    Indie Guns' sales to the undercover investigators demonstrated its complete and persisting lack of controls and exemplified just two instances of its admittedly many prohibited sales of unfinished frames into New York without conducting a background check or implementing any other controls to keep these illegal ghost gun products out of the hands of people who are prohibited from accessing firearms.

438.    These sales also demonstrate Indie Guns' practice of marketing, selling, and shipping these unlawful products to consumers in New York.

439.    Indie Guns has made no secret of its intent to deliberately distribute law-breaking products for its own maximum profit.  In fact, its marketing and business practices have grown increasingly hostile.  In recent months, Indie Guns has removed the ability to purchase products directly from its website, in order to obscure such purchases from law enforcement. Rather, while its products are still viewable on its site, any purchase must be made through direct communication with the company's owner, Lawrence Destefano, which Indie Guns has publicly detailed take place by telephone, text, private/direct messages over social media, or using an encrypted messaging service, specifically Signal.

440.    Consistent with this new sales process, Indie Guns' website now directs customers to

"FOLLOW OPSEC MEASURES.[66] CALL FOR PRICING CALL TO MAKE PAYMENT."

441.    Indie Guns admits that it is now using these "OPSEC" measures in place of its ordinary website ordering process because it is deliberately frustrating law enforcement's ability to discover its sales into New York, and to enable it to minimize its sales records and easily destroy them.

442.    Specifically, to assure its customers that it is operating with the greatest degree of secrecy, Indie Guns explained publicly that it altered its sales practices in order to minimize and destroy any evidence of sales, saying:

> I want all my customers to realize, everything now is offline now and off-the-books. When you order, you have to call me or we have to communicate through text…nothing is automated…because it's done this way, because everything is completely off-the-books, there is no customer data. There's no names…No customer data is digitally stored by whatever platform that we use as a business…The government has no access to data, so that's the beauty of all this.

443.    Indie Guns regularly markets and promotes itself on Instagram, where it has over 7,000 followers, and over 1,200 posts, including the video quoted in Paragraph 442-443.  On information and belief, Lawrence Destefano is the individual who personally operates and maintains Indie Guns' Instagram account, including starring in most of its video content, as well as selecting, creating, posting, and or deleting any content relating to the "indieguns" account.

444.    Indie Guns uses Instagram videos called "Reels" to communicate to its customers and keep them assured and informed, and also to taunt law enforcement, and even send messages to this Court.  In a video posted in February 2023, Indie Guns directed a message to the Honorable Jesse

---

[66] On information and belief, "OPSEC" refers to "operations security" and refers to protecting critical information from being accessed by "potential adversaries." *See* https://www.commerce.gov/osy/programs/operations-security-opsec (last accessed March 13, 2023).

Furman, as the presiding judge over this dispute, inviting Judge Furman to purchase an unfinished frame from Indie Guns without worry, assuring that Indie Guns destroys all records of such sales, and that the sale would never be discovered.

445.    In another video, Indie Guns riled up New York customers looking to purchase its illegal products by offering to ship an unfinished frame directly to the home of New York State Attorney General Letitia James, communicating that Indie Guns has no care whatsoever about the legality of its business conduct and that its products will continue to ship into New York undeterred.

446.    Indie Guns' Instagram content, website, and other marketing and sale activities admittedly done on Signal and other platforms are intended to sell as many "unserialized, untraceable, unregistered gun components" as possible. In his own words, Lawrence Destefano on behalf of Indie Guns states his mission as: "That's what we need to do is flood this damn market."

447.    Indie Guns has done just that.  As Mr. Destefano bragged on social media, "I sold thousands, tens of thousands to New York City and New York State."

448.    In another social media post, Mr. Destefano acknowledged "the tens of thousands of AR-15 80 percent lower receivers and 80 percent pistol frame kits that I had shipped to New York City and New York State."  In the same video, Mr. Destefano explained that these shipments were not the extent of his illicit sales into the State, bragging that he had "developed a client base of New Yorkers through word-of-mouth as being a DIY gun dealer that specialized in discretion," and that "when there was a hefty profit involved, I would pack my vehicle to the gills and personally deliver these full build kits to these special clients in New York."

449.    Consistent with its intent to "flood this damn market" with illegal products, Indie Guns

83

regularly purchases for resale massive quantities of Polymer80 unfinished frames and receivers. A single monthly invoice from 2021 reflects over $700,000 in Indie Gun wholesale purchases from Polymer80, including thousands of unfinished frames and receivers. For example, that month's invoice included 3,000 subcompact pistol frames alone.  On information and belief, a substantial portion of Indie Guns' inventory has been sold and continues to be sold to New York customers.

450.    Indie Guns also openly brags about a complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms.  And while all the other Defendants also fail to employ any such controls, Indie Guns is explicit and open about why.

451.    Indie Guns deliberately targets and markets its products to customers who may not be able to obtain firearms through legal means, and intentionally cultivates this customer base through its provocative anti-government messages.

452.    Based on its own public admissions and active marketing, Indie Guns has sold and continues to sell and ship illegal unfinished frames and receivers into New York State, exacerbating the dangerous condition it has cause, maintained, or contributed to.

453.    Indie Guns' public statements demonstrate that it—and the other Defendants who are part of the movement—have acted knowing that the sales of unfinished frames and receivers were illegal.  In Mr. Destefano's words, "[t]he DIY gun movement has always been a secret society . . . we've always been a tight-knit secret society.  And we didn't care, we really didn't care, what government regulations they had out there, or what the laws were, or where it was illegal to ship. We just didn't care, because it was our own secret society."  Later in the same public video, Mr.

84

Destefano says, "Everyone knows what this society is about . . . We didn't care what the government did, we didn't care about their laws, we just didn't care."

454.    Indie Guns has also repeatedly admitted to extensive spoliation after the commencement of this litigation and contrary to the legal advice of counsel—even using the word "spoliation" to publicly describe its conduct.  Indie Guns' spoliation efforts include wiping records that may have been in the custody and control of its former e-commerce or payment platforms and which would have evidenced the number of details of all shipments of unfinished frames and receivers to New York consumers during the Relevant Time Period.

455.    In yet another video created and posted in February 2023, Indie Guns individually names each of the undersigned counsel to the State and directed a message to counsel that it will never produce any information or documents over the course of discovery in this matter "because there is none," reiterating again that Indie Guns destroyed all evidence of its conduct after the commencement of this action and aggressively encouraging its competitors to do the same.

456.    Indie Guns' Instagram account also makes specific overtures towards New York residents in order to directly market to individuals in New York who may be unable to secure an unfinished frame from other sources. For example, many of Indie Guns' recent posts have headers reading "Honoring New York's Brothers-in-Arms," advertising products that Indie Guns has apparently named after New York City's boroughs and neighborhoods. Based on these active and targeted marketing strategies, on information and belief, Indie Guns' sales of unfinished frames and receivers into New York have only increased over recent months.

457.    Indie Guns has made clear via social media its intent is to put illegal, untraceable weapons

85

in as many hands as possible, exclaiming in one Instagram post "Yes! These are untraceable unserialized unregistered ghost gunners! And you can't do s[***] about it!!! 😊" In another video, Indie Guns claims it "never shipped any kits out to NY residents – **that they know about**" (emphasis added).

458.    In these ways, Indie Guns has worked diligently not only to become a major market player, but to establish unfinished frames and receivers as a major market.

459.    Using these strategies, Indie Guns has become a highly successful and profitable business, with a substantial portion of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

460.    Ultimately, Indie Guns has marketed its unfinished frames and/or receivers in these ways, including direct marketing and marketing through encrypted and private channels, with the cumulative effect of these marketing efforts being that Indie Guns not only maximized its sales to date, but also greatly expanded the market for unfinished frames or receivers broadly while also misinforming the public about the legality of its products.

### G.  KM TACTICAL

461.    KM Tactical is an online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.  KM Tactical marketed and repeatedly sold unfinished frames and receivers to New Yorkers, and failed to exercise any controls on its sales.

462.    KM Tactical sells a wide variety of different firearms, parts, and paraphernalia, including an extensive selection of unfinished frames and receivers divided between AR and Glock

86

platforms.[67]

463.    KM Tactical's website, on information and belief, sees on average of approximately 120,000 visitors per month.

464.    Since its inception ten years ago, KM Tactical has seen more than 50% growth each year, with the majority of KM Tactical's business being conducted online.

465.    KM Tactical is a significant dealer of Polymer80 products and is linked by Polymer80's own website as a dealer. KM Tactical's website marketed Polymer80 products, regularly featuring sales for many of its Polymer80 products, and affirmatively encouraged its customers to build their own firearms.

466.    Like the other Defendants, KM Tactical has engaged in deceptive business practices by suggesting to its customers that their products are legal and benign. For instance, KM Tactical's website represented that the ghost guns made from its unfinished receivers are legal, by labeling the product "ATF Approved."

467.    Like others in the industry, KM Tactical has invested in marketing designed to expand its market share of unfinished frames and receivers in New York and elsewhere, as well as to grow the industry as a whole.

468.    It is not surprising that individuals who are looking to get around gun control laws found KM Tactical's website and became customers. KM Tactical's business practices have increased the number of dangerous ghost guns present in the State.

---

[67] *See* https://kmtactical.net/product-category/default-category/accessories/80-lowers/ar-platform/ and https://kmtactical.net/product-category/default-category/accessories/80-lowers/glock-platform/ (last visited March 12, 2023).

469.     KM Tactical sent at least 8,544 packages into New York State between December 22, 2017 and June 28, 2022.

470.     At least 1,115 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

471.     At least 180 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

472.     A significant portion of each group of shipments discussed Paragraphs 469-471 contained unfinished frames and receivers.

473.     Beginning on November 2, 2021, KM Tactical sent at least three shipments to Victor Freeman of Grand Island, NY.

474.     The last of these shipments of which the State is aware was sent on May 6, 2022.

475.     On information and belief, the packages KM Tactical sent to Freeman contained unfinished frames or receivers and the parts to make them into ghost guns.

476.     On May 17, 2022, Freeman was driving southbound on Interstate 190 "when he brandished a handgun during a road rage incident with another driver," according to the Erie County District Attorney.[68]

477.     Troopers found a loaded ghost gun inside of Freeman's car, and a search of his home revealed "illegal weapons, which included two assault rifles, two large capacity ammunition feeding devices, and multiple 'ghost gun' kits."

---

[68] *See* https://www2.erie.gov/da/index.php?q=press/grand-island-man-indicted-gun-charges-after-state-police-seize-weapons-following-road-rage-inc (last visited March 13, 2023).

478.     On or around July 2020, KM Tactical sold and sent one unfinished pistol frame to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

479.     On or around July 29, 2021, KM Tactical sent a package to Jonathan Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY. *See* above ¶¶ 145-148.

480.     On or around September 22, 2021, KM Tactical sent a package to Santos at an address on 102nd Street in the Richmond Hill area of Queens, NY.

481.     On information and belief, the packages KM Tactical sent to Santos contained unfinished frames or receivers and the parts to make them into ghost guns.

482.     On or about April 10, 2020, KM Tactical sent a package to Craig Bubak at an address on Riggs Street in Franklinville, NY.  *See* above ¶¶ 336-337.

483.     On information and belief, the package KM Tactical sent to Bubak contained unfinished frames or receivers and the parts to make them into ghost guns.

484.     Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY. *See* above ¶¶ 329-332.

485.     On information and belief, the packages KM Tactical sent to Gerwitz contained unfinished frames or receivers and the parts to make them into ghost guns.

486.     Between approximately April 23, 2020, and April 30, 2020, KM Tactical sent two packages to Brandon Glaski at an address on Adams Crossing Road in East Nassau, NY.  *See* above ¶¶ 301-303.

487.     On information and belief, the packages sent from KM Tactical to Glaski contained

89

unfinished frames or receivers and the parts to make them into ghost guns.

488. On or around November 17, 2020, and September 21, 2021, KM Tactical sent two packages to Joshua Gotthart in Buffalo, NY. *See* above ¶¶ 356-359.

489. On information and belief, the packages KM Tactical sent to Gotthart contained unfinished frames or receivers and the parts to make them into ghost guns.

490. On or around September 14, 2021, KM Tactical sent a package to Joseph Maddaloni in the Whitestone neighborhood of Queens, NY. *See* above ¶¶ 422-423.

491. On information and belief, the packages KM Tactical sent to Maddaloni contained unfinished frames or receivers and the parts to make them into ghost guns.

492. Between approximately September 24, 2020, and September 29, 2020, KM Tactical sent two packages to David Goldberg at an address on Bullet Hole Road in Mahopac, NY. *See* above ¶ 152.

493. On information and belief, the packages KM Tactical sent to Goldberg contained unfinished frames or receivers and the parts to make them into ghost guns.

494. KM Tactical's sales to Freeman, Loyola, Santos, Bubak, Gerwitz, Glaski, Gotthart, Maddaloni, and Goldberg demonstrate KM Tactical's complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining KM Tactical's pockets at the expense of New Yorkers' safety.

## H. PRIMARY ARMS

495. Primary Arms is an online retailer of firearms, parts, and paraphernalia who marketed and repeatedly sold unfinished frames and receivers to New Yorkers and failed to exercise any controls

on its sales.

496.    Primary Arms began as an optics manufacturer, but expanded to provide a broad selection of firearm products and accessories, including unfinished frames and receivers. Its business is built on its online retail, and it is one of the fastest growing e-commerce retailers. Primary Arms has "grown exponentially" since its founding in 2007 and on information and belief, Primary Arms' e-commerce net sales generated approximately $98.2 million in 2021.

497.    On information and belief, Primary Arms' website sees on average 3.9 million visitors per month. Primary Arms actively uses its website as a powerful marketing tool for its products.

498.    Primary Arms sells over 20 types of Polymer80 products on its website, including frame parts kits for customers to complete their Polymer80 buildings. For a substantial segment of the Relevant Time Period, Primary Arms shipped unfinished frames and receivers directly to New York consumers, with no serialization and no background check.

499.    It is not surprising that individuals who are looking to get around gun control laws found Primary Arms' website and became customers. Primary Arms' business practices have increased the number of dangerous ghost guns present in the State. Indeed, Primary Arms has shipped large numbers of its illegal products into New York.

500.    Primary Arms sent at least 25,428 packages into New York State between July 25, 2016, and August 9, 2022.

501.    At least 1,305 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

502.    At least 835 of these shipments were sent into New York State after April 26, 2022, the

91

effective date of the State's ban on unfinished frames and receivers.

503.     A significant portion of each group of shipments discussed in Paragraphs 500-502 contained unfinished frames and receivers.

504.     On or around September 2020, Primary Arms sold and sent two unfinished AR-15-style lower receivers to Rene Loyola in the East Village neighborhood of Manhattan. *See* above ¶¶ 138-141.

505.     On or around December 2020, Primary Arms sold and sent another unfinished AR-15-style lower receiver to Loyola.

506.     On or around November 27, 2021, Primary Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County. Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons, including ghost guns. *See* above ¶¶ 214-215.

507.     On information and belief, the package sent to the address on Baisley Avenue contained unfinished frames or receivers and the parts to make them into ghost guns.

508.     Between approximately March 17, 2021, and September 13, 2021, Primary Arms sent at least four packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY. *See* above ¶¶ 320-325.

509.     On information and belief, the packages Primary Arms sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

510.     On or around August 22, 2021, and December 28, 2021, Primary Arms sent packages to

92

Edison Cruz at an address on Anderson Avenue in the Bronx, NY. *See* above ¶¶ 341-343.

511.    On information and belief, the shipments from Primary Arms to Cruz contained unfinished frames or receivers and the parts to make them into ghost guns.

512.    On or around December 17, 2021, Primary Arms sent a package to Theodore Brois at an address on Tallwoods Road in Armonk, NY. *See* above ¶ 347.

513.    On information and belief, the package Primary Arms sent to the Brois residence contained unfinished frames or receivers and the parts to make them into ghost guns.

514.    On or around May 26, 2021, Primary Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.

515.    On information and belief, the package Primary Arms sent to DiMaggio contained unfinished frames or receivers and the parts to make them into ghost guns.

516.    DiMaggio did not have a license to possess or own firearms.

517.    The FBI Safe Streets Task Force and Putnam County Sheriff's Office, arrested DiMaggio in late-January 2022 for unlawful possession or receipt of a firearm or ammunition by a prohibited person.

518.    As described below, in addition to Primary Arms, DiMaggio received a shipment from Defendant Rainier Arms. *See* below ¶ 556.

519.    On or around May 15, 2018, Primary Arms sent a package to Andrew Fisk in Greenwich, NY.

520.    On information and belief, the package Primary Arms sent to Fisk contained unfinished frames or receivers and the parts to make them into ghost guns.

521.   In August, 2022, State Police arrested Fisk and two accomplices who were "involved in manufacturing various illegal firearms parts." A search warrant recovered six assault rifles, two fully-automatic machine guns, two ghost gun handguns, and numerous other long guns, as well as over 40 high-capacity magazines.

522.   On or around May 29, 2021, Primary Arms sent a package to Grzegorz Blachowicz in the Ridgewood neighborhood of Queens, NY. *See* above ¶¶ 233-236.

523.   On information and belief, the package Primary Arms sent to Blachowicz contained unfinished frames or receivers and the parts to make them into ghost guns.

524.   On or around June 28, 2021 and July 3, 2021, Primary Arms sent two packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

525.   On information and belief, the packages Primary Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

526.   Primary Arms' sales to Loyola, Saxton, Kiem, Cruz, Brois, DiMaggio, Fisk, Blachowicz, and Carey demonstrate the complete and persisting lack of controls that Primary Arms employs in order to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, all while lining Primary Arms' pockets at the expense of New Yorkers' safety.

## I.   RAINIER ARMS

527.   Rainier Arms, another online retailer, repeatedly sold unfinished frames and receivers to undercover investigators in New York as late as May 2022, repeatedly marketed and sold unfinished frames and receivers to customers in New York, and failed to exercise any controls on its sales.

528.    Since Rainier Arms' inception in 2004, Rainier Arms has opened a second location in Wichita, Kansas for the specific purpose of marketing and selling more efficiently to the east coast, including New York. Specifically, Rainier Arms sought to save on increasing shipping costs and cut shipping times from the West Coast to the East Coast; it expected to save more than $10,000 monthly in such costs which, the company informed a third party, more than covers the cost of the Kansas lease.  On information and belief, since its expansion, Rainier Arms has grown its New York business substantially, including its sales of unfinished frames and receivers.

529.    On information and belief, Rainier Arms' website sees on average of about 530,000 visitors per month. Rainier Arms actively uses its website as a powerful marketing tool for its products.

530.    As of June 29, 2022, a substantial portion Rainier Arms' business included selling unfinished frames and receivers. Rainier Arms continues to market unfinished frames and receivers as exempt from public safety laws to attract customers who are trying to get around gun control laws. For example, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF.  As such, they can be bought, sold, and transported without restriction, as the government just considers them pieces of metal and/or plastic and not guns."[69]

531.    During the Relevant Time Period, Rainier Arms sold unfinished handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame, which product

---

[69] *See* https://www.rainierarms.com/manufacturers/polymer80/ (last visited March 6, 2023).  *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers/ (representing that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited March 12, 2023).

95

description continues to state "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[70]

532.    Rainier Arms also explains on its website that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government just considers them pieces of metal and/or plastic and not guns. [Polymer80's] motto is 'Reluctor Dominatus', which means 'Resist Tyranny'."[71]  Rainier Arms has actively marketed and promoted Polymer80 products by conducting flash sales of Polymer80 products that they have advertised by email, significantly discounting unfinished framed or receivers in an effort to market and sell them in large quantities, on information and belief including to New York residents.

533.    Rainier Arms has invested heavily in marketing designed to expand both its market share of unfinished frames and receivers and the industry, business practices that have created, maintained, or contributed to a condition that endangers the safety and health of the public. Consistent with its efforts to expand its market share and the industry, Rainier Arms illegally and repeatedly shipped unfinished frames and receivers directly to consumers in New York State for a substantial part of the Relevant Time Period.

---

[70] *See* https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame/ (last visited March 6, 2023).

[71] *See* https://www.rainierarms.com/manufacturers/polymer80/ (last visited March 12, 2023).  *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers/ (representing that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited March 12, 2023).

534.    According to its website, Rainier Arms is also actively marketing its business and products on Discord, YouTube, Instagram, Twitter, LinkedIn, through a private Facebook group called "Summit Club," and through an ordinary Facebook commercial account.

535.    Rainier Arms' routine illegal and repeated shipping of unfinished frames and receivers directly to consumers in New York State is evidenced by the fact that it sent several unfinished frames to New York State investigators in response to undercover purchases.

536.    For example, on or around April 27, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940SC Glock-compatible unfinished pistol frame from Rainier Arms.

537.    Rainier Arms accepted the order and shipped the frame into New York County.

538.    On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[72] and two parts kits for the Polymer80 ghost gun.

539.    Rainier Arms accepted the order and shipped the parts into New York County.

540.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Rainier Arms, along with a Glock 17-compatible slide and barrel.

541.    Rainier Arms accepted the order and shipped the frame and parts into New York County.

542.    These recent sales to the undercover investigators are wholly consistent with Rainier Arms'

---

[72] The large-capacity magazine Rainier Arms sold was separately illegal under New York State law. *See* N.Y. Penal Law § 265.00(23).

history of marketing, selling, and shipping these unlawful products to consumers in New York.

543.   It is not surprising that individuals who are looking to get around gun control laws found Rainier Arms' website and became customers. Rainier Arms' business practices have increased the number of dangerous ghost guns present in the State.

544.   Rainier Arms sent at least 6,428 packages into New York State between March 4, 2016, and January 5, 2023.

545.   At least 434 of these shipments were sent into New York City after February 23, 2020, the effective date of the City's ban on unfinished frames and receivers.

546.   At least 533 of these shipments were sent into New York State after April 26, 2022, the effective date of the State's ban on unfinished frames and receivers.

547.   A significant portion of each group of shipments discussed in Paragraphs 544-546 contained unfinished frames and receivers.

548.   Between approximately July 2, 2021, and September 1, 2021, Rainier Arms sent at least seven packages to Chaz McMillan at an address on 162nd Street in Queens, NY.  *See* above ¶¶ 200-204.

549.   On information and belief, the packages Rainier Arms sent to McMillan contained unfinished frames, unfinished receivers, and the parts to convert them into ghost guns.

550.   On or around March 12, 2018, Rainier Arms sent a shipment to Brandon Glaski in East Nassau, NY.  *See* above ¶¶ 301-303.

551.   On information and belief, the package Rainier Arms sent to Glaski contained unfinished frames or receivers and the parts to make them into ghost guns.

552.    Between approximately April 1, 2021, and May 22, 2021, Rainier Arms sent at least three packages to Ricardi Kiem at an address on Hook Creek Boulevard in the Rosedale area of Queens, NY.  *See* above ¶¶ 320-325.

553.    On information and belief, the packages Rainier Arms sent to Kiem contained unfinished frames or receivers and the parts to make them into ghost guns.

554.    On or around February 1, 2022, Rainier Arms sent a package to a woman with the initials N.S. at an address on Baisley Avenue in the East Rockaway area of Nassau County. Thomas Saxton, from the same address, would later be arrested after threatening to shoot his wife with a ghost gun while she held her child, and a search of the home turned up an arsenal of weapons, including ghost guns.  *See* above ¶¶ 214-215.

555.    On information and belief, the package Rainier Arms sent to the residence contained unfinished frames or receivers and the parts to make them into ghost guns.

556.    On or around July 20, 2021, Rainier Arms sent a package to Adam DiMaggio at an address on Lincoln Drive in Carmel, NY.  *See* above ¶¶ 516-517.

557.    On information and belief, the package Rainier Arms sent to DiMaggio contained unfinished frames or receivers and the parts to make them into ghost guns.

558.    Between approximately May 28, 2021 and November 22, 2021, Rainier Arms sent at least six packages to Paul Carey in Massapequa, NY. *See* above ¶¶ 240-249.

559.    On information and belief, the packages Rainier Arms sent to Carey contained unfinished frames or receivers and the parts to make them into ghost guns.

560.    Rainier Arms' sales to McMillan, Glaski, Kiem, Saxton, DiMaggio, and Carey demonstrate

Rainier Arms' complete and persisting lack of controls to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms, while lining Rainier Arms' pockets at the expense of New Yorkers' safety.

### J. ROCK SLIDE

561.    Rock Slide, a manufacturer and distributor of firearm parts, marketed unfinished frames and receivers to New Yorkers, sold an unfinished frame to an undercover investigator as late as May 2022, and failed to exercise any controls on this sale.

562.    While Rock Slide specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame, during the Relevant Time Period, a substantial portion of Rock Slide's business included selling Polymer80 brand Glock-compatible unfinished frames. Indeed, Rock Slide touted these products' compatibility with its own "upper" products.

563.    On information and belief, Rock Slide's website sees on average about 27,500 visitors per month. Rock Slide actively uses its website as a powerful marketing tool for its products.

564.    For example, on its website, Rock Slide has described the unfinished frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available.  No license required."[73]

565.    Rock Slide has successfully attracted New York business and shipped unfinished frames and receivers into New York State.

566.    Rock Slide's sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover

---

[73] Formerly available at https://rockslideusa.com/shop/ (last visited June 28, 2022).

purchase.

567.    On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Rock Slide, along with Rock Slide-brand upper and the remaining parts necessary to convert the unfinished frame into a working ghost gun.

568.    The checkout page included the words "No license required.  Ships anywhere in the USA."

569.    Rock Slide accepted the order and shipped the frame into New York County.

570.    Rock Slide's sale to the City investigator demonstrated its complete and persisting lack of controls, and exemplified just one instance of many prohibited sales of unfinished frames into New York, without conducting a background check or implementing any other controls to prevent an improper person from turning its products into working ghost guns, consistent with its central business purpose and model.

571.    Rock Slide has worked to become a major market player and to establish unfinished frames and receivers as a major market, actively marketing its products and touting their compatibility with Polymer80 products.

572.    Using these strategies, Rock Slide has become a highly successful and profitable business, with a significant amount of its revenue during the Relevant Time Period attributable to sales of unfinished frames or receivers, including into New York State.

573.    As demonstrated by the facts specific to each Defendant above, all Defendants have jointly and severally caused, contributed to, or maintained the same crisis—by following the same marketing and sales tactics, developing the unfinished frames and receivers industry, and in some

101

instances even by targeting and selling (and reselling) to the very same New York customers who should have never had access to firearms.

## IV. THE PRICE PAID BY THE STATE: DEFENDANTS' GHOST GUN-MAKING PRODUCTS HAVE HARMED NEW YORK AND WILL CONTINUE TO DO SO IF UNABATED.

574. The influx of ghost guns into New York is a significant threat to public health and safety. As summarized above, *see* above ¶¶ 96-103, New York's legislature has passed laws to serve this purpose, but by the conduct described in detail above, *see* above ¶¶ 115-573, Defendants not only undermine those laws, they affirmatively harm New Yorkers by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York.

575. As a result, to date, New York has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

### A. THE RISE OF GHOST GUNS AND THE DAMAGE DONE

576. The available data shows that ghost guns are proliferating—and are being used in crimes—at an exponential pace. According to the ATF, the number of ghost guns recovered at crime scenes nationwide increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in

102

2021.[74]  Notably, "[t]hese numbers are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that have no serial numbers or identifiable markings.[75]

577.     Researchers have confirmed this trend.  For example, a study published in 2022 analyzed data of recovered guns in a large U.S. city and concluded that there was "a 522% increase in the likelihood that a recovered gun was an untraceable PMF [privately manufactured firearm or ghost gun]" from pre-pandemic years, 2017-2019 to pandemic times, 2020-2021.[76]

578.      The number of ghost guns recovered in New York follows this disturbing trend.

579.     Specifically, New York law enforcement is recovering an increasing number of crime guns each year.  In 2018, law enforcement made 6,193 crime gun recoveries, but in 2021, that number rose to 9,861 crime guns—an increase of 59.2%.[77]  Ghost guns are an increasingly dangerous segment of this growing pool.  Throughout New York State, including New York City's five boroughs, the number of assembled ghost guns law enforcement recovered (and properly identified

---

[74] See 87 Fed. Reg. 24656 (citing internal figures from the ATF Office of Strategic Intelligence and Information).

[75] See id. at n.18.  Law enforcement officers often confuse ghost guns with "defaced" firearms.  The latter is a term of art that relates only to serialized firearms which had the serial number scraped, covered, or otherwise impeded from view.  Law enforcement agencies, including NYPD, have laboratory capabilities and processes to recover serial numbers on defaced firearms, and in some instances, a recovering officer may designate a recovered ghost gun as "defaced" so that the agency can take a closer look and determine whether a serial number may be recovered.  After subsequent review, a ghost gun initially misidentified as a defaced firearm will not be re-identified by law enforcement.  This accounts for a potentially significant undercount of recovered ghost guns.

[76] Anthony A. Braga, et al., *Privately manufactured firearms, newly purchased firearms, and the rise of urban gun violence*, Preventative Medicine, Dec. 2022.

[77] These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns with no serial number at all.

103

as such) increased from just 44 in 2018 to 797 in 2022—a 1,711% increase.[78]

580.    When considering the rate of ghost guns in the context of all gun recoveries across the State, the trend is deeply disturbing.  In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement.  That rate increased to 1.59% in 2019, then 4.4% in 2020, then further to 6.59% in 2021, and to 7.92% in 2022.  Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

581.    The number of assembled ghost guns in New York—including those created from Defendants' illegal products—has reached crisis levels and continues to climb.

582.    Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020.  On information and belief, Defendants' sales of unfinished frames and receivers have likewise increased exponentially over that same time period, with a significant number of those products being shipped directly into New York State or easily finding their way into New York State—leading to significant profits for Defendants from this illicit market.

583.    On information and belief, that increase in sales has coincided with a massive uptick in gun murders in the United States. In 2020, approximately 79% of murders—19,384 out of 24,576— involved a firearm. The total number of gun murders in 2020 represents a 34% increase from the number of gun murders in 2019, a 49% increase from the number of gun murders in 2015, and a

---

[78] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.  For example, these numbers do not account for the NYPD's recovery of 50 unfinished frames or receivers incident to arrests in 2020, 125 in 2021, and 100 for this calendar year through May 31.

75% increase from the number of gun murders in 2010.[79]

584.    Defendants' business practices, which at bottom increase the number of illegal operable firearms in New York, are also related to an increase in suicide deaths, as approximately half of all suicide deaths involve a firearm.  Like gun murders, gun-related suicides in the U.S. increased 10% between 2015 and 2020, and 25% when measured against 2010.[80]

## B.  DEFENDANTS' CONDUCT IS DANGEROUS AND DIRECTLY HARMS NEW YORK

585.    The evidence that Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of persons convicted of felonies.

586.    A study published in 2022 concluded that, relative to traditionally manufactured and serialized firearms, ghost guns "were 51% more likely to be recovered in violent crime during the 2017 through 2021 study period."[81]  That study revealed that ghost guns may have become a "weapon of choice" for violent gun criminals, as they accounted for nearly 1 in 4 guns recovered by the local police department providing the data, even though ghost guns cannot plausibly account for that share of guns entering firearms commerce.[82]  On information and belief, New York is in the same predicament, in which ghost guns account for a proportion of recovered and/or crime

---

[79] John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (Feb. 3, 2022) https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/ (last visited March 12, 2023).
[80] *Id.*
[81] Braga, *supra* note 73, at 6.
[82] *Id.*

guns that is disproportionate to their market share.

587.    Moreover, guns recovered at crime scenes are statistically related to gun manufacturer practices in the aggregate.  Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices.  For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appeared.  The more of these practices that a manufacturer has followed, the less frequently their products were recovered from crime scenes.  By these practices, a manufacturer aligns its business practices with its responsibilities under the law and incentivizes its dealer or distributor customers to do the same.

588.    Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices.  Defendants here have done and continue to do nothing to geographically restrain the marketing of their prohibited products, and they employ policies and practices that result in sales of these illegal products directly to unknown and deliberately unchecked individuals in New York.

589.    Moreover, Defendants are aware that persons who have been convicted of felonies are an important segment of the gun industry market.  To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws.  Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York were purchased outside of New York.  By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering

106

our communities by providing criminals and other individuals who either know or suspect they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one that is virtually untraceable. Thus, Defendants' conduct and business practices have created a new and more easily accessible market for illegal operable firearms in New York. *See, e.g.*, above ¶¶ 115-573.

590. ATF trace data has also long-established certain dealer characteristics that indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers but can bypass any and all dealers entirely.

591. In the context of domestic violence, an intimate partner is five times more likely to be murdered when the violent partner has access to a firearm.[83] New York law addresses this very real and substantial risk by, among other ways, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she possesses or owns when certain conditions are present. *See* N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Defendants' sale of ghost gun products and their refusal to conduct background checks undermine these important protections, *increasing* the already-significant risk that a protected person or persons will be murdered.

---

[83] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. *Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations With Intimate Partner Homicide.* Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

592.    Defendants' sale of unfinished frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public.  Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[84] Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[85] Consistent with that result, permit to purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[86]

593.    But by their conduct, Defendants are nullifying those benefits.  Defendants are stripping New York's effective licensing and permit laws of their impact, and consequently the number and rate of homicides and suicides will continue to rise.

594.    Accordingly, given the nature of Defendants' business practices and products, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and crime gun outcomes, Defendants are knowingly, negligently, and/or recklessly causing harm to New York's public health and safety.

---

[84] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. *Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States*, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.
[85]*Id.*
[86] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. *Association between Firearm Laws and Homicide in Urban Counties*. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. *Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health*. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

595.     With every sale Defendants have made during the Relevant Time Period, they circumvent
and undermine New York's firearms public safety measures for their own profit, and have created,
maintained, or contributed to a dangerous condition.

## CLAIMS FOR RELIEF

### AS AND FOR A FIRST CAUSE OF ACTION
**REPEATED AND PERSISTENT ILLEGALITY IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)**
*(Against All Defendants)*

596.     The State realleges each and every allegation in the paragraphs above as though fully set
forth herein.

597.     New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and
other relief when any person engages in repeated or persistent illegal conduct in the carrying on,
conducting, or transaction of business.

598.     Any conduct which violates state or federal law or regulation is actionable under New York
Executive Law § 63(12).

599.     As set forth above, Defendants have each engaged in repeated or persistent illegal conduct
in the carrying on, conducting, or transaction of business, by, *inter alia*:

- *Shipping and selling unfinished frames and receivers*: Each Defendant has repeatedly sold unfinished frames or receivers and shipped them directly to New York consumers, in violation of New York State and New York City law. *See* N.Y. Penal Law §§ 265.63, 265.64; N.Y. City Admin. Code § 10-314. Additionally, because unfinished frames and receivers are "designed to" and "may readily be converted" into working firearms, 18 U.S.C. § 921(a)(3); *see also id.* (including "the frame or receiver of any such weapon" in the definition), it is illegal to sell them under federal law unless they are serialized, subject to a background check, and sold through a federal firearms licensee.

- *Aiding and abetting the possession of firearms by convicted persons*: Each Defendant knew, intended, or was willingly blind to the fact that that by selling

109

their unfinished frames and receivers without following federal serialization, background check, and recordkeeping requirements, they would be purchased by convicted persons and others who could not buy a firearm through legitimate channels. Each Defendant thereby aided and abetted convicted persons in possessing a prohibited firearm.

- *Aiding and abetting the possession of firearms by unlicensed person*: Each Defendant knew, intended, or was willfully blind to the fact that that by selling their unfinished frames and receivers without performing a background check or otherwise confirming that the buyer had a valid license, they would be purchased by unlicensed persons, including persons who could not legitimately obtain a license. Each Defendant thereby aided and abetted unlicensed persons in possessing a prohibited firearm in violation of N.Y. Penal Law §§ 265.01(1), 265.20(3).

- *Deceptive business practices*: Each Defendant has repeatedly engaged in acts and practices in the conduct of business, trade, or commerce including but not limited to misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded. Each Defendant thereby engaged in deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York in violation of New York General Business Law § 349(c). The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

- *False advertising*: Each Defendant has repeatedly engaged in acts and practices in the conduct of business, trade, or commerce including but not limited to misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded. Each Defendant thereby engaged in false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York in

110

violation of New York General Business Law § 350. The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

- *Aiding and abetting possession of unserialized firearms*: Each Defendant sold unfinished frames or receivers into New York State knowing, intending, or being willfully blind to the fact that these products would be converted into working, unserialized firearms, while marketing their products as a way around serialization requirements, and portraying serialization as optional, unnecessary, or undesirable. Each Defendant thereby aided and abetted the possession of unserialized firearms in violation of, *inter alia*, 26 U.S.C. § 5842(b), 26 U.S.C. § 5861(c), 26 U.S.C. § 5861(d), and N.Y. Penal Law § 265.07. During the pendency of this litigation several Defendants have continued to promote their unfinished frames and receivers as a way around serialization requirements.

- *Transporting firearms without a federal firearms license*: Each Defendant that does not hold a federal firearms license, on information and belief including Defendants Indie Guns, KM Tactical, and Rock Slide, has repeatedly and persistently transported unfinished frames and receivers into New York State in violation of 18 U.S.C. § 922(a)(1)(A).

- *Transporting firearms in violation of law*: Each Defendant that holds a federal firearms license, on information and belief including Defendants Arm or Ally, 80 Percent Arms, 80P Builder, Brownells, Glockstore, Primary Arms, and Rainier Arms, has repeatedly and persistently transported unfinished frames and receivers directly to persons in New York State who were not federal firearms licensees in violation of 18 U.S.C. § 922(a)(2).

- *Transporting firearms to a foreign state*: Each Defendant has repeatedly and persistently transported unfinished frames and receivers directly to persons in New York State, in violation of 18 U.S.C. § 922(a)(5) and 18 U.S.C. § 922(b)(3).

- *Sale or delivery to persons prohibited by state law*: Each Defendant holding a federal firearms license intended, or was willfully blind to the fact that that their sales of unfinished frames and receivers to New Yorkers violated multiple state laws, including but not limited to the categorical prohibition on sale and possession of unfinished frames and receivers, *see* N.Y. Penal Law §§ 265.01(10), .63, .64, the categorical prohibition on sale and possession of ghost guns, *see* N.Y. Penal Law §§ 265.01(9), .60, .61, prohibitions on possession of weapons by unlicensed persons, *see* N.Y. Penal Law §§ 265.01(1), 265.20(3), and prohibitions on possession of weapons by convicted persons, *see* N.Y. Penal Law § 265.02. Despite these state laws, each of these Defendants repeatedly and persistently transported

111

unfinished frames and receivers directly to persons in New York State, including to persons forbidden from possessing them under the state laws above, in violation of 18 U.S.C. § 922(b)(2).

- *Sale or delivery to persons convicted of serious crimes*: Each Defendant knew, intended, or was willingly blind to the fact that that by selling their unfinished frames and receivers without following federal serialization, background check, and recordkeeping requirements, they would be purchased by convicted persons and others who could not buy a firearm through legitimate channels, in violation of 18 U.S.C. § 922(d)(1).

- *Sale or delivery of a firearm without a background check*: Each of the Defendants holding a federal firearms licenserepeatedly and persistently transported unfinished frames and receivers directly to persons in New York State who were not federal firearms licensees, without conducting a background check in connection with any such sale or transfer, in violation of 18 U.S.C. § 922(t).

- *Dealing in firearms without a license*: Each Defendant that does not hold a federal firearms license repeatedly and persistently transported unfinished frames and receivers directly to consumers in New York State, in violation of 18 U.S.C. § 923(a).

600. By reason of the foregoing, Defendants have engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## AS AND FOR A SECOND CAUSE OF ACTION
### REPEATED AND PERSISTENT FRAUDULENT CONDUCT IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)
*(Against All Defendants)*

601. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

602. New York Executive Law § 63(12) authorizes the Attorney General to seek injunctive and other relief when any person engages in repeated or persistent fraudulent conduct.

603. New York Executive Law § 63(12) defines "fraud" or "fraudulent" to "include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression,

false pretense, false premise or unconscionable contractual provisions."

604.    As set forth above, each Defendant has each engaged in repeated or persistent fraudulent conduct in the carrying on, conducting, or transaction of business, by misrepresenting, directly or by implication, in their advertising and elsewhere, (1) that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York; (2) that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York; and (3) the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

605.    By reason of the foregoing, Defendants have engaged in repeated and persistent fraudulent conduct in violation of New York Executive Law § 63(12).

## AS AND FOR A THIRD CAUSE OF ACTION
### PUBLIC NUISANCE PURSUANT TO N.Y. GENERAL BUSINESS LAW § 898-C
*(Against All Defendants)*

606.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

607.    The Attorney General acts within her authority to bring an action in this Court to enjoin and restrain each Defendant from its ongoing violations and to obtain restitution and damages, pursuant to New York General Business Law § 898-d.

608.    Each Defendant constitutes a "gun industry member," subject to New York General

Business Law § 898-b.

609.    Each Defendant has sold and continues to sell; has manufactured and continues to manufacture; has marketed and continues to market "qualified product[s]," as defined in New York General Business Law § 898-a.

610.    By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers directly into New York State.

611.    By the conduct described above, each Defendant has acted unlawfully by advertising, manufacturing, selling, and shipping unfinished frames and receivers that may foreseeably make their way into New York State.

612.    These actions have created, maintained, or contributed to a condition in New York State that endangers the safety and health of the public.

613.    Under state law, Defendants' activities constitute a public nuisance. *See* N.Y. General Business Law § 898-c(1).

614.    Moreover, each Defendant constitutes a "gun industry member," that is required to "establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed, or sold unlawfully." N.Y. General Business Law § 898-b(2).

615.    These required procedures include, but are not limited to "instituting screening, security, inventory and other business practices to prevent . . . sales of qualified products to . . . traffickers, persons prohibited from possessing firearms under state or federal law, or persons at risk of injuring themselves or others." N.Y. General Business Law § 898-a(2).

616.    Each defendant fails to have any policy or procedure that constitutes adequate measures to

114

screen security or inventory, or otherwise prevent its prohibited products from being possessed, used, marketed, or sold unlawfully in New York.

617. Each Defendant's failure to have reasonable controls and procedures has resulted and continues to result in ongoing harm to the public and constitutes a public nuisance. *See* N.Y. General Business Law § 898-c(1).

**AS AND FOR A FOURTH CAUSE OF ACTION**
**VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349**
*(Against All Defendants)*

618. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

619. New York General Business Law Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

620. As set forth above, Defendants have violated New York General Business Law § 349 by engaging in acts and practices including but not limited to:

    a. Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

    b. Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

    c. Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

115

## AS AND FOR A FIFTH CAUSE OF ACTION
### VIOLATION OF N.Y. GENERAL BUSINESS LAW § 350
*(Against All Defendants)*

621.    The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

622.    New York General Business Law Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in the State of New York.

623.    As set forth above, Defendants have violated New York General Business Law § 350 by engaging in acts and practices including but not limited to:

a.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell and possess the firearms sold by Defendants in the State of New York and/or the City of New York;

b.    Misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal to sell or possess unfinished frames, unfinished receivers, and/or ghost guns in the State of New York and/or the City of New York;

c.    Misrepresenting, directly or by implication, in their advertising and elsewhere, the legal requirements applicable to their sales of guns, including that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

The Attorney General timely provided each Defendant with the pre-litigation notice required by New York General Business Law § 349(c).

## AS AND FOR A SIXTH CAUSE OF ACTION
### NEGLIGENCE PER SE
*(Against All Defendants)*

116

624. The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

625. Each state and federal statute discussed above established a duty of care, which Defendants breached by violating each law's requirements, including but not limited to:

a. N.Y. Penal Law §§ 265.63, 265.64 and N.Y. City Admin. Code § 10-314, which prohibit the sale of unfinished frames and receivers.

b. N.Y. Penal Law § 265.07, requiring serialization of all unfinished frames and receivers.

c. 18 U.S.C. § 922(a)(1)(A), prohibiting those Defendants without federal firearms licenses from transporting firearms in interstate commerce.

d. 18 U.S.C. § 922(a)(2), prohibiting those Defendants with federal firearms licenses from transporting firearms directly to consumers.

e. 18 U.S.C. § 922(b)(2), prohibiting those Defendants with federal firearms licenses from transporting firearms to persons forbidden from possessing them under State law.

f. 18 U.S.C. § 922(d)(1), prohibiting Defendants from selling firearms to persons convicted of serious crimes.

g. 18 U.S.C. § 922(t), prohibiting those Defendants with federal firearms licenses from transporting firearms without a background check.

h. 18 U.S.C. § 923(a), prohibiting those Defendants without federal firearms licenses from dealing in firearms.

626. Each of the statutes discussed above, such as prohibitions on the sale of unfinished frames and receivers, prohibitions on the possession of ghost guns, prohibitions on sale of guns to unlicensed or convicted persons, and prohibitions on the sale of unserialized weapons, are designed to protect the public from gun violence.

117

627.     Each Defendant, through its sale of unfinished frames and receivers into New York, violated the duty of care imposed by these statutes, resulting in the type of harm the firearms laws were designed to prevent.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**NEGLIGENT ENTRUSTMENT**
*(Against All Defendants)*

628.     The State realleges each and every allegation in the paragraphs above as though fully set forth herein.

629.     Each Defendant may properly be deemed an "owner or possessor of a dangerous instrument" and was accordingly under a duty to entrust that instrument to a responsible person whose use would not create an unreasonable risk of harm to others.

630.     Each Defendant in this action breached that duty by entrusting their dangerous instruments, *i.e.,* unfinished frames and receivers, to persons in New York who were ineligible, unable, or unwilling to secure a firearm through the legal FFL process and thereby likely to create an unreasonable risk of harm to others.

631.     Each Defendant intended to sell and knowingly sold unfinished frames and/or receivers to individuals who were likely to create an unreasonable risk of harm to others, such as those with criminal convictions, subject to restraining orders, with disqualifying mental health histories, or who lacked proper licensing and training.

632.     Each Defendant is a distributor who engaged with such customers and directly and deliberately did nothing to verify their identity, permit status, or fitness to own a gun.

633.     Each Defendant intended to sell and knowingly sold unfinished frames and/or receivers to

118

customers intending to use them in the commission of a crime, as Defendants' workaround for

serialization and recordkeeping requirements meant that the ghost guns made from their products

would be untraceable and their customers could evade law enforcement. Each Defendant's intent

is demonstrated by the way each Defendant has emphasized the untraceability of their products in

their marketing.

634.    Each Defendant was in the best position to protect against the risk of harm.  They —and

only they—had the ability to know who they were shipping their "unfinished" products to—and

who would be turning them into ghost guns.

## DEMAND FOR JURY TRIAL

635.    Pursuant to Federal Rule of Civil Procedure 38(b), New York demands a trial by jury on

all the issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the People of the State of New York, respectfully requests that

the Court enter an order and judgment that:

1.    Enjoins each Defendant, pursuant to New York Executive Law § 63(12):

    a.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person or entity with a current New York State shipping or billing address;

    b.    From selling, shipping, distributing, or otherwise supplying unfinished frames or receivers to any person whom the Defendant knows or should know intends to bring, ship, sell, or otherwise transport, carry, or transfer any such unfinished frame or receiver, or an operable, unserialized firearm assembled therefrom, to New York State or to any person or entity with a current New York State shipping or billing address;

    c.    From manufacturing, distributing, selling, or marketing unserialized firearms or

119

products that are used to form or create operable, unserialized firearms within the State unless such conduct complies with heightened, independently-monitored safeguards against the recurrence of the Defendant's fraudulent, illegal, and/or unlawful practices, which are to be set forth in a compliance plan reviewed and approved by Plaintiff and the Court; and

d. To issue public corrective statements regarding their false and misleading public statements and omissions;

2. Directs each Defendant, pursuant to New York Executive Law § 63(12), to:

a. Pay restitution and damages for its fraudulent and/or illegal practices that violated that statute and caused compensable injuries to Plaintiff or any other person; and

b. Disgorge all revenues it wrongfully obtained as a result of its fraudulent and/or illegal practices in violation of that statute;

3. Directs Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

4. Grants civil penalties pursuant to New York General Business Law § 350-d, which provides for a penalty of up to $5,000 for each violation of New York General Business Law §§ 349 or 350;

5. Awards punitive damages, in an amount to be determined at trial;

6. Awards Plaintiff its costs and grants statutory costs pursuant to CPLR § 8303(a)(6); and

7. Grants such other and further relief as the Court deems just and proper.

120

Dated: New York, New York
March 13, 2023

LETITIA JAMES
Attorney General of the State of New York


By: _____
James M. Thompson
Monica Hanna
    Special Counsel
Abigail Katowitz
Matthew Conrad
    Assistant Attorneys General
28 Liberty Street
New York, New York 10005
(212) 416-6556
(212) 416-8227
(212) 416-8922
(212) 416-6352
james.thompson@ag.ny.gov
monica.hanna@ag.ny.gov
abigail.katowitz@ag.ny.gov
matthew.conrad@ag.ny.gov

121

# EXHIBIT 2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ERIE**

------------------------------------------------x

THE CITY OF BUFFALO,

                    Plaintiff,

                 – against–

SMITH & WESSON BRANDS, INC.; BERETTA U.S.A. CORP.;
BUSHMASTER FIREARMS INDUSTRIES, INC.; COLT'S
MANUFACTURING COMPANY, LLC; GLOCK, INC.; HI-
POINT FIREARMS, A/K/A STRASSEL'S MACHINE, INC.; JA
INDUSTRIES, LLC, F/K/A JENNINGS FIREARMS, F/K/A
BRYCO ARMS, F/K/A JIMENEZ ARMS; KEL-TEC CNC
INDUSTRIES, INC.; O.F. MOSSBERG & SONS,
INCORPORATED; REMARMS, LLC, A/K/A REMINGTON
FIREARMS; SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER & CO., INC.;
SCCY INDUSTRIES, LLC; TAURUS HOLDINGS, INC., A/K/A
TAURUS INTERNATIONAL MANUFACTURING, INC.; ARM
OR ALLY, LLC; BROWNELLS, INC., A/K/A BROWNELLS OR
BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A
GLOCKSTORE, A/K/A GSPC A/K/A DOUBLE DIAMOND;
INDIE GUNS, LLC; JSD SUPPLY; KM TACTICAL;
POLYMER80, INC.; PRIMARY ARMS, LLC; RANIER ARMS,
LLC; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER
OR 80P FREEDOM CO.; ROCK SLIDE USA, LLC; BANGERS,
L.P. N/K/A IRON VALLEY™ SUPPLY CO.; GUN CENTER
INC., A/K/A GC WHOLESALE; RSR GROUP, INC.; VINTAGE
FIREARMS, LLC; AND WOLCOTT GUNS INC.,

                    Defendants.

------------------------------------------------x

Index No.:

**VERIFIED**
**COMPLAINT**

**PLAINTIFF**
**DEMANDS A**
**TRIAL BY JURY**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2

Case 1:23-cv-00105-LJV Document 28-12 Filed 05/08/23 Page 131 of 197 PageID 1638

RECEIVED NYSCEF: 12/20/2022

INTRODUCTION ............................................................................................................. 1

JURISDICTION AND VENUE ...................................................................................... 17

PARTIES ........................................................................................................................... 18

   I.   Plaintiff .................................................................................................................. 18

   II.  Defendants. .......................................................................................................... 18

      A.  Manufacturers/Makers ................................................................................ 18

      B.  Ghost Gun Defendants ................................................................................ 26

      C.  Distributors ................................................................................................... 28

FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION .............. 33

   I.   Firearm Violence in the United States, State of New York, and City of Buffalo ..... 33

   II.  The Primary and Secondary Market for Guns ................................................... 45

   III.  Diversion to the Illegal Market ........................................................................ 46

      A.  Illegal Sales at Gun Shows ......................................................................... 47

      B.  Private Sellers and Other Non-Storefront Sales ......................................... 47

      C.  Straw Purchases ........................................................................................... 48

      D.  Multiple Sales .............................................................................................. 49

      E.  Corrupt FFLs ............................................................................................... 49

      F.  Other Means of Diversion ........................................................................... 49

   IV.  The Trace Database ........................................................................................... 76

   V.  Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market ................................................................................................... 78

   VI.  Merchandising Practices that Could Reduce Illegal Diversion ........................ 81

   VII.  2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits ......................................... 83

   IX.  Ghost Gun Defendants .................................................................................... 109

      A.  Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted into Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns ........................................ 109

      B.  Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety ......................... 119

          i.  The Federal Gun Control Act. ....................................................... 119

          ii.  New York State Law .................................................................... 122

      C.  Ghost Guns Endanger the Public and Undermine Law Enforcement ......... 122

      D.  Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns ......... 125

i

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

i. Arm or Ally ..................................................................................... 127

ii. Rainier Arms ................................................................................... 131

iii. 80P Builder ..................................................................................... 133

iv. Rock Slide USA ............................................................................... 136

v. Indie Guns ...................................................................................... 138

vi. Brownells ....................................................................................... 141

vii. Glockstore/GS Performance ............................................................ 146

viii. KM Tactical .................................................................................... 148

ix. Primary Arms ................................................................................. 150

x. Polymer 80 ..................................................................................... 150

xi. JSD Supply ..................................................................................... 155

E. Ghost Gun Defendants' Guns Have Harmed the City of Buffalo and Will Continue to Do So If Unabated. ......................................................................................... 158

i. The Rise of Ghost Guns and the Damage Done ............................... 159

ii. Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Concerns. ................................................................... 161

X. Defendants' Conduct Is Dangerous and Directly Harms the City of Buffalo ..................... 162

XI. This Avoidable Crisis Needs to Be Fixed ................................................................ 176

FIRST CAUSE OF ACTION ........................................................................................... 179

SECOND CAUSE OF ACTION ....................................................................................... 183

THIRD CAUSE OF ACTION .......................................................................................... 186

FOURTH CAUSE OF ACTION ....................................................................................... 188

REQUEST FOR RELIEF ............................................................................................... 190

ii

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Plaintiff, City of Buffalo, New York ("Plaintiff," "City," or "Buffalo"), by and through its attorneys,

Cavette A. Chambers, Corporation Counsel of the City of Buffalo, and Napoli Shkolnik PLLC, allege

upon personal knowledge as to itself, and upon information and belief as to all other matters, as follows:

## **INTRODUCTION**

1.      Defendants' conduct in the design, manufacturing, importing, selling, marketing and

distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful

possession, transportation and disposition of firearms and the utilization of guns in the commission of

an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease

of concealment, which appeals to prospective purchasers with criminal intent, including but not limited

to through advertisement, product placement in movies and social media; b) purposely supplying more

firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not

training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts

with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

2.      These actions have created, maintained, or contributed to a condition in the City of

Buffalo that endangers the safety and health of the public.

3.      All of the Defendants manufacture, import, sell, market, and/or distribute firearms that

have been possessed and/or used illegally in the City of Buffalo. Defendants are identified below as

Firearm Manufacturer Defendants, Firearm Distributor Defendants, and Ghost Gun Defendants.

4.      Defendants' actions have created, maintained, or contributed to a condition in Buffalo

that impacts the health and well being of us all.[1]  In 2020, gun deaths reached the highest number ever

recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than

---

[1]  *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a concurrent public health crisis intensified. Gun homicides rose dramatically across the country, increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in 2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[2]

5.      "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[3]

6.      "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[4]

7.      "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020.

---

[2]      *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge).

[3]      *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021)). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[4]      *Id.* at 5.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[5]

8.      "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15-19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20–39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[6]

9.      The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

10.      According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report*,[7] below is a chart of Violent Crimes by Firearm in Buffalo as of April 24, 2020:[8]

---

[5]  *Id.* at 7.

[6]  *Id.* at 13-14.

[7]  https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[8]  *Id.* at 201.

3

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 23-01010-MSC CW Document 1211 Filed 05/08/23 Page 186 of 197 Page ID 16043

NYSCEF DOC. NO. 2                                                          INDEX NO. UNASSIGNED
                                                                RECEIVED NYSCEF: 12/20/2022

**Violent Crimes by Firearm**
As of 04/24/2020
Buffalo City Police Department (UCR)

11. Below is also a chart of Firearm Activity:[9]

**Firearm Activity**
As of 5/11/2020
Buffalo City Police Department

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Average is rounded to the nearest whole number.

---

[9]  *Id.* at 202.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

12.     Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City of Buffalo and New York State.

13.     On May 14, 2022, gunman Payton S. Gendron, age 18, killed ten people and wounded three in a mass shooting at a Buffalo supermarket.[10]  Of the thirteen people shot, eleven were Black and two were white.[11]  Gendron used a Bushmaster XM-15, which was the same model that was used by a 20-year-old man to kill 26 people at Sandy Hook in 2012.[12]  Gendron bought the rifle at Vintage Firearms in Endicott.[13]

14.     In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms Tracing Database, traced 7,254 firearms.[14]

15.     Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[15]

16.     The top categories reported on firearm traces with a New York recovery for that year are as follows:[16]

---

[10]  https://buffalonews.com/news/local/complete-coverage-10-killed-3-wounded-in-mass-shooting-at-buffalo-supermarket/collection_e8c7df32-d402-11ec-9ebc-e39ca6890844.html.

[11]  *Id.*

[12]  https://buffalonews.com/news/local/crime-and-courts/tops-markets-shooter-chose-ar-15-to-stoke-controversy/article_28ed09a0-d54f-11ec-841c-6f77fed17035.html

[13]  *Id.*

[14]  https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[15]  *Id.*

[16]  *Id.*

5

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Top Categories Reported on Firearm Traces with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health - Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

**NOTE:** There were 541 additional traces that were associated with other categories.

17. The top 15 source states for firearms with a New York recovery for that year are as follows:[17]

---

[17] *Id.*

6

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## Top 15 Source States for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| State | Count |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

18.     The age of possessors for firearms with a New York recovery for that year is as follows:[18]

---

[18]  *Id.*

7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## Age of Possessors for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020-12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020-12/31/2020 National Average Age of Possessor: **34 Years**

19.     The top recovery cities for firearms with a New York recovery for that year are as follows:[19]

---

[19] *Id.*

8

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Top Recovery Cities for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

20.     Buffalo is third on the list with 478.

21.     The top recovery cities for firearms with a New York recovery for 2019 are as follows:[20]

---

[20] https://www.atf.gov/file/147286/download

9

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



## Top Recovery Cities for Firearms
## with a New York Recovery
### January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

22.    Buffalo is second on the list, behind the City of New York, with 615.

23.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[21]

---

[21]  https://www.atf.gov/file/137211/download

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

24.     Buffalo is again second on the list, behind New York City, with 571.

25.     Because some guns used in a crime start off as legal firearms, it is evident that guns manufactured by Defendant Firearm Manufacturers and distributed by Defendant Firearm Distributors are diverted into an illegal gun market which caters to juveniles, criminals and other persons who are prohibited from owning guns. In addition, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children —  anyone barred by law from acquiring guns.

26.     This diversion is a result of Defendants' failure to institute appropriate marketing and distribution practices.

11

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01016-MSS-TGW Document 31-2 Filed 09/08/23 Page 144 of 727 PageID 1051

27.     Defendants knew or should have known that (a) some of the firearms they manufacture and/or distribute would be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

28.     Reasonable measures are available to help ensure that the guns sold and distributed by Defendants do not find their way into a secondary illegal market.

29.     Defendants could, but do not, monitor, supervise or otherwise regulate the sale and distribution of their guns by their downstream distributors or dealer-customers. Defendants could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market. Defendants make no effort to identify the distributors and dealers whose sales disproportionately supply the illegal secondary market.

30.     On July 27, 2022, the U.S. House of Representatives issued a Memorandum from the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits.[22] The Memorandum, in part, found:

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

  i.   Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

---

[22] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

12

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

Case 8:23-cv-01016-MSS-TGW Document 31-2 Filed 05/08/23 Page 145 of 727 PageID 1052

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

    ii.   Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

    iii.   Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- Gun manufacturers fail to track or otherwise monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

    i.   All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

    ii.   Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

    iii.   Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

31.    Residents of the City of Buffalo are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if Defendants followed more prudent merchandising policies.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-01106-MSS-TGW Document 31-2 Filed 09/08/23 Page 146 of 727 PageID 1053

RECEIVED NYSCEF: 12/20/2022

32.     Defendants' conduct in the design, manufacturing, importing, selling, marketing and distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

33.     In particular, Firearm Manufacturers and Distributors' failure to institute appropriate marketing and distribution practices results in diversion of guns to the illegal secondary market.

34.     In addition to the manufacturers and distributors of finished guns, the manufacturers and distributors of "ghost guns"[23] sell directly to consumers untraceably, without a background check, and without any federally required record of their sale. In many cases, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children — anyone barred by law from acquiring guns.

35.     Ghost guns and their central component, so-called "unfinished" or "80%" frames or lower receivers, are illegal to sell or possess under the laws of New York State, and constitute a statutory and common law public nuisance, which Ghost Gun Defendants cause and to which they contribute.

---

[23] These firearms are called "ghost guns" because they lack serial numbers and thus when discovered at crime scenes are untraceable — invisible to law enforcement scrutiny.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Ghost Gun Defendants peddle ghost gun components over the internet to Buffalo residents and surrounding areas, thwarting federal and state firearms laws.

36.     Ghost gun sellers operate on the pretense that their products are not firearms because they are "unfinished," and hence when sold require neither serial numbers nor background checks. Ghost Gun Defendants' business model is to sell "unfinished" frames to persons who, following Ghost Gun Defendants' simple instructions, will finish them, and — by adding the remaining components Ghost Gun Defendants also provide — assemble fully operational weapons.

37.     The City of Buffalo is experiencing the entirely predictable result of Defendants' lawless behavior: exponentially increasing numbers of firearms, including untraceable ghost guns used in crimes in the City, including multiple murders and other crimes of violence, often committed by persons who could never legally acquire a conventional firearm in the first place.[24] As of January 2022, it was reported that the Buffalo Police Department seized 1300% more ghost guns in 2021 than 2020.[25]

38.     Nationally, the federal government estimates that between 2016 and 2021, law enforcement recovered more than 45,000 ghost guns from crime scenes, including 692 murder or attempted murder scenes. The annual totals recovered increased tenfold during the course of the six-year period analyzed by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),[26]

[24] *See* Aaron Besecker, "With Buffalo in ghost gun 'pandemic,' new state laws take aim at problem," https://buffalonews.com/news/local/crime-and-courts/with-buffalo-in-ghost-gun-pandemic-new-state-laws-take-aim-at-problem/article_06d53a46-38af-11ec-94ae-4fd26657b9ab.html (last visited July 12, 2022); Olivia Proia, "Buffalo Police: Ghost guns are a huge problem for us," https://www.wkbw.com/news/local-news/buffalo-police-ghost-guns-are-a-huge-problem-for-us (last visited July 12, 2022).

[25] *Id.*

[26] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022). Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

bearing in mind that these numbers are limited to *recovered* ghost guns: countless more remain on the streets or in homes — unlicensed, untraceable, and invisible to law enforcement.

39.     All Defendants have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps — or any steps at all — to keep their ghost gun products and firearms out of the hands of people who are prohibited from accessing firearms. Indeed, there are numerous commonsense, scientifically grounded policies and practices that, if implemented, would reduce the risk of Defendants' guns being used in murder, suicide, or violent crime.

40.     The very nature of the Ghost Guns Defendants' business model subverts and undermines the laws designed to protect New Yorkers' right to public safety. Ghost Gun Defendants also engage in fraudulent conduct, deception, and false advertising in violation of New York law. Through their marketing and customer communications, Ghost Gun Defendants mislead customers directly and indirectly about the legality of possessing the unfinished frames sold by them as well as the completed "ghost guns" created with the kits sold to consumers.

41.     Ghost Gun Defendants' illegal conduct thus results in a proliferation of firearms and unserialized, untraceable, unlawful ghost guns on the streets and in the homes of the City of Buffalo, making the City more dangerous for both the public and law enforcement, causing a quintessential public nuisance.

42.     Plaintiff's cause of action and claims for relief arise from the injuries occurring within the State of New York; the injuries were caused by actions either in the State of New York or by an act or omission outside of the State of New York; each of the Defendants regularly did business, and/or solicited business and/or engaged in other persistent courses of conduct within the State of New York;

16

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

each of the Defendants derived substantial revenues from goods and/or services consumed and/or used in the State of New York; and each of the Defendants placed in the stream of commerce in the United States and in the State of New York firearms and/or accessories or after-market parts which are the subject of this litigation.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a) and CPLR 301 and 302.

44.     This action is non-removable because there is no complete diversity of citizenship, and no substantial federal question is presented.

45.     Jurisdiction is proper under CPLR 302(a)(1) because each Defendant transacts substantial business within the State by supplying goods into New York State.

46.     Jurisdiction is also proper under CPLR 302(a)(3) because each Defendant commits tortious acts outside New York State that cause injury to persons or property within New York State, and because each Defendant (1) regularly solicits business in New York State, (2) engages in persistent conduct towards New York State consumers, (3) derives substantial revenue from goods used or consumed in New York State, and (4) expects or should reasonably expect its sale of its unfinished frames and receivers to have consequences in New York State and derives substantial revenue from interstate commerce.

47.     This Court has personal jurisdiction over all Defendants, as Defendants are manufacturers and distributors of firearms that caused injury and damage in New York and Defendants, at the time of placing their parts into the stream of commerce, could have foreseen, realized, expected and/or anticipated that the product might eventually be found in New York by reason of its nature and Defendants' business practices.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
Case 8:23-cv-01106-MSS-TGW Document 31-2 Filed 05/08/23 Page 150 of 727 PageID 1057
NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

48.     Venue in Erie County is proper under CPLR 503(a) because Defendants' tortious conduct, including shipments of unfinished frames and receivers, occurred within Erie County and is a substantial part of the events giving rise to the claim.

49.     Venue in Erie County is further proper under CPLR 503(a) and 509 because it is the county designated by the Plaintiff.

## PARTIES

### I. Plaintiff.

50.     Plaintiff the City of Buffalo is a municipal corporation organized under the laws of the State of New York.

### II. Defendants.

#### A. Manufacturers/Makers

51.     Defendant Smith & Wesson Brands, Inc., is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts located at Springfield, MA 01104; its registered agent is Registered Agent Solutions, Inc., at 44 School Street, Suite 505, Boston, MA 02108. At all times relevant to this action, Smith & Wesson Brands, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Smith & Wesson's website, it has ten dealers located within nineteen miles of Buffalo, including in Kenmore, NY, Grand Island, NY, and Cheektowaga, NY.[27]

52.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland located at 17601 Beretta Drive,

---

[27] https://www.smith-wesson.com/dealer-locator?location=14202

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607.

At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. Beretta operates a gallery in New York located at 718 Madison Avenue New York, NY 10065.[28]  Below is a photograph of Beretta's gallery in New York:



53.     Defendant Bushmaster Firearms Industries, Inc., is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Nevada at 3505 Arrowhead

---

[28] https://berettagalleryusa.com/pages/new-york-store.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)   INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                   RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01016-MSS-TGW Document 23-2 Filed 09/08/23 Page 152 of 727 PageID 1059

Drive, Carson City, NV 89706; its registered agent is Sun Naegele at 3505 Arrowhead Drive, Carson City, NV 8970. At all times relevant to this action, Bushmaster Firearms Industries, Inc. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo.

54.     Defendant Colt's Manufacturing Company, LLC, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut located at 545 New Park Avenue, West Hartford, CT 06110; its registered agent is Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE 19808. At all times relevant to this action, Colt's Manufacturing Company, LLC manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Colt's website it has dealers located within 20 miles of the City of Buffalo. They are located at Kenmore, NY; Buffalo, NY; Cheektowaga, NY; Depew, NY; Alden, NY; and Boston, NY.[29]

55.     Defendant Glock, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia located at 6000 Highlands Parkway SE, Smyrna, GA 30082-7204; its registered agent is Carlos Guevara c/o 6000 Highlands Pkwy, Attn: Legal Dept., Smyrna, GA, 30082. At all times relevant to this action, Glock, Inc. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Glock's

---

[29] https://www.colt.com/dealer-locator

20

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

website it has over 30 dealers in New York.[30]  These include locations in Kenmore, NY, Cheektowaga,

NY, Lackawanna, NY, Depew, NY, Tonawanda, NY, Grand Island, NY, Akron, NY, and Corfu, NY.[31]

56.     Defendant Hi-Point Firearms, a/k/a Strassel's Machine, Inc., is a corporation organized

and existing under the laws of the State of Ohio, with its principal place of business in Ohio located at

1015 Springmill Rd., Mansfield, OH 44906; its registered agent is Joseph M. Strassell at 1015 Springmill

Street, Mansfield, OH 44906. At all times relevant to this action, Hi-Point Firearms, a/k/a Strassel's

Machine, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed

and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within

the City of Buffalo. According to Hi-Point's website it has four dealers within 20 miles of Buffalo. The

dealers are located in Buffalo, NY; North Tonawanda, NY; Alden, NY; and Lockport, NY.[32]

57.     Defendant JA Industries, LLC, f/k/a Jennings Firearms, f/k/a Bryco Arms, f/k/a

Jimenez Arms, is a corporation organized and existing under the laws of the State of Nevada, with its

principal place of business in Nevada located at 249 Elliott Road Unit 1, Henderson, Nevada 89011; its

registered agent is the Amin Law Group NV, Ltd., at 3753 Howard Hughes Pkwy, Suite 200, Las Vegas,

NV 89169. At all times relevant to this action, JA Industries LLC, f/k/a Jennings Firearms, f/k/a Bryco

Arms, f/k/a Jimenez Arms, manufactured, assembled and/or imported firearms which were marketed,

distributed and/or sold in the United States, and which were distributed, marketed, sold and/or

possessed within the City of Buffalo. On March 30, 2022, the U.S. Attorney's Office for the Southern

District of New York in *Everytown for Gun Safety Support Fund et al. v. Bureau of Alcohol, Tobacco, Firearms and*

---

[30] https://us.glock.com/en/Dealer-Locator-USA

[31] *Id.*

[32] https://www.hi-pointfirearms.com/dealer-locator/index.php

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

*Explosives et al.*, 21 Civ. 0376 (ALC) filed a letter stating that the ATF, on March 24, 2022, sent JA industries a notice of revocation of its firearms license.[33]

58.     Defendant Kel-Tec CNC Industries, Inc., is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida at 1475 Cox Road, Cocoa, Florida; its registered agent is Ganon J. Studenberg, Esq., 1119 Palmetto Avenue, Melbourne, FL 32901. At all times relevant to this action, Kel-Tec CNC Industries, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Kel-Tec's website it has a distributor in New York located in Rochester, NY.[34]

59.     Defendant O.F. Mossberg & Sons, Incorporated, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut at 7 Grasso Avenue, North Haven, CT 06473; its registered agent is Corporation Service Company at Goodwin Square 225 Asylum Street, 20th Floor, Hartford, CT 06103. At all times relevant to this action, O.F. Mossberg & Sons, Incorporated, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to O.F. Mossberg & Sons, Incorporated's website, it has eleven dealers located within 20 miles or less of Buffalo.[35]

60.     Defendant RemArms, LLC, a/k/a Remington Firearms, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York; its registered agent is Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. At

---

[33] https://www.documentcloud.org/documents/21563108-20220330-joint-letter-to-court

[34] https://www.keltecweapons.com/

[35] https://www.mossberg.com/dealers/

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

all times relevant to this action, RemArms, LLC, a/k/a Remington Firearms, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to RemArms' website, "In 2020, RemArms acquired the Remington Firearms legacy manufacturing facility in Ilion, NY and the proud opportunity to build Remington firearms.  Our new company, RemArms, is designing, producing and shipping new Remington firearms to our dealers and customers across the country each and every day."[36]  According to Remington's website it has two dealers within 20 miles of Buffalo and they are located in Cheektowaga, NY, and Lockport, NY.[37]

61.     Defendant Savage Arms, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Massachusetts, located at 100 Springdale Rd, Westfield, MA 01085; its registered agent is Thomas W. Humphrey at 100 Springdale Road, Westfield, MA 01085. At all times relevant to this action, Savage Arms, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. Savage Arms, Inc., purchased Stevens Arms and is an importer for firearms manufactured by Sun City Machinery Co. According to Savage Arms' website, it has several dealers in New York, including three dealers within eight miles of Buffalo, located in Cheektowaga, NY; Amherst, NY; and Tonawanda, NY.[38]

62.     Defendant SIG Sauer, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New Hampshire, located at 72 Pease Boulevard, Newington, NH 03801; its registered agent is Cogency Global, Inc., at 850 New Burton Road, Suite 201,

---

[36]  https://www.remarms.com/about-us

[37]  https://www.remington.com/where-to-buy.html

[38]  https://www.savagearms.com/where.php

23

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Dover, DE 19904. At all times relevant to this action, SIG Sauer, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to SIG Sauer's website, it has two dealers within 25 miles of Buffalo and they are located in Cheektowaga, NY and Buffalo, NY.[39]

63.    Defendant Springfield Armory, Inc., is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois, located at 420 West Main Street, Geneseo, IL 61254; its registered agent is James S. Zmuda at 1515 5th Avenue, Suite 700, Moline, IL 61265. At all times relevant to this action, Springfield Armory, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Springfield's website, it has several retailers in New York, including locations in Kenmore, NY; Cheektowaga, NY; Depew, NY; Amherst, NY; and Eden, NY.[40]

64.    Defendant Sturm, Ruger & Co., Inc. ("Sturm"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut, located at 1 Lacey Place, Southport, CT 06890; its registered agent is The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. At all times relevant to this action, Sturm manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. In September 2020, Sturm purchased Marlin Firearms, which had previously acquired Hopkins & Allen Arms Company. According to Sturm's website, it has eight retailers within 22

---

[39]   https://www.sigsauer.com/dealer-locator

[40]   https://www.springfield-armory.com/find-a-retailer/

24

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

miles of Buffalo, NY, which include locations in Kenmore, NY; Cheektowaga, NY; Lancaster, NY; Eden, NY; Angola, NY; Lockport, NY; and North Collins, NY.[41]

65.     Defendant SCCY Industries, LLC, is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida, at 1800 Concept Court, Daytona Beach, FL 32114; its registered agent is Palmetto Charter Services, Inc., at 149 S. Ridgewood Avenue, Suite 700, Daytona, Beach, FL 32114. At all times relevant to this action, SCCY Industries, LLC manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to SCCY's website, under the title, "Partners" it lists distributors of SCCY firearms.[42] One of the dealers is Lipsey's, which has numerous dealers in New York, including several in the Buffalo vicinity, such as in Tonawanda.[43]

66.     Defendant Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, located at 100 Taurus Way, Bainbridge, GA 39817; its registered agent is Thomas Conger at 100 Taurus Way, Bainbridge, GA 39817. At all times relevant to this action, Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Taurus's website it has one

---

[41]  https://www.ruger.com/dataProcess/retailerLocator/

[42]  https://sccy.com/about/distributors/

[43]  https://www.lipseys.com/dealerstate?st=NY

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

dealer within 20 miles of Buffalo, located in Lockport, NY.[44]  Taurus also has dealers in Olean, NY, and Rochester, NY.[45]

### B. Ghost Gun Defendants

67.     Defendant Arm or Ally, LLC is a North Carolina limited liability corporation with its principal place of business in Indian Trail, NC, located at 1021-C Technology Drive, Indian Trail, NC 28079. It has a subsidiary named Arm or Ally S, LLC. The registered agent of Arm or Ally, LLC, is James F. Tobin at 6416 Providence Farm Lane, Apt. 1319, Charlotte, NC 28277.

68.     Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, Iowa, located at 3006 Brownells Pkwy, Grinnell, IA 50112. Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc. Brownells' registered agent is Corporation Service Company at 505 5th Avenue, Suite 729, Des Moines, IA 50309.

69.     Defendant GS Performance, L.L.C., also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, Tennessee, located at 1930 Air Lane Drive, Nashville, TN 37210, and in San Diego, California. It is the successor of a California limited liability corporation also named GS Performance, L.L.C., headquartered in San Diego. Glockstore's registered agent is Leonard L. Magill at 1930 Air Lane Dr., Nashville, TN 37210-3810.

---

[44] https://www.taurususa.com/dealer-locator

[45] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

70.     Defendant Indie Guns, LLC, is a Florida limited liability corporation with its headquarters in Orlando, Florida, located at 3208 E. Colonial Drive, #262, Orlando, FL 32803. Indie Guns' registered agent is Lawrence Destefano at 3000 Huntington Street, Orlando, FL 32803.

71.     Defendant JSD Supply is a Pennsylvania corporation with its principal place of business in Prospect, Pennsylvania, located at 1052 New Castle Road, Prospect, PA 16052. JSD's Officer is Jordon J. Vinroe, located at 106 Poplar Lane, Portersville, PA 16051.

72.     Defendant KM Tactical, LLC ("KM Tactical") is a Missouri limited liability corporation, with its registered office located 6 SW Industrial Drive, Lee's Summit MO, 64081. KM Tactical's registered agent is Kyle Wayne Murphy at 19009 E 31st Terr. Ct. S., Independence, MO 64057.

73.     Defendant Polymer80, Inc., is a Nevada-based corporation engaged in the business of advertising, offering, selling, and providing firearms located at 134 Lakes Blvd, Dayton, NV 89403. Polymer 80, Inc.'s registered agent is Mark H. Gunderson, Gunderson Law Firm, at 3895 Warren Way, Reno, NV 89509. Polymer80, Inc., was incorporated in December 2014 and, since that time, has advertised, offered and, on information and belief, sold and provided firearms to consumers in New York, and the City of Buffalo, both directly and indirectly.

74.     Defendant Primary Arms, L.L.C., is a Texas limited liability corporation, with its headquarters in Houston, Texas, located at 3219 S Sam Houston Pkwy E #100, Houston, TX 77047. Its subsidiaries include Primary Arms Optics, Primary Arms Wholesale, Primary Arms Online and Primary Arms Government. Primary Arms' registered agent is Marshall Lerner at 3219 S. Sam Houston Parkway, Houston, TX 77047.

75.     Defendant Rainier Arms, LLC, is a Washington State limited liability corporation with its principal place of business in Auburn, Washington, located at 2504 Auburn Way N, Auburn, WA 98002. It has subsidiaries including Rainier Arms Holdings, LLC; Rainier Arms International, Inc.; and

27

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Rainier Arms Manufacturing, LLC. Rainier Arms' registered agent is John Hwang at 2504 Auburn Way N, Auburn, WA 98002-2420.

76.     Defendant Rock Slide USA, LLC, is a North Carolina limited liability company with its principal place of business in Broadway, North Carolina, located at 303 N Main Street, Broadway, NC 27505. Rock Slide USA's registered agent is Ian O. Frampton at 303 N. Main St., Broadway, NC 27505.

77.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida, located at 8060 Bryan Dairy Rd, Largo, FL 33777. 80P Builder's registered agent is Heather Dunn at 8192 Hopwell Court, Seminole, FL 33777.

## C. Distributors

78.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland, located at 17601 Beretta Drive, Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607. At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. Beretta's website identified three dealers within 25 miles of Buffalo.[46]  The three stores are Cabela's 058, Johnson's Country Store, and Runnings.[47] Beretta operates a gallery in New York located at 718 Madison Avenue New York, NY 10065.[48]  Below is a picture of Beretta's gallery in New York:

---

[46]  https://www.beretta.com/en-us/dealer-locations/?F_City=buffalo&F_State=NY&F_Proximity=25&F_Type=0&F_Lng=-78.8783689&F_Lat=42.88644679999999

[47]  *Id.*

[48]  https://berettagalleryusa.com/pages/new-york-store

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01061-MSS-TGW Document 31-2 Filed 05/08/23 Page 161 of 727 PageID 1058

32 of 197



29

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

79.     Defendant Bangers, L.P., n/k/a Iron Valley™ Supply Co. ("Bangers"), is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama, located at 101 London Pkwy, Birmingham, AL 35211; its registered agent is Rick Bestwick at #10 South 14th Street, Birmingham, AL 35233. At all times relevant to this action, Bangers marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City of Buffalo. Bangers has several dealers located in New York, at least one less than 20 miles from the City of Buffalo.[49]  Bangers distributes firearms from the following Defendant Manufacturers: Colt, Glock, Hi-Point, Kel-Tec, Marlin, Mossberg, Polymer 80, Remington, RemArms, Savage Arms, SCCY, Sig Sauer, Smith & Wesson, Ruger, Springfield Armory, and Taurus.[50]



80.     Defendant Gun Center Inc., a/k/a GC Wholesale, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Cheektowaga, New York, located at 3385 Harlem Rd, Cheektowaga, NY 14225. At all times relevant to this action, Gun Center marketed, distributed, and/or sold firearms in New York which were distributed, marketed,

---

[49]  https://www.ironvalleysupply.com/find-a-dealer

[50]  https://www.ironvalleysupply.com/

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sold and/or possessed within the City of Buffalo. In 2016, the ATF issued a Firearms Inspection Report to Gun Center, Inc. and noted that on February 25, 2016, Gun Center's cited violations were: (1) failure to prohibit the transfer of firearm to an individual that was denied by a NICS background check; and (2) failure to locate firearms and/or disposition information for firearms listed as present in inventory in the licensee's acquisition and disposition record on one separate occasion.[51] The report noted that the second violation was a repeat violation from 2011.[52] A 2018 violation was also noted for failure to report multiple sales of handguns.[53]

81.     Defendant RSR Group, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Florida, located at 4405 Metric Drive, Winter Park, FL, 32792-6904; its registered agent is Incorporated Services, Ltd., at 3500 S Dupont Hwy, Dover, DE 19901. At all times relevant to this action, RSR Group, Inc., marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City of Buffalo. RSR's website lists the manufacturers for which it distributes firearms, which include the following Manufacturer Defendants: Beretta, Colt, Glock, Hi-Point, Marlin, Mossberg, Remington, Savage, SCCY, SIG Sauer, Kel-Tec, Smith & Wesson, Springfield, Ruger, and Taurus.[54] RSR has a location at 20 Cedarfield Commons, Rochester, NY 14612.

82.     Defendant Vintage Firearms, LLC, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, located at 120 Nanticoke

---

[51] https://gunstoretransparency.org/sites/default/files/reports/NYC133837900000003.007.pdf

[52] *Id.*

[53] https://gunstoretransparency.org/gun-store/gc-wholesale

[54] https://www.rsrgroup.com/search?Category=1

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Ave, Endicott, NY 13760. At all times relevant to this action, Vintage Firearms LLC marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City of Buffalo. On May 14, 2022, gunman Payton S. Gendron, 18, killed ten people and wounded three in a mass shooting at a Buffalo supermarket.[55]  Of the thirteen people shot, eleven were Black and two were white.[56]  Gendron used a Bushmaster XM-15, which was the same model that was used by a 20-year-old man to kill 26 people at Sandy Hook in 2012.[57]  Gendron bought the rifle at Vintage Firearms in Endicott.[58]

83.     Defendant Wolcott Guns Inc., is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Erie, New York, located at 3052 Walden Ave, Depew, NY 14043. At all times relevant to this action, Wolcott Guns marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City of Buffalo. In 2016, the ATF issued a violation to Wolcott Guns for "[f]ailure to conduct NICS background check prior to the transfer of a firearm, licensee used expired NICS check (over 30 days old) on [redacted] occasion."[59]  In the section "Corrective Action to be Taken," the document stated: "The licensee was advised that a NICS check must be conducted prior to all over-the-counter transfers of a firearm. Additionally, the licensee was instructed to conduct a new NICS check if the initial check passes

---

[55]   https://buffalonews.com/news/local/complete-coverage-10-killed-3-wounded-in-mass-shooting-at-buffalo-supermarket/collection_e8c7df32-d402-11ec-9ebc-e39ca6890844.html.

[56]   *Id.*

[57]   https://buffalonews.com/news/local/crime-and-courts/tops-markets-shooter-chose-ar-15-to-stoke-controversy/article_28ed09a0-d54f-11ec-841c-6f77fed17035.html

[58]   *Id.*

[59]   https://gunstoretransparency.org/sites/default/files/reports/NYC88147200000002.024.pdf.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

30 days before the firearm is transferred."[60] According to Wolcott Guns, Inc.'s website it sells firearms from the following Manufacturer Defendants: Glock, Springfield Armory, Remington, Savage, Ruger, Mossberg, Kel-Tec, Beretta, Sig Sauer, Smith & Wesson, Marlin, and Bushmaster.[61]

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### I.  Firearm Violence in the United States, State of New York, and City of Buffalo

84.    Defendants' actions have created, maintained, or contributed to a condition in Buffalo that impacts the health and well being of us all.[62]  In 2020, gun deaths reached the highest number ever recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than 45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a concurrent public health crisis intensified. Gun homicides rose dramatically across the country, increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in 2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[63]

---

[60]  *Id.*

[61]  https://wolcottgunsinc.com/manufacturers

[62]  *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

[63]  *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

85.     "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[64]

86.     "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[65]

87.     "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020. The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[66]

88.     "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of

---

[64]  *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[65]  *Id.* at 5.

[66]  *Id.* at 7.

34

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

Case 8:22-cv-01015-MSS-SWG Document 31-2 Filed 05/08/23 Page 167 of 727 PageID 9074

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15–19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20-39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[67]

89.     The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

90.     According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report,*[68] below is a chart of Violent Crimes by Firearm in Buffalo as of April 24, 2020:[69]

---

[67] *Id.* at 13-14.

[68] https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[69] *Id.* at 201.

35

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO: 2

Case 8:22-cv-00016-JSS-SRC Document 31-2 Filed 05/03/23 Page 168 of 197 PageID 1975

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Violent Crimes by Firearm
As of 04/24/2020
Buffalo City Police Department (UCR)

91.     Below is also a chart of Firearm Activity:[70]



Firearm Activity
As of 9/11/2020
Buffalo City Police Department

---

70   *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

92. Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City of Buffalo and New York State.

93. In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National firearms Tracing Database traced 7,254 firearms.[71]

94. Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[72]

95. The top categories reported on firearm traces with a New York recovery for that year are as follows:[73]

---

[71] https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[72] *Id.*

[73] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Top Categories Reported on Firearm Traces with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health - Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

**NOTE:** There were 541 additional traces that were associated with other categories.

96.    The top 15 source states for firearms with a New York recovery for that year are as follows:[74]

---

[74] *Id.*

38

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

## Top 15 Source States for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

97. The age of possessors for firearms with a New York recovery for that year is as follows:[75]

---

[75] *Id.*

39

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Age of Possessors for Firearms with a New York Recovery

### JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020-12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020-12/31/2020 National Average Age of Possessor: **34 Years**

98.    The top recovery cities for firearms with a New York recovery for that year are as follows:[76]

_____

[76] *Id.*

40

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

## Top Recovery Cities for Firearms with a New York Recovery

### JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

99.    Buffalo is number three on the list with 478.

100.    The top recovery cities for firearms with a New York recovery for 2019 are as follows:[77]

---

[77]    https://www.atf.gov/file/147286/download

41

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



**Top Recovery Cities for Firearms
with a New York Recovery**

January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

101.    Buffalo is second on the list, behind the City of New York, with 615.

102.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[78]

---

[78]   https://www.atf.gov/file/137211/download

42

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

103.    Buffalo is again second on the list, behind New York City, with 571.

104.    Firearm Manufacturer and Distributor Defendants manufactured or distributed a large number of guns recovered in crimes committed in the City of Buffalo.

105.    From 2010 through July 2022, Buffalo Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Count |
|---|---|
| Beretta | 102 |
| Bryco (Defendant JA Industries, LLC) | 78 |
| Bushmaster | 14 |
| Colt | 143 |
| Glock | 407 |

43

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

| Maker/Manufacturer | Approximate Count |
|---|---|
| Hi-Point | 325 |
| Jiminez (Defendant JA Industries, LLC) | 62 |
| Kel-Tec | 94 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 157 |
| Mossberg | 286 |
| Polymer | 115 |
| Remington | 179 |
| Savage | 102 |
| SCCY | 54 |
| Sig Sauer | 57 |
| Smith & Wesson | 750 |
| Springfield | 108 |
| Sturm Ruger | 383 |
| Taurus | 423 |

106. From 2021 through July 2022, Buffalo Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Count |
|---|---|
| Beretta | 20 |
| Bryco (Defendant JA Industries, LLC) | 5 |
| Bushmaster | 2 |
| Colt | 5 |

44

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

| Maker/Manufacturer | Approximate Count |
|---|---|
| Glock | 124 |
| Hi-Point | 28 |
| Jiminez (Defendant JA Industries, LLC) | 6 |
| Kel-Tec | 10 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 7 |
| Mossberg | 17 |
| Polymer | 93 |
| Remington | 14 |
| Savage | 14 |
| SCCY | 19 |
| Sig Sauer | 13 |
| Smith & Wesson | 132 |
| Springfield | 32 |
| Sturm Ruger | 61 |
| Taurus | 101 |

## II. The Primary and Secondary Market for Guns

107. The firearms market consists of a primary and a secondary market.

108. The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

109. Although there is a legitimate secondary market for firearms, that market also includes an illegal segment made up of private transactions among non-federally-licensed individuals.

45

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

110.     The illegal, secondary market is a significant source of firearms to criminals. Most firearms acquired by criminals are acquired through transactions in the secondary market.

111.     Criminals are an important market segment for the gun industry. Gun-trace studies have demonstrated that 11% of handguns sold between 1996 and 2000 were used in violent crimes by the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

112.     Empirical studies have shown that guns move quickly from the legal to the illegal market: 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within three years of their first sale. ATF trace data indicate that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime. A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited user or into the illegal market.

III.     **Diversion to the Illegal Market**

113.     Upon information and belief, diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through Defendants' marketing practices and unlawful and unreasonable conduct.

114.     Upon information and belief, Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market as a result of specific sales practices by gun dealers.

115.     Upon information and belief, Defendants have failed to prevent diversion to the illegal market by, inter alia, failing to: monitor corrupt dealers; require retail sales only through storefront establishments; limit sales made at gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

46

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### A. Illegal Sales at Gun Shows

116.     Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sale of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and, upon information and belief, Defendants are aware of this loophole.

117.     Although a Federal Firearms Licensee ("FFL") selling at a gun show must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

118.     Although federal law requires background checks for all gun sales by licensed gun dealers, it does not require background checks for guns sold by unlicensed sellers, like non-dealers who sell guns online or at gun shows. This loophole enables people with felony convictions, with domestic abuse restraining orders against them, and other people with a personal history such that they are prohibited from possessing guns, to buy guns with no questions asked.[79]

119.     Upon information and belief, firearms manufactured, imported or distributed by Defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

### B. Private Sellers and Other Non-Storefront Sales

120.     The law does not require private sellers of firearms — so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate from a storefront — to conduct background checks or to maintain records that an FFL is required to

---

[79]     https://www.everytown.org/solutions/background-checks/

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 8:23-cv-01016-MSS-TGW Document 11-2 Filed 09/08/23 Page 180 of 727 PageID 2087

NYSCEF DOC. NO. 2                                                                                                    INDEX NO. UNASSIGNED

                                                                                                 RECEIVED NYSCEF: 12/20/2022

maintain. This constitutes a loophole for diversion of guns to criminal elements, and upon information and belief, Defendants are aware of this loophole.

121.     Upon information and belief, Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table, dealers through the use of prudent merchandising practices at little cost or loss of business.

122.     Upon information and belief, firearms that Defendants have sold through non-stocking or kitchen table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

## C. Straw Purchases

123.     Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a major source of firearms for the secondary market. One law enforcement study found that more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase. The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

124.     A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits a felony. Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

125.     Upon information and belief, Defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices. This result could be achieved at little cost or loss of business.

126.     Upon information and belief, a substantial number of firearms manufactured, imported or distributed by Defendants were acquired by a straw purchase, diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### D. Multiple Sales

127.     Guns are diverted to the illegal secondary market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the illegal secondary market.

128.     Upon information and belief, firearms manufactured, imported or distributed by Defendants are acquired as part of a multiple purchase, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

### E. Corrupt FFLs

129.     Guns acquired by criminals can be obtained through intentional trafficking by an FFL. Defendants are aware that some FFLs are corrupt and that they should not do business with such dealers, but, upon information and belief, Defendants nevertheless continue selling to such dealers until ATF revokes the dealers' licenses, which often takes years.

130.     Guns are diverted to the illegitimate gun market through corrupt dealers. According to an ATF study, just 1.2% of dealers accounted for over 57% of the crime guns traced to current dealers in 1998.[80]  For example, in 1998, just over 450 licensed dealers had ten or more crime guns with a time-to-crime interval of three years or less traced to them. In addition, a congressional study of ATF data found that an extraordinary number of crime guns were purchased from the same "high crime" gun dealers. The same 137 dealers were the source of more than 34,000 crime guns between 1996 and 1998.

### F. Other Means of Diversion

---

[80]   https://www.usatoday.com/story/opinion/2013/03/21/gun-dealers-inventory-atf-editorials-debates/2007657/

49

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

131.     Upon information and belief, guns manufactured, imported or distributed by Firearm Manufacturer Defendants and Firearm Distributor Defendants are stolen from FFLs with poor security arrangements; moreover, FFLs falsely report thefts to conceal trafficking. These guns are diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo. Some Firearm Manufacturer Defendants and Firearm Distributor Defendants sell guns in states in which gun regulations are lax. Upon information and belief, these Defendants know or should know that the guns would be taken into the State of New York, including the City of Buffalo, to be used illegally. These Defendants produce, market and/or distribute substantially more handguns than they reasonably expect to be sold to law-abiding purchasers. They oversupply states with weak handgun controls and restrictions, such as certain southern states along the I-95 corridor, with substantially more handguns than will be purchased by legitimate purchasers in those states, as these Defendants know or should know. These Defendants do so with the actual or constructive knowledge that the oversupply will be sold to prohibited purchasers in states, counties and cities, like the City of Buffalo, which have strong restrictions on the purchase and ownership of firearms. Guns are thereby diverted to the illegal market through sales in states with weak gun control laws to persons who transport the guns to places with strict gun control laws, such as the City of Buffalo.

132.     On October 25, 2016, the New York State Office of the Attorney General issued a report, "Target on Trafficking: Analysis of New York Crime Guns."[81] According to the report, a majority of guns confiscated in New York come from out of state.[82] The study looked at the state of

---

[81]     https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

[82]     https://spectrumlocalnews.com/news/2016/10/27/schneiderman-gun-trafficking-database-law-enforcement-tool-crime

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

origin of more than 53,000 guns recovered in New York over a five-year period, from 2010 to 2015.[83]

The report found that 74% of all guns recovered by law enforcement came from out of state; a rate that

is more than twice the national average, and 86% of all handguns recovered in New York crime scenes

came into New York from out of state.[84]  Most of those handguns coming from states referred to by law

enforcement as the "Iron Pipeline": Florida, Georgia, North and South Carolina, Pennsylvania, Virginia,

and Ohio.[85]  Additional findings include:[86]

- 52,915 Total Gun Recoveries

  i. New York State law enforcement agencies recovered 52,915 firearms
     between 2010-2015. In the most recent year of data, 2015, New York
     recovered 7,827 guns.

- Only 6% Of Guns Were Recovered From a Possessor Who Was Also The
  Original Purchaser

  i. Only 3,208 guns were recovered from a possessor who was also the
     original purchaser of the gun. About half of these were low time-to-crime
     guns.

- 74% of All Recovered Guns Total (handguns, rifles, etc) Originated Out-of-State

---

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00106-GTS-TWD Document 21-2 Filed 05/03/23 Page 184 of 727 PageID 2091

RECEIVED NYSCEF: 12/20/2022

  i. 34,344 of the 46,514 recovered guns with a known purchase state originated outside of New York — well above the national average. Over half of these guns originated in Iron Pipeline states.

- 86% of Recovered Handguns Came From Out-of-State

  i. Nearly nine out of ten recovered handguns, the weapon of choice for violent criminals, came from out-of-state.

- 57% of All Recovered Guns Were Out-of-State Handguns

  i. For all the guns recovered in New York State, over half belong to a single category: out-of-state handguns. Handguns are known as the weapon of choice among violent criminals.

- New York has a low per-capita rate of gun recovery

  i. With 39.5 recoveries per 100,000 people in 2015, New York had half the per-capita recoveries than the national per-capita average (84 per 100,000 people).

- But New York has a very high rate of out-of-state gun recoveries

  i. A strong majority of crime guns originated out-of-state in 2015 (75%), more than double the national average (29%) of out-of-state sources of crime guns.

- 1 in 5 Recovered Guns Were "Recently Trafficked"

  i. Of the 30,595 guns for which there is complete data, 6,162 exhibited indicia of recent trafficking into New York.

133. On October 25, 2016, the *Buffalo News* issued an article, "Report: Guns brought into NY from States with Weaker Gun Laws," discussing the report from the Office of the New York Attorney

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

General.[87]  The article states, "In Buffalo and Niagara Falls, nearly six in 10 guns recovered by law

enforcement came from outside the state. Of 424 "likely-trafficked" guns in Erie and Niagara counties,

19 percent came from Ohio, 18 percent came from Georgia and 17 percent from Pennsylvania."[88]

"There were 5,255 guns recovered by police in Erie and Niagara counties over the six-year period, a

number that represented 10 percent of all guns recovered by law enforcement in New York over that

time, according to the report."[89]  "The report, citing difficulty in compiling full histories of individual

firearms, concluded 6,162 guns were 'likely-trafficked' into the state over the six-year period. In the

Buffalo area, 94 percent of 'likely-trafficked' firearms were handguns, according to the report."[90]

134.    According to the report, "As the second largest market for crime guns in New York

State, Buffalo and neighboring Niagara Falls (Erie and Niagara Counties) together recovered 5,255 crime

guns or 10% of statewide recoveries. Buffalo also has the second highest number of low time-to-crime

recoveries (605) and likely-trafficked guns (424). Buffalo recovered 3,076 handguns, making it the third

largest market for handguns in the State, with handguns making up 59% of recoveries in the market.

Erie County showed a high per capita recovery rate of 82 guns per 100,000 residents, with Niagara lower

at 58 per 100,000. Five zip codes (14215, 14211, 14213, 14207, 14212) accounted for almost 50% of the

region's recoveries, or 2,476 guns. These recoveries were located in or around the City of Buffalo and

had a slightly higher average out-of-state percentage than the rest of the market."[91]

---

[87]  https://buffalonews.com/news/local/crime-and-courts/report-guns-brought-into-ny-from-
states-with-weaker-gun-laws/article_41ba386b-d2c0-5e1c-921e-d6ec9b67cc07.html

The report is available here: https://targettrafficking.ag.ny.gov/#part1

[88]  *Id.*

[89]  *Id.*

[90]  *Id.*

[91]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

135.    The report also provided:



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



136.    The report contained the following graphic:

55

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.



137.    The report also contains a graphic for Buffalo:



This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-01106-MSS-TGW Document 11-2 Filed 05/08/23 Page 189 of 727 PageID 1096

RECEIVED NYSCEF: 12/20/2022

138.     An example of such diversion was reported by the United States Attorney's Office for the Northern District of Georgia on August 6, 2012.[92]  The press release stated: "Charles Horton, 36, of Buffalo, New York, was sentenced today by United States District Judge Thomas W. Thrash, Jr. to serve over 17 years in federal prison for the offenses of being a felon in possession of firearms, transporting guns from Georgia to New York without a license, and using straw purchasers to make false statements to gun dealers. United States Attorney Sally Quillian Yates said that, 'Horton persuaded four women, one of whom was homeless, to buy twenty firearms on his behalf, and when he learned he was under investigation, he attempted to tamper with a witness who agreed to testify against him at trial.   Law enforcement officers later recovered some of these firearms at crime scenes in the Buffalo area, including at the scene of a murder.' 'Gun traffickers commit a worse crime than the illegal purchase, sale and transportation of firearms. These criminals provide an iron pipeline of potentially deadly weapons for their own selfish profit at the expense of law abiding citizens and their families,' said Scott Sweetow, Special Agent in Charge of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Atlanta. 'The unlawful trafficking in firearms is a serious crime which feeds and amplifies the violence experienced in so many cities today. I applaud the efforts of the agents and the prosecutors who brought the Mr. Horton to justice.' . . . According to United States Attorney Yates, the charges and other information presented in court:   Horton, a convicted felon who was prohibited by federal and state law from possessing firearms, recruited four women to act as straw purchasers and buy a total of twenty firearms on his behalf.   Horton gave the straw purchasers the money for the guns, drove them to various gun stores in Georgia and South Carolina, and told them which firearms to purchase.   At the time of the gun sales, the straw purchasers falsely claimed that they were buying the guns for themselves. Horton was captured in video surveillance footage as he escorted three of the women to several gun

---

[92]   https://www.justice.gov/archive/usao/gan/press/2012/08-06-12.html

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

stores. A tip from a gun dealer about a car tag resulted in ATF determining that during the time of the straw purchases Horton used various rental cars to travel back and forth between Buffalo and Atlanta on multiple occasions. Law enforcement officers subsequently recovered these weapons at crime scenes in Buffalo, New York. When Horton learned that he was the subject of an investigation by ATF, he attempted to interfere with the investigation by asking one of the straw purchasers to falsely claim that the guns he purchased through the straw buyers had been stolen. Unbeknownst to Horton, the straw purchaser was cooperating with the ATF."[93]

139. The criminal indictment in *United States of America v. Charles Horton*, United States District Court for the Northern District of Georgia, 1:11-CR-427, identifies the manufacturers and models of the firearms Horton possessed which includes, in part: Hi-Point manufactured pistols; a Bryco manufactured pistol; and an SCCY Industries manufactured pistol. Additionally, the indictment provides that Horton transported Hi-Point manufactured pistols into the State of New York, and three of those pistols were recovered in Buffalo, New York.

140. On January 11, 1997, members of the Buffalo Violent Crime and Career Criminal Task Force arrested Jonathan Long of Buffalo, New York.[94] Long and five others conducted a gun-running operation from a small town outside of Atlanta, Georgia and onto Buffalo's streets.[95]

141. On September 23, 2018, it was reported that on March 23, Buffalo police officers investigated a report about a man holding a woman at gunpoint recovered a pistol.[96] They submitted the

---

[93] *Id.*

[94] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[95] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[96] https://buffalonews.com/news/local/the-90-connection-how-an-ohio-to-buffalo-gun-trafficking-ring-was-busted/article_bc70094c-e223-5c55-bb32-5fe6f90068e7.html

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

gun — a Glock, Model 33, .357 caliber handgun — for analysis.[97] According to federal court records, the gun had been purchased in November at a pawn shop in Ashtabula, Ohio, a lakeside city of about 18,000 that is just over a two-hour drive west of Buffalo on the Thruway.[98] The article further stated: "It also turned out be one of 29 guns an Ashtabula man is accused of buying at nine locations throughout that city over four months, according to federal prosecutors. The discovery marked the beginning of an investigation that led Buffalo police and agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives to uncover what they allege is a gun-trafficking ring involving the illegal purchases of more than 100 firearms in and around Ashtabula, many of which are believed to have ended up in Buffalo."[99] Sixty-two of those guns were bought for one Buffalo man, Robert L. Williams Jr., according to court records. He has been charged with federal counts of weapons possession as a convicted felon, and with illegally transporting firearms into New York. Nine Ashtabula residents were charged with conspiracy to traffic in firearms, six of whom are accused of buying the guns for Williams as straw purchasers.[100] Also, the article stated: "Most of the firearms recovered by law enforcement agencies in New York State that the ATF traces originate from out of state. Many are stolen and then sold on the street."[101] The article further stated: "Increasingly, gun traffickers are buying guns in other states with less restrictive gun laws and bringing them here to sell, often at a profit, said James P. Kennedy, U.S. Attorney for the Western District of New York. 'They're buying a gun in one of those states for $500 and can sell it up

---

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

here for $800 to $1,000,' Kennedy said. 'Turning that kind of profit on 10 guns — that can become very lucrative.' Traffickers are also bringing guns to New York to trade for heroin and other drugs which they bring back to their home states to sell, doubling and even tripling profits. 'Firearms can be used as currency,' Taylor said."[102]  The article then concluded: "Last year, law enforcement agencies in New York State asked the ATF to run traces on more than 9,000 firearms. The ATF was able to determine the source state — where the gun was legally purchased — in 5,565 of those firearms. Just over 4,200 of those originated from out of state. The ATF said 271 came from Ohio. Ohio consistently ranked around eighth in states from where firearms recovered in New York and analyzed by the ATF originated, including New York itself, according to annual ATF reports between 2013 and 2017."[103]

142.    On October 16, 2020, the Department of Justice issued a press release titled, "CBL/BFL Member Going To Prison For More Than 15 Years For Racketeering Conspiracy And Other Charges; Buffalo Woman Also Going To Prison For Lying About A Murder By Another CBL/BFL Gang Member."[104] CBL/BFL Gang, which stands for, among other things, "Cash Been Long" and "Brothers for Life."[105]  "The gang, which was involved in the illegal possession and distribution of narcotics, was formed around 2009 and operates primarily in the City of Buffalo at the Towne Gardens Housing Complex."[106] According to the Third Superseding Indictment in *United States of America v. Woods, et al.* (17-CR-103-V), the defendants were in possession of the following firearms, among others:

---

[102]  *Id.*

[103]  *Id.*

[104]  https://www.justice.gov/usao-wdny/pr/cblbfl-member-going-prison-more-15-years-racketeering-conspiracy-and-other-charges

[105]  *Id.*

[106]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- One (1) Taurus, semi-automatic pistol, Model No. PT111 Millennium G2, 9mm Luger caliber, bearing serial number TIX27131, and ammunition;

- One (1) Taurus, semi-automatic pistol, Model No. PT809, 9mm caliber, bearing serial number TJS29126, and ammunition;

- One (1) Glock, semi-automatic pistol, Model 30, 45 caliber, bearing serial number HLE328, and ammunition;

- One (1) Smith & Wesson, semi-automatic pistol, Model No. 410, 40 Smith & Wesson caliber, bearing serial number VMM1496, and ammunition;

- One (1) Savage Arms pump action 12 gauge shotgun, Model Stevens 67 Series E, bearing serial number E684403;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number HWY660, and ammunition;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number AANV538, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model C, 9mm, bearing serial number 804358, and ammunition;

- One (1) Beretta, semi-automatic pistol, Model 84 FS Cheetah, 380 caliber, bearing serial number E99268Y, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XDs, 45 caliber, bearing Serial Number S3256419, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model JCP, 40 Smith and Wesson, 40 caliber, with a defaced serial number, and ammunition;

61

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- One (1) Hipoint, semi-automatic pistol, Model JHP, 45 caliber, bearing serial number X4250584, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XD-40, 40 caliber, bearing serial number XD489138, and ammunition;

- One (1) Colt, semi-automatic pistol, 22 long rifle, bearing serial number PH32434, and ammunition;

- One (1) Smith and Wesson, Model 18-3 revolver, 22 long rifle, bearing serial number 3K93144, and ammunition;

- One (1) Ruger, model P95, 9mm semi-automatic pistol, bearing serial number 318-1933, and ammunition;

- One (1) Smith & Wesson, Model 686, 357 revolver, bearing serial number AJF3679, and ammunition; and

- One (1) Beretta Model 92FS, semi-automatic pistol, 9mm Luger, bearing serial number BER171801Z, and ammunition.

143. On March 9, 2016, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Drug Charge."[107] According to the press release, the Defendant Ronald Dodd "had three bags of marijuana, two bags of heroin, and two bags of cocaine in his pants. There was a stolen, Bryco Arms .380 semi-automatic handgun on the ground next to a tree where Dodd was apprehended."[108] According to the Complaint in *United States of America v. Dodd* (Case No. 15-MJ-4141),

---

[107] https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-drug-charge-2

[108] *Id.*

62

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the Bryco firearm was a ".380 semi-automatic handgun bearing serial number 115400 that was reported stolen on August 13, 2015."

144. On September 27, 2019, the Department of Justice issued a press release titled, "Medina Husband And Wife Indicted By A Federal Grand Jury On Multiple Drug And Gun Charges."[109] The federal grand jury "returned an indictment charging Anthony Allee, 28, and Tashira Allee, 36, both of Medina, NY, with maintaining a drug-involved premises, possession of firearms in furtherance of drug trafficking, unlawful possession of a short-barreled shotgun, and unlawful possession of a short-barreled rifle."[110] According to the Complaint in *United States of America v. Allee, et al.* (Case No. 19-MJ-137), a Colt .45 ACP pistol and Ruger model 10-22 carbine, bearing serial number 249-52473 were found during the search. The press release further provided, "Investigators seized 11 firearms, numerous articles of property reported as stolen, marijuana, pills believed to be controlled substances, ammunition, scales, bags, and other items of evidence including Tashira Allee's cell phone. The firearms included a Taurus Judge pistol that had been reported stolen in the Town of Tonawanda."[111]

145. On January 23, 2020, the Department of Justice issued a press release titled, "Rochester Man Going To Prison For Over 7 Years On Gun Trafficking And Drug Charges."[112] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Carlos Cruz-Garcia, 37, of Rochester, NY, who was convicted of conspiring to distribute, and possessing with intent to distribute, cocaine,

---

[109] https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[110] *Id.*

[111] https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[112] https://www.justice.gov/usao-wdny/pr/rochester-man-going-prison-over-7-years-gun-trafficking-and-drug-charges

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                                          RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01016-MSS-TGW Document 21-12 Filed 09/08/23 Page 196 of 727 PageID 2903

and possession of a firearm in furtherance of a drug trafficking crime, was sentenced to serve 87 months in prison U.S. District Judge Elizabeth A. Wolford."[113]  Additionally, the press release indicated, "At the time of Cruz-Garcia's arrest, law enforcement officers found a loaded Glock .40 caliber pistol, which the defendant possessed in connection with the drug conspiracy."[114]

146.    On June 21, 2022, the Department of Justice issued a press release titled, "Buffalo Man Pleads Guilty to Drug Charge."[115]  The press release stated: "U.S. Attorney Trini E. Ross announced today that Girard Jackson, 28, of Buffalo, NY, pleaded guilty before U.S. District Judge Lawrence J. Vilardo to possession of a firearm in furtherance of a drug trafficking crime."[116]  Additionally, the press release indicated, "Assistant U.S. Attorney Jeremiah E. Lenihan, who is handling the case, stated that in the early morning hours of June 19, 2021, law enforcement officers encountered Jackson on the 500 block of West State Street in Olean, NY, at which time they executed a search warrant of Jackson for firearms, narcotics, and U.S. currency. Located in a bag Jackson wore around his waist, officers found and seized a loaded Glock 9mm semi-automatic pistol. Wrapped around Jackson's ankle, officers found quantities of methamphetamine and cocaine."[117]

147.    On June 11, 2019, the Department of Justice issued a press release titled, "Buffalo man Pleads Guilty to Drug and Gun Charges."[118]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Leon R. Williams, 39, of Buffalo, NY, pleaded guilty before U.S. District Judge

---

[113]  *Id.*

[114]  *Id.*

[115]  https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-charge-11

[116]  *Id.*

[117]  *Id.*

[118]  https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-and-gun-charges-7

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Elizabeth A. Wolford to possession with intent to distribute heroin, and possession of a firearm in furtherance of drug trafficking activity."[119] The press release further indicated, "On November 29, 2017, a New York State search warrant was executed at the Williams' Texas Street residence in Buffalo. Investigators recovered heroin and cocaine, scales, razor blades, cutting agents, and $73,743 in U.S. currency, which was concealed inside of a vacuum cleaner, a backpack, and within a drop ceiling between two bedrooms. In addition, a Glock, .40 caliber firearm was recovered along with a magazine containing 10 rounds of ammunition loaded within the firearm."[120]

148.    On December 3, 2020, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Possession of a Machine Gun."[121]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron Graff, 44, of Rochester, NY, pleaded guilty today before U.S. District Judge David G. Larimer to possession of a machine gun."[122]  Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who is handling the case, stated that Graff was arrested after members of law enforcement intercepted and searched a package sent to him from an address in China. Officers found the package contained a Glock® conversion device which, when installed on a Glock® semi-automatic pistol, allows the pistol to discharge ammunition in fully automatic mode. On May 24, 2019, investigators delivered the package containing the device to Graff and then searched his residence pursuant to a search warrant.   During the search, officers found the intercepted

---

[119]  *Id.*

[120]  *Id.*

[121]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[122]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Glock® conversion device, as well as a second Glock® conversion device which the defendant admitted to ordering about a month earlier."[123]

149.    On August 12, 2019, the Department of Justice issued a press release titled, "Buffalo Man Going To Prison For More Than 21 Years For Selling Heroin And Fentanyl That Led To The Deaths Of Two People."[124]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron J. McDuffie, a/k/a "G", 24, of Buffalo, NY, who was convicted of distribution of heroin and butyryl fentanyl causing death, and distribution of fentanyl, butyryl fentanyl, and furanyl fentanyl causing death, was sentenced to serve 262 months in prison by U.S. District Judge Lawrence J. Vilardo."[125]  Additionally, the press release indicated, "On November 30, 2016, law enforcement officers arrested McDuffie leaving his residence in Buffalo. The defendant was on his way to distribute a quantity of powder that contained fentanyl, butyryl fentanyl, and furanyl fentanyl. Under McDuffie's's living room couch, officers recovered a Hi-Point, .40 caliber semi-automatic handgun that was loaded with eight rounds of .40 caliber ammunition."[126]

150.    On July 16, 2018, the Department of Justice issued a press release titled, "Buffalo Man Sentenced For Being A Felon In Possession Of Firearms."[127]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that David Hunter, 22, of Buffalo, NY, who was convicted of

---

[123]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[124]  https://www.justice.gov/usao-wdny/pr/buffalo-man-going-prison-more-21-years-selling-heroin-and-fentanyl-led-deaths-two

[125]  *Id.*

[126]  *Id.*

[127]  https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

being a felon in possession of firearms, was sentenced to serve 27 months in prison by U.S. District Judge Elizabeth A. Wolford."[128] Additionally, the press release indicated, "Assistant U.S. Attorney Joseph M. Tripi, who handled the case, stated that between March 3, 2017, and March 12, 2017, the defendant posted images to "Snap Chat" depicting himself in possession of a Hi-Point, model JH-45 semi-automatic firearm. On April 1, 2017, New York State Parole Officers, assisted by members of the Buffalo Police Department, searched Hunter's residence, recovered a Hi-Point, model CF380, .380 caliber semi-automatic firearm, and arrested the defendant. The defendant was previously convicted in state court of Criminal Possession of a Weapon in February 2014 and is legally prohibited from possessing a firearm."[129]

151.    On August 24, 2016, the Department of Justice issued a press release titled, "Wyoming County man Sentenced on Gun Charge."[130] The press release stated: "Attorney William J. Hochul Jr. announced today that Scott A. Wilcox, 46, of Pike, NY, who was convicted of being a felon in possession of a firearm, was sentenced to 21 months in prison by U.S. District Elizabeth A. Wolford."[131] Additionally, the press release indicated, "Assistant U.S. Attorney Frank T. Pimentel, who handled the case, stated that on January 25, 2015, Wyoming County Sheriff's deputies searched the defendant's residence at 7998 Wiscoy Road in Pike and found a Marlin .44 magnum caliber rifle, which belonged to Wilcox. Deputies also found 76 rounds of .44 caliber ammunition in an access panel in a bathroom. The defendant is a three-time convicted felon and is prohibited from legally possession firearms."[132]

---

[128] https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

[129] Id.

[130] https://www.justice.gov/usao-wdny/pr/wyoming-county-man-sentenced-gun-charge

[131] Id.

[132] Id.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

152.     On May 14, 2019, the Department of Justice issued a press release titled, "Greece Man Pleads Guilty to Lying to the FBI."[133]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Thomas Alonzo Bolin, a/k/a Peter Vincent, 22, of Greece, NY, pleaded guilty before U.S. District Judge David G. Larimer to making a false statement to the FBI."[134]  Additionally, the press release indicated, "On March 30, 2019, members of the FBI, as part of their investigation, interviewed the defendant. During the interview, Bolin falsely stated that he did not possess any firearms in New York State. At the time of the statement, the defendant knew that he possessed a Mossberg 12-gauge shotgun in his bedroom closet at 34 Third Avenue in Greece. This false statement was material to the FBI's investigation of possible civil rights and firearms violations by Bolin and others. The FBI recovered the shotgun during a subsequent search of the defendant's bedroom closet."[135]

153.     On March 18, 2015, the Department of Justice issued a press release titled, "City of Tonawanda Man Sentenced On A Gun Charge."[136]  The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Christopher Simmance, 38, of City of Tonawanda, NY, who was convicted of possession of a firearm after having been committed to a mental institution, was sentenced to time served (19 months) and two years supervised release by Senior U.S. District Judge William M. Skretny."[137]  Additionally, the press release indicated, "Assistant U.S. Attorney John M. Alsup, who handled the matter, stated that on November 12, 2011, law enforcement officers responded to the

---

[133] https://www.justice.gov/usao-wdny/pr/greece-man-pleads-guilty-lying-fbi

[134] *Id.*

[135] *Id.*

[136] https://www.justice.gov/usao-wdny/pr/city-tonawanda-man-sentenced-gun-charge

[137] *Id.*

68

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

defendant's Tonawanda residence where they located a Remington shotgun. Simmance had previously received mental health treatment preventing him from legally possessing any firearms."[138]

154. On January 6, 2014, the Department of Justice issued a press release titled, "Lockport Man Sentenced on Drug Charges."[139] The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Damian Ard, 33, of Lockport, N.Y., who was convicted of conspiracy to possess with intent to distribute, and to distribute, cocaine base, was sentenced to six years in prison by Chief U.S. District Judge William M. Skretny."[140] Additionally, the press release indicated, "During the execution of a federal search warrant at Ard's residence on August 17, 2010, law enforcement officers seized a Remington Model 597 rifle, two .22 caliber rifle magazines and a .22 caliber high capacity magazine; a RML 7.62 x 39 caliber semi-automatic rifle, two magazines and ammunition; a New England Firearms Pardner Model SBI 20 gauge shotgun, and ammunition."[141]

155. On January 23, 2018, the Department of Justice issued a press release titled, "Penn Yan Man Sentenced On Gun And Witness Tampering Charges." The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that James E. Sandford, III, 29, of Penn Yan, NY, who was convicted of possessing a stolen firearm, being a felon in possession of a firearm, and witness tampering, was sentenced to 156 months in prison by U.S. District Judge David G. Larimer."[142] Additionally, the press release indicated, "Eventually, Sandford was charged in a superseding indictment which alleged

---

[138] *Id.*

[139] https://www.justice.gov/usao-wdny/pr/lockport-man-sentenced-drug-charges

[140] *Id.*

[141] *Id.*

[142] https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-01016-MSS-TGW Document 31-2 Filed 09/08/23 Page 202 of 727 PageID 2209

RECEIVED NYSCEF: 12/20/2022

that he distributed synthetic cannabinoids (designer drugs) between July 2014 and March 24, 2015, in the Penn Yan area. He was further charged with distributing such substances — and controlled substance analogues, which are designed to mimic the effects of controlled substances — both to individuals under the age of 21 and within 1000 feet of St. Michael's School, a private elementary school in Penn Yan. In addition, the superseding indictment alleged that on February 22, 2015, the defendant traded synthetic cannabinoids to a minor in exchange for a stolen Savage .410 double barrel shotgun. At the time, the defendant had two prior felony convictions preventing him from legally possessing a gun."[143]

156.    On May 31, 2017, the Department of Justice issued a press release titled, "Buffalo Man Indicted For Distribution Of Cocaine, Crack Cocaine, Butyryl Fentanyl And Marijuana."[144]  The press release stated: "Acting U.S. Attorney James P. Kennedy, Jr. announced today that a federal grand jury has returned a 14-count indictment charging Tracy Bankston, 50, of Buffalo, NY, with conspiracy to distribute crack cocaine, cocaine, butyryl fentanyl, and marijuana. The defendant was also charged with possessing controlled substances with the intent to distribute; maintaining a drug-involved premises; possessing of a firearm in furtherance of a drug trafficking crime; and possessing of a firearm as a convicted felon."[145]  Additionally, the press release indicated, "Inside Bankston's bedroom, police recovered over 28 grams of crack cocaine, two ounces of marijuana, scales, baggies, a Smith and Wesson

---

[143] https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

[144] https://www.justice.gov/usao-wdny/pr/buffalo-man-indicted-distribution-cocaine-crack-cocaine-butyryl-fentanyl-and-marijuana

[145] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO: 2

Case 8:22-cv-01016-LCK-TWD Document 31-2 Filed 09/03/23 Page 203 of 727 PageID 2710

RECEIVED NYSCEF: 12/20/2022

.357 caliber revolver, and a TEC-9 9mm pistol with an extended clip as well as nearly 100 rounds of .357 and 9mm ammunition with the 2 handguns."[146]

157.    On September 2, 2015, the Department of Justice issued a press release titled, "Lackawanna Man Indicted On Gun Charge."[147]  The press release stated: "U.S. Attorney William J. Hochul Jr. announced today that a federal grand jury has returned an indictment charging Justin Vazquez, 29, of Lackawanna, NY, with being a felon in possession of a firearm."[148] Additionally, the press release indicated, "Officers apprehended Vazquez in the kitchen. The mother told police that Vazquez's gun was located in the back bedroom. A search recovered a loaded Smith & Wesson AR-15 rifle. The defendant was previously convicted on a state charge of Aggravated Criminal Contempt and therefore is not allowed to legally possess a firearm."[149]

158.    On September 12, 2014, the Department of Justice issued a press release titled, "Rochester Man Sentenced for Possessing Ammunition as a Convicted Felon."[150]  The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Frederick Stokes, 36, of Rochester, NY, who was convicted of possessing ammunition while being a convicted felon, was sentenced to 63 months in prison by U.S. District Court Judge David G. Larimer."[151]  Additionally, the press release indicated, "Assistant U.S. Attorneys Craig Gestring and Charles E. Moynihan, who handled the case,

---

[146] *Id.*

[147] https://www.justice.gov/usao-wdny/pr/lackawanna-man-indicted-gun-charge

[148] *Id.*

[149] *Id.*

[150] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-possessing-ammunition-convicted-felon

[151] *Id.*

71

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED

Case 8:23-cv-01016-MSS-TGW  Document 31-2  Filed 05/08/23  Page 204 of 727 PageID 2331

NYSCEF DOC. NO. 2                                                                RECEIVED NYSCEF: 12/20/2022

stated that Stokes was previously convicted in 2002 in Monroe County of Forgery in the Second Degree and in 1999 in Oneida County of Assault in the Second Degree. As a result of these previous convictions, the defendant was prohibited from possessing any firearms or ammunition. On April 12, 2013, members of the Rochester Police Department Tactical Unit arrested Stokes in the area of Ringle Street and Post Avenue in Rochester. Officers were looking for the defendant in connection with an unrelated investigation. When officers attempted to take Stokes into custody, he ran from them which resulted in a foot chase. During the chase, the defendant discarded a dark, denim jacket in the area of 93 Post Avenue. Officers arrested Stokes in front of 95 Post Avenue and recovered the jacket nearby. They found seven rounds of .45 caliber ammunition, which were placed inside of a magazine for a Sturm Ruger .45 caliber semiautomatic pistol, inside one of the jacket pockets."[152]

159. On February 27, 2018, the Department of Justice issued a press release titled, "Niagara Falls Man Sentenced On Heroin Charge."[153] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Shaquan M. Shingledecker, 23, of Niagara Falls, NY, who was convicted of possession with intent to distribute heroin, was sentenced to 30 months by U.S. District Judge Elizabeth A. Wolford."[154] Additionally, the press release indicated, "Inside Shingledecker's vehicle at the accident scene, police found 95 glassine envelopes containing heroin, a loaded Ruger handgun with 10 rounds of ammunition, and $1,439.08 in United States currency."[155]

---

[152] *Id.*

[153] https://www.justice.gov/usao-wdny/pr/niagara-falls-man-sentenced-heroin-charge

[154] *Id.*

[155] *Id.*

72

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

160.    On September 18, 2019, the Department of Justice issued a press release titled,
"Rochester Man Sentenced For Heroin Possession And Being A Felon In Possession Of A Gun."[156]
The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Joseph Delisio, 47,
of Rochester, NY, who was convicted of possession of heroin with intent to distribute and possession
of a firearm and ammunition by a convicted felon, was sentenced to serve 100 months in prison by U.S.
District Judge Elizabeth A. Wolford."[157]    Additionally, the press release indicated, "Assistant U.S.
Attorney Cassie Kocher, handled the case, stated that the defendant sold heroin between September 29,
2017, and April 11, 2018 to individuals working with the Drug Enforcement Administration. Delisio
was arrested on April 11, 2018, following a vehicle stop. The defendant had approximately $34,650 in
cash in his possession and officers found a bottle in the vehicle containing residue of suspected heroin,
scales which are commonly used to process narcotics for distribution, and a .22 caliber Ruger handgun.
During a subsequent search of Delisio's residence, officers recovered three more firearms and
ammunition. The defendant was previously convicted in Wayne County Court in 2013 of Criminal
Possession of a Controlled Substance in the Fourth Degree; in 2009 of Criminal Sale of a Controlled
Substance in the Fifth Degree; and in 2002 of Burglary in the Third Degree. As a result, Delisio is legally
prohibited from possessing firearms and ammunition."[158]

161.    On June 13, 2019, the Department of Justice issued a press release titled, "Armed Drug
Trafficker Pleads Guilty."[159]    The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced

---

[156]    https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-heroin-possession-and-being-felon-possession-gun

[157]    *Id.*

[158]    *Id.*

[159]    https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-pleads-guilty-3

73

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2
INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01016-MSS-TGW Document 31-2 Filed 05/08/23 Page 206 of 727 PageID 3013

today that Demetrius Jackson, 43, of Rochester, NY, pleaded guilty today before U.S. District Judge Charles J. Siragusa to possession with intent to distribute cocaine, and possession of a firearm and ammunition by a convicted felon."[160] Additionally, the press release indicated, "While searching the location, police officers found a green container with 10 small ziplock bags of cocaine in a bedroom which Jackson later admitted belonged to him. In the same bedroom, secreted in a crawl space, officers found a Taurus .45 caliber semiautomatic handgun which was loaded with 11 rounds of ammunition."[161]

162.      On March 9, 2022, the Erie County District Attorney's Office issued a press release titled, "Convicted Murderer Pleads Guilty to Manslaughter Charge for Killing Victim in Shooting on City's East Side in 2017."[162] The press release provided, "Erie County District Attorney John J. Flynn announces that 29-year-old Kenyatta Austin of Buffalo pleaded guilty this morning before Erie County Court Judge Kenneth Case to one count of Manslaughter in the First Degree (Class "B" violent felony). On March 19, 2017 at approximately 3:00 p.m., the defendant shot the victim on East Ferry Street near Bissell Avenue in the City of Buffalo. The victim, 24-year-old Luis Flores, died from his injuries a short time later. Austin faces a maximum of 25 years in prison when he is sentenced on Monday, May 9, 2022 at 2:00 p.m. The defendant continues to remain held without bail on this case. Austin is currently serving 64 years to life in prison after being convicted in a separate homicide case. A judge found the defendant guilty of murder, assault and gun charges for committing a shooting outside a home on Grape Street in

---

[160] *Id.*

[161] *Id.*

[162] "Convicted Murderer Guilty to Manslaughter Charge for Killing Victim in Shooting on City's East Side in 2017," available at https://www2.erie.gov/da/index.php?q=press/convicted-murderer-pleads-guilty-manslaughter-charge-killing-victim-shooting-citys-east-side-2

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                        RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01016-LEK-TWD   Document 31-2   Filed 05/08/23   Page 207 of 727   Page ID 3114

the City of Buffalo that killed 54-year-old Yvette Johnson and her 17-month-old grandson, Kyrie Johnson, on July 2, 2018. Two other individuals were injured by gunfire, but survived."[163]

163.    On June 28, 2022 (last updated June 29, 2022), WGRZ published an article titled, "Man and 2-year-old child shot on Decker Street Tuesday afternoon."[164]  The story provided, "Buffalo Police said a man and child were shot Tuesday afternoon. The shooting happened just before 4p.m. on the first block of Decker Street. Police said the man, 32, is in stable condition at ECMC, and his 2-year-old daughter is listed in stable condition at Oishei Children's Hospital. "The father and the daughter were innocent victims. In this case, they were shot through a fence," Buffalo Police commissioner Joe Gramaglia said Wednesday during a news conference. "So clearly, there's really not a lot that they could have seen when you're on the other side of a fence. But here we are another child in the City of Buffalo that's been shot, and we need some justice for this. You've got people that are firing weapons, randomly firing weapons, and you look at the results of what can happen there."[165]

164.    On September 27, 2022, Fox29 News At Ten published an article titled, "17-year-old shot and killed in Buffalo's Riverside neighborhood."[166]  The article provided, "A 17-year-old high school student was shot and killed in the riverside neighborhood Monday night. Buffalo police were called to the 200-block of Esser Avenue just before 10p.m. "He was a good kid. He was just trying to stay out of the way. He went right to the charter school." Says Eric Johnson, Mylik's brother. "I just don't

---

[163]    *Id.*

[164]    "Man and 2-year-old child shot on Decker Street Tuesday afternoon," available at https://www.wgrz.com/article/news/crime/man-and-child-shot-on-decker-street-tuesday-afternoon-crime-buffalo-community/71-e4e99873-0a72-423c-a7b1-31a2aeb93988

[165]    *Id.*

[166]    "17-year-old shot and killed in Buffalo's Riverside neighborhood," available at https://wutv29.com/news/local/17-year-old-shot-and-killed-in-buffalos-riverside-neighborhood

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

understand." Says Elijah Johnson, Mylik's brother. The brothers of high school student Mylik Johnson

in shock today after learning the 17-year-old was killed in a shooting Monday night in front of All Saints

Church in the riverside neighborhood. Mylik was a senior at Charter School for Applied

Technologies…Buffalo police say the shooting appeared to be targeted in nature, though they have not

yet arrested a suspect. Addressing the situation Mayor Byron Brown, commented "we are continuing to

follow up on leads, follow up on videographic evidence." Buffalo Mayor Byron Brown says he has been

working to end violence since the May 14th mass shooting. But since then, there have been more than

30 homicides in the city of Buffalo."[167]

165.    On December 22, 2020, an article was published titled, "Gun Trafficking Across State

Lines Is a Problem for Buffalo."[168] The article discussed two men, one from Ashtabula, Ohio and the

other from Buffalo, bringing guns into Buffalo.[169] The article quoted a U.S. Attorney for the Western

District of New York, stating: "They were both drug dealers and they used heroin customers that they

had to make these straw purchases from gun shops in Ohio and they trafficked over 100 guns which

actually made their way through these straw purchasers up here to the streets in the City of Buffalo[.]"[170]

166.    Handguns manufactured, imported or distributed by Defendants are acquired in states

and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause

injury, death or the threat thereof to residents of the City of Buffalo.

## IV.    The Trace Database

---

[167] *Id.*

[168] https://www.wgrz.com/article/news/gun-trafficking-across-state-lines-is-a-problem-for-buffalo/71-e74c157b-be28-48a8-85d9-acdd373235f5

[169] *Id.*

[170] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

167. An ATF gun "trace" identifies (a) the FFL that initially sold a gun recovered at a crime scene, (b) the manufacturer of the gun, and (c) the initial gun purchaser. The Trace Database traces a gun through the primary market, namely from the gun manufacturer or importer, distributor and retail dealer to the first retail purchaser. Defendants are an integral part of the tracing system because they receive requests for gun traces from ATF and other local law enforcement agencies.

168. The gun traces contained in the Trace Database overwhelmingly involve guns recovered in connection with a crime.

169. There is a statistically significant relationship between the number of homicides in various states and the number of dealers with firearms traced in those states.

170. By receiving trace requests from the ATF, manufacturers and distributors learn that guns sold by them were involved in crimes and can easily determine which specific retail dealers sold the guns.

171. Although trace data do not provide manufacturers and distributors with all conceivable information about a particular trace, when a disproportionate number of traces is attributable to a particular retailer, a prudent manufacturer or distributor has the ability to ensure that its guns are not falling into criminals' hands through lax practices by that retailer. Excessive numbers of traces to specific retailers or first purchasers can serve as cause for concern on the part of the manufacturers and distributors, who are not foreclosed from closing off illegal flows of their guns to such retailers. Defendants can take steps based on trace leads without interfering with or endangering law enforcement personnel. There is no ATF position or pronouncement that would preclude Defendants from using the elements of trace data available to them to institute more prudent merchandising practices to reduce the numbers of guns obtained from their retail dealers by criminals for use in crimes.

172. Although an FFL with a large number of sales may for that reason have a larger number of traces, data from the Trace Database have established that for many dealers, the number of traces is much larger than would be predicated based on sales volume. Although a large number of traces is not

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

itself proof of wrongdoing by the FFL, there is nothing to prevent Defendants from investigating whether volume alone accounts for the traces.

173. Responsible merchandising using trace data available to Defendants would not interfere with pending or prospective law enforcement proceedings and there is nothing inconsistent between ATF's efforts and use of the data by Defendants to reduce the flow of their firearms to criminal elements.

174. There are indicators other than amount of sales that predict that a dealer's guns are more likely to end up in the hands of criminals. Some indicators are: (1) out-of-state traces; (2) obliterated serial number traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and same dealer; (4) multiple sales forms; (5) traces from multiple sales; (6) record- keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically closer dealers — i.e., the purchaser for illegal use goes out of his way geographically to buy from certain retailers. If manufacturers made use of these indicators to police their customers, the volume of their guns diverted into the secondary market would be reduced.

175. Sufficient information in the trace database has been made available to Defendants (or would have been made available to any Defendant that had sought the information) so that each Defendant could have improved its distribution system to reduce the number of guns obtained by criminals.

176. Upon information and belief, firearms manufactured, imported, or distributed by Defendants that were sold by dealers with a disproportionately large number of traces or other indicators of improper sales practices have been, and continue to be, diverted to the illegal market in New York, and used to cause injury or death or the threat thereof to residents of the City of Buffalo and surrounding communities.

## V. Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market

78

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)     INDEX NO. UNASSIGNED

Case 8:23-cv-01106-MSS-TGW Document 21-2   Filed 05/08/23   Page 211 of 727 PageID 2518

NYSCEF DOC. NO. 2                                                          RECEIVED NYSCEF: 12/20/2022

177.   According to Robert Haas, the former Senior Vice President for Marketing and Sales for defendant Smith & Wesson, the gun industry knows that the criminal market is fueled by the industry's distribution practices, but does nothing:

> The company and the industry as a whole are fully aware of the extent of the criminal misuse of firearms. The company and the industry are also aware that the black market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices . . . .
>
> I am familiar with the distribution and marketing practices of all of the principal U.S. firearms manufacturers and wholesale distributors and none of them, to my knowledge, . . . investigate, screen or supervise the wholesale distributors and retail outlets that sell their products to insure that their products are distributed responsibly.

178.   In March 2000, Smith & Wesson agreed to accept a wide array of restrictions on the way it makes, sells and distributes hundreds of thousands of handguns each year in exchange for ending some lawsuits that had threatened to bankrupt it.[171]  Under the agreement, which was immediately criticized by other gun manufacturers, Smith & Wesson would place a second, hidden set of serial numbers in all its new guns to make it harder for criminals to scratch away those identifying marks.[172]  The company promised to sell with each new handgun a small lock that prevents the trigger from being pulled.[173]  And the agreement required, within three years, "smart-gun technology" that would allow each of its new handguns to be fired only by authorized users.[174]  The agreement also established a "code of conduct" for Smith & Wesson's authorized dealers and distributors that would prohibit them, under threat of

---

[171]   https://www.nytimes.com/2000/03/18/us/under-legal-siege-gun-maker-agrees-to-accept-curbs.html

[172]   *Id.*

[173]   *Id.*

[174]   *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 8:22-cv-01116-MSS-TGW Document 21-2 Filed 05/08/23 Page 212 of 727 PageID 3619

NYSCEF DOC. NO. 2                                                    INDEX NO. UNASSIGNED

                                                          RECEIVED NYSCEF: 12/20/2022

losing their franchises, from selling guns at gun shows unless the buyers have passed background checks.[175] Additionally, in a provision intended to discourage illegal gun trafficking, people who buy more than one gun from a Smith & Wesson dealer would be allowed to take home just one gun on the day of the sale, and will have to return 14 days later to claim the rest.[176] Unfortunately, Defendants such as Glock refused to sign on to the Smith & Wesson deal.[177]

179.   "But pro-gun advocates saw the agreement as a rank betrayal, and the National Rifle Association said the company had 'run up the white flag of surrender.' Under pressure from the boycott, sales fell 40 percent, and Smith & Wesson closed two factories. In 2001, Tompkins PLC, its British owner, sold the company to a U.S. buyer for $15 million, a fraction of the price it had paid for it just a few years earlier."[178] "Yet in just a few years, Smith & Wesson was back on its feet and well on its way to regaining its position at the top of U.S. gun manufacturers. A key element of its strategy was openly repudiating the terms of the Clinton gun safety deal and introducing a new line of high-capacity pistols and its first-ever, assault-style rifle, which became top-sellers for the company."[179]

---

[175] *Id.*

[176] *Id.*

[177] https://www.cnn.com/2000/ALLPOLITICS/stories/03/21/glock.guns/

[178] https://www.huffpost.com/entry/smith-wesson-clinton-bush-nra_n_2348503

[179] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

180.     As evidenced by Smith & Wesson's agreement to accept the restrictions in 2000,[180] Defendants are able to implement such restrictions, but choose not to.[181]

181.     Robert Ricker, an individual with years of experience as a National Rifle Association and gun industry trade association official, has testified in another lawsuit that the gun industry is aware of the means by which firearms are diverted from the legal to the illegal market. He has testified that the industry knows that gun traces are indicators of problems at the dealer level and are adequate notice to all upstream distribution entities of these problems. He has testified that dealers often falsely report guns as stolen, as a means of covering up trafficking. According to Mr. Ricker, industry members have not addressed the problems posed by unsupervised dealers because "if the industry took voluntary action, it would be admitting responsibility," and "the concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem."

## VI.     Merchandising Practices that Could Reduce Illegal Diversion

182.     Certain merchandising practices by the Gun Manufacturer Defendants and the Gun Distributor Defendants could substantially reduce guns flowing into criminal hands, thereby avoiding many murders and injuries.

183.     There is a statistically significant relationship between the use of certain distribution oversight practices followed by a manufacturer and the manufacturer's ratio of trace share to market share.

---

[180]  For a summary of the deal, see: https://archives.hud.gov/news/2000/gunagree.html. The full text is available here:
https://www.nraila.org/articles/20000317/smith-wesson-settlement-agreement.

[181]  For analysis of the decision of Smith & Wesson not to abide by the deal, *see* Daniel P. Rosner, Note, *In Guns We Entrust: Targeting Negligent Firearms Distribution*, 11 Drexel L. Rev. 421, 438-41 (2018).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

184.     Manufacturers that have adopted the following practices have smaller crime-gun ratios (i.e. ratio of guns traced, as part of a criminal investigation, to total guns sold): (i) requiring evidence of a storefront, (ii) having an authorized dealer program, (iii) maintaining records of sales to individual dealers, (iv) visiting dealers frequently, (v) commissioning market studies, (vi) maintaining distributor agreements, (vii) imposing controls over how the product is advertised, and (viii) inquiring about inventory level of distributors.

185.     Standard marketing mechanisms that could have been employed by these Defendants using their existing marketing infrastructures to prevent diversion of guns into the secondary market include: (i) requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; (ii) developing a management code establishing standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; (iii) requiring minimum inventory; (iv) imposing liability insurance standards; (v) limiting sales at gun shows; (vi) limiting multiple sales; (vii) limiting how the consumer gun transaction can be conducted to insure security; (viii) education and training of dealers; and (ix) monitoring dealers through visitation and other regular interaction.

186.     If the Gun Manufacturing Defendants entered into such marketing and distribution agreements with their distributors and dealers, there would be a significant reduction in the flow of firearms into the State of New York, including the City of Buffalo.

187.     If the Gun Manufacturing Defendants and Gun Distribution Defendants provided training in proper sales and distribution practices to those in the primary firearms market, many firearms would not have found, and will not in the future find, their way into the secondary market in New York and Buffalo.

188.     If these Defendants had studied available trace request data and acted upon that data to better control their downstream customers, they could have used the information to prevent injury or

82

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-01106-MSS-TGW Document 31-2 Filed 09/08/23 Page 215 of 727 PageID 2322

death or the threat thereof to the City of Buffalo and its residents. The necessary information was and is available to them.

189. Upon information and belief, the Gun Manufacturing Defendants make no meaningful effort to supervise or regulate the practices of either the distributors or dealers who sell their products to the public, despite their knowledge that particular dealers are known to supply large numbers of guns used to commit crimes. Because it is to their economic advantage, these Defendants exercise contractual control over their distributors and dealers in such areas as pricing and advertising, but fail to impose on the same distributors and dealers contractual arrangements by which they could regulate the sale and disposition of their guns. The Gun Manufacturing Defendants have instead adopted a strategy of willful blindness to the conduct of their distributors and dealers that facilitates the entry of their guns into the illegitimate market.

## VII. 2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits

190. On July 27, 2022, the U.S. House of Representatives issued a Memorandum by the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits.[182] "Following mass shootings in Buffalo, New York, and Uvalde, Texas, the Committee launched an investigation into the leading manufacturers of AR-15-style assault rifles."[183]

191. The Memorandum contained the following findings:

- "These companies sell weapons to civilians that are engineered to kill many people as fast as possible. These rifles are the weapon of choice for mass murderers who have terrorized and slaughtered young children at school,

---

[182] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

[183] *Id.* at 1.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

worshippers at churches and synagogues, and families celebrating the Fourth of July. On May 26, 2022, the Committee sent letters to five gun manufacturers seeking information on their sale and marketing of these deadly firearms and any efforts to monitor or track safety data related to their products. The manufacturers — Bushmaster, Daniel Defense, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company — have all made and sold AR-15-style semiautomatic weapons that have been used in mass shootings."[184]

- "The Committee has learned that gun companies collected more than $1 billion over the last decade from selling military-style assault weapons to civilians, even as gun violence increased across the United States. These companies used disturbing sales tactics — including marketing deadly weapons as a way for young men to prove their manliness and selling guns to mass shooters on credit — while failing to take even basic steps to monitor the violence and destruction their products have unleashed."[185]

192. "Documents and information obtained by the Committee show":[186]

- Gun manufacturers collected more than $1 billion from the sale of AR-15-style semiautomatic weapons in the last decade — and sales are increasing as gun deaths and mass shootings rise.

  i. Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million.

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

84

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

    ii. Smith & Wesson's revenue from all long guns, which include AR-15-style rifles, more than doubled between 2019 and 2021, from $108 million to $253 million.

    iii. Combined, these five manufacturers push hundreds of thousands of military-grade AR-style rifles into communities every year.

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

    i. Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

    ii. Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

    iii. Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- Gun manufacturers fail to track or monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

    i. All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

85

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00106-LSC-SGW Document 31-2 Filed 09/08/23 Page 218 of 727 PageID 2425

      ii.   Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

     iii.   Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

193.    Additionally:

- Bushmaster made the assault weapon used in the Sandy Hook mass shooting in Newtown, Connecticut, in 2012, and in the recent white supremacist attack in Buffalo, New York. A Bushmaster AR-15-style rifle was also used in the sniper attacks in Washington, D.C., in 2002. The company was previously a part of Remington, the nation's largest gun company. Remington filed for bankruptcy in 2018, and Franklin Armory purchased the Bushmaster trademark and continues to manufacture substantially similar AR-15-style rifles, trading on the reputation, history, and notoriety of the Bushmaster name.[187]

- Sig Sauer sold the AR-15-style rifle used by a mass shooter to kill 49 people at Pulse nightclub in Orlando, Florida, in 2016, and three of the weapons used by the shooter in Las Vegas, Nevada, in 2017 to kill 60 people. The company recently won the contract to replace the U.S. Army's M-4 carbine and is selling a

---

[187] *Id.* at 3-4 (internal citations omitted).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.) INDEX NO. UNASSIGNED

Case 8:23-cv-01016-MSS-TGW Document 31-2 Filed 09/08/23 Page 219 of 727 PageID 2426

NYSCEF DOC. NO. 2                                                          RECEIVED NYSCEF: 12/20/2022

version of its new rifle to civilians "in a configuration that is a near match" to what America's soldiers will soon be carrying into battle.[188]

- Smith & Wesson sold the assault weapons used in the Fourth of July massacre in Highland Park, Illinois, as well as the mass shootings in Parkland, Florida, in 2018, and San Bernadino, California, in 2015. Smith & Wesson was the second largest maker of rifles in the United States in 2020.[189]

- Sturm, Ruger & Company, Inc. Ruger's AR-15-style rifle and pistol variants were used by mass shooters in Sutherland Springs, Texas, in 2017 and Boulder, Colorado, in 2021. Ruger is the largest maker of rifles of all types in the United States.[190]

194. The Memorandum continued with findings regarding profits, sales, and deaths from guns:[191]

- The Committee has obtained internal financial data showing that major gun manufacturers have been enjoying record-breaking sales and profits from AR-15-style rifles, even as gun deaths and mass shootings have risen in the United States.

- In the past decade, these five manufacturers have collectively amassed more than $1 billion in revenue from AR-15-style firearms. Sales skyrocketed in 2021. According to data obtained by the Committee, in 2021, Daniel Defense and

---

[188] *Id.*

[189] *Id.* at 4-5.

[190] *Id.* at 5.

[191] *Id.* at 5-6.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Ruger nearly doubled their revenues from the sale of AR-15-style firearms compared to the previous year, with each company accumulating more than $100 million in gross sales from these weapons.

- Smith & Wesson refused to provide specific revenue and profit information for its AR-15-style firearms, instead providing aggregate "long gun" revenues that totaled over $250 million in 2021, more than doubling from 2020. Smith & Wesson informed the Committee that assault rifles make up more than half of overall long gun sales, meaning the company brought in at least $125 million from AR-15 style rifles in 2021 alone.

- Sig Sauer claimed it did not track revenue and profits from specific product lines but stated that AR-15-style rifles make up approximately 3% of its total revenues — financial figures that it has refused to provide to the Committee.

- Bushmaster claimed to the Committee that, as a "new company," it had no financial data from the previous owners of the Bushmaster trademark, despite public reporting that the 2020 sale of the brand to Franklin Armory included "historic sales, vendor and customer data," and "the technical data packages for numerous Bushmaster-branded firearms."[192]

---

[192] *Bushmaster Announces a Comeback*, Guns.com (Feb. 15, 2021) (available at www.guns.com/news/2021/02/15/bushmaster-announces-a-comeback).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

| Figure 1:  AR-15-Style Rifle Revenue and Recent Mass Murders | | |
| --- | --- | --- |
| | *AR-15-Style Rifle Revenue, 2012-2021* | *Recent Mass Murders with the Company's AR-15-Style Rifles* |
| SMITH & WESSON | At Least $695 Million | Highland Park (7 dead) Parkland (17 dead) San Bernadino (14 dead) |
| RUGER | $514 Million | Sutherland Springs (25 dead) Boulder (10 dead) |
| DANIEL DEFENSE | $528 Million | Uvalde (21 dead) Las Vegas (60 dead)* |
| SIG SAUER | REFUSED | Orlando (49 dead) Las Vegas (60 dead)* |
| BUSHMASTER | $2.9 Million (2021 Only) | Buffalo (10 dead) Sandy Hook (27 dead) |

\* Killer used weapons from multiple companies

195.    In addition, the Memorandum set forth:[193]

- Figure 2 below shows annual rifle revenues for Smith & Wesson, Daniel Defense, and Ruger from 2012 through 2021. Each of these companies has seen significant increases in revenue from assault weapons since 2019. Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million. Smith & Wesson provided only data on gross revenues from all long-gun sales, which include AR-15-style rifles. The company's revenue from that broad category of weapon more than doubled between 2019 and 2021, from $108 million to $253 million.

---

[193]https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 6-9.

89

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
Case 8:23-cv-01016-MSS-TGW Document 21-2 Filed 09/08/23 Page 222 of 727 PageID 2469
NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022



Figure 2: AR-15 Style Rifle Revenues (2012-2021)

- During the Committee's June 8, 2022, hearing on gun violence, gun industry expert Nick Suplina noted that "the gun industry has grown tremendously over the last two decades, business is booming, [and] profits are breaking records." He further remarked that "so are rates of gun violence."

- According to data from the Centers for Disease Control and Prevention and other sources, 2020 and 2021 witnessed the highest gun-related death totals in the United States in decades.

- Studies by the Harvard Injury Control Research Center have found a strong correlation between an increase in gun availability and rates of homicides, suicides, and accidental gun deaths.[194]

---

[194] Citing Harvard T.H. Chan School of Public Health, Harvard Injury Control Research Center, *Firearms Research — Homicide* (online at www.hsph.harvard.edu/hicrc/firearms-research/guns-and-death) (accessed July 14, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- Figure 3 below shows the annual number of gun-related deaths from 2012 through 2021.

- Figures 4a and 4b show internal rifle sales data from this same period. Daniel Defense and Ruger's figures are for "AR platform" rifles only. Smith & Wesson reported total long gun sales, although the company reported that AR-15-style rifles comprise more than half of that category. Sig Sauer and Bushmaster refused to provide concrete information on the number of AR-15-style rifles sold during this requested time-period.







*Figures 4a and 4b include "AR platform" rifles sold by Daniel Defense and Ruger and all long guns sold by Smith & Wesson.*

91

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

- The Committee's findings are consistent with longstanding trends of the gun industry. Gun sales tend to peak in the immediate aftermath of elections, civil unrest, and mass shootings, resulting partly from consumer anxieties and panic-purchasing.[195] This pattern culminated in record-breaking sales numbers for all firearm types during the coronavirus pandemic.[196]

- A June 2021 Smith & Wesson investor presentation bragged, "In a year of turmoil, we gained market share" and concluded, "we're just getting started."[197]

- The editor of a gun industry trade magazine described the first year of the coronavirus pandemic, when gun sales and gun deaths reached unprecedented levels, as a moment of "opportunity" for gun manufacturers.[198]

196.     The Memorandum also provided its findings regarding the marketing practices of gun manufacturers:[199]

- The Committee's investigation found that gun manufacturers' multimillion-dollar marketing campaigns have emphasized the AR-15-style rifle's military

---

[195] Citing "An Arms Race in America: Gun Buying Spiked During the Pandemic. It's Still Up," *New York Times* (May 29, 2021) (online at www.nytimes.com/2021/05/29/us/gun-purchases-ownership-pandemic.html); "The Pandemic and Fears of Civil Unrest Led to a Historic Boom in Gun Sales This Year," *Buzzfeed News* (Nov. 3, 2020) (online at www.buzzfeednews.com/article/peteraldhous/2020-record-us-gun-sales-election).

[196] *Id.*

[197] Citing *Shootings Have Surged—and Gun Companies Have Made Billions*, Rolling Stone (May 27, 2022) (online at www.rollingstone.com/politics/politics-news/gun-profits-surge-violence-1359155).

[198] *Id.*

[199] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 9-20.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

roots and its capacity to kill. The investigation also showed that gun makers use aggressive financing tactics to entice buyers. This is consistent with testimony at the Committee's June 8, 2022, hearing from Nick Suplina, who explained that "in a now crowded field, manufacturers of these guns are trying to market in increasingly brazen ways, often touting the deadliness of products, glorifying combat, and attempting to appeal to younger audiences."[200]

- Documents obtained by the Committee show that gun manufacturers use a variety of incentives and tactics to increase sales, including allowing their products to be purchased easily online, and offering rebates, free gifts, and financing opportunities for purchasing their weapons. Although these sales and financing innovations are not unique to the gun industry, these products are far more dangerous than other consumer goods. Daniel Defense, the manufacturer of the rifle purchased and used by the Uvalde shooter, offers its firearms for sale through a buy-now, pay-later, financing system advertised on the front page of its website.[201] To order the exact weapon used by the shooter in Uvalde requires

---

[200] Citing Committee on Oversight and Reform, Testimony of Nick Suplina, Senior Vice President for Law and Policy, Everytown for Gun Safety, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Suplina%20Testimony.pdf).

[201] Citing "Buy Now, Pay Later Dragged into Uvalde Shooting Controversy," *Australian Financial Review* (May 30, 2022) (online at www.afr.com/markets/equity-markets/buy-now-pay-later-dragged-into-uvalde-shooting-controversy-20220529-p5apdi); Daniel Defense, *Shooting Sports Financing* (online at https://danieldefense.com/daniel-defense-financing) (accessed June 23, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

just five clicks, and a pickup at a local gun store which includes a background check and proof of age.[202]

- The Committee has obtained documents showing that gun manufacturers seek to leverage the military lineage of the AR-15 to increase sales to civilians, depicting their AR-15-style rifles with military and law enforcement units and alongside their uniforms. These advertisements draw a direct connection between AR-15-style weapons on the civilian market and weapons of war, whose sole purpose is to inflict as many casualties in combat as possible.

- One advertisement produced to the Committee — shown below — depicts a Smith & Wesson M&P rifle, a variant of the AR-15, as "the chosen one" that is "selected by professionals," featuring the insignia of police, sheriff, highway patrol, and other law enforcement. In a complaint to the Federal Trade Commission alleging unfair and deceptive marketing practices, the Brady Center to Prevent Gun Violence and Everytown for Gun Safety have alleged that Smith & Wesson advertisements contain false endorsements from military and law enforcement. The complaint details that "only a small percentage of Smith & Wesson's overall sales are to law enforcement, and those appear to be mostly handguns, not rifles." The complaint also notes that Smith & Wesson has secured only one military contract in the past decade, a 2012 contract to deliver 250 revolvers destined for Thailand.[203]

---

[202] Citing "We Ordered the Same Gun Used in Uvalde. Here's How Easy It Was," *Quartz* (May 26, 2022) (online at https://qz.com/2170207/we-ordered-the-ar-15-rifle-used-in-uvalde-heres-how-easy-it-is).

[203] Citing "Letter from Brady: United Against Gun Violence and Everytown for Gun Safety to Acting Director Samuel Levine, Bureau of Consumer Protection, Federal Trade Commission" (Aug.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



- Young people with an affinity for law enforcement and the military have purchased assault weapons marketed in this manner, and some of these young people have used them to kill civilians. The shooters in the Parkland, Florida; Kenosha, Wisconsin; and Poway, California; synagogue shootings were all teenagers drawn to the military and law enforcement. The Parkland shooter was a student in his Junior Reserve Officer Training Corps class and member of the school's air rifle team, while Kyle Rittenhouse, who fatally shot two people and injured a third at a Black Lives Matter protest in Kenosha, Wisconsin, planned a career in law enforcement after being turned away from the military. The Poway, California, shooter wrote a militaristic, anti-Semitic manifesto and described himself as a soldier defending his country. All three used Smith & Wesson M&P rifles, like the one pictured above.[204]

- Sig Sauer also prominently features its military connections in advertisements to civilian gun buyers. Sig Sauer advertisements obtained by the Committee make explicit visual and textual connections between their AR-15-style civilian rifles

---

17, 2021) (online at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/2021.08.17-SW-FTC-Submission.pdf).

[204] Citing *id.*

95

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

and the military. The advertisement for the company's popular SIG MCX Virtus AR-15 platform, below, exemplifies several of these techniques.



- Though the rifle is being advertised to civilians, the advertisement shows five men in a destroyed building in a warzone. All are wearing military-style camouflage and tactical gear emblazoned with camouflage American flags and are carrying military versions of the Sig Sauer rifle. The rifle held by one the central kneeling figures appears to be modified with a grenade launcher. The text

96

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2

Case 8:23-cv-00006MSSTGW Document 23-1 Filed 09/08/23 Page 229 of 727 PageID 2536

RECEIVED NYSCEF: 12/20/2022

of the advertisement emphasizes that the rifle's "modularity" makes it "ready for every possible mission."

- Sig Sauer's website reinforces the impression that this rifle, despite being sold to civilians, is intended for military use. The product page for the "patrol" version of the MCX Virtus boasts that the original version of the rifle was "conceived for the demands of the Special Operations community" and describes the rifle as "the apex predator of the carbine world."[205]

- Ruger did not produce any marketing materials to the Committee that referenced military or law enforcement themes. In 2010, however, the company used military themes to market weapons of war to civilians. As documented by the Violence Policy Center, Ruger advertised its Mini-14 Tactical Rifle (below) as "Combat Customized."[206]



- Advertisements obtained by the Committee also seek to appeal to consumers' masculinity, suggesting that purchasing an assault rifle will allow the consumer

---

[205]  Citing Sig Sauer, "Sig MCX Virtus Patrol" (online at www.sigsauer.com/sig-mcx-virtus-patrol.html) (accessed July 18, 2022).

[206]  Citing Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market* (June 2011) (online at https://vpc.org/studies/militarization.pdf).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

to retain their "manhood." One Bushmaster advertisement depicts an AR-15 with the caption, "Consider your mancard reissued." Another advertisement suggests that by purchasing an AR-15, "your status at the top of the testosterone food chain is now irrevocable." One commentator found that the intended effect of these advertisements appeared to be to "humiliate men into arming themselves with combat weapons."[207]

 

- Gun manufacturer advertisements often combine the promise of an adrenaline rush with violent undertones. One Smith & Wesson advertisement obtained by the Committee depicts spent shell casings, its M&P rifle, and the caption, "Kick Brass." The advertisement claims the rifle will deliver "Pure Adrenaline."

---

[207] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



- Other manufacturers have used similar advertising techniques. In April 2022, Remington settled a landmark lawsuit for $73 million with the parents of children killed in Sandy Hook Elementary School, marking the first time since the enactment of the Protection of Lawful Commerce in Arms Act (PLCAA) that a firearm manufacturer was held liable for the destruction and death caused by its product. Plaintiffs successfully argued that Remington "tapped into anxieties of masculinity" to sell firearms to "impressionable" and lonely young men who are prone to violence.[208]

---

[208] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

99

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- The firearm industry has been marketing directly and indirectly to white supremacist and extremist organizations for years, playing on fears of government repression against gun owners and fomenting racial tensions. The increase in racially motivated violence has also led to rising rates of gun ownership among Black Americans, allowing the industry to profit from both white supremacists and their targets.

- Extremist imagery has frequently appeared on merchandise available at large industry-sponsored conventions such as the National Shooting Sports Foundation (NSSF) Shot Show and the NRA Annual Meeting, as well as in advertisements by major gun manufacturers.[209]

- There have been an increasing number of mass shootings in recent years carried out by shooters acting on their white supremacist beliefs, including the shootings in Buffalo, El Paso, and at the Tree of Life Synagogue in Pittsburgh.[210]

- As a result of the increase in racially motivated violence, firearms manufacturers profit from the business of both white supremacists and those extremists' targets. Gun ownership among Black Americans has soared by more than 50% since 2020, in response to increasing gun violence and the spike in anti-Black hate

---

[209] Citing "The Gun Industry Created a New Consumer. Now It's Killing Us," *The Atlantic* (July 25, 2022) (online at www.theatlantic.com/ideas/archive/2022/07/firearms-industry-marketing-mass-shooter/670621/).

[210] Citing "White Supremacist Extremism Takes Up Arms in the United States," *El País* (May 22, 2022) (online at https://english.elpais.com/international/2022-05-22/white-supremacism-takes-up-arms-in-the-united-states.html).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 8:23-cv-00006MSSTGCW Document 23-1  Filed 09/08/23  Page 103 of 197 PageID 1570

crimes.[211]  The firearms industry has capitalized on this fear and begun marketing

directly to minority communities with taglines such as "it's a jungle out there,"

and "mi casa no es sú casa."[212]  This marketing has increased the number of guns

in these communities, which are already the most negatively impacted by

rampant gun violence. Black Americans experience gun violence and assaults at

dramatically higher rates than other ethnicities.[213]

- Documents provided to the Committee show how manufacturers use the

imagery of first-person shooter video games to market their products. Below is

a comparison of two Smith & Wesson M&P advertisements and the video game

Call of Duty Modern Warfare, in which the player is using a similar M4 rifle.[214]

- Smith and Wesson advertisements:

---

[211] Citing "Why More Black People Are Looking for Safety in Gun Ownership," *NBC News* (June 14, 2022) (online at www.nbcnews.com/news/nbcblk/black-people-are-looking-safety-gun-ownership-rcna32150); "Black Americans Flock to Gun Stores and Clubs: 'I Needed to Protect Myself,'" *The Guardian* (Apr. 5, 2021) (online at www.theguardian.com/us-news/2021/apr/05/us-gun-ownership-black-americans-surge).

[212] Citing Violence Policy Center, *How the Firearms Industry and NRA Market Guns to Communities of Color* (Jan. 2021) (online at www.vpc.org/studies/marketingexecsum2021.pdf).

[213] Citing Everytown for Gun Safety, *Impact of Gun Violence on Black Americans* (online at www.everytown.org/issues/gun-violence-black-americans) (accessed June 30, 2022).

[214] Citing "Just Found Out About the Cleanest Iron Sight for the M4," *Reddit* (May 3, 2020) (online at www.reddit.com/r/modernwarfare/comments/gcnhdr/just_found_out_about_the_cleanest_iron_sight_for) (accessed July 25, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



- Call of Duty Modern Warfare video game:



102

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 235 of 727 PageID 2592

- Gun manufacturers also enter into licensing agreements to have their weapons featured in first-person shooter video games. Ralph Vaughn, who negotiates licensing agreements with game developers on behalf of sniper rifle manufacturer Barrett, said: "It is hard to qualify to what extent rifle sales have increased as a result of being in games, but video games expose our brand to a young audience who are considered possible future owners."[215]

197.    The Memorandum also set forth the Committee's findings with regard to the gun industry's failure to track crimes and deaths caused by its products:[216]

- The Committee's investigation found that the five gun manufacturers under review do not have any systems in place to monitor and analyze deaths and injuries associated with their products.[217]

- In response to the Committee's inquiries, all five companies asserted that they do not monitor or track injuries and deaths caused by their AR-15-style rifles, either from accidental discharge, product malfunction, or deliberate use, nor do they track crimes committed with the products.

---

[215]  Citing "Shooters: How Video Game Fund Arms Manufacturers," *Eurogamer* (May 14, 2019) (online at www.eurogamer.net/shooters-how-video-games-fund-arms-manufacturers).

[216]  https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf at 20-22.

[217]  Citing Committee on Oversight and Reform, *Press Release: Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022) (online at https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- Bushmaster represented that it "does not formally 'monitor' or 'track'" incidents,[218] and also claimed that there were no such deaths or injuries with its products, even though the mass shooter in Buffalo used a Bushmaster-brand assault weapon to kill ten people.[219]

- Ruger emphasized that the company becomes aware of deaths, injuries, and crimes associated with its products only through its "customer service department, through media reports, or occasionally in connection with actual or potential litigation." Ruger maintained that it deals with each customer claim of injuries or deaths associated with its products individually, and "does not create or maintain records based upon the nature of the injury claimed."[220]

- Sig Sauer asserted that it does "not have the means" to track such incidents.[221]

- Both Daniel Defense and Smith & Wesson asserted that they do "not monitor or track this information."[222]

---

[218] Citing *Internal letter from Bushmaster Firearms International to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[219] Citing "Buffalo Supermarket Shooting: What Do We Know So Far?," *Associated Press* (May 16, 2022) (online at https://apnews.com/article/buffalo-shooting-what-to-know-bcb5e0bd2aedb925d20440c2005ffef8).

[220] Citing *Internal letter from Sturm, Ruger & Company, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[221] Citing *Internal letter from Sig Sauer, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022).

[222] Citing *Internal letter from Daniel Defense to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022); *Internal letter from Smith & Wesson to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 7, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00006-MSS-TGW Document 23-1 Filed 09/08/23 Page 109 of 197 PageID 2644

RECEIVED NYSCEF: 12/20/2022

- In response to the Committee's request for internal company analyses of the use of their assault weapons "in mass shootings or other homicides," the "risks posed" by the marketing or sale of these weapons, and "the ability to modify these weapons to increase their lethality," none of the five companies produced a single document.

- These gun companies fail to track the deaths and crimes caused by their products even though they are included in a tracing process run by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). When law enforcement seizes a gun at a crime scene, they contact ATF's National Tracing Center to track the firearm from the manufacturer, through dealers and retailers, and into the hands of the most recent buyer.[223] During this tracing process, ATF works directly with firearm manufacturers to gain information about the gun.[224] Despite their involvement in this tracing process, each company claimed that they do not monitor or track this information.

- As the Committee has previously demonstrated, a "small number of retailers" are often responsible for supplying an inordinate number of guns used in crimes, suggesting that industry attention to where and how their products are misused by criminals could help curb violent crime or rising homicide rates.[225]

---

[223] Citing Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Tracing Center* (online at www.atf.gov/firearms/national-tracing-center) (accessed June 23, 2022).

[224] *Id.*

[225] "6 Gun Shops, 11,000 "Crime Guns": A Rare Peek at the Pipeline," *New York Times* (Apr. 28, 2022) (online at www.nytimes.com/2022/04/28/us/politics/gun-shops-weapons-resell.html).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- Gun manufacturers' failure to monitor injuries, deaths, and crimes associated with their products also stands in stark contrast with other consumer product industries, which are required to alert the public to risk of harm from their products through Consumer Product Safety Commission (CPSC). Manufacturers, importers, distributors, and retailers of consumer products must notify the CPSC within 24 hours if they become aware of information suggesting their product "creates an unreasonable risk of serious injury or death."[226]

- Other industries have similar requirements. For instance, the Food and Drug Administration (FDA) requires companies with prescription drugs to submit detailed "adverse event" information to FDA, and manufacturers of medical devices are "required to report to the FDA when they learn that any of their devices may have caused or contributed to a death or serious injury."[227]

- Even where a product operates as intended, an industry typically will face legal liability where their distribution or marketing practices yield excessive or unintended use of the product. For instance, a pharmaceutical company will face legal liability for failing to curb negligent monitoring or distribution practices of dangerous drugs such as opioids. Yet the gun industry faces no such consequences for its failure to track deaths, injuries, or crimes committed with their products.

---

[226] 15 U.S.C. § 2064(b).

[227] 21 C.F.R. § 314.80(a) (2014); Food and Drug Administration, *Mandatory Reporting Requirements: Manufacturers, Importers and Device User Facilities* (online at www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm) (accessed July 25, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

Case 8:23-cv-00066-MSS-CGW Document 23-1 Filed 09/08/23 Page 239 of 727 PageID 2636

RECEIVED NYSCEF: 12/20/2022

## VIII. AR-15-Style Assault Weapon Defendants

198. As the Committee's Memorandum documented, several of the Defendants named in this action have marketed, and continue to market, AR-15-Style Assault Weapons: Smith & Wesson Brands, Inc.; Bushmaster Firearms Industries, Inc.; RemArms, LLC, a/k/a Remington Firearms; Sig Sauer, Inc.; and Sturm, Ruger & Co., Inc. (hereinafter "AR-15-Style Assault Weapon Defendants" or simply, "AR-15 Defendants").

199. Born out of the exigencies of modern combat, the AR-15 was designed for the United States Military to be used in combat.

200. The AR-15 was designed with features that were chosen to maximize casualties and engineered to deliver maximum carnage with extreme efficiency on the battlefield.

201. The AR-15's combination of features resulted in a weapon so lethal that the United States Military adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

202. The AR-15 remains the United States Military's weapon of choice today.

203. The AR-15-style assault weapons produced by the AR-15 Defendants maintain the design, functionality and appearance of its military counterpart, the M16.

204. AR-15-style assault weapons have become the weapon of choice for mass shooters.

205. The AR-15 Defendants produce the majority of AR-15-style assault weapons sold in New York, including in Buffalo.

206. The AR-15 Defendants have marketed, and continue to market, their AR-15s by promoting their militaristic and assaultive uses.

207. The AR-15 Defendants' militaristic marketing promotes the image of their AR-15s as combat weapons used for the purpose of waging war and killing human beings.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

110 of 197

208. The AR-15 Defendants market their sporting and competition rifles with five- and ten-round magazines while marketing their AR-15 rifles with magazines containing up to 30 rounds.

209. The AR-15 Defendants' marketing glorifies the lone gunman.

210. The AR-15 Defendants' marketing promotes lone gunman assaults.

211. The AR-15 Defendants' marketing glorifies the military design, functionality and appearance of their AR-15s.

212. The AR-15 Defendants' marketing promotes their AR-15s for use in mass casualty assaults.

213. The AR-15 Defendants' marketing promotes criminal use of their AR-15s by their target market.

214. The AR-15 Defendants' marketing targets high-risk users.

215. The AR-15 Defendants' marketing targets impulsive young men who have an interest in military weapons who are particularly likely to be attracted to the unique capacities of AR-15-style assault weapons.

216. The AR-15 Defendants' marketing targets adolescents drawn to the excitement and risk-taking associated with militaristic weapons or combat missions, including young players of popular and realistic first-person shooter video games, which prominently feature variants of the weapons sold by the AR-15 Defendants in real life.

217. The AR-15 Defendants market their AR-15s as well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

218. The AR-15 Defendants have continued to market AR-15s in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

219. The AR-15 Defendants have marketed, and continue to market, their AR-15s without regard for public safety.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

220.    The AR-15 Defendants' marketing of these lethal weapons is unethical.

221.    The AR-15 Defendants' marketing of these lethal weapons is immoral.

222.    The AR-15 Defendants' marketing of these lethal weapons is unscrupulous.

223.    The AR-15 Defendants' marketing of these lethal weapons is oppressive.

224.    The AR-15 Defendants' marketing of these lethal weapons is reckless.

225.    The AR-15 Defendants have marketed these lethal weapons, and continue to market them, in the above manner both directly and through third parties.

## IX.    Ghost Gun Defendants

### A.    Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted in to Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns.

226.    Ghost Gun Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as conventional firearms and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and AR-10 and AR-15 assault rifles. But ghost guns are untraceable and designed to evade background checks, licensing, and other state and local rules governing sales, making the weapons extremely attractive to criminals, and dangerous to the public.

227.    The absence of serial numbers in ghost guns makes the investigation of crimes committed using them far more difficult. As the United States House Committee on Homeland Security concluded in a 2019 report, "[g]host guns not only pose a challenge on the front end, enabling prohibited buyers to purchase deadly weapons with just a few clicks online, but also on the back end, hamstringing

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)                    INDEX NO. UNASSIGNED
NYSCEF DOC. NO. 2                                                                                        RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00056-MSS-TGW Document 21-1  Filed 09/08/23  Page 242 of 727 PageID 2669

law enforcement's ability to investigate crimes committed with untraceable weapons."[228] ATF itself has explained that the absence of serial numbers "makes it more difficult for Federal, State, and local law enforcement to identify and prosecute illegal firearms traffickers who are often tied to violent criminals and armed narcotics traffickers."[229]

228. The unfinished frames and receivers marketed by Ghost Gun Defendants and sold into the City of Buffalo, the surrounding area, and New York State are designed to subvert the federal and state statutes that aim to prevent guns from falling into the hands of people who cannot and should not possess them.

229. As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun — it is merely missing a few drill holes and contains a small amount of extra plastic, and is easily convertible into the finished product, a deadly weapon.

230. The term "frame" generally refers to the core part of a pistol or handgun, whereas the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun. Current federal regulations define "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. It is this definition that Ghost Gun Defendants' unfinished frames seek to circumvent, by simply leaving a few key holes undrilled or plastic unfilled.

---

[228] ATF, Notice of Proposed Rulemaking, "Definition of 'Frame or Receiver' and Identification of Firearms," 86 FR 27220, 27223 (May 21, 2021) (quoting H.R. Rep. No. 116-88, at 2 (May 28, 2019)).

[229] *Id.* at 27225.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 2

Case 8:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 243 of 727 PageID 2650

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

231. Because these unfinished frames or receivers purportedly fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Ghost Gun Defendants sell them directly to consumers without following any of the federal laws and regulations that apply to the sale of firearms, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source when used in a crime.

232. The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so named because they are untraceable and there is no record of their sale, or even of their existence.[230] *Cf.* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that fails to comply with tracing and serialization requirements in Penal Law § 265.07).

233. Because of these characteristics, unfinished frames and receivers, and the ghost guns made from them, are particularly popular among (and, naturally, marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

234. But although Ghost Gun Defendants sell unfinished frames and receivers as part of this scheme to evade federal and state laws, there is little practical difference between their "unfinished" receivers and a "finished" receiver meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

235. Finishing a frame or receiver is easy and can be carried out by an amateur in under an hour using basic hand tools.

236. These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

---

[230] The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace. Although these 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially purchased unfinished frames and receivers, such as those sold by Ghost Gun Defendants. The ghost guns created out of the products marketed by Ghost Gun Defendants, which are the subject of this action, create a much higher quality firearm and are far more prevalent.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

237.     The result is that Ghost Gun Defendants sell these almost-but-not-quite guns online and ship them to New York consumers, with the full knowledge that many of these consumers cannot legally purchase a deadly weapon, making no effort to employ internal controls that would verify the identity of the customer and the appropriateness of the sale.

238.     The core component of any gun, including a ghost gun, is the frame, also known as the lower receiver. The frame or lower receiver[231] houses all or most of the gun's other essential components, including the trigger, magazine, slide, and barrel.

239.     Under federal law, a frame or lower receiver is regulated in the same way as a complete firearm. Indeed, federal law defines "firearm" to include a complete (or near-complete) gun and the "frame or receiver" of a firearm. Specifically, the Gun Control Act defines "firearm," in relevant part, as:

> (A) any weapon … which will or is designed to *or may readily be converted to* expel a projectile by the action of an explosive; [or] (B) *the frame or receiver of any such weapon.*

18 U.S.C. § 921(a)(3) (emphasis added). A frame or receiver is accordingly subject to the same serialization and federal background check requirements as a complete firearm.

240.     The business model of Ghost Gun Defendants is to sell so-called "unfinished" frames or receivers to persons who will assemble them into fully operational firearms, using parts or kits purchased from Ghost Gun Defendants or other ghost-gun dealers. Ghost Gun Defendants sell frames or receivers that they claim are partly "unfinished," or "80%" complete, and thereby purport to skirt the statutory definition of a firearm and avoid the application of federal law and regulation altogether. In fact, as sold by Ghost Gun Defendants, frames and receivers are "firearms" because they are "designed

---

[231]  The term "frame" is typically used for handguns, while "receiver" or "lower receiver" is typically used for longer guns, such as AR-15s.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

Case 8:23-cv-00066MSSTCGW Document 23-1 Filed 09/08/23 Page 245 of 793 PageID 2692

RECEIVED NYSCEF: 12/20/2022

to or may readily be converted to expel a projectile by the action of an explosive" or are "the frame or receiver of any such weapon."

241. Independently, "unfinished" frames and receivers and "80% frames" are illegal under local and state law. Legislatures responded to the ghost gun ruse by expressly so specifying. The sale and delivery of "unfinished" frames or receivers into New York has been illegal under N.Y. Penal Law §§ 265.60-.64 since April 26, 2022.

242. By purporting to sell "unfinished" frames and receivers to consumers without background checks, without serial numbers, and without complying with any other federal and state laws governing firearms, Ghost Gun Defendants assist and facilitate the evasion of federal and state laws banning the sale or possession of "unfinished" frames and receivers.

243. Indeed, evasion of regulation is the core of Ghost Gun Defendants' business model. The appeal of ghost guns is rooted largely, if not entirely, in their purported status as outside the reach of the firearms laws. Polymer80, Inc., the dominant ghost gun manufacturer in the United States, has admitted in court that if its "80%" frames and receivers were deemed firearms under federal law, sales of its products would decline precipitously: "annual revenue would be diminished by more than fifty (50) percent, and perhaps by as much as seventy-five (75) percent."[232]

244. It is simple and quick to turn an "unfinished" frame or receiver into a finished frame or receiver, and then assemble a fully functional gun. Ghost Gun Defendants make the finishing process still simpler and quicker by selling the "unfinished" frame or receiver in a kit that includes a template (known as a "jig"), drill bits, and other hardware. The jig is a molded case into which the "unfinished"

---

[232] *See* Declaration of David L. Borges in Support of Motion of Polymer80 Inc. to Intervene in this Action, dated Dec. 30, 2020, *City of Syracuse, NY v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 20-cv-6885 (S.D.N.Y.) (ECF # 80).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 3:23-cv-00056-MSST-CGW Document 23-1   Filed 09/08/23   Page 246 of 727 PageID 2763

frame or receiver fits, with holes labeled for insertion of drill bits, and with directions for the removal of certain polymer tabs.

245.     Step-by-step instruction manuals, easily accessible on the internet and from ghost gun manufacturers, explain to customers the steps to complete the frame or receiver and assemble an operable firearm using simple tools. *See, e.g.,* Polymer80 Website, "How to" (https://perma.cc/9A3U-K7FR?type=image). Retailers also provide guidance. S*ee* Arm or Ally's Website, "In the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools" (https://www.armorally.com/polymer80).

246.     Persons seeking to mass produce ghost guns can purchase the "Ghost Gunner," a machine that finishes the frame or receiver still faster and with less work than hand assembly — an especially attractive option for those seeking to traffic ghost guns in large quantities.[233]

247.     The difference between an "unfinished" frame and a finished frame is negligible, as is the effort required to convert the former into the latter.

248.     Compare, for instance, the following two pictures. On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame recently sold and shipped into New York by Defendant Indie Guns. On the right is a photograph of a finished Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm, complete with serialization and a background check:

---

[233]     *See* https://ghostgunner.net (also available at https://perma.cc/55AU-AEUA).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



249.    The two weapons — one an "unfinished" frame that Ghost Gun Defendants sell over the internet and ship into New York without serializing or conducting a background check, the other a finished frame that meets the definition of "firearm" under 18 U.S.C. § 921(a)(3) and is subject to these requirements — are nearly identical to the naked eye. That's because there is essentially no difference between them.

250.    The differences amount to drilling three small holes and milling down a small amount of plastic at the top of the frame. A finished frame sold by Defendant Primary Arms is illustrated as follows:



251.    The differences are equally minor in the context of an "unfinished" lower receiver for a rifle.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 3:23-cv-00066-MSS-CGW Document 21-2 Filed 09/08/23 Page 120 of 197 PageID 2735

RECEIVED NYSCEF: 12/20/2022

252. In the case of both "unfinished" frames (for handguns) and "unfinished" receivers (for rifles and shotguns), Ghost Gun Defendants' business model is simple: sell the core of a working firearm that requires just a bit of unsophisticated finishing work. Based on the need for that tiny bit of finishing by the consumer, Ghost Gun Defendants pretend that they are selling something that falls short of the legal definition of a "firearm," and on that basis they justify selling their product to anyone over the internet, without any controls or procedures to protect the public's safety.

253. With such a small difference between an "unfinished frame" and a finished frame, it takes very little time, effort, or skill to convert an "unfinished" frame or receiver into a working ghost gun.

254. Defendants make this ease of conversion a key part of their marketing.[234]

255. Defendants' customers agree. For instance, one of the reviews on the webpage for Brownells' exclusive Polymer80 Glock-compatible pistol frame is entitled "EASY AS CAN BE," and begins, "So I bought roughly three frames from Brownells and not one of them came to me in bad condition. I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other than what I saw on YouTube. And guess what they all go bang when I pull their trigger."[235]

256. Ghost Gun Defendants take further steps to eliminate the need for any technical skill on their customers' part by shipping the products in a "jig," a plastic setting for the frame or receiver that

---

[234] For example, Defendant Brownells says that unfinished frames (and specifically the kind marketed by Polymer80, Inc.) "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame." See https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).

[235] See https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

116

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

makes it easy for even an amateur to see and follow the steps necessary to convert the unfinished frame into finished form.

257.     Here is a picture of an unfinished Glock-compatible handgun frame purchased from Defendant Indie Guns by investigators from the Office of the Attorney General, as it was packaged inside the box in which it arrived:



258.     The unfinished handgun frame is shipped already inside the jig, and the jig itself is clearly labeled with the simple steps the consumer needs to take to finish the frame. The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic sticking up above them are the "rails" that the consumer is to mill off, along with another small piece of plastic inside the frame where the recoil spring will go.

259.     The jig makes sure that an untrained consumer will easily be able to remove the small plastic rails — and only the small plastic rails. As Defendant Brownells explains in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

117

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Case 3:23-cv-00056-MSST-CGW Document 23-2 Filed 09/08/23 Page 120 of 193 PageID 2737

260.    Once that's done, all that's left to do is to drill the three simple holes, which are helpfully labeled as "M2" or "M3" on the jig. These correspond to two drill bits that are included in the same box:



261.    All the consumer needs to do is drill the three holes using a hand drill or a drill press, following the instructions on the jig.

262.    The result is a finished frame that would have required serialization and a background check if Ghost Gun Defendants had sold it to a consumer. The finished frame can accept a few commercially available parts (sometimes sold as a kit along with the unfinished frame) in order to become a working ghost gun.

263.    Defendant Brownells goes a step further, providing an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.
121 of 197

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
INDEX NO. UNASSIGNED

Case 8:23-cv-00066-SST-CCW Document 23-1 Filed 09/08/23 Page 123 of 197 PageID 2758

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[236]

264.     The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

265.     Each Ghost Gun Defendant knows that the only purpose of the "unfinished" frames and receivers they sell is to become a finished frame or receiver that would have required serialization or a background check, and then to be further converted into a working ghost gun. Each Ghost Gun Defendant knows that these products are in demand from consumers who could not legally purchase firearms. If any Ghost Gun Defendant claims ignorance of these facts, it is being willfully blind to the illicit nature of its business.

**B.  Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety.**

266.     The purpose and the result of the ghost gun business model is the easy acquisition of untraceable, operable firearms without compliance with federal and state laws regulating firearms. Ghost Gun Defendants intentionally assist their customers in violating those laws, and themselves violate state laws prohibiting the sale of "unfinished" frames and receivers into the City of Buffalo and the State of New York.

**i.  The Federal Gun Control Act.**

---

[236]  *Id.*

119

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO: 2

Case 8:23-cv-00066-MSS-TGW Document 21-1 Filed 09/08/23 Page 252 of 727 PageID 2769

RECEIVED NYSCEF: 12/20/2022

267.     The 1968 federal Gun Control Act regulates the manufacture, sale, and possession of firearms, including frames and receivers. 18 U.S.C. § 921(a)(3). The Gun Control Act requires all commerce in firearms to proceed through federally licensed manufacturers, importers, and dealers, known as federal firearms licensees ("FFLs"), 18 U.S.C. §§ 922(a)(1)(A); 923(a), who in turn must operate in strict conformity with federal and state laws pertaining to firearms.

268.     To ensure that all firearms can be traced to the first purchaser, federal law requires licensed manufacturers and importers to inscribe a serial number on the frame or receiver of each firearm they manufacture or import. 18 U.S.C. § 923(i).

269.     To prevent the acquisition of firearms by people deemed unfit to possess them, licensed dealers may not sell or transfer a firearm to specified prohibited persons, as determined through a mandatory background check. 18 U.S.C. § 922(d), (t). Prohibited persons include, among others, individuals who: i) have been convicted of a felony; ii) have been convicted of any crime of domestic violence or are subject to a domestic violence restraining order; iii) have been involuntarily committed to a mental health facility or adjudged "mentally defective"; iv) have been dishonorably discharged from the military; or v) are unlawful users of controlled substances. 18 U.S.C. § 922(d), (g). FFLs may not sell or transfer rifles or shotguns to anyone under the age of 18, or other types of firearms to anyone under 21. 18 U.S.C.§ 922(b)(1).

270.     To curb gun trafficking or transfers of guns to prohibited persons, federal law prohibits FFLs from shipping firearms to purchasers, and requires that all firearm sales be conducted in person except in very limited circumstances requiring, among other things, notice to law enforcement. 18 U.S.C. §§ 922(a)(2), (c). FFLs may not sell or deliver a firearm to any person where the purchase or possession violates any applicable state or local law, 18 U.S.C. § 922(b)(2), or to persons that do not reside in the state of the dealer's place of business, except for in-person sales of rifles or shotguns that fully comply with both states' laws. 18 U.S.C. § 922(b)(3).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

123 of 197

271.    Licensed manufacturers and dealers must keep records of all firearm sales, noting the make, model, and serial number of the firearm, as well as the "name, age, and place of residence" of the purchaser. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A). FFLs may not sell a firearm without providing the recipient with a secure gun storage or safety device. 18 U.S.C. § 922(z).

272.    On April 26, 2022, ATF published a final rule, effective August 24, 2022, stating that the "unfinished" frame and receiver kits Defendants sell are firearms under the Gun Control Act. ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (April 26, 2022) ("Final Rule").[237]  The Final Rule explains that a "frame or receiver parts kit containing a partially complete … blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver." *Id.* at 24739; *see also id.* ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.")

273.    The Final Rule nullifies prior informal ATF guidance, set forth in determination letters to a ghost gun manufacturer, finding that certain examples of "unfinished" "80%" frames or receivers, when considered in isolation, did not constitute firearms under federal law. ATF's Final Rule is consistent with, and correctly interprets, the federal Gun Control Act.[238]

---

[237]    Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

[238]    In addition, in a May 9, 2022, letter to a ghost gun components retailer, ATF explained that, "notwithstanding the recently announced regulations and definitions" in the final rule, it has "always been" ATF's position that the sale and transfer to a single customer of "all the components necessary to produce a fully functional firearm," whether sold in "one or multiple transactions," constitutes the sale of a "firearm" under the Gun Control Act and is unlawful unless made according to the requirements of the Gun Control Act, including serialization and a background check. *See* May 9, 2022

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

### ii.  New York State Law

274.    Since April 26, 2022, the New York criminal code has expressly prohibited the possession, sale, or offering for sale of ghost guns and "unfinished" or unserialized frames or receivers by or to persons in New York State. *See* N.Y. Penal Law §§ 265.00(6) (defining "dispose of"), (8-a) (defining "serialized"), (32) (defining "unfinished frame or receiver" and "ghost gun"), 265.01(9) (prohibiting possession of ghost guns), (10) (prohibiting possession of unserialized or "unfinished" frame or receiver), 265.07 (registration and serialization of firearms, rifles, shotguns, finished frames or receivers, and "unfinished" frames or receivers), 265.60 (criminal sale of a ghost gun in the second degree), 265.61 (criminal sale of a ghost gun in the first degree), 265.63 (criminal sale of a frame or receiver in the first degree).

### C.  Ghost Guns Endanger the Public and Undermine Law Enforcement

275.    Despite — and in a direct affront to — New York's adoption of a ghost gun ban, ghost guns are flooding the City of Buffalo, and their prevalence is increasing at an alarming rate. The Buffalo Police Department recovered 62 ghost guns in connection with arrests in 2021 and 44 so far in 2022.

276.    In the first six months of 2022, the Buffalo Police Department took in 42 ghost guns compared to 20 at the same time through June 30.[239]

277.    These numbers are limited to ghost guns recovered by the Buffalo Police Department. The actual number of ghost guns on Buffalo's streets and in homes is undoubtedly far higher, but impossible to know — as ghost gun sellers do not report sales.

---

letter from Matthew Varisco, Special Agent in Charge, ATF Philadelphia Field Division to JSD Supply, available at https://perma.cc/YU47-TGPL (captured May 13, 2022).

[239] "Buffalo Police Seizing Twice as Many Ghost Guns So Far This Year," *Buffalo News*, July 15, 2022, available at https://buffalonews.com/news/local/buffalo-police-seizing-twice-as-many-ghost-guns-so-far-this-year/article_50f4d27c-02de-11ed-b24f-87b17f1fc325.html.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

278. Ghost guns make Buffalo's streets, schools, public spaces, and homes — and the job of patrol officers in the Buffalo Police Department — significantly more dangerous

279. Ghost guns have also been used to perpetrate violent crimes on city streets, including multiple murders, as well as non-fatal shootings.

280. As these arrests, arsenals, and shootings vividly and tragically illustrate, there is a thriving illicit market for the sale and delivery of illegal ghost guns into Buffalo which arm underage persons, and individuals with violent criminal histories who would not be able to obtain a firearm through regular channels.

281. The City of Buffalo has taken steps to combat the growing ghost gun scourge, incurring significant costs.

282. As ghost guns have increasingly become a major component of gun crime in the City, they have imposed significant costs and burdens on many other City institutions, including the public hospitals, which must care for people suffering serious injuries after violent incidents involving ghost guns; district attorneys' offices, which must build and prosecute criminal ghost gun cases; and courts, which must adjudicate the cases.

283. Buffalo's experience reflects a national trend. According to the ATF, 45,240 ghost guns were recovered by law enforcement across the country from 2016 through 2021, including 692 in connection with homicides or attempted homicides.[240] Ghost gun recoveries increase each year, from 1,758 in 2016 to 19,344 in 2021.[241] Cities nationwide have seen similar dramatic increases in ghost gun recoveries. The 1,921 ghost guns recovered by the Los Angeles Police Department in 2021 were more

---

[240] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022).

[241] *Id.* at 27723.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

than double the amount it recovered in 2020.[242] San Francisco has reportedly experienced a 27-fold increase in ghost gun recoveries by police over the past five years, with more than 200 ghost guns recovered in 2021.[243] Other municipalities have seen comparable rises, including Philadelphia (17 in 2018, 95 in 2019, 250 in 2020), Washington, D.C. (25 in 2018, 116 in 2019, 306 in 2020), San Diego (53 in 2018, 77 in 2019, 210 in 2020), Prince George's County, Maryland (17 in 2018, 50 in 2019, 176 in 2020), and Chicago (21 in 2018, 72 in 2019, 139 in 2020).[244]

284.    Tragically, ghost guns are increasingly being put to violent or deadly use across the country. In Los Angeles, ghost guns were linked to 24 murders, eight attempted murders, 20 robberies and 60 assaults with a deadly weapon as of November 2021.[245] And ghost guns accounted for nearly half of the guns recovered in homicides in San Francisco in 2020.[246]

285.    Often, violent crimes using ghost guns are committed by people who would not have been able lawfully to acquire firearms and presumptively would have failed background checks because, for example, of their criminal history or age. In 2013, a man who failed a background check at a licensed

---

[242]    *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022)).

[243]    *See id.*; Complaint, *The People of the State of California v. Blackhawk Mfg. Grp., Inc., et al.*, CGC-21-594577, at ¶¶ 77-78 (Aug. 18, 2021).

[244]    National Police Foundation, *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement*, at 15 (2021), available at https://www.policefoundation.org/wp-content/uploads/2021/08/NPF_The-Proliferation-of-Ghost-Guns_Final_2021.pdf (https://perma.cc/6NSJ-NHVG).

[245]    *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[246]    *Id.*

124

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

gun dealer used an AR-15 ghost gun to kill five people in Santa Monica, California.[247]  In 2017, a man

with a criminal record prohibiting his possession of a firearm used an AR-15 ghost gun in a California

mass shooting that killed five people and injured 18.[248]  In 2019, a 16-year-old brought a ghost gun to

school in Santa Clarita, California, and shot five students, killing two, before killing himself;[249] and a

convicted felon in Syracuse, New York, used a ghost gun to shoot his own nephew, a young child, in

the back.[250]  In 2020, a convicted felon used a ghost gun to shoot and injure two Los Angeles sheriff's

deputies.[251]  And in April 2021, a man with a criminal record for unlawfully carrying a concealed weapon

used a ghost gun to shoot five people, killing one, in a nighttime shooting spree in San Diego.[252]

### D.  Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns

286.    Each of the Ghost Gun Defendants markets, and makes available for sale over the

internet, ghost gun components, including unserialized, "unfinished" frames or receivers, to residents of

---

[247]  Alain Stephens, "Ghost Guns are Everywhere in California," *The Trace* (May 17, 2019), available at https://www.thetrace.org/2019/05/ghost-gun-california-crime.

[248]  *Id.*

[249]  *Id.*

[250]  "DA: Syracuse man shot 6-year-old nephew with untraceable 'ghost gun,'" *Syracuse.com* (Jan. 6, 2020), available at https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html).

[251]  "'Ghost Gun' Kit Maker Sued Over Ambush Shooting of Two Deputies at Compton Transit Station," *NBC Los Angeles* (Aug, 10, 2021), available at https://www.nbclosangeles.com/news/local/la-county-deputies-ghost-gun-kit-maker-lawsuit-compton-metro-rail-station/2668483; Complaint, *Apolinar v. Polymer80, Inc.*, Case No. 21STCV29196 (Sup. Ct. Los Angeles Cty.) (filed Aug. 9, 2021), at ¶ 9, available at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/Complaint.pdf.

[252]  "Untraceable 'ghost gun' allegedly used in fatal Gaslamp shooting spree," *CBS8.com* (Apr. 23, 2021), Allegedly Used in Fatal Gaslamp Shooting Spree, (Apr. 23, 2021), available at https://www.cbs8.com/article/news/local/untraceable-ghost-gun-allegedly-used-in-fatalgaslamp-shooting-spree/509-cc352272-85d9-4e4b-bc1b-7446dcb96660.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

the City of Buffalo and nearby communities. Each Ghost Gun Defendant sells parts and accessories through their websites that are compatible with conventional, serialized firearms and ghost guns. With the click of a mouse, and with no background check, residents of the City of Buffalo and nearby communities can purchase, and have purchased, from Ghost Gun Defendants unserialized, "unfinished" frames or receivers from which to construct operable ghost guns. Ghost Gun Defendants ship ghost gun components straight to these customers, with no intermediary.

287.   Defendant Rainier Arms markets the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License Required. Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[253]

288.   The "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit includes an exchange where a customer asks, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)? I want it and will buy it if it DOES NOT. I have asked this question before but never got an answer!" Brownells' staff expert answered: "Not serialized it's a 80% receiver."[254]

289.   The same Q&A page includes a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."[255]

---

[253]  *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 16, 2022).

[254]  *See* https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).

[255]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

290. Similarly, in touting the Polymer80 frame kits it sells, Defendant KM Tactical points to the "Blank Serialization Plate" as a significant feature.[256]

291. In 2022, the Buffalo Police Department recovered approximately 43 Polymer80 guns. In 2021, Buffalo Police Department recovered approximately 62 Polymer80 guns.

292. Defendants know, or should know, that they are selling their ghost gun products to buyers who are trying to evade federal and state gun laws.

### i. Arm or Ally

293. Arm or Ally is a distributor of firearms and firearms parts located in Indian Trail, NC.

294. Its business focuses on parts for AR-10 and AR-15-style rifles, including "unfinished" receivers that can be used to build ghost gun versions of those rifles. It also sells "unfinished" handgun frames, including into New York.

295. Its webpages selling AR-15-compatible receiver kits proclaim, in large bold green letters, "No FFL Required!"[257]

296. Meanwhile in tiny, mostly illegible text, Arm or Ally attempts to extricate itself from any responsibility for whether its sales are legal, throwing it onto the consumer instead. Its boilerplate text reads, "It is your responsibility to know and understand your state and local laws regarding the ownership

---

[256] *See* https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (last visited June 17, 2022), also available at https://web.archive.org/web/20220629152258/https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (https://perma.cc/64GX-VHWG?type=image).

[257] See https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3 (last visited June 23, 2022), also available at https://web.archive.org/web/20220520113005/https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

Case 8:23-cv-00066MSS-CGW Document 23-1 Filed 09/08/23 Page 260 of 727 PageID 2867

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

and possession of this product. We do not provide legal advice; if you are uncertain, consult with an attorney prior to purchasing."[258]

297. Although its AR-15-compatible "unfinished" lower receiver page says in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," the page in fact links to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle.[259]

298. Arm or Ally's sales pages discuss "State Restrictions" in New Jersey, Connecticut, Washington State, and Washington, DC, but not New York.[260]

299. In fact, Arm or Ally has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including the City of Buffalo.

300. Arm or Ally is a Federal Firearms License holder that operates an interactive website (armorally.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well as serialized frames, among other products.[261] Arm or Ally sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

301. Arm or Ally sells various Glock-compatible ghost gun kits, such as:

---

[258] *Id.*

[259] *Id.* (linking to: https://web.archive.org/web/20220602181003/https://www.polymer80.com/CMS-Images/Polymer80_Lower_AR15-G150_Build_Instructions-Phoenix_Version2_1.pdf) (https://perma.cc/H7LG-VJQR).

[260] *Id.*

[261] *See* https://www.armorally.com (also available at https://perma.cc/QPN5-WQZQ (captured May 20, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- Polymer80 frame kits for the PF45, PF940C, PF940V2, PF9SS, PF940SC and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig, with drill bits;[262] and

- The P80 Compact Frame & Slide Kit, that bundles into one package a Polymer80 PF940C frame kit, a slide from American Tactical Arms, and a slide completion kit from Arm or Ally.[263]

302.    For those buying in bulk, Arm or Ally offers the Polymer80 — PF45 Pistol Frame Kit — 25 Pack, which includes 25 sets of unserialized, "unfinished" frames, rails, and the jig and drill bits.[264]

303.    The remaining components needed to assemble these Glock-compatible ghost guns can be purchased on Arm or Ally's website or from other dealers.

304.    Significantly, before making an online sale of unserialized, "unfinished" frames, Arm or Ally does not conduct background checks, and does not require customers to have a valid state or city license or permit.

305.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on or around April 28, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally. Arm or Ally's website acknowledged that the company was shipping directly to consumers, and in fact

---

[262] https://www.armorally.com/product-category/glock/frame-parts/glock-frames (also available at https://perma.cc/3NQY-LXTA (captured May 20, 2022)).

[263] https://www.armorally.com/shop/p80-compact-frame-and-slide-kit (also available at https://perma.cc/B96L-6E6B (captured May 20, 2022)).

[264] https://www.armorally.com/shop/polymer80-pf45-pistol-frame-kit-25-pack (also available at https://perma.cc/7YF7-UJGP (captured May 20, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

stated that the order of an unfinished frame was "required to ship to your credit card's billing address." Arm or Ally accepted the order and shipped the frame into New York County.

306.     On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a G19-compatible slide, all manufactured by Arm or Ally. The City also purchased a Polymer80 9mm frame parts kit. Arm or Ally accepted the order and shipped the parts into New York County.

307.     The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

308.     Arm or Ally accepted the order and shipped the parts into New York County.

309.     On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

310.     The Arm or Ally website said of the product that "[t]his system is a complete kit. There are no additional jigs and parts to purchase. Polymer80 Spectre system is a complete, all-inclusive package including the jig and drill bits required to finish your Glock project."[265]

---

[265]     https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (last visited June 6, 2022), also available at https://web.archive.org/web/20220120133501/https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (https://perma.cc/V2PD-PGMZ?type=image).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

311.    Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License,"[266]  Arm or Ally did not actually require investigators to do so.

312.    Arm or Ally accepted the order and shipped the frame into Kings County.

### ii.  Rainier Arms

313.    Rainier Arms is a Washington State-based online retailer that describes itself as "the ultimate stop for AR-15 rifles and AR-15 parts."

314.    When Rainier Arms markets its "unfinished" frames or receivers, the company portrays them as exempt from public safety laws. For instance, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government jut considers them pieces of metal and/or plastic and not guns."[267]

315.    Rainier Arms also sells "unfinished" handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame. Rainier Arms' product description for the "unfinished" frame claims the product "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[268]

---

[266]  *Id.*

[267]  https://www.rainierarms.com/manufacturers/polymer80 (last visited June 28, 2022) (also available at https://perma.cc/HZ64-UMTZ). *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers (stating that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited June 28, 2022) (also available at https://perma.cc/E8DU-L3YX).

[268]  https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 28, 2022) (also available at https://perma.cc/7HRU-9FAU).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00006-MSS-TGW Document 23-1   Filed 09/08/23   Page 264 of 727 PageID 2881

316.     Rainier Arms is aware of state-law restrictions on the sale of "unfinished" frames or receivers to consumers, declaring that it will not ship them to New Jersey or sell them in-store within Washington State. However, the company acknowledges no restrictions on shipping to New York consumers.

317.     Rainier Arms has sold and continues to sell "unfinished" frames and receivers into New York State.

318.     Rainier Arms is a Federal Firearms License holder that operates an interactive website (rainierarms.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well conventional, serialized firearms, serialized frames, and ammunition, among other products.[269]  Rainier Arms sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

319.     Rainier Arms sells various Glock-compatible ghost gun kits such as:

- Polymer 80 frame kits for the PF940SC, PF940V2, and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig with drill bits.[270]

320.     The remaining components needed to assemble these Glock-compatible ghost guns, can be purchased on Rainier Arms' website or from other dealers.

321.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022),

---

[269]  *See* www.rainierarms.com (also available at https://perma.cc/HKV6-UGS4).

[270]  https://www.rainierarms.com/manufacturers/polymer80 (also available at https://perma.cc/VM7R-4AMY and https://perma.cc/NY8F-SPW6).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

Case 3:23-cv-00066-SFGCW Document 23-1 Filed 09/08/23 Page 265 of 727 PageID 2892

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

on or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[271] and two parts kits for the Polymer80 ghost gun.

322.    Ranier Arms accepted the order and shipped the parts into New York County.

323.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Ranier Arms, along with a Glock 17-compatible slide and barrel.

324.    Ranier Arms accepted the order and shipped the frame and parts into New York County.

325.    Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Rainier Arms sent approximately 131 packages to non-FFL addresses in New York State each month, with approximately 106 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

326.    Significantly, before making an online sale of unserialized, "unfinished" frames, Rainier Arms does not conduct background checks and does not require customers to have a valid state or city license or permit.

### iii.  80P Builder

327.    80P Builder, a division of Salvo Technologies, Inc. also known as 80P Freedom Co., is a Florida corporation that claims to "specialize in aftermarket parts while also offering Polymer80 frames." See https://80pbuilder.com (last visited June 23, 2022) (also available at https://web.archive.org/web/20220601181928/https://80pbuilder.com).

---

[271] The large-capacity magazine Rainier Arms sold was separately illegal under New York State law. See Penal Law § 265.00(23).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

328.    Despite the fact that selling "unfinished" frames and receivers is a core part of its business model, its website touts a claim that "**80P Freedom Co. does NOT sell firearms**" in bold, oversize letters. *Id.*

329.    80P Builder sells "unfinished" receivers in tandem with the "lower parts kit" containing the parts necessary to make it the fully functional lower part of a handgun.[272]

330.    80P Builder knows that these products are illegal, and in fact it informs consumers that it will not ship to New Jersey. As to other states, it simply says, "[a]t 80P Builder, we by no means provide legal advice or legal counsel. Every builder needs to research their respective State laws and Federal laws."[273]

331.    Despite New York State law, 80P Builder has shipped, and continues to ship "unfinished" frames and receivers into New York State, including the City of Buffalo.

332.    80P Builder, through its owner Salvo Technologies, Inc., is a Federal Firearms License holder that operates an interactive website (http://80pbuilder.com) through which consumers can purchase unserialized, "unfinished" frames, ghost gun components, and knives, among other products.[274] 80P Builder sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the State of New York, including in the City of Buffalo and nearby communities.

333.    80P Builder sells three Glock-compatible ghost gun kits and thirteen different "custom builds" such as:

---

[272] *See, e.g.,* https://web.archive.org/web/20220527204526/https://80pbuilder.com/pf940sc-frame.

[273] *Id.*

[274] *See* http://80pbuilder.com (also available at https://perma.cc/9RSG-BTWV (captured May 27, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED
Case 3:23-cv-00016-MSR-CGW Document 23-1 Filed 09/08/23 Page 267 of 795 PageID 2974
NYSCEF DOC. NO. 2                                                          RECEIVED NYSCEF: 12/20/2022

- Polymer 80 frame kits for the PF940SC and PF940SS models.[275]

- Polymer 80 frame kits for the PF940SC that can be bundled with lower parts kits that include the Polymer 80 ejector and housing, Ghost bullet slide release, Ghost slide stop, 80P Builder machined pins and springs, 80P Builder mag catch, and OEM Glock trigger bar.[276]

- "Custom builds" that bundle together into one purchase the items needed for a ghost gun build, and include one of the Polymer 80 frame kits for the PF940SC, PF940SS, and PF940V2, plus a customized slide, barrel, guide rod assembly, upper parts kit and lower parts kit.[277]

334. Additional components needed to assemble these Glock-compatible ghost guns, if any, can be purchased on 80P Builder's website or from other dealers.

335. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by 80P Builder, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

336. On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com,

---

[275] https://80pbuilder.com/products/frames (also available at https://perma.cc/K5D5-B9YH (captured May 27, 2022)).

[276] https://80pbuilder.com/pf940sc-frame (also available at https://perma.cc/XR7E-SNHL (captured May 27, 2022)).

[277] https://80pbuilder.com/products/customs/custom-bundles (also available at https://perma.cc/4GXR-QGSJ (captured May 27, 2022)).

135

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

337.    80P Builder accepted the order and shipped the ghost gun into New York County.

338.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on information and belief, this undercover purchase was just one of many instances when 80P Builder sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

339.    Significantly, before making an online sale of unserialized, "unfinished" frames, 80P Builders does not conduct background checks, and does not require customers to have a valid state or City license or permit.

### iv.  Rock Slide USA

340.    Defendant Rock Slide USA, LLC is a North Carolina limited liability company with its principal place of business in Broadway, NC.

341.    Rock Slide USA is a ghost gun retailer that operates an interactive website (www.rockslideusa.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[278] Upon information and belief, Rock Slide USA sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

---

[278] *See* www.rockslideusa.com (also available at https://perma.cc/7JTJ-UYMT (captured May 20, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

342.     Rock Slide USA specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame. Rock Slide USA also sells Polymer80 brand Glock-compatible "unfinished" frames, and touts their compatibility with its own "upper" products.

343.     Rock Slide USA sells various Glock-compatible ghost gun kits from Polymer80.[279] Additional components needed to assemble these ghost guns can be purchased on Rock Slide USA's website or from other dealers.

344.     Significantly, before making an online sale, Rock Slide USA does not conduct background checks and does not require customers to have a valid state or city license or permit.

345.     Rock Slide USA describes the "unfinished" frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available. No license required."[280]

346.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Rock Slide USA, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

347.     On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible "unfinished" frame from Rock Slide USA, along with Rock Slide-brand upper and the remaining parts necessary to convert the "unfinished" frame into a working ghost gun.

---

[279] https://rockslideusa.com/shop (also available at https://perma.cc/4VMT-BYNQ (captured May 27, 2022)).

[280] See https://web.archive.org/web/20220626200841/https://rockslideusa.com/shop (last visited June 28, 2022) (also available at https://perma.cc/GP6D-KS63?type=image).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

Case 8:23-cv-00016-MSS-TGW Document 23-1 Filed 09/08/23 Page 270 of 727 PageID 2947

348.     The checkout page included the words "No license required. Ships anywhere in the USA."

349.     Rock Slide USA accepted the order and shipped the frame into New York County.

350.     According to the Amended Complaint, on information and belief, this undercover purchase was just one of many instances when Rock Slide USA sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

### v.  Indie Guns

351.     Indie Guns, LLC, is a Florida limited liability company with its principal place of business in Orlando, Florida. It appears to be affiliated with another Florida limited liability company named Indie Group, LLC, also with its principal place of business in Orlando.

352.     Indie Guns is a ghost gun retailer that operates an interactive website (www.indieguns.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[281] Indie Guns sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

353.     Indie Guns focuses its business on ghost guns and the parts for them, particularly "unfinished" frames and receivers. It touts itself as the "[p]remiere distributor of high quality USA made polymer gun frames, 80% lowers, and build kits."

354.     Its website advertises a wide variety of "unfinished" frames, frame kits and full build kits.

---

[281]  *See* www.indieguns.com (also available at https://perma.cc/K4G5-QLGG (captured June 14, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 143 of 195 PageID 1958

355.    The company touts a "blank serialization plate" as one of the key features of the "unfinished" frames it sells.

356.    Indie Guns also sells "unfinished" frames as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "everything needed to build a complete pistol in a discounted bundle package."[282]

357.    The company ships these LSB kits directly to the consumer, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements. The company knows and intends that these consumers will convert the LSB kits into working firearms — as Indie Guns itself explains, "When done with your build, just grab a box of rounds and you're good to go . . . ."[283]

358.    Indie Guns has sold and continues to sell and ship illegal "unfinished" frames and receivers into New York State.

359.    Indie Guns is a high-volume seller of various Glock-compatible ghost gun kits, such as:

- Polymer 80 frame kits for the PF940V2, PF940C, PF940SC, PF940SS, and PF45 models.[284]

- A Polymer 80 "Complete Frame Assembly" kit for the PV940V2 model, bundled with a Polymer80 frame parts kit with trigger assembly and a Polymer80 magazine.[285]

---

[282]    See https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3 (last visited June 28, 2022).

[283]    *Id.*

[284]    https://indieguns.com/frame-kits (also available at https://perma.cc/5YD9-DP6T (captured June 14, 2022)).

[285]    https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (also available at https://perma.cc/QGA9-F3CC (captured June 14, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

Case 8:23-cv-00016-MSS-CPT Document 21-1 Filed 09/08/23 Page 272 of 727 PageID 2969

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

- A Polymer 80 kit for the PF940, bundled with a barrel and two 13-round magazines.[286]

360. Additional components needed to assemble these Glock-compatible ghost guns can be purchased on Indie Guns' website or from other dealers.

361. In fact, court filings from a recent lawsuit between Polymer80 and Indie Guns note that in July 2021, Polymer80 sold and shipped more than 13,000 unserialized "80%" Glock-compatible frame kits to Indie Guns. This shipment, for which Indie Guns was charged $700,000 (a 30% discount from the wholesale price), has a retail value of over $2 million, based on the price of $150 per frame kit that Indie Guns charges on its website for most of these kits.

362. Significantly, before making an online sale, Indie Guns does not conduct background checks and does not require customers to have a valid state or City license or permit.

363. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Indie Guns, its sale of unfinished frames into the New York market is evidenced by the fact that it sent unfinished frames to New York State and City investigators in response to undercover purchases.

364. According to the Amended Complaint, on or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a

---

[286] https://indieguns.com/bundle-deal-buy-1-pf45-frame-kit-buy-1-g21-oem-45-barrel-get-2-free-g21-oem-45-13-rd-mags (also available at https://perma.cc/7S6B-WKK2 (captured June, 14, 2022)).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED

Case 8:23-cv-00016-MSS-TGW Document 23-1 Filed 09/08/23 Page 273 of 727 PageID 2980

RECEIVED NYSCEF: 12/20/2022

trigger assembly, a magazine, and a complete slide with barrel. Indie Guns accepted the order and shipped the product into New York County.

365.     On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit.

366.     The Indie Guns website said that "Indie Guns is pleased to present the CFA-17 (COMPLETE FRAME ASSEMBLY-17) The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower." Indie Guns also touted the frame's "blank serialization plate."[287]

367.     Indie Guns accepted the order and shipped the unfinished frame into Kings County.

368.     According to the Amended Complaint, on information and belief, these undercover purchases were just two of many instances when Indie Guns sent prohibited unfinished frames and receivers into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

### vi. Brownells

369.     Brownells, Inc., also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, IA.

370.     Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it has taken to selling "unfinished" frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns.

---

[287] *See* https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (last visited June 6, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

371.     For instance, in an October 2017 press release announcing that the company would market a set of exclusive Polymer80 "unfinished" frames unique to Brownells, the company said that the "unfinished" frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes."[288]

372.     The same press release also advertised the legal conclusion that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."[289]

373.     As discussed above, Brownells' online materials go to great lengths to promote "unfinished" frames to consumers, saying that they "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[290]

374.     Brownells provides an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last "20%" of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[291]

---

[288] Press Release, "Brownells Announces Exclusive Polymer80 Frames" (Oct 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930.

[289] *Id.*

[290] https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022) (also available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513).

[291] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

375.     The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

376.     Brownells has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including in the City of Buffalo.

377.     Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

378.     On information and belief, the packages Brownells sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

379.     According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach.[292]

380.     When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

381.     The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and did not have a permit.

382.     Police found three more ghost guns when searching Gerwitz's home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

---

[292]  See https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited June 28, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

383.    On June 13, 2022, police arrested Salerna-Sanchez, also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns, the *Buffalo News* reported.[293]

384.    Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities, the Buffalo News reported. Gramaglia told the newspaper it takes about 30 minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street.

385.    "This is what feeds the everyday gun violence that we see in our community and in communities across America — not just in Buffalo," Gramaglia said.

386.    On or around April 14, 2022, Brownells sent a package to Joshua Gotthart at an address on Wright Avenue in Buffalo, NY.

387.    On information and belief, the package Brownells sent to Gotthart contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

388.    On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

389.    He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

390.    Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house, the *Buffalo News* reported. Using a search warrant, they said they found three

---

[293]    See https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited June 28, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

unregistered handguns in a bedroom and what the DA's office described as an "arsenal" of rifles, shotguns, and magazines. They also found tools used to assemble ghost guns and a large amount of ammunition in the house, the DA's office said in a statement.[294]

391.    Gotthart was arraigned on one count of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felony), three counts of Criminal Possession of a Firearm (Class "E" felonies), and one count of Unlawful Wearing of a Body Vest (Class "E" felony).

392.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Brownells sent approximately 1,300 packages to non-FFL addresses in New York State each month, with approximately 328 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

393.    Brownells' sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

394.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

395.    Brownells accepted the order and shipped the unfinished frame kit into Kings County.

396.    Brownells has sold a massive number of unfinished frames and receivers into New York State, many of which have been converted into ghost guns used in crimes or by persons who could not and should not legally possess a firearm.

---

[294]    See https://buffalonews.com/news/local/crime-and-courts/gunning-for-the-guns-police-cracking-down-in-buffalo-to-reduce-shootings/article_376afcfe-cc7a-11ec-ae52-efb7dcf5267c.html (last visited June 28, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

### vii. Glockstore/GS Performance

397.     GS Performance, LLC, also known as Glockstore and GSPC, is a Tennessee entity with offices in Nashville, TN and San Diego CA. It is the successor or affiliate of a California entity also named GS Performance, LLC.

398.     To look at Glockstore's website and marketing materials now, one would think the company has nothing to do with selling "unfinished" frames or receivers. Its website no longer offers the products, and a consumer visiting today will find no mention of "unfinished" frames, 80% lowers, or Polymer80's main product line.

399.     But in fact, "unfinished" frames and receivers were central to Glockstore's business model for many years, and the company was one of the most significant manufacturers and distributors of these deadly products.

400.     Glockstore was less than fully thorough in erasing the evidence of its prior business model. For instance, one still-online blog post talks about how a new model of "unfinished" pistol frame is "one of the most talked about firearm products ever!" Glockstore goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[295]

401.     The same blog post explains that one of the main reasons a consumer might like to buy an "unfinished" frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference." Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records . . . what's not to like?"[296]

---

[295]  See http://community.glockstore.com/i-can-build-my-own-gun-with-this (last visited June 28, 2022) (also available at https://perma.cc/B3FP-SQGJ).

[296]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)    INDEX NO. UNASSIGNED

Case 8:23-cv-00016-BSS-TGW Document 21-1   Filed 09/08/23   Page 279 of 727 PageID 3086

NYSCEF DOC. NO. 2                                               RECEIVED NYSCEF: 12/20/2022

402.     The blog post appears to have embedded a video of Glockstore owner Lenny Magill walking the consumer through how to "transform this 'not a firearm' into a fully functioning 9mm handgun."[297]  The video itself has been removed for violating YouTube's terms of service.[298]

403.     Another blog post Glockstore missed in its whitewashing attempt is still available at http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80 (last visited June 28, 2022) (also available at https://perma.cc/G4E2-U8Q6).

404.     The post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre Polymer80."

405.     The post describes the "unfinished" frame in question as "[o]ne of the most exciting and fastest selling items at the GlockStore." The blog post focuses both on the frame's usefulness for evading registration requirements and on the ease of converting it into a working ghost gun, explaining that "[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning lower. You then assemble them with readily available parts and legally own a firearm that does not have to be 'registered.'"

406.     According to Glockstore blog post, "[t]his is completely legal and acceptable based on Federal laws that have been on the record for many years that state an individual can actually make a firearm for personal use."[299]  The blog post does not acknowledge the existence of state laws, licensing requirements, or longstanding prohibitions against firearm possession by felons or other dangerous persons.

---

[297]  See also http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts (another blog post describing the contents of Mr. Magill's video) (last visited June 28, 2022) (also available at https://perma.cc/LMY6-KRJS).

[298]  *Id.*

[299]  *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

407.     Glockstore's illicit sales of "unfinished" frames and receivers stopped only after the State of California filed suit against it based on several consumer protection statutes.[300]

408.     California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated."[301]

409.     California specifically cited Glockstore's failure to inform consumers of the "unfinished" frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check.[302]

410.     Glockstore shipped large numbers of its illegal products into New York as well, again based on a manifest disregard for state law.

411.     Between approximately November 26, 2018, and December 6, 2019, GS Performance sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.

412.     On information and belief, the packages GS Performance sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

413.     As discussed above, Gerwitz conducted a drive-by shooting and shot a police officer multiple times, using weapons the Erie County District Attorney described as "homemade" and "off-the-internet."

### viii.   KM Tactical

---

[300]   See Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct., Oct. 13, 2021), available here: https://oag.ca.gov/system/files/attachments/press-docs/GHOSTGUNS%20-%20Amended%20Complaint.pdf.

[301]   *See id.* ¶¶ 106-112, 133-36.

[302]   *Id.* ¶¶ 138-40.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

414.     KM Tactical is a Missouri-based online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.

415.     Categorized under the "Goodies" section of the site, KM Tactical offers an extensive selection of "unfinished" frames and receivers divided between AR and Glock platforms.[303]

416.     According to KM Tactical owner Kyle Murphy in an October 2020 interview, "[n]othing we sell does damage, we don't sell serialized parts."[304]

417.     Mr. Murphy is correct that the "unfinished" frames and receivers his business sells into New York are unserialized, but the damage has been extensive.

418.     Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY.

419.     On information and belief, the packages KM Tactical sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

420.     According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach. When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective between multiple times.[305]

---

[303]  *See*
https://web.archive.org/web/20220629152306/https://www.rainierarms.com/lower/filter/category2
:stripped-lower-receivers (also available at https://perma.cc/DZ3K-88KN?type=image);
https://kmtactical.net/product-category/default-category/accessories/80-lowers/pistol-platform (also available at https://perma.cc/9VB5-AZQP).

[304]  "Husband, Wife Duo Move Business, Home to Lee's Summit," *Lee's Summit Economic Development Council* (Oct. 28, 2020), https://www.leessummit.org/husband-wife-duo-move-business-home-to-lees-summit.

[305]  See https://buffalonews.com/news/local/tonawanda-man-indicted-in-drive-by-slaying-attempted-murder-of-cop/article_fff58d82-e7b7-11ea-a7fe-7f8ba091a3f4.html (last visited June 28, 2022).

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

Case 1:23-cv-00065-MSM-PAS Document 23-1 Filed 09/08/23 Page 282 of 727 PageID 3069

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

421.     The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

422.     Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

423.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, KM Tactical sent approximately 246 packages to non-FFL addresses in New York State each month, with approximately 222 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### ix. Primary Arms

424.     Defendant Primary Arms, LLC, is a Houston-based online retailer of firearms, parts, and paraphernalia.

425.     Although Primary Arms now appears to sell their "unfinished" frames and receivers serialized and through a FFL, for many years the company shipped "unfinished" frames and receivers directly to New York consumers, with no serialization and no background check.

426.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Primary Arms sent approximately 790 packages to non-FFL addresses in New York State each month, with approximately 332 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### x. Polymer 80

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

427.    Defendant Polymer 80, Inc., misleadingly advertises and, on information and belief, sells and provides illegal firearms to consumers in the State of New York, including the City of Buffalo. Through a website and a network of dealers, Polymer80 sells a variety of almost complete firearms, including AR-15 semi-automatic rifles and several handguns, which consumers can easily finish at home. These products, which lack identifying information such as serial numbers, are untraceable.

428.    In 2022, the Buffalo Police Department recovered approximately 43 Polymer80 guns. In 2021, Buffalo Police Department recovered approximately 62 Polymer80 guns.

429.    Polymer80 tells consumers, including those in Buffalo, that they can legally purchase and possess its products because the guns are no more than 80% complete, and thus do not reach the necessary state of manufacturing to constitute a firearm under federal and state law.

430.    However, Polymer80's core products — lower receivers for rifles and handgun frames — are firearms under federal and state law.

431.    On its website, Polymer80 claims that these weapons, which include an AR-15 semi-automatic rifle, a .308 semi-automatic rifle, and at least seven types of handguns, are no more than 80% complete. Consumers can purchase the lower receivers of rifles or handgun frames, along with other materials — generally, the trigger, barrel, and firing pin, all of which are available, if in stock, on Polymer80's website — needed to complete the receivers and handgun frames into fully functional firearms. The consumers then receive those materials via mail.

432.    To further facilitate the ease of completing its firearms, Polymer80 offers, "Buy, Build, Shoot" kits which "contain[] all the necessary components to build [two different] complete pistol[s]." The website states that these kits include an "80% frame kit, complete slide assembly, complete frame part kit, 10 round magazine and a pistol case."

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.
154 of 197

433.     Consumers can then follow Polymer80's written step-by-step instructions online, often accompanied by supplemental videos, to finish both the pistols and the semi-automatic rifles in a matter of hours.

434.     All of Polymer80's lower receivers and handgun frames lack a unique manufacturer's number, serial number, or a unique dealer's identification number, making these guns untraceable "ghost guns."

435.     Polymer80 tells consumers at multiple places on its website that because the lower receivers and handgun frames it sells are supposedly no more than 80% complete, they can be legally sold, distributed, and possessed.

436.     For instance, Polymer80's website homepage, copied below, asks, "is it legal?" and responds unequivocally, "YES!" This statement would lead a reasonable consumer in Buffalo to believe that Polymer80's handguns are legal for them to purchase and possess.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been     155 of 197
accepted for filing by the County Clerk.



437.    To establish the purported legality of all its products, Polymer80 links to a determination letter from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to Polymer80 regarding just one of its products, the AR-15 lower receiver. The letter states that the AR-15 lower receiver is not a "firearm" under federal law because it has not reached the necessary state of manufacturing under the federal Gun Control Act of 1968. Polymer80's website provides no similar letter establishing the legality, under federal law or elsewhere, of the other firearms it sells. Polymer80 also provides no information regarding the legality of its products under New York law.

438.    Polymer80 products are also available through its "Dealers," at least 48 in total, which consumers can access through Polymer80's website.

439.    Polymer80 advertises, and, on information and belief, sells, both directly and through its Dealers, lower receivers and handgun frames to New York State and City of Buffalo consumers.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
Case 8:23-cv-00006NSST@JV Document 23-1   Filed 09/08/23   Page 288 of 733 PageID 1193
NYSCEF DOC. NO: 2                                                    RECEIVED NYSCEF: 12/20/2022

INDEX NO. UNASSIGNED

440.     On information and belief, Polymer80 engages in the business of selling firearms to New York and Buffalo consumers without a dealer's license.

441.     On information and belief, Polymer80 does not adhere to the mandatory waiting period on firearm purchases.

442.     On August 10, 2022, the Superior Court of the District of Columbia, Civil Division issued an order granting in part and denying in party the District of Columbia's motion for summary judgment for violations of the Consumer Protection Procedures Act. *See District of Columbia v. Polymer80, Inc.*, Case No. 2020 CA 002878 B (available here: https://oag.dc.gov/sites/default/files/2022-08/OGIPSJPoly-20CA2878-.pdf

443.     The Court held: "As a preliminary matter, the Court finds that Polymer80's handgun frames, semi-automatic receivers, and Buy, Build, Shoot kits are firearms." *Id.* at 5.

444.     Additionally, the Court held, "In the instant case, Polymer80 sold unfinished handgun frames, unfinished semi-automatic receivers, and Buy, Build, Shoot kits to District consumers, and these products are (and were) readily converted into firearms." *Id.*

445.     The Court held "that Polymer80 violated the CPPA with respect to D.C. Code § 28-3904 (a),(b),(e-1), and that the District is entitled to summary judgment as to these claims as a matter of law." *Id.* at 9.

446.     Also, the Court held, "the Court finds that the District has satisfied its burden in establishing that there is no genuine issue of material fact that Polymer80 violated the District's gun laws, which in turn, served as a violation of the CPPA. Polymer80 violated District law by selling firearms to District consumers without the requisite licenses, and failing to comply with the series of restrictions and requirements the District imposes on licensees. Additionally, Polymer80's firearms violated District law because the firearms were not registered and failed to have an identification number or serial number. Accordingly, the District is entitled to summary judgment as to Count II as a matter of law." *Id.* at 13.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

Case 8:23-cv-00006-MSG-TGW Document 23-1 Filed 09/08/23 Page 287 of 727 PageID 3194

RECEIVED NYSCEF: 12/20/2022

447.    The Court also held: "Given the Court's ruling that Polymer80 violated the CPPA and the District's gun laws, and Polymer80's alarming belief that the sale of its firearms is now legal in the District, to prohibit future sales of its firearms to District consumers, the Court shall grant the Plaintiff's request for a permanent injunction." *Id.* at 14.

448.    The Court also imposed a civil penalty of $4,038,000 for Polymer80's violation of the CPPA. *Id.* at 16-17.

### xi.   JSD Supply

449.    Defendant JSD Supply is a Prospect, Pennsylvania online retailer of "do-it-yourself firearms finishing and customization."[306]

450.    JSD Supply's website boasts, "JSD was founded in a love of guns and hate of paperwork. Since 2013, we've helped thousands of people build their own gun from the privacy of their garage. No serialization, no background check, no government fee."[307]

451.    JSD Supply's website states, "Everything we carry has been personally tested by our team. We know that every component and tool will work for you because we've used them all ourselves. Built correctly, your firearm will look, feel, and operate identically to store-bought models. Expect a firearm that works well and reliably performs year after year. Order a complete build kit and all the tools you need here with us online, or follow JSD Supply on Instagram."[308]

452.    On August 20, 2021, the U.S. Attorney's Office for the Western District of New York issued a press release announcing that, "Lamborghini Lucas, 33, of Buffalo, NY, was arrested and

---

[306]  https://web.archive.org/web/20220517213953/https://jsdsupply.com/about-us (also available at https://perma.cc/7Q35-HZC7?type=image).

[307]  *Id.*

[308]  *Id.*

155

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00069MSSTCGW Document 23-1 Filed 09/08/23 Page 288 of 797 PageID 3195

RECEIVED NYSCEF: 12/20/2022

charged by criminal complaint with unlawfully manufacturing firearms."[309] The press release stated: "Assistant U.S. Attorney Seth T. Molisani, who is handling the case, stated that according to the complaint, on August 6, 2021, investigators executed a New York State search warrant at the defendant's Woodlawn Avenue residence. During the search, a loaded Polymer 80 PF940SC 9mm PMF firearm, also known as a ghost gun, was recovered under a mattress in a bedroom. An additional three Polymer 80 PF940SC 9mm PMF firearms were discovered in a laundry basket full of clothing. A box sent from 'JSD Supply,' which sells gun parts kits, was located in the living room. A receipt in the box showed three 'PF940SC Full build kit-Minus Frame,' Two 'Polymer 80 PF940SC Black,' One 'Polymer 80 PF940SC Gray' for a total of $1,259.94. Throughout the residence, investigators also located three Polymer 80 boxes, three polymer 80 jigs, rotary bits, and a power drill. A records check determined that Lucas does not have a license to manufacture or deal in firearms."[310]

453. According to the Complaint, "Law enforcement located a Polymer 80 PF940SC 9mm PFM loaded with 9 rounds of 9mm ammunition under the mattress of the front bedroom. Directly next to this firearm was mail addressed to LUCAS. Within a laundry basket full of clothing, three Polymer 80 PF940SC 9rhm PFMs were recovered. A United States Postal Box sent from 'JSD Supply' was located in the living area of the apartment. A Web search shows a JSD Supply website featuring 'JSD 80% Lower Receivers, Jigs, and Gun Parts Kits . . . 80% lower build kits are used to create fully functional firearms with no registration or serial numbers.' Within this box was a receipt addressed to Mike Tate 495 Woodlawn, 'User' mrlambolights@gamil.com, this receipt shows three 'PF940SC Full

---

[309] https://www.justice.gov/usao-wdny/pr/buffalo-man-arrested-charged-manufacturing-ghost-guns

[310] Id.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

Case 8:23-cv-00006-MSS-TGW Document 21-1 Filed 09/08/23 Page 289 of 727 PageID 3196

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

build kit-Minus Frame', Two 'Polymer 80 PF940SC Black', One 'Polymer 80 PF940SC Gray' for a total of $1,259.94."[311]

454.    On July 23, 2020 the Department of Justice issued a press release titled, "Armed Trafficker Sentenced."[312]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Billy B. Sanders, 37, of Rochester, NY, who was convicted of being a felon in possession of ammunition, was sentenced to serve 71 months in prison by U.S. District Judge Charles J. Siragusa."[313] Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who handled the case, stated that the defendant was arrested on May 2, 2019, after New York State Parole officers went to Sander's residence on Saratoga Avenue in Rochester, for a compliance check. During that check, parole officers found a Polymer 80 semiautomatic pistol loaded with eight rounds of ammunition inside a backpack. The handgun did not have a serial number on it. During his plea, Sanders stated that he had the handgun and ammunition because he had been shot and needed the handgun for protection. The defendant admitted he also possessed a small amount of cocaine."[314]

455.    On August 18, 2021, the Department of Justice issued a press release titled, "Rochester Man Arrested At The Peace Bridge With Cocaine And A Ghost Gun."[315]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Luis Amed Colon Molina, 42, of Rochester, NY, was arrested and charged by criminal complaint with possession with intent to

---

[311]    *United States of America v. Lucas*, 1:22-cr-00013-JLS.

[312]    https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-sentenced-1

[313]    *Id.*

[314]    *Id.*

[315]    https://www.justice.gov/usao-wdny/pr/rochester-man-arrested-peace-bridge-cocaine-and-ghost-gun

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

160 of 197

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

NYSCEF DOC. NO. 2

Case 8:23-cv-00016-MSS-TGW Document 23-1 Filed 09/08/23 Page 290 of 727 PageID 3197

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

distribute cocaine and possession of a firearm in furtherance of drug trafficking activity."[316] Additionally, the press release indicated, " During a search of the defendant's vehicle, the gray fanny pack was removed from the trunk. In addition to the baggies containing a white powder substance, officers also found a digital scale with white powder residue inside the fanny pack. The substance was field tested resulting in a positive presence of cocaine. Officers also recovered a loaded 9mm, Polymer 80 handgun in the vehicle's glove box. The gun did not have a serial number and is considered a 'Ghost Gun.'"[317]

### E. Ghost Gun Defendants' Guns Have Harmed the City of Buffalo and Will Continue to Do So If Unabated.

456.     The influx of ghost guns into the State of New York, including the City of Buffalo, is a significant threat to public health and safety. New York's legislature has passed laws designed to ameliorate this threat, but by the conduct described in detail above, Ghost Gun Defendants not only undermine these laws, they affirmatively harm New Yorkers, including residents of the City of Buffalo, by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York, including the City of Buffalo.

457.     As a result, to date, the City of Buffalo has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii)

---

[316] *Id.*

[317] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 291 of 727 PageID 3198

RECEIVED NYSCEF: 12/20/2022

research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

458.    On July 20, 2021, Erie County issued an Executive Order declaring gun violence as a public health crisis in Erie County.[318]

### i.  The Rise of Ghost Guns and the Damage Done

459.    The available data indicate that ghost guns are proliferating — and are being used in crimes — exponentially. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives, the number of ghost guns recovered at crime scenes nationwide has increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in 2021.[319]  Notably, according to the ATF, "[t]hese numbers . . . are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that have no serial numbers or identifiable markings.[320]

460.    The number of ghost guns recovered at crime scenes in New York likely follows this disturbing upward national trend.

461.    Specifically, New York law enforcement is recovering an increasing number of crime guns each year. In 2018, law enforcement made 6,559 crime gun recoveries, but in 2021, that number rose to 10,132 crime guns — an increase of 54.5%.[321]

---

[318]  https://www2.erie.gov/exec/index.php?q=press/poloncarz-declares-gun-violence-erie-county-public-health-crisis.

[319]  *See* ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 & n.18 (April 26, 2022) (citing internal figures from the ATF Office of Strategic Intelligence and Information).

[320]  *See id.* at 24656 n.18.

[321]  These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns, which never had a serial number.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

462.     Ghost guns are an increasingly concerning part of this mushrooming phenomenon. Throughout New York State, including the City of Buffalo. The Buffalo Police Department recovered 62 ghost guns in connection with arrests in 2021 and 44 so far in 2022. The City of Buffalo believes that the number of ghost guns being recovered only scratches the surface of the problem.

463.     In the first six months of 2022, the Buffalo Police Department has taken in 42 ghost guns compared to 20 at the same time through June 30.[322]

464.     Moreover, as of June 17, 2022, there have been 373 recoveries of assembled ghost guns, putting New York on pace to recover over 800 ghost guns over the full year.[323]

465.     When considering the rate of ghost gun recovery in the context of all gun recoveries across the State, the trend is deeply disturbing. In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement. That rate increased to 1.5% in 2019, then 3.6% in 2020, then further to 6.32% in 2021. Upon information and belief, from January 1 through June 20, 2022, law enforcement has recovered an assembled ghost gun 8.7% of the time that a gun was recovered. Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

466.     The number of assembled ghost guns in New York — including those created from Ghost Gun Defendants' illegal products — has reached crisis levels and continues to climb.

467.     The pandemic has exacerbated the issue. Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020. Upon information and belief, Ghost Gun Defendants'

---

[322] "Buffalo Police Seizing Twice as Many Ghost Guns So Far This Year," available at https://buffalonews.com/news/local/buffalo-police-seizing-twice-as-many-ghost-guns-so-far-this-year/article_50f4d27c-02de-11ed-b24f-87b17f1fc325.html.

[323] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

sales of "unfinished" frames and receivers have likewise increased significantly over that same time period, with a significant number of those products being shipped directly into New York State or otherwise easily finding their way into New York State — leading to significant profits from this illicit market for Ghost Gun Defendants.

468.    Upon information and belief, that increase in sales has coincided with a massive uptick in gun murders, as approximately 79% of U.S. murders committed in 2020 involved a firearm, which represents a 34% increase from 2019, a 49% increase from 2015, and a 75% increase from 2010.[324]

469.    While New York was among the states with the lowest rates of gun fatalities in 2020, Ghost Gun Defendants' products and practices are rapidly altering the picture. Indeed, Ghost Gun Defendants' business practices and conduct are significant contributors to New York's increasing rates of gun-related fatalities, including in the City of Buffalo.

> ### ii.  Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Concerns.

470.    Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as a conventional firearm and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and the AR-10 and AR-15.

471.    On December 2, 2022, the Erie County District Attorney's Office issued a press release titled, "Juvenile Offender Sentenced for Killing Teenage Girl in Double Shooting on Koons Avenue."[325]

---

[324]  https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

[325]  "Juvenile Offender Sentenced for Killing Teenage Girl in Double Shooting on Koons Avenue," available at https://www2.erie.gov/da/index.php?q=press/juvenile-offender-sentenced-killing-teenage-girl-double-shooting-koons-avenue

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

The press release provided, "Erie County District Attorney John J. Flynn announces that a 16-year-old male from Buffalo was sentenced this morning before Erie County Court Judge Kenneth Case to 12 years to life in prison. On Tuesday, January 25, 2022, at approximately 2:38 p.m., the juvenile offender, while acting in concert with a co-defendant, unlawfully entered a home on the 200 block of Koons Avenue in the City of Buffalo through a window. Once inside of the home, the juvenile offender, who was 15-years-old at the time of the crime, intentionally shot two teenagers with an illegal 'ghost gun.' One victim, a 17-year-old female, died at the scene. Due to the age of the deceased, her name will not be released by our office. The second victim, a 19-year-old male, was taken to ECMC where he was treated for an injury to his arm. The juvenile offender pleaded guilty to one count of Murder in the Second Degree (Class "A-I" felony), the highest charge in the indictment, on October 11, 2022."[326]

## X.    Defendants' Conduct Is Dangerous and Directly Harms the City of Buffalo

472.    The evidence that all Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of convicted felons.

473.    Rather, guns recovered at crime scenes are statistically related to gun manufacturer practices in the aggregate. Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices. For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appears. The more of these practices that a manufacturer implements and adheres to, the less frequently its products will be recovered from crime scenes. By these practices, a manufacturer

---

[326]    *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 295 of 727 PageID 1292

RECEIVED NYSCEF: 12/20/2022

can align its business practices with its responsibilities under the law and incentivize its dealer and distributor customers to do the same.

474. Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices. Defendants named here do nothing to geographically restrain the marketing of their products so as to stem the flow of these products to criminals through the illegal secondary market, and they follow policies and practices that directly result in sales of these illegal products directly to unknown and unchecked individuals in New York, including the City of Buffalo.

475. Moreover, Defendants are aware that criminals are an important segment of the gun industry market. To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws. Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York have been purchased outside of New York. By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering our communities by providing criminals and other individuals who either know, or suspect, they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one.

476. Moreover, ATF trace data have also long established that certain dealer characteristics indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers, but can bypass any and all dealers entirely.

477. In the context of domestic violence, an intimate partner is five times more likely to be murdered when the violent partner has access to a firearm.[327] New York law addresses this very real and

---

[327] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

substantial risk by, among other things, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she owns or possesses when certain conditions are present. See N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Ghost Gun Defendants' sale of ghost gun products, and their refusal to conduct background checks, undermine these important protections, increasing the already significant risk that a protected person or persons will be murdered.

478. On October 21, 2022 (last updated December 4, 2022), The Buffalo News published an article titled, "'Stuff of nightmares': Man indicted on charges he killed estranged wife in front of children."[328] The story provided, "When Adam R. Bennefield allegedly fatally shot his estranged wife on Oct. 5, Keaira Bennefield's 9- and 5-year-old daughters were nearby, according to Erie County prosecutors. Also in the back seat of her SUV was the couple's 6-month-old-son. On Friday, Adam Bennefield-in handcuffs and shackles-pleaded not guilty to murder and other charges in connection with the slaying…An Erie County grand jury indicted Adam Bennefield on charges of second-degree murder, aggravated criminal contempt and three counts of child endangerment. "The allegations contained in this indictment are horrifying," Assistant District Attorney Ryan Haggerty said in court during the roughly two-minute proceeding. "They are the stuff of nightmares."…The day before Keaira Bennefield was killed, Adam Bennefield appeared in Cheektowaga Town Court on misdemeanor charges to an alleged domestic violence incident from Sept. 28 in which he allegedly hit and kicked her inside her

---

With Intimate Partner Homicide. Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

[328] "'Stuff of nightmares': Man indicted on charges he killed estranged wife in front of children," available at https://buffalonews.com/news/local/crime-and-courts/stuff-of-nightmares-man-indicted-on-charges-he-killed-estranged-wife-in-front-of-children/article_1ffaa620-508f-11ed-998b-cfa9a45f4a21.html

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

home. A judge released him because state law prevented him from setting bail…Investigators have not recovered the shotgun allegedly used in the killing, District Attorney John Flynn said during a news conference following the arraignment…The district attorney said there was "zero evidence" that would have allowed police to charge Adam Bennefield with anything more serious than the misdemeanors he faced for the alleged beating on Sept. 28. "The injuries and the evidence did not sustain higher charges," he said…Bennefield was paroled from state prison in 2015 after being convicted in 2000 of kidnapping his estranged girlfriend and another woman, as well as escaping from the Erie County Correctional Facility…Morning, Oct 5 – Keaira Bennefield, who was staying at her mother's home, dons a bulletproof vest as she gets ready to take her children to school. Adam Bennefield rammed his car into her vehicle, got out, pulled out a shotgun and fatally shot her, according to police."[329]

479. Ghost Gun Defendants' sale of "unfinished" frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public. Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[330] Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[331] Consistent with that

---

[329] *Id.*

[330] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.

[331] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

Case 8:23-cv-00006-MSS-TGW Document 21-1 Filed 09/08/23 Page 298 of 727 PageID 3205

NYSCEF DOC. NO: 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

result, permit-to-purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[332]

480.  But by their conduct, Ghost Gun Defendants are nullifying those benefits. Defendants are negating the impact of New York's effective licensing and permit laws, and as a consequence the number and rate of homicides and suicides will continue to rise.

481.  Given the nature of the business practices and products of all of Defendants, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and crime gun outcomes, Defendants are knowingly and/or recklessly causing harm to the City of Buffalo's public health and safety.

482.  With every sale Defendants have made and continue to make, they circumvent and undermine the City of Buffalo's firearms public safety measures for their own profit.

483.  Using CDC data from 2015-2019, Brady United Against Gun Violence established five-year averages of firearm fatalities:

---

[332] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

166

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

The Centers for Disease Control (CDC) provides <span style="color:red">detailed and reliable data</span>. Using data from the most recent years available (2015-2019), Brady established five-year averages of firearm fatalities.

## EVERY YEAR ON AVERAGE

### 115,551
People are shot

### 7,957
Children and teens (age 1-17) are shot

**FATALITIES**

**38,826**
People die from gun violence

**14,062**
murdered

**23,437**
die from suicide

**483**
killed unintentionally

**521**
killed by legal intervention

**324**
died but intent was unknown

**547***
women killed by husband or male dating partner*

**GUN INJURIES**

**76,725**
People survive gun injuries

**34,566**
intentionally shot by someone else

**3,554**
survive an attempted gun suicide

**32,759**
shot unintentionally

**1,376**
shot by legal intervention

**4,471**
shot but intent was unknown

**FATALITIES**

**1,663**
Kids & teens die from gun violence

**864**
murdered

**662**
die from gun suicide

**89**
killed unintentionally

**10**
killed by legal intervention

**38**
die but intent was unknown

**GUN INJURIES**

**6,294**
Children & teens survive gunshot injuries

**2,788**
intentionally shot by someone else

**166**
survive an attempted gun suicide

**2,893**
shot unintentionally

**101**
shot by legal intervention

**380**
shot but intent was unknown


**BRADY**
UNITED AGAINST GUN VIOLENCE

*This number is a five-year average derived from Violence Policy Center's "When Men Murder Women" analysis of FBI homicide data, 2014-18 (the five most recent years available for this).

167

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

Case 3:23-cv-00056-MSS-TGW Document 23-1 Filed 09/08/23 Page 300 of 727 PageID 3207

NYSCEF DOC. NO. 2

RECEIVED NYSCEF: 12/20/2022

## EVERY DAY ON AVERAGE

# 316

People are shot

# 22

Children and teens (age 1-17) are shot

### FATALITIES

**106**
People die from gun violence

**39**
murdered

**64**
die from suicide

**1**
killed unintentionally

**1**
killed by legal intervention

**1**
died but intent was unknown

### GUN INJURIES

**210**
People survive gun injuries

**95**
intentionally shot by someone else

**10**
survive an attempted gun suicide

**90**
shot unintentionally

**4**
shot by legal intervention

**12**
shot but intent was unknown

### FATALITIES

**5**
Kids & teens die from gun violence

**2**
murdered

### GUN INJURIES

**17**
Children & teens survive gunshot injuries

**8**
intentionally shot by someone else

**2**
children and teens either die from suicide or survive a suicide attempt.

**8**
children and teens are unintentionally shot in instances of family fire — a shooting involving an improperly stored or misused gun found in the home, resulting in injury or death.

While Brady historically used CDC data to establish averages for gun injuries as well, recent funding cuts there are more accurate sources. Due to funding restrictions and other constraints, the sample size utilized by the CDC is so small that its estimate of firearm injuries varies significantly. Data provided by Healthcare Cost and Utilization Project's HCUPnet, and collected from emergency departments and databases, gives a more comprehensive picture of gun injuries in the U.S. The numbers below represent a three-year average of the **most recent** HCUPnet data available (2013, '14, and '16). It is important to note that data reported for children and teens contains data only for 1-17 year-olds.



**This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.**

484.     On July 20, 2021, Erie County issued Executive Order #022: Declaration of Gun Violence as a Public Health Crisis.[333]  Buffalo is the second-largest city in New York and the seat of Erie County. The executive Order declaring the following facts as the predicate for action:

- WHEREAS, in June 2021, the New York State Division of Criminal Justice Services released a report indicating Erie County was the county that had the highest rate of violent crimes involving a firearm in 2020, per capita, across New York State (130.7 crimes involving a firearm per 100,000 residents), which was more than double the state average (57.4 per 100,000 residents), and even much greater than New York City's rate (77.6 per 100,000 residents); and

- WHEREAS, the Erie County Crime Analysis Center data shows that homicides have increased in Erie County for the past four years, from 46 in 2017, to 58 in 2018, 59 in 2019 and 69 in 2020, the vast majority of these having been through the use of a firearm against the decedent; and

- WHEREAS, as of July 14, 2021, 44 of the 49 homicides committed in Erie County used a firearm; and

- WHEREAS, the effects of gun violence extend far beyond these casualties because gun violence shapes and reshapes the lives of those who witness it by either knowing someone who was shot or living in fear of the next shooting; and

- WHEREAS, according to research compiled by the Everytown for Gun Safety Research Division, these injuries, whether direct or indirect, costs the United States nearly $280 billion in three different categories: (1) immediate costs

---

[333] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/Executive-Order-22-Gun-Violence-as-a-PHC-002.pdf

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

Case 3:23-cv-00016-MSS-TGW Document 21-1 Filed 09/08/23 Page 302 of 727 PageID 1269

RECEIVED NYSCEF: 12/20/2022

starting at the time of an incident; (2) subsequent costs such as treatment, long-term physical and mental health care, forgone earnings, criminal justice costs; and (3) cost estimates of quality-of life lost over a victim's lifespan; and for the enormous costs associated with this violence, whether they own a gun or not; and

- WHEREAS, gun violence is not limited to person-on-person acts, nor certain geographic areas of Erie County, but all areas of Erie County when suicides are included; and

- WHEREAS, the Erie County Medical Examiner Office has issued reports indicating that a firearm was used in 29 suicides in 2019, 30 in 2020 and, as of July 14, 2021, 8 in 2021; and

- WHEREAS, the Erie County Medical Examiner's Office reports indicate that a firearm was used in thirty-two percent (32%) of suicides in Erie County in 2020 and thirty-one percent (31%) of suicides in Erie County in 2021; and

- WHEREAS, Live Well Erie was established by Executive Order No. 21 in September 2019 to focus on the social determinants of health, including housing stability, job opportunities, and neighborhood crime and safety, which dramatically influence the ability of every resident to achieve his or her full potential; and

- WHEREAS, the impact of gun violence on public health deserves action from all levels of government, especially counties.

485. On this basis, the Erie County Executive, Marc C. Poloncarz, ordered:

- I declare gun violence to be a public health crisis in Erie County.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- I direct the Commissioner of Central Police Services, Commissioner of Probation, Commissioner of Health, Commissioner of the Department of Mental Health, and Commissioner of the Department of Social Services to form a task force to work in concert with local law enforcement, including the Erie County Sheriff's Office and Buffalo Police Department, the Erie County District Attorney's Office, members of the Erie County Legislature, local anti-violence organizations and leaders, and the Live Well Erie Task Force to prepare programs and initiatives that (a) decrease gun violence among youth; (b) increase funding to programs specifically designed to reduce gun-violence; (c) work with local law enforcement agencies to create strategies to reduce the amount of illegal firearms in Erie County; (d) work with marginalized populations to provide education on gun violence, issues and solutions; (e) advocate for relevant policies that improve health in communities of color; and (f) support local, State, and Federal programs that advance anti-gun violence initiatives.

- I direct and authorize the Commissioner of the Department of Probation to increase the number of monthly home visits, known as Individual Custom Notifications, performed by Department of Probation officers with probationers who are at high-risk of involvement with guns and violence under the Gun Involved Violence Elimination ("GIVE") Initiative.

- I direct and authorize the Commissioner of the Department of Social Services to (a) expedite the investment of the additional $530,727 received by Erie County from New York State for additional summer youth employment opportunities, under the new age and geographic residence restrictions provided by New York State, thereby making more at-risk youth and young adults eligible for the

171

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

Case 8:23-cv-00016-BSS-CGW Document 21-2   Filed 09/08/23   Page 304 of 727 PageID 3281

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

program, and to work with local anti-violence organizations and leaders to identify at-risk youth and young adults for the initiative; and (b) following placement of at-risk young adults into temporary employment opportunities as described above, work to transition said young adults into permanent employment opportunities using the Department of Social Services' Placing Individuals in Vital Opportunity Training ("PIVOT") program.

486.    The Erie County Gun Violence Prevention Task Force was created in July, 2021, by Erie County Executive Order #22, which declared gun violence to be a public health crisis.[334]  The Task Force has been working diligently since then to address the Order's key objectives. The Erie County Commissioners of Central Police Services, Probation, Health, Mental Health, and Social Services collaborate on the Task Force with local law enforcement including the Erie County Sheriff's Office and Buffalo Police Department, the Erie County District Attorney's Office, members of the Erie County Legislature, local antiviolence organizations and leaders, and the Live Well Erie Task Force.[335]

487.    The Task Force is charged with preparing programs and initiatives addressing six areas of concern:[336]

- decrease gun violence among youth;

- increase funding to programs specifically designed to reduce gun-violence;

- work with local law enforcement agencies to create strategies to reduce the number of illegal firearms in Erie County;

---

[334] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/7-18-22-gun-violence-prevention-task-force-report.pdf

[335] *Id.*

[336] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

- work with marginalized populations to provide education on gun violence, issues and solutions;

- advocate for relevant policies that improve health in communities of color; and

- support local, State, and Federal programs that advance anti-gun violence initiatives.

488.     On June 20, 2022, the Task Force issued a report. The report noted that the Task Force increased funding to the GIVE program;[337] expedited an additional $530,727 in funding received by Erie County from NYS to expand the 2021 Summer Youth Employment Program ("SYEP") to have a focus on gun violence prevention in targeted zip codes throughout the City of Buffalo;[338] is working on its own initiatives and has secured three hundred gunlocks to distribute to Erie County residents;[339] and is now partnering with the University of Buffalo School of Social Work to create an environmental scan which will integrate mapping of gun violence "hot spots" in the community with mapping of assets and resources associated with gun violence prevention and recovery.[340]

489.     The report also contained the following chart:

---

[337] The Gun Involved Violence Elimination (GIVE) Initiative provides state funding to local law enforcement agencies for equipment, overtime, personnel, as well as focused training and technical assistance. GIVE is a key component of New York State's shooting and homicide reduction strategy. GIVE supports 20 police departments, district attorneys' offices, probation departments and sheriffs' offices in 17 counties: Albany, Broome, Chautauqua, Dutchess, Erie, Monroe, Nassau, Niagara, Oneida, Onondaga, Orange, Rensselaer, Rockland, Schenectady, Suffolk, Ulster and Westchester. These counties historically account for more than 80 percent of the violent crime that occurs in New York State outside of New York City. *See* https://www.criminaljustice.ny.gov/ops/gunviolencereduction/index.htm#:~:text=The%20Gun%20Involved%20Violence%20Elimination,shooting%20and%20homicide%20reduction%20strategy.

[338] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/7-18-22-gun-violence-prevention-task-force-report.pdf

[339] *Id.*

[340] *Id.*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.



490.    Despite these proactive approaches, gun violence continues to be an urgent matter in

the City of Buffalo. For example, on March 30, 2022, the Erie County Sheriff reported the arrest of two

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been    177 of 197
accepted for filing by the County Clerk.

individuals on March 29 for weapon charges.[341] Both individuals were arrested in the Bailey and Broadway area of Buffalo.[342] The arrests follow an investigation into illegal gun trafficking activity in the area.[343]

491.　　On July 8, 2021 (last updated July 11, 2021), 7 Eyewitness News (7abc, WKBW-Buffalo) published an article titled, "Three-year-old boy shot in Buffalo on Monday dies; grandfather remembers 'cheerful,' 'funny' child."[344] The story provided, "The family of three-year-old Shaquelle Walker Jr. who was among four people shot on Donovan Drive in Buffalo on Monday says the boy has died. "I really don't know what to say right now," said Maurice Walker, the boy's grandfather. "I'm just at a loss for words, that it can happen to a little kid when he's in front of his house, his grandmother's house with his father, looking, enjoying fireworks, everyone else was doing on the 4th and the 5th."" The boy, who went by the nickname Quelle, was shot along with three men just after 11p.m. Monday on Donovan Drive…Two of those men were listed on stable condition following the shooting, while another man was grazed, treated, and released…Two people, 22-year-old Dequan Richardson and 25-year-old Jonay Robinson of Cheektowaga, were arraigned Thursday morning on separate drug and gun charges but are considered "person of interest" in connection with the shooting, according to Erie County District Attorney John Flynn. The investigation into the shooting led Buffalo police to obtain a search warrant

---

[341] https://www2.erie.gov/sheriff/index.php?q=press/2-arrested-following-gun-trafficking-investigation

[342] *Id.*

[343] *Id.*

[344] "Three-year-old boy shot in Buffalo on Monday dies; grandfather remembers 'cheerful,' 'funny' child," available at https://www.wkbw.com/news/local-news/three-year-old-boy-shot-in-buffalo-on-monday-dies-grandfather-remembers-cheerful-funny-child

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00006-MSS-TGW Document 23-1 Filed 09/08/23 Page 308 of 727 PageID 3375

for the apartment where the drugs and guns were found. However, Flynn could not say whether the guns taken from the apartment were used in the shooting."[345]

492. On September 21, 2021, the Erie County District Attorney's Office issued a press released titled, "Cheektowaga Couple Indicted on Murder, Assault and Gun Charges for Shooting That Killed Toddler, Injured Three Adults on Donovan Drive."[346] The press release provided, "Erie County District Attorney John J. Flynn announces that 22-year-old Dequan I. Richardson and 25-year-old Jonay B. Robinson of Cheektowaga were arraigned this morning before Erie County Court judge Susan Eagan on an indictment charging them each with the following offenses…It is alleged that on July 5, 2021, at approximately 10:58p.m., the defendants drove to Donovan Drive in the City of Buffalo. The defendants, while acting in concert with one another, are accused of firing numerous shots into a crowd of people, who were gathered in the courtyard of the Ferry Grider Homes housing complex to watch fireworks, before driving form the area. Three adult males were hit by gunfire, but survived their injuries…The fourth victim, 3-year-old Shaquelle Walker, Jr., was hit in the head by a bullet. He was taken to Oishei Children's Hospital where he died from his injuries on July 9, 2021. It is further alleged that on the afternoon of July 6, 2021, a search warrant was executed at the defendants' residence on Slate Creek Drive in the Town of Cheektowaga as part of the investigation into the shooting on Donovan Drive. Investigators allegedly found an illegal pistol and a rifle inside the shared apartment."[347]

## XI.   This Avoidable Crisis Needs to Be Fixed

---

[345] *Id.*

[346] "Cheektowaga Couple Indicted on Murder, Assault and Gun Charges for Shooting That Killed Toddler, Injured Three Adults on Donovan Drive," available at https://www2.erie.gov/da/index.php?q=press/cheektowaga-couple-indicted-murder-assault-and-gun-charges-shooting-killed-toddler-injured-thr

[347] *Id.*

176

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00016-MSS-TGW Document 21-1 Filed 09/08/23 Page 309 of 727 PageID 3336

493. The rise of gun violence in the State of New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order.[348]

494. As herein described, Defendants have created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating the ongoing public health crisis.

495. New York's Penal Law establishes that the unlawful possession, sale, or use of an "unfinished" frame or receiver constitutes a nuisance. N.Y. Penal Law §§ 265.07, 400.05.

496. New York law permits civil enforcement actions based on such a nuisance. Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities."[349]

497. Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

498. Moreover, "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." Id. § 898-b(2). A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce. Id. § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

---

[348] See N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence) (available at https://www.governor.ny.gov/sites/default/files/2022-06/EO_3.9.pdf).

[349] New York Sponsors Memorandum, 2021 S.B. 7196 (available at https://www.nysenate.gov/legislation/bills/2021/S7196); see also N.Y. Gen. Bus. Law § 898-d.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

499.    Here, and as described more fully above, each Defendant has engaged in conduct prohibited by General Business Law § 898-b.

500.    For example, as detailed above, several Ghost Gun Defendants sent several shipments to individual consumers in a short period of time, making no effort to determine whether those consumers were engaged in firearms trafficking; shipped "unfinished" frames and receivers to individuals who were not eligible to legally own a firearm; and, as to those Ghost Gun Defendants who sold "unfinished" frames or receivers to undercover employees of New York City or the Office of the Attorney General, they made no attempt to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State. Upon information and belief, each sale of Ghost Gun Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

501.    The misconduct of each Defendant is ongoing and continuous.

502.    Each Defendant's misconduct has resulted in significant ongoing harm and costs to the City of Buffalo.

503.    The City of Buffalo believes that abating the public health and safety crisis caused by Defendants' products will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy "unfinished" frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard hit by gun violence and crimes.

504.    Despite enacting evidence-based gun control laws and effective enforcement strategies, the City of Buffalo finds itself in a gun violence crisis. All Defendants herein named caused, maintained, and/or contributed to this crisis for their own profit, and must be held accountable.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

## FIRST CAUSE OF ACTION
### (Violation of GBL § 898 (a-e))

505.    The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

506.    Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained, and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City of Buffalo.

507.    By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City of Buffalo residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City of Buffalo.

508.    Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and diverted scarce law enforcement resources.

509.    Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City of Buffalo.

510.    Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals,

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the State of New York and the City of Buffalo.

511. Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

512. Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

513. Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City of Buffalo and in the State of New York by unlawfully and unreasonably interfering with public safety and health and undermining New York's General Business Law § 898 (a-e), and it has resulted in the specific and particularized injuries suffered by the City of Buffalo.

514. Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

515. Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City of Buffalo and State of New York.

516. Upon information and belief, Defendants' actions make the City of Buffalo and the public vulnerable to crime and assault, and their conduct creates a public nuisance within the meaning of New York's General Business Law § 898 (a-e).

180

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

517.     Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers who have criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear, in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

518.     Upon information and belief, as a result, Defendants' conduct unreasonably exposes the City of Buffalo and the public to a risk of harm.

519.     Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

520.     Upon information and belief, Defendants' acts are the cause of the Plaintiff's past, present and future injury.

521.     Defendants' conduct violates § 898-b of the New York General Business Law ("GBL"), which declares such conduct to be a public nuisance under GBL § 898-c. The statute expressly provides that a city corporation counsel may bring a lawsuit on behalf of the municipality to enjoin and restrain violations of §§ 898-b(1) or (2). GBL § 898-d.

522.     GBL § 898-b provides a statutory cause of action against "gun industry members" who endanger the public through unlawful or unreasonable business practices involving firearms or firearm

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00016-SSTCGW Document 23-1 Filed 09/08/23 Page 314 of 727 PageID 3381

RECEIVED NYSCEF: 12/20/2022

components or who fail to use reasonable controls to prevent those products from being possessed, used, sold, or marketed unlawfully in New York State.

523. Specifically, GBL § 898-b provides:

1. No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

2. All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

524. The statute defines "gun industry member" as any person or entity "engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories." GBL § 898-a(4). Each Defendant is a gun industry member because it engages in one or more of the above.

525. "Qualified product" is defined under GBL § 898-b by reference to 15 U.S.C. § 7903(4), which in turn defines "qualified product" to include "a firearm" as defined in the federal Gun Control Act, or "a component part of a firearm or ammunition," that "has been shipped or transported in interstate or foreign commerce." See GBL § 898-a(6). Each Defendant sells, manufactures, assembles, imports, distributes and/or markets Qualified Products.

526. Under the federal Gun Control Act, a "firearm" is defined, in relevant part, as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

527. Each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market "Qualified Products" in the City of Buffalo and New York State.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 2

Case 8:23-cv-00016-MSS-TGW Document 21-2 Filed 09/08/23 Page 185 of 197 PageID 3292

RECEIVED NYSCEF: 12/20/2022

528.     Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of Qualified Products, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City of Buffalo and New York State that endangers the health and safety of the public.

529.     Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its Qualified Products from being possessed, used, marketed or sold unlawfully in New York and the City of Buffalo.

530.     Accordingly, each Defendant has violated, and continues to violate GBL § 898-b.

## SECOND CAUSE OF ACTION
### (Common Law Public Nuisance)

531.     The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

532.     Defendants, through their past and present business practices, create, contribute to, and maintain a public nuisance under the common law.

533.     A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977) (internal citations omitted).

534.     Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City of Buffalo.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

535. By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City of Buffalo residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City of Buffalo.

536. Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and caused the diversion of scarce law enforcement resources.

537. Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City of Buffalo.

538. Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in New York and Buffalo.

539. Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

540. Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

Case 8:23-cv-00066-MSS-TGW Document 23-1  Filed 09/08/23  Page 189 of 793 PageID 3224

easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

541.  Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City of Buffalo and State of New York by unlawfully and unreasonably interfering with public safety and health.

542.  Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

543.  Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City of Buffalo and State of New York.

544.  Upon information and belief, Defendants' actions make the Plaintiff and public vulnerable to crime and assault and their conduct creates a public nuisance.

545.  Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, that appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

546.     Upon information and belief, as a result, Defendants' conduct unreasonably exposed Plaintiff to a risk of harm.

547.     Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

548.     Furthermore, upon information and belief, Defendants have created a firearms market that is oversaturated and their conduct has unreasonably interfered with public safety and health.

549.     Upon information and belief, Defendants' acts are the cause of Plaintiff's past, present, and future injury.

550.     Upon information and belief, each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market firearms in the City of Buffalo and New York State.

551.     Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of firearms, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City of Buffalo and New York State that endangers the health and safety of the public.

552.     Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its firearms from being possessed, used, marketed or sold unlawfully in New York and the City of Buffalo.

553.     Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in the City of Buffalo.

**THIRD CAUSE OF ACTION**
**(Deceptive Business Practices in Violation of GBL 349)**

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

554.    The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

555.    GBL Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

556.    Upon information and belief, all Defendants have repeatedly violated GBL § 349 by engaging in a wide array of deceptive acts and practices, as set forth above.

557.    In particular, the Ghost Gun Defendants have repeatedly violated GBL § 349 by selling "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Buffalo, and also by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess these products, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

558.    In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 349 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

559.    Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

560.    Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

561.    Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

562.     Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

563.     As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

## FOURTH CAUSE OF ACTION
### (Deceptive Business Practices in Violation of GBL 350)

564.     The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

565.     GBL Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

566.     Upon information and belief, all Defendants have repeatedly violated GBL § 350 by engaging in a wide array of deceptive acts and practices, as set forth above.

567.     In particular, the Ghost Gun Defendants have repeatedly violated GBL § 350 by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Buffalo, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

568.     In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 350 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

188

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED

RECEIVED NYSCEF: 12/20/2022

569.    Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

570.    Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

571.    Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

572.    Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

573.    As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i)) which, at the time of its printout from the court system's electronic website, had not yet been reviewed and approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject filings for various reasons, readers should be aware that documents bearing this legend may not have been accepted for filing by the County Clerk.

CAUTION: THIS DOCUMENT HAS NOT YET BEEN REVIEWED BY THE COUNTY CLERK. (See below.)
NYSCEF DOC. NO. 2

INDEX NO. UNASSIGNED
RECEIVED NYSCEF: 12/20/2022

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as to the FIRST, SECOND, THIRD, and FOURTH Causes of Action, awarding Plaintiff amounts that exceed the jurisdiction of all lower Courts:

i.      compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.     direct Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

iii.    treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

iv.    punitive damages;

v.     attorneys' fees;

vi.    interest, costs and disbursements; and

vii.   such and further relief as this Court may deem just and proper.

Dated:   December 20, 2022
           Melville, New York

                                      _____

                                        Salvatore C. Badala
                                        Shayna E. Sacks
                                        NAPOLI SHKOLNIK PLLC
                                        400 Broadhollow Road, Suite 305
                                        Melville, New York 11747

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

Paul J. Napoli
Hunter J. Shkolnik
NAPOLI SHKOLNIK
1302 Avenida Ponce de León,
Santurce, Puerto Rico 00907
Phone: (347) 379-1688
pnapoli@NSPRlaw.com
hunter@NSPRlaw.com

*Attorneys for Plaintiff*

This is a copy of a pleading filed electronically pursuant to New York State court rules (22 NYCRR §202.5-b(d)(3)(i))
which, at the time of its printout from the court system's electronic website, had not yet been reviewed and
approved by the County Clerk. Because court rules (22 NYCRR §202.5[d]) authorize the County Clerk to reject
filings for various reasons, readers should be aware that documents bearing this legend may not have been
accepted for filing by the County Clerk.

# EXHIBIT 3

FILED: MONROE COUNTY CLERK 12/21/2022 10:06 AM
INDEX NO. E2022010581
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 12/21/2022

Case 6:23-cv-06161-MSG-CDH Document 13 Filed 05/16/23 Page 325 of 727 PageID 4932

MONROE COUNTY CLERK'S OFFICE

THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 3288414

Book    Page    CIVIL

Return To:
SALVATORE CHARLES BADALA
360 Lexington Avenue, 11th Floor
New York, NY 10017

No. Pages:  201

Instrument: COMPLAINT

Control #:        202212210388
Index #:          E2022010581

Date: 12/21/2022

The City of Rochester

Time: 10:37:55 AM

SMITH & WESSON BRANDS, INC.
BERETTA U.S.A. CORP.
BUSHMASTER FIREARMS INDUSTRIES, INC.
COLT'S MANUFACTURING COMPANY, LLC
GLOCK, INC.

Total Fees Paid:                          $0.00

Employee:

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK

Case 6:23-cv-06110-MAV-CDH   Document 61-13   Filed 05/16/25   Page 326 of 727   PageID 85033

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

------------------------------------------------- x

THE CITY OF ROCHESTER,

               Plaintiff,

         – against–

SMITH & WESSON BRANDS, INC.; BERETTA U.S.A. CORP.;
BUSHMASTER FIREARMS INDUSTRIES, INC.; COLT'S
MANUFACTURING COMPANY, LLC; GLOCK, INC.; HI-
POINT FIREARMS, A/K/A STRASSEL'S MACHINE, INC.; JA
INDUSTRIES, LLC, F/K/A JENNINGS FIREARMS, F/K/A
BRYCO ARMS, F/K/A JIMENEZ ARMS; KEL-TEC CNC
INDUSTRIES, INC.; O.F. MOSSBERG & SONS,
INCORPORATED; REMARMS, LLC, A/K/A REMINGTON
FIREARMS; SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER & CO., INC.;
SCCY INDUSTRIES, LLC; TAURUS HOLDINGS, INC., A/K/A
TAURUS INTERNATIONAL MANUFACTURING, INC.; JJE
CAPITAL HOLDINGS, LLC; ARM OR ALLY, LLC;
BROWNELLS, INC., A/K/A BROWNELLS OR BOB
BROWNELL'S; GS PERFORMANCE, LLC, A/K/A
GLOCKSTORE, AKA GSPC AKA DOUBLE DIAMOND;
INDIE GUNS, LLC; JSD SUPPLY; KM TACTICAL;
POLYMER80, INC.; PRIMARY ARMS, LLC; RANIER ARMS,
LLC; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER
OR 80P FREEDOM CO.; ROCK SLIDE USA, LLC; BANGERS,
L.P. N/K/A IRON VALLEY™ SUPPLY CO.; GUN CENTER
INC., A/K/A GC WHOLESALE; RSR GROUP, INC.; VINTAGE
FIREARMS, LLC; AND WOLCOTT GUNS INC.,

               Defendants.

------------------------------------------------- x

Index No.:

**VERIFIED**
**COMPLAINT**

**PLAINTIFF**
**DEMANDS A**
**TRIAL BY JURY**

Case 1:23-cv-01614-MSG Document 1-3 Filed 05/08/23 Page 327 of 727 PageID #: 5234

INTRODUCTION ...................................................................................................................1

JURISDICTION AND VENUE ...........................................................................................17

PARTIES ..............................................................................................................................18

    I.    Plaintiff ..........................................................................................................18

    II.   Defendants. .....................................................................................................18

        A.   Manufacturers/Makers ..........................................................................18

        B.   Ghost Gun Defendants ...........................................................................26

        C.   Distributors ...........................................................................................28

FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION .................33

    I.    Firearm Violence in the United States, State of New York, and City of Rochester ...............33

    II.   The Primary and Secondary Market for Guns ...........................................45

    III.  Diversion to the Illegal Market .....................................................................46

        A.   Illegal Sales at Gun Shows .....................................................................47

        B.   Private Sellers and Other Non-Storefront Sales ....................................47

        C.   Straw Purchases .....................................................................................48

        D.   Multiple Sales .........................................................................................49

        E.   Corrupt FFLs ..........................................................................................49

        F.   Other Means of Diversion ......................................................................50

    IV.  The Trace Database .......................................................................................84

    V.   Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market ...........................................86

    VI.  Merchandising Practices that Could Reduce Illegal Diversion .................88

    VII. 2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits ....................90

    IX.  Ghost Gun Defendants ............................................................................. 117

        A.   Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted into Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns .................. 117

        B.   Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety ......................... 127

          i.   The Federal Gun Control Act. .................................................. 127

          ii.  New York State Law ................................................................. 129

        C.   Ghost Guns Endanger the Public and Undermine Law Enforcement ............................ 130

        D.   Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns ............................ 133

i

i.  Arm or Ally ............................................................................................. 135

ii.  Rainier Arms ......................................................................................... 138

iii.  80P Builder ............................................................................................ 141

iv.  Rock Slide USA .................................................................................... 144

v.  Indie Guns............................................................................................. 145

vi.  Brownells .............................................................................................. 149

vii.  Glockstore/GS Performance ................................................................ 153

viii.  KM Tactical........................................................................................... 156

ix.  Primary Arms ....................................................................................... 158

x.  Polymer 80 ............................................................................................ 158

xi.  JSD Supply ............................................................................................ 162

E.  Ghost Gun Defendants' Guns Have Harmed the City and Will Continue to Do So If Unabated. ...................................................................................................................... 165

i.  The Rise of Ghost Guns and the Damage Done............................................. 166

ii.  Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Concerns. ...................................................................................... 168

X.  Defendants' Conduct Is Dangerous and Directly Harms the City of Rochester ................. 169

XI.  This Avoidable Crisis Needs to Be Fixed .................................................................. 180

FIRST CAUSE OF ACTION .............................................................................................. 183

SECOND CAUSE OF ACTION ........................................................................................... 187

THIRD CAUSE OF ACTION ............................................................................................... 190

FOURTH CAUSE OF ACTION ............................................................................................ 192

REQUEST FOR RELIEF ...................................................................................................... 193

ii

Case 6:23-cv-00161-MJP-CDH Document 1-13 Filed 05/26/23 Page 329 of 727 Page ID #5336

Plaintiff, City of Rochester, New York ("Plaintiff," "City," or "Rochester"), by and through its attorneys, Napoli Shkolnik PLLC, allege upon personal knowledge as to itself, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Defendants' conduct in the design, manufacturing, importing, selling, marketing and distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

2.      These actions have created, maintained, or contributed to a condition in the City that endangers the safety and health of the public.

3.      All of the Defendants manufacture, import, sell, market, and/or distribute firearms that have been possessed and/or used illegally in the City. Defendants are identified below as Firearm Manufacturer Defendants, Firearm Distributor Defendants, and Ghost Gun Defendants.

4.      Defendants' actions have created, maintained, or contributed to a condition in the City that impacts the health and well being of us all.[1]  In 2020, gun deaths reached the highest number ever recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than

---

[1]  *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

INDEX NO. E2022010581
RECEIVED NYSCEF: 12/21/2022

45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a concurrent public health crisis intensified. Gun homicides rose dramatically across the country, increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in 2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[2]

5. "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[3]

6. "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[4]

7. "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020.

---

[2] *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge).

[3] *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021)). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[4] *Id.* at 5.

Case 23-CV-016-MSEEMPCV Document 5113 Filed 05/16/23 Page 331 of 727 PageID 35338

The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[5]

8.     "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15-19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20–39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[6]

9.     The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

10.     According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report*,[7] below is a chart of Violent Crimes by Firearm in Rochester as of April 30, 2020:[8]

---

[5] *Id.* at 7.

[6] *Id.* at 13-14.

[7] https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[8] *Id.* at 201.

**Violent Crimes by Firearm**

As of 04/30/2020
Rochester City Police Department (IBR)

**Firearm Activity**

As of 5/11/2020
Rochester City Police Department

11.    Below is also a chart of Firearm Activity:[9]

---

12.     Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City and New York State.

13.     In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms Tracing Database, traced 7,254 firearms.[10]

14.     Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[11]

15.     The top categories reported on firearm traces with a New York recovery for that year are as follows:[12]

---

[10]  https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[11]  *Id.*

[12]  *Id.*

## Top Categories Reported on Firearm Traces with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health - Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

**NOTE:** There were 541 additional traces that were associated with other categories.

16.    The top 15 source states for firearms with a New York recovery for that year are as follows:[13]

---

[13]    *Id.*

## Top 15 Source States for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

17.     The age of possessors for firearms with a New York recovery for that year is as follows:[14]

---

[14]  *Id.*

## Age of Possessors for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020-12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020-12/31/2020 National Average Age of Possessor: **34 Years**

18.     The top recovery cities for firearms with a New York recovery for that year are as follows:[15]

---

[15] *Id.*

8

## Top Recovery Cities for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

19.     Rochester is second on the list with 708.

20.     The top recovery cities for firearms with a New York recovery for 2019 are as follows:[16]

---

[16]  https://www.atf.gov/file/147286/download



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

21.    Rochester is third on the list with 548.

22.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[17]

---

[17]  https://www.atf.gov/file/137211/download

10



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

23. Rochester is again third on the list with 530.

24. Because some guns used in a crime start off as legal firearms, it is evident that guns manufactured by Defendant Firearm Manufacturers and distributed by Defendant Firearm Distributors are diverted into an illegal gun market which caters to juveniles, criminals and other persons who are prohibited from owning guns. In addition, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children — anyone barred by law from acquiring guns.

25. This diversion is a result of Defendants' failure to institute appropriate marketing and distribution practices.

11

26.     Defendants knew or should have known that (a) some of the firearms they manufacture and/or distribute would be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

27.     Reasonable measures are available to help ensure that the guns sold and distributed by Defendants do not find their way into a secondary illegal market.

28.     Defendants could, but do not, monitor, supervise or otherwise regulate the sale and distribution of their guns by their downstream distributors or dealer-customers. Defendants could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market. Defendants make no effort to identify the distributors and dealers whose sales disproportionately supply the illegal secondary market.

29.     On July 27, 2022, the U.S. House of Representatives issued a Memorandum from the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits.[18] The Memorandum, in part, found:

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

    i.   Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

---

[18] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

12

Case 1:22-cv-10016-VSB-GWG Document 13-3 Filed 05/26/23 Page 341 of 727 PageID 36548

    ii.   Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

    iii.   Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- Gun manufacturers fail to track or otherwise monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

    i.   All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

    ii.   Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

    iii.   Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

30.    Residents of the City are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if Defendants followed more prudent merchandising policies.

31.    Defendants' conduct in the design, manufacturing, importing, selling, marketing and distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful

13

possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

32.     In particular, Firearm Manufacturers and Distributors' failure to institute appropriate marketing and distribution practices results in diversion of guns to the illegal secondary market.

33.     In addition to the manufacturers and distributors of finished guns, the manufacturers and distributors of "ghost guns"[19] sell directly to consumers untraceably, without a background check, and without any federally required record of their sale. In many cases, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children — anyone barred by law from acquiring guns.

34.     Ghost guns and their central component, so-called "unfinished" or "80%" frames or lower receivers, are illegal to sell or possess under the laws of New York State, and constitute a statutory and common law public nuisance, which Ghost Gun Defendants cause and to which they contribute. Ghost Gun Defendants peddle ghost gun components over the internet to City residents and surrounding areas, thwarting federal and state firearms laws.

---

[19] These firearms are called "ghost guns" because they lack serial numbers and thus when discovered at crime scenes are untraceable — invisible to law enforcement scrutiny.

14

35.     Ghost gun sellers operate on the pretense that their products are not firearms because they are "unfinished," and hence when sold require neither serial numbers nor background checks. Ghost Gun Defendants' business model is to sell "unfinished" frames to persons who, following Ghost Gun Defendants' simple instructions, will finish them, and — by adding the remaining components Ghost Gun Defendants also provide — assemble fully operational weapons.

36.     The City is experiencing the entirely predictable result of Defendants' lawless behavior: exponentially increasing numbers of firearms, including untraceable ghost guns used in crimes in the City, including multiple murders and other crimes of violence, often committed by persons who could never legally acquire a conventional firearm in the first place.[20]

37.     Nationally, the federal government estimates that between 2016 and 2021, law enforcement recovered more than 45,000 ghost guns from crime scenes, including 692 murder or attempted murder scenes. The annual totals recovered increased tenfold during the course of the six-year period analyzed by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),[21]

---

[20]   *See* Panagiotis Argitis, "'I Will Use everything We Have': Evans Declares Gun Violence Emergency Order," https://www.rochesterfirst.com/rochester/watch-live-mayor-evans-rpd-chief-smith-address-gun-violence-in-rochester/(last visited December 6, 2022); Jim Tortora, "Rochester City Officials Addressed Gun Violence Crime, in Rochester," https://www.rochesterfirst.com/news/rochester-mayor-evans-to-address-city-violence/(last visited December 6, 2022); Jim Tortora, "Rochester Up to 50 Homicides Days After Extension of State of Emergency Over Gun Violence," https://13wham.com/news/local/rochester-up-to-50-homicides-days-after-extension-of-state-of-emergency-over-gun-violence (last visited December 6, 2022); Ally Peters, "Ghost Guns Are An Increasing Problem In Rochester. Could a New Law Help?," https://www.rochesterfirst.com/rochester/ghost-guns-are-an-increasing-problem-in-rochester-could-a-new-law-help/ (last visited December 6, 2022).

[21]   ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022). Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

15

Case 8:23-cv-00016-GTS-CFH Document 13-3 Filed 05/26/23 Page 344 of 727 Page ID 3651

bearing in mind that these numbers are limited to *recovered* ghost guns: countless more remain on the streets or in homes — unlicensed, untraceable, and invisible to law enforcement.

38.     All Defendants have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps — or any steps at all — to keep their ghost gun products and firearms out of the hands of people who are prohibited from accessing firearms. Indeed, there are numerous commonsense, scientifically grounded policies and practices that, if implemented, would reduce the risk of Defendants' guns being used in murder, suicide, or violent crime.

39.     The very nature of the Ghost Guns Defendants' business model subverts and undermines the laws designed to protect New Yorkers' right to public safety. Ghost Gun Defendants also engage in fraudulent conduct, deception, and false advertising in violation of New York law. Through their marketing and customer communications, Ghost Gun Defendants mislead customers directly and indirectly about the legality of possessing the unfinished frames sold by them as well as the completed "ghost guns" created with the kits sold to consumers.

40.     Ghost Gun Defendants' illegal conduct thus results in a proliferation of firearms and unserialized, untraceable, unlawful ghost guns on the streets and in the homes of the City, making the City more dangerous for both the public and law enforcement, causing a quintessential public nuisance.

41.     Plaintiff's cause of action and claims for relief arise from the injuries occurring within the State of New York; the injuries were caused by actions either in the State of New York or by an act or omission outside of the State of New York; each of the Defendants regularly did business, and/or solicited business and/or engaged in other persistent courses of conduct within the State of New York; each of the Defendants derived substantial revenues from goods and/or services consumed and/or used in the State of New York; and each of the Defendants placed in the stream of commerce in the United States and in the State of New York firearms and/or accessories or after-market parts which are the subject of this litigation.

## JURISDICTION AND VENUE

42.     This Court has jurisdiction over this action pursuant to New York Constitution, article

VI, § 7(a) and CPLR 301 and 302.

43.     This action is non-removable because there is no complete diversity of citizenship, and

no substantial federal question is presented.

44.     Jurisdiction is proper under CPLR 302(a)(1) because each Defendant transacts

substantial business within the State by supplying goods into New York State.

45.     Jurisdiction is also proper under CPLR 302(a)(3) because each Defendant commits

tortious acts outside New York State that cause injury to persons or property within New York State,

and because each Defendant (1) regularly solicits business in New York State, (2) engages in persistent

conduct towards New York State consumers, (3) derives substantial revenue from goods used or

consumed in New York State, and (4) expects or should reasonably expect its sale of its unfinished

frames and receivers to have consequences in New York State and derives substantial revenue from

interstate commerce.

46.     This Court has personal jurisdiction over all Defendants, as Defendants are

manufacturers and distributors of firearms that caused injury and damage in New York and Defendants,

at the time of placing their parts into the stream of commerce, could have foreseen, realized, expected

and/or anticipated that the product might eventually be found in New York by reason of its nature and

Defendants' business practices.

47.     Venue in Monroe County is proper under CPLR 503(a) because Defendants' tortious

conduct, including shipments of unfinished frames and receivers, occurred within Monroe County and

is a substantial part of the events giving rise to the claim.

48.     Venue in Monroe County is further proper under CPLR 503(a) and 509 because it is the

county designated by the Plaintiff.

Case 8:23-cv-01025-GTS-TWD Document 1-3 Filed 06/26/23 Page 346 of 727 PageID 3753

# PARTIES

## I.  Plaintiff.

49.     Plaintiff the City of Rochester is a municipal corporation organized under the laws of the State of New York.

## II.  Defendants.

### A.  Manufacturers/Makers

50.     Defendant Smith & Wesson Brands, Inc., is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts located at Springfield, MA 01104; its registered agent is Registered Agent Solutions, Inc., at 44 School Street, Suite 505, Boston, MA 02108. At all times relevant to this action, Smith & Wesson Brands, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Smith & Wesson's website, it has ten dealers located within eighteen miles of Rochester.[22]

51.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland located at 17601 Beretta Drive, Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607. At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Beretta's website, it has three dealers

---

[22] https://www.smith-wesson.com/dealer-locator?location=14602

18

located within twenty-three miles of Rochester.[23]  Beretta operates a gallery in New York located at 718 Madison Avenue New York, NY 10065.[24]  Below is a photograph of Beretta's gallery in New York:



52.     Defendant Bushmaster Firearms Industries, Inc., is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Nevada at 3505 Arrowhead Drive, Carson City, NV 89706; its registered agent is Sun Naegele at 3505 Arrowhead Drive, Carson City, NV 8970. At all times relevant to this action, Bushmaster Firearms Industries, Inc. manufactured,

---

[23] https://www.beretta.com/en-us/dealer-locations/?F_City=rochester&F_State=NY&F_Proximity=25&F_Type=0&F_Lng=-77.6088465&F_Lat=43.15657789999999

[24] https://berettagalleryusa.com/pages/new-york-store

assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City.

53. Defendant Colt's Manufacturing Company, LLC, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut located at 545 New Park Avenue, West Hartford, CT 06110; its registered agent is Corporation Service Company located at 251 Little Falls Drive, Wilmington, DE 19808. At all times relevant to this action, Colt's Manufacturing Company, LLC manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Colt's website it has eight dealers located within 20 miles of the City. They are located at.[25]

54. Defendant Glock, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia located at 6000 Highlands Parkway SE, Smyrna, GA 30082-7204; its registered agent is Carlos Guevara c/o 6000 Highlands Pkwy, Attn: Legal Dept., Smyrna, GA, 30082. At all times relevant to this action, Glock, Inc. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Glock's website it has over 30 dealers in New York.[26] These include locations in Rochester, NY.[27]

55. Defendant Hi-Point Firearms, a/k/a Strassel's Machine, Inc., is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio located at 1015 Springmill Rd., Mansfield, OH 44906; its registered agent is Joseph M. Strassell at 1015 Springmill

---

[25] https://www.colt.com/dealer-locator

[26] https://us.glock.com/en/Dealer-Locator-USA

[27] *Id.*

20

Street, Mansfield, OH 44906. At all times relevant to this action, Hi-Point Firearms, a/k/a Strassel's Machine, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Hi-Point's website it has three dealers within 20 miles of the City. The dealers are located in Rochester, NY; Walworth, NY; and Brockport, NY.[28]

56.     Defendant JA Industries, LLC, f/k/a Jennings Firearms, f/k/a Bryco Arms, f/k/a Jimenez Arms, is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Nevada located at 249 Elliott Road Unit 1, Henderson, Nevada 89011; its registered agent is the Amin Law Group NV, Ltd., at 3753 Howard Hughes Pkwy, Suite 200, Las Vegas, NV 89169. At all times relevant to this action, JA Industries LLC, f/k/a Jennings Firearms, f/k/a Bryco Arms, f/k/a Jimenez Arms, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. On March 30, 2022, the U.S. Attorney's Office for the Southern District of New York in *Everytown for Gun Safety Support Fund et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al.*, 21 Civ. 0376 (ALC) filed a letter stating that the ATF, on March 24, 2022, sent JA industries a notice of revocation of its firearms license.[29]

57.     Defendant Kel-Tec CNC Industries, Inc., is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida at 1475 Cox Road, Cocoa, Florida; its registered agent is Ganon J. Studenberg, Esq., 1119 Palmetto Avenue, Melbourne, FL 32901. At all times relevant to this action, Kel-Tec CNC Industries, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were

---

[28] https://www.hi-pointfirearms.com/dealer-locator/index.php

[29] https://www.documentcloud.org/documents/21563108-20220330-joint-letter-to-court

21

distributed, marketed, sold and/or possessed within the City. According to Kel-Tec's website it has a distributor in New York located in Rochester, NY.[30]

58.     Defendant O.F. Mossberg & Sons, Incorporated, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut at 7 Grasso Avenue, North Haven, CT 06473; its registered agent is Corporation Service Company at Goodwin Square 225 Asylum Street, 20th Floor, Hartford, CT 06103. At all times relevant to this action, O.F. Mossberg & Sons, Incorporated, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to O.F. Mossberg & Sons, Incorporated's website, it has six dealers located within 25 miles or less of the City.[31]

59.     Defendant RemArms, LLC, a/k/a Remington Firearms, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York; its registered agent is Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. At all times relevant to this action, RemArms, LLC, a/k/a Remington Firearms, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to RemArms' website, "In 2020, RemArms acquired the Remington Firearms legacy manufacturing facility in Ilion, NY and the proud opportunity to build Remington firearms. Our new company, RemArms, is designing, producing and shipping new Remington firearms to our dealers and customers across the country each and every

---

[30] https://www.keltecweapons.com/

[31] https://www.mossberg.com/dealers/

22

day."[32] According to Remington's website it has four dealers within 20 miles of Rochester and they are located in Rochester, NY; Brockport, NY; Hilton, NY; and Bloomfield, NY.[33]

60.     Defendant Savage Arms, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Massachusetts, located at 100 Springdale Rd, Westfield, MA 01085; its registered agent is Thomas W. Humphrey at 100 Springdale Road, Westfield, MA 01085. At all times relevant to this action, Savage Arms, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. Savage Arms, Inc., purchased Stevens Arms and is an importer for firearms manufactured by Sun City Machinery Co. According to Savage Arms' website, it has several dealers in New York, including three dealers within eight miles of the City, located in Rochester, NY and Webster, NY.[34]

61.     Defendant SIG Sauer, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New Hampshire, located at 72 Pease Boulevard, Newington, NH 03801; its registered agent is Cogency Global, Inc., at 850 New Burton Road, Suite 201, Dover, DE 19904. At all times relevant to this action, SIG Sauer, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to SIG Sauer's website, it has two dealers within 25 miles of the City and they are located in Rochester, NY.[35]

---

[32] https://www.remarms.com/about-us

[33] https://www.remington.com/where-to-buy.html

[34] https://www.savagearms.com/where.php

[35] https://www.sigsauer.com/dealer-locator

23

62.    Defendant Springfield Armory, Inc., is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois, located at 420 West Main Street, Geneseo, IL 61254; its registered agent is James S. Zmuda at 1515 5th Avenue, Suite 700, Moline, IL 61265. At all times relevant to this action, Springfield Armory, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Springfield's website, it has several retailers in New York, including nine within 20 miles of the City.[36]

63.    Defendant Sturm, Ruger & Co., Inc. ("Sturm"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut, located at 1 Lacey Place, Southport, CT 06890; its registered agent is The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. At all times relevant to this action, Sturm manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. In September 2020, Sturm purchased Marlin Firearms, which had previously acquired Hopkins & Allen Arms Company. According to Sturm's website, it has seven retailers within 25 miles of the City.[37]

64.    Defendant SCCY Industries, LLC, is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida, at 1800 Concept Court, Daytona Beach, FL 32114; its registered agent is Palmetto Charter Services, Inc., at 149 S. Ridgewood Avenue, Suite 700, Daytona, Beach, FL 32114. At all times relevant to this action, SCCY Industries, LLC manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in

---

[36]    https://www.springfield-armory.com/find-a-retailer/

[37]    https://www.ruger.com/dataProcess/retailerLocator/

24

the United States, and which were distributed, marketed, sold and/or possessed within the City. According to SCCY's website, under the title, "Partners" it lists distributors of SCCY firearms.[38]  One of the dealers is Lipsey's, which has numerous dealers in New York, including fourteen locations within 25 miles of the City.[39]

65.     Defendant Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, located at 100 Taurus Way, Bainbridge, GA 39817; its registered agent is Thomas Conger at 100 Taurus Way, Bainbridge, GA 39817. At all times relevant to this action, Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Taurus's website it has dealers in Olean, NY, and Rochester, NY. [40]

66.     Defendant JJE Capital Holdings, LLC, is the parent company of H&R Firearms, a/k/a H&R 1871, LLC, which at all times relevant to this action manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. H&R Firearms, a/k/a H&R 1871, LLC, also manufactured New England Firearms. In 2020, JJE Capital Holdings, LLC, purchased from Remington the H&R brand products. JJE Capital's website lists H&R as one of its portfolio companies.[41]  JJE Capital Holdings is a limited liability company organized and existing under the law of the State of South

---

[38]   https://sccy.com/about/distributors/

[39]   https://www.lipseys.com/dealerstate?st=NY

[40]   https://www.taurususa.com/dealer-locator

[41]   https://jjech.com/portfolio-companies/

Case 3:23-cv-00018-MSS-SGW Document 13-3 Filed 05/25/23 Page 354 of 727 PageID 3761

Carolina, located at 3850 Fernandina Rd., Columbia, SC 29210; its registered agent is John Roberts at 930 Richland Street, Columbia, SC 29201.

### B. Ghost Gun Defendants

67.     Defendant Arm or Ally, LLC is a North Carolina limited liability corporation with its principal place of business in Indian Trail, NC, located at 1021-C Technology Drive, Indian Trail, NC 28079. It has a subsidiary named Arm or Ally S, LLC. The registered agent of Arm or Ally, LLC, is James F. Tobin at 6416 Providence Farm Lane, Apt. 1319, Charlotte, NC 28277.

68.     Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, Iowa, located at 3006 Brownells Pkwy, Grinnell, IA 50112. Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc. Brownells' registered agent is Corporation Service Company at 505 5th Avenue, Suite 729, Des Moines, IA 50309.

69.     Defendant GS Performance, L.L.C., also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, Tennessee, located at 1930 Air Lane Drive, Nashville, TN 37210, and in San Diego, California. It is the successor of a California limited liability corporation also named GS Performance, L.L.C., headquartered in San Diego. Glockstore's registered agent is Leonard L. Magill at 1930 Air Lane Dr., Nashville, TN 37210-3810.

70.     Defendant Indie Guns, LLC, is a Florida limited liability corporation with its headquarters in Orlando, Florida, located at 3208 E. Colonial Drive, #262, Orlando, FL 32803. Indie Guns' registered agent is Lawrence Destefano at 3000 Huntington Street, Orlando, FL 32803.

71.     Defendant JSD Supply is a Pennsylvania corporation with its principal place of business in Prospect, Pennsylvania, located at 1052 New Castle Road, Prospect, PA 16052. JSD's Officer is Jordon J. Vinroe, located at 106 Poplar Lane, Portersville, PA 16051.

72.     Defendant KM Tactical, LLC ("KM Tactical") is a Missouri limited liability corporation, with its registered office located 6 SW Industrial Drive, Lee's Summit MO, 64081. KM Tactical's registered agent is Kyle Wayne Murphy at 19009 E 31st Terr. Ct. S., Independence, MO 64057.

73.     Defendant Polymer80, Inc., is a Nevada-based corporation engaged in the business of advertising, offering, selling, and providing firearms located at 134 Lakes Blvd, Dayton, NV 89403. Polymer 80, Inc.'s registered agent is Mark H. Gunderson, Gunderson Law Firm, at 3895 Warren Way, Reno, NV 89509. Polymer80, Inc., was incorporated in December 2014 and, since that time, has advertised, offered and, on information and belief, sold and provided firearms to consumers in New York, and the City, both directly and indirectly.

74.     Defendant Primary Arms, L.L.C., is a Texas limited liability corporation, with its headquarters in Houston, Texas, located at 3219 S Sam Houston Pkwy E #100, Houston, TX 77047. Its subsidiaries include Primary Arms Optics, Primary Arms Wholesale, Primary Arms Online and Primary Arms Government. Primary Arms' registered agent is Marshall Lerner at 3219 S. Sam Houston Parkway, Houston, TX 77047.

75.     Defendant Rainier Arms, LLC, is a Washington State limited liability corporation with its principal place of business in Auburn, Washington, located at 2504 Auburn Way N, Auburn, WA 98002. It has subsidiaries including Rainier Arms Holdings, LLC; Rainier Arms International, Inc.; and Rainier Arms Manufacturing, LLC. Rainier Arms' registered agent is John Hwang at 2504 Auburn Way N, Auburn, WA 98002-2420.

76.     Defendant Rock Slide USA, LLC, is a North Carolina limited liability company with its principal place of business in Broadway, North Carolina, located at 303 N Main Street, Broadway, NC 27505. Rock Slide USA's registered agent is Ian O. Frampton at 303 N. Main St., Broadway, NC 27505.

77.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida, located at 8060 Bryan Dairy Rd, Largo, FL 33777. 80P Builder's registered agent is Heather Dunn at 8192 Hopwell Court, Seminole, FL 33777.

### C. Distributors

78.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland, located at 17601 Beretta Drive, Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607. At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City. According to Beretta's website, it has three dealers located within twenty-three miles of Rochester.[42] Beretta operates a gallery in New York located at 718 Madison Avenue New York, NY 10065.[43] Below is a picture of Beretta's gallery in New York:

---

[42] https://www.beretta.com/en-us/dealer-locations/?F_City=rochester&F_State=NY&F_Proximity=25&F_Type=0&F_Lng=-77.6088465&F_Lat=43.15657789999999

[43] https://berettagalleryusa.com/pages/new-york-store

28

Case 8:23-cv-01016-GTS-TWD Document 13-3 Filed 09/05/23 Page 357 of 727 PageID 38264



79. Defendant Bangers, L.P., n/k/a Iron Valley™ Supply Co. ("Bangers"), is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama, located at 101 London Pkwy, Birmingham, AL 35211; its registered agent is Rick Bestwick at #10 South 14th Street, Birmingham, AL 35233. At all times relevant to this action, Bangers marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City. Bangers has several dealers located in New York, including two within 15 miles from the City.[44] Bangers distributes firearms from the following Defendant Manufacturers: Colt, Glock, Hi-Point, Kel-Tec, Marlin, Mossberg, Polymer 80, Remington, RemArms, Savage Arms, SCCY, Sig Sauer, Smith & Wesson, Ruger, Springfield Armory, and Taurus.[45]



80. Defendant Gun Center Inc., a/k/a GC Wholesale, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Cheektowaga, New York, located at 3385 Harlem Rd, Cheektowaga, NY 14225. At all times relevant to this action, Gun Center marketed, distributed, and/or sold firearms in New York which were distributed, marketed,

---

[44] https://www.ironvalleysupply.com/find-a-dealer

[45] https://www.ironvalleysupply.com/

30

sold and/or possessed within the City. In 2016, the ATF issued a Firearms Inspection Report to Gun Center, Inc. and noted that on February 25, 2016, Gun Center's cited violations were: (1) failure to prohibit the transfer of firearm to an individual that was denied by a NICS background check; and (2) failure to locate firearms and/or disposition information for firearms listed as present in inventory in the licensee's acquisition and disposition record on one separate occasion.[46] The report noted that the second violation was a repeat violation from 2011.[47] A 2018 violation was also noted for failure to report multiple sales of handguns.[48]

81.    Defendant RSR Group, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Florida, located at 4405 Metric Drive, Winter Park, FL, 32792-6904; its registered agent is Incorporated Services, Ltd., at 3500 S Dupont Hwy, Dover, DE 19901. At all times relevant to this action, RSR Group, Inc., marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City. RSR's website lists the manufacturers for which it distributes firearms, which include the following Manufacturer Defendants: Beretta, Colt, Glock, Hi-Point, Marlin, Mossberg, Remington, Savage, SCCY, SIG Sauer, Kel-Tec, Smith & Wesson, Springfield, Ruger, and Taurus.[49] RSR has a location at 20 Cedarfield Commons, Rochester, NY 14612.

82.    Defendant Vintage Firearms, LLC, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, located at 120 Nanticoke

---

[46] https://gunstoretransparency.org/sites/default/files/reports/NYC133837900000003.007.pdf

[47] *Id.*

[48] https://gunstoretransparency.org/gun-store/gc-wholesale

[49] https://www.rsrgroup.com/search?Category=1

Ave, Endicott, NY 13760. At all times relevant to this action, Vintage Firearms LLC marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City. On May 14, 2022, gunman Payton S. Gendron, 18, killed ten people and wounded three in a mass shooting at a Buffalo supermarket.[50] Of the thirteen people shot, eleven were Black and two were white.[51] Gendron used a Bushmaster XM-15, which was the same model that was used by a 20-year-old man to kill 26 people at Sandy Hook in 2012.[52] Gendron bought the rifle at Vintage Firearms in Endicott.[53]

83.     Defendant Wolcott Guns Inc., is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Erie, New York, located at 3052 Walden Ave, Depew, NY 14043. At all times relevant to this action, Wolcott Guns marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City. In 2016, the ATF issued a violation to Wolcott Guns for "[f]ailure to conduct NICS background check prior to the transfer of a firearm, licensee used expired NICS check (over 30 days old) on [redacted] occasion."[54] In the section "Corrective Action to be Taken," the document stated: "The licensee was advised that a NICS check must be conducted prior to all over-the-counter transfers of a firearm. Additionally, the licensee was instructed to conduct a new NICS check if the initial check passes 30 days

---

[50]  https://buffalonews.com/news/local/complete-coverage-10-killed-3-wounded-in-mass-shooting-at-buffalo-supermarket/collection_e8c7df32-d402-11ec-9ebc-e39ca6890844.html.

[51]  *Id.*

[52]  https://buffalonews.com/news/local/crime-and-courts/tops-markets-shooter-chose-ar-15-to-stoke-controversy/article_28ed09a0-d54f-11ec-841c-6f77fed17035.html

[53]  *Id.*

[54]
https://gunstoretransparency.org/sites/default/files/reports/NYC88147200000002.024.pdf.

before the firearm is transferred."[55] According to Wolcott Guns, Inc.'s website it sells firearms from the following Manufacturer Defendants: Glock, Springfield Armory, Remington, Savage, Ruger, Mossberg, Kel-Tec, Beretta, Sig Sauer, Smith & Wesson, Marlin, and Bushmaster.[56]

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### I. Firearm Violence in the United States, State of New York, and City of Rochester

84.  Defendants' actions have created, maintained, or contributed to a condition in the City that impacts the health and well being of us all.[57] In 2020, gun deaths reached the highest number ever recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than 45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a concurrent public health crisis intensified. Gun homicides rose dramatically across the country, increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in 2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[58]

---

[55] *Id.*

[56] https://wolcottgunsinc.com/manufacturers

[57] *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

[58] *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge).

33

85.     "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[59]

86.     "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[60]

87.     "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020. The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[61]

88.     "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of

---

[59]     *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021)). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[60]     *Id.* at 5.

[61]     *Id.* at 7.

eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15–19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20-39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[62]

89.      The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

90.      According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report,*[63]  below is a chart of Violent Crimes by Firearm in Rochester as of April 30, 2020:[64]

---

[62] *Id.* at 13-14.

[63] https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[64] *Id.* at 201.

**Violent Crimes by Firearm**
As of 04/30/2020
Rochester City Police Department (IBR)

| | Apr 19 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | Jan 20 | Feb 20 | Mar 20 | Current Month 2019 | Current Month 2020 | % Change From Month in Previous Year | 2019 | 2020 | % Change 2019-20 | 5 Year Average 2015-19 | 2020 | % Change 5 Year Avg. vs. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Violent Crimes** | 142 | 150 | 129 | 170 | 167 | 140 | 129 | 111 | 115 | 123 | 89 | 138 | 101 | 138 | 36.6% | 288 | 350 | 21.5% | 346 | 350 | 1.0% |
| Firearm Related | 48 | 51 | 39 | 74 | 57 | 64 | 48 | 38 | 44 | 48 | 36 | 44 | 23 | 44 | 91.3% | 88 | 128 | 45.5% | 126 | 128 | 1.6% |
| Percent Firearm | 33.8% | 34.0% | 30.2% | 43.5% | 34.1% | 45.7% | 31.3% | 34.2% | 38.3% | 39.0% | 40.4% | 31.9% | 22.8% | 31.9% | | 30.6% | 36.6% | | 36.4% | 36.6% | |
| **Murder** | 1 | 6 | 4 | 7 | 3 | 2 | 1 | 1 | 3 | 1 | 0 | 13 | 1 | 13 | | 5 | 14 | | 5 | 14 | |
| Firearm Related | 0 | 3 | 3 | 4 | 3 | 2 | 0 | 0 | 3 | 1 | 0 | 3 | 1 | 3 | | 4 | 4 | | 3 | 4 | |
| Percent Firearm | 0.0% | 50.0% | 75.0% | 57.1% | 100.0% | 100.0% | 0.0% | 0.0% | 100.0% | 100.0% | | 23.1% | 100.0% | 23.1% | | 80.0% | 28.6% | | 51.9% | 28.6% | |
| **Rape*** | 10 | 8 | 12 | 9 | 10 | 13 | 5 | 8 | 9 | 7 | 12 | 8 | 0 | 12 | | 18 | 28 | 55.6% | N/A | 28 | N/A |
| Firearm Related | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | | 0 | 1 | | N/A | 1 | N/A |
| Percent Firearm | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 8.3% | | 8.3% | | 0.0% | 3.6% | | N/A | 3.6% | N/A |
| **Robbery** | 35 | 28 | 28 | 49 | 45 | 50 | 31 | 33 | 31 | 44 | 33 | 34 | 31 | 24 | -22.6% | 100 | 101 | 1.0% | 137 | 101 | -26.4% |
| Firearm Related | 14 | 13 | 8 | 26 | 23 | 32 | 17 | 13 | 13 | 22 | 18 | 9 | 6 | 6 | | 42 | 46 | 9.5% | 64 | 46 | -28.0% |
| Percent Firearm | 40.0% | 46.4% | 28.6% | 53.1% | 51.1% | 64.0% | 54.8% | 39.4% | 41.9% | 50.0% | 54.5% | 25.0% | | 25.0% | | 42.0% | 45.5% | | 46.9% | 45.5% | |
| **Aggravated Assault** | 97 | 108 | 85 | 105 | 110 | 75 | 83 | 72 | 73 | 69 | 49 | 89 | 81 | 89 | 45.9% | 165 | 207 | 25.5% | 175 | 207 | 18.0% |
| Firearm Related | 34 | 35 | 28 | 44 | 31 | 30 | 23 | 25 | 28 | 25 | 18 | 34 | 17 | 34 | 161.5% | 42 | 77 | 83.3% | 58 | 77 | 32.3% |
| Percent Firearm | 35.1% | 32.4% | 32.9% | 41.9% | 28.2% | 36.5% | 27.7% | 34.7% | 36.4% | 36.2% | 36.7% | 38.2% | 21.3% | 38.2% | | 25.5% | 37.2% | | 33.2% | 37.2% | |

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* | 2016* | 2017* | 2018* | 2019* | % Change 2018-19 | 5 Year Average 2014-18 | % Change 5 Year Avg. vs. 2019 | 10 Year Average 2009-18 | % Change 10 Year Avg. vs. 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Violent Crimes** | 2,231 | 2,026 | 2,067 | 2,109 | 1,690 | 1,839 | 1,845 | 1,872 | 1,615 | 1,541 | -4.6% | 1,772 | -13.0% | 1,933 | -20.3% |
| Firearm Related | 707 | 590 | 694 | 735 | 612 | 608 | 691 | 632 | 549 | 543 | -1.1% | 618 | -12.2% | 682 | -16.7% |
| Percent Firearm | 31.7% | 29.0% | 33.6% | 36.8% | 36.2% | 33.1% | 37.5% | 33.8% | 34.0% | 35.2% | | 34.9% | | 33.6% | |
| **Murder** | 41 | 31 | 36 | 42 | 32 | 33 | 44 | 27 | 29 | 33 | 13.8% | 33 | 0.0% | 34 | -3.0% |
| Firearm Related | 29 | 14 | 28 | 29 | 24 | 23 | 28 | 15 | 20 | 22 | 10.0% | 22 | 1.9% | 23 | -4.8% |
| Percent Firearm | 70.7% | 45.2% | 77.8% | 69.0% | 75.0% | 69.7% | 59.1% | 55.6% | 69.0% | 66.7% | | 65.7% | | 67.3% | |
| **Rape*** | 97 | 97 | 111 | 94 | 112 | 148 | 161 | 141 | 131 | 102 | -22.1% | N/A | N/A | N/A | N/A |
| Firearm Related | 4 | 6 | 7 | 4 | 4 | 1 | 4 | 2 | 5 | 0 | | N/A | N/A | N/A | N/A |
| Percent Firearm | 4.1% | 6.2% | 6.3% | 4.3% | 3.6% | 0.7% | 2.5% | 1.4% | 3.8% | 0.0% | | N/A | | N/A | |
| **Robbery** | 917 | 759 | 810 | 918 | 698 | 640 | 670 | 707 | 518 | 430 | -16.7% | 646 | -33.5% | 738 | -41.7% |
| Firearm Related | 374 | 325 | 345 | 406 | 318 | 283 | 339 | 307 | 227 | 201 | -11.5% | 295 | -31.9% | 330 | -39.1% |
| Percent Firearm | 40.8% | 42.8% | 42.2% | 44.2% | 45.6% | 44.2% | 50.6% | 43.4% | 44.0% | 46.7% | | 45.6% | | 44.6% | |
| **Aggravated Assault** | 1,276 | 1,149 | 1,104 | 1055 | 848 | 1,018 | 970 | 997 | 938 | 976 | 3.8% | 954 | 2.3% | 1,043 | -6.4% |
| Firearm Related | 300 | 245 | 314 | 316 | 266 | 301 | 322 | 308 | 297 | 320 | 7.7% | 298 | 7.1% | 295 | 8.6% |
| Percent Firearm | 23.5% | 21.3% | 28.4% | 30.0% | 31.4% | 29.6% | 33.2% | 30.9% | 31.6% | 32.8% | | 31.3% | | 28.4% | |

*PLEASE SEE Definitions Page for Reporting Changes to the Index Crime of Rape effective March 2016, which also impacts violent crime totals.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year and 10-year Averages are rounded to the nearest whole number.

91.    Below is also a chart of Firearm Activity:[65]

**Firearm Activity**
As of 5/11/2020
Rochester City Police Department

| | Apr 19 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | Jan 20 | Feb 20 | Mar 20 | Current Month 2019 | Current Month 2020 | % Change From Month in Previous Year | 2019 | 2020 | % Change 2019-20 | 5 Year Average 2015-19 | 2020 | % Change 5 Year Avg. vs. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shooting Incidents Involving Injury | 16 | 18 | 22 | 22 | 8 | 11 | 9 | 17 | 14 | 9 | 11 | 9 | 9 | 9 | | 20 | 29 | 45.0% | 28 | 29 | 5.1% |
| Shooting Victims (Persons Hit) | 16 | 20 | 24 | 25 | 8 | 11 | 9 | 22 | 15 | 10 | 12 | 10 | 11 | 10 | | 22 | 32 | 45.5% | 33 | 32 | -2.4% |
| Individuals Killed by Gun Violence | 0 | 3 | 3 | 4 | 3 | 2 | 0 | 0 | 3 | 1 | 0 | 3 | 1 | 3 | | 4 | 4 | | 4 | 4 | |

| Totals | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | % Change 2018-19 | 5 Year Average 2014-18 | % Change 5 Year Avg. vs. 2019 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shooting Incidents Involving Injury | 131 | 194 | 192 | 168 | 191 | 156 | 156 | 137 | 157 | 14.6% | 162 | -2.8% | | | | | | | | | |
| Shooting Victims (Persons Hit) | 143 | 218 | 228 | 187 | 225 | 183 | 179 | 154 | 172 | 11.7% | 186 | -7.3% | | | | | | | | | |
| Individuals Killed by Gun Violence | 14 | 28 | 29 | 24 | 23 | 26 | 15 | 20 | 22 | 10.0% | 22 | 1.0% | | | | | | | | | |

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Average is rounded to the nearest whole number.

---

[65] *Id.*

92.     Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City and New York State.

93.     In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National firearms Tracing Database traced 7,254 firearms.[66]

94.     Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[67]

95.     The top categories reported on firearm traces with a New York recovery for that year are as follows:[68]

---

[66]   https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[67]   *Id.*

[68]   *Id.*

37

## Top Categories Reported on Firearm Traces with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health – Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

NOTE: There were 541 additional traces that were associated with other categories.

96.    The top 15 source states for firearms with a New York recovery for that year are as follows:[69]

---

[69] *Id.*

## Top 15 Source States for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

97.      The age of possessors for firearms with a New York recovery for that year is as follows:[70]

---

[70] *Id.*

39

## Age of Possessors for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020-12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020-12/31/2020 National Average Age of Possessor: **34 Years**

98.     The top recovery cities for firearms with a New York recovery for that year are as follows:[71]

_____

[71] *Id.*

40

## Top Recovery Cities for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

99.     Rochester is number two on the list with 708.

100.    The top recovery cities for firearms with a New York recovery for 2019 are as follows:[72]

---

[72] https://www.atf.gov/file/147286/download



# Top Recovery Cities for Firearms
## with a New York Recovery
### January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

101.    Rochester is third on the list with 548.

102.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[73]

---

[73]    https://www.atf.gov/file/137211/download



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

103. Rochester is again third on the list with 530.

104. Firearm Manufacturer and Distributor Defendants manufactured or distributed a large number of guns recovered in crimes committed in the City.

105. From 2010 through October 25, 2022, Rochester Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Total |
|---|---|
| Smith & Wesson | 994 |
| Mossberg | 722 |
| Sturm, Ruger & Co. | 644 |
| Remington | 571 |
| Glock | 499 |

43

| Maker/Manufacturer | Approximate Total |
|---|---|
| Taurus | 439 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 327 |
| Colt | 306 |
| Savage Arms | 265 |
| Harrington & Richardson (Defendant JJE Capital Holdings) | 364 |
| Springfield Armory | 170 |
| Stevens Arms (Defendant Savage Arms) | 168 |
| Beretta | 238 |
| Bryco (Defendant JA Indusries, LLC) | 93 |
| Hi-Point | 240 |
| Sig Sauer | 95 |
| Bushmaster | 20 |
| SCCY | 44 |

106. From 2021 through October 25, 2022, Rochester Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Count |
|---|---|
| Beretta | 17 |
| Bryco (Defendant JA Industries, LLC) | 8 |
| Bushmaster | 2 |
| Colt | 23 |

44

| Maker/Manufacturer | Approximate Count |
|---|---|
| Glock | 145 |
| Hi-Point | 14 |
| Kel-Tec | 17 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 14 |
| Mossberg | 63 |
| Polymer (Data from 2021 through 12/10/22) | 83 |
| Remington | 38 |
| Savage | 36 |
| SCCY | 20 |
| Sig Sauer | 21 |
| Smith & Wesson | 148 |
| Springfield | 43 |
| Sturm Ruger | 105 |
| Taurus | 133 |
| Harrington & Richardson (Defendant JJE Capital Holdings) | 34 |
| Stevens Arms (Defendant Savage Arms) | 27 |

## II.   The Primary and Secondary Market for Guns

107.    The firearms market consists of a primary and a secondary market.

108.    The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

Case 8:23-cv-01103-GTS-TWD Document 1-3 Filed 05/26/23 Page 374 of 727 PageID 381

109.    Although there is a legitimate secondary market for firearms, that market also includes an illegal segment made up of private transactions among non-federally-licensed individuals.

110.    The illegal, secondary market is a significant source of firearms to criminals. Most firearms acquired by criminals are acquired through transactions in the secondary market.

111.    Criminals are an important market segment for the gun industry. Gun-trace studies have demonstrated that 11% of handguns sold between 1996 and 2000 were used in violent crimes by the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

112.    Empirical studies have shown that guns move quickly from the legal to the illegal market: 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within three years of their first sale. ATF trace data indicate that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime. A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited user or into the illegal market.

### III.    Diversion to the Illegal Market

113.    Upon information and belief, diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through Defendants' marketing practices and unlawful and unreasonable conduct.

114.    Upon information and belief, Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market as a result of specific sales practices by gun dealers.

115.    Upon information and belief, Defendants have failed to prevent diversion to the illegal market by, inter alia, failing to: monitor corrupt dealers; require retail sales only through storefront

establishments; limit sales made at gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

### A. Illegal Sales at Gun Shows

116.    Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sale of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and, upon information and belief, Defendants are aware of this loophole.

117.    Although a Federal Firearms Licensee ("FFL") selling at a gun show must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

118.    Although federal law requires background checks for all gun sales by licensed gun dealers, it does not require background checks for guns sold by unlicensed sellers, like non-dealers who sell guns online or at gun shows. This loophole enables people with felony convictions, with domestic abuse restraining orders against them, and other people with a personal history such that they are prohibited from possessing guns, to buy guns with no questions asked.[74]

119.    Upon information and belief, firearms manufactured, imported or distributed by Defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City.

### B. Private Sellers and Other Non-Storefront Sales

120.    The law does not require private sellers of firearms — so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate

---

[74]    https://www.everytown.org/solutions/background-checks/

from a storefront — to conduct background checks or to maintain records that an FFL is required to maintain. This constitutes a loophole for diversion of guns to criminal elements, and, upon information and belief, Defendants are aware of this loophole.

121. Upon information and belief, Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table, dealers through the use of prudent merchandising practices at little cost or loss of business.

122. Upon information and belief, firearms that Defendants have sold through non-stocking or kitchen table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City.

### C. Straw Purchases

123. Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a major source of firearms for the secondary market. One law enforcement study found that more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase. The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

124. A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits a felony. Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

125. Upon information and belief, defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices. This result could be achieved at little cost or loss of business.

48

126.    Upon information and belief, a substantial number of firearms manufactured, imported or distributed by Defendants were acquired by a straw purchase, diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City.

### D. Multiple Sales

127.    Guns are diverted to the illegal secondary market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the illegal secondary market.

128.    Upon information and belief, firearms manufactured, imported or distributed by Defendants are acquired as part of a multiple purchase, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City.

### E. Corrupt FFLs

129.    Guns acquired by criminals can be obtained through intentional trafficking by an FFL. Defendants are aware that some FFLs are corrupt and that they should not do business with such dealers, but, upon information and belief, Defendants nevertheless continue selling to such dealers until ATF revokes the dealers' licenses, which often takes years.

130.    Guns are diverted to the illegitimate gun market through corrupt dealers. According to an ATF study, just 1.2% of dealers accounted for over 57% of the crime guns traced to current dealers in 1998.[75]  For example, in 1998, just over 450 licensed dealers had ten or more crime guns with a time-to-crime interval of three years or less traced to them. In addition, a congressional study of ATF data

---

[75]  https://www.usatoday.com/story/opinion/2013/03/21/gun-dealers-inventory-atf-editorials-debates/2007657/

found that an extraordinary number of crime guns were purchased from the same "high crime" gun dealers. The same 137 dealers were the source of more than 34,000 crime guns between 1996 and 1998.

### F.  Other Means of Diversion

131.    Upon information and belief, guns manufactured, imported or distributed by Firearm Manufacturer Defendants and Firearm Distributor Defendants are stolen from FFLs with poor security arrangements; moreover, FFLs falsely report thefts to conceal trafficking. These guns are diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City. Some Firearm Manufacturer Defendants and Firearm Distributor Defendants sell guns in states in which gun regulations are lax. Upon information and belief, these Defendants know or should know that the guns would be taken into the State of New York, including the City, to be used illegally. These Defendants produce, market and/or distribute substantially more handguns than they reasonably expect to be sold to law-abiding purchasers. They oversupply states with weak handgun controls and restrictions, such as certain southern states along the I-95 corridor, with substantially more handguns than will be purchased by legitimate purchasers in those states, as these Defendants know or should know. These Defendants do so with the actual or constructive knowledge that the oversupply will be sold to prohibited purchasers in states, counties and cities, like the City, which have strong restrictions on the purchase and ownership of firearms. Guns are thereby diverted to the illegal market through sales in states with weak gun control laws to persons who transport the guns to places with strict gun control laws, such as the City.

132.    On October 25, 2016, the New York State Office of the Attorney General issued a report, "Target on Trafficking: Analysis of New York Crime Guns."[76] According to the report, a

---

[76]  https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

majority of guns confiscated in New York come from out of state.[77]  The study looked at the state of origin of more than 53,000 guns recovered in New York over a five-year period, from 2010 to 2015.[78] The report found that 74% of all guns recovered by law enforcement came from out of state; a rate is more than twice the national average, and 86% of all handguns recovered in New York crime scenes came into New York from out of state.[79]  Most of those handguns coming from states referred to by law enforcement as the "Iron Pipeline": Florida, Georgia, North and South Carolina, Pennsylvania, Virginia, and Ohio.[80]  Additional findings include:[81]

- 52,915 Total Gun Recoveries
    - i. New York State law enforcement agencies recovered 52,915 firearms between 2010-2015. In the most recent year of data, 2015, New York recovered 7,827 guns.

- Only 6% Of Guns Were Recovered From a Possessor Who Was Also The Original Purchaser
    - i. Only 3,208 guns were recovered from a possessor who was also the original purchaser of the gun. About half of these were low time-to-crime guns.

- 74% of All Recovered Guns Total (handguns, rifles, etc) Originated Out-of-State

---

[77]  https://spectrumlocalnews.com/news/2016/10/27/schneiderman-gun-trafficking-database-law-enforcement-tool-crime

[78]  *Id.*

[79]  *Id.*

[80]  *Id.*

[81]  https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

     i.  34,344 of the 46,514 recovered guns with a known purchase state originated outside of New York — well above the national average. Over half of these guns originated in Iron Pipeline states.

- 86% of Recovered Handguns Came From Out-of-State

     i.  Nearly nine out of ten recovered handguns, the weapon of choice for violent criminals, came from out-of-state.

- 57% of All Recovered Guns Were Out-of-State Handguns

     i.  For all the guns recovered in New York State, over half belong to a single category: out-of-state handguns. Handguns are known as the weapon of choice among violent criminals.

- New York has a low per-capita rate of gun recovery

     i.  With 39.5 recoveries per 100,000 people in 2015, New York had half the per-capita recoveries than the national per-capita average (84 per 100,000 people).

- But New York has a very high rate of out-of-state gun recoveries

     i.  A strong majority of crime guns originated out-of-state in 2015 (75%), more than double the national average (29%) of out-of-state sources of crime guns.

- 1 in 5 Recovered Guns Were "Recently Trafficked"

     i.  Of the 30,595 guns for which there is complete data, 6,162 exhibited indicia of recent trafficking into New York.

133.    On October 25, 2016, the *Buffalo News* issued an article, "Report: Guns brought into NY from States with Weaker Gun Laws," discussing the report from the Office of the New York Attorney

General.[82] The article states, "In Buffalo and Niagara Falls, nearly six in 10 guns recovered by law enforcement came from outside the state. Of 424 "likely-trafficked" guns in Erie and Niagara counties, 19 percent came from Ohio, 18 percent came from Georgia and 17 percent from Pennsylvania."[83] "There were 5,255 guns recovered by police in Erie and Niagara counties over the six-year period, a number that represented 10 percent of all guns recovered by law enforcement in New York over that time, according to the report."[84] "The report, citing difficulty in compiling full histories of individual firearms, concluded 6,162 guns were 'likely-trafficked' into the state over the six-year period. In the Buffalo area, 94 percent of 'likely-trafficked' firearms were handguns, according to the report."[85]

134. According to the report, "Rochester-area (Monroe County) law enforcement recovered 4,536 crime guns or 9% of all recoveries in the State. Rochester is unique among the markets with the highest percentage of low time-to-crime guns, the lowest percentage of guns originating out-of-state, and the lowest percentage of handguns compared to the State average. The market leads the State in the percentage of guns (23%) that are low time-to-crime. Only 44% of crime guns originated outside New York State – almost 30 points below the statewide average. And only 54% of Rochester's crime guns were handguns, with shotguns and rifles making up 25% and 20% of recoveries, respectively. Monroe County had by far the highest per capita recovery rate by county of any market jurisdiction, with approximately 101 recoveries for every 100,000 people. Just one zip code in Rochester (14621)

---

[82] https://buffalonews.com/news/local/crime-and-courts/report-guns-brought-into-ny-from-states-with-weaker-gun-laws/article_41ba386b-d2c0-5e1c-921e-d6ec9b67cc07.html

The report is available here: https://targettrafficking.ag.ny.gov/#part1

[83] *Id.*

[84] *Id.*

[85] *Id.*

accounted for 22% of recoveries in the region. Two additional zip codes (14611 and 14609) contributed another 21% of recoveries."[86]

135. The report also provided:



Rochester, with 165 likely-trafficked guns and the largest percentage of in-state gun contribution, still gets its likely-trafficked guns from Pipeline states. The same source states top the list – Georgia (20%), Florida (15%), and Pennsylvania (11%). Rochester had the lowest proportion of guns that were handguns, with 87%.

---

[86] *Id.*

Case 8:23-cv-01016-GTS-TWD   Document 13-3   Filed 05/26/23   Page 383 of 727 PageID 4790



| PIPELINE | PENNSYLVANIA | VIRGINIA | NORTH CAROLINA | SOUTH CAROLINA | GEORGIA | FLORIDA | OHIO |

**New York Pipeline**

Total Guns to New York:

**18,361**

Percentage of Trafficked Guns to New York:

**76%**

Trafficking Index:

**78**

Handguns Sent to New York:

**17,085**

New York's Pipeline, which includes Ohio, supplies a steady stream of guns to New York State. Nearly 35% of all guns and over 43% of all handguns originated in these seven states. In every state's own right, they score poorly on gun safety laws, especially those necessary to prevent illegal diversion. With easy access to New York via I-95 and I-90, gun traffickers tend to obtain guns that begin in these states. As noted, Ohio shares characteristics with the traditional Iron Pipeline states in that it has weak guns safety laws and has easy access to New York via interstate highway. For this reason and since it contributes 3% of all guns and 4% of handguns, we include it in the New York Pipeline.

136.   The report contained the following graphic:

55

Case 8:22-cv-01018-GTS-CFH   Document 13-3   Filed 05/05/23   Page 384 of 727   PageID # 4091



137.   The report also contains a graphic for Rochester:



138.    On March 9, 2016, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Drug Charge."[87]  According to the press release, the Defendant Ronald Dodd "had three bags of marijuana, two bags of heroin, and two bags of cocaine in his pants. There was a stolen, Bryco Arms .380 semi-automatic handgun on the ground next to a tree where Dodd was apprehended."[88] According to the Complaint in *United States of America v. Dodd* (Case No. 15-MJ-4141), the Bryco firearm was a ".380 semi-automatic handgun bearing serial number 115400 that was reported stolen on August 13, 2015."

---

[87]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-drug-charge-2

[88]  *Id.*

57

139.     On September 27, 2019, the Department of Justice issued a press release titled, "Medina Husband And Wife Indicted By A Federal Grand Jury On Multiple Drug And Gun Charges."[89] The federal grand jury "returned an indictment charging Anthony Allee, 28, and Tashira Allee, 36, both of Medina, NY, with maintaining a drug-involved premises, possession of firearms in furtherance of drug trafficking, unlawful possession of a short-barreled shotgun, and unlawful possession of a short-barreled rifle."[90] According to the Complaint in *United States of America v. Allee, et al.* (Case No. 19-MJ-137), a Colt .45 ACP pistol and Ruger model 10-22 carbine, bearing serial number 249-52473 were found during the search. The press release further provided, "Investigators seized 11 firearms, numerous articles of property reported as stolen, marijuana, pills believed to be controlled substances, ammunition, scales, bags, and other items of evidence including Tashira Allee's cell phone. The firearms included a Taurus Judge pistol that had been reported stolen in the Town of Tonawanda."[91]

140.     On January 23, 2020, the Department of Justice issued a press release titled, "Rochester Man Going To Prison For Over 7 Years On Gun Trafficking And Drug Charges."[92] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Carlos Cruz-Garcia, 37, of Rochester, NY, who was convicted of conspiring to distribute, and possessing with intent to distribute, cocaine, and possession of a firearm in furtherance of a drug trafficking crime, was sentenced to serve 87 months in prison U.S. District Judge Elizabeth A. Wolford."[93] Additionally, the press release indicated, "At the

---

[89]     https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[90]     *Id.*

[91]     https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[92]     https://www.justice.gov/usao-wdny/pr/rochester-man-going-prison-over-7-years-gun-trafficking-and-drug-charges

[93]     *Id.*

58

time of Cruz-Garcia's arrest, law enforcement officers found a loaded Glock .40 caliber pistol, which the defendant possessed in connection with the drug conspiracy."[94]

141. On September 12, 2014, the Department of Justice issued a press release titled, "Rochester Man Sentenced for Possessing Ammunition as a Convicted Felon."[95] The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Frederick Stokes, 36, of Rochester, NY, who was convicted of possessing ammunition while being a convicted felon, was sentenced to 63 months in prison by U.S. District Court Judge David G. Larimer."[96] Additionally, the press release indicated, "Assistant U.S. Attorneys Craig Gestring and Charles E. Moynihan, who handled the case, stated that Stokes was previously convicted in 2002 in Monroe County of Forgery in the Second Degree and in 1999 in Oneida County of Assault in the Second Degree. As a result of these previous convictions, the defendant was prohibited from possessing any firearms or ammunition. On April 12, 2013, members of the Rochester Police Department Tactical Unit arrested Stokes in the area of Ringle Street and Post Avenue in Rochester. Officers were looking for the defendant in connection with an unrelated investigation. When officers attempted to take Stokes into custody, he ran from them which resulted in a foot chase. During the chase, the defendant discarded a dark, denim jacket in the area of 93 Post Avenue. Officers arrested Stokes in front of 95 Post Avenue and recovered the jacket nearby. They found seven rounds of .45 caliber ammunition, which were placed inside of a magazine for a Sturm Ruger .45 caliber semiautomatic pistol, inside one of the jacket pockets."[97]

---

[94] *Id.*

[95] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-possessing-ammunition-convicted-felon

[96] *Id.*

[97] *Id.*

142.     On February 27, 2018, the Department of Justice issued a press release titled, "Niagara Falls Man Sentenced On Heroin Charge."[98] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Shaquan M. Shingledecker, 23, of Niagara Falls, NY, who was convicted of possession with intent to distribute heroin, was sentenced to 30 months by U.S. District Judge Elizabeth A. Wolford."[99] Additionally, the press release indicated, "Inside Shingledecker's vehicle at the accident scene, police found 95 glassine envelopes containing heroin, a loaded Ruger handgun with 10 rounds of ammunition, and $1,439.08 in United States currency."[100]

143.     On September 18, 2019, the Department of Justice issued a press release titled, "Rochester Man Sentenced For Heroin Possession And Being A Felon In Possession Of A Gun."[101] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Joseph Delisio, 47, of Rochester, NY, who was convicted of possession of heroin with intent to distribute and possession of a firearm and ammunition by a convicted felon, was sentenced to serve 100 months in prison by U.S. District Judge Elizabeth A. Wolford."[102] Additionally, the press release indicated, "Assistant U.S. Attorney Cassie Kocher, handled the case, stated that the defendant sold heroin between September 29, 2017, and April 11, 2018 to individuals working with the Drug Enforcement Administration. Delisio was arrested on April 11, 2018, following a vehicle stop. The defendant had approximately $34,650 in cash in his possession and officers found a bottle in the vehicle containing residue of suspected heroin,

---

[98] https://www.justice.gov/usao-wdny/pr/niagara-falls-man-sentenced-heroin-charge

[99] *Id.*

[100] *Id.*

[101] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-heroin-possession-and-being-felon-possession-gun

[102] *Id.*

60

scales which are commonly used to process narcotics for distribution, and a .22 caliber Ruger handgun. During a subsequent search of Delisio's residence, officers recovered three more firearms and ammunition. The defendant was previously convicted in Wayne County Court in 2013 of Criminal Possession of a Controlled Substance in the Fourth Degree; in 2009 of Criminal Sale of a Controlled Substance in the Fifth Degree; and in 2002 of Burglary in the Third Degree. As a result, Delisio is legally prohibited from possessing firearms and ammunition."[103]

144.    On March 24, 2015, the Department of Justice issued a press release titled, "Rochester Man Sentenced On Gun Charge."[104]  The press release provided, "U.S. Attorney William J. Hochul, Jr. announced today that Miguel Calixto, 28, of Rochester, NY, who was convicted of possession of a firearm by a convicted felon, was sentenced to 10 years in prison by Chief U.S. District Court Judge Frank P. Geraci, Jr. Assistant U.S. Attorney Jennifer Noto, who handled the case, stated that on July 2, 2013, Rochester Police officers observed the defendant in possession of a 380 caliber Smith and Wesson semiautomatic pistol. Calixto was previously convicted of a felony weapons offense, and was therefore prohibited from legally possessing a firearm under federal law. The defendant used the pistol on June 8, 2013 on Wadsworth Street in Rochester to shoot another individual four times, resulting in the victim's permanent paralysis from the waist down. In conjunction with his plea in federal court, Calixto was convicted of Assault in the First Degree in Monroe County Court. The sentencing is the culmination of an investigation on the part of Special Agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives, under the direction of Special Agent in Charge Delano A. Reid and the Rochester Police Department, under the direction of Chief Michael Ciminelli."[105]

---

[103]  *Id.*

[104]  https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-gun-charge-0
[105]  *Id.*

145.     On July 11, 2014, the Department of Justice issued a press release titled, "Jury Convicts Rochester Woman of Drug Trafficking and Rochester Man of Firearms Offenses."[106]  The press release provides, "U.S. Attorney William J. Hochul, Jr. announced today that a federal jury has found Ashley Travis, 29, of Rochester, N.Y., guilty of conspiracy to possess with intent to distribute crack cocaine and to maintain a drug involved premises, distribution of crack cocaine, possessing crack cocaine with intent to distribute, and maintaining a drug involved premises. The charges carry a maximum penalty of 20 years in prison and a fine of $1,000,000 or both. In addition, the jury found Fawndell Henderson, 39, also of Rochester, guilty of being a felon in possession of a Smith and Wesson revolver and ammunition, as well as possessing a short-barreled Remington 20 gauge shotgun which was made in violation of the National Firearms Act and which was not registered to Henderson in the National Firearms Registration and Transfer Record. The charges carry a maximum penalty of 10 years in prison and a fine of $250,000 or both.   The jury was unable to reach a verdict relating to various drug trafficking offenses and whether Henderson possessed the firearms in furtherance of the drug trafficking offenses. Assistant U.S. Attorney Charles E. Moynihan, who handled the prosecution of the case, stated that on September 12, 2012, Henderson and Travis were arrested at 104 Weeger Street in Rochester, after police officers executed a search warrant at the location. Immediately prior to executing the search warrant, Travis sold four bags of crack cocaine to an undercover police officer. Once inside of the location, law enforcement officers found three additional bags containing crack cocaine, as well digital scales commonly used to measure drugs for distribution and small ziplock bags used to package drugs for distribution. Officers also located $201.00 in United States currency in Henderson's pocket, as well as $40.00 in United States currency on a table in the residence. Law enforcement officers also located and seized a loaded Smith and Wesson revolver and an unloaded Remington 20 gauge shotgun, which had the barrel shortened to

---

[106]  https://www.justice.gov/usao-wdny/pr/jury-convicts-rochester-woman-drug-trafficking-and-rochester-man-firearms-offenses

a length of 14 and ¼ inches, testimony presented by the Government showed. The wooden stock of the shotgun was also removed. Furthermore, the testimony showed that the firearms were secreted in a compartment near the doorway to the residence in a location which would have been easily reachable by the children of Henderson and Travis, who were also found in the residence. Henderson confessed to police in a written statement after his arrest, admitting that he had been selling crack cocaine for several months from his house and the he possessed the firearms. The defendant said that he bought the shotgun from an addict in exchange for two bags of crack and that he had the shotgun for protection. Henderson also admitted to pointing it at rival drug dealers in the neighborhood. He also said that he took possession of the revolver from a friend because his friend had announced intention to use it against rival drug dealers."[107]

146.    On November 29, 2018, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty To Machinegun Charge."[108]  The press release provides, "U.S. Attorney James P. Kennedy, Jr. announced today that Luis Garcia-Canales, 29, of Rochester, NY, pleaded guilty to transfer of a machinegun before U.S. District Judge David G. Larimer. The charge carries a maximum penalty of 10 years in prison and a $250,000 fine.

147.    Assistant U.S. Attorney Katelyn Hartford, who is handling the case, stated that on July 26, 2018, the defendant sold three "auto-sear" devices to an undercover ATF Special Agent in exchange for $900. The "auto-sear" devices are parts designed and intended solely and exclusively for use in converting a weapon into a machinegun. At the time of the transaction, Garcia-Canales explained to the undercover ATF Special Agent that each "auto-sear" device would make a Glock 9mm pistol function fully automatic, and he explained how to install the devices."[109]

---

[107] *Id.*
[108] https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-machinegun-charge
[109] *Id.*

148.    On December 19, 2018, the Department of Justice issued a press release titled, "Rochester Man Sentenced To Eight Years In Prison For Robbing A Dunkin' Donuts."[110]  The press release provides, "U.S. Attorney James P. Kennedy, Jr. announced today that Ramon Crespo, 32, of Rochester, NY, who was convicted of robbery and possession and brandishing a firearm in furtherance of a crime of violence, was sentenced to serve 96 months in prison by U.S. District Judge David G. Larimer. Assistant U.S. Attorney Cassie Kocher, who handled the case, stated that on March 15, 2018, the defendant robbed the Dunkin' Donuts located at 277 East Ridge Road in Rochester. During the robbery, Crespo waved a firearm at store employees and stole approximately $200 in cash. After investigators with the Rochester Police Department conducted their investigation, the defendant was arrested on March 22, 2018, following a traffic stop. Upon searching the vehicle, officers located a loaded .40 caliber Glock model 27 semi-automatic handgun. The case was brought by the U.S. Attorney's Office as part of its Project Safe Neighborhoods (PSN) initiative. PSN is the centerpiece of the Department of Justice's violent crime reduction efforts.   PSN is an evidence-based program proven to be effective at reducing violent crime. Through PSN, a broad spectrum of stakeholders work together to identify the most pressing violent crime problems in the community and develop comprehensive solutions to address them. As part of this strategy, PSN focuses enforcement efforts on the most violent offenders and partners with locally based prevention and reentry programs for lasting reductions in crime."[111]

149.    It was reported by the United States Attorney's Office for the Northern District of Georgia on August 6, 2012.[112]  The press release stated: "Charles Horton, 36, of Buffalo, New York, was sentenced today by United States District Judge Thomas W. Thrash, Jr. to serve over 17 years in federal

---

[110]  https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-eight-years-prison-robbing-dunkin-donuts

[111]  *Id.*

[112]  https://www.justice.gov/archive/usao/gan/press/2012/08-06-12.html

INDEX NO. E2022010581

RECEIVED NYSCEF: 12/21/2022

prison for the offenses of being a felon in possession of firearms, transporting guns from Georgia to New York without a license, and using straw purchasers to make false statements to gun dealers. United States Attorney Sally Quillian Yates said that, 'Horton persuaded four women, one of whom was homeless, to buy twenty firearms on his behalf, and when he learned he was under investigation, he attempted to tamper with a witness who agreed to testify against him at trial.    Law enforcement officers later recovered some of these firearms at crime scenes in the Buffalo area, including at the scene of a murder.' 'Gun traffickers commit a worse crime than the illegal purchase, sale and transportation of firearms. These criminals provide an iron pipeline of potentially deadly weapons for their own selfish profit at the expense of law abiding citizens and their families,' said Scott Sweetow, Special Agent in Charge of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Atlanta. 'The unlawful trafficking in firearms is a serious crime which feeds and amplifies the violence experienced in so many cities today. I applaud the efforts of the agents and the prosecutors who brought the Mr. Horton to justice.' . . . According to United States Attorney Yates, the charges and other information presented in court:    Horton, a convicted felon who was prohibited by federal and state law from possessing firearms, recruited four women to act as straw purchasers and buy a total of twenty firearms on his behalf. Horton gave the straw purchasers the money for the guns, drove them to various gun stores in Georgia and South Carolina, and told them which firearms to purchase.    At the time of the gun sales, the straw purchasers falsely claimed that they were buying the guns for themselves.    Horton was captured in video surveillance footage as he escorted three of the women to several gun stores.    A tip from a gun dealer about a car tag resulted in ATF determining that during the time of the straw purchases Horton used various rental cars to travel back and forth between Buffalo and Atlanta on multiple occasions.    Law enforcement officers subsequently recovered these weapons at crime scenes in Buffalo, New York. When Horton learned that he was the subject of an investigation by ATF, he attempted to interfere with the investigation by asking one of the straw purchasers to falsely claim that the guns he purchased

65

through the straw buyers had been stolen. Unbeknownst to Horton, the straw purchaser was cooperating with the ATF."[113]

150. The criminal indictment in *United States of America v. Charles Horton*, United States District Court for the Northern District of Georgia, 1:11-CR-427, identifies the manufacturers and models of the firearms Horton possessed which includes, in part: Hi-Point manufactured pistols; a Bryco manufactured pistol; and an SCCY Industries manufactured pistol. Additionally, the indictment provides that Horton transported Hi-Point manufactured pistols into the State of New York, and three of those pistols were recovered in Buffalo, New York.

151. On January 11, 1997, members of the Buffalo Violent Crime and Career Criminal Task Force arrested Jonathan Long of Buffalo, New York.[114] Long and five others conducted a gun-running operation from a small town outside of Atlanta, Georgia and onto Buffalo's streets.[115]

152. On September 23, 2018, it was reported that on March 23, Buffalo police officers investigated a report about a man holding a woman at gunpoint recovered a pistol.[116] They submitted the gun — a Glock, Model 33, .357 caliber handgun — for analysis.[117] According to federal court records, the gun had been purchased in November at a pawn shop in Ashtabula, Ohio, a lakeside city of about 18,000 that is just over a two-hour drive west of Buffalo on the Thruway.[118] The article further

---

[113] *Id.*

[114] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[115] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[116] https://buffalonews.com/news/local/the-90-connection-how-an-ohio-to-buffalo-gun-trafficking-ring-was-busted/article_bc70094c-e223-5c55-bb32-5fe6f90068e7.html

[117] *Id.*

[118] *Id.*

66

stated: "It also turned out be one of 29 guns an Ashtabula man is accused of buying at nine locations throughout that city over four months, according to federal prosecutors. The discovery marked the beginning of an investigation that led Buffalo police and agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives to uncover what they allege is a gun-trafficking ring involving the illegal purchases of more than 100 firearms in and around Ashtabula, many of which are believed to have ended up in Buffalo."[119] Sixty-two of those guns were bought for one Buffalo man, Robert L. Williams Jr., according to court records. He has been charged with federal counts of weapons possession as a convicted felon, and with illegally transporting firearms into New York. Nine Ashtabula residents were charged with conspiracy to traffic in firearms, six of whom are accused of buying the guns for Williams as straw purchasers.[120] Also, the article stated: "Most of the firearms recovered by law enforcement agencies in New York State that the ATF traces originate from out of state. Many are stolen and then sold on the street."[121]  The article further stated: "Increasingly, gun traffickers are buying guns in other states with less restrictive gun laws and bringing them here to sell, often at a profit, said James P. Kennedy, U.S. Attorney for the Western District of New York. 'They're buying a gun in one of those states for $500 and can sell it up here for $800 to $1,000,' Kennedy said. 'Turning that kind of profit on 10 guns — that can become very lucrative.' Traffickers are also bringing guns to New York to trade for heroin and other drugs which they bring back to their home states to sell, doubling and even tripling profits. 'Firearms can be used as currency,' Taylor said."[122]  The article then concluded: "Last year, law

---

[119]  *Id.*

[120]  *Id.*

[121]  *Id.*

[122]  *Id.*

enforcement agencies in New York State asked the ATF to run traces on more than 9,000 firearms. The ATF was able to determine the source state — where the gun was legally purchased — in 5,565 of those firearms. Just over 4,200 of those originated from out of state. The ATF said 271 came from Ohio. Ohio consistently ranked around eighth in states from where firearms recovered in New York and analyzed by the ATF originated, including New York itself, according to annual ATF reports between 2013 and 2017."[123]

153.    On October 16, 2020, the Department of Justice issued a press release titled, "CBL/BFL Member Going To Prison For More Than 15 Years For Racketeering Conspiracy And Other Charges; Buffalo Woman Also Going To Prison For Lying About A Murder By Another CBL/BFL Gang Member."[124] CBL/BFL Gang, which stands for, among other things, "Cash Been Long" and "Brothers for Life."[125]  "The gang, which was involved in the illegal possession and distribution of narcotics, was formed around 2009 and operates primarily in the City of Buffalo at the Towne Gardens Housing Complex."[126]  According to the Third Superseding Indictment in *United States of America v. Woods, et al.* (17-CR-103-V), the defendants were in possession of the following firearms, among others:

- One (1) Taurus, semi-automatic pistol, Model No. PT111 Millennium G2, 9mm Luger caliber, bearing serial number TIX27131, and ammunition;

- One (1) Taurus, semi-automatic pistol, Model No. PT809, 9mm caliber, bearing serial number TJS29126, and ammunition;

---

[123]  *Id.*

[124]  https://www.justice.gov/usao-wdny/pr/cblbfl-member-going-prison-more-15-years-racketeering-conspiracy-and-other-charges

[125]  *Id.*

[126]  *Id.*

Case 6:23-cv-06010-FPG-MJP Document 13-3 Filed 05/26/23 Page 397 of 727 Page ID #304

- One (1) Glock, semi-automatic pistol, Model 30, 45 caliber, bearing serial number HLE328, and ammunition;

- One (1) Smith & Wesson, semi-automatic pistol, Model No. 410, 40 Smith & Wesson caliber, bearing serial number VMM1496, and ammunition;

- One (1) Savage Arms pump action 12 gauge shotgun, Model Stevens 67 Series E, bearing serial number E684403;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number HWY660, and ammunition;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number AANV538, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model C, 9mm, bearing serial number 804358, and ammunition;

- One (1) Beretta, semi-automatic pistol, Model 84 FS Cheetah, 380 caliber, bearing serial number E99268Y, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XDs, 45 caliber, bearing Serial Number S3256419, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model JCP, 40 Smith and Wesson, 40 caliber, with a defaced serial number, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model JHP, 45 caliber, bearing serial number X4250584, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XD-40, 40 caliber, bearing serial number XD489138, and ammunition;

69

- One (1) Colt, semi-automatic pistol, 22 long rifle, bearing serial number PH32434, and ammunition;

- One (1) Smith and Wesson, Model 18-3 revolver, 22 long rifle, bearing serial number 3K93144, and ammunition;

- One (1) Ruger, model P95, 9mm semi-automatic pistol, bearing serial number 318-1933, and ammunition;

- One (1) Smith & Wesson, Model 686, 357 revolver, bearing serial number AJF3679, and ammunition; and

- One (1) Beretta Model 92FS, semi-automatic pistol, 9mm Luger, bearing serial number BER171801Z, and ammunition.

154. On June 21, 2022, the Department of Justice issued a press release titled, "Buffalo Man Pleads Guilty to Drug Charge."[127] The press release stated: "U.S. Attorney Trini E. Ross announced today that Girard Jackson, 28, of Buffalo, NY, pleaded guilty before U.S. District Judge Lawrence J. Vilardo to possession of a firearm in furtherance of a drug trafficking crime."[128] Additionally, the press release indicated, "Assistant U.S. Attorney Jeremiah E. Lenihan, who is handling the case, stated that in the early morning hours of June 19, 2021, law enforcement officers encountered Jackson on the 500 block of West State Street in Olean, NY, at which time they executed a search warrant of Jackson for firearms, narcotics, and U.S. currency. Located in a bag Jackson wore around his waist, officers found and seized a loaded Glock 9mm semi-automatic pistol. Wrapped around Jackson's ankle, officers found quantities of methamphetamine and cocaine."[129]

---

[127] https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-charge-11

[128] *Id.*

[129] *Id.*

155.     On June 11, 2019, the Department of Justice issued a press release titled, "Buffalo man Pleads Guilty to Drug and Gun Charges."[130]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Leon R. Williams, 39, of Buffalo, NY, pleaded guilty before U.S. District Judge Elizabeth A. Wolford to possession with intent to distribute heroin, and possession of a firearm in furtherance of drug trafficking activity."[131] The press release further indicated, "On November 29, 2017, a New York State search warrant was executed at the Williams' Texas Street residence in Buffalo. Investigators recovered heroin and cocaine, scales, razor blades, cutting agents, and $73,743 in U.S. currency, which was concealed inside of a vacuum cleaner, a backpack, and within a drop ceiling between two bedrooms. In addition, a Glock, .40 caliber firearm was recovered along with a magazine containing 10 rounds of ammunition loaded within the firearm."[132]

156.     On December 3, 2020, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Possession of a Machine Gun."[133]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron Graff, 44, of Rochester, NY, pleaded guilty today before U.S. District Judge David G. Larimer to possession of a machine gun."[134]  Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who is handling the case, stated that Graff was arrested after members of law enforcement intercepted and searched a package sent to him from an address in China. Officers found the package contained a Glock® conversion device which, when

---

[130]  https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-and-gun-charges-7

[131]  *Id.*

[132]  *Id.*

[133]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[134]  *Id.*

71

installed on a Glock® semi-automatic pistol, allows the pistol to discharge ammunition in fully automatic mode. On May 24, 2019, investigators delivered the package containing the device to Graff and then searched his residence pursuant to a search warrant. During the search, officers found the intercepted Glock® conversion device, as well as a second Glock® conversion device which the defendant admitted to ordering about a month earlier."[135]

157.    On August 12, 2019, the Department of Justice issued a press release titled, "Buffalo Man Going To Prison For More Than 21 Years For Selling Heroin And Fentanyl That Led To The Deaths Of Two People."[136]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron J. McDuffie, a/k/a "G", 24, of Buffalo, NY, who was convicted of distribution of heroin and butyryl fentanyl causing death, and distribution of fentanyl, butyryl fentanyl, and furanyl fentanyl causing death, was sentenced to serve 262 months in prison by U.S. District Judge Lawrence J. Vilardo."[137]  Additionally, the press release indicated, "On November 30, 2016, law enforcement officers arrested McDuffie leaving his residence in Buffalo. The defendant was on his way to distribute a quantity of powder that contained fentanyl, butyryl fentanyl, and furanyl fentanyl. Under McDuffie's's living room couch, officers recovered a Hi-Point, .40 caliber semi-automatic handgun that was loaded with eight rounds of .40 caliber ammunition."[138]

---

[135] https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[136] https://www.justice.gov/usao-wdny/pr/buffalo-man-going-prison-more-21-years-selling-heroin-and-fentanyl-led-deaths-two

[137] *Id.*

[138] *Id.*

158.    On July 16, 2018, the Department of Justice issued a press release titled, "Buffalo Man Sentenced For Being A Felon In Possession Of Firearms."[139]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that David Hunter, 22, of Buffalo, NY, who was convicted of being a felon in possession of firearms, was sentenced to serve 27 months in prison by U.S. District Judge Elizabeth A. Wolford."[140]  Additionally, the press release indicated, "Assistant U.S. Attorney Joseph M. Tripi, who handled the case, stated that between March 3, 2017, and March 12, 2017, the defendant posted images to "Snap Chat" depicting himself in possession of a Hi-Point, model JH-45 semi-automatic firearm. On April 1, 2017, New York State Parole Officers, assisted by members of the Buffalo Police Department, searched Hunter's residence, recovered a Hi-Point, model CF380, .380 caliber semi-automatic firearm, and arrested the defendant. The defendant was previously convicted in state court of Criminal Possession of a Weapon in February 2014 and is legally prohibited from possessing a firearm."[141]

159.    On August 24, 2016, the Department of Justice issued a press release titled, "Wyoming County man Sentenced on Gun Charge."[142]  The press release stated: "Attorney William J. Hochul Jr. announced today that Scott A. Wilcox, 46, of Pike, NY, who was convicted of being a felon in possession of a firearm, was sentenced to 21 months in prison by U.S. District Elizabeth A. Wolford."[143]  Additionally, the press release indicated, "Assistant U.S. Attorney Frank T. Pimentel, who handled the

---

[139] https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

[140] https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

[141] *Id.*

[142] https://www.justice.gov/usao-wdny/pr/wyoming-county-man-sentenced-gun-charge

[143] *Id.*

73

case, stated that on January 25, 2015, Wyoming County Sheriff's deputies searched the defendant's residence at 7998 Wiscoy Road in Pike and found a Marlin .44 magnum caliber rifle, which belonged to Wilcox. Deputies also found 76 rounds of .44 caliber ammunition in an access panel in a bathroom. The defendant is a three-time convicted felon and is prohibited from legally possession firearms."[144]

160.    On May 14, 2019, the Department of Justice issued a press release titled, "Greece Man Pleads Guilty to Lying to the FBI."[145]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Thomas Alonzo Bolin, a/k/a Peter Vincent, 22, of Greece, NY, pleaded guilty before U.S. District Judge David G. Larimer to making a false statement to the FBI."[146]  Additionally, the press release indicated, "On March 30, 2019, members of the FBI, as part of their investigation, interviewed the defendant. During the interview, Bolin falsely stated that he did not possess any firearms in New York State. At the time of the statement, the defendant knew that he possessed a Mossberg 12-gauge shotgun in his bedroom closet at 34 Third Avenue in Greece. This false statement was material to the FBI's investigation of possible civil rights and firearms violations by Bolin and others. The FBI recovered the shotgun during a subsequent search of the defendant's bedroom closet."[147]

161.    On March 18, 2015, the Department of Justice issued a press release titled, "City of Tonawanda Man Sentenced On A Gun Charge."[148]  The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Christopher Simmance, 38, of City of Tonawanda, NY, who was convicted of possession of a firearm after having been committed to a mental institution, was sentenced

---

[144] *Id.*

[145] https://www.justice.gov/usao-wdny/pr/greece-man-pleads-guilty-lying-fbi

[146] *Id.*

[147] *Id.*

[148] https://www.justice.gov/usao-wdny/pr/city-tonawanda-man-sentenced-gun-charge

to time served (19 months) and two years supervised release by Senior U.S. District Judge William M. Skretny."[149]  Additionally, the press release indicated, "Assistant U.S. Attorney John M. Alsup, who handled the matter, stated that on November 12, 2011, law enforcement officers responded to the defendant's Tonawanda residence where they located a Remington shotgun. Simmance had previously received mental health treatment preventing him from legally possessing any firearms."[150]

162.    On January 6, 2014, the Department of Justice issued a press release titled, "Lockport Man Sentenced on Drug Charges."[151]  The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Damian Ard, 33, of Lockport, N.Y., who was convicted of conspiracy to possess with intent to distribute, and to distribute, cocaine base, was sentenced to six years in prison by Chief U.S. District Judge William M. Skretny."[152]  Additionally, the press release indicated, "During the execution of a federal search warrant at Ard's residence on August 17, 2010, law enforcement officers seized a Remington Model 597 rifle, two .22 caliber rifle magazines and a .22 caliber high capacity magazine; a RML 7.62 x 39 caliber semi-automatic rifle, two magazines and ammunition; a New England Firearms Pardner Model SBI 20 gauge shotgun, and ammunition."[153]

163.    On January 23, 2018, the Department of Justice issued a press release titled, "Penn Yan Man Sentenced On Gun And Witness Tampering Charges." The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that James E. Sandford, III, 29, of Penn Yan, NY, who was convicted of possessing a stolen firearm, being a felon in possession of a firearm, and witness tampering,

---

[149]  *Id.*

[150]  *Id.*

[151]  https://www.justice.gov/usao-wdny/pr/lockport-man-sentenced-drug-charges

[152]  *Id.*

[153]  *Id.*

was sentenced to 156 months in prison by U.S. District Judge David G. Larimer."[154]  Additionally, the press release indicated, "Eventually, Sandford was charged in a superseding indictment which alleged that he distributed synthetic cannabinoids (designer drugs) between July 2014 and March 24, 2015, in the Penn Yan area. He was further charged with distributing such substances — and controlled substance analogues, which are designed to mimic the effects of controlled substances — both to individuals under the age of 21 and within 1000 feet of St. Michael's School, a private elementary school in Penn Yan. In addition, the superseding indictment alleged that on February 22, 2015, the defendant traded synthetic cannabinoids to a minor in exchange for a stolen Savage .410 double barrel shotgun. At the time, the defendant had two prior felony convictions preventing him from legally possessing a gun."[155]

164.    On May 31, 2017, the Department of Justice issued a press release titled, "Buffalo Man Indicted For Distribution Of Cocaine, Crack Cocaine, Butyryl Fentanyl And Marijuana."[156]  The press release stated: "Acting U.S. Attorney James P. Kennedy, Jr. announced today that a federal grand jury has returned a 14-count indictment charging Tracy Bankston, 50, of Buffalo, NY, with conspiracy to distribute crack cocaine, cocaine, butyryl fentanyl, and marijuana. The defendant was also charged with possessing controlled substances with the intent to distribute; maintaining a drug-involved premises; possessing of a firearm in furtherance of a drug trafficking crime; and possessing of a firearm as a convicted felon."[157]  Additionally, the press release indicated, "Inside Bankston's bedroom, police

---

[154]  https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

[155]  https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

[156]  https://www.justice.gov/usao-wdny/pr/buffalo-man-indicted-distribution-cocaine-crack-cocaine-butyryl-fentanyl-and-marijuana

[157]  *Id.*

recovered over 28 grams of crack cocaine, two ounces of marijuana, scales, baggies, a Smith and Wesson

.357 caliber revolver, and a TEC-9 9mm pistol with an extended clip as well as nearly 100 rounds of .357

and 9mm ammunition with the 2 handguns."[158]

165.    On September 2, 2015, the Department of Justice issued a press release titled,

"Lackawanna Man Indicted On Gun Charge."[159]  The press release stated: "U.S. Attorney William J.

Hochul Jr. announced today that a federal grand jury has returned an indictment charging

Justin Vazquez, 29, of Lackawanna, NY, with being a felon in possession of a firearm."[160]

Additionally, the press release indicated, "Officers apprehended Vazquez in the kitchen. The

mother told police that Vazquez's gun was located in the back bedroom. A search recovered a

loaded Smith & Wesson AR-15 rifle. The defendant was previously convicted on a state

charge of Aggravated Criminal Contempt and therefore is not allowed to legally possess a firearm."[161]

166.    On June 13, 2019, the Department of Justice issued a press release titled, "Armed Drug

Trafficker Pleads Guilty."[162]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced

today that Demetrius Jackson, 43, of Rochester, NY, pleaded guilty today before U.S. District Judge

Charles J. Siragusa to possession with intent to distribute cocaine, and possession of a firearm and

ammunition by a convicted felon."[163]  Additionally, the press release indicated, "While searching the

---

[158]  *Id.*

[159]  https://www.justice.gov/usao-wdny/pr/lackawanna-man-indicted-gun-charge

[160]  *Id.*

[161]  *Id.*

[162]  https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-pleads-guilty-3

[163]  *Id.*

77

location, police officers found a green container with 10 small ziplock bags of cocaine in a bedroom which Jackson later admitted belonged to him.   In the same bedroom, secreted in a crawl space, officers found a Taurus .45 caliber semiautomatic handgun which was loaded with 11 rounds of ammunition."[164]

167.    On June 29, 2018, the Department of Justice issued a press release titled, "Elmira Man Sentenced On Drug Trafficking And Gun Charges."[165]  The press release provides, "U.S. Attorney James P. Kennedy, Jr. announced today that Devaughn Salazar, a/k/a "Snake," 41, of Elmira, NY, who was convicted following a jury trial of knowingly possessing with intent to distribute and distributing cocaine, possessing a firearm in furtherance of a drug trafficking offense, and being a felon in possession of a firearm, was sentenced to serve 80 months in prison by U.S. District Judge Charles J. Siragusa. Assistant U.S. Attorneys Sean Eldridge and Charles Moynihan, who handled the prosecution of the case, stated that on October 21, 2012, members of the Elmira Police Department recovered a Taurus .40 caliber pistol during a robbery investigation. Further investigation revealed that, in June of 2012, the owner of the handgun reported it stolen to the Addison Police Department. Agents from the Bureau of Alcohol Tobacco, Firearms and Explosives followed up and determined that the defendant acquired the handgun from Kevin Krowiak, the person who stole it, by trading cocaine for the gun. After acquiring the gun but prior to its recovery by the Elmira Police Department, defendant sold the gun to a third person. The defendant, having been previously convicted on May 6, 2009, in Steuben County Court of a felony offense, was legally prohibited from possessing any firearm."[166]

168.    On March 31, 2016, the Department of Justice issued a press release titled, "13 People Under Federal Arrest In Major Heroin And Gun Bust With Links To Philadelphia; Police Continue To

---

[164] *Id.*

[165] https://www.justice.gov/usao-wdny/pr/elmira-man-sentenced-drug-trafficking-and-gun-charges
[166] *Id.*

78

Search For An Additional Defendant."[167]  The press release provides, "U.S. Attorney William J. Hochul Jr. announced today 13 defendants have been arrested and charged by criminal complaint in a major heroin trafficking operation with links to Philadelphia, Pennsylvania. During the execution of search warrants following the arrests, law enforcement officers seized 22,713 decks of heroin, $93,399.00 in cash and nine firearms."[168]  It further provides, "According to the complaint, the case involves the trafficking of large quantities of heroin from a group of individuals located in Philadelphia, PA to a group of individuals in Rochester."[169]  Further, "1 KARNES STREET On March 11, 2016, during a traffic stop of Frank Figueroa, a search of his vehicle revealed a loaded Smith and Wesson revolver, 62 decks of heroin and 4.2 grams of powder cocaine, and $5,257 in cash. 440 THURSTON ROAD, Apt #108 On March 17, 2016, investigators executed a search warrant at the residence of Paris Montgomery. During the execution of the search warrant, investigators recovered two firearms, including a loaded Smith and Wesson 9mm, semi-automatic handgun and a Taurus, 45 caliber semi-automatic handgun, as well as 520 decks of heroin, numerous new, unused wax envelopes used in packaging heroin and $2,913 in cash.  909 SAINT BERNARD STREET, PHILADELPHIA, PA On March 22, 2016, a search warrant was executed at the residence of David Haynes. Investigators located approximately $25,000 in United States currency, a loaded Ruger 9mm semi-automatic handgun, scales and 73 grams of heroin. 304 WEST ERIE AVENUE, PHILADELPHIA, PA On March 22, 2016, a search warrant was executed at the residence of Edwin Rodriguez. Investigators located two handguns, including a loaded Bushmaster, .223 caliber rifle and a H&K 40 semi-automatic handgun, Ruger, 9mm semi-automatic handgun, approximately $6,000.00 in cash, and assorted ammunition. 2510 WEST DIAMOND STREET, PHILADELPHIA, PA On March 22, 2016, a search warrant was executed at the residence

---

[167]  https://www.justice.gov/usao-wdny/pr/13-people-under-federal-arrest-major-heroin-and-gun-bust-links-philadelphia-police

[168]  *Id.*

[169]  *Id.*

79

of Jerome Randolph. Investigators located a large amount of ammunition and several loaded gun clips, scales, a money counter, a police scanner and approximately $3,000. 89 ANGLE STREET On March 22, 2016, a search warrant was executed at the residence of Robert Cochran. During the search, investigators located a loaded 410 gauge Mossburg shotgun, 27 decks of heroin, new and unused ziplock narcotics bags, a scale, approximately $2,339 in cash, an empty shoulder holster and assorted 45 caliber ammunition. 97 MICHIGAN STREET On March 22, 2016, a search warrant was executed at the residence of Jonathan Figueroa. Investigators recovered a Smith and Wesson 9mm semi-automatic handgun, a Kimber 45 caliber semi-automatic handgun and a small amount of heroin."[170]

169.    On December 2, 2016, the Department of Justice issued a press release titled, "Buffalo Man Charged With Gun Crime."[171]  The press release provides, "Acting U.S. Attorney James P. Kennedy, Jr. announced today that Jesse Lewis, 46, of Buffalo, NY, was arrested and charged by criminal complaint with being a felon in possession of a firearm. The charge carries a maximum penalty of 10 years in prison and a $250,000 fine. Assistant U.S. Attorney Patricia Astorga who is handling the case, stated that according to the complaint, on September 30, 2016, Buffalo Police Officers, with the assistance of Lackawanna Police Officers, executed a search warrant at Lewis's residence at 234 North Ogden Street in Buffalo. During the search, officers recovered a Harrington and Richardson Arms Company .32 caliber revolver which was loaded with six rounds of ammunition. Officers also recovered cocaine and drug paraphernalia."[172]

170.    On April 4, 2014, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Drug Charges."[173]  The press release provides, "U.S. Attorney William J. Hochul, Jr. announced today that Anthony Grimes, 29, of Rochester, N.Y., pleaded guilty before U.S. District Judge

---

[170]  *Id.*
[171]  https://www.justice.gov/usao-wdny/pr/buffalo-man-charged-gun-crime
[172]  *Id.*
[173]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-drug-charges-1

Case 6:23-cv-06150-FPG-MWP Document 13-3 Filed 05/26/23 Page 409 of 727 PageID 4316

Charles J. Siragusa to possession with intent to distribute crack cocaine. The charge carries a maximum penalty of 30 years in prison, a fine of $2,000,000 or both. The defendant, a convicted felon on federal supervised release, also pleaded guilty to violating the terms of his supervision. Under the terms of the plea agreement, Grimes will receive a sentence of 204-235 months in prison. Assistant U.S. Attorney Robert A. Marangola, who is handling the case, stated that Grimes was arrested October 2, 2013 after U.S. Probation officers searched his residence at 7 Grace Street in Rochester. During the search, officers seized crack cocaine packaged for street sale, a loaded, Beretta .380 Auto caliber semiautomatic pistol, $220 in U.S. currency, and a digital scale all secreted in a women's purse. Officers also seized additional drug trafficking paraphernalia, including packaging material in the residence."[174]

171.    On June 16, 2016, the Department of Justice issued a press release titled, "Rochester Man Sentenced On Drug And Gun Charges."[175]  The press release provides, "U.S. Attorney William J. Hochul, Jr. announced today that Ronald Dodd, 32, of Rochester, NY, who was convicted of possession with intent to distribute heroin, and possession and brandishing of a firearm in furtherance of a drug trafficking crime, was sentenced to nine years in prison by U.S. District Judge Charles J. Siragusa. The defendant was also ordered to forfeit a .380 caliber pistol and rounds of ammunition. Assistant U.S. Attorney Robert A. Marangola, who handled the case, stated that shortly after midnight on August 15, 2015, Rochester Police Department Officers responded to a report of gunfire at 431 Lake Avenue in Rochester. Officers spoke to a witness who stated that an unknown black male on a bike had pulled out a handgun from his waist and yelled that this was "his hood" during an argument outside the residence. Shortly afterward, witnesses heard gunshots and the gunman left the area.  Responding officers observed Dodd riding a bike a short distance away and pursued him. The defendant fled but officers apprehended him hiding behind a bush at 17 Phelps Avenue. Dodd had three bags of marijuana, two

---

[174] *Id.*
[175] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-drug-and-gun-charges-2

bags of heroin, and two bags of cocaine in his pants. There was a stolen, Bryco Arms .380 semi-automatic handgun on the ground next to a tree where Dodd was apprehended."[176]

172.   On October 28, 2016, the Department of Justice issued a press release titled, "Franklinville Man Sentenced On Gun Charge; Violating Supervised Release."[177] The press release provides, "U.S. Attorney William J. Hochul, Jr. announced today that Salvatore Faliero, 53, of Franklinville, NY, who was convicted of being a felon in possession of a firearm, was sentenced to 12 months in prison by Senior U.S. District Judge William M. Skretny. In addition, the defendant was sentenced to 15 months in prison (to be served concurrently to the 12 month sentence on the gun charge), for violation of supervised release. Faliero was on federal supervised release following a 2009 conviction of accessory after the fact when he was arrested on the gun charge. Soon after this third complaint, troopers observed the defendant driving his red Honda CRV and stopped the vehicle. Troopers discovered a loaded Marlin, Model 336W, 30-30 caliber lever action rifle on the back seat of the vehicle. Ammunition for the firearm was found on the center console. Faliero admitted that he had been using the rifle. In September 1985, the defendant was convicted in state court of Attempted Criminal Possession of a Controlled Substance. In October 1998, Faliero was convicted in Cattaraugus County Court of Attempted Burglary followed by his 2009 federal conviction.   As a result, the defendant is prohibited from legally possessing a firearm."[178]

173.   On December 17, 2014, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty To Drug & Firearm Possession."[179] The press release provides, ".S. Attorney William J. Hochul, Jr. announced today that Leroy J. Smith, 37, of Rochester, NY, pleaded

---

[176] *Id.*

[177] https://www.justice.gov/usao-wdny/pr/franklinville-man-sentenced-gun-charge-violating-supervised-release

[178] *Id.*

[179] https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-drug-firearm-possession

guilty plea to possession of a firearm as a convicted felon, and possession of a firearm in furtherance of a drug trafficking crime before U.S. District Judge Frank P. Geraci. The charges carry a mandatory minimum sentence of five years in prison and a maximum of life. Assistant U.S. Attorney Robert Marangola, who is handling the case, stated that between January and June 2012, the defendant possessed a 20 gauge shotgun while he was also in possession of quantities of marijuana for distribution. Smith came to the attention of law enforcement in 2013 during a law enforcement initiative in the vicinity of Linnert Street in Rochester. At that time, the defendant was in possession of a Colt .38 caliber double action revolver."[180]

174. On September 17, 2014, the Department of Justice issued a press release titled, "Greece Woman Sentenced for Supplying Guns Used in Christmas Eve Shooting."[181] The press release provides, "U.S. Attorney William J. Hochul, Jr. announced today that Dawn Nguyen, 25, of Greece, N.Y., who was convicted of knowingly making a false statement in connection with the purchase of firearms; selling and disposing of firearms to William Spengler, a known felon; and possession of firearms while being an unlawful user of marijuana, was sentenced to 96 months in prison by U.S. District Judge David G. Larimer. The charges involve the purchase and disposition of the firearms that were used in the Christmas Eve shooting in December 2012 that resulted in the deaths of Webster Police Lieutenant Michael Chiapperini and West Webster Firefighter Tomasz Kaczowka, and seriously injured Firefighters Theodore Scardino and Joseph Hostetter. Assistant U.S. Attorney Jennifer Noto, who handled the case, stated that Nguyen made false statements during the purchase of a Bushmaster semiautomatic rifle and a Mossberg 12 gauge shotgun at Gander Mountain in Henrietta, N.Y., in order to acquire those firearms on behalf of William Spengler, Jr. The defendant gave those firearms to Spengler with the knowledge

---

[180] *Id.*
[181] https://www.justice.gov/usao-wdny/pr/greece-woman-sentenced-supplying-guns-used-christmas-eve-shooting

that Spengler was a convicted felon. In addition, Nguyen unlawfully possessed the firearms at a time when she was an unlawful user of marijuana."[182]

175.    Handguns manufactured, imported or distributed by Defendants are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City.

## IV.    The Trace Database

176.    An ATF gun "trace" identifies (a) the FFL that initially sold a gun recovered at a crime scene, (b) the manufacturer of the gun, and (c) the initial gun purchaser. The Trace Database traces a gun through the primary market, namely from the gun manufacturer or importer, distributor and retail dealer to the first retail purchaser. Defendants are an integral part of the tracing system because they receive requests for gun traces from ATF and other local law enforcement agencies.

177.    The gun traces contained in the Trace Database overwhelmingly involve guns recovered in connection with a crime.

178.    There is a statistically significant relationship between the number of homicides in various states and the number of dealers with firearms traced in those states.

179.    By receiving trace requests from the ATF, manufacturers and distributors learn that guns sold by them were involved in crimes and can easily determine which specific retail dealers sold the guns.

180.    Although trace data do not provide manufacturers and distributors with all conceivable information about a particular trace, when a disproportionate number of traces is attributable to a particular retailer, a prudent manufacturer or distributor has the ability to ensure that its guns are not falling into criminals' hands through lax practices by that retailer. Excessive numbers of traces to specific retailers or first purchasers can serve as cause for concern on the part of the manufacturers and

---

[182] *Id.*

distributors, who are not foreclosed from closing off illegal flows of their guns to such retailers. Defendants can take steps based on trace leads without interfering with or endangering law enforcement personnel. There is no ATF position or pronouncement that would preclude Defendants from using the elements of trace data available to them to institute more prudent merchandising practices to reduce the numbers of guns obtained from their retail dealers by criminals for use in crimes.

181. Although an FFL with a large number of sales may for that reason have a larger number of traces, data from the Trace Database have established that for many dealers, the number of traces is much larger than would be predicated based on sales volume. Although a large number of traces is not itself proof of wrongdoing by the FFL, there is nothing to prevent Defendants from investigating whether volume alone accounts for the traces.

182. Responsible merchandising using trace data available to Defendants would not interfere with pending or prospective law enforcement proceedings and there is nothing inconsistent between ATF's efforts and use of the data by Defendants to reduce the flow of their firearms to criminal elements.

183. There are indicators other than amount of sales that predict that a dealer's guns are more likely to end up in the hands of criminals. Some indicators are: (1) out-of-state traces; (2) obliterated serial number traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and same dealer; (4) multiple sales forms; (5) traces from multiple sales; (6) record- keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically closer dealers — i.e., the purchaser for illegal use goes out of his way geographically to buy from certain retailers. If manufacturers made use of these indicators to police their customers, the volume of their guns diverted into the secondary market would be reduced.

184. Sufficient information in the trace database has been made available to Defendants (or would have been made available to any Defendant that had sought the information) so that each

Case 1:23-cv-00065-LG-RPM   Document 13-3   Filed 05/26/23   Page 414 of 727   PageID 4321

Defendant could have improved its distribution system to reduce the number of guns obtained by criminals.

185.    Upon information and belief, firearms manufactured, imported, or distributed by Defendants that were sold by dealers with a disproportionately large number of traces or other indicators of improper sales practices have been, and continue to be, diverted to the illegal market in New York, and used to cause injury or death or the threat thereof to residents of the City and surrounding communities.

## V.    Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market

186.    According to Robert Haas, the former Senior Vice President for Marketing and Sales for defendant Smith & Wesson, the gun industry knows that the criminal market is fueled by the industry's distribution practices, but does nothing:

> The company and the industry as a whole are fully aware of the extent of the criminal misuse of firearms. The company and the industry are also aware that the black market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices . . . .

> I am familiar with the distribution and marketing practices of all of the principal U.S. firearms manufacturers and wholesale distributors and none of them, to my knowledge, . . . investigate, screen or supervise the wholesale distributors and retail outlets that sell their products to insure that their products are distributed responsibly.

187.    In March 2000, Smith & Wesson agreed to accept a wide array of restrictions on the way it makes, sells and distributes hundreds of thousands of handguns each year in exchange for ending some lawsuits that had threatened to bankrupt it.[183]   Under the agreement, which was immediately criticized by other gun manufacturers, Smith & Wesson would place a second, hidden set of serial numbers in all

---

[183]   https://www.nytimes.com/2000/03/18/us/under-legal-siege-gun-maker-agrees-to-accept-curbs.html

its new guns to make it harder for criminals to scratch away those identifying marks.[184]  The company

promised to sell with each new handgun a small lock that prevents the trigger from being pulled.[185]  And

the agreement required, within three years, "smart-gun technology" that would allow each of its new

handguns to be fired only by authorized users.[186]  The agreement also established a "code of conduct"

for Smith & Wesson's authorized dealers and distributors that would prohibit them, under threat of

losing their franchises, from selling guns at gun shows unless the buyers have passed background

checks.[187]  Additionally, in a provision intended to discourage illegal gun trafficking, people who buy

more than one gun from a Smith & Wesson dealer would be allowed to take home just one gun on the

day of the sale, and will have to return 14 days later to claim the rest.[188]  Unfortunately, Defendants such

as Glock refused to sign on to the Smith & Wesson deal.[189]

188.    "But pro-gun advocates saw the agreement as a rank betrayal, and the National Rifle

Association said the company had 'run up the white flag of surrender.' Under pressure from the boycott,

sales fell 40 percent, and Smith & Wesson closed two factories. In 2001, Tompkins PLC, its British

owner, sold the company to a U.S. buyer for $15 million, a fraction of the price it had paid for it just a

few years earlier."[190]  "Yet in just a few years, Smith & Wesson was back on its feet and well on its way

to regaining its position at the top of U.S. gun manufacturers. A key element of its strategy was openly

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] https://www.cnn.com/2000/ALLPOLITICS/stories/03/21/glock.guns/

[190] https://www.huffpost.com/entry/smith-wesson-clinton-bush-nra_n_2348503

repudiating the terms of the Clinton gun safety deal and introducing a new line of high-capacity pistols and its first-ever, assault-style rifle, which became top-sellers for the company."[191]

189.     As evidenced by Smith & Wesson's agreement to accept the restrictions in 2000,[192] Defendants are able to implement such restrictions, but choose not to.[193]

190.     Robert Ricker, an individual with years of experience as a National Rifle Association and gun industry trade association official, has testified in another lawsuit that the gun industry is aware of the means by which firearms are diverted from the legal to the illegal market. He has testified that the industry knows that gun traces are indicators of problems at the dealer level and are adequate notice to all upstream distribution entities of these problems. He has testified that dealers often falsely report guns as stolen, as a means of covering up trafficking. According to Mr. Ricker, industry members have not addressed the problems posed by unsupervised dealers because "if the industry took voluntary action, it would be admitting responsibility," and "the concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem."

## VI.     Merchandising Practices that Could Reduce Illegal Diversion

191.     Certain merchandising practices by the Gun Manufacturer Defendants and the Gun Distributor Defendants could substantially reduce guns flowing into criminal hands, thereby avoiding many murders and injuries.

---

[191]  *Id.*

[192]  For a summary of the deal, see: https://archives.hud.gov/news/2000/gunagree.html. The full text is available here:
https://www.nraila.org/articles/20000317/smith-wesson-settlement-agreement.

[193]  For analysis of the decision of Smith & Wesson not to abide by the deal, *see* Daniel P. Rosner, Note, *In Guns We Entrust: Targeting Negligent Firearms Distribution*, 11 Drexel L. Rev. 421, 438-41 (2018).

192.    There is a statistically significant relationship between the use of certain distribution oversight practices followed by a manufacturer and the manufacturer's ratio of trace share to market share.

193.    Manufacturers that have adopted the following practices have smaller crime-gun ratios (i.e. ratio of guns traced, as part of a criminal investigation, to total guns sold): (i) requiring evidence of a storefront, (ii) having an authorized dealer program, (iii) maintaining records of sales to individual dealers, (iv) visiting dealers frequently, (v) commissioning market studies, (vi) maintaining distributor agreements, (vii) imposing controls over how the product is advertised, and (viii) inquiring about inventory level of distributors.

194.    Standard marketing mechanisms that could have been employed by these Defendants using their existing marketing infrastructures to prevent diversion of guns into the secondary market include: (i) requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; (ii) developing a management code establishing standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; (iii) requiring minimum inventory; (iv) imposing liability insurance standards; (v) limiting sales at gun shows; (vi) limiting multiple sales; (vii) limiting how the consumer gun transaction can be conducted to insure security; (viii) education and training of dealers; and (ix) monitoring dealers through visitation and other regular interaction.

195.    If the Gun Manufacturing Defendants entered into such marketing and distribution agreements with their distributors and dealers, there would be a significant reduction in the flow of firearms into the State of New York, including the City.

196.    If the Gun Manufacturing Defendants and Gun Distribution Defendants provided training in proper sales and distribution practices to those in the primary firearms market, many firearms

would not have found, and will not in the future find, their way into the secondary market in New York and the City.

197.     If these Defendants had studied available trace request data and acted upon that data to better control their downstream customers, they could have used the information to prevent injury or death or the threat thereof to the City and its residents. The necessary information was and is available to them.

198.     Upon information and belief, the Gun Manufacturing Defendants make no meaningful effort to supervise or regulate the practices of either the distributors or dealers who sell their products to the public, despite their knowledge that particular dealers are known to supply large numbers of guns used to commit crimes. Because it is to their economic advantage, these Defendants exercise contractual control over their distributors and dealers in such areas as pricing and advertising, but fail to impose on the same distributors and dealers contractual arrangements by which they could regulate the sale and disposition of their guns. The Gun Manufacturing Defendants have instead adopted a strategy of willful blindness to the conduct of their distributors and dealers that facilitates the entry of their guns into the illegitimate market.

## VII.     2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits

199.     On July 27, 2022, the U.S. House of Representatives issued a Memorandum by the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits. [194] "Following mass shootings in Buffalo, New York, and Uvalde, Texas, the Committee launched an investigation into the leading manufacturers of AR-15-style assault rifles."[195]

---

[194] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

[195] *Id.* at 1.

200. The Memorandum contained the following findings:

- "These companies sell weapons to civilians that are engineered to kill many people as fast as possible. These rifles are the weapon of choice for mass murderers who have terrorized and slaughtered young children at school, worshippers at churches and synagogues, and families celebrating the Fourth of July. On May 26, 2022, the Committee sent letters to five gun manufacturers seeking information on their sale and marketing of these deadly firearms and any efforts to monitor or track safety data related to their products. The manufacturers — Bushmaster, Daniel Defense, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company — have all made and sold AR-15-style semiautomatic weapons that have been used in mass shootings."[196]

- "The Committee has learned that gun companies collected more than $1 billion over the last decade from selling military-style assault weapons to civilians, even as gun violence increased across the United States. These companies used disturbing sales tactics — including marketing deadly weapons as a way for young men to prove their manliness and selling guns to mass shooters on credit — while failing to take even basic steps to monitor the violence and destruction their products have unleashed."[197]

201. "Documents and information obtained by the Committee show":[198]

---

[196] *Id.*

[197] *Id.*

[198] *Id.*

91

- Gun manufacturers collected more than $1 billion from the sale of AR-15-style semiautomatic weapons in the last decade — and sales are increasing as gun deaths and mass shootings rise.

    i. Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million.

    ii. Smith & Wesson's revenue from all long guns, which include AR-15-style rifles, more than doubled between 2019 and 2021, from $108 million to $253 million.

    iii. Combined, these five manufacturers push hundreds of thousands of military-grade AR-style rifles into communities every year.

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

    i. Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

    ii. Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

    iii. Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

92

- Gun manufacturers fail to track or monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

  i. All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

  ii. Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

  iii. Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

202. Additionally:

- Bushmaster made the assault weapon used in the Sandy Hook mass shooting in Newtown, Connecticut, in 2012, and in the recent white supremacist attack in Buffalo, New York. A Bushmaster AR-15-style rifle was also used in the sniper attacks in Washington, D.C., in 2002. The company was previously a part of Remington, the nation's largest gun company. Remington filed for bankruptcy in 2018, and Franklin Armory purchased the Bushmaster trademark and

93

continues to manufacture substantially similar AR-15-style rifles, trading on the reputation, history, and notoriety of the Bushmaster name.[199]

- Sig Sauer sold the AR-15-style rifle used by a mass shooter to kill 49 people at Pulse nightclub in Orlando, Florida, in 2016, and three of the weapons used by the shooter in Las Vegas, Nevada, in 2017 to kill 60 people. The company recently won the contract to replace the U.S. Army's M-4 carbine and is selling a version of its new rifle to civilians "in a configuration that is a near match" to what America's soldiers will soon be carrying into battle.[200]

- Smith & Wesson sold the assault weapons used in the Fourth of July massacre in Highland Park, Illinois, as well as the mass shootings in Parkland, Florida, in 2018, and San Bernadino, California, in 2015. Smith & Wesson was the second largest maker of rifles in the United States in 2020.[201]

- Sturm, Ruger & Company, Inc. Ruger's AR-15-style rifle and pistol variants were used by mass shooters in Sutherland Springs, Texas, in 2017 and Boulder, Colorado, in 2021. Ruger is the largest maker of rifles of all types in the United States.[202]

203. The Memorandum continued with findings regarding profits, sales, and deaths from guns:[203]

---

[199] *Id.* at 3-4 (internal citations omitted).

[200] *Id.*

[201] *Id.* at 4-5.

[202] *Id.* at 5.

[203] *Id.* at 5-6.

94

Case 3:23-cv-00066-MSS-FCW Document 23-1 Filed 09/08/23 Page 400 of 727 PageID 4330

- The Committee has obtained internal financial data showing that major gun manufacturers have been enjoying record-breaking sales and profits from AR-15-style rifles, even as gun deaths and mass shootings have risen in the United States.

- In the past decade, these five manufacturers have collectively amassed more than $1 billion in revenue from AR-15-style firearms. Sales skyrocketed in 2021. According to data obtained by the Committee, in 2021, Daniel Defense and Ruger nearly doubled their revenues from the sale of AR-15-style firearms compared to the previous year, with each company accumulating more than $100 million in gross sales from these weapons.

- Smith & Wesson refused to provide specific revenue and profit information for its AR-15-style firearms, instead providing aggregate "long gun" revenues that totaled over $250 million in 2021, more than doubling from 2020. Smith & Wesson informed the Committee that assault rifles make up more than half of overall long gun sales, meaning the company brought in at least $125 million from AR-15 style rifles in 2021 alone.

- Sig Sauer claimed it did not track revenue and profits from specific product lines but stated that AR-15-style rifles make up approximately 3% of its total revenues — financial figures that it has refused to provide to the Committee.

- Bushmaster claimed to the Committee that, as a "new company," it had no financial data from the previous owners of the Bushmaster trademark, despite public reporting that the 2020 sale of the brand to Franklin Armory included

"historic sales, vendor and customer data," and "the technical data packages for numerous Bushmaster-branded firearms."[204]

| Figure 1: AR-15-Style Rifle Revenue and Recent Mass Murders | | |
|---|---|---|
| | *AR-15-Style Rifle Revenue, 2012-2021* | *Recent Mass Murders with the Company's AR-15-Style Rifles* |
| SMITH & WESSON | At Least $695 Million | Highland Park (7 dead) Parkland (17 dead) San Bernardino (14 dead) |
| RUGER | $514 Million | Sutherland Springs (25 dead) Boulder (10 dead) |
| DANIEL DEFENSE | $528 Million | Uvalde (21 dead) Las Vegas (60 dead)* |
| SIG SAUER | REFUSED | Orlando (49 dead) Las Vegas (60 dead)* |
| BUSHMASTER | $2.9 Million (2021 Only) | Buffalo (10 dead) Sandy Hook (27 dead) |

\* Killer used weapons from multiple companies

204. In addition, the Memorandum set forth:[205]

- Figure 2 below shows annual rifle revenues for Smith & Wesson, Daniel Defense, and Ruger from 2012 through 2021. Each of these companies has seen significant increases in revenue from assault weapons since 2019. Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from

---

[204] *Bushmaster Announces a Comeback*, Guns.com (Feb. 15, 2021) (available at www.guns.com/news/2021/02/15/bushmaster-announces-a-comeback).

[205] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 6-9.

96

$39 million to over $103 million. Smith & Wesson provided only data on gross revenues from all long-gun sales, which include AR-15-style rifles. The company's revenue from that broad category of weapon more than doubled between 2019 and 2021, from $108 million to $253 million.



- During the Committee's June 8, 2022, hearing on gun violence, gun industry expert Nick Suplina noted that "the gun industry has grown tremendously over the last two decades, business is booming, [and] profits are breaking records." He further remarked that "so are rates of gun violence."

- According to data from the Centers for Disease Control and Prevention and other sources, 2020 and 2021 witnessed the highest gun-related death totals in the United States in decades.

97

- Studies by the Harvard Injury Control Research Center have found a strong correlation between an increase in gun availability and rates of homicides, suicides, and accidental gun deaths.[206]

- Figure 3 below shows the annual number of gun-related deaths from 2012 through 2021.

- Figures 4a and 4b show internal rifle sales data from this same period. Daniel Defense and Ruger's figures are for "AR platform" rifles only. Smith & Wesson reported total long gun sales, although the company reported that AR-15-style rifles comprise more than half of that category. Sig Sauer and Bushmaster refused to provide concrete information on the number of AR-15-style rifles sold during this requested time-period.

---

[206] Citing Harvard T.H. Chan School of Public Health, Harvard Injury Control Research Center, *Firearms Research — Homicide* (online at www.hsph.harvard.edu/hicrc/firearms-research/guns-and-death) (accessed July 14, 2022).

98

Case 8:23-cv-00066-MSS-FCW Document 23-1 Filed 09/08/23 Page 427 of 727 PageID 1534







*Figures 4a and 4b include "AR platform" rifles sold by Daniel Defense and Ruger and all long guns sold by Smith & Wesson.*

- The Committee's findings are consistent with longstanding trends of the gun industry. Gun sales tend to peak in the immediate aftermath of elections, civil unrest, and mass shootings, resulting partly from consumer anxieties and panic-

99

purchasing.[207] This pattern culminated in record-breaking sales numbers for all firearm types during the coronavirus pandemic.[208]

- A June 2021 Smith & Wesson investor presentation bragged, "In a year of turmoil, we gained market share" and concluded, "we're just getting started."[209]

- The editor of a gun industry trade magazine described the first year of the coronavirus pandemic, when gun sales and gun deaths reached unprecedented levels, as a moment of "opportunity" for gun manufacturers.[210]

205. The Memorandum also provided its findings regarding the marketing practices of gun manufacturers:[211]

- The Committee's investigation found that gun manufacturers' multimillion-dollar marketing campaigns have emphasized the AR-15-style rifle's military roots and its capacity to kill. The investigation also showed that gun makers use aggressive financing tactics to entice buyers. This is consistent with testimony at the Committee's June 8, 2022, hearing from Nick Suplina, who explained that

---

[207] Citing "An Arms Race in America: Gun Buying Spiked During the Pandemic. It's Still Up," *New York Times* (May 29, 2021) (online at www.nytimes.com/2021/05/29/us/gun-purchases-ownership-pandemic.html); "The Pandemic and Fears of Civil Unrest Led to a Historic Boom in Gun Sales This Year," *Buzzfeed News* (Nov. 3, 2020) (online at www.buzzfeednews.com/article/peteraldhous/2020-record-us-gun-sales-election).

[208] *Id.*

[209] Citing *Shootings Have Surged—and Gun Companies Have Made Billions*, Rolling Stone (May 27, 2022) (online at www.rollingstone.com/politics/politics-news/gun-profits-surge-violence-1359155).

[210] *Id.*

[211] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 9-20.

"in a now crowded field, manufacturers of these guns are trying to market in increasingly brazen ways, often touting the deadliness of products, glorifying combat, and attempting to appeal to younger audiences."[212]

- Documents obtained by the Committee show that gun manufacturers use a variety of incentives and tactics to increase sales, including allowing their products to be purchased easily online, and offering rebates, free gifts, and financing opportunities for purchasing their weapons. Although these sales and financing innovations are not unique to the gun industry, these products are far more dangerous than other consumer goods. Daniel Defense, the manufacturer of the rifle purchased and used by the Uvalde shooter, offers its firearms for sale through a buy-now, pay-later, financing system advertised on the front page of its website.[213] To order the exact weapon used by the shooter in Uvalde requires just five clicks, and a pickup at a local gun store which includes a background check and proof of age.[214]

- The Committee has obtained documents showing that gun manufacturers seek to leverage the military lineage of the AR-15 to increase sales to civilians,

---

[212] Citing Committee on Oversight and Reform, Testimony of Nick Suplina, Senior Vice President for Law and Policy, Everytown for Gun Safety, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Suplina%20Testimony.pdf).

[213] Citing "Buy Now, Pay Later Dragged into Uvalde Shooting Controversy," *Australian Financial Review* (May 30, 2022) (online at www.afr.com/markets/equity-markets/buy-now-pay-later-dragged-into-uvalde-shooting-controversy-20220529-p5apdi); Daniel Defense, *Shooting Sports Financing* (online at https://danieldefense.com/daniel-defense-financing) (accessed June 23, 2022).

[214] Citing "We Ordered the Same Gun Used in Uvalde. Here's How Easy It Was," *Quartz* (May 26, 2022) (online at https://qz.com/2170207/we-ordered-the-ar-15-rifle-used-in-uvalde-heres-how-easy-it-is).

101

depicting their AR-15-style rifles with military and law enforcement units and alongside their uniforms. These advertisements draw a direct connection between AR-15-style weapons on the civilian market and weapons of war, whose sole purpose is to inflict as many casualties in combat as possible.

- One advertisement produced to the Committee — shown below — depicts a Smith & Wesson M&P rifle, a variant of the AR-15, as "the chosen one" that is "selected by professionals," featuring the insignia of police, sheriff, highway patrol, and other law enforcement. In a complaint to the Federal Trade Commission alleging unfair and deceptive marketing practices, the Brady Center to Prevent Gun Violence and Everytown for Gun Safety have alleged that Smith & Wesson advertisements contain false endorsements from military and law enforcement. The complaint details that "only a small percentage of Smith & Wesson's overall sales are to law enforcement, and those appear to be mostly handguns, not rifles." The complaint also notes that Smith & Wesson has secured only one military contract in the past decade, a 2012 contract to deliver 250 revolvers destined for Thailand.[215]

---

[215] Citing "Letter from Brady: United Against Gun Violence and Everytown for Gun Safety to Acting Director Samuel Levine, Bureau of Consumer Protection, Federal Trade Commission" (Aug. 17, 2021) (online at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/2021.08.17-SW-FTC-Submission.pdf).

102

Case 3:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 408 of 707 PageID 1558



- Young people with an affinity for law enforcement and the military have purchased assault weapons marketed in this manner, and some of these young people have used them to kill civilians. The shooters in the Parkland, Florida; Kenosha, Wisconsin; and Poway, California; synagogue shootings were all teenagers drawn to the military and law enforcement. The Parkland shooter was a student in his Junior Reserve Officer Training Corps class and member of the school's air rifle team, while Kyle Rittenhouse, who fatally shot two people and injured a third at a Black Lives Matter protest in Kenosha, Wisconsin, planned a career in law enforcement after being turned away from the military. The Poway, California, shooter wrote a militaristic, anti-Semitic manifesto and described himself as a soldier defending his country. All three used Smith & Wesson M&P rifles, like the one pictured above.[216]

- Sig Sauer also prominently features its military connections in advertisements to civilian gun buyers. Sig Sauer advertisements obtained by the Committee make explicit visual and textual connections between their AR-15-style civilian rifles

---

[216] Citing *id.*

103

Case 3:23-cv-00066-MSS-TGW Document 23-1 Filed 09/08/23 Page 432 of 727 PageID 4569

and the military. The advertisement for the company's popular SIG MCX Virtus AR-15 platform, below, exemplifies several of these techniques.



- Though the rifle is being advertised to civilians, the advertisement shows five men in a destroyed building in a warzone. All are wearing military-style camouflage and tactical gear emblazoned with camouflage American flags and are carrying military versions of the Sig Sauer rifle. The rifle held by one the central kneeling figures appears to be modified with a grenade launcher. The text

104

of the advertisement emphasizes that the rifle's "modularity" makes it "ready for every possible mission."

• Sig Sauer's website reinforces the impression that this rifle, despite being sold to civilians, is intended for military use. The product page for the "patrol" version of the MCX Virtus boasts that the original version of the rifle was "conceived for the demands of the Special Operations community" and describes the rifle as "the apex predator of the carbine world."[217]

• Ruger did not produce any marketing materials to the Committee that referenced military or law enforcement themes. In 2010, however, the company used military themes to market weapons of war to civilians. As documented by the Violence Policy Center, Ruger advertised its Mini-14 Tactical Rifle (below) as "Combat Customized."[218]



• Advertisements obtained by the Committee also seek to appeal to consumers' masculinity, suggesting that purchasing an assault rifle will allow the consumer

---

[217] Citing Sig Sauer, "Sig MCX Virtus Patrol" (online at www.sigsauer.com/sig-mcx-virtus-patrol.html) (accessed July 18, 2022).

[218] Citing Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market* (June 2011) (online at https://vpc.org/studies/militarization.pdf).

105

to retain their "manhood." One Bushmaster advertisement depicts an AR-15 with the caption, "Consider your mancard reissued." Another advertisement suggests that by purchasing an AR-15, "your status at the top of the testosterone food chain is now irrevocable." One commentator found that the intended effect of these advertisements appeared to be to "humiliate men into arming themselves with combat weapons."[219]

 

- Gun manufacturer advertisements often combine the promise of an adrenaline rush with violent undertones. One Smith & Wesson advertisement obtained by the Committee depicts spent shell casings, its M&P rifle, and the caption, "Kick Brass." The advertisement claims the rifle will deliver "Pure Adrenaline."

---

[219] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

106

F-2022-121-21-21-10-381-M
INDEX #: E2022010581
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 12/21/2022
Case 3:23-cv-00066-MSS-FCW Document 23-3 Filed 05/08/23 Page 435 of 727 PageID 1502



- Other manufacturers have used similar advertising techniques. In April 2022, Remington settled a landmark lawsuit for $73 million with the parents of children killed in Sandy Hook Elementary School, marking the first time since the enactment of the Protection of Lawful Commerce in Arms Act (PLCAA) that a firearm manufacturer was held liable for the destruction and death caused by its product. Plaintiffs successfully argued that Remington "tapped into anxieties of masculinity" to sell firearms to "impressionable" and lonely young men who are prone to violence.[220]

---

[220] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

107

Case 8:23-cv-00056-GLW Document 23-3 Filed 09/08/23 Page 436 of 727 PageID 4603

- The firearm industry has been marketing directly and indirectly to white supremacist and extremist organizations for years, playing on fears of government repression against gun owners and fomenting racial tensions. The increase in racially motivated violence has also led to rising rates of gun ownership among Black Americans, allowing the industry to profit from both white supremacists and their targets.

- Extremist imagery has frequently appeared on merchandise available at large industry-sponsored conventions such as the National Shooting Sports Foundation (NSSF) Shot Show and the NRA Annual Meeting, as well as in advertisements by major gun manufacturers.[221]

- There have been an increasing number of mass shootings in recent years carried out by shooters acting on their white supremacist beliefs, including the shootings in Buffalo, El Paso, and at the Tree of Life Synagogue in Pittsburgh.[222]

- As a result of the increase in racially motivated violence, firearms manufacturers profit from the business of both white supremacists and those extremists' targets. Gun ownership among Black Americans has soared by more than 50% since 2020, in response to increasing gun violence and the spike in anti-Black hate

---

[221] Citing "The Gun Industry Created a New Consumer. Now It's Killing Us," *The Atlantic* (July 25, 2022) (online at www.theatlantic.com/ideas/archive/2022/07/firearms-industry-marketing-mass-shooter/670621).

[222] Citing "White Supremacist Extremism Takes Up Arms in the United States," *El País* (May 22, 2022) (online at https://english.elpais.com/international/2022-05-22/white-supremacism-takes-up-arms-in-the-united-states.html).

108

crimes.[223] The firearms industry has capitalized on this fear and begun marketing directly to minority communities with taglines such as "it's a jungle out there," and "mi casa no es sú casa."[224] This marketing has increased the number of guns in these communities, which are already the most negatively impacted by rampant gun violence. Black Americans experience gun violence and assaults at dramatically higher rates than other ethnicities.[225]

- Documents provided to the Committee show how manufacturers use the imagery of first-person shooter video games to market their products. Below is a comparison of two Smith & Wesson M&P advertisements and the video game Call of Duty Modern Warfare, in which the player is using a similar M4 rifle.[226]

- Smith and Wesson advertisements:

---

[223] Citing "Why More Black People Are Looking for Safety in Gun Ownership," *NBC News* (June 14, 2022) (online at www.nbcnews.com/news/nbcblk/black-people-are-looking-safety-gun-ownership-rcna32150); "Black Americans Flock to Gun Stores and Clubs: 'I Needed to Protect Myself,'" *The Guardian* (Apr. 5, 2021) (online at www.theguardian.com/us-news/2021/apr/05/us-gun-ownership-black-americans-surge).

[224] Citing Violence Policy Center, *How the Firearms Industry and NRA Market Guns to Communities of Color* (Jan. 2021) (online at www.vpc.org/studies/marketingexecsum2021.pdf).

[225] Citing Everytown for Gun Safety, *Impact of Gun Violence on Black Americans* (online at www.everytown.org/issues/gun-violence-black-americans) (accessed June 30, 2022).

[226] Citing "Just Found Out About the Cleanest Iron Sight for the M4," *Reddit* (May 3, 2020) (online at www.reddit.com/r/modernwarfare/comments/gcnhdr/just_found_out_about_the_cleanest_iron_sight_for) (accessed July 25, 2022).

20231321103882

FILED: MONROE COUNTY CLERK 12/21/2022 10:06 AM    INDEX #: E2022010581

NYSCEF DOC. NO. 2    Case 8:23-cv-00006-SSS-FGW Document 23-3   Filed 09/08/23   Page 438 of 727 PageID 1625    RECEIVED NYSCEF: 12/21/2022



- Call of Duty Modern Warfare video game:



- Gun manufacturers also enter into licensing agreements to have their weapons featured in first-person shooter video games. Ralph Vaughn, who negotiates licensing agreements with game developers on behalf of sniper rifle manufacturer Barrett, said: "It is hard to qualify to what extent rifle sales have increased as a result of being in games, but video games expose our brand to a young audience who are considered possible future owners."[227]

206. The Memorandum also set forth the Committee's findings with regard to the gun industry's failure to track crimes and deaths caused by its products:[228]

- The Committee's investigation found that the five gun manufacturers under review do not have any systems in place to monitor and analyze deaths and injuries associated with their products.[229]

- In response to the Committee's inquiries, all five companies asserted that they do not monitor or track injuries and deaths caused by their AR-15-style rifles, either from accidental discharge, product malfunction, or deliberate use, nor do they track crimes committed with the products.

---

[227] Citing "Shooters: How Video Game Fund Arms Manufacturers," *Eurogamer* (May 14, 2019) (online at www.eurogamer.net/shooters-how-video-games-fund-arms-manufacturers).

[228] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf at 20-22.

[229] Citing Committee on Oversight and Reform, *Press Release: Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022) (online at https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons).

111

- Bushmaster represented that it "does not formally 'monitor' or 'track'" incidents,[230] and also claimed that there were no such deaths or injuries with its products, even though the mass shooter in Buffalo used a Bushmaster-brand assault weapon to kill ten people.[231]

- Ruger emphasized that the company becomes aware of deaths, injuries, and crimes associated with its products only through its "customer service department, through media reports, or occasionally in connection with actual or potential litigation." Ruger maintained that it deals with each customer claim of injuries or deaths associated with its products individually, and "does not create or maintain records based upon the nature of the injury claimed."[232]

- Sig Sauer asserted that it does "not have the means" to track such incidents.[233]

- Both Daniel Defense and Smith & Wesson asserted that they do "not monitor or track this information."[234]

---

[230] Citing *Internal letter from Bushmaster Firearms International to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[231] Citing "Buffalo Supermarket Shooting: What Do We Know So Far?," *Associated Press* (May 16, 2022) (online at https://apnews.com/article/buffalo-shooting-what-to-know-bcb5e0bd2aedb925d20440c2005ffef8).

[232] Citing *Internal letter from Sturm, Ruger & Company, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[233] Citing *Internal letter from Sig Sauer, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022).

[234] Citing *Internal letter from Daniel Defense to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022); *Internal letter from Smith & Wesson to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 7, 2022).

112

- In response to the Committee's request for internal company analyses of the use of their assault weapons "in mass shootings or other homicides," the "risks posed" by the marketing or sale of these weapons, and "the ability to modify these weapons to increase their lethality," none of the five companies produced a single document.

- These gun companies fail to track the deaths and crimes caused by their products even though they are included in a tracing process run by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). When law enforcement seizes a gun at a crime scene, they contact ATF's National Tracing Center to track the firearm from the manufacturer, through dealers and retailers, and into the hands of the most recent buyer.[235] During this tracing process, ATF works directly with firearm manufacturers to gain information about the gun.[236] Despite their involvement in this tracing process, each company claimed that they do not monitor or track this information.

- As the Committee has previously demonstrated, a "small number of retailers" are often responsible for supplying an inordinate number of guns used in crimes, suggesting that industry attention to where and how their products are misused by criminals could help curb violent crime or rising homicide rates.[237]

---

[235] Citing Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Tracing Center* (online at www.atf.gov/firearms/national-tracing-center) (accessed June 23, 2022).

[236] *Id.*

[237] "6 Gun Shops, 11,000 "Crime Guns": A Rare Peek at the Pipeline," *New York Times* (Apr. 28, 2022) (online at www.nytimes.com/2022/04/28/us/politics/gun-shops-weapons-resell.html).

113

- Gun manufacturers' failure to monitor injuries, deaths, and crimes associated with their products also stands in stark contrast with other consumer product industries, which are required to alert the public to risk of harm from their products through Consumer Product Safety Commission (CPSC). Manufacturers, importers, distributors, and retailers of consumer products must notify the CPSC within 24 hours if they become aware of information suggesting their product "creates an unreasonable risk of serious injury or death."[238]

- Other industries have similar requirements. For instance, the Food and Drug Administration (FDA) requires companies with prescription drugs to submit detailed "adverse event" information to FDA, and manufacturers of medical devices are "required to report to the FDA when they learn that any of their devices may have caused or contributed to a death or serious injury."[239]

- Even where a product operates as intended, an industry typically will face legal liability where their distribution or marketing practices yield excessive or unintended use of the product. For instance, a pharmaceutical company will face legal liability for failing to curb negligent monitoring or distribution practices of dangerous drugs such as opioids. Yet the gun industry faces no such consequences for its failure to track deaths, injuries, or crimes committed with their products.

---

[238] 15 U.S.C. § 2064(b).

[239] 21 C.F.R. § 314.80(a) (2014); Food and Drug Administration, *Mandatory Reporting Requirements: Manufacturers, Importers and Device User Facilities* (online at www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm) (accessed July 25, 2022).

114

## VIII. AR-15-Style Assault Weapon Defendants

207.    As the Committee's Memorandum documented, several of the Defendants named in this action have marketed, and continue to market, AR-15-Style Assault Weapons: Smith & Wesson Brands, Inc.; Bushmaster Firearms Industries, Inc.; RemArms, LLC, a/k/a Remington Firearms; Sig Sauer, Inc.; and Sturm, Ruger & Co., Inc. (hereinafter "AR-15-Style Assault Weapon Defendants" or simply, "AR-15 Defendants").

208.    Born out of the exigencies of modern combat, the AR-15 was designed for the United States Military to be used in combat.

209.    The AR-15 was designed with features that were chosen to maximize casualties and engineered to deliver maximum carnage with extreme efficiency on the battlefield.

210.    The AR-15's combination of features resulted in a weapon so lethal that the United States Military adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

211.    The AR-15 remains the United States Military's weapon of choice today.

212.    The AR-15-style assault weapons produced by the AR-15 Defendants maintain the design, functionality and appearance of its military counterpart, the M16.

213.    AR-15-style assault weapons have become the weapon of choice for mass shooters.

214.    The AR-15 Defendants produce the majority of AR-15-style assault weapons sold in New York, including in the City of Rochester.

215.    The AR-15 Defendants have marketed, and continue to market, their AR-15s by promoting their militaristic and assaultive uses.

216.    The AR-15 Defendants' militaristic marketing promotes the image of their AR-15s as combat weapons used for the purpose of waging war and killing human beings.

115

217.    The AR-15 Defendants market their sporting and competition rifles with five- and ten-round magazines while marketing their AR-15 rifles with magazines containing up to 30 rounds.

218.    The AR-15 Defendants' marketing glorifies the lone gunman.

219.    The AR-15 Defendants' marketing promotes lone gunman assaults.

220.    The AR-15 Defendants' marketing glorifies the military design, functionality and appearance of their AR-15s.

221.    The AR-15 Defendants' marketing promotes their AR-15s for use in mass casualty assaults.

222.    The AR-15 Defendants' marketing promotes criminal use of their AR-15s by their target market.

223.    The AR-15 Defendants' marketing targets high-risk users.

224.    The AR-15 Defendants' marketing targets impulsive young men who have an interest in military weapons who are particularly likely to be attracted to the unique capacities of AR-15-style assault weapons.

225.    The AR-15 Defendants' marketing targets adolescents drawn to the excitement and risk-taking associated with militaristic weapons or combat missions, including young players of popular and realistic first-person shooter video games, which prominently feature variants of the weapons sold by the AR-15 Defendants in real life.

226.    The AR-15 Defendants market their AR-15s as well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

227.    The AR-15 Defendants have continued to market AR-15s in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

228.    The AR-15 Defendants have marketed, and continue to market, their AR-15s without regard for public safety.

116

229.    The AR-15 Defendants' marketing of these lethal weapons is unethical.

230.    The AR-15 Defendants' marketing of these lethal weapons is immoral.

231.    The AR-15 Defendants' marketing of these lethal weapons is unscrupulous.

232.    The AR-15 Defendants' marketing of these lethal weapons is oppressive.

233.    The AR-15 Defendants' marketing of these lethal weapons is reckless.

234.    The AR-15 Defendants have marketed these lethal weapons, and continue to market them, in the above manner both directly and through third parties.

## IX.    Ghost Gun Defendants

### A.    Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted in to Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns.

235.    Ghost Gun Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as conventional firearms and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and AR-10 and AR-15 assault rifles. But ghost guns are untraceable and designed to evade background checks, licensing, and other state and local rules governing sales, making the weapons extremely attractive to criminals, and dangerous to the public.

236.    The absence of serial numbers in ghost guns makes the investigation of crimes committed using them far more difficult. As the United States House Committee on Homeland Security concluded in a 2019 report, "[g]host guns not only pose a challenge on the front end, enabling prohibited buyers to purchase deadly weapons with just a few clicks online, but also on the back end, hamstringing

law enforcement's ability to investigate crimes committed with untraceable weapons."[240] ATF itself has explained that the absence of serial numbers "makes it more difficult for Federal, State, and local law enforcement to identify and prosecute illegal firearms traffickers who are often tied to violent criminals and armed narcotics traffickers."[241]

237.    The unfinished frames and receivers marketed by Ghost Gun Defendants and sold into the City, the surrounding area, and New York State are designed to subvert the federal and state statutes that aim to prevent guns from falling into the hands of people who cannot and should not possess them.

238.    As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun — it is merely missing a few drill holes and contains a small amount of extra plastic, and is easily convertible into the finished product, a deadly weapon.

239.    The term "frame" generally refers to the core part of a pistol or handgun, whereas the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun. Current federal regulations define "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. It is this definition that Ghost Gun Defendants' unfinished frames seek to circumvent, by simply leaving a few key holes undrilled or plastic unfilled.

240.    Because these unfinished frames or receivers purportedly fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Ghost Gun Defendants sell them directly to consumers

---

[240]    ATF, Notice of Proposed Rulemaking, "Definition of 'Frame or Receiver' and Identification of Firearms," 86 FR 27220, 27223 (May 21, 2021) (quoting H.R. Rep. No. 116-88, at 2 (May 28, 2019)).

[241]    *Id.* at 27225.

118

without following any of the federal laws and regulations that apply to the sale of firearms, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source when used in a crime.

241.    The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so named because they are untraceable and there is no record of their sale, or even of their existence.[242] *Cf.* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that fails to comply with tracing and serialization requirements in Penal Law § 265.07).

242.    Because of these characteristics, unfinished frames and receivers, and the ghost guns made from them, are particularly popular among (and, naturally, marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

243.    But although Ghost Gun Defendants sell unfinished frames and receivers as part of this scheme to evade federal and state laws, there is little practical difference between their "unfinished" receivers and a "finished" receiver meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

244.    Finishing a frame or receiver is easy and can be carried out by an amateur in under an hour using basic hand tools.

245.    These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

246.    The result is that Ghost Gun Defendants sell these almost-but-not-quite guns online and ship them to New York consumers, with the full knowledge that many of these consumers cannot legally

---

[242]   The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace. Although these 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially purchased unfinished frames and receivers, such as those sold by Ghost Gun Defendants. The ghost guns created out of the products marketed by Ghost Gun Defendants, which are the subject of this action, create a much higher quality firearm and are far more prevalent.

purchase a deadly weapon, making no effort to employ internal controls that would verify the identity of the customer and the appropriateness of the sale.

247. The core component of any gun, including a ghost gun, is the frame, also known as the lower receiver. The frame or lower receiver[243] houses all or most of the gun's other essential components, including the trigger, magazine, slide, and barrel.

248. Under federal law, a frame or lower receiver is regulated in the same way as a complete firearm. Indeed, federal law defines "firearm" to include a complete (or near-complete) gun and the "frame or receiver" of a firearm. Specifically, the Gun Control Act defines "firearm," in relevant part, as:

(A) any weapon … which will or is designed to *or may readily be converted to* expel a projectile by the action of an explosive; [or] (B) *the frame or receiver of any such weapon.*

18 U.S.C. § 921(a)(3) (emphasis added). A frame or receiver is accordingly subject to the same serialization and federal background check requirements as a complete firearm.

249. The business model of Ghost Gun Defendants is to sell so-called "unfinished" frames or receivers to persons who will assemble them into fully operational firearms, using parts or kits purchased from Ghost Gun Defendants or other ghost-gun dealers. Ghost Gun Defendants sell frames or receivers that they claim are partly "unfinished," or "80%" complete, and thereby purport to skirt the statutory definition of a firearm and avoid the application of federal law and regulation altogether. In fact, as sold by Ghost Gun Defendants, frames and receivers are "firearms" because they are "designed to or may readily be converted to expel a projectile by the action of an explosive" or are "the frame or receiver of any such weapon."

---

[243] The term "frame" is typically used for handguns, while "receiver" or "lower receiver" is typically used for longer guns, such as AR-15s.

120

250. Independently, "unfinished" frames and receivers and "80% frames" are illegal under local and state law. Legislatures responded to the ghost gun ruse by expressly so specifying. The sale and delivery of "unfinished" frames or receivers into New York has been illegal under N.Y. Penal Law §§ 265.60-.64 since April 26, 2022.

251. By purporting to sell "unfinished" frames and receivers to consumers without background checks, without serial numbers, and without complying with any other federal and state laws governing firearms, Ghost Gun Defendants assist and facilitate the evasion of federal and state laws banning the sale or possession of "unfinished" frames and receivers.

252. Indeed, evasion of regulation is the core of Ghost Gun Defendants' business model. The appeal of ghost guns is rooted largely, if not entirely, in their purported status as outside the reach of the firearms laws. Polymer80, Inc., the dominant ghost gun manufacturer in the United States, has admitted in court that if its "80%" frames and receivers were deemed firearms under federal law, sales of its products would decline precipitously: "annual revenue would be diminished by more than fifty (50) percent, and perhaps by as much as seventy-five (75) percent."[244]

253. It is simple and quick to turn an "unfinished" frame or receiver into a finished frame or receiver, and then assemble a fully functional gun. Ghost Gun Defendants make the finishing process still simpler and quicker by selling the "unfinished" frame or receiver in a kit that includes a template (known as a "jig"), drill bits, and other hardware. The jig is a molded case into which the "unfinished" frame or receiver fits, with holes labeled for insertion of drill bits, and with directions for the removal of certain polymer tabs.

---

[244] *See* Declaration of David L. Borges in Support of Motion of Polymer80 Inc. to Intervene in this Action, dated Dec. 30, 2020, *City of Syracuse, NY v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 20-cv-6885 (S.D.N.Y.) (ECF # 80).

121

254.    Step-by-step instruction manuals, easily accessible on the internet and from ghost gun manufacturers, explain to customers the steps to complete the frame or receiver and assemble an operable firearm using simple tools. *See, e.g.,* Polymer80 Website, "How to" (https://perma.cc/9A3U-K7FR?type=image). Retailers also provide guidance. S*ee* Arm or Ally's Website, "In the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools" (https://www.armorally.com/polymer80).

255.    Persons seeking to mass produce ghost guns can purchase the "Ghost Gunner," a machine that finishes the frame or receiver still faster and with less work than hand assembly — an especially attractive option for those seeking to traffic ghost guns in large quantities.[245]

256.    The difference between an "unfinished" frame and a finished frame is negligible, as is the effort required to convert the former into the latter.

257.    Compare, for instance, the following two pictures. On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame recently sold and shipped into New York by Defendant Indie Guns. On the right is a photograph of a finished Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm, complete with serialization and a background check:



---

[245]    *See* https://ghostgunner.net (also available at https://perma.cc/55AU-AEUA).

122

Case 3:23-cv-00065-MSS-CPT Document 13-1 Filed 09/08/23 Page 128 of 202 PageID 4358

258.    The two weapons — one an "unfinished" frame that Ghost Gun Defendants sell over the internet and ship into New York without serializing or conducting a background check, the other a finished frame that meets the definition of "firearm" under 18 U.S.C. § 921(a)(3) and is subject to these requirements — are nearly identical to the naked eye. That's because there is essentially no difference between them.

259.    The differences amount to drilling three small holes and milling down a small amount of plastic at the top of the frame. A finished frame sold by Defendant Primary Arms is illustrated as follows:



260.    The differences are equally minor in the context of an "unfinished" lower receiver for a rifle.

261.    In the case of both "unfinished" frames (for handguns) and "unfinished" receivers (for rifles and shotguns), Ghost Gun Defendants' business model is simple: sell the core of a working firearm that requires just a bit of unsophisticated finishing work. Based on the need for that tiny bit of finishing by the consumer, Ghost Gun Defendants pretend that they are selling something that falls short of the legal definition of a "firearm," and on that basis they justify selling their product to anyone over the internet, without any controls or procedures to protect the public's safety.

123

262.  With such a small difference between an "unfinished frame" and a finished frame, it takes very little time, effort, or skill to convert an "unfinished" frame or receiver into a working ghost gun.

263.  Defendants make this ease of conversion a key part of their marketing.[246]

264.  Defendants' customers agree. For instance, one of the reviews on the webpage for Brownells' exclusive Polymer80 Glock-compatible pistol frame is entitled "EASY AS CAN BE," and begins, "So I bought roughly three frames from Brownells and not one of them came to me in bad condition. I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other than what I saw on YouTube. And guess what they all go bang when I pull their trigger."[247]

265.  Ghost Gun Defendants take further steps to eliminate the need for any technical skill on their customers' part by shipping the products in a "jig," a plastic setting for the frame or receiver that makes it easy for even an amateur to see and follow the steps necessary to convert the unfinished frame into finished form.

266.  Here is a picture of an unfinished Glock-compatible handgun frame purchased from Defendant Indie Guns by investigators from the Office of the Attorney General, as it was packaged inside the box in which it arrived:

---

[246]  For example, Defendant Brownells says that unfinished frames (and specifically the kind marketed by Polymer80, Inc.) "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame." See https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).

[247]  See https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

124

NYSCEF DOC. NO: 2
INDEX NO. E2022010581
RECEIVED NYSCEF: 12/21/2022

Case 3:23-cv-00066-MSS-CGW Document 23-1   Filed 05/08/23   Page 450 of 727 PageID 1360



267.     The unfinished handgun frame is shipped already inside the jig, and the jig itself is clearly labeled with the simple steps the consumer needs to take to finish the frame. The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic sticking up above them are the "rails" that the consumer is to mill off, along with another small piece of plastic inside the frame where the recoil spring will go.

268.     The jig makes sure that an untrained consumer will easily be able to remove the small plastic rails — and only the small plastic rails. As Defendant Brownells explains in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

269.     Once that's done, all that's left to do is to drill the three simple holes, which are helpfully labeled as "M2" or "M3" on the jig. These correspond to two drill bits that are included in the same box:

125

NYSCEF DOC. NO: 2



270.    All the consumer needs to do is drill the three holes using a hand drill or a drill press, following the instructions on the jig.

271.    The result is a finished frame that would have required serialization and a background check if Ghost Gun Defendants had sold it to a consumer. The finished frame can accept a few commercially available parts (sometimes sold as a kit along with the unfinished frame) in order to become a working ghost gun.

272.    Defendant Brownells goes a step further, providing an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned

126

Case 8:23-cv-00066-MSS-FGW Document 13-3 Filed 09/08/23 Page 455 of 727 PageID 1302

as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[248]

273.     The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

274.     Each Ghost Gun Defendant knows that the only purpose of the "unfinished" frames and receivers they sell is to become a finished frame or receiver that would have required serialization or a background check, and then to be further converted into a working ghost gun. Each Ghost Gun Defendant knows that these products are in demand from consumers who could not legally purchase firearms. If any Ghost Gun Defendant claims ignorance of these facts, it is being willfully blind to the illicit nature of its business.

   **B.  Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety.**

275.     The purpose and the result of the ghost gun business model is the easy acquisition of untraceable, operable firearms without compliance with federal and state laws regulating firearms. Ghost Gun Defendants intentionally assist their customers in violating those laws, and themselves violate state laws prohibiting the sale of "unfinished" frames and receivers into the City and the State of New York.

        **i.  The Federal Gun Control Act.**

276.     The 1968 federal Gun Control Act regulates the manufacture, sale, and possession of firearms, including frames and receivers. 18 U.S.C. § 921(a)(3). The Gun Control Act requires all

---

[248]  *Id.*

commerce in firearms to proceed through federally licensed manufacturers, importers, and dealers, known as federal firearms licensees ("FFLs"), 18 U.S.C. §§ 922(a)(1)(A); 923(a), who in turn must operate in strict conformity with federal and state laws pertaining to firearms.

277.   To ensure that all firearms can be traced to the first purchaser, federal law requires licensed manufacturers and importers to inscribe a serial number on the frame or receiver of each firearm they manufacture or import. 18 U.S.C. § 923(i).

278.   To prevent the acquisition of firearms by people deemed unfit to possess them, licensed dealers may not sell or transfer a firearm to specified prohibited persons, as determined through a mandatory background check. 18 U.S.C. § 922(d), (t). Prohibited persons include, among others, individuals who: i) have been convicted of a felony; ii) have been convicted of any crime of domestic violence or are subject to a domestic violence restraining order; iii) have been involuntarily committed to a mental health facility or adjudged "mentally defective"; iv) have been dishonorably discharged from the military; or v) are unlawful users of controlled substances. 18 U.S.C. § 922(d), (g). FFLs may not sell or transfer rifles or shotguns to anyone under the age of 18, or other types of firearms to anyone under 21. 18 U.S.C.§ 922(b)(1).

279.   To curb gun trafficking or transfers of guns to prohibited persons, federal law prohibits FFLs from shipping firearms to purchasers, and requires that all firearm sales be conducted in person except in very limited circumstances requiring, among other things, notice to law enforcement. 18 U.S.C. §§ 922(a)(2), (c). FFLs may not sell or deliver a firearm to any person where the purchase or possession violates any applicable state or local law, 18 U.S.C. § 922(b)(2), or to persons that do not reside in the state of the dealer's place of business, except for in-person sales of rifles or shotguns that fully comply with both states' laws. 18 U.S.C. § 922(b)(3).

280.   Licensed manufacturers and dealers must keep records of all firearm sales, noting the make, model, and serial number of the firearm, as well as the "name, age, and place of residence" of the

128

purchaser. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A). FFLs may not sell a firearm without providing the recipient with a secure gun storage or safety device. 18 U.S.C. § 922(z).

281.    On April 26, 2022, ATF published a final rule, effective August 24, 2022, stating that the "unfinished" frame and receiver kits Defendants sell are firearms under the Gun Control Act. ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (April 26, 2022) ("Final Rule").[249]  The Final Rule explains that a "frame or receiver parts kit containing a partially complete … blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver." *Id.* at 24739; *see also id.* ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.")

282.    The Final Rule nullifies prior informal ATF guidance, set forth in determination letters to a ghost gun manufacturer, finding that certain examples of "unfinished" "80%" frames or receivers, when considered in isolation, did not constitute firearms under federal law. ATF's Final Rule is consistent with, and correctly interprets, the federal Gun Control Act.[250]

ii.   **New York State Law**

---

[249]  Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

[250]  In addition, in a May 9, 2022, letter to a ghost gun components retailer, ATF explained that, "notwithstanding the recently announced regulations and definitions" in the final rule, it has "always been" ATF's position that the sale and transfer to a single customer of "all the components necessary to produce a fully functional firearm," whether sold in "one or multiple transactions," constitutes the sale of a "firearm" under the Gun Control Act and is unlawful unless made according to the requirements of the Gun Control Act, including serialization and a background check. *See* May 9, 2022 letter from Matthew Varisco, Special Agent in Charge, ATF Philadelphia Field Division to JSD Supply, available at https://perma.cc/YU47-TGPL (captured May 13, 2022).

Case 8:23-cv-00608-MSS-FGW Document 23-1 Filed 09/08/23 Page 458 of 727 PageID 4305

283.    Since April 26, 2022, the New York criminal code has expressly prohibited the possession, sale, or offering for sale of ghost guns and "unfinished" or unserialized frames or receivers by or to persons in New York State. *See* N.Y. Penal Law §§ 265.00(6) (defining "dispose of"), (8-a) (defining "serialized"), (32) (defining "unfinished frame or receiver" and "ghost gun"), 265.01(9) (prohibiting possession of ghost guns), (10) (prohibiting possession of unserialized or "unfinished" frame or receiver), 265.07 (registration and serialization of firearms, rifles, shotguns, finished frames or receivers, and "unfinished" frames or receivers), 265.60 (criminal sale of a ghost gun in the second degree), 265.61 (criminal sale of a ghost gun in the first degree), 265.63 (criminal sale of a frame or receiver in the first degree).

### C.  Ghost Guns Endanger the Public and Undermine Law Enforcement

284.    Despite — and in a direct affront to — New York's adoption of a ghost gun ban, ghost guns are flooding the City, and their prevalence is increasing at an alarming rate. Rochester Police recovered 45 ghost guns in connection with arrests in 2021 and 57 so far in 2022 as of December 10, 2022.

285.    These numbers are limited to ghost guns recovered by the Rochester Police Department. The actual number of ghost guns on the City's streets and in homes is undoubtedly far higher, but impossible to know — as ghost gun sellers do not report sales.

286.    Ghost guns make the City's streets, schools, public spaces, and homes — and the job of patrol officers in the Rochester Police Department — significantly more dangerous

287.    Ghost guns have also been used to perpetrate violent crimes on city streets, including multiple murders, as well as non-fatal shootings.

288.    As these arrests, arsenals, and shootings vividly and tragically illustrate, there is a thriving illicit market for the sale and delivery of illegal ghost guns into the City which arm underage persons,

and individuals with violent criminal histories who would not be able to obtain a firearm through regular

channels.

289.    The City has taken steps to combat the growing ghost gun scourge, incurring significant

costs.

290.    As ghost guns have increasingly become a major component of gun crime in the City,

they have imposed significant costs and burdens on many other City institutions, including the public

hospitals, which must care for people suffering serious injuries after violent incidents involving ghost

guns; district attorneys' offices, which must build and prosecute criminal ghost gun cases; and courts,

which must adjudicate the cases.

291.    The City's experience reflects a national trend. According to the ATF, 45,240 ghost guns

were recovered by law enforcement across the country from 2016 through 2021, including 692 in

connection with homicides or attempted homicides.[251] Ghost gun recoveries increase each year, from

1,758 in 2016 to 19,344 in 2021.[252] Cities nationwide have seen similar dramatic increases in ghost gun

recoveries. The 1,921 ghost guns recovered by the Los Angeles Police Department in 2021 were more

than double the amount it recovered in 2020.[253] San Francisco has reportedly experienced a 27-fold

increase in ghost gun recoveries by police over the past five years, with more than 200 ghost guns

recovered in 2021.[254] Other municipalities have seen comparable rises, including Philadelphia (17 in

---

[251] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022).

[252] *Id.* at 27723.

[253] *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022)).

[254] *See id.*; Complaint, *The People of the State of California v. Blackhawk Mfg. Grp., Inc., et al.*, CGC-21-594577, at ¶¶ 77-78 (Aug. 18, 2021).

Case 8:23-cv-00066-MSS-FGW Document 23-1   Filed 09/08/23   Page 460 of 727 PageID 4367

2018, 95 in 2019, 250 in 2020), Washington, D.C. (25 in 2018, 116 in 2019, 306 in 2020), San Diego (53 in 2018, 77 in 2019, 210 in 2020), Prince George's County, Maryland (17 in 2018, 50 in 2019, 176 in 2020), and Chicago (21 in 2018, 72 in 2019, 139 in 2020).[255]

292.    Tragically, ghost guns are increasingly being put to violent or deadly use across the country. In Los Angeles, ghost guns were linked to 24 murders, eight attempted murders, 20 robberies and 60 assaults with a deadly weapon as of November 2021.[256]   And ghost guns accounted for nearly half of the guns recovered in homicides in San Francisco in 2020.[257]

293.    Often, violent crimes using ghost guns are committed by people who would not have been able lawfully to acquire firearms and presumptively would have failed background checks because, for example, of their criminal history or age. In 2013, a man who failed a background check at a licensed gun dealer used an AR-15 ghost gun to kill five people in Santa Monica, California.[258]   In 2017, a man with a criminal record prohibiting his possession of a firearm used an AR-15 ghost gun in a California mass shooting that killed five people and injured 18.[259]   In 2019, a 16-year-old brought a ghost gun to

---

[255] National Police Foundation, *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement*, at 15 (2021), available at https://www.policefoundation.org/wp-content/uploads/2021/08/NPF_The-Proliferation-of-Ghost-Guns_Final_2021.pdf (https://perma.cc/6NSJ-NHVG).

[256] *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[257] *Id.*

[258] Alain Stephens, "Ghost Guns are Everywhere in California," *The Trace* (May 17, 2019), available at https://www.thetrace.org/2019/05/ghost-gun-california-crime.

[259] *Id.*

132

school in Santa Clarita, California, and shot five students, killing two, before killing himself;[260] and a convicted felon in Syracuse, New York, used a ghost gun to shoot his own nephew, a young child, in the back.[261]  In 2020, a convicted felon used a ghost gun to shoot and injure two Los Angeles sheriff's deputies.[262]  And in April 2021, a man with a criminal record for unlawfully carrying a concealed weapon used a ghost gun to shoot five people, killing one, in a nighttime shooting spree in San Diego.[263]

### D.  Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns

294.    Each of the Ghost Gun Defendants markets, and makes available for sale over the internet, ghost gun components, including unserialized, "unfinished" frames or receivers, to residents of the City and nearby communities. Each Ghost Gun Defendant sells parts and accessories through their websites that are compatible with conventional, serialized firearms and ghost guns. With the click of a mouse, and with no background check, residents of the City and nearby communities can purchase, and have purchased, from Ghost Gun Defendants unserialized, "unfinished" frames or receivers from which to construct operable ghost guns. Ghost Gun Defendants ship ghost gun components straight to these customers, with no intermediary.

---

[260]  *Id.*

[261]  "DA: Syracuse man shot 6-year-old nephew with untraceable 'ghost gun,'" *Syracuse.com* (Jan. 6, 2020), available at https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html).

[262]  "'Ghost Gun' Kit Maker Sued Over Ambush Shooting of Two Deputies at Compton Transit Station," *NBC Los Angeles* (Aug, 10, 2021), available at https://www.nbclosangeles.com/news/local/la-county-deputies-ghost-gun-kit-maker-lawsuit-compton-metro-rail-station/2668483; Complaint, *Apolinar v. Polymer80, Inc.*, Case No. 21STCV29196 (Sup. Ct. Los Angeles Cty.) (filed Aug. 9, 2021), at ¶ 9, available at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/Complaint.pdf.

[263]  "Untraceable 'ghost gun' allegedly used in fatal Gaslamp shooting spree," *CBS8.com* (Apr. 23, 2021), Allegedly Used in Fatal Gaslamp Shooting Spree, (Apr. 23, 2021), available at https://www.cbs8.com/article/news/local/untraceable-ghost-gun-allegedly-used-in-fatalgaslamp-shooting-spree/509-cc352272-85d9-4e4b-bc1b-7446dcb96660.

295.     Defendant Rainier Arms markets the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License Required. Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[264]

296.     The "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit includes an exchange where a customer asks, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)? I want it and will buy it if it DOES NOT. I have asked this question before but never got an answer!" Brownells' staff expert answered: "Not serialized it's a 80% receiver."[265]

297.     The same Q&A page includes a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."[266]

298.     Similarly, in touting the Polymer80 frame kits it sells, Defendant KM Tactical points to the "Blank Serialization Plate" as a significant feature.[267]

---

[264] *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 16, 2022).

[265] *See* https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).

[266] *Id.*

[267] *See* https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (last visited June 17, 2022), also available at https://web.archive.org/web/20220629152258/https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (https://perma.cc/64GX-VHWG?type=image).

299.     In 2022, Rochester Police recovered approximately 46 Polymer80 guns. In 2021, Rochester Police recovered approximately 46 Polymer80 guns.

300.     Defendants know, or should know, that they are selling their ghost gun products to buyers who are trying to evade federal and state gun laws.

### i. Arm or Ally

301.     Arm or Ally is a distributor of firearms and firearms parts located in Indian Trail, NC.

302.     Its business focuses on parts for AR-10 and AR-15-style rifles, including "unfinished" receivers that can be used to build ghost gun versions of those rifles. It also sells "unfinished" handgun frames, including into New York.

303.     Its webpages selling AR-15-compatible receiver kits proclaim, in large bold green letters, "No FFL Required!"[268]

304.     Meanwhile in tiny, mostly illegible text, Arm or Ally attempts to extricate itself from any responsibility for whether its sales are legal, throwing it onto the consumer instead. Its boilerplate text reads, "It is your responsibility to know and understand your state and local laws regarding the ownership and possession of this product. We do not provide legal advice; if you are uncertain, consult with an attorney prior to purchasing."[269]

305.     Although its AR-15-compatible "unfinished" lower receiver page says in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," the page in fact

---

[268]  See https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3 (last visited June 23, 2022), also available at https://web.archive.org/web/20220520113005/https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3.

[269]  *Id.*

135

Case 8:23-cv-00046-MSS-FGW Document 23-3 Filed 05/08/23 Page 464 of 727 PageID 1881

links to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle.[270]

306.    Arm or Ally's sales pages discuss "State Restrictions" in New Jersey, Connecticut, Washington State, and Washington, DC, but not New York.[271]

307.    In fact, Arm or Ally has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including the City.

308.    Arm or Ally is a Federal Firearms License holder that operates an interactive website (armorally.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well as serialized frames, among other products.[272]  Arm or Ally sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City.

309.    Arm or Ally sells various Glock-compatible ghost gun kits, such as:

- Polymer80 frame kits for the PF45, PF940C, PF940V2, PF9SS, PF940SC and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig, with drill bits;[273]  and

---

[270]  *Id.* (linking to: https://web.archive.org/web/20220602181003/https://www.polymer80.com/CMS-Images/Polymer80_Lower_AR15-G150_Build_Instructions-Phoenix_Version2_1.pdf) (https://perma.cc/H7LG-VJQR).

[271]  *Id.*

[272]  *See* https://www.armorally.com (also available at https://perma.cc/QPN5-WQZQ) (captured May 20, 2022)).

[273]  https://www.armorally.com/product-category/glock/frame-parts/glock-frames (also available at https://perma.cc/3NQY-LXTA (captured May 20, 2022)).

- The P80 Compact Frame & Slide Kit, that bundles into one package a Polymer80 PF940C frame kit, a slide from American Tactical Arms, and a slide completion kit from Arm or Ally.[274]

310. For those buying in bulk, Arm or Ally offers the Polymer80 — PF45 Pistol Frame Kit — 25 Pack, which includes 25 sets of unserialized, "unfinished" frames, rails, and the jig and drill bits.[275]

311. The remaining components needed to assemble these Glock-compatible ghost guns can be purchased on Arm or Ally's website or from other dealers.

312. Significantly, before making an online sale of unserialized, "unfinished" frames, Arm or Ally does not conduct background checks, and does not require customers to have a valid state or city license or permit.

313. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on or around April 28, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally. Arm or Ally's website acknowledged that the company was shipping directly to consumers, and in fact stated that the order of an unfinished frame was "required to ship to your credit card's billing address." Arm or Ally accepted the order and shipped the frame into New York County.

314. On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a G19-compatible

---

[274] https://www.armorally.com/shop/p80-compact-frame-and-slide-kit (also available at https://perma.cc/B96L-6E6B (captured May 20, 2022)).

[275] https://www.armorally.com/shop/polymer80-pf45-pistol-frame-kit-25-pack (also available at https://perma.cc/7YF7-UJGP (captured May 20, 2022)).

137

slide, all manufactured by Arm or Ally. The City also purchased a Polymer80 9mm frame parts kit. Arm or Ally accepted the order and shipped the parts into New York County.

315.    The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

316.    Arm or Ally accepted the order and shipped the parts into New York County.

317.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

318.    The Arm or Ally website said of the product that "[t]his system is a complete kit. There are no additional jigs and parts to purchase. Polymer80 Spectre system is a complete, all-inclusive package including the jig and drill bits required to finish your Glock project."[276]

319.    Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License,"[277] Arm or Ally did not actually require investigators to do so.

320.    Arm or Ally accepted the order and shipped the frame into Kings County.

### ii. Rainier Arms

321.    Rainier Arms is a Washington State-based online retailer that describes itself as "the ultimate stop for AR-15 rifles and AR-15 parts."

---

[276]    https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (last visited June 6, 2022), also available at
https://web.archive.org/web/20220120133501/https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (https://perma.cc/V2PD-PGMZ?type=image).
[277]    *Id.*

NYSCEF DOC. NO: 2
INDEX NO. E2022010581
RECEIVED NYSCEF: 12/21/2022

322.     When Rainier Arms markets its "unfinished" frames or receivers, the company portrays them as exempt from public safety laws. For instance, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government jut considers them pieces of metal and/or plastic and not guns."[278]

323.     Rainier Arms also sells "unfinished" handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame. Rainier Arms' product description for the "unfinished" frame claims the product "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[279]

324.     Rainier Arms is aware of state-law restrictions on the sale of "unfinished" frames or receivers to consumers, declaring that it will not ship them to New Jersey or sell them in-store within Washington State. However, the company acknowledges no restrictions on shipping to New York consumers.

325.     Rainier Arms has sold and continues to sell "unfinished" frames and receivers into New York State.

326.     Rainier Arms is a Federal Firearms License holder that operates an interactive website (rainierarms.com) through which consumers can purchase unserialized, "unfinished" frames and

---

[278]  https://www.rainierarms.com/manufacturers/polymer80 (last visited June 28, 2022) (also available at https://perma.cc/HZ64-UMTZ). *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers (stating that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited June 28, 2022) (also available at https://perma.cc/E8DU-L3YX).

[279]  https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 28, 2022) (also available at https://perma.cc/7HRU-9FAU).

139

Case 8:23-cv-00056-MSS-FGW Document 23-3 Filed 09/08/23 Page 468 of 727 PageID 4975

receivers and ghost gun components, as well conventional, serialized firearms, serialized frames, and ammunition, among other products.[280]  Rainier Arms sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in the City.

327.    Rainier Arms sells various Glock-compatible ghost gun kits such as:

- Polymer 80 frame kits for the PF940SC, PF940V2, and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig with drill bits.[281]

328.    The remaining components needed to assemble these Glock-compatible ghost guns, can be purchased on Rainier Arms' website or from other dealers.

329.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[282]  and two parts kits for the Polymer80 ghost gun.

330.    Ranier Arms accepted the order and shipped the parts into New York County.

331.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Ranier Arms, along with a Glock 17-compatible slide and barrel.

332.    Ranier Arms accepted the order and shipped the frame and parts into New York County.

---

[280]  *See* www.rainierarms.com (also available at https://perma.cc/HKV6-UGS4).

[281]  https://www.rainierarms.com/manufacturers/polymer80 (also available at https://perma.cc/VM7R-4AMY and https://perma.cc/NY8F-SPW6).

[282]  The large-capacity magazine Rainier Arms sold was separately illegal under New York State law. See Penal Law § 265.00(23).

333.    Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Rainier Arms sent approximately 131 packages to non-FFL addresses in New York State each month, with approximately 106 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

334.    Significantly, before making an online sale of unserialized, "unfinished" frames, Rainier Arms does not conduct background checks and does not require customers to have a valid state or city license or permit.

### iii.  80P Builder

335.    80P Builder, a division of Salvo Technologies, Inc. also known as 80P Freedom Co., is a Florida corporation that claims to "specialize in aftermarket parts while also offering Polymer80 frames." See    https://80pbuilder.com    (last    visited    June    23,    2022)    (also    available    at https://web.archive.org/web/20220601181928/https://80pbuilder.com).


336.    Despite the fact that selling "unfinished" frames and receivers is a core part of its business model, its website touts a claim that "**80P Freedom Co. does NOT sell firearms**" in bold, oversize letters. *Id.*

337.    80P Builder sells "unfinished" receivers in tandem with the "lower parts kit" containing the parts necessary to make it the fully functional lower part of a handgun.[283]

338.    80P Builder knows that these products are illegal, and in fact it informs consumers that it will not ship to New Jersey. As to other states, it simply says, "[a]t 80P Builder, we by no means provide

---

[283]    *See, e.g.,* https://web.archive.org/web/20220527204526/https://80pbuilder.com/pf940sc-frame.

141

Case 8:23-cv-00006-MSS-FGW Document 23-1 Filed 09/08/23 Page 470 of 727 PageID 4947

legal advice or legal counsel. Every builder needs to research their respective State laws and Federal laws."[284]

339.    Despite New York State law, 80P Builder has shipped, and continues to ship "unfinished" frames and receivers into New York State, including the City.

340.    80P Builder, through its owner Salvo Technologies, Inc., is a Federal Firearms License holder that operates an interactive website (http://80pbuilder.com) through which consumers can purchase unserialized, "unfinished" frames, ghost gun components, and knives, among other products.[285] 80P Builder sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the State of New York, including in the City and nearby communities.

341.    80P Builder sells three Glock-compatible ghost gun kits and thirteen different "custom builds" such as:

- Polymer 80 frame kits for the PF940SC and PF940SS models.[286]

- Polymer 80 frame kits for the PF940SC that can be bundled with lower parts kits that include the Polymer 80 ejector and housing, Ghost bullet slide release, Ghost slide stop, 80P Builder machined pins and springs, 80P Builder mag catch, and OEM Glock trigger bar.[287]

---

[284] *Id.*

[285] *See* http://80pbuilder.com (also available at https://perma.cc/9RSG-BTWV (captured May 27, 2022)).

[286] https://80pbuilder.com/products/frames (also available at https://perma.cc/K5D5-B9YH (captured May 27, 2022)).

[287] https://80pbuilder.com/pf940sc-frame (also available at https://perma.cc/XR7E-SNHL (captured May 27, 2022)).

142

- "Custom builds" that bundle together into one purchase the items needed for a ghost gun build, and include one of the Polymer 80 frame kits for the PF940SC, PF940SS, and PF940V2, plus a customized slide, barrel, guide rod assembly, upper parts kit and lower parts kit.[288]

342.    Additional components needed to assemble these Glock-compatible ghost guns, if any, can be purchased on 80P Builder's website or from other dealers.

343.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by 80P Builder, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

344.    On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com, along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

345.    80P Builder accepted the order and shipped the ghost gun into New York County.

346.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on information and belief, this undercover purchase was just one of many instances when 80P Builder sent prohibited unfinished frames into New York, without conducting a background check or

---

[288]  https://80pbuilder.com/products/customs/custom-bundles (also available at https://perma.cc/4GXR-QGSJ (captured May 27, 2022)).

implementing any other controls to prevent improper persons from turning its products into working ghost guns.

347. Significantly, before making an online sale of unserialized, "unfinished" frames, 80P Builders does not conduct background checks, and does not require customers to have a valid state or City license or permit.

### iv. Rock Slide USA

348. Defendant Rock Slide USA, LLC is a North Carolina limited liability company with its principal place of business in Broadway, NC.

349. Rock Slide USA is a ghost gun retailer that operates an interactive website (www.rockslideusa.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[289] Upon information and belief, Rock Slide USA sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City.

350. Rock Slide USA specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame. Rock Slide USA also sells Polymer80 brand Glock-compatible "unfinished" frames, and touts their compatibility with its own "upper" products.

351. Rock Slide USA sells various Glock-compatible ghost gun kits from Polymer80.[290] Additional components needed to assemble these ghost guns can be purchased on Rock Slide USA's website or from other dealers.

---

[289] *See* www.rockslideusa.com (also available at https://perma.cc/7JTJ-UYMT (captured May 20, 2022)).

[290] https://rockslideusa.com/shop (also available at https://perma.cc/4VMT-BYNQ (captured May 27, 2022)).

352. Significantly, before making an online sale, Rock Slide USA does not conduct background checks and does not require customers to have a valid state or city license or permit.

353. Rock Slide USA describes the "unfinished" frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available. No license required."[291]

354. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Rock Slide USA, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

355. On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible "unfinished" frame from Rock Slide USA, along with Rock Slide-brand upper and the remaining parts necessary to convert the "unfinished" frame into a working ghost gun.

356. The checkout page included the words "No license required. Ships anywhere in the USA."

357. Rock Slide USA accepted the order and shipped the frame into New York County.

358. According to the Amended Complaint, on information and belief, this undercover purchase was just one of many instances when Rock Slide USA sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

**v. Indie Guns**

---

[291] See https://web.archive.org/web/20220626200841/https://rockslideusa.com/shop (last visited June 28, 2022) (also available at https://perma.cc/GP6D-KS63?type=image).

Case 3:23-cv-00066-MSS-FGW Document 23-1  Filed 09/08/23  Page 474 of 727 PageID 4981

359.    Indie Guns, LLC, is a Florida limited liability company with its principal place of business in Orlando, Florida. It appears to be affiliated with another Florida limited liability company named Indie Group, LLC, also with its principal place of business in Orlando.

360.    Indie Guns is a ghost gun retailer that operates an interactive website (www.indieguns.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[292]  Indie Guns sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City.

361.    Indie Guns focuses its business on ghost guns and the parts for them, particularly "unfinished" frames and receivers. It touts itself as the "[p]remiere distributor of high quality USA made polymer gun frames, 80% lowers, and build kits."

362.    Its website advertises a wide variety of "unfinished" frames, frame kits and full build kits.

363.    The company touts a "blank serialization plate" as one of the key features of the "unfinished" frames it sells.

364.    Indie Guns also sells "unfinished" frames as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "everything needed to build a complete pistol in a discounted bundle package."[293]

365.    The company ships these LSB kits directly to the consumer, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements. The company knows and intends that these consumers will convert the LSB kits into working firearms — as

---

[292]  *See* www.indieguns.com (also available at https://perma.cc/K4G5-QLGG (captured June 14, 2022)).

[293]  See https://indieguns.com/kangal-17-urban- camo-lsb-kit-lock-stock-barrel-for-g17-gen3 (last visited June 28, 2022).

146

Case 3:23-cv-00056-MSS-PCW Document 23-1 Filed 09/08/23 Page 475 of 727 PageID 1992

Indie Guns itself explains, "When done with your build, just grab a box of rounds and you're good to go . . . ."[294]

366. Indie Guns has sold and continues to sell and ship illegal "unfinished" frames and receivers into New York State.

367. Indie Guns is a high-volume seller of various Glock-compatible ghost gun kits, such as:

- Polymer 80 frame kits for the PF940V2, PF940C, PF940SC, PF940SS, and PF45 models.[295]

- A Polymer 80 "Complete Frame Assembly" kit for the PV940V2 model, bundled with a Polymer80 frame parts kit with trigger assembly and a Polymer80 magazine.[296]

- A Polymer 80 kit for the PF940, bundled with a barrel and two 13-round magazines.[297]

368. Additional components needed to assemble these Glock-compatible ghost guns can be purchased on Indie Guns' website or from other dealers.

369. In fact, court filings from a recent lawsuit between Polymer80 and Indie Guns note that in July 2021, Polymer80 sold and shipped more than 13,000 unserialized "80%" Glock-compatible frame kits to Indie Guns. This shipment, for which Indie Guns was charged $700,000 (a 30% discount from

---

[294] *Id.*

[295] https://indieguns.com/frame-kits (also available at https://perma.cc/5YD9-DP6T (captured June 14, 2022)).

[296] https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (also available at https://perma.cc/QGA9-F3CC (captured June 14, 2022)).

[297] https://indieguns.com/bundle-deal-buy-1-pf45-frame-kit-buy-1-g21-oem-45-barrel-get-2-free-g21-oem-45-13-rd-mags (also available at https://perma.cc/7S6B-WKK2 (captured June, 14, 2022)).

147

Case 3:23-cv-00066-FGW Document 3-1 Filed 03/08/23 Page 476 of 727 PageID 5003

the wholesale price), has a retail value of over $2 million, based on the price of $150 per frame kit that Indie Guns charges on its website for most of these kits.

370.     Significantly, before making an online sale, Indie Guns does not conduct background checks and does not require customers to have a valid state or City license or permit.

371.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Indie Guns, its sale of unfinished frames into the New York market is evidenced by the fact that it sent unfinished frames to New York State and City investigators in response to undercover purchases.

372.     According to the Amended Complaint, on or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a trigger assembly, a magazine, and a complete slide with barrel. Indie Guns accepted the order and shipped the product into New York County.

373.     On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit.

374.     The Indie Guns website said that "Indie Guns is pleased to present the CFA-17 (COMPLETE FRAME ASSEMBLY-17) The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower." Indie Guns also touted the frame's "blank serialization plate."[298]

375.     Indie Guns accepted the order and shipped the unfinished frame into Kings County.

---

[298]  *See* https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (last visited June 6, 2022).

376.    According to the Amended Complaint, on information and belief, these undercover purchases were just two of many instances when Indie Guns sent prohibited unfinished frames and receivers into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

### vi.  Brownells

377.    Brownells, Inc., also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, IA.

378.    Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it has taken to selling "unfinished" frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns.

379.    For instance, in an October 2017 press release announcing that the company would market a set of exclusive Polymer80 "unfinished" frames unique to Brownells, the company said that the "unfinished" frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes."[299]

380.    The same press release also advertised the legal conclusion that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."[300]

381.    As discussed above, Brownells' online materials go to great lengths to promote "unfinished" frames to consumers, saying that they "ha[ve] revolutionized the custom gun world. If you

---

[299]  Press Release, "Brownells Announces Exclusive Polymer80 Frames" (Oct 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930.

[300]  *Id.*

have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[301]

382. Brownells provides an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last "20%" of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[302]

383. The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

384. Brownells has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including in the City.

385. Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

---

[301] https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022) (also available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513).

[302] *Id.*

150

Case 1:23-cv-00006-MSS-CCW Document 23-1 Filed 05/08/23 Page 479 of 727 PageID 5986

386. On information and belief, the packages Brownells sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

387. According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach.[303]

388. When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

389. The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and did not have a permit.

390. Police found three more ghost guns when searching Gerwitz's home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

391. On June 13, 2022, police arrested Salerna-Sanchez, also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns, the *Buffalo News* reported.[304]

392. Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities, the Buffalo News reported. Gramaglia told the newspaper it takes about 30

---

[303] See https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited June 28, 2022).

[304] See https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited June 28, 2022).

151

Case 1:23-cv-00065-MSS-FGW Document 23-3 Filed 05/08/23 Page 480 of 727 PageID 5987

minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street.

393.    "This is what feeds the everyday gun violence that we see in our community and in communities across America — not just in Buffalo," Gramaglia said.

394.    On or around April 14, 2022, Brownells sent a package to Joshua Gotthart at an address on Wright Avenue in Buffalo, NY.

395.    On information and belief, the package Brownells sent to Gotthart contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

396.    On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

397.    He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

398.    Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house, the *Buffalo News* reported. Using a search warrant, they said they found three unregistered handguns in a bedroom and what the DA's office described as an "arsenal" of rifles, shotguns, and magazines. They also found tools used to assemble ghost guns and a large amount of ammunition in the house, the DA's office said in a statement.[305]

399.    Gotthart was arraigned on one count of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felony), three counts of Criminal Possession of a Firearm (Class "E" felonies), and one count of Unlawful Wearing of a Body Vest (Class "E" felony).

---

[305]  See https://buffalonews.com/news/local/crime-and-courts/gunning-for-the-guns-police-cracking-down-in-buffalo-to-reduce-shootings/article_376afcfe-cc7a-11ec-ae52-efb7dcf5267c.html (last visited June 28, 2022).

400. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Brownells sent approximately 1,300 packages to non-FFL addresses in New York State each month, with approximately 328 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

401. Brownells' sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

402. On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

403. Brownells accepted the order and shipped the unfinished frame kit into Kings County.

404. Brownells has sold a massive number of unfinished frames and receivers into New York State, many of which have been converted into ghost guns used in crimes or by persons who could not and should not legally possess a firearm.

### vii. Glockstore/GS Performance

405. GS Performance, LLC, also known as Glockstore and GSPC, is a Tennessee entity with offices in Nashville, TN and San Diego CA. It is the successor or affiliate of a California entity also named GS Performance, LLC.

406. To look at Glockstore's website and marketing materials now, one would think the company has nothing to do with selling "unfinished" frames or receivers. Its website no longer offers the products, and a consumer visiting today will find no mention of "unfinished" frames, 80% lowers, or Polymer80's main product line.

Case 3:23-cv-00056-MSS-PCW Document 1-3   Filed 05/08/23   Page 489 of 727 PageID 5069

407.    But in fact, "unfinished" frames and receivers were central to Glockstore's business model for many years, and the company was one of the most significant manufacturers and distributors of these deadly products.

408.    Glockstore was less than fully thorough in erasing the evidence of its prior business model. For instance, one still-online blog post talks about how a new model of "unfinished" pistol frame is "one of the most talked about firearm products ever!" Glockstore goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[306]

409.    The same blog post explains that one of the main reasons a consumer might like to buy an "unfinished" frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference." Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records . . . what's not to like?"[307]

410.    The blog post appears to have embedded a video of Glockstore owner Lenny Magill walking the consumer through how to "transform this 'not a firearm' into a fully functioning 9mm handgun."[308] The video itself has been removed for violating YouTube's terms of service.[309]

411.    Another blog post Glockstore missed in its whitewashing attempt is still available at http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80

---

[306] See http://community.glockstore.com/i-can-build-my-own-gun-with-this (last visited June 28, 2022) (also available at https://perma.cc/B3FP-SQGJ).

[307] Id.

[308] See also http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts (another blog post describing the contents of Mr. Magill's video) (last visited June 28, 2022) (also available at https://perma.cc/LMY6-KRJS).

[309] Id.

154

Case 1:23-cv-00066-MSM-PAS Document 23-1 Filed 09/08/23 Page 160 of 202 PageID 5090

(last visited June 28, 2022) (also available at https://perma.cc/G4E2-U8Q6).

412.    The post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre Polymer80."

413.    The post describes the "unfinished" frame in question as "[o]ne of the most exciting and fastest selling items at the GlockStore." The blog post focuses both on the frame's usefulness for evading registration requirements and on the ease of converting it into a working ghost gun, explaining that "[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning lower. You then assemble them with readily available parts and legally own a firearm that does not have to be 'registered.'"

414.    According to Glockstore blog post, "[t]his is completely legal and acceptable based on Federal laws that have been on the record for many years that state an individual can actually make a firearm for personal use."[310] The blog post does not acknowledge the existence of state laws, licensing requirements, or longstanding prohibitions against firearm possession by felons or other dangerous persons.

415.    Glockstore's illicit sales of "unfinished" frames and receivers stopped only after the State of California filed suit against it based on several consumer protection statutes.[311]

416.    California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated."[312]

---

[310]  *Id.*

[311]  See Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct., Oct. 13, 2021), available here: https://oag.ca.gov/system/files/attachments/press-docs/GHOSTGUNS%20-%20Amended%20Complaint.pdf.

[312]  *See id.* ¶¶ 106-112, 133-36.

155

Case 8:23-cv-00056-MSS-FGW Document 13-1 Filed 09/08/23 Page 484 of 727 PageID 5091

417.    California specifically cited Glockstore's failure to inform consumers of the "unfinished" frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check.[313]

418.    Glockstore shipped large numbers of its illegal products into New York as well, again based on a manifest disregard for state law.

419.    Between approximately November 26, 2018, and December 6, 2019, GS Performance sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.

420.    On information and belief, the packages GS Performance sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

421.    As discussed above, Gerwitz conducted a drive-by shooting and shot a police officer multiple times, using weapons the Erie County District Attorney described as "homemade" and "off-the-internet."

### viii.  KM Tactical

422.    KM Tactical is a Missouri-based online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.

423.    Categorized under the "Goodies" section of the site, KM Tactical offers an extensive selection of "unfinished" frames and receivers divided between AR and Glock platforms.[314]

---

[313]  *Id.* ¶¶ 138-40.

[314]  *See*
https://web.archive.org/web/20220629152306/https://www.rainierarms.com/lower/filter/category2
:stripped-lower-receivers (also available at https://perma.cc/DZ3K-88KN?type=image);
https://kmtactical.net/product-category/default-category/accessories/80-lowers/pistol-platform (also
available at https://perma.cc/9VB5-AZQP).

424.    According to KM Tactical owner Kyle Murphy in an October 2020 interview, "[n]othing we sell does damage, we don't sell serialized parts."[315]

425.    Mr. Murphy is correct that the "unfinished" frames and receivers his business sells into New York are unserialized, but the damage has been extensive.

426.    Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY.

427.    On information and belief, the packages KM Tactical sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

428.    According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach. When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective between multiple times.[316]

429.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

430.    Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

431.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022),

---

[315] "Husband, Wife Duo Move Business, Home to Lee's Summit," *Lee's Summit Economic Development Council* (Oct. 28, 2020), https://www.leessummit.org/husband-wife-duo-move-business-home-to-lees-summit.

[316] See https://buffalonews.com/news/local/tonawanda-man-indicted-in-drive-by-slaying-attempted-murder-of-cop/article_fff58d82-e7b7-11ea-a7fe-7f8ba091a3f4.html (last visited June 28, 2022).

157

shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, KM Tactical sent approximately 246 packages to non-FFL addresses in New York State each month, with approximately 222 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### ix. Primary Arms

432.    Defendant Primary Arms, LLC, is a Houston-based online retailer of firearms, parts, and paraphernalia.

433.    Although Primary Arms now appears to sell their "unfinished" frames and receivers serialized and through a FFL, for many years the company shipped "unfinished" frames and receivers directly to New York consumers, with no serialization and no background check.

434.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Primary Arms sent approximately 790 packages to non-FFL addresses in New York State each month, with approximately 332 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### x. Polymer 80

435.    Defendant Polymer 80, Inc., misleadingly advertises and, on information and belief, sells and provides illegal firearms to consumers in the State of New York, including the City. Through a website and a network of dealers, Polymer80 sells a variety of almost complete firearms, including AR-15 semi-automatic rifles and several handguns, which consumers can easily finish at home. These products, which lack identifying information such as serial numbers, are untraceable.

436.    In 2022, Rochester Police recovered approximately 46 Polymer80 guns. In 2021, Rochester Police recovered approximately 46 Polymer80 guns.

437.    Polymer80 tells consumers, including those in the City, that they can legally purchase and possess its products because the guns are no more than 80% complete, and thus do not reach the necessary state of manufacturing to constitute a firearm under federal and state law.

438.    However, Polymer80's core products — lower receivers for rifles and handgun frames — are firearms under federal and state law.

439.    On its website, Polymer80 claims that these weapons, which include an AR-15 semi-automatic rifle, a .308 semi-automatic rifle, and at least seven types of handguns, are no more than 80% complete. Consumers can purchase the lower receivers of rifles or handgun frames, along with other materials — generally, the trigger, barrel, and firing pin, all of which are available, if in stock, on Polymer80's website — needed to complete the receivers and handgun frames into fully functional firearms. The consumers then receive those materials via mail.

440.    To further facilitate the ease of completing its firearms, Polymer80 offers, "Buy, Build, Shoot" kits which "contain[] all the necessary components to build [two different] complete pistol[s]." The website states that these kits include an "80% frame kit, complete slide assembly, complete frame part kit, 10 round magazine and a pistol case."

441.    Consumers can then follow Polymer80's written step-by-step instructions online, often accompanied by supplemental videos, to finish both the pistols and the semi-automatic rifles in a matter of hours.

442.    All of Polymer80's lower receivers and handgun frames lack a unique manufacturer's number, serial number, or a unique dealer's identification number, making these guns untraceable "ghost guns."

443.    Polymer80 tells consumers at multiple places on its website that because the lower receivers and handgun frames it sells are supposedly no more than 80% complete, they can be legally sold, distributed, and possessed.

444.     For instance, Polymer80's website homepage, copied below, asks, "is it legal?" and responds unequivocally, "YES!" This statement would lead a reasonable consumer in the City to believe that Polymer80's handguns are legal for them to purchase and possess.



445.     To establish the purported legality of all its products, Polymer80 links to a determination letter from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to Polymer80 regarding just one of its products, the AR-15 lower receiver. The letter states that the AR-15 lower receiver is not a "firearm" under federal law because it has not reached the necessary state of manufacturing under the federal Gun Control Act of 1968. Polymer80's website provides no similar letter establishing the legality, under federal law or elsewhere, of the other firearms it sells. Polymer80 also provides no information regarding the legality of its products under New York law.

160

446. Polymer80 products are also available through its "Dealers," at least 48 in total, which consumers can access through Polymer80's website.

447. Polymer80 advertises, and, on information and belief, sells, both directly and through its Dealers, lower receivers and handgun frames to New York State and City consumers.

448. On information and belief, Polymer80 engages in the business of selling firearms to New York and City consumers without a dealer's license.

449. On information and belief, Polymer80 does not adhere to the mandatory waiting period on firearm purchases.

450. On August 10, 2022, the Superior Court of the District of Columbia, Civil Division issued an order granting in part and denying in party the District of Columbia's motion for summary judgment for violations of the Consumer Protection Procedures Act. *See District of Columbia v. Polymer80, Inc.*, Case No. 2020 CA 002878 B (available here: https://oag.dc.gov/sites/default/files/2022-08/OGIPSJPoly-20CA2878-.pdf

451. The Court held: "As a preliminary matter, the Court finds that Polymer80's handgun frames, semi-automatic receivers, and Buy, Build, Shoot kits are firearms." *Id.* at 5.

452. Additionally, the Court held, "In the instant case, Polymer80 sold unfinished handgun frames, unfinished semi-automatic receivers, and Buy, Build, Shoot kits to District consumers, and these products are (and were) readily converted into firearms." *Id.*

453. The Court held "that Polymer80 violated the CPPA with respect to D.C. Code § 28-3904 (a),(b),(e-1), and that the District is entitled to summary judgment as to these claims as a matter of law." *Id.* at 9.

454. Also, the Court held, "the Court finds that the District has satisfied its burden in establishing that there is no genuine issue of material fact that Polymer80 violated the District's gun laws, which in turn, served as a violation of the CPPA. Polymer80 violated District law by selling firearms to

161

District consumers without the requisite licenses, and failing to comply with the series of restrictions and requirements the District imposes on licensees. Additionally, Polymer80's firearms violated District law because the firearms were not registered and failed to have an identification number or serial number. Accordingly, the District is entitled to summary judgment as to Count II as a matter of law." *Id.* at 13.

455.    The Court also held: "Given the Court's ruling that Polymer80 violated the CPPA and the District's gun laws, and Polymer80's alarming belief that the sale of its firearms is now legal in the District, to prohibit future sales of its firearms to District consumers, the Court shall grant the Plaintiff's request for a permanent injunction." *Id.* at 14.

456.    The Court also imposed a civil penalty of $4,038,000 for Polymer80's violation of the CPPA. *Id.* at 16-17.

### xi.  JSD Supply

457.    Defendant JSD Supply is a Prospect, Pennsylvania online retailer of "do-it-yourself firearms finishing and customization."[317]

458.    JSD Supply's website boasts, "JSD was founded in a love of guns and hate of paperwork. Since 2013, we've helped thousands of people build their own gun from the privacy of their garage. No serialization, no background check, no government fee."[318]

459.    JSD Supply's website states, "Everything we carry has been personally tested by our team. We know that every component and tool will work for you because we've used them all ourselves. Built correctly, your firearm will look, feel, and operate identically to store-bought models. Expect a

---

[317] https://web.archive.org/web/20220517213953/https://jsdsupply.com/about-us (also available at https://perma.cc/7Q35-HZC7?type=image).

[318] *Id.*

162

firearm that works well and reliably performs year after year. Order a complete build kit and all the tools you need here with us online, or follow JSD Supply on Instagram."[319]

460.    On August 20, 2021, the U.S. Attorney's Office for the Western District of New York issued a press release announcing that, "Lamborghini Lucas, 33, of Buffalo, NY, was arrested and charged by criminal complaint with unlawfully manufacturing firearms."[320]  The press release stated: "Assistant U.S. Attorney Seth T. Molisani, who is handling the case, stated that according to the complaint, on August 6, 2021, investigators executed a New York State search warrant at the defendant's Woodlawn Avenue residence. During the search, a loaded Polymer 80 PF940SC 9mm PMF firearm, also known as a ghost gun, was recovered under a mattress in a bedroom. An additional three Polymer 80 PF940SC 9mm PMF firearms were discovered in a laundry basket full of clothing. A box sent from 'JSD Supply,' which sells gun parts kits, was located in the living room. A receipt in the box showed three 'PF940SC Full build kit-Minus Frame,' Two 'Polymer 80 PF940SC Black,' One 'Polymer 80 PF940SC Gray' for a total of $1,259.94. Throughout the residence, investigators also located three Polymer 80 boxes, three polymer 80 jigs, rotary bits, and a power drill. A records check determined that Lucas does not have a license to manufacture or deal in firearms."[321]

461.    According to the Complaint, "Law enforcement located a Polymer 80 PF940SC 9mm PFM loaded with 9 rounds of 9mm ammunition under the mattress of the front bedroom. Directly next to this firearm was mail addressed to LUCAS. Within a laundry basket full of clothing, three Polymer 80 PF940SC 9rhm PFMs were recovered. A United States Postal Box sent from 'JSD Supply'

---

[319] *Id.*

[320] https://www.justice.gov/usao-wdny/pr/buffalo-man-arrested-charged-manufacturing-ghost-guns

[321] *Id.*

was located in the living area of the apartment. A Web search shows a JSD Supply website featuring 'JSD 80% Lower Receivers, Jigs, and Gun Parts Kits . . . 80% lower build kits are used to create fully functional firearms with no registration or serial numbers.' Within this box was a receipt addressed to Mike Tate 495 Woodlawn, 'User' mrlambolights@gamil.com, this receipt shows three 'PF940SC Full build kit-Minus Frame', Two 'Polymer 80 PF940SC Black', One 'Polymer 80 PF940SC Gray' for a total of $1,259.94."[322]

462.    On July 23, 2020 the Department of Justice issued a press release titled, "Armed Trafficker Sentenced."[323]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Billy B. Sanders, 37, of Rochester, NY, who was convicted of being a felon in possession of ammunition, was sentenced to serve 71 months in prison by U.S. District Judge Charles J. Siragusa."[324] Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who handled the case, stated that the defendant was arrested on May 2, 2019, after New York State Parole officers went to Sander's residence on Saratoga Avenue in Rochester, for a compliance check. During that check, parole officers found a Polymer 80 semiautomatic pistol loaded with eight rounds of ammunition inside a backpack. The handgun did not have a serial number on it. During his plea, Sanders stated that he had the handgun and ammunition because he had been shot and needed the handgun for protection. The defendant admitted he also possessed a small amount of cocaine."[325]

---

[322]  *United States of America v. Lucas*, 1:22-cr-00013-JLS.

[323]  https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-sentenced-1

[324]  *Id.*

[325]  *Id.*

463.     On August 18, 2021, the Department of Justice issued a press release titled, "Rochester Man Arrested At The Peace Bridge With Cocaine And A Ghost Gun."[326]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Luis Amed Colon Molina, 42, of Rochester, NY, was arrested and charged by criminal complaint with possession with intent to distribute cocaine and possession of a firearm in furtherance of drug trafficking activity."[327] Additionally, the press release indicated, " During a search of the defendant's vehicle, the gray fanny pack was removed from the trunk. In addition to the baggies containing a white powder substance, officers also found a digital scale with white powder residue inside the fanny pack. The substance was field tested resulting in a positive presence of cocaine. Officers also recovered a loaded 9mm, Polymer 80 handgun in the vehicle's glove box. The gun did not have a serial number and is considered a 'Ghost Gun.'"[328]

**E.  Ghost Gun Defendants' Guns Have Harmed the City and Will Continue to Do So If Unabated.**

464.     The influx of ghost guns into the State of New York, including the City, is a significant threat to public health and safety. New York's legislature has passed laws designed to ameliorate this threat, but by the conduct described in detail above, Ghost Gun Defendants not only undermine these laws, they affirmatively harm New Yorkers, including residents of the City, by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the

---

[326] https://www.justice.gov/usao-wdny/pr/rochester-man-arrested-peace-bridge-cocaine-and-ghost-gun

[327] *Id.*

[328] *Id.*

number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York, including the City.

465.    As a result, to date, the City has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii) research and implement other measures to quell the crisis, including expanding relevant community support and services and equipping more public hospitals with resources to treat gun-related injuries.

466.    On July 21, 2022, the City of Rochester issued a Proclamation declaring a local State of emergency throughout the City of Rochester due to gun violence.[329]

### i.    The Rise of Ghost Guns and the Damage Done

467.    The available data indicate that ghost guns are proliferating — and are being used in crimes — exponentially. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives, the number of ghost guns recovered at crime scenes nationwide has increased more than elevenfold in just six years, from 1,758 in 2016 to 19,344 in 2021.[330]  Notably, according to the ATF, "[t]hese numbers . . . are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that have no serial numbers or identifiable markings.[331]

---

[329]  https://www.rochesterfirst.com/rochester/watch-live-mayor-evans-rpd-chief-smith-address-gun-violence-in-rochester/

[330]  *See* ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 & n.18 (April 26, 2022) (citing internal figures from the ATF Office of Strategic Intelligence and Information).

[331]  *See id.* at 24656 n.18.

166

468.     The number of ghost guns recovered at crime scenes in New York likely follows this disturbing upward national trend.

469.     Specifically, New York law enforcement is recovering an increasing number of crime guns each year. In 2018, law enforcement made 6,559 crime gun recoveries, but in 2021, that number rose to 10,132 crime guns — an increase of 54.5%.[332]

470.     Ghost guns are an increasingly concerning part of this mushrooming phenomenon. Throughout New York State, including the City. Rochester Police recovered 45 ghost guns in connection with arrests in 2021 and 57so far in 2022. The City believes that the number of ghost guns being recovered only scratches the surface of the problem.

471.     Rochester Police recovered 16 ghost guns in 2020. That number jumped to 45 in 2021 and this year six ghost guns have already been recovered.[333]

472.     Moreover, as of June 17, 2022, there have been 373 recoveries of assembled ghost guns, putting New York on pace to recover over 800 ghost guns over the full year.[334]

473.     When considering the rate of ghost gun recovery in the context of all gun recoveries across the State, the trend is deeply disturbing. In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement. That rate increased to 1.5% in 2019, then 3.6% in 2020, then further to 6.32% in 2021. Upon information and belief, from January 1 through June 20, 2022, law

---

[332] These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns, which never had a serial number.

[333] "Number of Ghost Guns Recovered in Rochester Nearly Triples," available at https://www.nysenate.gov/newsroom/in-the-news/jeremy-cooney/number-ghost-guns-recovered-rochester-nearly-triples

[334] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.

167

enforcement has recovered an assembled ghost gun 8.7% of the time that a gun was recovered. Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

474. The number of assembled ghost guns in New York — including those created from Ghost Gun Defendants' illegal products — has reached crisis levels and continues to climb.

475. The pandemic has exacerbated the issue. Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020. Upon information and belief, Ghost Gun Defendants' sales of "unfinished" frames and receivers have likewise increased significantly over that same time period, with a significant number of those products being shipped directly into New York State or otherwise easily finding their way into New York State — leading to significant profits from this illicit market for Ghost Gun Defendants.

476. Upon information and belief, that increase in sales has coincided with a massive uptick in gun murders, as approximately 79% of U.S. murders committed in 2020 involved a firearm, which represents a 34% increase from 2019, a 49% increase from 2015, and a 75% increase from 2010.[335]

477. While New York was among the states with the lowest rates of gun fatalities in 2020, Ghost Gun Defendants' products and practices are rapidly altering the picture. Indeed, Ghost Gun Defendants' business practices and conduct are significant contributors to New York's increasing rates of gun-related fatalities, including in the City.

> ii. **Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Concerns.**

---

[335] https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

168

478.     Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as a conventional firearm and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and the AR-10 and AR-15.

## X.     Defendants' Conduct Is Dangerous and Directly Harms the City of Rochester

479.     The evidence that all Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of convicted felons.

480.     Rather, guns recovered at crime scenes are statistically related to gun manufacturer practices in the aggregate. Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices. For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appears. The more of these practices that a manufacturer implements and adheres to, the less frequently its products will be recovered from crime scenes. By these practices, a manufacturer can align its business practices with its responsibilities under the law and incentivize its dealer and distributor customers to do the same.

481.     Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices. Defendants named here do nothing to geographically restrain the marketing of their products so as to stem the flow of these products to criminals through the illegal secondary market, and they follow policies and practices that directly result in sales of these illegal products directly to unknown and unchecked individuals in New York, including the City.

169

482.    Moreover, Defendants are aware that criminals are an important segment of the gun industry market. To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws. Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York have been purchased outside of New York. By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering our communities by providing criminals and other individuals who either know, or suspect, they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one.

483.    Moreover, ATF trace data have also long established that certain dealer characteristics indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers, but can bypass any and all dealers entirely.

484.    In the context of domestic violence, an intimate partner is five times more likely to be murdered when the violent partner has access to a firearm.[336] New York law addresses this very real and substantial risk by, among other things, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she owns or possesses when certain conditions are present. See N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Ghost Gun Defendants' sale

---

[336] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations With Intimate Partner Homicide. Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

Case 8:23-cv-00056-MSS-SPF Document 23-3 Filed 05/08/23 Page 499 of 727 PageID 5206

of ghost gun products, and their refusal to conduct background checks, undermine these important protections, increasing the already significant risk that a protected person or persons will be murdered.

485. Ghost Gun Defendants' sale of "unfinished" frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public. Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[337] Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[338] Consistent with that result, permit-to-purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[339]

486. But by their conduct, Ghost Gun Defendants are nullifying those benefits. Defendants are negating the impact of New York's effective licensing and permit laws, and as a consequence the number and rate of homicides and suicides will continue to rise.

487. Given the nature of the business practices and products of all of Defendants, together with the known nature of the gun industry market and the statistical relationship between a gun

---

[337] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.

[338] *Id.*

[339] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

manufacturer's conduct and crime gun outcomes, Defendants are knowingly and/or recklessly causing harm to the City's public health and safety.

488.     With every sale Defendants have made and continue to make, they circumvent and undermine the City's firearms public safety measures for their own profit.

489.     On September 29, 2022, Spectrum News1 published an article titled, "'Justice needs to served': Outcry over shooting of 3-year-old boy in Rochester."[340]  The story provided, "Police say Marlo Joseph, 3, was caught in the crossfire of a shootout between two groups of people Wednesday evening. Rochester police say the boy was inside a parked car when he was struck by a bullet during the gunfire at 700/800 blocks of North Clinton Avenue Wednesday at 6:00 p.m… "All hell was breaking loose. There were gunshots back and forth," said Monroe County Legislator Mercedes Vazquez Simmons, who saw the incident on video. "It looked like a scene out of the wild west where people were just shooting at each other with no regard of anyone being in the city." Rochester police say two people were arrested in connection with the shooting. Police say a 16-year-old suspect has been arraigned on charges of first-degree assault, second-degree criminal possession of a weapon and third-degree criminal possession of a controlled substance. Investigators say he was found wearing a body armor and had a loaded .40 caliber Smith & Wesson handgun…Police say they also took Travis Lewis, 34, into custody following a chase into a house near the crime scene. Lewis tossed a Smith & Wesson 9mm handgun during the chase, according to investigators."[341]

---

[340]  "'Justice needs to be served': Outcry over shooting of 3-year-old boy in Rochester," available at https://spectrumlocalnews.com/nys/rochester/news/2022/09/29/outcry-after-3-year-old-boy-shot-in-rochester

[341]  *Id.*

Case 6:23-cv-06662-MAV-CDL Document 23-1 Filed 09/08/23 Page 503 of 727 PageID 5368

490.    On November 7, 2022, abc13 WHAM published an article titled, "Man arrested on gun charge after shooting of 4-year-old-relative."[342]  The article provides, "A man faces a weapons charge after a 4-year-old girl was shot on the city's northwest side Saturday night, though the suspected shooter remains at large. Officers responded to Selye Terrace before midnight and found evidence of a shooting, though the victim had already been taken to the hospital by private vehicle. Police said the child arrived at Rochester General Hospital with a non-life-threatening gunshot wound and was later transferred to Strong Memorial Hospital. The investigation found that the girl was in a parked car, with two other children and three adults, when an unknown suspect approached and opened fire…Mayor Malik Evans released a statement about the incident Monday. "This weekend's shooting of a 4-year-old child once again illustrates that a small percentage of people have such a depraved indifference to human life that they don't even care if children are caught in the crossfire. We will continue to work to bring these individuals to justice…"[343]

491.    On November 22, 2022, Democrat & Chronicle published an article titled, "'Enough is enough.' Community, mayor react to killing of 12-year-old."[344]  The article provides, "Two children were shot, one fatally, while walking in their neighborhood in southwest Rochester Monday evening. Around 7 p.m., officers from the Rochester Police Department responded to Atkinson and Reynolds streets for multiple ShotSpotter activations, according to a statement by Capt. Frank Umbrino. Once there, they found a 12-year-old boy dead on the sidewalk from at least one gunshot wound to his upper body.

---

[342]  "Man arrested on gun charge after shooting of 4-year-old relative," available at https://13wham.com/news/local/man-arrested-on-gun-charge-after-shooting-of-4-year-old-relative

[343]  *Id.*

[344]  "'Enough is enough.' Community, mayor react to killing of 12-year-old," available at https://www.democratandchronicle.com/story/news/2022/11/22/rochester-ny-shooting-12-year-old-boy-dead-teen-injured-atkinson-reynolds-prospect-streets/69670163007/

Case 6:23-cv-06006-MAV-CDH Document 23-3   Filed 09/08/23   Page 509 of 727 PageID 5269

Umbrino later identified the victim as Juan Lopez, a seventh-grader at the Benjamin Franklin Educational Campus on Norton Street. After Juan was found, a call came in for a second shooting victim on Prospect Street, about two blocks east. There, in the backyard of a home, officers discovered a 16-year-old boy with multiple gunshot wounds. The officers and bystanders gave the teenager lifesaving aid, which included applying a tourniquet to an arterial wound, and he was taken by ambulance to the University of Rochester Medical Center. His condition is serious but stable, Umbrino said in his statement. An initial investigation leads police to believe that the two victims were waling down the street when they were shot by at least one suspect. No arrest have been made…Juan's death marks Rochester's 74th homicide of 2022. Its first was of a 14-year-old boy waling to a corner store in his neighborhood to buy noodles. Julius Greer Jr. was fatally shot in the back while running his errand near North and Herald streets in northeast Rochester."[345]

492.    On December 8, 2022 (last updated December 9, 2022), News10 NBC published an article titled, "If it feels like more children are getting shot, we can tell you the feeling is true."[346]  The story provides, "Compared to years over the past decade, this year the number of children 18 and under who have been shot and killed has doubled and sometimes tripled. Monday, at a remembrance vigil for a 17-year-old murdered in June, a 12-year-old and 16-year-old were shot. Two weeks ago, a 12-year-old was murdered on a sidewalk. This year, the number of homicide victims 18 and under is eight. Two years ago it was three. Fiver years ago it was one. Ten years ago, four. Brean (Berkeley Brean, author): "Why do you think so many children are getting shot and killed?" Dwayne Mahoney, Boys and Girls Club: "Well obviously Berkeley I think it's a complicated question and reason but I think the biggest problem

---

[345]  *Id.*

[346]  "If it feels like more children are getting shot, we can tell you the feeling is true," available at https://www.whec.com/top-news/if-it-feels-like-more-children-are-getting-shot-we-can-tell-you-the-feeling-is-true/

is the access to, the easy access to firearms these days." When it comes to guns, I have done a number of stories asking: where do the guns come from? The police say the data belongs to the ATF. The ATF says it's barred from sharing it. The city is working on a gun trace data report. It's due out in the spring. This year, the number of children 18 and under shot is 54. In 2020 it was 35. Five years ago, 18. A decade ago, 25."[347]

493.     On November 2, 2022 (last updated November 3, 2022), News10 NBC published an article titled, "UPDATE: Girl, 14, charged after students brought gun into Rochester charter school."[348] The article provides, "A 14-year old girl is facing weapons charges after Rochester police said two students brought a loaded gun into the Academy of Health Sciences Charter School on Wednesday. A 13-year old boy was released without being charged. The girl was arraigned in Monroe County Family Court and she was taken to the Monroe County Children's Center. RPD said the information they're releasing is limited because it involves juveniles…Lt. Bello (RPD lieutenant Greg Bello) says they are looking into how the students got ahold of the gun and were able to bring it into school. An investigation is ongoing."[349]

494.     On February 10, 2022, abc13 WHAM published an article titled, "Rochester pediatric doc on gun violence: 'Why does this keep happening?'."[350]  The story provides, "The city of Rochester has been hit by a surge in gun violence over the past two years. An epidemic of gun violence with blood

---

[347]  *Id.*

[348]  "UPDATE: Girl, 14, charged after students brought gun into Rochester charter school," available at https://www.whec.com/top-news/rochester-police-students-bring-loaded-gun-into-school/

[349]  *Id.*

[350]  "Rochester pediatric doc on gun violence: 'Why does this keep happening?'," available at https://13wham.com/news/local/rochester-pediatric-doc-on-gun-violence-why-does-this-keep-happening

being shed by younger and younger victims, like Julius Greer Jr. The 14-year-old was shot and killed picking up an ingredient for his family's dinner. The city is seeing a record breaking 81 homicides and over 400 shooting victims. One alarming difference is the age of the victims. Derek Wakeman, Pediatric General Surgeon & Pediatric Trauma Medical Director University of Rochester, explains how much the numbers have gone up. "The numbers have gone up a lot and that's really happened over the last two years and even this last year was more than the year prior. Quite significantly. In addition to the numbers going up a lot, the number of shooting victims in young children have gone up a lot," said Dr. Wakeman… "I would say when I started this job in 2016, we saw one or two gunshot victims a year. I'd say we're seeing one a month right now. That's a big increase…"[351]

495. On July 21, 2022, the City of Rochester, NY issued a press release titled, "Gun Violence State of Emergency Proclamation."[352] The press release provided, "Mayor Malik D. Evans declared a Gun Violence State of Emergency in the City of Rochester in response to a surge in shootings and deadly shootings. Pursuant to N.Y. State Executive Law Section 24(1) and (2) the Mayor of Rochester has issued a Proclamation of a Local State of Emergency effective today, July 21, 2022, due to a gun violence emergency. The Proclamation gives the Mayor broad powers to protect life and property and to bring the emergency under control."[353] The Proclamation was renewed on August 18, September 20, October 19, November 17, and December 16, 2022.

---

[351] *Id.*

[352] "Gun Violence State of Emergency Proclamation," available at https://www.cityofrochester.gov/gunviolencestateofemergency/

[353] *Id.*

176

496.     On May 10, 2022, Spectrum News1 published and article titled, "Some Rochester children dealing with trauma of city's recent violence."[354]  The article provides, "Violence in the city of Rochester is continuing as police say a 41-year old man was shot multiple times on Melrose Street Tuesday afternoon. Officer say the man was transported to Strong Memorial Hospital with what were first thought to be life-threatening injuries. He's now expected to survive. The shooting follows a violent weekend in the city, where at least eight people were shot, with one killed. Monroe County Legislator Mercedes Vazquez Simmons recently shared her thoughts on the historic level of violence in the city… "I think we need to take an aggressive action," Vazquez said. "As the weather gets warmer, we're going to see an increase in violence."…Some families are participating in the county legislator's city soccer league, the Latino Youth Development Resource Center Summer Soccer League. The idea is to start talking about violence and how to resolve the conflict at an early age. Vazquez reaches out to teens, schools age children and their families in District 22 that are hard hit by the violence. Some of the children say they are so fearful of the guns and criminals, they don't sleep in, but rather under their beds…. "These experiences with the violence becomes traumatic for them," Rochester parent Ebony Stubbs said. "Traumatic in a way that maybe they won't talk about it now, but they physically see it."…The program encourages parent involvement. "We need to work together to get gun violence to stop and stop killing our children and young people because they need to be living," Rochester parent Aliya Cooper said. This program offers an opportunity to forget about the violence, or to talk about it. "So we want to give them a little bit of normalcy with this program," Vazquez Simmons said. "You know, you see, the kids are allowed to just be kids."[355]

---

[354] "Some Rochester children dealing with trauma of city's recent violence," available at https://spectrumlocalnews.com/nys/rochester/news/2022/05/10/children-in-rochester-dealing-with-trauma-of-city-s-recent-violence

[355] *Id.*

497.    Using CDC data from 2015-2019, Brady United Against Gun Violence established five-

year averages of firearm fatalities:



## EVERY DAY ON AVERAGE

### 316
People are shot

### 22
Children and teens (age 1-17) are shot

| FATALITIES | GUN INJURIES |
|---|---|
| **106** People die from gun violence | **210** People survive gun injuries |
| **39** murdered | **95** intentionally shot by someone else |
| **64** die from suicide | **10** survive an attempted gun suicide |
| **1** killed unintentionally | **90** shot unintentionally |
| **1** killed by legal intervention | **4** shot by legal intervention |
| **1** died but intent was unknown | **12** shot but intent was unknown |

| FATALITIES | GUN INJURIES |
|---|---|
| **5** Kids & teens die from gun violence | **17** Children & teens survive gunshot injuries |
| **2** murdered | **8** intentionally shot by someone else |

**2**
children and teens either die from suicide or survive a suicide attempt.

**8**
children and teens are unintentionally shot in instances of family fire — a shooting involving an improperly stored or misused gun found in the home, resulting in injury or death.

While Brady historically used CDC data to establish averages for gun injuries as well, recent findings show there are more accurate sources. Due to funding restrictions and other constraints, the sample size utilized by the CDC is so small that its estimate of firearm injuries varies significantly. Data provided by Healthcare Cost and Utilization Project's HCUPnet, and collected from emergency departments and databases, gives a more comprehensive picture of gun injuries in the U.S. The numbers below represent a three-year average of the **most recent** HCUPnet data available (2013, '14, and '16). It is important to note that data reported for children and teens contains data only for 1-17 year-olds.

179

498.    On July 21, 2022, the City of Rochester issued a Proclamation proclaiming a Local State of Emergency throughout the City of Rochester due to gun violence.[356]  The Proclamation was renewed on November 17, 2022 and proclaims:

- WHEREAS, by Executive Order 211and executive 3.10 there exists a statewide gun violence emergency; and

- WHEREAS, in order to address the threat that gun violence poses to the health and welfare of the City of Rochester's residents and visitors, I previously proclaimed a Local State of emergency on July 21, 2022; and renewed the same on August 18, 2022, September 20, 2022, and October 19, 2022; and

- WHEREAS, the City of Rochester continues to see unprecedented levels of gun violence; and

- WHEREAS, as of November 17, 2022, there have been 318 shooting victims in calendar year 2022; and

- WHEREAS, as of November 17, 2022, the City's homicides have totaled 72;

- NOW, THEREFORE, I, Malik D. Evans, Mayor of the City of Rochester, New York, pursuant to the powers granted me under New York State executive Law Section 24 hereby continue the previously proclaimed local State of Emergency throughout the City of Rochester due to gun violence. This State of emergency shall continue through December 16, 2022.

## XI.    This Avoidable Crisis Needs to Be Fixed

---

[356]

https://www.cityofrochester.gov/gunviolencestateofemergency/#:~:text=State%20Executive%20Law%20Section%2024,to%20a%20gun%20violence%20emergency.

180

499.    The rise of gun violence in the State of New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order.[357]

500.    As herein described, Defendants have created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating the ongoing public health crisis.

501.    New York's Penal Law establishes that the unlawful possession, sale, or use of an "unfinished" frame or receiver constitutes a nuisance. N.Y. Penal Law §§ 265.07, 400.05.

502.    New York law permits civil enforcement actions based on such a nuisance. Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities."[358]

503.    Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

504.    Moreover, "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." Id. § 898-b(2). A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce. Id. § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

---

[357]    See N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence) (available at https://www.governor.ny.gov/sites/default/files/2022-06/EO_3.9.pdf).

[358]    New York Sponsors Memorandum, 2021 S.B. 7196 (available at https://www.nysenate.gov/legislation/bills/2021/S7196); see also N.Y. Gen. Bus. Law § 898-d.

181

Case 8:23-cv-00066-MSS-JSS Document 23-1 Filed 09/08/23 Page 510 of 727 PageID 5417

505.    Here, and as described more fully above, each Defendant has engaged in conduct prohibited by General Business Law § 898-b.

506.    For example, as detailed above, several Ghost Gun Defendants sent several shipments to individual consumers in a short period of time, making no effort to determine whether those consumers were engaged in firearms trafficking; shipped "unfinished" frames and receivers to individuals who were not eligible to legally own a firearm; and, as to those Ghost Gun Defendants who sold "unfinished" frames or receivers to undercover employees of New York City or the Office of the Attorney General, they made no attempt to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State. Upon information and belief, each sale of Ghost Gun Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

507.    The misconduct of each Defendant is ongoing and continuous.

508.    Each Defendant's misconduct has resulted in significant ongoing harm and costs to the City.

509.    The City believes that abating the public health and safety crisis caused by Defendants' products will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy "unfinished" frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard hit by gun violence and crimes.

510.    Despite enacting evidence-based gun control laws and effective enforcement strategies, the City finds itself in a gun violence crisis. All Defendants herein named caused, maintained, and/or contributed to this crisis for their own profit, and must be held accountable.

Case 3:23-cv-00056-MSS-FGW Document 23-1 Filed 09/08/23 Page 588 of 727 PageID 5358

### FIRST CAUSE OF ACTION
**(Violation of GBL § 898 (a-e))**

511.     The City incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

512.     Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained, and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City.

513.     By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City.

514.     Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and diverted scarce law enforcement resources.

515.     Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City.

516.     Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals,

183

juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the State of New York and the City.

517.     Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

518.     Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

519.     Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City and in the State of New York by unlawfully and unreasonably interfering with public safety and health and undermining New York's General Business Law § 898 (a-e), and it has resulted in the specific and particularized injuries suffered by the City.

520.     Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

521.     Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City and State of New York.

522.     Upon information and belief, Defendants' actions make the City and the public vulnerable to crime and assault, and their conduct creates a public nuisance within the meaning of New York's General Business Law § 898 (a-e).

523. Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers who have criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear, in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

524. Upon information and belief, as a result, Defendants' conduct unreasonably exposes the City and the public to a risk of harm.

525. Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

526. Upon information and belief, Defendants' acts are the cause of the Plaintiff's past, present and future injury.

527. Defendants' conduct violates § 898-b of the New York General Business Law ("GBL"), which declares such conduct to be a public nuisance under GBL § 898-c. The statute expressly provides that a city corporation counsel may bring a lawsuit on behalf of the municipality to enjoin and restrain violations of §§ 898-b(1) or (2). GBL § 898-d.

528. GBL § 898-b provides a statutory cause of action against "gun industry members" who endanger the public through unlawful or unreasonable business practices involving firearms or firearm

185

Case 8:23-cv-00066-MSS-SPF   Document 23-3   Filed 09/08/23   Page 514 of 727 PageID 5381

components or who fail to use reasonable controls to prevent those products from being possessed, used, sold, or marketed unlawfully in New York State.

529.    Specifically, GBL § 898-b provides:

> 1. No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

> 2. All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

530.    The statute defines "gun industry member" as any person or entity "engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories." GBL § 898-a(4). Each Defendant is a gun industry member because it engages in one or more of the above.

531.    "Qualified product" is defined under GBL § 898-b by reference to 15 U.S.C. § 7903(4), which in turn defines "qualified product" to include "a firearm" as defined in the federal Gun Control Act, or "a component part of a firearm or ammunition," that "has been shipped or transported in interstate or foreign commerce." See GBL § 898-a(6). Each Defendant sells, manufactures, assembles, imports, distributes and/or markets Qualified Products.

532.    Under the federal Gun Control Act, a "firearm" is defined, in relevant part, as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

533.    Each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market "Qualified Products" in the City and New York State.

Case 3:23-cv-00066-MSS-FGW Document 23-1 Filed 09/08/23 Page 515 of 727 PageID 5392

534.     Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of Qualified Products, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City and New York State that endangers the health and safety of the public.

535.     Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its Qualified Products from being possessed, used, marketed or sold unlawfully in New York and the City.

536.     Accordingly, each Defendant has violated, and continues to violate GBL § 898-b.

## SECOND CAUSE OF ACTION
### (Common Law Public Nuisance)

537.     The City incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

538.     Defendants, through their past and present business practices, create, contribute to, and maintain a public nuisance under the common law.

539.     A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977) (internal citations omitted).

540.     Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City.

187

541.    By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City.

542.    Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and caused the diversion of scarce law enforcement resources.

543.    Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City.

544.    Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in New York and the City.

545.    Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

546.    Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to

188

easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

547. Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City and State of New York by unlawfully and unreasonably interfering with public safety and health.

548. Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

549. Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City and State of New York.

550. Upon information and belief, Defendants' actions make the Plaintiff and public vulnerable to crime and assault and their conduct creates a public nuisance.

551. Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, that appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

552. Upon information and belief, as a result, Defendants' conduct unreasonably exposed Plaintiff to a risk of harm.

553. Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

554. Furthermore, upon information and belief, Defendants have created a firearms market that is oversaturated and their conduct has unreasonably interfered with public safety and health.

555. Upon information and belief, Defendants' acts are the cause of Plaintiff's past, present, and future injury.

556. Upon information and belief, each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market firearms in the City and New York State.

557. Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of firearms, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City and New York State that endangers the health and safety of the public.

558. Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its firearms from being possessed, used, marketed or sold unlawfully in New York and the City.

559. Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in the City.

### THIRD CAUSE OF ACTION
### (Deceptive Business Practices in Violation of GBL 349)

560. The City incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

190

561.     GBL Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

562.     Upon information and belief, all Defendants have repeatedly violated GBL § 349 by engaging in a wide array of deceptive acts and practices, as set forth above.

563.     In particular, the Ghost Gun Defendants have repeatedly violated GBL § 349 by selling "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Rochester, and also by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess these products, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

564.     In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 349 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

565.     Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

566.     Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

567.     Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

568. Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

569. As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

### FOURTH CAUSE OF ACTION
### (Deceptive Business Practices in Violation of GBL 350)

570. The City incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

571. GBL Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

572. Upon information and belief, all Defendants have repeatedly violated GBL § 350 by engaging in a wide array of deceptive acts and practices, as set forth above.

573. In particular, the Ghost Gun Defendants have repeatedly violated GBL § 350 by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Rochester, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

574. In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 350 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

575.     Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

576.     Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

577.     Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

578.     Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

579.     As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as to the FIRST, SECOND, THIRD, and FOURTH Causes of Action, awarding Plaintiff amounts that exceed the jurisdiction of all lower Courts:

i.     compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.    direct Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

iii.   treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

iv.    punitive damages;

Case 8:23-cv-00066-MSS-JSS   Document 23-3   Filed 09/08/23   Page 522 of 727 PageID 5469

v.    attorneys' fees;

vi.   interest, costs and disbursements; and

vii.  such and further relief as this Court may deem just and proper.

Dated:    December 21, 2022
          Melville, New York

 

Salvatore C. Badala
Shayna E. Sacks
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, New York 11747
SBadala@Napolilaw.com
SSacks@Napolilaw.com

 

Paul J. Napoli
Hunter J. Shkolnik
NAPOLI SHKOLNIK
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
Phone: (347) 379-1688
pnapoli@NSPRlaw.com
hunter@NSPRlaw.com

*Attorneys for Plaintiff*

Case 3:23-cv-00066-RSB-JCH Document 23-1 Filed 09/08/23 Page 200 of 202 PageID 5430

# VERIFICATION

STATE OF NEW YORK    )
                     )    ss.:
COUNTY OF SUFFOLK    )

Salvatore Badala, being first duly sworn, deposes and says: That he represents the Plaintiff in

the above entitled action, that he has read the foregoing Verified Complaint and knows the contents

thereof; that the same is true of her own knowledge except as to matters and things therein stated

upon information and belief, and as to those matters and things she believes it to be true.

_____
Salvatore C. Badala

Sworn before me this
21st day of December, 2022

_____
Harold May
Notary Public, State of New York
No. 01MA5069176
Qualified in Suffolk County
My Commission Expires: November 18, 2026

195

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

---------------------------------------------------------------------X

THE CITY OF ROCHESTER,

               Plaintiff,

      – against–

SMITH & WESSON BRANDS, INC.; BERETTA U.S.A.
CORP.; BUSHMASTER FIREARMS INDUSTRIES, INC.;
COLT'S MANUFACTURING COMPANY, LLC;
GLOCK, INC.; HI-POINT FIREARMS, A/K/A
STRASSEL'S MACHINE, INC.; JA INDUSTRIES, LLC,
F/K/A JENNINGS FIREARMS, F/K/A BRYCO ARMS,
F/K/A JIMENEZ ARMS; KEL-TEC CNC INDUSTRIES,
INC.; O.F. MOSSBERG & SONS, INCORPORATED;
REMARMS, LLC, A/K/A REMINGTON FIREARMS;
SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER &
CO., INC.; SCCY INDUSTRIES, LLC; TAURUS
HOLDINGS, INC., A/K/A TAURUS INTERNATIONAL
MANUFACTURING, INC.; JJE CAPITAL HOLDINGS,
LLC; ARM OR ALLY, LLC; BROWNELLS, INC., A/K/A
BROWNELLS OR BOB BROWNELL'S; GS
PERFORMANCE, LLC, A/K/A GLOCKSTORE, A/K/A
GSPC A/K/A DOUBLE DIAMOND; INDIE GUNS, LLC;
JSD SUPPLY; KM TACTICAL; POLYMER80, INC.;
PRIMARY ARMS, LLC; RANIER ARMS, LLC; SALVO
TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P
FREEDOM CO.; ROCK SLIDE USA, LLC; BANGERS,
L.P. N/K/A IRON VALLEY™ SUPPLY CO.; GUN
CENTER INC., A/K/A GC WHOLESALE; RSR GROUP,
INC.; VINTAGE FIREARMS, LLC; AND WOLCOTT
GUNS INC.,

               Defendants.

---------------------------------------------------------------------X

Index No.:

================================================================

## VERIFIED COMPLAINT

================================================================

**NAPOLI SHKOLNIK PLLC**

400 Broadhollow Road, Ste. 305.Melville, New York 11747, Tel: (212) 397-1000
*Attorneys for Plaintiff*

================================================================

The undersigned attorney hereby certifies, pursuant to 22 NYCRR 130-1.1a that he has read the
within papers and that same are not frivolous as that term is defined in 22 NYCRR 130-1.1(c).

                   /s/ Salvatore C. Badala
                   Salvatore C. Badala

196

Case 8:23-cv-00066-MSS-SPF Document 23-3 Filed 09/08/23 Page 202 of 202 PageID 5492

================================================================

Service of a copy of the within                                      is hereby admitted.

Dated,              _____

        Attorney(s) for

================================================================

PLEASE TAKE NOTICE:

    ☐   NOTICE OF ENTRY

          that the within is a (certified) true copy of an                  duly entered in the office of the clerk of the within named court on _____200__.

    ☐   NOTICE OF SETTLEMENT

          that an order                of which the within is a true copy will be presented for settlement to the HON.        one of the judges of the within named Court, at on         200____ at_____ O'clock ____.M.

Dated,    _____

                       Yours, etc.

### NAPOLI SHKOLNIK PLLC

197

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
THE CITY OF NEW YORK,

|  |  |
|---|---|
| Plaintiff, | CIVIL ACTION NO. 22-CV-5525 |
| -against- |  |
| ARM OR ALLY LLC, RAINIER ARMS, LLC, SALVO TECHNOLOGIES, INC. d/b/a "80P BUILDER," ROCK SLIDE USA, LLC, and INDIE GUNS LLC, | **AMENDED COMPLAINT FOR INJUNCTIVE RELIEF** |
| Defendants. |  |

--------------------------------------------------------------------x

Plaintiff the City of New York (the "City") by and through its attorney, Hon. Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, alleges upon personal knowledge as to itself and upon information and belief as to all other matters as follows:

## INTRODUCTION

1.      This is an action to end the tide of illegal "ghost guns" flowing into New York City. Ghost guns are unserialized, user-assembled firearms named for their most desired feature—invisibility to law enforcement. Ghost guns are deliberately sold without the federally-mandated serial number that enables law enforcement to trace to purchasers the firearms recovered at crime scenes. That feature alone makes the guns attractive to the criminal market bent on evading detection.  Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market of felons, domestic abusers, children – anyone barred by law from acquiring guns.

2.      Ghost guns and their central component, so-called "unfinished" or "80%" frames or lower receivers, are illegal to sell or possess under New York City and New York State law, and constitute a statutory and common law public nuisance, which defendants cause and to which

1

they contribute. Defendants hawk ghost gun components over the internet to New York City residents, thwarting federal, state and local firearms laws.

3.      Ghost gun sellers operate on the pretense that their products are not firearms because they are "unfinished" and hence when sold require neither serial numbers nor background checks. Defendants' business model is to sell "unfinished" frames to persons who, following Defendants' simple instructions, will "finish" them, and – by adding the remaining components Defendants also provide – assemble fully operational weapons.

4.      New York City is experiencing the entirely predictable result of Defendants' lawless behavior: exponentially-increasing numbers of untraceable ghost guns used in crimes in the City, including multiple murders and other crimes of violence, often committed by persons could never legally acquire a conventional firearm in the first place.[1] Felons and other prohibited or unlicensed possessors of guns also amass large caches of untraceable weapons;[2] a ghost gun has even been brought to school by a high school student.[3]

5.      Incidents involving ghost guns reflect a dangerously escalating trend, from 17 ghost guns recovered in arrests in 2018, to 48 in 2019, 150 in 2020 and 263 in 2021. The recovery by

---

[1] Reuven Fenton, Joe Marino and Jorge Fitz-Gibbon, *'Ghost gun'-obsessed Taco Bell staffer returned to work after fatal shooting: DA,* N.Y. Post (May 4, 2022), available at https://perma.cc/Q8SX-AWFW (captured May, 17, 2022); Larry Celona, Tina Moore, Kevin Sheehan and Jorge Fitz-Gibbon, *This is the 'ghost gun' tied to the shooting of a Bronx teenager,* N.Y. Post (April 10, 2022), available at https://perma.cc/2XCX-U3X3 (captured May 6, 2022); *NYPD: 5 Shot, Including Suspect, After Fight Breaks Out As Bars Close In Upper Manhattan,* CBS News New York (Sept. 27, 2021), available at https://perma.cc/3TE3-EEET (captured May 17, 2022); *3 Men Shot As Groups Clash Outside Manhattan Recording Studio,* CBS News New York (November 17, 2021), available at https://perma.cc/SDS5-84LZ (captured May 17, 2022).

[2] Press Release, *Queens Man Charged With Possessing Arsenal of Illegal "Ghost" Guns,* Queens County District Attorney (Dec. 9, 2021), available at https://perma.cc/7C9D-XJ4L; *see also* http://www.brooklynda.org/2022/04/22/bushwick-man-indicted-for-illegal-possession-of-ghost-guns/; Ben Feuerherd, *NYC man allegedly kept 'arsenal' of 'ghost guns' and ammo in Brooklyn home,* N. Y. Post (Oct. 4, 2021), available at https://perma.cc/X6KF-3DP9; *United States v. Gary Brown,* Criminal Docket No. 20-352 (E.D.N.Y.) (ECF No. 26, Sentencing Memorandum, filed Oct. 14, 2021).

[3] *Student arrested with gun, $30K cash in backpack at Brooklyn high school,* ABC7 NY Eyewitness News (Dec. 2, 2021), available at https://perma.cc/8RSL-GNRS.

NYPD of 263 ghost guns in 2021 arrests represents a fifteen-fold increase over the 17 ghost guns recovered in 2018. NYPD's 2022 ghost gun recoveries are on pace to exceed the 2021 total, with 175 ghost guns recovered via arrests through June 14, 2022, approximately 9% of the guns recovered by the NYPD during arrests.

6.        Nationally, the federal government estimates that between 2016 and 2021, law enforcement recovered more than 45,000 ghost guns from crime scenes, including 692 murder or attempted murder scenes. The annual totals recovered increased ten-fold during the course of the six-year period considered by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),[4] bearing in mind that these numbers are limited to recovered ghost guns; countless more remain on the streets or in homes—unlicensed, untraceable, and invisible to law enforcement.

7.        Defendants' illegal conduct thus results in a proliferation of unserialized, untraceable, unlawful ghost guns in the City's streets and homes, making the City more dangerous for both the public and for law enforcement, causing a quintessential public nuisance. The Court should order Defendants to cease immediately their sales and deliveries into New York City and abate the nuisance by providing the City with the information needed for law enforcement to recover these unlawful, dangerous, and untraceable weapons.

## JURISDICTION AND VENUE

8.        The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the City and each Defendant are citizens of different States and the value of the injunctive relief sought from each Defendant exceeds $75,000, excluding interest and costs.

9.        Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

---

[4] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," Fed. Reg. Vol. 87. No. 80, 24652, 24656 (April 26, 2022).

## PARTIES

10.     Plaintiff the City of New York (the "City") is a municipal corporation organized under the laws of the State of New York.

11.     Defendant Arm or Ally LLC ("Arm or Ally") is a Missouri limited liability company headquartered in Kansas City, Missouri, with a principal place of business at 1803 NW 93rd Terrace, Kansas City, MO 64155. Arm or Ally has two members/owners: Geoffrey Poitras and James F. Tobin. Mr. Poitras is a resident of and is domiciled in the State of Missouri and Mr. Tobin is a resident of and is domiciled in the state of North Carolina. Arm or Ally is therefore a citizen of the State of Missouri and the State of North Carolina for purposes of diversity jurisdiction.

12.     Defendant Rainier Arms, LLC ("Rainier Arms") is a Washington limited liability company headquartered in North Auburn, Washington, with a principal place of business at 2504 Auburn Way, North Auburn, WA 98002. Rainier Arms has one member/owner: John Hwang. Mr. Hwang is a resident of and is domiciled in the State of Washington. Rainier Arms is therefore a citizen of the State of Washington for purposes of diversity jurisdiction.

13.     Defendant Salvo Technologies, Inc., ("80P Builder") is a Florida corporation headquartered in Clearwater, Florida, with a principal place of business at 711 Pinellas St., Clearwater, FL 33756 and doing business as 80P Builder, which is based in Largo, Florida and has a principal place of business at 10781 75th Street, Largo, FL 33777.

14.     Defendant Rock Slide USA, LLC ("Rock Slide USA") is a North Carolina limited liability company headquartered in Broadway, North Carolina, with a principal place of business at 303 N. Main St., Broadway, NC 27505. Rock Slide USA has one member/owner: Ian O. Frampton. Mr. Frampton is a resident of and is domiciled in the State of North Carolina. Rock Slide USA is therefore a citizen of the State of North Carlina for purposes of diversity jurisdiction.

4

15.     Defendant Indie Guns, LLC ("Indie Guns") is a Florida limited liability company headquartered in Orlando, Florida, with a principal place of business at 3000 Huntington St. Orlando, FL 32803. Indie Guns has two members/owners: Lawrence Destefano and Raymond Villafane. Mr. Destefano and Mr. Villafane are residents of and are domiciled in the State of Florida. Indie Guns LLC is therefore a citizen of the State of Florida for purposes of diversity jurisdiction.

## FACTUAL ALLEGATIONS

## I.     Ghost Guns are Untraceable Firearms Intended to Evade Gun Control Laws.

16.     Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as a conventional firearm and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and AR-10 and AR-15 assault rifles. But ghost guns are untraceable and designed to evade background checks, licensing, and other state and local rules governing sales, making the weapons extremely attractive to criminals and dangerous to the public. As San Diego's Police Chief has put it, "We work so hard in ensuring that individuals pass background checks and are responsible gun owners. And that really gets thrown out the door when you have individuals that can just make a homemade gun."[5]

17.     The absence of serial numbers makes the investigation of crimes committed using ghost guns far more difficult. As the United State House Committee on Homeland Security concluded in a 2019 report, "[g]host guns not only pose a challenge on the front end, enabling

---

[5] Alain Stephens, Ghost Guns are Everywhere in California, The Trace (May 17, 2019), https://www.thetrace.org/2019/05/ghost-gun-california-crime/.

prohibited buyers to purchase deadly weapons with just a few clicks online, but also on the back end, hamstringing law enforcement's ability to investigate crimes committed with untraceable weapons."[6] ATF itself has explained that the absence of serial numbers "makes it more difficult for Federal, State, and local law enforcement to identify and prosecute illegal firearms traffickers who are often tied to violent criminals and armed narcotics traffickers."[7]

### A. Defendants market and sell gun frames and receivers in a not-quite-finished state, to skirt federal gun laws and regulations.

18.     The core component of any gun, including a ghost gun, is the frame, also known as the lower receiver. The frame or lower receiver[8] houses all or most of the gun's other essential components, including the trigger, magazine, slide, and barrel.

19.     The image below shows the parts of a simulated Glock ghost gun—the most commonly-recovered type of ghost gun in New York City—with the frame shown in light gray,

---

[6] ATF, Notice of Proposed Rulemaking, "Definition of 'Frame or Receiver' and Identification of Firearms," Fed. Reg. Vol. 86. No. 97, 27220, 27223 (May 21, 2021) (quoting H.R. Rep. No. 116-88, at 2 (May 28, 2019)).

[7] ATF, Notice of Proposed Rulemaking, "Definition of 'Frame or Receiver' and Identification of Firearms," Fed. Reg. Vol. 86. No. 97, 27220, 27225 (May 21, 2021).

[8] The term "frame" is typically used for handguns, while "receiver" or "lower receiver" is typically used for longer guns, such as AR-15s.

and the parts required to finish the gun shown in black.[9]  Below that is an image that shows the parts of a ghost assault rifle.





20.     Under federal law, a frame or lower receiver is regulated in the same way as a complete firearm. Indeed, federal law defines "firearm" to include a complete (or near complete)

---

[9] Everytownresearch.org, *Untraceable: The Rising Specter of Ghost Guns*, (May 14, 2020), https://everytownresearch.org/report/the-rising-specter-of-ghost-guns/.

gun and the "frame or receiver" of a firearm. Specifically, the Gun Control Act defines "firearm," in relevant part, as:

> (A) any weapon … which will or is designed to *or may readily be converted to* expel a projectile by the action of an explosive; [or] (B) *the frame or receiver of any such weapon*.

18 U.S.C. § 921(a)(3) (emphasis added). A frame or receiver is accordingly subject to the same serialization and federal background check requirements as a complete firearm.

21.     Defendants' business model is to sell so-called "unfinished" frames or receivers to persons who will assemble them into fully operational firearms, using parts or kits purchased from Defendants or other ghost gun dealers.  Defendants sell frames or receivers that they claim are partly "unfinished," or "80%" complete, and thereby purport to skirt the statutory definition of a firearm and avoid the application of federal law and regulation altogether. In fact, as sold by Defendants, frames and receivers are "firearms" because they are "designed to or may readily be converted to expel a projectile by the action of an explosive" or are "the frame or receiver of any such weapon."

22.     Independently, "unfinished" frames and receivers and "80% frames" are illegal under local and state law.  Legislatures responded to the ghost gun ruse by expressly so specifying. Sales and delivery of "unfinished" frames or receivers into New York City has been illegal under N.Y.C. Admin. Code § 10-314 since February 2020, and under N.Y. Penal Law §§ 265.60-.64 since April 26, 2022.

23.     By purporting to sell "unfinished" frames and receivers to consumers without background checks, without serial numbers, and without complying with any other federal, state,

and local laws governing firearms, Defendants assist and facilitate the evasion of federal, state and local laws banning the sale or possession of "unfinished" frames and receivers.

24.    Indeed, evasion of regulation is the core of Defendants' business model. The appeal of ghost guns is rooted largely, if not entirely, in their purported status as outside the reach of the firearms laws.  Polymer80, Inc., the dominant ghost gun manufacturer in the United States, has admitted in court that if its "80%" frames and receivers were deemed firearms under federal law, sales of its products would decline precipitously: "annual revenue would be diminished by more than fifty (50) percent, and perhaps as much as seventy-five (75) percent."[10]

25.    It is child's play to turn an "unfinished" frame or receiver into a "finished" frame or receiver, and then assemble a fully functional gun. Defendants make "finishing" still simpler and quicker by selling the "unfinished" frame or receiver in a kit that includes a template (known as a "jig"), drill bits, and other hardware. The jig is a molded case into which the "unfinished" frame or receiver fits, with holes labeled for insertion of drill bits, and with directions about the removal of certain polymer tabs.

26.    Step by step instruction manuals, easily accessible on the internet and from ghost gun manufacturers, explain to customers the steps to complete the frame or receiver and assemble an operable firearm using simple tools. *See, e.g.,* Polymer80 Website, "How to," https://bit.ly/30GNCOy. Retailers also provide guidance. S*ee* Arm or Ally's Website, "In the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools," https://bit.ly/3a0f9PN; Rock Slide USA Website, "Polymer

---

[10] *See* Declaration of David L. Borges in Support of Motion of Polymer80 Inc. to Intervene in this Action, dated Dec. 30, 2020, *City of Syracuse, NY v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 20-cv-6885 (S.D.N.Y.) (ECF # 80).

80, 80% lowers come with everything needed to make your own custom, Glock compatible pistol at home", https://bit.ly/3NpBGTY.

27.    Persons seeking to mass-produce ghost guns can purchase the "Ghost Gunner," a machine that finishes the frame or receiver still faster and with less work than hand assembly—an especially attractive option for those seeking to traffic ghost guns.[11]

## II.    Defendants violate and circumvent, and assist their customers in violating and evading local, state, and federal gun laws designed to protect public safety.

28.    The purpose and the result of the ghost gun business model is the easy acquisition of untraceable, operable firearms without compliance with federal, state, and local laws regulating firearms. Defendants intentionally assist their customers in violating those laws, and themselves violate the state and local laws prohibiting the sale of "unfinished" frames and receivers into New York City and State.

### A.    The Federal Gun Control Act

29.    The 1968 federal Gun Control Act regulates the manufacture, sale, and possession of firearms, including frames and receivers. 18 U.S.C. § 921(a)(3). The Gun Control Act requires all commerce in firearms to proceed through federally licensed manufacturers, importers, and dealers, known as federal firearms licensees ("FFLs"), 18 U.S.C. §§ 922(a)(1)(A); 923(a), who in turn must operate in strict conformity with federal, state, and local laws pertaining to firearms.

30.    To ensure that all firearms may be traced to the first purchaser, federal law requires licensed manufacturers and importers to inscribe a serial number on the frame or receiver of each firearm they manufacture or import. 18 U.S.C. § 923(i).

31.    To prevent the acquisition of firearms by people deemed unfit to possess them, licensed dealers may not sell or transfer a firearm to specified prohibited persons, as determined

---

[11] *See* https://ghostgunner.net/, also available at https://perma.cc/55AU-AEUA.

through a mandatory background check. 18 U.S.C. § 922(d), (t). Prohibited persons include, among others, individuals who: i) have been convicted of a felony; ii) have been convicted of any crime of domestic violence or are subject to a domestic violence restraining order; iii) have been involuntarily committed to a mental health facility or adjudged "mentally defective"; iv) have been dishonorably discharged from the military; or v) are unlawful users of controlled substances. 18 U.S.C. § 922(d), (g). FFLs may not sell or transfer rifles or shotguns to anyone under the age of 18, or other types of firearms to anyone under 21. 18 U.S.C.§ 922(b)(1).

32. To curb gun trafficking or transfers of guns to prohibited persons, federal law prohibits FFLs from shipping firearms to purchasers, and requires all firearm sales be conducted in person except in very limited circumstances requiring, among other things, notice to law enforcement. 18 U.S.C. §§ 922(a)(2), (c). FFLs may not sell or deliver a firearm to any person where the purchase or possession violates any applicable state or local law, 18 U.S.C. § 922(b)(2), or to persons that do not reside in the state of the dealer's place of business, except for in-person sales of rifles or shotguns that fully comply with both states' laws. 18 U.S.C. § 922(b)(3).

33. Licensed manufacturers and dealers must keep records of all firearm sales, noting the make, model, and serial number of the firearm, as well as the "name, age, and place of residence" of the purchaser. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A). FFLs may not sell a firearm without providing the recipient with a secure gun storage or safety device. 18 U.S.C. § 922(z).

34. On April 26, 2022, ATF published a final rule, effective August 24, 2022, stating that the "unfinished" frame and receiver kits Defendants sell are firearms under the Gun Control Act. *See* ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," Fed. Reg. Vol. 87. No. 80, 24652, 24673 (April 26, 2022)("Final Rule"). The Final Rule explains that "a frame or receiver parts kit containing a partially complete … blank of a frame or receiver

11

that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver." *Id.* at 24739; *see also id.* ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.")

35.     The Final Rule nullifies prior informal ATF guidance, set forth in determination letters to a ghost gun manufacturer, finding that certain examples of "unfinished" "80%" frames or receivers, when considered in isolation, did not constitute firearms under federal law. ATF's Final Rule is consistent with, and correctly interprets, the federal Gun Control Act.[12]

**B.     New York State Law**

36.     Since April 26, 2022, New York State law has expressly prohibited the possession, sale, or offering for sale of ghost guns and "unfinished" or unserialized frames or receivers by or to persons in New York State. *See* N.Y. Penal Law §§ 265.00(6) (defining "dispose of"), (8-a) (defining "serialized"), (32) (defining "unfinished frame or receiver" and "ghost gun"), 265.01(9) (prohibiting possession of ghost guns), (10) (prohibiting possession of unserialized or "unfinished" frame or receiver), 265.07 (registration and serialization of firearms, rifles, shotguns, finished frames or receivers, and "unfinished" frames or receivers), 265.60 (criminal sale of a ghost gun in

---

[12] In addition, in a May 9, 2022 letter to a ghost gun components retailer, ATF explained that, "notwithstanding the recently announced regulations and definitions" in the final rule, it has "always been" ATF's position that the sale and transfer to a single customer of "all the components necessary to produce a fully functional firearm," whether sold in "one or multiple transactions," constitutes the sale of a "firearm" under the Gun Control Act and is unlawful unless made according to the requirements of the Gun Control Act, including serialization and a background check. *See* May 9, 2022 letter from Matthew Varisco, Special Agent in Charge, ATF Philadelphia Field Division to JSD Supply, available at https://perma.cc/YU47-TGPL (captured May 13, 2022).

the second degree), 265.61  (criminal sale of a ghost gun in the first degree), 265.63 (criminal sale of a frame or receiver in the first degree).

### C.      New York City Law

37.      Since February 2020, New York City law has prohibited the possession, sale, transfer, or offering for sale of an "unfinished frame or receiver" by or to a person in New York City. N.Y.C. Admin. Code § 10-314; *see id.* § 10-301(8). An "unfinished frame or receiver" is defined as a "piece of material that does not constitute the frame or receiver of a firearm, rifle, shotgun, or assault weapon, but that has been shaped or formed in any way for the purpose of becoming the frame or receiver of a firearm, rifle, shotgun, or assault weapon with modification by the user and that is not engraved with a serial number . . . ." N.Y.C. Admin. Code § 10-301(22).

## III.    Ghost Guns Endanger the Public and Undermine Law Enforcement

38.      Despite—and in a direct affront to—New York City's adoption of a ghost gun ban, ghost guns are flooding the City, and their prevalence is increasing at an alarming rate. The NYPD seized 17 ghost guns in connection with arrests in 2018, 48 in 2019, 150 in 2020, 263 in 2021 and through June 14, 2022, 175—a pace that will exceed by far the 2021 total. Approximately 9% of all guns recovered in 2022 by the NYPD incident to arrests have been ghost guns.

39.      These numbers are limited to ghost guns recovered by NYPD. The actual number of ghost guns on New York City's streets and in homes is undoubtedly far higher, but impossible to know—ghost gun sellers do not report sales.

40.      Ghost guns make New York City's streets, schools, public spaces, and homes—and NYPD patrol officers' jobs—significantly more dangerous. In 2021, for example, the NYPD recovered ghost guns from arrestees while responding to the full spectrum of life-threatening events: shootings, robberies, domestic violence incidents, executing search warrants, conducting street and car stops, accidental shootings and an incident of road rage. In one instance, a 17-year-

old was caught attempting to enter his Brooklyn high school with a ghost gun and $30,000 in his backpack.[13]

41.      Ghost gun arsenals and assembly lines are springing up around the city, creating what the Queens County District Attorney has called a "Polymer pipeline," named for the polymer plastic used in most ghost gun frames.[14] Between August and December 2021, five separate ghost gun arsenals were seized by law enforcement in Queens, NY, including an arsenal belonging to a 20-year old man—too young to lawfully possess handguns—that included 25 ghost guns (19 semi-automatic handguns, five assault weapons, and one semi-automatic shotgun) along with 31 large-capacity magazines, 670 rounds of ammunition, and parts and equipment to assemble several additional ghost guns.[15] The five Queens seizures netted a total of 51 completed ghost guns, including 31 handguns, 17 assault weapons, two machine guns, and one semi-automatic shotgun, along with 91 "unfinished" frames or receivers, 222 high-capacity magazines, four rapid-fire modification devices, and over 30,000 rounds of ammunition.[16]

42.      Another ghost gun arsenal—consisting of enough parts to make 14 ghost guns, and a "Ghost Gunner" device to speed up the assembly process, along with multiple high-capacity magazines, 850 rounds of ammunition, and other weapons—was found strewn about the toddler-

---

[13] *Student arrested with gun, $30K cash in backpack at Brooklyn high school*, ABC7 NY Eyewitness News (Dec. 2, 2021), available at  https://perma.cc/8RSL-GNRS.

[14] Press Release, "Queens Man Charged With Possessing Arsenal of Illegal "Ghost" Guns," Queens County District Attorney (Dec. 9, 2021), available at https://perma.cc/7C9D-XJ4L.

[15] Press Release, "Queens Man Charged With Possessing Arsenal of Illegal "Ghost" Guns," Queens County District Attorney (Dec. 9, 2021), available at https://perma.cc/7C9D-XJ4L.

[16] *See id.*

occupied Brooklyn home of a convicted felon barred from purchasing or possessing firearms following a conviction for manslaughter.[17]

43.    On May 25, 2022, the New York County District Attorney announced the seizure of yet another significant ghost gun arsenal, divided between locations in Manhattan and Brooklyn. A search warrant executed for a Manhattan storage unit netted 29 lower receivers, and over 293 high capacity magazines, capable of holding over 8600 bullets. The joint District Attorney-NYPD investigation that culminated in the seizure revealed that between March 2020 and March 2022, the defendant purchased over $20,000 in ghost gun parts and kits, high capacity magazines, and related gear from eleven online retailers, including Defendant Arm or Ally.[18]

44.    Ghost guns have also been used to perpetrate violent crimes on city streets, including multiple murders and non-fatal shootings. For example, in May 2022, a ghost-gun obsessed man, Edison Cruz, allegedly used a ghost gun to kill a man on a Bronx street, and injure two bystanders, after a confrontation in a fast-food restaurant.[19] Cruz had a lengthy criminal history, including multiple prior arrests for possessing ghost guns that he ordered online. These arrests included one while he was subject to an order of protection obtained by his parents which prohibited him from possessing any firearms, and another after he was found walking through the Bronx with a bulletproof vest and a grenade launcher. A search of his Bronx home revealed two

---

[17] Ben Feuerherd, *NYC man allegedly kept 'arsenal' of 'ghost guns' and ammo in Brooklyn home*, N. Y. Post (Oct. 4, 2021), available at https://perma.cc/X6KF-3DP9; *see also United States v. Gary Brown*, Criminal Docket No. 20-352 (E.D.N.Y.) (ECF No. 26, Sentencing Memorandum, filed Oct. 14, 2021).

[18] *People of the State of New York v. Rene Loyola*, Indictment No. 71721-22 (NYSC, Part 42) (Statement of Facts, filed May 25, 2022).

[19] Reuven Fenton, Joe Marino and Jorge Fitz-Gibbon, *'Ghost gun'-obsessed Taco Bell staffer returned to work after fatal shooting: DA,* N.Y. Post (May 4, 2022), available at https://perma.cc/Q8SX-AWFW (captured May, 17, 2022).

15

"unfinished" handgun frames, and tools and parts to assemble them.[20] There is evidence that Cruz made at least two online purchases from Defendant 80P Builders in 2021.

45.     Just a month earlier, in April 2022, a 17-year old allegedly shot and killed a 16-year old girl on a Bronx street and injured two other teens, using a ghost gun. The victims were all bystanders walking home from school when the shooter opened fire.[21]

46.     In November 2021, a ghost gun was recovered at the scene of a shootout between rival groups on a Midtown Manhattan street that injured three people, including a 19-year-old.[22] And in September 2021, a man was arrested for attempted murder after allegedly opening fire with a ghost gun outside a Manhattan bar, wounding four people, following a dispute that spilled onto the street.[23] The man himself was shot and wounded by law enforcement. *Id.*

47.     As these arrests, arsenals, and shootings vividly and tragically illustrate, there is a thriving illicit market for the sale and delivery of illegal ghost guns into New York City that arms underage persons and individuals with violent criminal histories, who would not be able to obtain a firearm through lawful means.

48.     The City has taken steps to combat the growing ghost gun scourge, incurring significant costs. In addition to enacting N.Y.C. Admin. Code § 10-314, discussed above, prohibiting the possession or sale of "unfinished" frames or receivers, in February 2020 the City

---

[20] Joe Marino, Tina Moore, Mark Lungariello and Amanda Woods, *Fast-food worker obsessed with 'ghost guns' killed one, injured two others in Bronx shooting: cops*, N.Y. Post (May 3, 2022), available at https://perma.cc/WTB6-Z75C.

[21] https://nypost.com/2022/04/10/ghost-gun-recovered-after-nyc-shooting/, also available at https://perma.cc/2XCX-U3X3 (captured May 6, 2022); https://www.fox5ny.com/news/nypd-shooter-used-ghost-gun-in-bronx-killing, also available at https://perma.cc/4AMW-VMB3 (captured May 10, 2022).

[22] *3 Men Shot As Groups Clash Outside Manhattan Recording Studio*, CBS News New York (November 17, 2021), available at https://perma.cc/SDS5-84LZ (captured May 17, 2022).

[23] *NYPD: 5 Shot, Including Suspect, After Fight Breaks Out As Bars Close In Upper Manhattan*, CBS News New York (Sept. 27, 2021), available at https://perma.cc/3TE3-EEET (captured May 17, 2022).

established an NYPD team dedicated exclusively, through long- and short-term investigations, to stopping the flow of ghost guns to New York City before they reach city streets, and to recover ghost guns illegally possessed in the City. The Major Case Field Intelligence Team, operating under the Commanding Officer of the NYPD's Field Intelligence Program, is comprised of two full-time NYPD Field Intelligence Sergeants and five full-time detectives serving as Field Intelligence Officers, and supported by three civilian criminal analysts. The Team works with federal, state, and local law enforcement and prosecutors on in-depth ghost gun investigations, search warrant executions and arrests, and conducts ghost gun-related trainings for police officers and prosecutors.

49.     As ghost guns have increasingly become a major component of gun crime in the City, they have imposed significant costs and burdens on many other city institutions, including the public hospitals, which must care for New Yorkers suffering serious injuries after violent incidents involving ghost guns; district attorneys' offices, which must build and prosecute criminal ghost gun cases; and courts, which must adjudicate the cases.

50.     New York City's experience reflects a national trend. According to the ATF, 45,240 ghost guns were recovered by law enforcement across the country from 2016 through 2021, including 692 in connection with homicides or attempted homicides.[24] Ghost gun recoveries increase each year, from 1,758 in 2016 to 19,344 in 2021.[25] Cities nationwide have seen similar dramatic increases in ghost gun recoveries. The 1,921 ghost guns recovered by the Los Angeles Police Department in 2021 were more than double the amount it recovered in 2020.[26] San

---

[24] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," Fed. Reg. Vol. 87. No. 80, 24652, 24656 (April 26, 2022).

[25] *Id.* at 27723.

[26] *See* https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html, available at https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

Francisco has reportedly experienced a 27-fold increase in ghost gun recoveries by police over the past five years, with more than 200 ghost guns recovered in 2021.[27] Other municipalities have seen comparable rises, including Philadelphia (17 in 2018, 95 in 2019, 250 in 2020), Washington, D.C. (25 in 2018, 116 in 2019, 306 in 2020), San Diego (53 in 2018, 77 in 2019, 210 in 2020), Prince George's County, Maryland (17 in 2018, 50 in 2019, 176 in 2020), and Chicago (21 in 2018, 72 in 2019, 139 in 2020).[28]

51.     Tragically, ghost guns are increasingly being put to violent or deadly use across the country. In Los Angeles, ghost guns were linked to 24 murders, eight attempted murders, 20 robberies and 60 assaults with a deadly weapon as of November 2021.[29] And ghost guns accounted for nearly half of the guns recovered in homicides in San Francisco in 2020.[30]

52.     Often, violent crimes using ghost guns are committed by people who would not have been able lawfully to acquire firearms and presumptively would have failed background checks because, for example, of their criminal history or age. In 2013, a man who failed a background check at a licensed gun dealer used an AR-15 ghost gun to kill five people in Santa Monica, California.[31] In 2017, a man with a criminal record prohibiting his possession of a firearm

---

[27] *See* Complaint, *The People of the State of California v. Blackhawk Mfg. Grp., Inc., et al.*, CGC-21-594577, at ¶¶ 77-78 (Aug. 18, 2021); *see also* https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html, available at https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[28] National Police Foundation, *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement*, at 15 (2021), https://www.policefoundation.org/wp-content/uploads/2021/08/NPF_The-Proliferation-of-Ghost-Guns_Final_2021.pdf, available at https://perma.cc/6NSJ-NHVG.

[29]     *See*     https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html,     available     at https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[30]     *See*     https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html,     available     at https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[31] Alain Stephens, Ghost Guns are Everywhere in California, The Trace (May 17, 2019), https://www.thetrace.org/2019/05/ghost-gun-california-crime/.

used an AR-15 ghost gun in a California mass shooting that killed five people and injured 18.[32] In 2019, a 16-year-old brought a ghost gun to school in Santa Clarita, California, and shot five students, killing two, before killing himself[33]; and a convicted felon in Syracuse, New York, used a ghost gun to shoot his own nephew, a young child, in the back.[34] In 2020, a convicted felon used a ghost gun to shoot and injure two Los Angeles sheriff's deputies.[35] And in April 2021, a man with a criminal record for unlawfully carrying a concealed weapon used a ghost gun to shoot five people, killing one, in a nighttime shooting spree in San Diego. [36]

## IV.    Defendants' Online Marketing and Sales of Ghost Guns

53.    Each of the Defendants markets and sells ghost gun components, including unserialized "unfinished" frames or receivers, to New York City residents over the internet. All defendants sell parts and accessories through their websites that are compatible with conventional, serialized firearms and ghost guns.

54.    With the click of a mouse, and with no background check, New Yorkers can and have purchased from Defendants unserialized, "unfinished" frames or receivers from which to construct operable ghost guns. Defendants ship ghost gun components straight to their New York City customers.

---

[32] *Id.*

[33] *Id.*

[34] Douglass Dowty, "DA: Syracuse Man Shot 6-Year-Old Nephew with Untraceable 'Ghost Gun,'" Syracuse.Com, January 6, 2020, https://bit.ly/2wdXnV8.

[35] NBC Los Angeles, 'Ghost Gun' Kit Maker Sued Over Ambush Shooting of Two Deputies at Compton Transit Station, (Aug, 10, 2021), https://www.nbclosangeles.com/news/local/la-countydeputies-ghost-gun-kit-maker-lawsuit-compton-metro-rail-station/2668483/; First Amended Complaint for Damages, *Apolinar v. Polymer80, Inc.*, Case No. 21STCV29196 (Sup. Ct. Los Angeles Cty.) (filed Aug. 2021), at ¶ 9.

[36] CBS8, Untraceable 'Ghost Gun" Allegedly Used in Fatal Gaslamp Shooting Spree, (Apr. 23, 2021), available at https://bit.ly/3G2Yyqp.

A.      Arm or Ally

55.      Arm or Ally is a Federal Firearms License holder that operates an interactive website (armorally.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well as serialized frames, among other products.[37] Arm or Ally sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in New York City.

56.      Arm or Ally sells various Glock-compatible ghost gun kits, such as:

- Polymer80 frame kits for the PF45, PF940C, PF940V2, PF9SS, PF940SC and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig, with drill bits[38]; and

- The P80 Compact Frame & Slide Kit, that bundles into one package a Polymer80 PF940C frame kit, a slide from American Tactical Arms, and a slide completion kit from Arm or Ally.[39]

57.      For those buying in bulk, Arm or Ally offers the Polymer80 – PF45 Pistol Frame Kit – 25 Pack, which includes 25 sets of unserialized, "unfinished" frames, rails, and the jig and drill bits.[40]

58.      The remaining components needed to assemble these Glock-compatible ghost guns can be purchased on Arm or Ally's website or from other dealers.

---

[37] *See* https://www.armorally.com, also available at https://perma.cc/QPN5-WQZQ (captured May 20, 2022).

[38] https://www.armorally.com/product-category/glock/frame-parts/glock-frames/, also available at https://perma.cc/3NQY-LXTA (captured May 20, 2022).

[39] https://www.armorally.com/shop/p80-compact-frame-and-slide-kit/, also available at https://perma.cc/B96L-6E6B (captured May 20, 2022).
[40] https://www.armorally.com/shop/polymer80-pf45-pistol-frame-kit-25-pack/, also available at https://perma.cc/7YF7-UJGP (captured May 20, 2022).

59.     Arm or Ally shipped at least 511 packages, which are believed to include packages with illegal frames and receivers, to purchasers located in New York state between January 3, 2021 and June 7, 2022, including at least 36 packages shipped to addresses in New York City during that period. Arm or Ally is known to have shipped five of those packages, over the course of 45 days, to a New York City resident who was later arrested in possession of 14 ghost guns, including 7 handguns and 7 AR-style rifles.

60.     In addition, details of a recent ghost gun seizure and prosecution announced by the New York County District Attorney's Office on May 25, 2022 revealed that the New York City resident who has been indicted in connection with the ghost guns recovered—including for 29 counts of violating the City's prohibition on possession of "unfinished" frames or receivers—is alleged to have made online purchases of nine separate ghost gun components from Arm or Ally between July 2020 and October 2021, including frames or receivers and completion parts kits.[41]

61.     Significantly, before making an online sale of unserialized, "unfinished" frames, Arm or Ally does not conduct background checks, and does not require customers to have a valid state or city license or permit.

62.     On or about April 28, 2022, an undercover investigator ("UI") from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Arm or Ally's website to purchase a Polymer80 PF940C unserialized, "unfinished" frame, to be delivered to an address in Manhattan.

63.     Arm or Ally did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Instead, Arm or Ally accepted the order and the frame was delivered to an address in Manhattan on or about May 3, 2022.

---

[41] *People v. Loyola*, Indictment No. 71721-22, Statement of Facts.

21

64.     On or about May 12, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Arm or Ally's website to purchase an Arm or Ally slide parts kit, slide, and threaded barrel, as well as a Polymer 80 frame parts kit, to be delivered to the same Manhattan address to which the frame had been delivered. These components would be needed to complete the firearm the UI previously ordered. Again, Arm or Ally did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Instead, Arm or Ally accepted the order and the items were delivered to an address in Manhattan on or about May 16, 2022.

**B.     Rainier Arms**

65.     Rainier Arms is a Federal Firearms License holder that operates an interactive website (rainierarms.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well conventional, serialized firearms, serialized frames, and ammunition, among other products.[42]  Rainier Arms sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in New York City.

66.     Rainier Arms sells various Glock-compatible ghost gun kits such as:

- Polymer 80 frame kits for the PF940SC, PF940V2, and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig with drill bits.[43]

67.     The remaining components needed to assemble these Glock-compatible ghost guns, can be purchased on Rainier Arms' website or from other dealers.

---

[42] *See* www.rainierarms.com, also available at https://perma.cc/HKV6-UGS4 (captured May 20, 2022).

[43] https://www.rainierarms.com/manufacturers/polymer80/, also available at https://perma.cc/VM7R-4AMY and https://perma.cc/NY8F-SPW6.

22

68. Rainier Arms shipped at least 846 packages, which are believed to include packages with illegal frames and receivers, to purchasers located in New York state between January 4, 2021 and April 28, 2022, including at least 69 packages shipped to addresses in New York City during that period.

69. Significantly, before making an online sale of unserialized, "unfinished" frames, Rainier Arms does not conduct background checks and does not require customers to have a valid state or City license or permit.

70. On or about April 27, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Rainier Arm's website to purchase a Polymer80 PF940SC unserialized, "unfinished" frame to be delivered to an address in Manhattan.

71. Rainier Arms did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Instead, Rainier Arms accepted the order and the frame was delivered to an address in Manhattan on or about May 2, 2022.

72. On or about May 12, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Rainier Arms' website to purchase 24-round magazines, a Polymer80 frame parts kit, and a Polymer80 slide parts kit, to be delivered to the same Manhattan address to which the frame had been delivered. These components would be needed to complete a firearm. Again, Rainier Arms did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Instead, Rainier Arms accepted the order and the items were delivered to an address in Manhattan on or about May 18, 2022.

73. On or about May 18, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Rainier Arms' website to purchase a Polymer80

23

PF940v2 unserialized, "unfinished" frame and a slide and barrel, to be delivered to the same Manhattan address to which the prior orders had been delivered. Again, Rainier Arms did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Rainier Arms accepted the order and the items were delivered to an address in Manhattan in two separate deliveries, on or about May 24 and May 25, 2022.

### C.  80P Builder

74.     80P Builder, through its owner Salvo Technologies, Inc., is a Federal Firearms License holder that operates an interactive website (80pbuilder.com) through which consumers can purchase unserialized, "unfinished" frames, ghost gun components, and knives, among other products.[44] 80P Builder sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in New York City.

75.     80P Builder sells three Glock-compatible ghost gun kits and thirteen different "custom builds" such as:

- Polymer 80 frame kits for the PF940SC and PF940SS models.[45]

- Polymer 80 frame kits for the PF940SC that can be bundled with lower parts kits that include the Polymer 80 ejector and housing, Ghost bullet slide release, Ghost slide stop, 80P Builder machined pins and springs, 80P Builder mag catch, and OEM Glock trigger bar.[46]

- "Custom builds" that bundle together into one purchase the items needed for a ghost gun build, and include one of the Polymer 80 frame kits for

---

[44] *See* www.80pbuilder.com, also available at https://perma.cc/9RSG-BTWV (captured May 27, 2022).

[45] https://80pbuilder.com/products/frames also available at https://perma.cc/K5D5-B9YH (captured May 27, 2022).
[46] https://80pbuilder.com/pf940sc-frame also available at https://perma.cc/XR7E-SNHL (captured May 27, 2022).

the PF940SC, PF940SS, and PF940V2, plus a customized slide, barrel, guide rod assembly, upper parts kit and lower parts kit. [47]

76.     Additional components needed to assemble these Glock-compatible ghost guns, if any, can be purchased on 80P Builder's website or from other dealers.

77.     80P Builders shipped at least 258 packages, which are believed to include packages with illegal frames and receivers, to purchasers located in New York state between April 21, 2021 and May 26, 2021, including at least 65 packages shipped to addresses in New York City during that period. Moreover, in 2021, at least four individuals arrested in New York City with ghost guns received one or more deliveries from 80P Builder, including Edison Cruz who, as described above, was arrested and charged with murder in 2022, and possession of ghost guns in 2021; a person arrested following a street encounter; a person arrested following a car stop; and a person who, after having received four deliveries from 80P Builders in 2021, was arrested in possession of three lower receivers pursuant to a search warrant executed by the Major Case Field Intelligence Team.

78.     Significantly, before making an online sale of unserialized, "unfinished" frames, 80P Builders does not conduct background checks, and does not require customers to have a valid state or City license or permit.

79.     On or about May 11, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on 80P Builder's website to purchase a Polymer 80 PF940v2 unserialized, "unfinished" frame, lower parts kit, upper parts kit, slide, barrel, guide rod, and HD fiber optic sight to be delivered to an address in Manhattan.

---

[47] https://80pbuilder.com/products/customs/custom-bundles also available at https://perma.cc/4GXR-QGSJ (captured May 27, 2022).

80.     80P Builder did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit.  Instead, 80P Builder accepted the order and the products were delivered to an address in Manhattan on or about May 16, 2022.

**D.     Rock Slide USA**

81.     Rock Slide USA is a ghost gun retailer that operates an interactive website (rockslideusa.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[48] Rock Slide USA sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in New York City.

82.     Rock Slide USA sells various Glock-compatible ghost gun kits from Polymer80.[49] Additional components needed to assemble these ghost guns can be purchased on Rock Slide USA's website or from other dealers.

83.     Significantly, before making an online sale, Rock Slide USA does not conduct background checks and does not require customers to have a valid state or City license or permit.

84.     On or about May 11, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Rock Slide USA's website to purchase a Polymer80 PF940C unserialized, "unfinished" frame, slide, internal upper parts kit, recoil spring and guide rod, lower parts kit with trigger, and 32-round Magazine to be delivered to an address in Manhattan.

---

[48] *See* www.rockslideusa.com, also available at https://perma.cc/7JTJ-UYMT (captured May 20, 2022).

[49] https://rockslideusa.com/shop/ available at https://perma.cc/4VMT-BYNQ (captured May 27, 2022).

85. Rock Slide USA did not perform a background check on the UI and did not require customers to have a valid state or City license or permit. Instead, Rock Slide USA accepted the order and the products were delivered to an address in Manhattan on or about May 16, 2022.

86. On or about May 21, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Rock Slide USA's website to purchase an upper parts kit and a barrel to be delivered to the same Manhattan address to which the prior order had been delivered. These components would be needed to complete a firearm. Again, Rock Slide USA did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Rock Slide USA accepted the order and the items were delivered to an address in Manhattan on or about May 27, 2022.

**E.    Indie Guns**

87. Indie Guns is a ghost gun retailer that operates an interactive website (indieguns.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[50]  Indie Guns sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in New York City.

88. Indie Guns is a high volume seller of various Glock-compatible ghost gun kits, such as:

- Polymer 80 frame kits for the PF940V2, PF940C, PF940SC, PF940SS, and PF45 models.[51]

---

[50] *See* www.indieguns.com, also available at https://perma.cc/K4G5-QLGG  (captured June 14, 2022).
[51] https://indieguns.com/frame-kits/ also available at https://perma.cc/5YD9-DP6T (captured June 14, 2022).

- A Polymer 80 "Complete Frame Assembly" kit for the PV940V2 model, bundled with a Polymer80 frame parts kit with trigger assembly and a Polymer80 magazine.[52]

- A Polymer 80 kit for the PF940, bundled with a barrel and two 13-round magazines.[53]

89.     Additional components needed to assemble these Glock-compatible ghost guns can be purchased on Indie Guns' website or from other dealers.

90.     In fact, court filings from a recent lawsuit between Polymer80 and Indie Guns note that in July 2021, Polymer80 sold and shipped more than 13,000 unserialized "80%" Glock-compatible frame kits to Indie Guns. This shipment, for which Indie Guns was charged $700,000 (a 30% discount from the wholesale price), has a retail value of over $2 million, based on the price of $150 per frame kit that Indie Guns charges on its website for most of these kits.

91.     Significantly, before making an online sale, Indie Guns does not conduct background checks and does not require customers to have a valid state or City license or permit.

92.     On or about May 18, 2022, the UI from the New York City Sheriff's Office, using a fictitious name, submitted an online order on Indie Guns' website to purchase a Polymer80 PF940V2 unserialized, "unfinished" frame, frame parts kit with trigger assembly, 17-round Magazine, and a complete slide assembly to be delivered to an address in Manhattan.

---

[52]     https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35/ also available at https://perma.cc/QGA9-F3CC (captured June 14, 2022).

[53]     https://indieguns.com/bundle-deal-buy-1-pf45-frame-kit-buy-1-g21-oem-45-barrel-get-2-free-g21-oem-45-13-rd-mags/ also available at https://perma.cc/7S6B-WKK2 (captured June, 14, 2022).

93.     Indie Guns did not perform a background check on the UI and did not require the UI to have a valid state or City license or permit. Instead, Indie Arms accepted the order and the products were delivered to an address in Manhattan on or about June 9, 2022.

### FIRST CLAIM FOR RELIEF
#### (Violation of GBL § 898-b)

94.     The City repeats, realleges, and incorporates herein the allegations of paragraphs 1 through 93 above.

95.     Through the conduct described above, Defendants have contributed to the flood of illegal and untraceable guns in New York City, in violation of N.Y.C. Admin. Code § 10-314 and N.Y. Penal Law §§ 265.01(9)-(10), 265.60, 265.61, 265.63, 265.64, prohibiting the possession and sale of "unfinished" frames and receivers and ghost guns. Defendants have also aided individuals in unlawfully possessing "unfinished" frames and receivers and ghost guns in New York City. *Id.* Defendants have thereby endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and diverted scarce law enforcement resources.

96.     Defendants' conduct violates sections 898-b of the New York General Business Law ("GBL"), which declares such conduct to be a public nuisance under GBL section 898-c.  The statute expressly provides that a city corporation counsel may bring a lawsuit on behalf of the municipality to enjoin and restrain violations of sections 898-b(1) or (2).  GBL § 898-d.

97.     GBL section 898-b provides a statutory cause of action against "gun industry members" who endanger the public through unlawful or unreasonable business practices involving firearms or firearm components or who fail to use reasonable controls to prevent those products from being possessed, used, sold, or marketed unlawfully in New York State.

98.     Specifically, GBL § 898-b provides:

29

1. No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

2. All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

99.    The statute defines "gun industry member" as any person or entity "engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories." GBL § 898-a(4).  Each Defendant is a gun industry member because they engage in one or more of the above.

100.    "Qualified product" is defined under GBL § 898-b by reference to 15 U.S.C. § 7903(4), which in turn defines "qualified product" to include "a firearm" as defined in the federal Gun Control Act, or "a component part of a firearm or ammunition," that "has been shipped or transported in interstate or foreign commerce." See GBL § 898-a(6). Each Defendant sells, manufactures, imports or markets Qualified Products.

101.    Under the federal Gun Control Act, a "firearm" is defined, in relevant part, as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

102.    Each Defendant has, and continues to sell, manufacture and market Qualified Products" in New York City and New York State.

103.    Each Defendant, through the sale, manufacturing, and marketing of Qualified Products, has engaged in conduct that is unlawful and/or unreasonable under the circumstances

and has knowingly or recklessly created, maintained, or contributed to a condition in New York City and New York State that endangers the health and safety of the public.

104.    Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its Qualified Products from being possessed, used, marketed or sold unlawfully in New York.

105.    Accordingly, each Defendant has violated, and continues to violate GBL § 898-b and should be enjoined from selling illegal "unfinished" frames and receivers and ghost guns into New York City. Because Defendants' violations have harmed the public, Defendants should also be ordered to abate the nuisance that their violations have created, contributed to, and maintained.

## SECOND CLAIM FOR RELIEF
### (Common Law Public Nuisance)

106.    The City repeats, realleges, and incorporates herein the allegations of paragraphs 1 through 105 above.

107.    Defendants, through their past and present business practices, create, contribute to, and maintain a public nuisance under the common law.

108.    A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977) (internal citations omitted).

109.    Under New York State law, any firearm or major component of a firearm, including a ghost gun or an "unfinished" frame or receiver, that is "unlawfully possessed, manufactured, transported or disposed of," is deemed a nuisance. N.Y. Penal Law § 400.05.

31

110. Each Defendant offers for sale and sells "unfinished" frames and receivers to New York City residents, shipping them directly to New York City addresses, thereby violating N.Y.C. Admin. Code § 10-314 and N.Y. Penal Law §§ 265.01(9)-(10), 265.60, 265.61, 265.63, 265.64 Each Defendant also thereby knowingly causes and aids its customers to possess "unfinished" frames and receivers in violation of N.Y.C. Admin. Code § 10-314 and N.Y. Penal Law § 265.01 (9)-(10).

111. Each Defendant knows that these sales allow the purchasers to acquire, assemble, and illegally possess untraceable ghost guns in New York City.

112. Each Defendant, through their business practices, contributes to the proliferation of illegal ghost guns in New York City, endangers the health and safety of large numbers of New York City residents; deprives New York City residents of the peaceful use of the public streets, sidewalks, and parks; undermines law enforcement efforts; increases law enforcement costs and diverts law enforcement resources; and interferes with commerce, travel, and the quality of daily life in New York City.

113. Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in New York City.

## REQUEST FOR RELIEF

Wherefore, the City requests that the Court grant judgment, as follows:

1) Enjoining each Defendant from selling, shipping, distributing, delivering or otherwise supplying unserialized, "unfinished" frames or receivers to a New York City address or to a person or entity that Defendant knows or should know will bring, ship, sell, or otherwise transport or transfer any such unserialized, "unfinished" frame or receiver, or a gun assembled therefrom, into New York City or to a New York City address;

2)      Ordering each Defendant to abate the nuisance that its violations have created, contributed to, and/or maintained, including by providing the City with all records of sales or shipments of unserialized "unfinished" frames or receivers into New York City or to a New York City address within the past five years; and

3)      Providing such further relief as the Court deems appropriate.

Dated:     New York, New York
June 29, 2022

**HON. SYLVIA O. HINDS-RADIX**
Corporation Counsel of the
   City of New York
*Attorneys for Plaintiff The City of New York*
100 Church Street, Rm. 20-099
New York, New York 10007
(212) 356-2032

By: _____s/_____

     Eric Proshansky
     Melanie Ash
     Doris Bernhardt
     Gail Rubin

     Assistant Corporation Counsels

# EXHIBIT 5



## Private PROtect<sup>SM</sup>

## FLORIDA

## Private Company Directors & Officers, Employment Practices and Fiduciary Liability Insurance Policy Declarations

**NNOTICE: THIS IS CLAIMS MADE AND REPORTED COVERAGE. DEFENSE COSTS ARE A PART OF, AND NOT IN ADDITION TO, THE POLICY LIMITS. PLEASE READ THE POLICY CAREFULLY.**

**DEFENSE WITHIN LIMITS: THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED, AND MAY BE EXHAUSTED, BY DEFENSE COSTS.**

| Insurer: | Argonaut Insurance Company<br>225 West Washington Street<br>24th Floor<br>Chicago, IL 60606 | Producer: | R-T Specialty, LLC<br>5565 Glenridge Connector, Suite 550<br>Atlanta, GA 30342 |
|---|---|---|---|
| **Policy Number:** | ML4263632-0 | | |
| Renewal of Policy Number: | New Business | | |

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS AND CONDITIONS OF THIS POLICY, THE INSURER AGREES WITH THE INSUREDS TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

Item 1. **Named Insured**:     Salvo Technologies, Inc
Mailing Address:     8060 Bryan Dairy Rd
Largo, FL 33777

Item 2. **Policy Period:**  From: 12:01 a.m. on April 25, 2022     To: 12:01 a.m. on April 25, 2023
Local time at the address shown in Item 1.

Item 3.   **Coverage Parts**:

| Coverage Part | Purchased | Not Purchased | Separate Limits | Shared Limits |
|---|---|---|---|---|
| Directors & Officers Liability | ☒ | ☐ | ☐ | ☒ |
| Employment Practices Liability | ☐ | ☒ | ☐ | ☐ |
| Fiduciary Liability | ☒ | ☐ | ☐ | ☒ |

Item 4.   Limits of Liability:

A.   Maximum Aggregate Limit of Liability for all **Loss** under all **Coverage Parts** other than as indicated in Item 4.B.4. below:                                      $1,000,000

B.   Limits of Liability applicable to **Directors & Officers Liability Coverage Part**:

    1.   Maximum Aggregate Limit of Liability for all **Loss** under **INSURING AGREEMENTS** A., B., C. and D.:                                      $1,000,000

    2.   Aggregate Sub-Limit of Liability for all **Shareholder Derivative Demands** under **INSURING AGREEMENT** D.:                                      $250,000

    3.   Aggregate Sub-Limit of Liability for all **Inquiry Costs** under **INSURING AGREEMENT** E.:                                      $10,000

    4.   Aggregate Sub-Limit of Liability for all **Loss** from all **Employed Lawyers Claims**:                                      $1,000,000

    5.   Aggregate Additional Limit of Liability for Non-Indemnified **Loss**:                                      $1,000,000

C.   Limit of Liability applicable to **Employment Practices Liability Coverage Part**:

    1.   Maximum Aggregate Limit of Liability for all **Loss** under **INSURING AGREEMENTS** A. and B.:                                      No Coverage

    2.   Aggregate Sub-Limit of Liability for all **Loss** from all **Claims** under **INSURING AGREEMENT** B.:                                      No Coverage

    3.   Aggregate Sub-Limit of Liability for all **Loss** constituting **Sensitivity Training Costs** under **INSURING AGREEMENTS** A. and B.:                                      No Coverage

D.   Limits of Liability applicable to **Fiduciary Liability Coverage Part**:

    1.   Maximum Aggregate Limit of Liability for all **Loss** under **INSURING AGREEMENTS** A. and B.:                                      $1,000,000

    2    Aggregate Sub-Limit of Liability for all Loss from all Claims under **INSURING AGREEMENT** B.:                                      $250,000

    3.   Aggregate Sub-Limit of Liability for all **Loss** from all **HIPAA CLAIMS** under **INSURING AGREEMENT** A.:                                      $250,000

Item 5.  Retentions:

    A.   Retentions applicable to **Directors & Officers Liability Coverage Part:**

        1.  Each **Claim** under **INSURING AGREEMENT** B.:          $25,000

        2.  Each **Claim** under **INSURING AGREEMENT** C.:          $25,000

No Retention is applicable to **INSURING AGREEMENTS** A. (**NON-INDEMNIFIED LOSS COVERAGE**) and D. (**DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE**)

    B.   Retentions applicable to **Employment Practices Liability Coverage Part**:

        1.  Each **Claim** under **INSURING AGREEMENT** A.:          No Coverage

        2.  Each **Claim** under **INSURING AGREEMENT** B.:          No Coverage

    C.   Retentions applicable to **Fiduciary Liability Coverage Part**:

        1.  Each **Claim** under **INSURING AGREEMENT** A.:          $0
           (Not Applicable to **Non-Indemnified Loss** or **HIPAA Claims**)

        No Retention is applicable to **INSURING AGREEMENT** B.

Item 6.  Annual Premiums:

    A.   **Directors & Officers Liability Coverage Part**:          Included

    B.   **Employment Practices Liability Coverage Part:**          No Coverage

    C.   **Fiduciary Liability Coverage Part**:          Included

                                         Total   $23,000

Other: _____
       (Specific type of tax, fee or surcharge, if required)         N/A

                                         Total   $23,000

Item 7.  Notices to **Insurer**:

**Broker Fee: $500.00**
**FL State Surcharge: $161.00**

Claims:                               All Other Notices:
Attn:  Argo Pro Claims                 Attn:  Argo Pro Underwriting
       PO BOX 469012                      PO BOX 469012
       San Antonio, TX 78246           San Antonio, TX 78246
       Phone: (833) 240-4128           Phone: (210) 321-8400
        New Claims ArgoProNewClaims@argogroupus.com
       Existing claims ArgoProClaimsMail@argogroupus.com

PPRO0001FL-0919                                              

Item 8.   Endorsements Applicable to Coverage at Inception of Policy:

| | |
|---|---|
| PPRO0002 0219 | General Terms and Conditions |
| PPRO0003 0219 | Private PROtect D and O |
| PPRO0005 0219 | Fiduciary Part |
| PPRO2034FL 0219 | Florida D and O Table Contents |
| PPRO2036FL-0219 | Table of Contents Private Protect Fiduciary Liability Coverage Part |
| PPRO2037FL 0219 | Florida GTC Table Contents |
| PrivacyNotice 0820 | Notice Of Insurance Information Practices |
| TRIA Notice A 0115 | Policyholder Disclosure Statement Under the Terrorism Risk Insurance Act |
| ILP001 0104 | Policyholder Notice- US Dept of Treasury Office of Foreign Asset Control (OFAC) |
| FS-APP001 0618 | Fraud Statements |
| SIGAIC 0416 | Signature Page-SIGAIC |
| CLMSMADENOTICE 0117 | Important Information For Policyholders - Claims-Made Notice |
| ILP0220FL 0920 | Florida Changes - Cancellation And Nonrenewal |
| DWLNOTICE 0117 | Policyholder Notice - Defense Within Limits |
| PPRO2032FL 0219 | FL Changes |
| PPRO4032 0719 | Liquidated Damages Exclusion Endorsement |
| PPRO-4204 0420 | Amended Retention Endorsement |
| PPRO-4048 0919 | Crisis Management Coverage Endorsement |
| PPRO-4122 0220 | Run-Off Endorsement |
| PPRO1012 0219 | State Amendatory Inconsistency |
| PPRO-4027 0819 | Antitrust Claim Coverage Subject To A Sub-Limit And Coinsurance Percentage Endorsement |
| PPRO2015 0219 | FLC-Sublimit For Certain Civil Penalties |

Item 9.   Pending or Prior Date:

| | | |
|---|---|---|
| A. | **Directors & Officers Liability Coverage Part**: | April 25, 2022 |
| B. | **Employment Practices Liability Coverage Part**: | No Coverage |
| C. | **Fiduciary Liability Coverage Part**: | No Coverage |

This Policy shall not be valid unless also signed by another duly authorized representative of the **Insurer**.

Countersigned:                          By:

Date: Apr 26, 2022                     Authorized Representative: Austin King



# Private PROtect<sup>SM</sup>
# General Terms and Conditions Part

In consideration of payment of the premium and in reliance upon the statements and representations made in the **Application**, all of which are made part of this Policy, and subject to the Declarations and the other terms of this Policy, the Insurance Company shown in the Declarations (the "**Insurer**") and the **Insured(s)** agree as follows:

## I.   APPLICABILITY OF GENERAL TERMS AND CONDITIONS

**All Coverage Parts** are subject to this General Terms and Conditions Part. In the event of any conflict between this General Terms and Conditions Part and a particular **Coverage Part**, the terms of the **Coverage Part** shall apply to the coverage afforded by such **Coverage Part**.  The terms of each **Coverage Part** shall only apply to that **Coverage Part**.  Any term that is bolded but not defined in this General Terms and Conditions Part shall, for the purpose of applying this General Terms and Conditions Part to a particular **Coverage Part**, incorporate the definition of such term as set forth in such **Coverage Part**.

## II.   DEFINITIONS

A.  **Application** means the written statements and representations made by an **Insured** including as defined in any **Coverage Part** (if applicable) and provided to the **Insurer** during the negotiation of this Policy, or contained in any application or other materials or information provided to the **Insurer** in connection with the underwriting of this Policy.

B.  **Company** means:

1.  the **Named Insured**; and

2.  any **Subsidiary** of the **Named Insured**.

**Company** shall also include any such organization as a debtor-in-possession under United States bankruptcy law or an equivalent status under the law of any other country.

C.  **Coverage Part** means the **Directors & Officers Liability Coverage Part**, the **Employment Practices Liability Coverage Part** and the **Fiduciary Liability Coverage Part**, but only if such **Coverage Part** is purchased.

D.  **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses (other than regular or overtime wages, benefit expenses, salaries, fees, other

types of compensation or overhead expenses of **Insured Person(s)**, or the **Company**) (i) incurred by the **Insurer** on behalf of the **Insured(s)** or by the **Insured(s)** and consented to by the **Insurer** (such consent to not be unreasonably withheld) in defending or investigating **Claims**, including costs assessed against the **Insured(s)** in a **Claim** or the premium for appeal, attachment or similar bonds provided the **Insurer** shall have no obligation to apply for or furnish such bonds or (ii) incurred at the **Insurer's** request to assist the **Insurer** in the investigation of a **Claim**.

E.   **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state, local law or under the provisions of any formal program established by the **Company**.

F.   **Employee** means any past, present or future full time, part time, seasonal or temporary employee of the **Company**, including any officer, volunteer, intern, leased employee or natural person independent contractor, provided, that in each instance such individual is an **Employee** solely in his or her capacity as such and provided, further, in the case of leased employees, volunteers and independent contractors, the **Company** indemnifies such individuals in the same manner it indemnifies permanent employees. Furthermore, regarding leased employees and independent contractors, coverage provided under this policy shall be excess of any other insurance coverage or other indemnification provision provided by any professional employment organization.

Regarding the coverage provided under the **Fiduciary Liability Coverage Part**, if purchased, **Employee** will not include any independent contractor.

G.   **Extended Reporting Period** means the period or periods of extended coverage set forth in Item 7. of the Declarations.

H.   **Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

I.   **Financial Insolvency** means the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Company**, or the **Company** becoming a debtor in possession.

J.   **Insured(s)** means:

1.   the **Insured Person(s)**; and

2.   the **Company**.

K.   **Insured Person(s)** means:

1.   any one or more natural persons who were, now are or shall become (i) a duly elected or appointed director, trustee, governor, management committee member, advisory board member, **Manager**, officer, in-house

general counsel or controller of the **Company** (ii) director of human resources, risk manager or their functional equivalent of the **Company**; or (iii) with respect to a **Company** incorporated outside the United States, the functional equivalent of any of the foregoing positions; or

2.      any **Employee**;

Any individual included in Subsections 1. or 2. above is an **Insured Person** solely in his or her capacity as specified in such subsection.

If the **Fiduciary Liability Coverage Part** is purchased, any individual included in Subsections 1. or 2. above is an **Insured Person** solely in his or her capacity as a fiduciary of a **Plan** or in his or her **Administration** of a **Plan**. A **Claim** against a "plan committee" comprised entirely of **Insured Persons** shall be deemed to be a **Claim** against each of the individual members of the committee.

L.      **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of logically or causally connected facts, circumstances, situations, events, transactions or causes.

M.      **Manager** means any natural person who was, now is or shall become a (i) a manager, member of the board of managers or equivalent executive of a **Company** that is a limited liability company, and (ii) a general partner, managing partner or equivalent executive of a **Company** that is a partnership or joint venture.

N.      **Named Insured** means the organization set forth in Item 1. of the Declarations.

O.      **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations or any earlier Policy cancellation or termination date.

P.      **Pollutants** means any substance located anywhere in the world exhibiting hazardous characteristics as defined by, or identified on any list of hazardous substances issued by, the United States Environmental Protection Agency or any state, local or foreign counterpart. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise, fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured(s)** for consumption) and electric or magnetic or electromagnetic field. Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

Q.      **Subsidiary** means:

1.      any entity in which more than fifty percent (50%) of the outstanding voting securities or voting rights representing the present right to vote for election of directors, **Managers** or equivalent executives is owned or controlled by the **Named Insured**, either directly or indirectly on or before

the effective date of this Policy;

2.     any entity in which the **Named Insured** has the right, pursuant to written contract or by-laws, charter, operating agreement or similar documents of a **Company**, to elect, appoint or designate a majority of: the Board of Directors of a corporation; the management committee of a joint venture; or the management board of a limited liability company; or

3.     any entity that becomes a subsidiary (as defined in subparts Q.1. or Q.2.) after the effective date of this Policy by reason of being created or acquired by the **Named Insured** after such date.

**Subsidiary** also means any foundation or charitable trust controlled or directly sponsored by the **Named Insured**.

Provided, however, this Policy shall only apply to **Wrongful Acts** committed or allegedly committed after the effective date an entity becomes a **Subsidiary** and prior to the effective date such entity ceases to be a **Subsidiary**.

R.     **Wage and Hour Violation** means any actual or alleged:

1.     violation of the Fair Labor Standards Act (except the Equal Pay Act)

2.     refusal, failure, or inability of any **Insured** to pay, or to pay timely, wages, bonuses, perquisites, benefits or overtime pay for time worked (as opposed to front pay or back pay arising from tortious conduct or violations of the Civil Rights Act of 1964 or any similar federal, state, local or foreign statute, rule regulation or common law); or

3.     failure to provide or enforce meal breaks or rest breaks required by law;

4.     improper classification of individuals for the purposes of determining eligibility for compensation or other benefits under any statute;

5.     improper deductions from pay for any **Employee**;

6.     failure to provide, or to provide timely, statements of earnings or amounts withheld from earnings.

## III.     GENERAL EXCLUSIONS

Under all **Coverage Parts** purchased, and in addition to any Exclusions included in such **Coverage Parts**, the **Insurer** shall not be liable for that portion of **Loss** in connection with any **Claim** made against any **Insured**:

A.     based upon, arising out of, or attributable to:

1.     any **Wrongful Act**, matter, fact, circumstance, situation, transaction, or event which has been the subject of written notice given and accepted prior to the inception of this Policy under any other directors & officers

management, employment practices or fiduciary liability policy; or

    2.    any other **Wrongful Act**, whenever committed or allegedly committed, which together with a **Wrongful Act** described in Subsection 1. above, constitute **Interrelated Wrongful Acts**;

B.    based upon, arising out of, or attributable to:

    1.    any **Claim** pending as of or made prior to the Pending or Prior Date set forth in Item 11. of the Declarations, or any **Wrongful Act**, fact, circumstance or situation underlying or alleged therein; or

    2.    any other **Wrongful Act**, whenever committed or allegedly committed, which together with a **Wrongful Act** described in Subsection 1. above, constitute **Interrelated Wrongful Acts**;

C.    based upon, arising out of or attributable to:

    1.    any deliberate criminal or deliberate fraudulent act or omission or intentional or knowing violation of law by any **Insured** if established by any final, non-appealable adjudication in any underlying action or proceeding; or

    2.    any **Insured** gaining any personal profit, remuneration, or other financial advantage to which the **Insured** was not legally entitled if established by any final, non-appealable adjudication in any underlying action or proceeding.

For the purpose of determining the applicability of this General Exclusion C., the **Wrongful Act** or knowledge of any **Insured Person** shall not be attributed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of any past, present or future Chief Executive Officer or Chief Financial Officer (or functional equivalent), and/or regarding coverage provided under the **Employment Practices Liability Coverage Part**, if purchased, the head of the department of Human Resources (or functional equivalent), of the **Company** (or of any **Plan** if the **Fiduciary Liability Coverage Part** is purchased) shall be imputed to such **Company** (or **Plan** if the **Fiduciary Liability Coverage Part** is purchased).

D.    for bodily injury, sickness, disease emotional distress or mental anguish or death of any person or damage to or destruction of any tangible property including loss of use thereof; provided this exclusion shall not apply:

    1.    to **Loss** for emotional distress or mental anguish that is attributable to any **Claim** otherwise covered under the **Employment Practices Liability Coverage Part**; or

    2.    if the **Directors & Officers Liability Coverage Part** is purchased, to any **Exempt Securities Claim** as defined and otherwise covered under such **Coverage Part**.

IV.   **EXTENSIONS OF COVERAGE**

A.   **ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS**

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Person(s)** shall be considered an **Insured Person(s)** under this Policy but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person(s)** to the spouse or **Domestic Partner**.  No coverage is provided for any wrongful act or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**.  All terms of this Policy applicable to **Loss** incurred by the **Insured Person(s)** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

B.   **EXTENDED REPORTING PERIOD**

If the **Insurer** or **Named Insured** terminates or refuses to renew this Policy or any **Coverage Part** of this Policy other than for nonpayment of premium, the **Insured(s)** shall have the right, upon payment of the applicable additional premium set forth in Item 7. of the Declarations, to the applicable **Extended Reporting Period** following the effective date of termination or nonrenewal, but only with respect to any **Wrongful Act** taking place in whole or in part prior to the effective date of such termination or nonrenewal.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due is given by the **Insured(s)** to the **Insurer** within sixty (60) days following the effective date of termination or nonrenewal.  The **Extended Reporting Period** shall only be applicable to a particular **Coverage Part** if the **Insurer** or **Named Insured** terminates or refuses to renew such **Coverage Part**.

The **Extended Reporting Period** shall be subject to all the terms and conditions of this Policy. No coverage will be provided for any actual or alleged **Wrongful Acts** occurring in whole after the effective date of such termination or nonrenewal.

The **Extended Reporting Period** is non-cancellable and the entire additional premium shall be deemed fully earned.

C.   **PRE-DETERMINED RUN-OFF**

In the event of an **Organizational Change** in accordance with **SECTION V. GENERAL CONDITIONS AND LIMITATIONS**, subsection H of the **General Terms and Conditions Part,** and solely with respect to coverage sections already purchased by the **Insured** (hereinafter the **Applicable Coverage Part(s)**), the **Named Insured**, on its own behalf or on behalf of any **Subsidiary** thereof, for an additional premium as indicated below, shall have the right to choose a period of time as listed in Item 8. Pre-Determined Run-Off of the Declarations following the effective date of the **Organizational Change** (hereinafter the **Run-Off Period**) in which to give written notice to the **Insurer** of **Claims** first made against the **Insureds** during said **Run-Off Period** for any

**Wrongful Act** occurring in whole or in part on or prior to the effective date of said **Organizational Change**.

The additional premium for the election of the **Run-Off Period** shall be the corresponding percentage amount as indicated in Item 8. Pre-Determined Run-Off of the Declarations for the option chosen of the full annual premium, less any remaining unearned pro-rata premium of this policy.

The **Run-Off Period** shall be subject to all the terms and conditions of this policy. No coverage will be provided for any actual or alleged **Wrongful Acts** occurring in whole after the effective date of the **Organizational Change**.

The Policy Aggregate Limit of Liability for the **Run-off Period** shall be part of and not in addition to the remaining Policy Aggregate Limit of Liability of this policy as of the effective date of the **Organizational Change**. If a Separate Limit of Liability applied to an **Applicable Coverage Part** for the **Policy Period**, then the same such Separate Limit of Liability shall also apply to such **Applicable Coverage Part** for the **Discovery Period**, and such Separate Limit of Liability for the **Run-Off Period** shall be part of and not in addition to the Separate Limit of Liability for the **Policy Period**. If a Shared Limit of Liability applied to two or more **Applicable Coverage Parts** for the **Policy Period**, then the same such Shared Limit of Liability shall also apply to such **Coverage Parts** for the **Run-Off Period**, and such Shared Limit of liability for the **Run-Off Period** shall be part of and not in addition to the Shared Limit of Liability for the **Policy Period**. In no way shall the language of this endorsement be construed to reinstate, renew or increase the Aggregate Limit of Liability for this policy or any applicable Separate Limit of Liability or Shared Limit of Liability for the **Discovery Period**.

## V.    GENERAL CONDITIONS AND LIMITATIONS

### A.    LIMITS OF LIABILITY

1.    The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under all **Coverage Parts** combined shall be the maximum aggregate Limit of Liability, if any, set forth in Item 4.A. of the Declarations.

2.    The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under any **Coverage Part** shall be the maximum aggregate Limit of Liability for such **Coverage Part** set forth in Item 4. of the Declarations, which shall be part of and not in addition to the maximum aggregate Limit of Liability set forth in Item 4.A. of the Declarations.

3.    The **Insurer's** maximum aggregate Limit of Liability for all **Loss** covered under all such shared **Coverage Parts** as set forth in Item 3. of the Declarations shall be the largest of such single maximum aggregate Limit of Liability applicable to any one **Coverage Part** subject to the shared Limit of Liability, which shall be part of and not in addition to the maximum aggregate Limit of Liability, set forth in Item 4.A. of the Declarations.

4.    The **Insurer's** maximum aggregate Limit of Liability for any coverage

subject to a Sub-limit of Liability as provided in any **Coverage Part** shall be the Sub-limit set forth in Item 4. of the Declarations for such sub-limited coverage. The Sub-limit of Liability shall be part of and not in addition to the maximum aggregate Limit of Liability applicable to such **Coverage Part**. The maximum aggregate Limit of Liability applicable to such **Coverage Part** shall be subject to any applicable shared maximum Limit of Liability, and the maximum aggregate Limit of Liability set forth in Item 4.A. of the Declarations.

5.  **Defense Costs** under all **Coverage Parts** are part of and not in addition to each of the Limits of Liability set forth in Item 4. of the Declarations, and any payments by the **Insurer** of **Defense Costs** under any **Coverage Part** shall reduce the maximum aggregate Limit of Liability applicable to such **Coverage Part** and any applicable Sub-limit of Liability. The maximum aggregate Limit of Liability applicable to such **Coverage Part** shall be subject to any applicable shared Limit of Liability, and the maximum aggregate Limit of Liability set forth in Item 4.A. of the Declarations. In the event of the reduction of any shared maximum aggregate Limit of Liability by payment of **Defense Costs**, such reduced Limit of Liability shall be applicable to all **Coverage Parts** subject to such shared Limit of Liability.

6.  If the maximum aggregate Limit of Liability, if any, for all **Loss** on account of all **Claims** under all **Coverage Parts** is exhausted by payment of **Loss**, the **Insurer's** obligations under this Policy shall be completely fulfilled. If the maximum aggregate Limit of Liability for any **Coverage Part** for all **Loss** on account of all **Claims** under that **Coverage Part** is exhausted by payment of **Loss**, the **Insurer's** obligations under that **Coverage Part** shall be completely fulfilled. If the maximum aggregate Limit of Liability for any **Coverage Part** subject to a shared Limit of Liability is exhausted by payment of **Loss** under that **Coverage Part**, the **Insurer's** obligations under all **Coverage Parts** subject to that shared Limit of Liability shall be completely fulfilled.

7.  The Limit of Liability for any **Extended Reporting Period** shall be part of and not in addition to the applicable Limits of Liability set forth in Item 4. of the Declarations.

B.  **RETENTION**

1.  Unless otherwise stated, the **Insurer** shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention set forth in Item 5 of the Declarations.

2.  Each Retention amount shall apply separately to each **Coverage Part** as set forth in the Declarations. The payment of **Loss** credited to the satisfaction of the Retention under one **Coverage Part** shall not be credited to the satisfaction of the Retention under any other **Coverage Part.**

3.  In the event a **Claim** gives rise to **Loss** covered under multiple **Coverage**

**Parts** and no such **Coverage Parts** are subject to a shared Limit of Liability, the Retention amount for each such **Coverage Part** shall apply separately to the **Loss** under such **Coverage Part**.

4.   In the event a **Claim** gives rise to **Loss** covered under multiple **Coverage Parts** and such **Coverage Parts** are subject to a shared Limit of Liability, the Retention applicable to **Loss** covered under such multiple **Coverage Parts** with a shared Limit of Liability shall be the single highest Retention applicable to such **Loss** under any one **Coverage Part**.

5.   If for any reason (including but not limited to **Financial Insolvency**), the **Company** fails or refuses to advance, pay or indemnify **Loss** of an **Insured Person** within the applicable Retention, if any, then the **Insurer** shall advance such amounts on behalf of the **Insured Person** until the **Company** agrees to make such payments, or the Retention has been satisfied.  In no event shall any such advancement by the **Insurer** relieve the **Company** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person**, and the **Company** agrees to provide such advancement, payment or indemnification to the fullest extent permitted by law.

C.   **DEFENSE, SETTLEMENT AND COOPERATION**

1.   The **Insurer** shall have the right and duty to defend any **Claim,** other than a **Claim** alleging, in whole or in part, a **Wage and Hour Violation,** covered under any applicable **Coverage Part** under this Policy even if the allegations are false, fraudulent or groundless.  The **Insurer's** duty to defend any **Claim** under this Policy shall terminate upon the earliest of (i) the exhaustion of the maximum aggregate Limit of Liability applicable to this Policy; (ii) the exhaustion of the maximum aggregate Limit of Liability applicable to any applicable **Coverage Part**; or (iii) the exhaustion of any applicable Sub-limit of Liability of coverage for the **Claim** if coverage is afforded solely under a Sub-limit. If the maximum aggregate Limit of Liability applicable to any **Coverage Part** is subject to a shared Limit of Liability with another **Coverage Part**, the maximum aggregate Limit of Liability applicable to this **Coverage Part** shall be reduced or exhausted by payments made by the **Insurer** under such other **Coverage Part**.

2.   Regarding any **Claim** alleging, in whole or in part, a **Wage and Hour Violation**, it shall be the duty of the **Insureds**, and not the **Insurer**, to defend such **Claim**.

3.   The **Insured(s)** shall give the **Insurer** full cooperation, assistance and information as the **Insurer** shall reasonably require, including without limitation: attendance at hearings and trials; the giving and securing of evidence; assistance in enforcing rights of contribution and indemnity or in asserting any counterclaim, cross claim or third party claim; and in the evaluation of damages and liability in connection with any **Claim** (or **Voluntary Compliance Loss** if the Fiduciary Liability Coverage Section is purchased).   The **Insured(s)** shall do nothing that shall prejudice the **Insurer's** position or its potential rights of recovery. The **Insured(s)** shall

not undertake to negotiate to settle, offer to settle, or settle any **Claim**, (or negotiate to pay, offer to pay or pay any **Voluntary Compliance Loss** if the **Fiduciary Liability Coverage Part** is purchased), incur any **Defense Costs** or otherwise assume any contractual obligation, admit any liability, or stipulate to any judgment with respect to any **Claim** without the **Insurer's** prior written consent, such consent not to be unreasonably withheld. The failure of any **Insured Person** to comply with the provisions of this subsection shall not be imputed to any other **Insured Person**. Any **Defense Costs** incurred or settlements made (or agreement to pay **Voluntary Compliance Loss** if the **Fiduciary Liability Coverage Part** is purchased) without the **Insurer's** prior written consent shall not be covered under this Policy.

D. **ALLOCATION**

In the event the **Insured(s)** incur **Loss** that is both covered and not covered by this Policy, either because the **Claim** includes both covered and uncovered matters or because the **Claim** includes both insured and uninsured parties, the **Insured(s)** and the **Insurer** agree to use all reasonable efforts to determine a fair and equitable allocation of the amounts as between covered and uncovered **Loss** based upon the relative legal exposure of the parties, without any presumption as to a fair and equitable allocation; provided, however, regarding **Defense Costs** to be advanced under any applicable **Coverage Part,** one hundred percent (100%) of any such **Defense Costs** shall be allocated to covered **Loss** if and to the extent such **Defense Costs** are incurred by covered **Insureds** and are in part covered and in part not covered by this Policy solely because the **Claim** against the **Insureds** includes both covered and uncovered matters.

Notwithstanding the above, no **Defense Costs** shall be allocated to that portion of **Loss** in connection with any **Claim** alleging, in whole or in part, a **Wage and Hour Violation**.

E. **PRIORITY OF PAYMENTS**

In the event of **Loss** arising from one or more covered **Claims** for which payment is due under this Policy, the **Insurer** shall:

1. first, pay the **Loss** incurred by an **Insured Person** that is not paid, advanced or indemnified by the **Company**;

2. second, only after paying **Loss** pursuant to Subsection 1. above, and to the extent of any remaining Limit of Liability, pay the **Loss** of the **Company,** whether directly or as indemnitor of an **Insured Person**.

F. **REPORTING AND NOTICE**

1. As a condition precedent to coverage under this Policy under each **Coverage Part** other than the **Directors and Officers Liability Coverage Part**, the **Insured(s)** shall give to the **Insurer** written notice of

any **Claim** made against, or, if the **Fiduciary Liability Coverage Part** is purchased, the intent to enter into a **Voluntary Compliance Program** by, the **Insured(s)** as soon as practicable after the **Company**'s general counsel or risk manager (or functionally equivalent position) first becomes aware of the **Claim** or potential of the payment of **Voluntary Compliance Loss**, but in no event later than: (i) sixty (60) days after expiration of the **Policy Period**; or (ii) the expiration of the applicable **Extended Reporting Period**, if exercised.

2. As a condition precedent to coverage under this Policy under the **Directors and Officer Liability Coverage Part**, the **Insured(s)** shall give to the **Insurer** written notice of any **Claim** made against the **Insured(s)** as soon as practicable after the **Company's** general counsel or risk manager (or functionally equivalent position) first becomes aware of the **Claim**, but in no event later than (i) ninety (90) days after the expiration of the **Policy Period** if this Policy is not renewed; (ii) one hundred and twenty (120) days after the expiration of the **Policy Period** if this Policy is renewed; or (iii) the expiration of the applicable **Extended Reporting Period**, if exercised.

3. The **Insurer** shall not raise as a defense to any **Claim** that notice was not "as soon as practicable" if such **Claim** was reported during the **Policy Period**, and was otherwise reported in compliance with this section.

4. If during the **Policy Period** the **Insured(s)** become aware of and notifies the **Insurer** in writing of circumstances that may give rise to a **Claim** against the **Insured(s)** and provides details as set forth in this paragraph, then any **Claim** that is subsequently made against an **Insured** that arises from such circumstances and that is reported in accordance with this Section **V**.F., shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period**. No coverage is afforded under this Policy for any **Loss** incurred in connection with such circumstances prior to the time such circumstances result in a **Claim**. Pursuant to this paragraph, and as a condition precedent to exercising any rights under this Policy with respect to a notice of circumstances that may give rise to a **Claim** against the **Insured(s)**, the **Insured(s)** shall specify and include within any such notice of circumstance a description of the circumstances that may give rise to a **Claim**, the nature of the alleged **Wrongful Act(s)** (or the nature of the alleged **Wrongful Act(s)** anticipated) and reasons for anticipating such **Claim**, with full particulars as to dates, persons and entities involved.

G. **INTERRELATED CLAIMS**

All **Claims** arising from, based upon, or attributable to the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** first made on the earliest date that:

1.    any of such **Claims** was first made, or deemed to have been made pursuant to Section **V**.F. above, even if such date is before the **Policy Period**;

2.    proper notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given to the **Insurer** pursuant to Section **V**.F. above; or

3.    notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given under any other policy of insurance of which any of the applicable Coverage Parts is a direct or indirect renewal or replacement.

H.    **ORGANIZATIONAL CHANGES**

If during the **Policy Period**:

1.    the **Named Insured** shall consolidate with, merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert;

2.    any person or entity or group of persons or entities acting in concert shall acquire:

   i)    more than fifty percent (50%) of the voting, appointment or designation power for the selection of a majority of: the Board of Directors; management committee members (if a joint venture); or the members of the management board (if a limited liability company), of the **Named Insured**; or

   ii)   the right, pursuant to a written contract or the by-laws, charter, operating agreement or similar documents of the **Named Insured**, to elect, appoint or designate the majority of: the Board of Directors; management committee members (if a joint venture); or the members of the management board (if a limited liability company), of the **Named Insured,**

(any events described in Subsections 1. or 2. above is an "**Organizational Change**"), then this Policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective date of the **Organizational Change**. However, there shall be no coverage afforded by this Policy for any actual or alleged **Wrongful Act(s)** occurring after the effective date of the **Organizational Change**.

In the event of an **Organizational Change**, this Policy shall not be cancelled by the **Named Insured** after such **Organizational Change** occurs.

I.    **OTHER INSURANCE**

The **Insured(s)** agree that any insurance provided by this Policy shall apply only as excess over any other valid and collectible insurance, whether primary, contributory, excess, contingent or otherwise, unless such insurance is written only as specific excess insurance over the Limits of Liability provided by this

Policy. For coverage provided under this Policy to any **Employee** that is a leased employee or independent contractor, any insurance provided under this Policy shall be excess over any insurance or indemnification provided by any professional employer organization. This Policy shall not be subject to the terms and conditions of any other insurance policy.

Notwithstanding the foregoing, this policy shall apply as primary insurance with respect to: (i) any private equity or venture capital liability, general partner liability, or other similar management or professional liability insurance maintained by any **Insured Person** or any direct or indirect shareholder of the **Named Insured**; (ii) any indemnification which may be owed to any **Insured Person** by a direct or indirect shareholder of the **Named Insured**; (iii) any personal liability or umbrella insurance that may be available to an **Insured Person**; or (iv) if the **Employment Practices Liability Coverage Part** is purchased, with respect to any **Claim** covered under said **Coverage Part** for an **Employment Practices Wrongful Act,** other than that portion of a **Claim** made against a leased employee or natural person independent contractor.

J.     **TERMINATION, CANCELLATION AND NONRENEWAL**

This Policy shall terminate at the earlier of the end of the **Policy Period** shown in Item 2. of the Declarations or the effective date of cancellation, as described below.

1.     Cancellation

   a.     The **Named Insured** may cancel this Policy by surrender of this Policy to the **Insurer.** The **Named Insured** may also cancel this Policy or any **Coverage Part** by giving prior written notice to the **Insurer** stating when such cancellation shall take effect; provided, however, that such date of cancellation shall not be later than the end of the **Policy Period**. If the **Named Insured** cancels this Policy, or any **Coverage Part**, the **Insurer** shall retain the proportion of the premium paid for the Policy, or any such **Coverage Part**, on a pro-rata basis.

   b.     The **Insurer** may cancel this Policy or any **Coverage Part** only for non-payment of premium. In this event, the **Insurer** shall mail written notice of cancellation for non-payment of premium to the **Named Insured**. The **Insurer's** notice shall state the effective date of cancellation, which shall not be less than twenty (20) days after mailing such notice. If the **Insurer** cancels this Policy or any **Coverage Part**, the **Insurer** shall retain the proportion of the premium paid on a pro-rata basis.

2.     Non-Renewal

The **Insurer** has no obligation to renew this Policy or any **Coverage Part**. If the **Insurer** elects not to renew this Policy or any **Coverage Part**, the **Insurer** shall mail to the **Named Insured** written notice of non-renewal at least sixty (60) days prior to the expiration of the **Policy Period**.

3. Notice

The **Insurer** shall send all notices required under this Section **V.J.** by certified or registered mail to the **Named Insured** at the address listed in Item 1. of the Declarations, and by mail or electronic mail to the **Named Insured's** authorized agent, if any.  Proof of mailing shall be sufficient proof of notice.

K.  **SUBROGATION**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to any **Insured(s)'** rights of recovery.  The **Insured(s)** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights in the name of the **Company** or any **Insured Person**.

Regarding coverage provided by this Policy under the **Directors and Officers Liability Coverage Part** and/or the **Employment Practices Liability Coverage Part**, if purchased and as applicable:

In no event shall the **Insurer** exercise its right of subrogation against an **Insured** under this Policy unless there has been a final, non-appealable adjudication in the underlying proceeding establishing that such **Insured** committed a deliberate criminal or deliberate fraudulent act or omission, knowingly violated any statute, regulation or law or gained any personal profit, remuneration or other financial advantage to which such **Insured** was not legally entitled.

Regarding coverage provided by this Policy under the **Fiduciary Liability Coverage Part**, if purchased and as applicable:

If the premium for this Policy has been paid by an **Insured** other than a **Plan,**  the **Insurer** shall not exercise its right of subrogation against an **Insured** under this Policy unless there has been a final, non-appealable adjudication in the underlying proceeding establishing that such **Insured** committed a deliberate criminal or deliberate fraudulent act or omission, knowingly violated any statute, regulation or law or gained any personal profit, remuneration or other financial advantage to which such **Insured** was not legally entitled.

L.  **BANKRUPTCY**

Bankruptcy or insolvency of any **Insured** shall not relieve the **Insurer** of its obligations nor deprive the **Insurer** of its rights, remedies or defenses under this Policy or at law.

In the event a liquidation or reorganization proceeding is commenced by or against the **Company** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Company** and the **Insured Person(s)** hereby agree to cooperate in any efforts by the **Insurer**, the

**Company** or any **Insured Person(s)** to obtain relief from any stay or injunction that may prohibit or delay the **Insurer's** payment of **Loss**.

M.   **ALTERATION AND HEADINGS**

No alteration, change or modification to this Policy shall be effective unless made by written Endorsement to this Policy which is signed by an authorized representative of the **Insurer**.

The titles and headings to the various sections, subsections and endorsements of this Policy are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such sections, subsections or endorsements.

N.   **TERRITORY AND VALUATION**

Coverage under this Policy shall extend to **Wrongful Acts** taking place, **Loss** incurred or **Claims** made anywhere in the world, to the extent legally permitted.

All premiums, Limits of Liability, Retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

O.   **AUTHORIZATION CLAUSE**

By acceptance of this Policy, the **Named Insured** agrees to act on behalf of the **Insured(s)** with respect to:

1.   giving or receiving notices provided for in this Policy, including but not limited to giving notices of **Claim** or circumstances that may give rise to a **Claim** or giving or receiving notice of termination, cancellation or non-renewal, provided, however, that any **Insured Person** may give notice to the **Insurer** pursuant to Section **V**.F. of this Policy

2.   paying premiums and receiving any return premiums that may become due under this Policy;

3.   agreeing to any changes in the Policy; and

the **Insured(s)** agree that the **Named Insured** shall act on their behalf.

P.   **ASSIGNMENT**

This Policy and any and all rights hereunder are not assignable without the prior written consent of the **Insurer**.

Q.   **REPRESENTATIONS**

By acceptance of this Policy, the **Insured(s)** represent and acknowledge that the statements and information contained in the **Application** are accurate and complete and that this Policy is issued in reliance upon the accuracy and completeness of such representations, statements and information.   No knowledge possessed by an **Insured Person** shall be imputed to any other **Insured Person**.

The **Insured(s)** further agree that in the event of any material misstatement, misrepresentation or omission in the **Application**, no coverage under this Policy shall apply to:

1.   Any **Insured Person** who knew, as of the inception date of this Policy, that the facts were not accurately and completely disclosed; and

2.   The **Company** (or any **Plan** if the **Fiduciary Liability Coverage Part** is purchased), either for **Claims** against it or as indemnitor of any **Insured Person**, if any of the following individuals, or their functional equivalents, knew, as of the inception date of the Policy, the facts that were not accurately and completely disclosed:

   i)   regarding coverage under the **Directors and Officers Coverage Part**, or the **Fiduciary Liability Coverage Part**, if purchased: any **Insured Person** who is or was a Chief Executive Officer or Chief Financial Officer;

   ii)   regarding coverage under the **Employment Practices Liability Coverage Part**: any **Insured Person** who was or is the head of the **Company's** Human Resources department.

The **Insurer** waives any right it may have to rescind or void this Policy.



# Private PROtect<sup>SM</sup>
# Directors & Officers Liability Coverage Part

In consideration of payment of the premium and in reliance upon the statements and representations made in the **Application**, all of which are made part of this Policy, and subject to the Declarations and the other terms of this Policy applicable to this **Coverage Part**, the Insurance Company shown in the Declarations (the "**Insurer**") and the **Insured(s)** agree as follows:

## I. INSURING AGREEMENTS

### A. NON-INDEMNIFIED LOSS COVERAGE

The **Insurer** shall pay **Loss** of any **Insured Person(s)** arising from a **Claim** first made during the **Policy Period** (or **Extended Reporting Period**, if exercised) against such **Insured Person(s)** for a **Wrongful Act**, if the **Company** has not indemnified the **Insured Person(s)** for such **Loss**.

### B. COMPANY REIMBURSEMENT COVERAGE

The **Insurer** shall pay **Loss** of the **Company** arising from a **Claim** first made during the **Policy Period** (or **Extended Reporting Period**, if exercised) against any **Insured Person(s)** for a **Wrongful Act**, but only to the extent the **Company** has indemnified the **Insured Person(s)** for such **Loss**.

### C. COMPANY LIABILITY COVERAGE

The **Insurer** shall pay **Loss** of the **Company** arising from a **Claim** first made during the **Policy Period** (or **Extended Reporting Period**, if exercised) against the **Company** for a **Wrongful Act**.

### D. DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE

The **Insurer** shall pay **Investigative Costs**, subject to an aggregate Sub-limit of Liability as stated in Item 4.B.2. of the Declarations, resulting from a **Shareholder Derivative Demand** first made during the **Policy Period** (or **Extended Reporting Period**, if exercised) regardless of the outcome of, or finding as a result of, such **Shareholder Derivative Demand**.

### E. INQUIRY COSTS COVERAGE

The **Insurer** will pay **Inquiry Costs**, subject to an aggregate Sub-Limit of Liability as stated in Item 4.B.3. of the Declarations, incurred by an **Insured Person(s)** as a result of an **Inquiry** first received by such **Insured Person(s)** during the **Policy Period** (or **Extended Reporting Period**, if applicable) if the **Company** has not indemnified such **Insured Person** for such **Inquiry Costs**.

## II.   DEFINITIONS

A.   **Claim** means:

1.   a written demand against any **Insured** for monetary damages, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations pertaining to a **Wrongful Act,** commenced by the **Insured's** receipt of such demand;

2.   a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3.   a criminal proceeding against any **Insured** commenced by return of an indictment or similar document;

4.   an administrative or regulatory proceeding against any **Insured** commenced by the filing of a notice of charges or similar document;

5.   a civil, criminal, administrative or regulatory investigation of any **Insured Person** commenced by the service upon or other receipt by the **Insured Person** of a Wells notice, target letter or other written notice from the investigating authority identifying by name the **Insured Person** as an individual against whom a proceeding may be commenced;

6.   an official request for the **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**; or

7.   an arbitration, mediation or any other alternative dispute resolution proceeding against any **Insured** commenced by the service of such proceeding or demand or similar document;

8.   solely with respect to **INSURING AGREEMENT** D., a **Shareholder Derivative Demand**.

9.   solely with respect to **INSURING AGREEMENT** E., an **Inquiry.**

10.   any of 1 through 7 above against an **Insured Person** arising out of, based upon or attributable to an actual or alleged **Wrongful Act** as defined below in Section **II. DEFINITIONS**, subsection N., paragraph 2.

**Claim** shall also include any appeal resulting from Subsections 2., 3., 4. or 5. above.

B.   **Employed Lawyers Claim** means a **Claim** as defined in Subsection A. 10. of this **Coverage Part,** subject to an aggregate Sub-Limit of Liability as stated in Item 4.B.4. of the Declarations.

C.  **Exempt Securities Claim** means any **Claim**:

1.  Based upon, arising out of or attributable to the actual or alleged purchase, sale or offer to purchase or sell any securities of the **Company** in any transaction that is in fact exempt from registration under the Securities Act of 1933 (including any amendments thereto and regulations promulgated there under and ), including any Regulation CF offering, or any other offering under any similar provision of foreign law;

2.  by a securities holder of the **Company** arising out of the actual or alleged failure of the **Company** to undertake a public offering of securities;

3.  for a **Wrongful Act** in connection with the preparation of the **Company** to commence an initial public offering of securities, including without limitation, any **Wrongful Act** relating to a road show. This addition to the definition of **Exempt Securities Claim** shall be void ab initio upon the registration statement for such initial public offering's becoming effective (the "**IPO Commencement Time**") except to the extent, (i) prior to the **IPO Commencement Time**, a **Claim** was made against an **Insured** and reported to the **Insurer** in accordance with the reporting provisions of the General Terms and Conditions Section, Section **V. GENERAL CONDITIONS AND LIMITATIONS**, subsection F.2. **REPORTING AND NOTICE** of this Policy and (ii) no other insurance policy is applicable to the **Claim** or would be applicable but for the exhaustion of its Limit of Liability or the failure to provide notice to the insurer of such other policy.

D.  **Inquiry** means:

1.  a subpoena or similar document compelling witness testimony or document production by an **Insured Person** with respect to such **Insured Person's** capacity in any **Company** or a **Company's** business activities;

2.  a written request by an **Investigating Authority** for an **Insured Person** to appear for an interview or meeting with respect to such **Insured Person's** capacity in the **Company** or **Company's** business activities; or

3.  a written request by a **Company** for an **Insured Person** to appear for an interview or meeting in connection with an investigation by an **Investigating Authority** or a security holder derivative demand, with respect to such **Insured Person's** capacity in any **Company** or a **Company's** business activities;

    provided that, **Inquiry** shall not mean any routine or regularly scheduled oversight, compliance, audit, examination or inspection conducted by an **Investigating Authority**.

E.  **Inquiry Costs** means reasonable and necessary fees, costs and expenses incurred solely by an **Insured Person** in connection with the preparation for or response to an **Inquiry**, but shall not include salaries, wages, overhead or benefit expenses associated with **Insured Persons** or employees of the **Company** or the costs of complying with any formal or informal discovery request or production request seeking documents, records or electronic information that are in the possession of the **Company** or any third party.

F. **Investigating Authority** means any federal, state, local or foreign law enforcement or governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general) or the enforcement unit of any securities or commodities exchange or other self-regulatory body.

G. **Investigative Costs** means that part of **Loss** consisting of reasonable and necessary fees (including but not limited to attorney's fees and expert's fees), costs and expenses (other than regular or overtime wages, benefit expenses, salaries, fees, other types of compensation or overhead expenses of **Insured Person(s)** or the **Company**) incurred by the **Company** (including its Board of Directors or any committee of its Board of Directors) and consented to by the **Insurer** (such consent to not be unreasonably withheld), in investigating or evaluating the claims alleged in a **Shareholder Derivative Demand**.

H. **Loss** means the total amount which the **Insured(s)** become legally obligated to pay on account of **Claims** made against them solely for **Wrongful Acts** for which coverage applies, including, but not limited to: damages, judgments and settlements; any award of pre-judgment and post-judgment interest on covered judgments and settlements; claimants' attorney's fee award pursuant to a covered judgment or included as part of a covered settlement; and **Defense Costs**.
**Loss** shall also include punitive, exemplary, and multiplied damages included as part of a covered settlement to the extent that such damages are insurable provided, however, that the insurability of punitive, exemplary and multiplied damages shall be governed by the law of any jurisdiction having a substantial relationship to the **Claim**, the **Loss** or this **Coverage Part,** that most favors the insurability of such punitive, exemplary or multiplied damages. Solely with respect to **INSURING AGREEMENT** D., **Loss** means **Investigative Costs**. Solely with respect to **INSURING AGREEMENT** E., **Loss** means **Inquiry Costs**.

Loss shall not include, other than **Defense Costs**:

1. criminal or civil fines or penalties, other than civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B), or to **UK Bribery Act Fines**;

2. taxes;

3. any amount for which the **Insured(s)** are not financially liable or which are without legal recourse to the **Insured(s)**;

4. matters which are deemed uninsurable under the law pursuant to which this **Coverage Part** shall be construed;

5. any amounts paid or incurred by any **Insured(s)** in providing injunctive or non-pecuniary relief;

6. any amounts incurred by any **Insured(s)** to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants** regardless of whether such amounts are incurred compulsorily or voluntarily;

7.  disgorgement or restitution, whether paid, returned or reimbursed pursuant to a settlement or in satisfaction of a judgment; or

8.  any amount of any judgment or settlement representing the amount by which any price or consideration is effectively increased in connection with the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or assets of an entity; provided this paragraph shall not exclude plaintiffs' attorney's fees with respect to any such judgment or settlement.

In addition, the **Insurer** shall not assert with respect to a **Claim** that **Loss** incurred by any **Insured**, in the **Insured's** capacity as such, is uninsurable due to the **Insured's** actual or alleged violation of Sections 11, 12 or 15 of the Securities Act of 1933, as amended; provided, however, this paragraph shall not apply to any settlement or judgment in said **Claim** if and to the extent a final and non-appealable judgment adverse to such **Insured** in any proceeding not brought by the **Insurer**, or a final determination by a regulatory or other governmental authority, or a written admission by such **Insured** in a settlement of such **Claim**, establishes such settlement or judgment constitutes disgorgement, restitution or the return of ill-gotten gain.

I.  **Moonlighting** means professional legal services rendered by an **Insured Person** outside the scope of his or her employment with the **Company** but during such time as the **Insured Person** is a licensed attorney employed by the **Company** to render professional legal services, which include notarizing, certifying or acknowledging signatures. **Moonlighting** shall not include any such professional legal services by any such **Insured Person** in his or her capacity with any entity that is not a current **Insured** at the time such services are rendered, including, without limitation, such **Insured Person's** capacity as an owner, principal, partner, employee, counsel or of counsel with any such entity.

J.  **Outside Entity** means:

1.  any organization chartered and operated as a not-for-profit organization;

2.  any other organization specifically included as an **Outside Entity** by specific written Endorsement applicable to this **Coverage Part**;

provided any organization referred to in Subsections 1. or 2. above is not included in the definition of **Company**.

K.  **Outside Position** means the position of director, officer, manager, trustee, governor or other equivalent executive position in an **Outside Entity** held by an **Insured Person** as defined in Subsection 1. of **II. DEFINITIONS** Section F. if service in such position is with the knowledge and consent of and at the direction or request of or part of the duties regularly assigned to the **Insured Person**, by the **Company**.

L.  **Shareholder Derivative Demand** means a written demand by one or more shareholders of the **Company** against the **Company's** board of directors or board of managers to bring a civil proceeding on behalf of the **Company** against any **Insured Person** for a **Wrongful Act**;

M.  **UK Bribery Act Fines** means fines or penalties assessed against any **Insured Person**

pursuant to Section 11(1)(a) of the United Kingdom Bribery Act of 2012, Chapter 23, up to a maximum amount of $10,000 per event.

N. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty:

1. by an **Insured Person** while acting in his or her capacity as such and on behalf of the **Company**, or any matter claimed against the **Insured Person** solely by reason of his or her status as an **Insured Person**;

2. by an **Insured Person** employed by the **Company** as an attorney (i) while acting in his or her capacity as an **Insured Person** and as a licensed attorney rendering professional legal services, including, without limitation, pro bono legal service; or (ii) while **Moonlighting;** or (iii) by any **Insured Person** while acting under the supervision of and at the direction of another **Insured Person** who is employed by the **Company** as an attorney provided that such other **Insured Person**, is providing. such supervision and direction, is acting in his or her capacity as an **Insured Person** and as a licensed attorney rendering professional legal services. Rendering professional legal services includes notarizing, certifying or acknowledging signatures;

3. with respect to any **Outside Position**, by such **Insured Person** in his or her capacity as such and while acting on behalf of the **Outside Entity** or any matter claimed against such **Insured Person** solely by reason of his or her status in such **Outside Position**; or

4. with respect to **INSURING AGREEMENT** C., by the **Company**.

## III.   EXCLUSIONS

The **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against any **Insured**:

A. brought or maintained by or on behalf of the **Company,** any **Insured Person** (other than an **Employee**) in any capacity or by any past, present or future security holder, partner or member of the **Company**, provided this exclusion shall not apply to:

1. a **Claim** by or on behalf of a security holder, partner or member of the **Company**, whether direct or derivative, that is brought and maintained without the solicitation, assistance or participation of any **Insured** or **Outside Entity**;

2. a **Claim** brought or maintained by any **Insured Person** that is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is otherwise covered under the terms of this **Coverage Part;**

3. a **Claim** brought by any **Insured Person** who has not served in such capacity for at least two (2) years prior to the date such **Claim** is first made and who brings and maintains such **Claim** without the solicitation or active assistance or participation of the **Company** or any other **Insured Person** who is serving or has served as an **Insured Person** within such two (2) year period;

4.      a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver, similar official or creditors' committee for such **Company**, or any assignee of such trustee, examiner, receiver, or similar official or creditors' committee;

5.      a **Claim** brought by or on behalf of the **Company** against any **Insured Person** that is brought and maintained in any non-common law jurisdiction outside the United States; or

6.      a **Claim** brought against an **Insured Person** based upon or arising out of any protected activity specified in any "whistleblower" protection pursuant to any foreign, federal, state or local law;

B.      for any **Wrongful Act** by an **Insured Person** in an **Outside Position** if such **Claim** is brought or maintained by or on behalf of the **Outside Entity** in which the **Insured Person** serves, or by or on behalf of any past, present or future director, officer, manager, governor, trustee, security holder, partner or member of such **Outside Entity**, provided this exclusion shall not apply to:

1.      a **Claim** by or on behalf of a security holder, partner or member of the **Outside Entity**, whether direct or derivative, that is brought and maintained without the solicitation, assistance or participation of the **Company**, any **Insured Person**, the **Outside Entity** or any director, officer, manager, governor or trustee of the **Outside Entity**;

2.      a **Claim** brought or maintained by or on behalf of such **Outside Entity** that is in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a **Claim** which is otherwise covered under the terms of this **Coverage Part**;

3.      a **Claim** brought by a director, officer, manager, governor or trustee of such **Outside Entity** who has not served as such for at least two (2) years prior to the date such **Claim** is first made and who brings and maintains such **Claim** without the solicitation by, or active assistance or participation of, such **Outside Entity** or any other director, officer, manager, governor or trustee of such **Outside Entity** who is serving or has served as such within such two (2) year period;

4.      a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver, similar official or creditors' committee for such **Outside Entity**, or any assignee of such trustee, examiner, receiver, similar official or creditors' committee;

5.      a **Claim** by or on behalf of the **Outside Entity** brought and maintained in any non-common law jurisdiction outside the United States; or

6.      a **Claim** brought against the **Outside Entity** based upon or arising out of any protected activity specified in any "whistleblower" protection pursuant to any foreign, federal, state or local law;

C.      based upon, arising out of or attributable to:

1.  the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants** at any time; provided, however, that this Subsection 1. shall not be applicable to **INSURING AGREEMENT** A. except with respect to **Loss** (Including without limitation legal and professional fees) incurred in connection with testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to, or assessing the effects of, **Pollutants**; or

2.  any direction, demand or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **Pollutants**;

D.  for service by the **Insured Person(s)** in any position or capacity in any organization other than the **Company** even if the **Company** directed or requested the **Insured Person(s)** to serve in such other position or capacity, provided this exclusion shall not apply to service by the **Insured Person** in an **Outside Position**;

E.  based upon, arising out of or attributable to (i) the actual or alleged purchase or sale, or offer to purchase or sell any securities of any kind, including, without limitation, securities issued by an entity other than the **Company**, or (ii) the actual or alleged violation of: the Securities Act of 1933; the Securities Exchange Act of 1934; the Investment Act of 1940; any state "Blue Sky" securities law;  or any other federal, state or local regulation, rule or statute regulating securities.  This exclusion shall not be applicable to any **Exempt Securities Claim.**

F.  based upon, arising out of or attributable to any actual or alleged employment related **Wrongful Act**, including but not limited to any refusal to employ, wrongful termination, wrongful discipline, breach of contract, harassment, violation of civil rights, or retaliation; however, if the Employment Practices Liability **Coverage Part** is not purchased, this exclusion will only apply to Insuring Agreement C.

G.  based upon, arising out of, attributable to any actual or alleged:

1.  **Wage and Hour Violation**; or

2.  any violation of: (i) any law governing workers' compensation, unemployment insurance, social security or disability benefits; (ii) the National Labor Relations Act; (iii) the Worker Adjustment and Retraining Notification Act; (iv) the Consolidated Omnibus Budget Reconciliation Act of 1985; (v) the Occupational Safety and Health Act; (vi) the Employee Retirement Security Act of 1974 (vii) any federal, state, local or foreign statute, rule, regulation or common law similar or related to, or promulgated pursuant to, any of the foregoing in subparts (i) through (vi);

H.  based upon, arising out of or attributable to any actual or alleged:

1.  Payments, commissions, gratuities, benefits or favors to or for the benefit of any full or part time domestic or foreign government official, agent, representative, employee, or military personnel, including any family member of, or any entity affiliated with, any of the foregoing;

2. Payments, commissions, gratuities, benefits or favors to or for the benefit of any full or part time officers, directors, agents, partners, representatives, principal shareholders, owners or employees of any customer or potential customer of any **Insured**, including any family member of, or any entity affiliated with, any of the foregoing; or

3. Political contributions, whether domestic or foreign;

Provided, however, this Exclusion shall not apply to civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B) or to **UK Bribery Act Fines.**

Solely with respect to **INSURING AGREEMENT** C., the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against the **Company**:

I. based upon, arising out of or attributable to any actual or alleged libel, slander oral or written publication of defamatory or disparaging material, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, assault, battery, loss of consortium, malicious prosecution or malicious use or abuse or process;

J. based upon, arising out of or attributable to any actual or alleged discrimination against, or harassment of, any person or entity, whether employment related or not;

K. based upon, arising out of or attributable to the actual or alleged violation of intellectual property rights, including, without limitation: (i) infringement of patent, copyright, trademark, trade dress, service mark, service name, title or slogan; (ii) misappropriation of ideas or trade secrets; or iii) plagiarism. This exclusion will not apply to any **Exempt Securities Claim**.

L. based upon, arising out of or attributable to any actual or alleged false advertising or misrepresentation in advertising, with respects to the advertising of the **Insured's** own goods, products, publications or services.

M. based upon, arising out of or attributable to any actual or alleged price fixing, predatory pricing, restraint of trade, monopolization, anti-competitive conduct, unfair competition or unfair business or trade practice or any interference in another's contractual or business relationship. Without limitation, this exclusion shall be applicable to any actual or alleged violation of: the Federal Trade Commission Act; the Sherman Act; the Clayton Act; any amendments to any of the foregoing or any regulations promulgated pursuant to any of the foregoing; any statutory or common law definition of unfair competition, or unfair business or trade practice; or any provision of any federal, state, local or foreign statute regulation or common law relating to any of the foregoing or actually or allegedly relating to any activity set forth in this exclusion. However, this Exclusion shall not apply to civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B) or to **UK Bribery Act Fines**;

N. based upon, arising out of or attributable to any **Insured's** actual or alleged rendering or failure to render professional services, provided, however, that this exclusion shall not be applicable to **Investigative Costs**; or

O. based upon, arising out of or attributable to any actual or alleged liability of the **Company** under any contract or agreement; provided, however, that this exclusion shall not be applicable to any liability that would have attached to the **Company** in the absence of such contract or agreement.

## IV.    OUTSIDE POSITION COVERAGE

Subject to this Policy's other terms, **INSURING AGREEMENTS** A. and B. shall extend coverage to **Insured Persons** while serving in an **Outside Position**. However, this coverage shall be specifically excess of any indemnification and insurance available from or provided by the **Outside Entity** or any other entity in which the **Insured Person(s)** serve(s) in the **Outside Position**. Payment by the **Insurer** or any affiliate of the **Insurer** under another policy as a result of a **Claim** against an **Insured Person(s)** in an **Outside Position** shall reduce, by the amount of such payment, the **Insurer's** Limit of Liability applicable to this **Coverage Part** with respect to such **Claim**.

## V.    ADDITIONAL LIMIT FOR NON-INDEMNIFIED LOSS

The **Insurer** shall pay **Loss** of any **Insured Person(s)** for which the **Insured Person(s)** are not indemnified by the **Company** and which the **Insured Person(s)** become legally obligated to pay on account of any **Claim** first made against them, individually or otherwise, during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act**, subject to a limit as set forth in Item 4.B.5 of the Declarations. Coverage under this Subsection shall apply only if the Limits of Liability in Item 4.B.1. of the Declarations are exhausted by reason of payment by the **Insurer** of **Loss**; such coverage shall then be excess of all other insurance specifically excess of this policy as well as all other insurance described the **General Terms and Conditions** Section, Subsection **V. GENERAL CONDITIONS AND LIMITATIONS**, subparagraph I. **OTHER INSURANCE**.

## VI.    PRESUMPTIVE INDEMNIFICATION

If the **Company** is permitted or required by common or statutory law to indemnify the **Insured Person(s)** for **Loss** but fails or refuses to do so other than for reason of **Financial Insolvency** then, notwithstanding any other conditions, provisions or terms of this policy to the contrary, any payment by the **Insurer** of such **Loss** under **INSURING AGREEMENT** A. shall be subject to the Retention set forth in Item 5.A.1. of the Declarations

For purposes of this section, the shareholder and board of director resolutions of the **Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.



# Private PROtect<sup>SM</sup>
# Fiduciary Liability Coverage Part

In consideration of payment of the premium and in reliance upon the statements and representations made in the **Application**, all of which are made part of this Policy, and subject to the Declarations and the other terms of this Policy applicable to this **Coverage Part**, the Insurance Company shown in the Declarations (the "**Insurer**") and the **Insured(s)** agree as follows:

## I.    INSURING AGREEMENTS

A.    **WRONGFUL ACTS COVERAGE**

The **Insurer** shall pay the **Loss** of any **Insured** arising from a **Claim** first made during the **Policy Period** (or the **Extended Reporting Period**, if exercised) against such **Insured** for a **Wrongful Act**.

B.    **VOLUNTARY COMPLIANCE LOSS COVERAGE**

The **Insurer** shall pay the **Voluntary Compliance Loss** first assessed in writing against any **Insured** during the **Policy Period** (or the **Extended Reporting Period**, if exercised), subject to the aggregate Sub-Limit of Liability set forth in Item 4.D.2. of the Declarations.

## II.    DEFINITIONS

A.    **Administration** means with respect to a **Plan**:

1.    advising, counseling or giving notice to **Employees**, **Plan** participants and beneficiaries;

2.    providing interpretations to **Employees**, **Plan** participants and beneficiaries;

3.    handling of records; or

4.    effecting enrollment, termination or cancellation of **Employees**, participants and beneficiaries under a **Plan**.

B.    **Application** means, in addition to the information and representations included in the definition of **Application** in **II. DEFINITIONS** Section A. of the General Terms and Conditions, the following materials: any public documents filed by or on behalf of the **Company** or any **Plan** during the twelve (12) month period prior to the inception of the **Policy Period** with any state, federal or local government agency, including without limitation the Securities and Exchange Commission and the United States Department of Labor.

C.   **Benefits** means any obligation under a **Plan** to a **Plan** participant or beneficiary, or that would be such an obligation if the **Plan** complied with applicable law.   **Benefits** shall include plaintiffs' attorneys fees in any settlement or judgment based upon a percentage of **Benefits** or payable from a common fund established to pay **Benefits**.  Solely for the purpose of this Definition, an "obligation" is a payment of money or property, or the grant of a privilege, right, option or perquisite.

D.   **Claim** means:

1.   a written demand against any **Insured** for monetary, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations pertaining to a **Wrongful Act** commenced by the **Insured's** receipt of such demand;

2.   a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3.   a criminal proceeding against any **Insured** commenced by return of an indictment, information or similar document;

4.   an administrative or regulatory proceeding against any **Insured** commenced by the filing of a notice of charges or similar document;

5.   an arbitration, mediation or any other alternative dispute resolution proceeding against any **Insured** commenced by the service of such proceeding or demand or similar document; or

6.   written notice of the commencement of a fact finding investigation of an **Insured** pertaining to a **Wrongful Act** by the United States Department of Labor, the United States Pension Benefit Guaranty Corporation or any similar foreign governmental agency, including but not limited to the Pensions Ombudsmen or Pensions Regulator in the United Kingdom, having authority to regulate the governance, terms or solvency of a **Plan**.  Nothing in this Subsection 6. shall be deemed to include a fact finding investigation by the United States Internal Revenue Service or any similar foreign governmental agency having responsibility for the administration of tax laws or any governmental agency conducting a criminal investigation.

7.   solely with Insuring Agreement B., written notice of an assessment by a governmental regulatory authority of a **Voluntary Compliance Loss** against any **Insured**.

8.   any of the above based upon, arising out of or attributable to an actual or alleged violation of **HIPAA** or **HIPAA Privacy Regulations**.

**Claim** shall also include any appeal resulting from the **Claims** listed above in Subsections 2., 3., 4. or 5. above.

E.   **Corporate Trustee** means any corporation that (i) is established by the **Named Insured**; (ii) is formed and operating outside the United States; (iii) is duly appointed to act as a

trustee of the assets of a **Plan;** and (iv) performs no other function. Such an entity shall be considered a **Subsidiary** during such time as all the conditions of this Definition are met even if it does not otherwise meet the definition of **Subsidiary** set forth in **II**. **DEFINITIONS** Section L. of the General Terms and Conditions.

F.     **Defense Costs**, in addition to the provisions of the General Terms and Conditions Section, shall also include the reasonable and necessary fees and expenses of an independent fiduciary (and such independent fiduciary's legal counsel) retained to review the proposed settlement of a covered **Claim** pursuant to the United States Department of Labor Prohibited Transaction Exemption PTE 2003-39 and any amendments thereto. **Defense Costs** shall not include costs, charges, fees or expenses incurred by any **Insured** in connection with any circumstance involving an actual or potential **Voluntary Compliance Loss**, whether such costs, charges, fees or expenses are incurred in connection with a defense to or investigation of a **Voluntary Compliance Loss**, or a correction or remedy of a non-compliance with applicable law.

G.     **Employee Benefits Law** means:

    1.     the Employee Retirement Income Act of 1974 ("ERISA"), including all amendments thereto, including amendments contained in **HIPAA**, regulations promulgated under ERISA, and any similar state, local or foreign statute, regulation or common law provision pertaining to the governance, terms or solvency of a **Plan**;

    2.     **HIPAA Privacy Regulations**; or

    3.     in addition to the laws specified above in subsections 1. and 2. above, but solely with respect to a **Wrongful Act** as defined in **II**. **DEFINITIONS** Section V. Subsections 2. and 4., and solely with respect to a **Government Plan** any law governing workers' compensation, unemployment insurance, social security or disability insurance for **Employees** of the **Company**.

H.     **ESOP** means an Employee Stock Ownership Plan as defined in ERISA and regulations promulgated pursuant thereto, or any other plan, fund or program whose assets are comprised in whole or part in securities of or issued by the **Company**.

I.     **Government Plan** means a government mandated program for workers compensation, unemployment insurance, social security or disability insurance for **Employees** of the **Company**.

J.     **Health Care Exchange** means the American Health Benefit Exchange, the SHOP Exchange, as such terms are defined in Section 1311 of the Patient Protection and Affordable Care Act, and any other exchange, including any public or private entity established to facilitate the purchase of health insurance coverage in accordance with the Patient Protection and Affordable Care Act, as amended.

K.     **Health Care Exchange Wrongful Act** means any actual or alleged breach of fiduciary duty by an **Insured**, or any actual or alleged act, error or omission by an **Insured**, in connection with the insurance purchased through, or attempted to be purchased through, a **Health Care Exchange**.

L.  **HIPAA** means the Health Insurance Portability and Accountability Act of 1996, including any amendments thereto.

M.  **HIPAA Claim** means a **Claim** as defined in paragraph 8. of subsection D of this **Coverage Part**, subject to the aggregate Sub-Limit of Liability set forth in Item 4.D.3. of the Declarations.

N.  **HIPAA Privacy Regulations** means privacy regulations promulgated pursuant to **HIPAA** insofar as any such privacy regulations pertain to a **Plan**.

O.  **Insured(s)**, in addition to the meaning set forth in the General Terms and Conditions Section, shall also include any **Plan** except a **Government Plan**.

P.  **Loss** means the total amount the **Insured(s)** become legally obligated to pay on account of **Claims** made against them solely for **Wrongful Acts** for which coverage applies, including, but not limited to damages, judgments and settlements; any award of pre-judgment and post-judgment interest on covered judgments and settlements; claimants' counsel's fees awarded pursuant to a covered judgment or included as part of a covered settlement; **Defense Costs**; and **Voluntary Compliance Loss** under Insuring Agreement B.  **Loss** shall also include punitive and exemplary damages and multiplied damages not in excess of the damage award so multiplied awarded as part of a covered judgment or included as part of a covered settlement where insurable under applicable law.

In determining the insurability of punitive or exemplary damages, the multiplied portion of multiplied damages, or any other **Loss** the insurability of which is dependent on the law applicable to this **Coverage Part**, the law of the jurisdiction having a substantial relationship to the **Claim**, the **Loss** or this **Coverage Part** that most favors the insurability of such damages or **Loss** shall apply.

**Loss** shall not include:

1.  criminal or civil fines or penalties, except the following civil fines or penalties solely in connection with a **Plan**:
    a.  the five percent (5%) or less civil penalty imposed upon an **Insured** pursuant to section 502(i) of ERISA;
    b.  the twenty percent (20%) or less civil penalty imposed upon an **Insured** pursuant to Section 502(l) of ERISA;
    c.  civil fines or penalties imposed by the Pensions Ombudsmen or Pensions Regulator (or any successor regulatory authority) in the United Kingdom;
    d.  civil fines or penalties constituting **Voluntary Compliance Loss** under Insuring Agreement B subject to the sub-limit of Liability set forth in Item 4.D.2. of the Declarations**;** and
    e.  civil penalties imposed upon an **Insured** for violations of **HIPAA Privacy Regulations** subject to the sub-limit of Liability set forth in Item 4.D.3. of the Declarations;

2.  taxes;

3.  any amounts for which the **Insured(s)** are not financially liable or which are without legal recourse to the **Insured(s)**;

4.      matters which are deemed uninsurable under the law pursuant to which this **Coverage Part** shall be construed;

5.      amounts paid or incurred by any **Insured(s)** in providing injunctive or non-pecuniary relief;

6.      amounts constituting disgorgement or restitution whether paid, returned or reimbursed pursuant to a settlement or in satisfaction of a judgment;

7.      **Benefits**, or that portion of any settlement, judgment or award in an amount equal to such **Benefits**, unless and to the extent that the recovery of such **Benefits** is based upon a covered **Wrongful Act** and is payable as a personal obligation of an **Insured Person** without indemnification, payment or advancement from any source.  Notwithstanding the foregoing, loss or damages sought by a claimant for diminution in the value of the assets of a **Plan**, including the value of individual accounts in a **Plan**, because of a change in the value of investments held by the **Plan**, shall not be considered **Benefits** even if the claimants or a court has characterized such loss or damage as "benefits";

8.      the return or reversion to an employer of any contribution to, or asset of, a **Plan**; or

9.      wages, tips, commissions, fees or investigative costs except fees or investigative costs that constitute **Defense Costs.**

Q.    **Managed Care Services** means the administration or management of a health care, pharmaceutical, vision or dental **Plan** utilizing cost control mechanisms, including, but not limited to utilization review, case management, the use of a preferred provider medical, vision or dental network, or a health maintenance organization

R.    **Multiemployer Plan** means any multiemployer plan as defined by ERISA to which the **Company** and an employer other than the **Company** are required to contribute.

S.    **Non-indemnifiable Loss** means **Loss,** incurred by an **Insured Person,** that has not been indemnified, paid or advanced by the **Company** or a **Plan** and for which the **Company** or a **Plan** is not permitted to indemnify pursuant to law.

T.    **Plan** means:

1.      a welfare plan, as defined in ERISA, sponsored solely by the **Company** or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees** of the **Company**;

2.      a pension plan, as defined in ERISA, sponsored solely by the **Company** or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees** of the **Company** provided that such plan was in existence before the beginning of the **Policy Period**; or

3.      a pension plan (including a plan that is both welfare plan and a pension plan) as defined in ERISA, which during the **Policy Period** first becomes sponsored solely

by the **Company** or sponsored jointly by the **Company** and a labor organization, solely for the benefit of **Employees** of the **Company**, subject to the following:

a.    this **Coverage Part** shall only provide coverage with respect to **Wrongful Acts** occurring after the first date of such sponsorship;

b.    the **Company** shall provide written notice of such sponsorship to the **Insurer** by the end of the **Policy Period** or, if there are fewer than thirty (30) days remaining in the **Policy Period** on the first date of such sponsorship, then within thirty (30) days after the **Policy Period**; or

4.    A **Government Plan**; however, coverage with respect a **Government Plan** is solely for a **Wrongful Act** as defined in **II**. **DEFINITIONS** Section V. Subsections 2. or 4.

Any entity meeting the definition of **Plan** set forth in this Definition shall constitute a **Plan** irrespective of whether such entity is subject to regulation under any provision of ERISA or constitutes a qualified or non-qualified plan under the United States Internal Revenue Code**.**

Notwithstanding anything in this Definition, **Plan** shall not include (i) any **ESOP**, unless included by specific written endorsement to this Policy that is applicable to this **Coverage Part**; or (ii) a **Multiemployer Plan**. Coverage relating to an **Insured Person's** serving with a **Multiemployer Plan** shall be afforded solely for any **Wrongful Act** as defined in **II. DEFINITIONS** Section T. Subsection 5. and only if (i) the **Insured Person** is serving with the **Multiemployer Plan** at the specific direction of the **Company;** and (ii) the **Insured Person's** service with the **Multiemployer Plan** is added by specific written endorsement applicable to this **Coverage Part**.  In no event shall any **Multiemployer Plan** be an **Insured** under this **Coverage Part**.

Without in any way limiting the applicability of Exclusion F., coverage under this **Coverage Part** relating to a **Wrongful Act** concerning a **Plan** as defined in Subsections 1., 2. or 3. above with respect to any **Claim** made against any **Insured** or **Voluntary Compliance Loss** incurred by an **Insured** shall only apply for **Wrongful Acts** occurring during such time as the **Plan** is sponsored by the **Named Insured** or a then current **Subsidiary** (whether solely or jointly with a labor organization) solely for the benefit of **Employees** of the **Company**.  In the event any such **Plan** is merged, sold, spun off or terminated whether prior to or during the **Policy Period,** coverage under this **Coverage Part** shall only apply with respect to **Wrongful Acts** occurring prior to the date of such merger, sale, spin off or termination, or prior to the date of final distribution of the assets of any such **Plan**, whichever is later.

U.    **Voluntary Compliance Loss** means fines, penalties, or fees, subject to the sub-limit of Liability set forth in Item 4.D.2. of the Declarations, assessed in writing by a governmental regulatory authority against, and collected from, an **Insured** in connection with the correction of a **Plan's** noncompliance with applicable law pursuant to the following programs: the Employee Plans Compliance Resolution System; the Delinquent Filer Voluntary Compliance Program; the Voluntary Fiduciary Correction Program; and the Participant Notice Voluntary Correction Program; provided, however, that the **Insured** first became aware of such non-compliance during the **Policy Period** or during the policy period of a policy or coverage section of a policy providing fiduciary liability

coverage issued by the **Insurer** of which this **Coverage Part** is a continuous renewal and provided further, that the United States Department of Labor or other applicable regulatory body shall have issued a "No Action" letter or similar document to the extent applicable procedures pursuant to any of the foregoing programs provide for the issuance of any such document.

V.  **Wrongful Act** means:

1.  any actual or alleged violation by an **Insured** of any of the responsibilities, obligations or duties imposed upon fiduciaries by **Employee Benefits Law** with respect to a **Plan,** including but not limited to breaches of such duties in connection with the hiring or monitoring of third party service providers, or the violation of **HIPAA Privacy Regulations** with respect to a **Plan**;

2.  any actual or alleged negligent act, error or omission in the **Administration** of a **Plan**;

3.  any matter claimed against an **Insured** solely by reason of his, her or its status as a fiduciary of a **Plan**;

4.  any matter claimed against an **Insured** solely by reason of his, her or its status as a person or entity engaging in **Administration** of a **Plan**;

5.  in connection with an **Insured Person's** service with a **Multiemployer Plan** at the specific direction of the **Company**, any actual or alleged breach of any of the duties imposed upon such **Insured Person** as a fiduciary of the **Multiemployer Plan** by **Employee Benefits Law;** any actual or alleged negligent act, error or omission by such **Insured Person** in the **Administration** of such **Multiemployer Plan**; any matter claimed against such **Insured Person** solely by reason of his or her status as a fiduciary of such **Multiemployer Plan**; or any matter claimed against such **Insured Person** solely by reason of his or her status as a person engaging in the **Administration** of such **Multiemployer Plan**. **Wrongful Act** shall also include any actual or alleged violation of the responsibilities, obligations or duties imposed upon fiduciaries by **Employee Benefits Law** by, or any actual or alleged negligent act, error or omission in the **Administration** by, another **Insured** arising out of or related to such **Insured Person's** service with the **Multiemployer Plan** and any matter claimed against such other **Insured** solely by reason of his, her or its status as a fiduciary of, or engaging in the **Administration** of, the **Multiemployer Plan**. This paragraph shall only be applicable if the **Insured Person's** service with the **Multiemployer Plan** is added by specific written endorsement applicable to this **Coverage Part**;

6.  any matter claimed against an **Insured** in their capacity as a settlor of any **Plan**.

7.  any of the following:

    i)  improper or negligent selection of a **Managed Care Services** provider;

    ii)  denial or delay of any benefit under a health care, pharmaceutical, vision, or dental **Plan** of an **Insured**;

iii) the actual or alleged improper selection of or inadequate monitoring of third-party service providers;

iv) the actual or alleged failure to properly and timely provide notices under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) or other required notices, the alleged failure to make timely determinations of eligibility for benefits;

v) any **Health Care Exchange Wrongful Act**.

## III.    EXCLUSIONS

The **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against any **Insured**:

A.    for the actual or alleged failure to fund a **Plan** in accordance with **Employee Benefits Law** or the terms of the **Plan** or to collect an employer's contributions owed to a **Plan**

B.    for any actual or alleged liability of any **Insured** under any contract or agreement; provided, however, that this exclusion shall not apply to (i) any liability that would have attached in the absence of such contract or agreement; (ii) **Defense Costs**; or (iii) liability assumed in accordance with the agreement or declaration of trust pursuant to which the **Plan** was established;

C.    based upon, arising out of or attributable to:

1.    the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants**; provided, however, this subsection 1. of Exclusion C. shall not be applicable to **Defense Costs** or **Non-indemnifiable Loss** incurred by an **Insured Person** in connection with any **Claim** based upon, arising out of or attributable to the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants**; or

2.    any direction, demand or request to test for, monitor, clean up, remove contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **Pollutants**;

D.    for libel, slander, oral or written publication of defamatory or disparaging material; provided this exclusion shall not be applicable to **Defense Costs** incurred in the defense of a **Claim** for a violation of **Employee Benefits Law**;

E.    based upon, arising out of or attributable to any actual or alleged discrimination, harassment, retaliation, wrongful discharge, or other employment practices act, error or omission; provided this exclusion shall not be applicable to an actual or alleged violation of Section 510 of **ERISA**;

F.    based upon, arising out of or attributable to any **Wrongful Act** with respect to a **Plan** actually or allegedly committed at a time when the **Named Insured** or a then current **Subsidiary** did not sponsor the **Plan** or actually or allegedly committed when the **Insured Person(s)** against whom the **Claim** is made were not, at the time of the alleged

**Wrongful Act(s)**, then current **Insured Person(s)** acting in their capacity as a fiduciary of, or in the **Administration** of, such **Plan**;

G.    based upon, arising out of or attributable to an **Insured(s)'** actual or alleged act or omission in his or her capacity as a fiduciary or administrator of any plan, fund or program other than a **Plan** or by reason of his**,** her or its status as a fiduciary or administrator of such plan, fund or program;

H.    by or in the right of a fidelity insurer against an **Insured Person** whose conduct has resulted in the payment of loss by such fidelity insurer under a fidelity bond;

I.    for any actual or alleged violation of any law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law except (i) the Consolidated Omnibus Budget Reconciliation Act of 1985; (ii) **HIPAA**; or (iii) as respects a **Government Plan** any **Claim** for any **Wrongful Act** except a **Wrongful Act** as defined in **II**. **DEFINITIONS** Section V. Subsections 2. or 4;

## IV.   SUBROGATION

In the event of any payment under this Policy, the **Insurer** shall be subrogated to any **Insured(s)'** rights of recovery.  The **Insured(s)** shall execute all papers reasonably required and provide reasonable assistance and cooperation in securing or enabling the **Insurer** to exercise subrogation rights or any other rights, directly in the name of the **Company,** the **Plan** or any **Insured Person**.

If the premium for this Policy has been paid by an **Insured** other than a **Plan**, the **Insurer** shall not exercise its right of subrogation against any **Insured** unless it shall have been finally adjudicated that such **Insured** committed a deliberate criminal or deliberate fraudulent act or omission, knowingly violated any statute, regulation or law or gained any profit, remuneration or other advantage to which such **Insured** was not legally entitled pursuant to the terms of the exclusions set forth in any **Coverage Part.**

Argonaut Insurance Company

---

## TABLE OF CONTENTS

### PRIVATE PROTECT
### DIRECTORS & OFFICERS LIABILITY COVERAGE PART

**I.    INSURING AGREEMENTS** ..................................................................1

    A.    **NON-INDEMNIFIED LOSS COVERAGE**................................1
    B.    **COMPANY REIMBURSEMENT COVERAGE** ........................1
    C.    **COMPANY LIABILITY COVERAGE** ....................................1
    D.    **DERIVATIVE DEMAND INVESTIGATION COSTS COVERAGE** ..........1

**II.   DEFINITIONS** ...............................................................................2

    A.    **Claim** ...........................................................................2
    B.    **Employed Lawyers Claim** ...............................................2
    C.    **Exempt Securities Claim** ................................................2
    D.    **Inquiry** .........................................................................3
    E.    **Inquiry Costs** ................................................................3
    F.    **Investigating Authority** ...................................................3
    G.    **Investigative Costs** ........................................................4
    H.    **Loss** ...........................................................................4
    I.    **Moonlighting** ................................................................5
    J.    **Outside Entity** ..............................................................5
    K.    **Outside Position** ...........................................................5
    L.    **Shareholder Derivative Demand** .......................................5
    M.    **UK Bribery Act Fines** .....................................................5
    N.    **Wrongful Act** ...............................................................6

**III.  EXCLUSIONS** ................................................................................6

**IV.   OUTSIDE POSITION COVERAGE** ....................................................10

**V.    ADDITIONAL LIMIT FOR NON-INDEMNIFIED LOSS** .........................10

**VI.   PRESUMPTIVE INDEMNIFICATION** ................................................10

Argonaut Insurance Company

_____

# TABLE OF CONTENTS

## PRIVATE PROTECT
## FIDUCIARY LIABILITY COVERAGE PART

I.    **INSURING AGREEMENTS** ................................................................1

     A.   **WRONGFUL ACTS COVERAGE** ......................................1

II.   **DEFINITIONS** ............................................................................1

     A.   **Administration** .............................................................1
     B.   **Application** ...................................................................1
     C.   **Benefits** ......................................................................2
     D.   **Claim** .........................................................................2
     E.   **Corporate Trustee** .....................................................2
     F.   **Defense Costs** ...........................................................3
     G.   **Employee Benefits Law** ..............................................3
     H    **ESOP** .........................................................................3
     I.    **Government Plan** .........................................................3
     J.    **Health Care Exchange** ................................................3
     K.   **Health Care Exchange Wrongful Act** ............................3
     L.    **HIPAA** ........................................................................4
     M.   **HIPAA Claim** ..............................................................4
     N.   **HIPAA Privacy Regulations** .......................................4
     O.   **Insured(s)** ..................................................................4
     P.    **Loss** ..........................................................................4
     Q.   **Managed Care Services** ..............................................5
     R.   **Multiemployer Plan** .....................................................5
     S.    **Non-indemnifiable Loss** ..............................................5
     T.    **Plan** ...........................................................................5
     U.   **Voluntary Compliance Loss** .......................................6
     V.    **Wrongful Act** .............................................................7

III.  **EXCLUSIONS** ............................................................................8

IV.  **SUBROGATION** ........................................................................9

Argonaut Insurance Company

---

# TABLE OF CONTENTS

## PRIVATE PROTECT
### GENERAL TERMS AND CONDITIONS

I.      APPLICABILITY OF GENERAL TERMS AND CONDITIONS ............................1

II.    DEFINITIONS.............................................................................................................1

    A.      Application .......................................................................................................1
    B.      Company .........................................................................................................1
    C.      Coverage Part ................................................................................................1
    D.      Defense Costs ...............................................................................................1
    E.      Domestic Partner ..........................................................................................2
    F.      Employee .......................................................................................................2
    G.      Extended Reporting Period ...........................................................................2
    H.      Extradition .....................................................................................................2
    I.       Financial Insolvency ......................................................................................2
    J.      Insured(s) .......................................................................................................2
    K.      Insured Person(s) ..........................................................................................2
    L.      Interrelated Wrongful Acts ............................................................................3
    M.      Manager .........................................................................................................3
    N.      Named Insured ..............................................................................................3
    O.      Policy Period .................................................................................................3
    P.      Pollutants ......................................................................................................3
    Q.      Subsidiary .....................................................................................................3
    R.      Wage and Hour Violation ..............................................................................4

III.   GENERAL EXCLUSIONS .........................................................................................4

IV.   EXTENSIONS OF COVERAGE ................................................................................5

    A.      ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC
          PARTNERS ....................................................................................................5
    B.      EXTENDED REPORTING PERIOD ................................................................6

V.    GENERAL CONDITIONS AND LIMITATIONS ..........................................................7

    A.      LIMITS OF LIABILTIY ...................................................................................7
    B.      RETENTION...................................................................................................8
    C.      DEFENSE, SETTLEMENT AND COOPERATION .........................................9
    D.      ALLOCATION ................................................................................................10
    E.      PRIORITY OF PAYMENTS ...........................................................................10
    F.      REPORTING AND NOTICE ..........................................................................10
    G.      INTERRELATED CLAIMS .............................................................................11
    H.      ORGANIZATIONAL CHANGES .....................................................................12
    I.       OTHER INSURANCE ....................................................................................12
    J.      TERMINATION, CANCELLATION AND NONRENEWAL ...............................13
    K.      SUBROGATION.............................................................................................14
    L.      BANKRUPTCY................................................................................................14

---

M.    **ALTERATION AND HEADINGS** ........................................................15

N.    **TERRITORY AND VALUATION** ....................................................15

O.    **AUTHORIZATION CLAUSE** .........................................................15

P.    **ASSIGNMENT** .........................................................................15

Q.    **REPRESENTATIONS** ................................................................15

# Notice of Insurance Information Practices

Argo Group US, Inc., and each of its subsidiaries ("Argo Group") recognizes the importance of maintaining the privacy of our customers and their personal information. We take seriously the responsibility that accompanies our collection and use of your personal information. Argo Group protects the privacy and security of our customers and their personal information as required by applicable privacy and security laws.

This Notice of Insurance Information Practices ("Insurance Privacy Notice") provides notice of our information practices to all applicants, policyholders, and where applicable claimants, in connection with our insurance transactions. It supplements the privacy and security provisions contained in Argo Group's Global Privacy Notice (which is located at *www.argolimited.com/privacy-policy*).

This Insurance Privacy Notice applies to all companies and business produced or underwritten within Argo Group, and complies with the requirements of the Gramm-Leach-Bliley Act (GLBA), and any federal and state privacy and security laws and regulations applicable to insurance transactions. You are receiving this Insurance Privacy Notice with respect to your relationship with Argo Group* and one or more of the subsidiaries listed below.

## Information Collection and Use

To conveniently and effectively provide and service the insurance products we sell, we may collect and use your personal information, including information that may be considered nonpublic personal information, under applicable privacy and security laws. This personal information may include identifiers, financial and insurance underwriting information, financial and account information, and information considered protected classifications under applicable privacy and security laws. More information on the specific personal information we may collect and how we might use it is available in our Global Privacy Notice referenced above.

## Information Sharing and Disclosure

Applicable laws impose certain obligations upon third parties and organizations with which we share personal information. Accordingly, we prohibit the unauthorized disclosure of personal information, except as legally required or permitted.

Argo Group does not rent, sell or share your personal information with nonaffiliated third parties except that Argo Group may share personal information with nonaffiliated third parties to the extent necessary in furtherance of the applicable insurance transaction, including third party contractors. These third parties are prohibited from using the information for purposes other than performing services for Argo Group. Argo Group may disclose your information to third parties when obligated to do so by law and to investigate, prevent, or act regarding suspected or actual prohibited activities, including but not limited to fraud and situations involving the security of our operations and employees. In certain instances, you may share your information with a third party directly and that information may be subject to that party's applicable security and privacy policies.

Finally, Argo Group may transfer your personal information to a successor entity in connection with a corporate merger, consolidation, sale of all or a portion of its assets, bankruptcy, or other corporate change.

## Security

We implement technical and organizational security measures designed to secure and protect personal information. Please note, however, we cannot fully eliminate security risks associated with the storage and transmission of personal information.

To protect the confidentiality and integrity of your personal information, we limit access to personal information by only allowing authorized personnel to have access to such information. We maintain physical, electronic and procedural security protections to safeguard the nonpublic personal information in our records. Documents that contain an individual's personal information are appropriately destroyed or deleted before disposal; Argo Group maintains security measures to protect the loss, misuse and alteration of the information under our control. Our hardware infrastructure is housed in a controlled access facility that restricts access to authorized individuals. The network infrastructure is protected by a firewall and traffic is monitored and logged on the firewall and servers. Sensitive administrative activities are carried out over secure, encrypted links between our offices and hosting

facility. Administrative access is limited to authorized employees including specific remote administration protocols and IP addresses. All employees with access to personal information have been advised of Argo Group's security policies and practices and receive regular training regarding these policies and practices.

Any Argo Group employee who becomes aware of the inappropriate use or disclosure of your nonpublic personal information is expected and required to immediately report such behavior to Argo Group's Data Protection Officer.

## **Contact Us**

If you have any questions about this Insurance Privacy Notice, our Global Privacy Notice, or our privacy and security practices, please contact:

> Data Protection Officer
> privacy@argogroupus.com
> Argo Group International Holdings Ltd.
> P.O. Box 469011
> San Antonio, TX 78246
> 800-470-7958

*Note: Argo Group is the parent of Argonaut Insurance Company; Argonaut-Midwest Insurance Company; Argonaut Great Central Insurance Company; ARIS Title Insurance Corporation; Colony Insurance Company; Colony Specialty Insurance Company; Peleus Insurance Company; Rockwood Casualty Insurance Company; Somerset Casualty Insurance Company; Central Insurance Management, Inc.; Alteris Insurance Services, Inc.; Trident Insurance Services, LLC; and Argonaut Management Services, Inc. This Privacy Policy applies to all companies and business produced or underwritten within Argo Group.

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, *as defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury - in consultation with the Secretary of Homeland Security, and the Attorney General of the United States - to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019; AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURER'S LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

PLEASE ALSO BE AWARE THAT YOUR POLICY DOES NOT PROVIDE COVERAGE FOR ACTS OF TERRORISM THAT ARE NOT CERTIFIED BY THE SECRETARY OF THE TREASURY.

### Acceptance or Rejection of Terrorism Insurance Coverage

You must accept or reject this insurance coverage for losses arising out of acts of terrorism, *as defined in Section 102(1) of the Act*, before the effective date of this policy.  Your coverage cannot be bound unless our representative has received this form signed by you on behalf of all insureds with all premiums due.

[x] **Coverage acceptance:**

I hereby elect to purchase coverage for certified acts of terrorism, *as defined in Section 102(1) of the Act* for a prospective premium of  $  Included_____ .  I understand that I will not have coverage for losses resulting from any non-certified acts of terrorism.

**OR**

[ ] **Coverage rejection:**

I hereby decline to purchase coverage for certified acts of terrorism, *as defined in Section 102(1) of the Act*. I understand that I will not have coverage for any losses arising from either certified or non-certified acts of terrorism.

| | |
|---|---|
| Signature On File | Argonaut Insurance Company |
| **Policyholder/Applicant's Signature-** **Must be person authorized to sign for all Insureds.** | **Insurance Company** |
| On File | ML4263632-0 |
| **Print Name** | **Policy Number** |
| | On File |
| Salvo Technologies, Inc | **Submission Number** |
| **Named Insured** | |
| | **Producer Number** |
| On File | |
| **Date** | R-T Specialty, LLC |
| | **Producer Name** |
| | 5565 Glenridge Connector, Suite 550 |
| | **Street Address** |
| | Atlanta, GA 30342 |
| | **City, State, Zip** |

**The producer shown above is the wholesale insurance broker your insurance agent used to place your insurance coverage with us.  Please discuss this Disclosure with your agent before signing.**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**FRAUD STATEMENTS**

| |
|---|
| **FRAUD STATEMENT** |
| **(Not applicable in the states mentioned below where a specific warning applies.)** |
| Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be committing a fraudulent insurance act, and may be subject to a civil penalty or fine. |
| **Alabama** |
| Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution, fines, or confinement in prison, or any combination thereof. |
| **Arkansas, District of Columbia, Louisiana, Rhode Island, West Virginia** |
| Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** |
| It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable for insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies. |
| **Florida** |
| Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** |
| Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act. |
| **Kentucky** |
| Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Maine** |
| It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or denial of insurance benefits. |
| **Maryland** |
| Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey, New Mexico** |
| Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties. |
| **Ohio** |
| Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |

**Oklahoma**

WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Oregon**

Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

**Pennsylvania**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Pennsylvania (Auto)**

Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000.

**Tennessee, Virginia, Washington**

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**New York**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**New York (Auto)**

Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.

---

## SIGNATURES

**DO NOT SIGN UNTIL YOU HAVE READ THE CONTENTS OF THIS APPLICATION AND THE APPLICABLE FRAUD WARNING(S).**

I have reviewed the contents of this application and with my signature, I declare to the best of my knowledge that all statements herein are true and no material facts have been suppressed or misstated. I am also aware that my operation may be inspected by the Insurance Company.

| APPLICANT/NAMED INSURED | |
|---|---|
| APPLICANT/NAMED INSURED SIGNATURE | DATE |

**Agent/Broker:**

Are you personally familiar with this Applicant's operations?  ☐ Yes  ☐ No

Did your office control this risk in the past year?  ☐ Yes  ☐ No

| AGENT'S OR BROKER'S NAME AND ADDRESS | TELEPHONE NUMBER | LICENSE NO. |
|---|---|---|
| AGENT'S OR BROKER'S SIGNATURE | | DATE |

# SIGNATURE PAGE

IN WITNESS WHEREOF, the company issuing this policy has caused this policy to be signed by its President and its Secretary and countersigned (if required) on the Declarations page by a duly authorized representative of the company. This endorsement is executed by the company stated in the Declarations.

Argonaut Insurance Company

**President**          **Secretary**

# IMPORTANT INFORMATION FOR POLICYHOLDERS - CLAIMS-MADE NOTICE

THIS POLICY PROVIDES COVERAGE ON A CLAIMS-MADE BASIS.

This means that only claims actually made and reported DURING the policy period are covered unless coverage for an extended reporting period is purchased. If an extended reporting period is NOT made available to you, you risk having gaps in coverage when switching from one company to another. Moreover, even if such a reporting period is made available to you, you may still be personally liable for claims reported after the period expires.

Claims-made policies do NOT provide coverage for loss, injury or damage, as defined by the policy, that occur before a fixed retroactive date.

I / We hereby acknowledge the differences in a claims-made policy, and agree to purchase claims-made coverage.

_____           _____

INSURED'S SIGNATURE                         DATE

_____           _____

AGENT'S SIGNATURE                           DATE

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES –
# CANCELLATION AND NONRENEWAL

All Coverage Parts included in this policy are subject to the following condition.

Throughout this endorsement, the term **Named Insured** refers to the **Policyholder**, **Named Entity** or **Named Insured** shown in Item 1. of the Declarations.

Any Cancellation, Nonrenewal or similar provision(s) of this policy is/are deleted and replaced with the language below. If no such provisions exist, the language below is added:

A.  Cancellation

1.   The first **Named Insured** shown in the Declarations may cancel this policy by mailing or delivering to the **Insurer** advance written notice of cancellation.

2.   Cancellation of policies in effect:

   a.  for 90 days or less

   If this policy has been in effect for 90 days or less, the **Insurer** may cancel this policy by mailing or delivering to the first **Named Insured** written notice of cancellation, accompanied by the reasons for cancellation, at least:

   (1) 10 days before the effective date of cancellation if the **Insurer** cancels for nonpayment of premium; or

   (2) 20 days before the effective date of cancellation if the **Insurer** cancels for any other reason, except the **Insurer** may cancel immediately if there has been:

      (a) a material misstatement or misrepresentation; or

      (b) a failure to comply with the underwriting requirements established by the **Insurer**.

   b.  for more than 90 days

   If this policy has been in effect for more than 90 days, the **Insurer** may cancel this policy only for one or more of the following reasons:

   (1) nonpayment of premium;

   (2) the policy was obtained by a material misstatement;

   (3) failure to comply with underwriting requirements established by the **Insurer** within 90 days of the effective date of coverage;

   (4) a substantial change in the risk covered by the policy; or

   (5) the cancellation is for all **Insureds** under such policies for a given class.

   If the **Insurer** cancels this policy for any of these reasons, the **Insurer** will mail or deliver to the first **Named Insured** written notice of cancellation, accompanied by the reasons for cancellation, at least:

      (a) 10 days before the effective date of cancellation if the **Insurer** cancels for nonpayment of premium; or

      (b) 45 days before the effective date of cancellation if the **Insurer** cancels for any of the other reasons stated in paragraph 2.b.

3. The **Insurer** will mail or deliver the **Insurer's** notice to the first **Named Insured** at the last mailing address known to the **Insurer**.

4. Notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date.

5. If this policy is cancelled, the **Insurer** will send the first **Named Insured** any premium refund due. If the **Insurer** cancels, the refund will be pro rata. If the first **Named Insured** cancels, the refund may be less than pro rata. If the return premium is not refunded with the notice of cancellation or when this policy is returned to the **Insurer**, the **Insurer** will mail the refund within 15 working days after the date cancellation takes effect, unless this is an audit policy.

If this is an audit policy, then, subject to the **Insured's** full cooperation with the **Insurer** or the **Insurer's** agent in securing the necessary data for audit, the **Insurer** will return any premium refund due within 90 days of the date cancellation takes effect. If the **Insurer's** audit is not completed within this time limitation, then the **Insurer** will accept the **Insured's** own audit, and any premium refund due will be mailed within 10 working days of receipt of the **Insured's** audit.

The cancellation will be effective even if the **Insurer** has not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. Nonrenewal

1. If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the first **Named Insured** written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the first **Named Insured** at the last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# POLICYHOLDER NOTICE – DEFENSE WITHIN LIMITS

I hereby acknowledge that I understand that this policy is written on a defense within limits basis.  The limits of liability may be reduced or completely exhausted by payments for defense costs as defined in the policy.

Policy No.   ML4263632-0 _____

Policy Inception Date   April 25, 2022 _____

_____   Date   _____
Insured or Insured's Representative

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES

This endorsement modifies insurance provided by this policy

A.  Section **II. DEFINITIONS** E. **Domestic Partner** of the **General Terms and Conditions Part** is deleted in its entirety.

B.  Section **II. DEFINITIONS** P. **Pollutants** of the **General Terms and Conditions Part** is deleted and replaced by the following:

    P.  **Pollutants** means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste.  Waste includes materials to be recycled, reconditioned, or reclaimed.

C.  Section **IV. EXTENSIONS OF COVERAGE** A. **ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS** of the **General Terms and Conditions Part** is deleted and replaced by the following:

    A.  **ESTATES, LEGAL REPRESENTATIVES AND SPOUSES**

    The estates, heirs, legal representatives, assigns and spouses of **Insured Person(s)**  shall be considered an **Insured Person(s)** under this Policy but only for a **Claim** arising  solely out of their status as such and, in the case of a spouse, where such **Claim**  seeks  damages from marital community property, jointly held  property or property transferred  from the Insured Person(s) to the spouse.  No coverage is provided for any wrongful act  or omission of an estate, heir, legal representative, assign or spouse. All terms of this  Policy applicable to **Loss** incurred by the **Insured Person(s)** shall also apply to **Loss**  incurred by such estates, heirs, legal representatives, assigns and spouses.

D.  The last sentence of Section **V. GENERAL CONDITIONS AND LIMITATIONS** F. **REPORTING AND NOTICE** of the **General Terms and Conditions Part** is deleted in its entirety.

E.  In the event the Insured needs to contact someone about this Policy for any reason or to obtain infor-mation about coverage or receive assistance in resolving complaints, the Insurer may be contacted at the Home Office address listed in the Policy's Declarations or at the following telephone number: 1-800-470-7958.

F.  The definition of **Loss** in Section **II. DEFINITIONS** under all of the **Coverage Parts** is amended by the addition of the following:

    Notwithstanding anything stated to the contrary in this Policy, punitive damages are not insurable in Florida.

The following applies only to the **Fiduciary Liability Coverage Part:**

G.  Section **I. INSURING AGREEMENTS** B. **VOLUNTARY COMPLIANCE LOSS COVERAGE** is deleted in its entirety.

H.  Section **II. DEFINITIONS** D. **Claim** 7. is deleted in its entirety.

I.   Section **II. DEFINITIONS** F. **Defense Costs** is deleted in its entirety.

J.   The first paragraph of Section **II. DEFINITIONS** P. **Loss** is amended by deleting the words "; and **Vol-untary Compliance Loss** (if purchased)".

K.  Section **II. DEFINITIONS** P. **Loss** 1. is amended by deleting the words "civil fines or penalties consti-tuting **Voluntary Compliance Loss**,".

M. Section **II. DEFINITIONS** T. **Plan** 4. is amended by deleting the words "or **Voluntary Compliance Loss** incurred by an **Insured**".

N. Section **II. DEFINITIONS** U. **Voluntary Compliance Loss** is deleted in its entirety.

O. Section **II. DEFINITIONS** V. **Wrongful Act** 6. is deleted in its entirety.

P. Section **V. GENERAL CONDITIONS AND LIMITATIONS** A. **LIMITS OF LIABILITY** 1. is deleted in its entirety.

Q. Section **V. GENERAL CONDITIONS AND LIMITATIONS** A. **LIMITS OF LIABILITY** 2. is amended by replacing the words "Item 4.D.3." with the words "Item 4.D.2.".

R. The second paragraph of Section **V. GENERAL CONDITIONS AND LIMITATIONS** C. **DEFENSE, SETTLEMENT AND COOPERATION** is deleted and replaced by the following:

The **Insured(s)** shall give the **Insurer** full cooperation, assistance and information as the **Insurer** shall reasonably require, including without limitation, attendance at hearings and trials; the giving and securing of evidence; assistance in enforcing rights of contribution and indemnity or in asserting any counterclaim, cross claim or third party claim; and in the evaluation of damages and liability in connection with any **Claim**. The **Insured(s)** shall do nothing that shall prejudice the **Insurer's** position or its potential rights of recovery. The **Insured(s)** shall not undertake to negotiate to settle, offer to settle, or settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation, admit any liability, or stipulate to any judgment with respect to any **Claim** without the **Insurer's** prior written consent, such consent not to be unreasonably withheld. Any **Defense Costs** incurred or settlements made without the **Insurer's** prior written consent shall not be covered under this **Coverage Part**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective    April 25, 2022    Policy No.    ML4263632-0    Endorsement No.    1

Insured    Salvo Technologies, Inc    Premium

Insurance Company    Argonaut Insurance Company    Authorized Signature

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIQUIDATED DAMAGES EXCLUSION ENDORSEMENT

This Endorsement modifies the coverage provided under the following insurance policy:

**Private PROtect: General Terms and Conditions Part, Private Company Directors & Officers Liability Coverage Part, Employment Practices Liability Coverage Part, Fiduciary Liability Coverage Part**

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that Section **III. GENERAL EXCLUSIONS** of the General Terms and Conditions Part is amended to add the following exclusion:

> Under all **Coverage Parts** purchased, and in addition to any Exclusions included in such **Coverage Parts**, the **Insurer** shall not be liable for that portion of **Loss** in connection with any **Claim** made against any **Insured** based upon, arising out of, or attributable to liquidated damages, provided this exclusion shall not apply to liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act that are otherwise covered under the **Employment Practices Liability Coverage Part**.

All other terms and conditions remain unchanged.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective  April 25, 2022          Policy No.  ML4263632-0        Endorsement No.          2

Insured    Salvo Technologies, Inc                                             Premium

Insurance Company    Argonaut Insurance Company        Authorized Signature

PPRO-4032-0719

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDED RETENTION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Private PROtect: General Terms and Conditions Part, Directors & Officers Liability Coverage Part, Employment Practices Liability Coverage Part, Fiduciary Liability Coverage Part**

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph B. **RETENTION** of the General Terms and Conditions Part is amended as follows:

I.  Subsection 1. is amended to add the following final sentence to the paragraph:

The Retention amount shall be borne by the **Insureds** uninsured and at their own risk.

II.  Subsection 5. is deleted and replaced with the following:

5.  For the **Directors & Officers Liability Coverage Part** only, no Retention shall apply to an **Insured Person** for **Loss** incurred by such **Insured Person** when the **Company** is prohibited from indemnifying such **Insured Person** either: (i) under applicable bylaws, statutory, law or common law; or (ii) by reason of **Financial Insolvency**. The **Company** agrees to indemnify the **Insured Persons** to the fullest extent permitted by law. To the extent the **Company** fails to pay a Retention because of **Financial Insolvency**, the **Insurer** shall have the right to claim such unpaid Retention amount as a debt in any **Financial Insolvency** proceeding.

III.  The following subsections are added:

6.  For all purchased **Coverage Parts**, if for any reason, other than the ones described in Subsection 5. above for the **Directors & Officers Liability Coverage Part**, the **Insureds** fail to pay all or part of a Retention applicable to the **Loss** of an **Insured Person**, then the **Insurer** may, in its sole discretion, advance the **Loss** of such **Insured Person**. The **Insurer** shall have an immediate contractual right of reimbursement from the **Company** for any **Loss** advanced under this Subsection.

7.  Any amounts of **Loss** advanced by the **Insurer** under Subsection 5. or 6. above shall apply towards exhaustion of the applicable Limit of Liability. Any amount of such advanced **Loss** which is reimbursed by the **Company** to the **Insurer** shall be added back into the Limit of Liability.

8.  Subsections 5. and 6. only concern the Retention obligations for **Loss** of an **Insured Person**, nothing in these Subsections shall apply to the Retention

PPRO-4204-0420

Page **1** of 2

obligations for **Loss** of a **Company**.

All other terms and conditions remain unchanged.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective ___April 25, 2022___     Policy No. ___ML4263632-0___     Endorsement No. ___3___

Insured ___Salvo Technologies, Inc___                                Premium _____

Insurance Company ___Argonaut Insurance Company___     Authorized Signature _____

Page **2** of **2**

PPRO-4204-0420

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CRISIS MANAGEMENT COVERAGE ENDORSEMENT

---

This Endorsement modifies the coverage provided under the following insurance policy:

**Private PROtect:  General Terms and Conditions Part and Directors & Officers Liability Coverage Part**

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that, solely for the purposes of the coverage provided by this Endorsement, the Policy is amended as follows:

I.      The **Directors and Officers Liability Coverage Part** is amended as follows:

   A.      Section **I**. **INSURING AGREEMENTS** is amended to include the following additional Insuring Agreement:

   **CRISIS MANAGEMENT COVERAGE**

   Subject to the limit of liability set forth in Section II. of this Endorsement, the **Insurer** shall pay the **Crisis Management Loss** of the **Company** arising from a **Crisis Management Event** first occurring during the **Policy Period**.

   B.      Section **II. DEFINITIONS**, Definition H. **Loss** is amended to add the following:

   **Loss** also includes **Crisis Management Loss**.

   C.      The exclusions set forth in Section **III**. **EXCLUSIONS** shall not apply to **Crisis Management Loss**.

II.     The General Terms and Conditions Part is amended as follows:

   A.      Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph **A. LIMITS OF LIABILITY** is amended to include the following additional subparagraph:

   The limit of the **Insurer's** liability for **Crisis Management Loss** arising from all **Crisis Management Events** occurring during the **Policy Period**, in the aggregate, shall be the amount set forth in Section III. of this Endorsement as the **Crisis Management Fund**. This limit shall be the maximum limit of the **Insurer** under this policy, regardless of the number of **Crisis Management Events** occurring during the **Policy Period** and shall be in part of and not in addition to the Limit of Liability stated in Item 4.B of the Declarations.

   B.      Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph **B. RETENTION** is amended to include the following additional subparagraph:

   A retention amount of $2,500 shall be applicable to **Crisis Management Loss** and the **Insurer** shall pay such **Crisis Management Loss** excess of such Retention amount subject to the other terms and conditions of this Endorsement and the Policy.

   C.      Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph **C. DEFENSE**, **SETTLEMENT AND COOPERATION** is amended to include the following additional subparagraph:

The **Company** shall not be required to obtain the prior written approval of the **Insurer** before incurring any **Crisis Management Loss**, provided that the **Crisis Management Firm** selected by the **Company** to perform the **Crisis Management Services** has been pre-approved by the **Insurer**.

D.   Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph **F. REPORTING AND NOTICE** is amended to include the following additional subparagraph:

An actual or anticipated **Crisis Management Event** shall be reported to the **Insurer** as soon as practicable but in no event later than thirty (30) days after the **Company** first incurs **Crisis Management Loss** for which coverage will be requested under this Endorsement.

III.   Solely with respect to the coverage provided by this Endorsement, Section **II. DEFINITIONS** of the General Terms and Conditions Part is amended to add the following definitions:

- **Material Effect** means the publication of unfavorable information regarding the **Company**, which can reasonable be considered to lessen public confidence in the competence of the **Company**. Such publication must occur in either:

    a.   A daily newspaper of general circulation in the geographic area of the **Company**; or
    b.   A radio or television news report on a facility received in the geographic area of the **Company**.

- **Crisis Management Event** means one of the following events which, in the good faith opinion of the **Company**, did, or is reasonably likely to, cause a **Material Effect**.

| | |
|---|---|
| Mass Tort: | The public announcement or accusation that a **Company** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof. |
| Debt Default: | The public announcement that the **Company** has defaulted or intends to default on its debt or intends to engage in a debt restructuring. |
| Bankruptcy: | The public announcement that the **Company** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Company**; or the imminence of bankruptcy proceedings, whether voluntary or involuntary. |
| Employee Layoffs or loss of key executive officer(s): | The public announcement of layoffs of **Employees** of the **Company**. The death or resignation of one or more key directors, trustees or officers of the **Named Insured**. |
| Regulatory Crisis: | The public announcement of the commencement or threat of commencement of litigation or governmental or regulatory proceedings against a **Company**. |

PPRO-4048-0919

Provided, however, that the term **Crisis Management Event** shall not include any event relating to:

1. any **Claim** which has been reported, or any circumstance of which notice has been given, under any policy of which this Policy is a renewal or replacement or which it may succeed in time;

2. any litigation, proceeding, or administrative action pending on or prior to [Insert Date];

3. the actual, alleged or threatened discharge, dispersal release or escape of **Pollutants**; or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants; or the hazardous properties of nuclear materials.

For the purpose of this Endorsement, a **Crisis Management Event** shall first commence when the **Company** or any of its directors or executive officers shall first become aware of the event during the **Policy Period** and shall conclude at the earliest of:

1. the time when the **Crisis Management Firm** advises the **Company** that the crisis no longer exists; or

2. when the **Crisis Management Fund** has been exhausted.

- **Crisis Management Firm** means any public relations firm hired by the **Company** subject to the **Insurer's** consent, provided always such consent shall not be unreasonably withheld, to perform **Crisis Management Services**.

- **Crisis Management Fund** shall mean: $25,000.

- **Crisis Management Loss** shall mean the following amounts incurred during the pendency of or within ninety (90) days prior to and in anticipation of, the **Crisis Management Event**, regardless of whether a **Claim** is ever made against an **Insured** arising from the **Crisis Management Event** and, in the case where a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**:

  1. amounts for which the **Company** is legally liable for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Company** arising from a **Crisis Management Event**; and

  2. amounts for which the **Company** is legally liable for the reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Company** or the **Crisis Management Firm**, in connection with the **Crisis Management Event**.

- **Crisis Management Services** means those services performed by a **Crisis Management Firm** in advising the **Company** or any of its directors, officers or **Employees** on minimizing potential harm to the **Company** arising from the **Crisis Management Event**, including but not limited to maintaining and restoring public confidence in the **Company**.

All other terms and conditions remain unchanged.

PPRO-4048-0919

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective   April 25, 2022   Policy No.   ML4263632-0   Endorsement No.   4

Insured   Salvo Technologies, Inc   Premium

Insurance Company   Argonaut Insurance Company   Authorized Signature

Page **4** of **4**

PPRO-4048-0919

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RUN-OFF ENDORSEMENT

This Endorsement modifies the coverage provided under the following insurance policy:

**Private PROtect: General Terms and Conditions, Directors & Officers Liability Coverage Pat, Employment Practices Liability Coverage Part, Fiduciary Liability Coverage Part**

In consideration of an additional premium of $0 it is hereby understood and agreed that solely with respect to the following <u>Directors & Officers Liability & Fiduciary</u> **Coverage Part(s)**, the Policy is amended as follows:

I.      Item 2. of the Declarations is deleted and replaced with the following:

      Item 2. **Policy Period**: From: 12:01 a.m. on <u>April 25, 2022</u> To: 12:01 a.m. on <u>April 25, 2028</u> Local time at the address shown in Item 1.

II.      Item 7. of the Declarations is deleted.

III.      Section **II. DEFINITIONS** of the General Terms and Conditions Part is amended to add the following definitions:

      **Run-Off Date** means: <u>April 25, 2022</u> and 12:01 a.m.

IV.      Section **IV. EXTENSIONS OF COVERAGE**, Paragraph B. **EXTENDED REPORTING PERIOD** is deleted and all other references to Extended Reporting Period are deleted.  The **Insurer** will not be required to renew this policy upon its expiration.

V.      Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph J. **TERMINATION, CANCELLATION AND NONRENEWAL** subparagraph 1. Cancellation is amended to add the following:

      Notwithstanding anything to the contrary in this Subparagraph, this policy may not be terminated by the **Policyholder** for any reason after the **Run-Off Date**.  The entire premium will be deemed fully earned as of the **Run-Off Date**.

VI.      Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph H. **ORGANIZATIONAL CHANGES** is deleted.

VII.      No coverage will be available under this policy for **Loss** in connection with any **Claim** based upon, arising from, or in consequence of any fact, circumstance, or **Wrongful Act** committed, attempted, or allegedly committed or attempted on or after the **Run-Off Date**.

PPRO-4122-0220

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

All other terms and conditions remain unchanged.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective   April 25, 2022        Policy No.    ML4263632-0    Endorsement No.        5

Insured    Salvo Technologies, Inc                              Premium

Insurance Company    Argonaut Insurance Company      Authorized Signature

PPRO-4122-0220

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# STATE AMENDATORY INCONSISTENCY

This endorsement modifies insurance provided under the following:

DIRECTORS & OFFICERS LIABILITY COVERAGE PART
EMPLOYMENT PRACTICES LIABILITY COVERAGE PART
FIDUCIARY LIABILITY COVERAGE PART

In consideration of the payment of the premium, it is hereby understood and agreed that in the event there is an inconsistency between a state amendatory endorsement applicable to this Policy or any **Coverage Part** and any term or condition of this Policy or of any such **Coverage Part**, then where permitted by applicable law, the **Insurer** shall apply those terms and conditions of either the amendatory endorsement or the Policy or any such **Coverage Part** that are more favorable to the **Insured**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective   April 25, 2022          Policy No.      ML4263632-0      Endorsement No.          6

Insured    Salvo Technologies, Inc                                        Premium

Insurance Company      Argonaut Insurance Company       Authorized Signature

PPRO1012-0219                                                                 Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ANTITRUST CLAIM COVERAGE SUBJECT TO A SUB-LIMIT AND COINSURANCE PERCENTAGE ENDORSEMENT

---

This Endorsement modifies the coverage provided under the following insurance policy:

**Private PROtect: Private Company Directors & Officers Liability Coverage Part**

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that the Declarations and the Policy are amended as follows:

I.      Item 4.B. of the Declarations is amended to include the following:

        Aggregate Sub-Limit of Liability for all **Loss** from all **Antitrust Claims**: $\underline{\$1,000,000}$

II.     Item 5.A. of the Declarations is amended to add the following:

        Each **Antitrust Claim** under **INSURING AGREEMENTS** B. and C.: $\underline{\$50,000}$

III.    Section **II. DEFINITIONS** of the Directors & Officers Liability **Coverage Part** is amended as follows:

      A.      Definition N. **Wrongful Act** is amended as follows:

           **Wrongful Act** also includes any **Antitrust Wrongful Act**.

      B.      The following definitions are added:

           **Antitrust Claim** means any **Claim** based upon, arising out of, or attributable to any **Antitrust Wrongful Act**.

           **Antitrust Wrongful Act** means any actual or alleged price fixing, predatory pricing, restraint of trade, monopolization, anti-competitive conduct, unfair competition or unfair business or trade practice or any interference in another's contractual or business relationship by an **Insured Person** while acting in his or her capacity as such and on behalf of the **Company** or with respect to **INSURING AGREEMENT** C, by the **Company**.

           **Antitrust Wrongful Act** shall also include any actual or alleged violation of: the Federal Trade Commission Act; the Sherman Act; the Clayton Act; or any amendments to any of the foregoing or any regulations promulgated pursuant to any of the foregoing; any statutory or common law definition of unfair competition, or unfair business or trade practice; or any provision of any federal, state, local or foreign statute regulation or common law relating to any of the foregoing; by an **Insured Person** while acting in his or her capacity as such and on behalf of the **Company** or with respect to **INSURING AGREEMENT** C, by the **Company**.

IV.    Solely with respect to the coverage provided by this Endorsement, Section **III. EXCLUSIONS**, Exclusion M. of the Directors & Officers Liability **Coverage Part** is deleted.

V.     Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph A. **LIMITS OF LIABILITY** of the General Terms and Conditions Part is amended to add the following:

The Aggregate Sub-Limit of Liability for all **Loss** from all **Antitrust Claims** set forth in Section I. of this Endorsement is the **Insurer's** maximum aggregate Limit of Liability for all **Antitrust Claims** first made during the **Policy Period** or **Extended Reporting Period**, if exercised.  This Sub-Limit shall be part of and not in addition to, the maximum aggregate Limit of Liability applicable to the Directors & Officers Liability **Coverage Part**.

VI.    Section **V. GENERAL CONDITIONS AND LIMITATIONS**, Paragraph B. **RETENTION** of the General Terms and Conditions Part is amended to add the following:

Notwithstanding anything in the Policy to the contrary, the Retention amount applicable to each **Antitrust Claim** is set forth in Section II. of this Endorsement.

VII.    Notwithstanding any other provision in this Policy, the **Insurer's** liability for all **Loss** in connection with any **Antitrust Claim** shall be subject to a <u>zero</u> percent (0%) coinsurance obligation to be paid by the **Insured**.

VIII.    Solely with respect to any **Antitrust Claim**, Item 11.A. Pending or Prior Date of the Declarations is deleted and replaced with the date specified for such entity on the Schedule, below.  If no date is specified, the Pending or Prior Date for such entity shall be the date set forth in Item 11.A. on the Declarations.

**Schedule**

| Entity | Pending or Prior Date |
|---|---|
| N/A | N/A |
|  |  |
|  |  |
|  |  |

All other terms and conditions remain unchanged.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective   April 25, 2022      Policy No.    ML4263632-0    Endorsement No.    7

Insured   Salvo Technologies, Inc                 Premium

Insurance Company   Argonaut Insurance Company    Authorized Signature

PPRO-4027-0819

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FIDUCIARY LIABILITY COVERAGE PART: SUB-LIMIT FOR CERTAIN CIVIL PENALTIES

This endorsement modifies insurance provided under the following:

    FIDUCIARY LIABILITY COVERAGE PART

In consideration of the payment of the premium for this Policy, it is hereby understood and agreed that Section **II. DEFINITIONS** of the **Fiduciary Liability Coverage Part** of this Policy is amended as follows:

I.    Subsection P. is amended to include the following:

    Notwithstanding any provision in this Subsection, **Loss** shall also include **Pension Protection Act Penalties**, **Section 4975 Penalties**, **Section 502(c) Penalties** and **Health Care Reform Act Penalties.**

II.    Section **II. DEFINITIONS** is further amended to include the following additional definitions:

    **Pension Protection Act Penalties** means the civil penalties imposed upon an **Insured** for inadvertent violations of the Pension Protection Act of 2006, subject to a sub-limit of $100,000, which shall be part of, and not in addition to, the Limit of Liability as indicated in Item 4.D. of the Declarations.

    **Section 4975 Penalties** means the 15% or less civil penalties imposed upon an **Insured** for inadvertent violations under Section 4975 of the Internal Revenue Code of 1986, arising from or relating to a covered judgment, subject to a sub-limit of $100,000, which shall be part of, and not in addition to, the Limit of Liability as indicated in Item 4.D. of the Declarations.

    **Section 502(c) Penalties** means the civil penalties imposed upon an **Insured** for inadvertent violations under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, subject to a sub-limit of $100,000, which shall be part of, and not in addition to, the Limit of Liability as indicated in Item 4.D. of the Declarations.

    **Health Care Reform Act Penalties** means the civil penalties imposed under rules and regulations (including interim final rules and regulations) provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service ("IRS"), and the Department of Labor, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration), for inadvertent violations by an **Insured** of the Patient Protection and Affordable Care Act ("PPACA") and the Health Care and Education Reconciliation Act of 2010, subject to a sub-limit of $100,000, which shall be part of, and not in addition to, the Limit of Liability as indicated in Item 4.D. of the Declarations.

    ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

This endorsement changes the Policy to which it is attached and is effective on the date issued unless otherwise stated.

Endorsement Effective  __April 25, 2022__     Policy No.  __ML4263632-0__   Endorsement No.  __8__

Insured  __Salvo Technologies, Inc__                                    Premium  _____

Insurance Company  __Argonaut Insurance Company__   Authorized Signature

# EXHIBIT 6



**Corporate Office**
945 East Paces Ferry Rd.
Atlanta, GA 30326-1160

# PRIVATE COMPANY
# MANAGEMENT LIABILITY POLICY

**NOTICE:** THIS IS A CLAIMS MADE AND REPORTED POLICY THAT APPLIES ONLY TO THOSE **CLAIMS** FIRST MADE AGAINST THE **INSURED** DURING THE **POLICY PERIOD** THAT ARE REPORTED TO THE **INSURER** DURING THE **POLICY PERIOD**, OR EXTENDED REPORTING PERIOD (IF APPLICABLE) AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS. THE LIMIT OF LIABILITY AVAILABLE TO PAY **LOSS** SHALL BE REDUCED OR TOTALLY EXHAUSTED BY PAYMENT OF **DEFENSE EXPENSES**.

**PLEASE READ YOUR POLICY CAREFULLY**

# CLAIM NOTICE

**Mail notices to:** **RSUI Group, Inc.**
**945 East Paces Ferry Rd.**
**Suite 1800**
**Atlanta, GA 30326-1160**

**Fax notices to:** **(404) 231-3755**
**Attn: Claims Department**

**E-mail notices to:** **reportclaims@rsui.com**

**RSUI's Panel Counsel Finder:** **Panel Counsel Link**

*A member of Alleghany Insurance Holdings LLC*

RSG 241006 0118

# FLORIDA - PRIVATE COMPANY COMMON POLICY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER | RENEWAL OF |
|---|---|---|
| L | PP699354 | N/A |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**    INSURED ORGANIZATION'S NAME AND MAILING ADDRESS              PRODUCER'S NAME AND ADDRESS

DBH TIDES SALVO HOLDCO, LLC
8060 BRYAN DAIRY ROAD
LARGO, FL 33777

IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS HEREIN OR ATTACHED HERETO, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE INSURER AGREES TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

**ITEM 2. POLICY PERIOD:**

FROM _____ 4/25/2022 _____ TO _____ 4/25/2023 _____ 12:01 AM Standard Time at the Insured's address as stated herein

**ITEM 3. COVERAGE SECTIONS APPLICABLE TO POLICY:**

|  | **Purchased** | **Shared Limit** | **Separate Limit** |
|---|---|---|---|
| A.  Directors and Officers Liability Insurance | ☒ Yes  ☐ No | ☐ | ☒ |
| B.  Employment Practices Liability Insurance | ☒ Yes  ☐ No | ☐ | ☒ |
| 1)  Third Party Liability Coverage | ☒ Yes  ☐ No | | |
| C.  Fiduciary Liability Insurance | ☒ Yes  ☐ No | ☐ | ☒ |

**ITEM 4. LIMIT OF LIABILITY:**

$  3,000,000 _____        Aggregate Limit of Liability for All **Coverage Sections**

**ITEM 5. PREMIUM:**

$  48,180.00 _____        Total Policy Premium for All **Coverage Sections**

**ITEM 6. POLICY FORM AND ENDORSEMENTS MADE A PART OF THIS POLICY AT THE TIME OF ISSUE:**
SEE SCHEDULE OF ENDORSEMENTS – RSG 240041 0118

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

**SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**

Countersigned: _____        June 16, 2022 _____        _____
                                                                                  DATE                          AUTHORIZED REPRESENTATIVE

RSG 240038 0118                              A member of Alleghany Insurance Holdings LLC                              Page 1 of 1

# PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | PP699354 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

DBH TIDES SALVO HOLDCO, LLC

## ITEM 2. LIMIT OF LIABILITY:

| | | |
|---|---|---|
| A.  Directors and Officers Limit of Liability | $ | 1,000,000 |
| B.  Additional Side-A Limit of Liability | $ | Not Applicable |
| C.  Investigative Costs Sublimit of Liability | $ | Not Applicable |

## ITEM 3. RETENTION:

A. Directors and Officers Liability Retentions

| | | |
|---|---|---|
| 1)  Insuring Agreement A | $ | 0 |
| 2)  Insuring Agreement B | $ | 50,000 |
| 3)  Insuring Agreement C | $ | 50,000 |

## ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:

Directors and Officers Prior and/or Pending Litigation Date:   04/25/2022

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     June 16, 2022     _____
                                              DATE                    AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY EMPLOYMENT PRACTICES LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | PP699354 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:   Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**   INSURED ORGANIZATION'S NAME

DBH TIDES SALVO HOLDCO, LLC

**ITEM 2. LIMIT OF LIABILITY:**

| | | |
|---|---|---|
| A. Employment Practices Limit of Liability | $ | 1,000,000 |
| (Including Third Party Liability, if purchased) | | |
| B. Workplace Violence Expenses Sublimit | $ | 250,000 |

**ITEM 3. RETENTION:**

A. Employment Practices Liability Retentions

| | | |
|---|---|---|
| 1) Employment Practices Liability | $ | 50,000 |
| 2) Third Party Liability Coverage | $ | 50,000 |

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Employment Practices Prior and/or Pending Litigation Date:   04/25/2022

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____     June 16, 2022 _____     *Kynn Hadgell*

_____     DATE     AUTHORIZED REPRESENTATIVE

# PRIVATE COMPANY FIDUCIARY LIABILITY DECLARATIONS

**RSUI**

Corporate Office
945 E. Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326

| COMPANY SYMBOL | POLICY PREFIX & NUMBER |
|---|---|
| L | PP699354 |

●THIS IS A CLAIMS MADE AND REPORTED POLICY.  PLEASE READ IT CAREFULLY.●

THIS POLICY IS ISSUED BY:    Landmark American Insurance Company (hereinafter referred to as the Insurer)

**ITEM 1.**    INSURED ORGANIZATION'S NAME

DBH TIDES SALVO HOLDCO, LLC

**ITEM 2. LIMIT OF LIABILITY:**

Fiduciary Limit of Liability                                    $  1,000,000

**ITEM 3. RETENTION:**

Fiduciary Liability Retention                                $  0

**ITEM 4. PRIOR AND/OR PENDING LITIGATION DATE:**

Fiduciary Liability Prior and/or Pending Litigation Date:         04/25/2022

**ITEM 5. FIDUCIARY LIABILITY ADDITIONAL COVERAGES:**

| ADDITIONAL COVERAGES | SUBLIMIT | RETENTION | PRIOR/PENDING LITIGATION DATE |
|---|---|---|---|
| ☐HIPAA Violations | N/A | N/A | N/A |
| ☐Voluntary Compliance Fees or Sanctions | N/A | N/A | N/A |
| ☐PPACA Civil Money Penalties | N/A | N/A | N/A |
| ☐Plan Value Fiduciary Liability | N/A | N/A | N/A |
| ☐Settlor Breaches of Duty | N/A | N/A | N/A |
| ☐Other Penalties | N/A | N/A | N/A |

THESE DECLARATIONS TOGETHER WITH THE COMPLETED, SIGNED AND DATED APPLICATION, POLICY FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Countersigned: _____          June 16, 2022
                                                                    DATE                    AUTHORIZED REPRESENTATIVE

RSG 240044 0118                        A member of Alleghany Insurance Holdings LLC                        Page 1 of 1

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# SUPPLEMENTAL DECLARATIONS

RSUI

POLICY NUMBER:   LPP699354

## SCHEDULE OF FORMS AND ENDORSEMENTS

| TITLE | FORM NUMBER |
|---|---|
| Florida Changes | RSG 202250 0118 |
| Florida Changes-Marital Estate | RSG 202152 0118 |
| Florida Changes-Merger, Consolidation or Acquisition | RSG 202268 0118 |
| Florida Changes-No Action Against Insurer | RSG 202278 0121 |
| Florida-Changes-Punitive Damages | RSG 202061 0118 |
| Florida Changes-Cancellation and Nonrenewal | RSG 203009 0118 |
| Disclosure Pursuant to Terrorism Risk Insurance Act | RSG 204123 0121 |
| Cap on Losses From Certified Acts of Terrorism | RSG 204198 0118 |
| **FORMS APPLICABLE TO MULTIPLE COVERAGE PARTS** | |
| Common Policy Terms and Conditions Coverage Section-Private Company | RSG 241001 0121 |
| Absolute Exclusion-Bodily Injury and Property Damage with Allocation | RSG 206117 0119 |
| Amended Definition of Insured Person-Additional Positions | RSG 204089 0118 |
| Exclusion-Biometric Privacy Claims | RSG 206125 0120 |
| Exclusion-Network Security and Privacy Information | RSG 206126 1120 |
| Exclusion-Prior Acts | RSG 206108 0118 |
| Fully Non-Rescindable Coverage | RSG 204157 0119 |
| Service of Suit | RSG 204108 0118 |
| State Amendatory Discrepancy | RSG 204202 0118 |
| **FORMS APPLICABLE TO DIRECTORS & OFFICERS LIABILITY** | |
| Directors and Officers Liability Coverage Section-Private Company | RSG 241007 0121 |
| Exclusion-Broadcasting, Advertising and Publishing | RSG 206105 0118 |
| Exclusion-Products Liability | RSG 206109 0118 |
| Florida-Regulatory Coverage | RSG 202165 0320 |
| **FORMS APPLICABLE TO EMPLOYMENT PRACTICES LIABILITY** | |
| Employment Practices Liability Coverage Section-Private Company | RSG 241008 0118 |
| **FORMS APPLICABLE TO FIDUCIARY LIABILITY** | |
| Fiduciary Liability Coverage Section-Private Company | RSG 241009 0118 |
| Florida-Fiduciary Liability Changes | RSG 202219 0118 |

# *IMPORTANT NOTICE*

**IMPORTANT INFORMATION TO FLORIDA POLICYHOLDERS**

**KEEP THIS NOTICE WITH YOUR INSURANCE PAPERS**

**QUESTIONS ABOUT YOUR INSURANCE? -** If you have any inquiries, need to obtain coverage information or need assistance in resolving complaints, please do not hesitate to contact your insurance company or agent.

FOR **COMMERCIAL INSURANCE** CONTACT:

RSUI Group, Inc.
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326

Call Collect          (404) 231-2366

RSG 99003 0803

# *IMPORTANT NOTICE*

### FLORIDA SURPLUS LINES DISCLOSURE NOTICE

**THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER.**

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION IV. – EXCLUSIONS, 2. of  the Common Policy Terms and Conditions Coverage Section is deleted in its entirety.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 202250 0118

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – MARITAL ESTATE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION II. – COVERAGE EXTENSIONS, A. Marital Estate of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**A.  Marital Estate**

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized "domestic partner" of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or "domestic partner" of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or "domestic partner".

"Domestic Partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 202152 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – MERGER, CONSOLIDATION OR ACQUISITION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, G. Merger, Consolidation or Acquisition of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**G.  Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition.  After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization,** unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization,** as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

      (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction" ),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354       **Effective:** 4/25/2022

RSG 202268 0118

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA CHANGES – NO ACTION AGAINST INSURER

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, I. No Action Against Insurer of the Common Policy Terms and Conditions Coverage Section is deleted in its entirety and replaced with the following:

**I.   No Action Against Insurer**

No action may be taken against the **Insurer** unless there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

All other terms and conditions of this policy remain unchanged.

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy. Please Read It Carefully.*

## FLORIDA - CHANGES- PUNITIVE DAMAGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The last paragraph of DEFINITIONS, **Loss** in the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section is amended to read as follows:

The DEFINITION of **Loss** shall include:

1) vicarious liability for punitive or exemplary damages incurred by the Insured, but only to the extent that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to Florida law, and the multiplied portion of any multiplied damage award, if and where insurable; or

2) punitive or exemplary damages, but only to the extent:

   a. such damages are insurable under the law of any jurisdiction other than Florida that has a substantial relationship to the **Insured**, the **Claim**, the **Insurer**, or this policy and is most favorable to the insurability of such damages; and

   b. that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to the laws of any jurisdiction other than Florida.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354    **Effective:** 4/25/2022

RSG 202061 0118

*This Endorsement Changes The Policy. Please Read It Carefully.*

# FLORIDA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION V. – CONDITIONS, F. Cancellation; Renewal Provision of the Common Policy Terms and Conditions Coverage Section is deleted and replaced by the following:

**F. Cancellation; Renewal Provision**

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice accompanied by the specific reason for cancellation. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the refund may be less than pro rata.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

**Nonrenewal**

1. If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of nonrenewal, accompanied by the specific reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354        **Effective:** 4/25/2022

RSG 203009 0118

**THIS ENDORSEMENT IS ATTACHED TO AND MADE A PART OF THIS POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

## DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

**SCHEDULE\***

| | |
|---|---|
| **Terrorism Premium** | **$0** |

**Additional information, if any, concerning the terrorism premium:**
**The portion of your premium for the policy term attributable to coverage for all acts of terrorism covered under this policy including terrorist acts certified under the Act is listed above.**

*\*Information required to complete this Schedule, if not shown above, will be shown in the Declarations Page.*

**A. Disclosure of Premium**

In accordance with the federal Terrorism Risk Insurance Act, as amended, the **Insurer** is required to provide the **Insured** with a notice disclosing the portion of the **Insured's** premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of the **Insured's** premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations Page.

As defined in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B. Disclosure of Federal Participation in Payment of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% of that portion of the amount of such insured losses that exceeds the applicable **Insurer** retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap Insurer Participation in Payment of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our **Insurer** deductible under the Terrorism Risk Insurance Act, the **Insurer** will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Policy No.:** LPP699354      **Effective:** 4/25/2022

RSG 204123 0121

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

*This Endorsement Changes The Policy. Please Read It Carefully.*

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met our insurer deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Exclusion.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 204198 0118



# www.RSUIextra.com

## Online Human Resource Loss Prevention Services for Directors and Officers Liability Policyholders

### Key Features

- Best Practice Help Line for call-in assistance
- Checklist database for lowering risk
- Links to important federal and state government sites
- Online library with up-to-date articles on productivity, leadership and loss prevention
- Sample Human Resource policies and forms
- Online reporting function allows the Site Administrator to monitor usage
- Online training modules designed for managers and supervisors with the ability to adapt programs to meet their own needs.  Best Practice training modules include:
    - Preventing Sexual Harassment
    - Preventing Discrimination
    - Preventing Wrongful Termination
    - Promoting Ethical Behavior

### How to get started

1. Designate a person to serve as the Site Administrator for your organization.
2. Go to **www.RSUIextra.com**.
3. Click the *Register* link on the left-hand side of the home page.
4. Enter your RSUI policy number as the Passcode/Organization Code (i.e. NHP123456).
5. Complete the Registration Information and click *Submit.*
6. You are now registered as the Site Administrator.

### Who is a Site Administrator?

A Site Administrator is often a person who works with personnel or legal matters and is the person who will oversee the use of **www.RSUIextra.com**.  A Site Administrator will have the ability to recruit and add other users as well as make training decisions.

### Questions?

Please call The McCalmon Group at (888) 712-7667 or click *CONTACT US* at **www.RSUIextra.com** on the upper right hand side of the home page.  You will be directed to The McCalmon Group for assistance.

*This site is administered by The McCalmon Group.*

RSG 204154 0716

# COMMON POLICY TERMS AND CONDITIONS
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. - DEFINITIONS.

In consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations hereinafter provided, the **Insurer** agrees:

## SECTION I. – COMMON POLICY TERMS AND CONDITIONS

The Common Policy Terms and Conditions Section of this policy shall apply to all **Coverage Sections**.  Unless stated to the contrary in any **Coverage Section**, the terms and conditions of each **Coverage Section** of this policy shall apply only to that **Coverage Section** and shall not apply to any other **Coverage Section** of this policy.  If any provision in the Common Policy Terms and Conditions sections is inconsistent or in conflict with the terms and conditions in any **Coverage Section**, including any endorsements attached thereto, the terms and conditions of such **Coverage Section** or endorsement, shall supersede for the purposes of that **Coverage Section**.

## SECTION II. - COVERAGE EXTENSIONS

### A.  Marital Estate

This policy shall cover **Loss** arising from any **Claim** made against the lawful spouse or any legally recognized domestic partner of an **Insured Person** for **Claims** arising solely out of his or her status as the spouse or domestic partner of an **Insured Person** (where such status is derived by reason of statutory law or common law) where such **Insured Person** is entitled to coverage under this policy.  Such coverage shall extend to any **Claim** in which a recovery is sought from marital community property, property jointly held by the **Insured Person** and the spouse or domestic partner, or property transferred from the **Insured Person** to the spouse or domestic partner.

Provided, however, that this COVERAGE EXTENSION shall not extend coverage to any **Claim** for, arising from, based upon or attributable to any actual or alleged **Wrongful Act** of the spouse or domestic partner.

### B.  Extended Reporting Period

If the **Insurer** shall refuse to renew this policy or the **Insured Organization** shall cancel or refuse to renew this policy, the **Insured Organization** shall have the right, upon payment of seventy five percent (75%) of the Full Annual Premium, to a period of three hundred and sixty five (365) days following the effective date of such cancellation or nonrenewal (herein referred to as the "Extended Reporting Period") in which to give written notice to the **Insurer** of any **Claim** first made against the **Insured** during said three hundred and sixty five (365) day period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "Full Annual Premium" means the premium stated in Item 5. of the Common Policy Declarations Page and any additional premium(s) charged during the **Policy Period**.  The rights contained in this clause shall terminate unless written notice of such election together with the additional premium due is received by the **Insurer** at its address shown on the Declarations Page within thirty (30) days of the effective date of cancellation or nonrenewal.

The Extended Reporting Period is not cancelable and the additional premium charged shall be fully earned at the inception of the Extended Reporting Period.

The Limit of Liability available under the Extended Reporting Period is part of and not in addition to the Limit of Liability stated in Item 4. of the Declarations Page.

The rights contained in this clause shall not apply in the event of cancellation resulting from non-payment of premium.

### C.  Estates and Legal Representatives

This policy shall cover **Loss** arising from any **Claim** made against the estates, heirs, legal representatives or assigns of an **Insured Person** who is deceased, or against the legal representatives or assigns of an **Insured Person** who is incompetent, insolvent or bankrupt, for the **Wrongful Act** of such **Insured Person**.

## SECTION III. - DEFINITIONS

**A.** **Application** means the application attached to and forming a part of this policy, including any materials submitted or requested in connection with such application within 12 months prior to the inception date of this policy, all of which are deemed a part of this policy.

**B.** **Claim** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**C.** **Coverage Section** means, individually or collectively, the purchased coverage sections listed in Item 3. of the Declarations, including all endorsements attached thereto.

**D.** **Defense Expenses** means reasonable and necessary legal fees and expenses incurred, with the **Insurer's** consent, by any **Insured** in defense of a **Claim**, including any appeal therefrom. **Defense Expenses**, however, shall not include:

    **1.** Remuneration, overhead or benefit expenses associated with any **Insured Person**; or

    **2.** Any obligation to apply for or furnish any appellate or similar bond.

**E.** **Employment Practices Wrongful Act** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**F.** **Fiduciary Wrongful Act** shall have the meaning set forth in the Fiduciary Liability Coverage Section, whether or not purchased.

**G.** **Insured** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**H.** **Insured Organization** means:

    **1.** The organization named in Item 1. of the Declarations Page and any **Subsidiary** existing prior to or at the inception date of this policy; or

    **2.** Subject to SECTION V. - CONDITIONS, G. Merger, Consolidation or Acquisition of this policy, **Insured Organization** shall include any **Subsidiary** created or acquired after the inception date of this policy; or

    **3.** In the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

**I.** **Insured Person** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**J.** **Insurer** means the Company providing this insurance as shown on the Declarations Page.

**K.** **Loss** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

**L.** **Policy Period** means the period beginning at the inception date and ending at the expiration date stated in Item 2. of the Declarations Page or to any earlier policy cancellation or termination date.

**M.** **Subsidiary** means any entity of which the **Insured Organization**, either directly or indirectly, or through one or more of its **Subsidiaries**:

    **1.** Owns more than fifty percent (50%) of the voting stock and/or outstanding securities; or

    **2.** Has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers.

    A **Subsidiary** ceases to be a **Subsidiary** when the **Insured Organization** no longer owns more than fifty percent (50%) of the voting stock and/or outstanding securities, or no longer has the right to elect or appoint more than fifty percent (50%) of the voting directors, management committee members or members of the Board of Managers, or the means by which the **Insured Organization** is legally enabled to exercise fifty percent (50%) ownership or control is formally extinguished.

**N.** **Third Party Discrimination** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**O.** **Third Party Harassment** shall have the meaning set forth in the Employment Practices Liability Coverage Section, whether or not purchased.

**P. Wrongful Act** shall have the meaning set forth in each applicable **Coverage Section** or any applicable endorsements attached to this policy.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, directly or indirectly, the same or essentially the same facts underlying or alleged in any matter which, prior to the inception date of this policy, has been the subject of notice to any insurer of a **Claim**, or a potential or threatened **Claim**, or an occurrence or circumstance that might give rise to a **Claim** under any policy of which this insurance is a renewal or replacement or which it may succeed in time;

2. Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any nuclear reaction, nuclear radiation, or radioactive contamination, or any related act or incident;

3. Any **Telecommunications Claim**, as defined below.

   A **Telecommunications Claim** is any **Claim**:

   **a.** Arising from, based upon, attributable to, or in consequence of any proceeding against any **Insured** brought by the Federal Trade Commission or any other federal, state or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulation pertaining to unsolicited or non-consensual advertising, through faxes, telephone calls, texting or any other medium; and/or

   **b.** Arising from, based upon, attributable to, or in consequence of, any actual or alleged violation of:

   **(1)** The Fair Debt Collection Practices Act or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

   **(2)** The CAN-SPAM Act of 2003 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world;

   **(3)** The Telephone Consumer Protection Act (TCPA) of 1991 or any amendments thereto or any rules or regulations promulgated thereunder, or any similar provisions of any federal, state or local statutory law or common law anywhere in the world; or

   **(4)** Any other law, ordinance, regulation, statute or common law relating to any communication, distribution, publication, sending or transmission via telephone, telephone facsimile machine, computer or other telephonic or electronic devices.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

## SECTION V. - CONDITIONS

### A. Duty to Defend

It shall be the right and duty of the **Insurer** to defend any **Claim** against any **Insured** for which coverage applies under this policy, and the **Insurer** shall have the right to appoint counsel of its choosing. No **Insured** may incur any **Defense Expenses**, admit liability for or settle any **Claim** or negotiate any settlement without the **Insurer's** prior written consent; such consent not to be unreasonably withheld. Any **Defense Expenses** incurred or settlements made without the prior written consent of the **Insurer** will not be covered under this policy. The **Insurer** shall have the right to appoint counsel, investigate and conduct negotiations and, with the consent of the **Insured**, to enter into the settlement of any **Claim** that the **Insurer** deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the **Insurer's** recommendations, the **Insurer's** liability for all **Loss** on account of such **Claim** shall not exceed:

1. The amount for which the **Insurer** could have settled such **Claim** plus **Defense Expenses** incurred as of the date such settlement was proposed in writing by the **Insurer** ("Settlement Opportunity Amount"); plus

2. Seventy percent (70%) of covered **Loss** in excess of such Settlement Opportunity Amount subject to the policy's Limit of Liability.

In no event shall the **Insurer** be liable under this policy for more than the Limit of Liability shown in Item 4. of the Common Policy Declarations Page.

**B. Limit of Liability; Retention; Payment of Loss**

    **1. Aggregate Limit of Liability**

Regardless of **Coverage Sections** purchased, as stated in Item 3. of the Common Policy Declarations Page, the amount shown in Item 4. of the Common Policy Declarations Page is the maximum aggregate limit that the **Insurer** will pay for all **Loss** under all **Coverage Sections** combined, arising out of any and all **Claims** first made against the **Insured** during the **Policy Period** and the Extended Reporting Period (if purchased) and reported in accordance with the terms and conditions of this policy.

The **Insurer** will have no obligation to pay **Loss** or to defend or continue to defend any **Claim** after the aggregate Limit of Liability, stated in Item 4. of the Common Policy Declarations Page, has been exhausted by payment of **Loss**. **Defense Expenses** shall be part of and not in addition to the Limit of Liability and payment of **Defense Expenses** by the **Insurer** will reduce the Limit of Liability.

    **2. Separate Limit of Liability**

Regardless of any Separate Limit(s) of Liability purchased, as stated in Item 3. of the Common Policy Declarations, the maximum limit of the **Insurer's** liability for all **Loss** for each applicable **Coverage Section** purchased shall not exceed the Separate Limit of Liability as stated in Item 2. of each applicable Declarations for each applicable **Coverage Section**. Where two or more Separate Limits of Liability are or could be applicable to one **Claim** or series of interrelated **Claims** deemed to be a single **Claim** pursuant to Section V.B.4. below, the larger of the applicable Separate Limits of Liability shall apply, but in no event shall more than one Separate Limit of Liability apply to any **Claim** or series of interrelated **Claims** and in no event shall the Insurer be obligated to pay **Loss** or to defend or continue to defend any **Claim** after the Insurer has paid the applicable Separate Limit of Liability or the Aggregate Limit of Liability per Section V.B.1. of these Common Policy Terms and Conditions.

    **3.** As a condition precedent to coverage under this policy, the **Insured** shall pay with respect to each **Claim** the applicable Retention amount, as identified in Item 3. of the Declarations Page for each applicable **Coverage Section** or as otherwise identified. The Retention amount shall be reduced solely by covered **Loss** and shall be applied to all **Loss**, including **Defense Expenses**, and the **Insurer** shall only be liable for the amount of **Loss** that is excess of the stated Retention amount.

    **4.** All **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events, shall be deemed to be a single **Claim** for all purposes under this policy, shall be subject to the Retention stated in Item 3. of the Declarations Page for each applicable **Coverage Section**, or other applicable Retention, and shall be deemed first made when the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

    **5.** In the event that a **Claim** implicates more than one Retention amount, then the largest of the applicable Retention amounts shall be applied, but in no event shall more than one Retention amount be applied to a **Claim**.

    **6.** Any Retention amount applicable to a **Claim** against an **Insured Person** shall apply where indemnification by the **Insured Organization** is permitted or required, regardless of whether the **Insured Organization** has agreed, failed or refused to indemnify such **Insured Person**, provided it shall not apply when indemnification cannot be made by the **Insured Organization** by reason of the **Insured Organization's** financial insolvency.

    **7.** The **Insurer's** duty to defend the **Insured** and pay **Defense Expenses** ends upon exhaustion of the Limit of Liability, which includes paying or tendering the Limit of Liability into court.

    **8.** Except for payment of **Defense Expenses**, the **Insurer** shall pay for **Loss** only upon final disposition of any **Claim**.

**C. Notice of Claim or Circumstance**

    **1.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Claim** is first made, it shall be a condition precedent to the **Insurer's** obligation to pay, that the **Insured** give written notice of such **Claim** to the **Insurer** as soon as practicable after such **Claim** is first made, but in no event shall such notice be given later than sixty (60) days after either the **Policy Period** expires or any earlier cancellation date of this policy.

**2.** If, during the **Policy Period** or Extended Reporting Period (if applicable), any **Insured** first becomes aware of any facts or circumstances which may reasonably be expected to give rise to a **Claim** against any **Insured** for any **Claim** made against the **Insured** for any **Wrongful Act** occurring prior to the end of the **Policy Period**, and as soon as practicable thereafter, but before the expiration date or any earlier cancellation date of this policy, gives to the **Insurer** written notice, of such facts or circumstances along with the full particulars described below, then any **Claim** subsequently made against any **Insured** arising out of such facts or circumstances will be deemed first made during the **Policy Period**. The written notice shall include, at a minimum:

**a.** The names or identity of the potential claimants and a detailed description of the specific alleged **Wrongful Act**; and

**b.** The circumstances by which the **Insured** first became aware of the specific alleged **Wrongful Act**.

Further, if any **Claim** first made after the **Policy Period** expires is nonetheless deemed to be made during the **Policy Period** pursuant to Section V.B.4., then it is a condition precedent to coverage for such **Claim** that the **Insured** report it to the **Insurer** as soon as practicable.

### D. Cooperation

In the event of a **Claim** or notice of circumstances under SECTION V. - CONDITIONS, C. Notice of Claim or Circumstance of this policy, the **Insured** will provide the **Insurer** with all information, assistance and cooperation that the **Insurer** reasonably requests, and will take no action, without the **Insurer's** prior written consent, that might prejudice the **Insured's** or the **Insurer's** position, potential or actual rights, or defense under this policy.

### E. Allocation

If both **Loss** covered under this policy and loss not covered under this policy are jointly incurred either because a **Claim** includes both covered and non-covered matters or covered and non-covered causes of action or because a **Claim** is made against both an **Insured** and any other parties not insured by this policy, then the **Insured** and the **Insurer** shall use their best efforts to fairly and reasonably allocate payment under this policy between covered **Loss** and non-covered loss based on the relative legal exposures of the parties with respect to covered and non-covered matters or covered and non-covered causes of action.

If the **Insurer** and the **Insured** agree on an allocation of **Defense Expenses**, based on covered and non covered matters or persons, the **Insurer** shall advance **Defense Expenses** allocated to covered **Loss**. If there is no agreement on an allocation of **Defense Expenses**, the **Insurer** shall advance **Defense Expenses** that the **Insurer** believes to be covered under this policy until a different allocation is negotiated, arbitrated, or judicially determined.

Any negotiated, arbitrated or judicially determined allocation of **Defense Expenses** on account of a **Claim** shall be applied retroactively to all **Defense Expenses** on account of such **Claim**, notwithstanding any prior advancement to the contrary. Any advancement or allocation of **Defense Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

### F. Cancellation; Renewal Provision

The **Insured Organization** may cancel this policy at any time by written notice or by surrender of this policy to the **Insurer** at its address shown on the Declarations Page.

This policy may only be cancelled by or on behalf of the **Insurer** in the event the **Insured Organization** fails to pay any premium when due. In the event of non-payment of premium by the **Insured Organization**, the **Insurer** may cancel this policy upon ten (10) days written notice. The **Insurer** will mail notice to the **Insured Organization's** address as shown in Item 1. of the Declarations Page. The mailing of such notice as aforesaid shall be sufficient proof of notice.

If the **Insured Organization** cancels this policy, the **Insurer** will retain the customary short rate proportion of the premium hereon.

The **Insurer** shall not be required to renew this policy upon its expiration. The offer by the **Insurer** of renewal terms, conditions, Limit of Liability and/or premiums varying from those of the expiring policy shall not constitute a refusal to renew.

If the **Insurer** decides not to renew this policy, the **Insurer** will mail or deliver to the **Insured Organization** written notice of non-renewal, stating the reasons for non-renewal, at least sixty (60) days prior to the expiration date of this policy.

Any notice of non-renewal will be mailed or delivered to the **Insured Organization's** last mailing address known to the **Insurer**. If notice is mailed, proof of mailing will be sufficient proof of notice.

**G. Merger, Consolidation or Acquisition**

1. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets do not exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place on or after the effective date of such creation or acquisition.

2. If, after this policy's inception date, the **Insured Organization** creates or acquires a **Subsidiary** whose assets exceed twenty five percent (25%) of the total consolidated assets of the **Insured Organization**, not including the assets of the created or acquired **Subsidiary**, such **Subsidiary** shall be deemed to qualify as an **Insured Organization**, but solely for a **Wrongful Act** that takes place within the first ninety (90) days after the date of such creation or acquisition. After this ninety (90) day period, the created or acquired **Subsidiary** shall no longer be deemed an **Insured Organization,** unless:

   a. Written notice of the **Subsidiary's** creation or acquisition has been provided to the **Insurer** by the **Insured Organization**, as soon as practicable, and in no event later than ninety (90) days after the date of the creation or acquisition;

   b. The **Insured Organization** has provided the **Insurer** with any additional information the **Insurer** may request;

   c. The **Insured Organization** has agreed to the terms, conditions, exclusions and additional premium charge as may be required by the **Insurer**; and

   d. The **Insurer**, at its sole discretion, has agreed in writing to extend the coverage of this policy to the created or acquired **Subsidiary**.

3. If during the **Policy Period**:

   a. The **Insured Organization** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons or entities acting in concert; or

   b. Any person or entity or group of persons or entities acting in concert shall acquire an amount of more than fifty percent (50%) of the voting power for the election of directors of the **Insured Organization**;

   (either of the above events in 3. a. or b. are hereunder referred to as the "Transaction"),

   then this policy shall continue in full force and effect for any **Wrongful Act** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the premium for this policy shall be deemed fully earned as of such time.

   The **Insured Organization** shall give the **Insurer** written notice of the Transaction as soon as practicable, but not later than thirty (30) days after the effective date of the Transaction.

**H. Representations**

The **Insured** represents that the information, particulars, documents, representations and statements contained in the **Application** are complete, true and accurate; are deemed incorporated into and constituting part of this policy; are material to the acceptance of the risk assumed by the **Insurer** under this policy. This policy is issued in reliance upon the truth of such representations. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. If any of the information, particulars, documents, representations and statements contained in the **Application** are untrue, this policy will be void with respect to any **Insured** who knew of such untruth.

**I. No Action Against Insurer**

No action may be taken against the **Insurer** unless, as a condition precedent thereto, there has been full compliance with all of the terms and conditions of this policy and until the amount of any **Insured's** obligation to pay **Loss** has been finally determined either by judgment against such **Insured** after adjudicatory proceedings, or by written agreement of the **Insured**, the claimant and the **Insurer**.

No **Insured** has any right under this policy to join the **Insurer** as a party to any **Claim** against an **Insured** to determine the liability of such **Insured**, nor shall the **Insurer** be impleaded by an **Insured** or his, her or its legal representative in any such **Claim**.

**J. Subrogation**

In the event the **Insurer** makes any payment under this Policy, the **Insurer** shall be subrogated to all of the rights of recovery of the **Insured**, who shall execute all papers and take all necessary actions to secure such rights, including the execution of any documents necessary to enable the **Insurer** to effectively bring suit in the name of an **Insured**.

**K. Authorization and Notices**

The **Insured Persons** agree that the **Insured Organization** shown in Item 1. of the Declarations Page acts on their behalf with respect to giving and receiving all notices and return of premium from the **Insurer**.

**L. Changes**

Notice to any agent or knowledge possessed by any agent or representations by persons acting on behalf of the **Insurer** do not effect a waiver or change in any part of this policy or estop the **Insurer** from asserting any right under the terms, conditions and limitations of this policy. The terms, conditions and limitations of this policy can only be waived or changed by written endorsement.

**M. Assignment**

Assignment of interest under this policy does not bind the **Insurer** without its prior written consent.

**N. Acceptance**

The **Insureds** agree that this policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the **Insurer** relating to this insurance policy.

**O. Headings**

The description in the headings and sub-headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

**P. Governing Law Clause**

This policy shall, to the extent permitted by applicable law, be construed in accordance with the laws of the state or jurisdiction of incorporation or organization of the **Insured Organization** shown in Item 1. of the Declarations Page or, in the case of matters pertaining to a **Subsidiary**, the laws of the state or jurisdiction of incorporation or organization thereof.

**Q. Territory**

This policy shall apply to **Claims** made against any **Insured** anywhere in the world.

**R. Other Insurance**

Unless specifically stated otherwise, the insurance provided under this policy shall apply only as excess over any other valid and collectible insurance, unless such other insurance is written as specific excess insurance over the Aggregate Limit of Liability or Shared Limit of Liability provided by this policy. Any coverage otherwise available under any **Coverage Section** shall be specifically excess over any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a **Claim** for which this policy may be obligated to pay **Loss**.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                          President

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# ABSOLUTE EXCLUSION – BODILY INJURY AND PROPERTY DAMAGE WITH ALLOCATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  SECTION IV. – EXCLUSIONS, 6. of the Directors and Officers Liability Coverage Section is deleted and replaced by the following:

6.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

B.  The first paragraph in SECTION IV. – EXCLUSIONS, 2. of the Employment Practices Liability Coverage Section is deleted and replaced by the following:

2.  Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly:

a.  Bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; provided, this EXCLUSION 2.a. will not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim** or a **Claim** for **Third Party Discrimination** and/or **Third Party Harassment**; or

b.  Damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

provided that, regardless of any other terms or conditions in this Policy, including any endorsements, the covered and uncovered portions of **Loss** arising from any such **Claim** shall be allocated in accordance with this Policy's allocation provision.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 206117 0119

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# AMENDED DEFINITION OF INSURED PERSON
# (ADDITIONAL POSITIONS)

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION III. – DEFINITIONS, **I. Insured Person** of the Common Policy Terms and Conditions Coverage Section, is amended to include <u>Advisory Board Member</u>.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354        **Effective:** 4/25/2022

RSG 204089 0118

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## EXCLUSION – BIOMETRIC PRIVACY CLAIMS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section and Employment Practices Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Biometric Privacy Information**.

For the purpose of this endorsement, **Biometric Privacy Information** is defined as the Biometric Information Privacy Act ("BIPA"), the California Consumer Privacy Act ("CCPA"), or any federal, state, municipal or local statutory biometric privacy law or any such similar law or statute anywhere in the world that governs or relates to the collection, use, safeguarding, handling, storage, retention or destruction of biometric identifiers, biometric data or biometric information of any kind, including but not limited to retina or iris scans, fingerprints, voiceprints or scans of hand or face geometry.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – NETWORK SECURITY AND PRIVACY INFORMATION

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any actual or alleged violation of **Network Security and Privacy Information**.

B.  The following is added to Section III. – DEFINITIONS, of the Common Policy Terms and Conditions Coverage Section:

1.  **Network Security and Privacy Information** shall mean:

    a.  failure to prevent the transmission of a **Computer Virus**; or

    b.  failure to provide any authorized user of the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, with access to such website, or computer or communications network; or

    c.  failure to prevent unauthorized access to, or use of, data containing private or confidential information of others; or

    d.  failure to properly handle, manage, store, destroy or otherwise control confidential corporate or personally identifiable information; or

    e.  failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any state or federal regulation or statute.

2.  **Computer Virus** shall mean any malicious code which could destroy, alter, contaminate or degrade the integrity, quality or performance of data of any computer application software, computer network, or computer operating system or related network, upon the introduction of such malicious code through any computer, communications equipment or communications network that is owned or operated by the **Insured Organization**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:**  LPP699354      **Effective:**  4/25/2022

RSG 206126 1120

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRIOR ACTS

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to 4/25/2022.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354      **Effective:** 4/25/2022

RSG 206108 0118

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

## FULLY NON-RESCINDABLE COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this policy shall be non-rescindable by the **Insurer**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354        **Effective:** 4/25/2022

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# SERVICE OF SUIT

This endorsement modifies insurance provided under the following:

### ALL COVERAGE PARTS

In the event of the failure of the **Insurer** to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured**, will submit to the jurisdiction of any court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the **Insurer's** rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court or seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States, moreover, this endorsement is not an agreement that the law of a particular jurisdiction applies to any dispute under the policy.

Service of process in such suit may be made upon the highest one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the **Insured Organization** named in Item 1. of the Declarations Page of this policy is located, and that in any suit instituted against it based upon this contract the **Insurer** will abide by the final decision of such court or any appellate court in the event of an appeal. The one in authority bearing the title "Commissioner", "Director" or "Superintendent" of Insurance of the state or commonwealth wherein the **Insured Organization** named in Item 1. of the Declarations Page of this policy is located, is hereby authorized and directed to accept service of process on behalf of the **Insurer** in any such suit and/or upon the **Insured's** request to give a written undertaking to the **Insured** that they will enter a general appearance upon the **Insurer's** behalf in the event such a suit shall be instituted.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354      **Effective:** 4/25/2022

RSG 204108 0118

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# STATE AMENDATORY DISCREPANCY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to the Common Policy Terms and Conditions Coverage Section:

In the event that there is a discrepancy between a state amendatory attached to this policy and any term or condition of this policy, then it is understood and agreed that, where permitted by law, the **Insurer** shall apply the most favorable terms in the contract to the **Insured**, whether those terms and conditions are in either the amendatory or the policy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 204202 0118

# DIRECTORS AND OFFICERS LIABILITY
# COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

**Directors and Officers Liability**

**A.** With the **Insured Person**, that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of such **Insured Person** all **Loss** such **Insured Person** is legally obligated to pay, except and to the extent that the **Insured Organization** is required or permitted to indemnify such **Insured Person** for such **Loss.**

**B.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against any **Insured Person** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** for which the **Insured Organization** is required or permitted to indemnify the **Insured Person**.

**C.** With the **Insured Organization,** that if a **Claim** for a **Wrongful Act** is first made against the **Insured Organization** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy, the **Insurer** will pay on behalf of the **Insured Organization** all **Loss** the **Insured Organization** is legally obligated to pay.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under SECTION I. INSURING AGREEMENTS A. and B. shall be non-rescindable by the **Insurer**.

## SECTION II. – COVERAGE EXTENSIONS

**A. Outside Board Extension**

This policy shall cover **Loss** arising from an **Insured Person** having served, at the direction of and with the consent of the **Insured Organization**, as Director, Officer, or Trustee for any eleemosynary corporation or other not for profit organization where such **Insured Person** is entitled to indemnification by the **Insured Organization**.

This COVERAGE EXTENSION shall be excess of any indemnification and/or insurance that may be permitted or provided by such eleemosynary corporation or organization, regardless of payment made by or on behalf of such eleemosynary corporation or organization, including but not limited to any other Director and Officer Liability Insurance or similar insurance provided for, to, or by any such eleemosynary corporation or organization.

**B. Additional Side-A Limit of Liability**

If a limit is shown in Item 2.B of the Directors and Officers Liability Declarations, then there shall be an addition to the maximum aggregate Limit of Liability available under this Directors and Officers Coverage Section. This amount shall be in addition to the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page and shall be available solely for **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this coverage section, and shall be subject to the following additional conditions:

(1) Any **Loss** resulting from a **Claim** against any **Insured Persons** covered under SECTION I. INSURING AGREEMENT A. of this Directors and Officers Coverage Section shall first be paid under the Limit of Liability as set forth in Item 2.A. of the Directors and Officers Liability Declarations Page, and such Limit of Liability must be completely exhausted by payment of **Loss** under SECTION I. INSURING

AGREEMENTS A., B., and/or C. of this Directors and Officers Coverage Section before **Loss** shall be paid under the additional Limit of Liability dedicated for **Insured Persons:** and

(2) The additional Limit of Liability dedicated for **Insured Persons** shall be excess of any insurance available that is specifically excess of this policy and such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment on account of the additional Limit of Liability dedicated for **Insured Persons**.

**C. Investigation Costs Sublimit of Liability**

The **Insurer's** maximum aggregate Limit of Liability for all **Loss** under this policy for all **Investigative Costs** shall be the Investigative Costs Sublimit of Liability as indicated in Item 2.C. of the Directors and Officers Liability Declarations Page. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A. of the Directors and Officers Liability Declarations Page.

This policy shall cover **Loss** arising from all **Investigative Costs** which the **Insured Organization** shall become legally obligated to pay as a result of a **Shareholder Derivative Demand** first made during the **Policy Period** or Discovery Period, if applicable, against the **Insured Organization** for a **Wrongful Act** of an **Insured Person**.

**SECTION III. - DEFINITIONS**

**A. Claim**, either in the singular or the plural, means:

**1.** A written demand for monetary or non-monetary relief;

**2.** A civil, criminal, administrative, regulatory or arbitration proceeding, or arbitration demand for monetary or non-monetary relief which is commenced by:

   **a.** Receipt or service of a complaint or similar pleading;

   **b.** Return of an indictment or filing of information; or

   **c.** Receipt of a notice of charges;

**3.** A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

**4.** A civil, criminal, administrative or regulatory investigation of an **Insured Person** by the Securities Exchange Commission ("SEC") or similar state or foreign government authority, after the **Insured Person** is identified in a written "Wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such **Insured Person**;

**B. Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**. An individual who is leased or contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C. Insured** means any **Insured Organization** and/or any **Insured Person**.

**D. Insured Person** means:

**1.** Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**E. Investigative Costs** means reasonable costs, charges, fees (including attorneys' and experts' fees) and expenses incurred by the **Insured Organization**, its board of directors or any committee thereof in connection with the investigation or evaluation of any **Shareholder Derivative Demand**; provided, however, that **Investigative Costs** shall not include salaries, wages, benefits, expenses or fees of any director, officer or **Employee** of the **Insured Organization**.

**F. Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages, compensation, severance or benefits previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

G. **Shareholder Derivative Demand** means any written demand by one or more shareholders of the **Insured Organization** made upon the board of directors of the **Insured Organization** to bring a proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

H. **Wrongful Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

1. An **Insured Person** acting in his or her capacity as such and on behalf of the **Insured Organization** or any matter claimed against them solely by reason of their status as an **Insured Person**; or

2. The **Insured Organization**.

## SECTION IV. - EXCLUSIONS

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Based upon, arising out of or attributable to any remuneration received by an **Insured**, or the granting of any remuneration to any **Insured**, without the previous approval of the stockholders or the Board of Directors, which remuneration is found to have been illegal; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** received remuneration to which such **Insured** was not legally entitled;

2. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

3. Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the gaining of any profit or advantage to which an **Insured** was not legally entitled; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** gained profit or advantage to which such **Insured** was not legally entitled;

4. Alleging, arising out of, based upon or attributable to, in whole or part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Directors and Officers Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

5. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law;

6. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged;

7. Alleging, arising out of, based upon or attributable to, in whole or in part, the performance or rendering of or failure to perform professional services, where such services are undertaken for others for a fee;

8. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

9. Brought by or on behalf of any **Insured**, or which is brought by any security holder of the **Insured Organization**, whether directly or derivatively, unless such **Claim** is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.  Provided, however, this EXCLUSION shall not apply to:

   a. Any **Claim** brought by an **Insured Person**, where such **Claim** is in the form of a cross-claim or a third-party claim for contribution or indemnity, which is part of and results directly from a **Claim** that is not otherwise excluded by the terms of this policy;

   b. Any **Claim** brought by the examiner, trustee, receiver, liquidator or rehabilitator (or any assignee thereof) of such **Insured Organization**, in or after any bankruptcy proceeding by or against an **Insured Organization**;

   c. Any **Claim** brought by any past director, officer, trustee, manager or equivalent executives of the **Insured Organization** who have not served as a director, officer, trustee, manager or equivalent executive for at least three (3) years prior to the date such **Claim** is first made, but only if the **Claim** is brought and maintained totally independent of and without the solicitation, assistance, active participation or intervention of the **Insured Organization** or any **Insured Person** not described in this paragraph 9.c;

   d. Any **Claim** brought by an **Employee** of the **Insured Organization** who is not or was not a director or officer of the **Insured Organization** and where such **Claim** is brought by such **Employee** only in their capacity as a stockholder and independently of assistance from **Insureds**, except those expressly as noted in section 9.c., above; or

   e. Any instigation of or involvement in any **Claim**, or solicitation, assistance, active participation or intervention by any **Insured** whistleblower under Section 806 of the Sarbanes-Oxley Act of 2002 or any rule or regulation promulgated thereunder, or under any similar whistleblower statute, rule or regulation under any other federal or state law.

   Provided further, however, that in the event that an **Insured Person** brings a cross-claim or third-party claim, as described in 9.a. above, against another **Insured Person**, then solely with respect to the **Loss** derived from a cross-claim or third-party claim, the **Insurer** shall be liable solely for **Defense Expenses**;

10. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

    Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

11. Alleging, arising out of, based upon or attributable to any initial public offering of securities by the **Insured Organization** or alleging the purchase or sale of such securities subsequent to such offering;

12. With respect to INSURING AGREEMENT C. of this policy, only:

    a. For actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, secret or any other intellectual property rights;

**b.** For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; or

**c.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement.

**13.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Employment Practices Wrongful Act**.

**14.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Third Party Discrimination** and/or **Third Party Harassment**.

**15.** Alleging, arising out of, based upon or attributable to, in whole or in part, any **Fiduciary Wrongful Act**.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**SECTION V. - CONDITIONS**

**A. Bankruptcy and Priority of Payments**

The bankruptcy or insolvency of the **Insured Organization** or any **Subsidiary** shall not relieve the **Insurer** of any of its obligations hereunder. The coverage provided by this policy, however, is intended primarily to protect and benefit the **Insured Persons**.

With respect to the payment of the policy proceeds, it is agreed that covered **Loss** due under this policy shall be paid by the **Insurer** in the following order of priority:

**1.** First pay such **Loss** for which coverage is provided under INSURING AGREEMENT A. of this policy;

**2.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT B. of this policy; and

**3.** With respect to any remaining amount of the Limit of Liability still available after payment of such **Loss**, pay **Loss** for which coverage is provided under INSURING AGREEMENT C. of this policy.

The **Insured Organization** or its representatives and the **Insurer** shall use their best efforts to agree upon the priority of payment of all **Loss** under this policy. If no agreement is reached regarding the priority of payments, then the **Insurer** and **Insured Organization** will submit the issue of such priority, and only that issue, to binding arbitration.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – BROADCASTING, ADVERTISING AND PUBLISHING LIABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon or attributable to, directly or indirectly or in any way involving:

a.  Publishing or re-publishing;

b.  Advertising;

c.  Broadcasting or re-broadcasting;

d.  Telecasting or re-telecasting;

e.  Any actual or alleged piracy;

f.  Any actual or alleged idea misappropriation under implied contract;

g.  Any actual or alleged libel, slander, or other defamation or invasion of privacy in connection with any advertisement, publicity, article, broadcast or telecast;

h.  Any actual or alleged plagiarism, infringement of patent, copyright, trademark, title or slogan; or

i.  Any actual or alleged false arrest, false imprisonment, wrongful entry or eviction or other wrongful invasion of the right to private occupancy, wrongful detention, malicious prosecution, humiliation, defamation of character or invasion of rights of privacy.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354    **Effective:** 4/25/2022

**LANDMARK AMERICAN INSURANCE COMPANY**

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# EXCLUSION – PRODUCTS LIABILITY

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, directly or indirectly, in whole or in part, or in any way involving the failure, malfunction or misuse of any product(s) manufactured, designed or sold by the **Insured Organization**.

All other terms and conditions of this policy remain unchanged.

**Policy No.:** LPP699354     **Effective:** 4/25/2022

RSG 206109 0118

LANDMARK AMERICAN INSURANCE COMPANY

*This Endorsement Changes The Policy.  Please Read It Carefully.*

# FLORIDA - REGULATORY COVERAGE

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

A.  The following is added to SECTION II. – COVERAGE EXTENSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** will pay on behalf of the **Insured** any **Loss** from a **Regulatory Claim** first made against them during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance of the Common Policy Conditions Coverage Section, which shall be applicable to **Regulatory Claims** as it is for **Claims** generally.  The **Insurer's** maximum aggregate Limit of Liability for **Loss** under this policy in connection with **Regulatory Claims** made against all **Insureds** shall be $250,000. This sublimit shall be part of and not in addition to the amount set forth in Item 2.A of the Directors and Officers Liability Declarations Page.

A Retention in the amount of $250,000 shall apply to any **Loss** arising from a **Regulatory Claim**.  Such Retention shall be borne by the **Insured**, and the **Insurer** shall only be liable for the amount of **Loss** arising from a **Regulatory Claim** which is in excess of the above stated Retention amount.

Notwithstanding anything contained in this endorsement to the contrary, however, solely where coverage for any **Claim** is triggered as "Side A", or non-indemnifiable or non-indemnified **Loss** in keeping with Policy terms and conditions, the Retention normally applicable in such situations shall apply to such **Claim**, and the Retention stated here shall not apply.

B.  The following are added to SECTION III. – DEFINITIONS, of the Directors and Officers Liability Coverage Section:

1.  **Regulatory Claim** shall mean:

    (a)  a written demand for monetary damages or non-monetary relief;

    (b)  a search warrant, subpoena, notice of investigation, or contact letter;

    (c)  a civil proceeding commenced by the service of a complaint or similar pleading;

    (d)  a criminal proceeding commenced by the return of an indictment or information;

    (e)  a civil administrative or civil regulatory proceeding commenced by the filing of a demand or notice of charges; or

    (f)  a qui tam action or a relator lawsuit commenced by the service of a complaint or similar pleading,

    brought by or on behalf of a federal, state or local governmental, regulatory or administrative agency or entity against an **Insured** for a **Regulatory Wrongful Act**, including any appeal therefrom.

    **Regulatory Claim** shall not include any customary or routine audit or reconciliation involving an **Insured** by any federal, state or local governmental, regulatory or administrative agency or entity.

    A **Regulatory Claim** will be deemed to have first been made when, with respect to any civil, criminal, or civil administrative or civil regulatory proceeding or qui tam action or relator lawsuit described in (c) - (f) above, such **Regulatory Claim** is commenced as set forth in this definition or, in the case of any written demand, search warrant, subpoena, notice of investigation, or contact letter described in (a) or (b) above, when such demand is first received by an **Insured**.

2.  **Regulatory Wrongful Act** shall mean any actual or alleged violation by an **Insured** of the responsibilities, obligations or duties imposed by the Federal False Claims Act or any similar federal, state, or local statutory law or common law anywhere in the world, any federal, state, or local anti-kickback, self-referral or healthcare fraud and abuse law anywhere in the world, or amendments to or

**Policy No.:** LPP699354          **Effective:** 4/25/2022

RSG 202165 0320                                                                                    Page 1 of 2

regulations promulgated under any such law; provided that a **Regulatory Wrongful Act** shall not include any actual or alleged **Retaliation**.

**Retaliation** shall mean retaliatory treatment against any **Insured Person** on account of such individual:

(a) exercising his or her rights under law;

(b) refusing to violate any law;

(c) opposing any unlawful practice;

(d) disclosing or threatening to disclose to a superior or to any governmental agency alleged violations of law; or

(e) having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured Entity**.

C. Solely with respect to coverage afforded by this endorsement, the term **Loss**, as defined in SECTION III. - DEFINITIONS of the Directors and Officers Liability Coverage Section, is amended to include the amount that any **Insured** shall become legally obligated to pay on account of any covered **Regulatory Claim**, including but not limited to:

(a) damages;

(b) judgments;

(c) settlements; and

(d) pre-judgment and post-judgment interest.

D. Solely with respect to coverage afforded by this endorsement, the term **Loss**, as defined in SECTION III. - DEFINITIONS of the Directors and Officers Liability Coverage Section shall not include:

(a) any bond or surety requirement;

(b) any amount of overpayment or restitution that is identified as such in any document or instrument effecting any settlement;

(c) fees, profits, or other revenue lost, or any costs incurred, by an **Insured** in connection with the termination, suspension, or limitation of such **Insured's** right to participate in any program of a federal, state or local governmental, regulatory or administrative agency or entity; or

(d) the cost of any compliance program, or the cost of complying with any integrity agreement made as part of, or in anticipation or expectation of, or otherwise in connection with any such settlement.

E. If any **Regulatory Claim** is filed under seal, the **Insured** shall, as a condition precedent to exercising any right to coverage under this policy, immediately upon becoming aware of such **Regulatory Claim** petition the applicable court, agency, or entity to allow such sealed information be provided to the **Insurer**.

All other terms and conditions of this policy remain unchanged.

# EMPLOYMENT PRACTICES LIABILITY
## COVERAGE SECTION (PRIVATE)
## PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning.  Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page, and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### A. Employment Practices Liability

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Employment Practices Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy**.**

### B. Third Party Liability Coverage

The **Insurer** shall pay for **Loss** up to the Limit of Liability applicable to this **Coverage Section** arising out of or in connection with any **Claim** for **Third Party Discrimination** and/or **Third Party Harassment** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

## SECTION II. – COVERAGE EXTENSIONS

### Workplace Violence Expenses Sublimit

If a sublimit is shown in Item 2.B. of the Employment Practices Liability Declarations Page, the **Insurer** shall provide coverage for **Workplace Violence Expense** the **Insured Organization** incurs resulting directly from any **Workplace Violence**.  This sublimit shall be part of and not in addition to the Limit of Liability set forth in Item 2.A. of the Employment Practices Liability Declarations Page.

No Retention shall apply to the **Workplace Violence Expense** Coverage.

## SECTION III. - DEFINITIONS

### A. **Claim**, for purposes of this **Coverage Section** shall be an **Employment Practices Claim**, which means:

A written demand for monetary or non-monetary relief solely where alleging an **Employment Practices Wrongful Act**, including:

1. A civil, criminal, administrative, regulatory or arbitration proceeding or arbitration demand for monetary or non-monetary relief which is commenced by:

    a. Receipt or service of a complaint or similar pleading;

    b. Return of an indictment or filing of information; or

    c. Receipt of a notice of charges;

2. A written request to an **Insured** to toll or waive a statute of limitations regarding a potential **Claim**, commenced by the receipt of such request by the **Insured**;

3. An administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or equivalent state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the **Insured**.

    Provided, such **Employment Practices Claim** shall not include any internal or external labor or grievance proceeding which is pursuant to a collective bargaining agreement.

### B. **Employee** means any past, present or future employee of the **Insured Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonal and temporary employee of the **Insured Organization**.  An individual who is leased or

contracted to the **Insured Organization** shall also be an **Employee**, but only if the **Insured Organization** provides indemnification to such leased or contracted individual in the same manner as is provided to the **Insured Organization's** employees.

**C.** **Employment Practices Claim** means any **Claim** for an **Employment Practices Wrongful Act**.

**D.** **Employment Practices Wrongful Act** means any actual or alleged:

**1.** Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;

**2.** Employment related harassment (including but not limited to sexual harassment);

**3.** Employment related discrimination (including but not limited to discrimination based upon age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);

**4.** Employment-related retaliation;

**5.** Employment-related misrepresentation to an **Employee** or applicant for employment with the **Insured Organization**;

**6.** Employment-related libel, slander, humiliation, defamation and/or invasion of privacy;

**7.** Wrongful failure to employ or promote;

**8.** Wrongful deprivation of career opportunity, wrongful demotion or negligent **Employee** evaluation, including the giving of defamatory statements in connection with an **Employee** reference;

**9.** Employment related wrongful discipline;

**10.** Failure to grant tenure or practice privileges;

**11.** Failure to provide or enforce adequate or consistent organization policies or procedures relating to employment performance;

**12.** Violations of the following federal laws (as amended) including all regulations promulgated thereunder:

    **a.** Family and Medical Leave Act of 1993;

    **b.** Americans with Disabilities Act of 1992 (ADA);

    **c.** Civil Rights Act of 1991;

    **d.** Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or

    **e.** Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;

**13.** Violation of an **Insured Person's** civil rights relating to any of the above; or

**14.** Negligent hiring, retention, training or supervision, infliction of emotional distress, or violation of an individual's civil rights, when alleged in conjunction with any of the foregoing items 1. through 13.,

whether such **Employment Practices Wrongful Act** as described in 1-14 above is committed directly, indirectly, intentionally or unintentionally, but only if the **Employment Practices Wrongful Act** actually or allegedly pertains to acts committed by an **Insured** and are alleged against an **Insured** by an **Insured Person** or applicant for employment with the **Insured Organization**.

**E.** **Insured** means any **Insured Organization** and/or any **Insured Person**.

**F.** **Insured Person** means:

**1.** Any past, present or future director, officer, or **Employee**, management committee members or members of the Board of Managers of the **Insured Organization**; or

**2.** In the event the **Insured Organization** or a **Subsidiary** thereof operates outside the United States, then the term **Insured Person** also means those titles, positions or capacities for such foreign **Insured Organization** or **Subsidiary** that are equivalent to the positions of directors or officers in the United States.

**G. Loss** means damages (including back pay and front pay), settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

2. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

3. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

4. The cost of creating or reinstating employment;

5. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

6. Civil or criminal fines or penalties;

7. Taxes, whether owed to or by any **Insured**;

8. Amounts, including **Defense Expenses**, arising out of, based upon or attributable to actual or alleged liability or costs incurred by any **Insured** to modify any building or property in order to make such building or property more accessible or accommodating to any disabled person, or any actual or alleged liability or costs incurred in connection with any educational, sensitivity or other corporate program, policy or seminar relating to an **Employment Practices Claim**;

9. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**H. Premises** means the buildings, facilities or properties occupied by the **Insured Organization** in conducting its business.

**I. Third Party** means any person(s) with whom an **Insured** interacts.

**J. Third Party Discrimination** means any discrimination by an **Insured** in his or her capacity as such against a **Third Party** based on such **Third Party's** race, color, creed, religion, age, gender, national origin, sexual orientation or preference, disability, pregnancy or other protected status that is protected pursuant to any applicable federal, state or local statute or ordinance.

**K. Third Party Harassment** means any type of sexual or gender harassment as well as racial, religious, sexual orientation, pregnancy, disability, age, or national origin-based harassment that is by an **Insured** to a **Third Party**.

**L. Workplace Violence** means any intentional and unlawful act:

1. of deadly force involving the use of lethal weapon; or

2. the threat of deadly force involving the display of a lethal weapon,

which occurs on or in the **Premises** and which did or could result in bodily injury or death to an **Insured Person**.

**M. Workplace Violence Expense** means the reasonable fees and expenses, or cost of:

1. an independent security consultant for ninety (90) days following the date **Workplace Violence** occurs;

2. an independent public relations consultant for ninety (90) days following the date **Workplace Violence** occurs;

3. a counseling seminar for all **Employees** conducted by an independent consultant following **Workplace Violence**;

4. independent security guard services for up to fifteen (15) days; and

5. an independent forensic analyst.

**SECTION IV. - EXCLUSIONS**

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

1. Alleging, arising out of, based upon or attributable to, in whole or in part, any litigation involving any **Insured** that was commenced or initiated prior to, or was pending on or before the date referenced in Item 4. of the Employment Practices Liability Declarations Page, or arising out of or based upon, in whole or in part, any facts or circumstances underlying or alleged in any such prior or pending litigation;

2. For actual or alleged bodily injury, sickness, disease or death of any person, mental anguish or emotional distress; damage to or destruction of any tangible property, including loss of use thereof, whether or not such property is physically damaged; provided, this EXCLUSION shall not apply to allegations of mental anguish or emotional distress made solely in connection with an **Employment Practices Claim**;

   The **Insurer** shall not be liable to make any payment, and shall have no duty to defend or pay **Loss** of any sort, in connection with any **Workplace Violence**:

   **a.** which occurs at any location other than the **Insured Organization's Premises**;

   **b.** arising from declared or undeclared war, civil war, insurrection, riot, civil commotion, rebellion or revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization;

   **c.** that reflects legal costs, judgments and settlements incurred as the result of any **Claim**, suit or judicial action brought against an **Insured Organization** in connection with **Workplace Violence**; or

   **d.** resulting from the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property.

3. For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

   Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

4. For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the Employee Retirement Income Security Act of 1974; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

5. Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement; provided this EXCLUSION shall not apply to **Defense Expenses** in connection with an **Employment Practices Claim**;

6. Alleging, arising out of, based upon or attributable to any workers' compensation, disability benefits, unemployment compensation, unemployment insurance, retirement benefits, social security benefits or similar law; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

7. Alleging, arising out of, based upon, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such Insured committed such criminal or fraudulent act.

The **Wrongful Act** of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the EXCLUSIONS set forth in SECTION IV.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary

President

# FIDUCIARY LIABILITY COVERAGE SECTION (PRIVATE)
# PLEASE READ YOUR POLICY CAREFULLY

Words and phrases that appear in **bold** text have special meaning. Refer to SECTION III. – DEFINITIONS in this Coverage Section or the Common Policy Terms and Conditions.

If purchased, as indicated in Item 3. of the Common Policy Declarations Page and in consideration of the payment of premium and in reliance upon all statements made to the **Insurer** in the **Application**, and subject to the terms, conditions, definitions, exclusions and limitations provided hereinafter or in the Common Policy Terms and Conditions, the **Insurer** agrees:

## SECTION I. - INSURING AGREEMENTS

### Fiduciary Liability

The **Insurer** shall pay **Loss** up to the Limit of Liability applicable to this **Coverage Section** on behalf of the **Insured** in connection with any **Fiduciary Claim** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy.

Notwithstanding anything contained in this policy to the contrary, the coverage provided under this Coverage Section shall be non-rescindable by the **Insurer**.

## SECTION II. – ADDITIONAL COVERAGES

The **Insurer** shall pay **Loss** arising from **Additional Claims** first made against any **Insured** during the **Policy Period** and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim or Circumstance in the Common Policy Terms and Conditions of this policy which result in **Loss** as described in the Additional Coverages as shown below.

Any Sublimits and Retentions set forth in the Fiduciary Liability Declarations Page for the Additional Coverage(s) shall apply separately and specifically to any **Loss** arising from the specified Additional Coverage(s). Such Retentions shall be borne by the **Insured Organization**, and the **Insurer** shall only be liable for the amount of **Loss** arising from the specified Additional Coverage(s) that is in excess of the specifically stated Retention amount applicable to such Additional Coverage, and subject to the applicable Sublimit.

### A. HIPAA Violations

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act ("HIPAA").

### B. Voluntary Compliance Fees/Sanctions

The definition of **Loss** is amended to include:

**1.** Any sanctions imposed upon an **Insured** as a fiduciary; or

**2.** Any compliance fees incurred by an **Insured**, under the Employee Plans Compliance Resolution System described in any applicable Internal Revenue Service Revenue Procedure ("EPCRS Sanctions/Fees").

### C. PPACA Civil Money Penalties

**Loss** is amended to include any civil money penalties imposed upon an **Insured** for inadvertent violation of the Patient Protection and Affordable Care Act, as amended ("PPACA"), and any rules or regulations promulgated thereunder.

### D. Plan Value Fiduciary Liability

**Loss** is amended to include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits".

### E. Settlor Breaches of Duty

**Loss** is amended to include amounts incurred arising from Settlor Breaches of Duty meaning any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA**, COBRA, or HIPAA, in the discharge of any **Insured's** duties in a settlor capacity with respect to **Employee Benefits**.

**F. Other Penalties**

**Loss** is amended to include **Defense Expenses** resulting from any **Claim** arising out of:

1. the civil penalties under Section 502(c) of **ERISA**;

2. the civil penalties under the Pension Protection Act of 2006; and

3. the 15% or less tax penalty imposed upon an Insured under Section 4975 of the Internal Revenue Code of 1986, with respect to covered judgments.

**SECTION III. – DEFINITIONS**

**A. Additional Claims** means written demands or written allegations demanding relief as described in Section II., Additional Coverages, of this **Coverage Section**.

**B. Administration** means:

1. handling records in connection with **Employee Benefits**;

2. effecting enrollment, termination or cancellation of **Employees** under an **Employee Benefits** program;

3. giving counsel to **Employees** with respect to **Employee Benefits**; or

4. interpreting **Employee Benefits**.

**C. Claim** means a **Fiduciary Claim**.

**D. Employee** means any natural persons whose labor or service is engaged by and directed by the **Insured Organization**, including part-time, seasonal, leased and temporary employees.  **Employee** shall not include any independent contractor.

**E. Employee Benefits** means any **Plan** or **Healthcare Exchange**, and any workers' compensation insurance, unemployment insurance, Social Security or disability benefits for **Employees** of the **Insured Organization**.

**F. ERISA** means:

1. the Employee Retirement Income Security Act of 1974, as amended and any rules or regulations promulgated thereunder (including, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, and the Heath Insurance Portability and Accountability Act of 1996 ("HIPAA"));

2. the English Pension Scheme Act of 1993, and the English Pensions Act of 1995, as such Acts are amended and any rules or regulations promulgated under such Acts, and

any similar statutory or common law anywhere in the world, and any rules or regulations promulgated thereunder, and

3. the privacy provisions under HIPAA.

**G. Fiduciary Claim** means a:

1. written demand for money or other civil relief commenced by the receipt of such demand;

2. civil proceeding, including any arbitration or other alternative dispute resolution proceeding commenced by the service of a complaint, filing of a demand for arbitration, or similar pleading;

3. criminal proceeding commenced by the return of an indictment;

4. written notice of the commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation; or

5. formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar documents;

against an **Insured** for a **Fiduciary Wrongful Act**.

**H. Fiduciary Wrongful Act** means any actual or alleged:

1. breach of the duties, responsibilities or obligations imposed upon fiduciaries of any **Plan** by **ERISA** or the common law or statutory law of any jurisdiction governing such **Plan**; or

2. any negligent act, error or omission by an **Insured** in the **Administration** of **Employee Benefits** or any other matter claimed against an **Insured** solely by reason of their service as a fiduciary of any **Plan**.

3. Violation of any of the responsibilities, obligations or duties imposed upon fiduciaries of any **Plan** by the Health Insurance Portability and Accountability Act of 1996 and any rules or regulations promulgated thereunder ("HIPAA"); or

4. Other violation of HIPAA claimed against an **Insured** due solely to such **Insured's** service as a fiduciary of any **Plan**; or

5. Negligent violation of HIPAA by an **Insured** in the **Administration** of any **Plan**.

**I.** **Healthcare Exchange** shall be any facility or vehicle set up to facilitate the purchase of health insurance in each state in accordance with the Patient Protection and Affordable Care Act.

**J.** **Insured** means the **Insured Persons**, the **Plan** and the **Sponsor Organization**.

**K.** **Insured Person** means any director, officer, trustee, partner or **Employee** of the **Plan** or of the **Sponsor Organization** while acting in his or her capacity as a fiduciary or settlor of the **Plan**.

**L.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:

1. Fines, penalties or taxes imposed by law, except that **Loss** may include claimant's attorney's fees awarded by a court pursuant to Section 502(g) of the Employee Retirement Income Security Act of 1974, as amended, against an Insured; civil penalties of up to five percent (5%) imposed pursuant to Section 502(i) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") for inadvertent violation of Section 406 of **ERISA**, and civil penalties of up to twenty percent (20%) of any settlement or judgment imposed pursuant to Section 502(l) of **ERISA** for breach of fiduciary duty;

2. Benefits due or to become due under the terms of any **Plan**, unless and then only to the extent that recovery for such benefits is based on a **Fiduciary Wrongful Act** and is payable as the personal obligation of an **Insured** who is a natural person; provided that **Loss** shall include **Defense Expenses** with respect to any **Claim** seeking benefits due or to become due under the terms of any **Plan**; and **Loss** shall include a monetary award in, or fund for settling, a **Claim** against any **Insured** to the extent it alleges a loss to a **Plan** and/or loss in the actual account of participants in a **Plan** by reason of a change in the value of investments held by that **Plan**, regardless of whether the amounts sought in such **Claim** have been characterized by plaintiffs as "benefits" or held by a court to be "benefits";

3. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

4. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

6. The cost of creating or reinstating employment;

7. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

8. Civil or criminal fines or penalties not expressly provided for in this **Coverage Section**;

9. Taxes, whether owed to or by any **Insured**;

10. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include punitive or exemplary damages and the multiplied portion of any multiplied damage award, if and where insurable. For purposes of determining whether punitive or exemplary damages, or the multiplied portion of any multiplied damage award arising from any **Claim** shall be insurable by law, the **Insurer** agrees to abide by the law of whichever jurisdiction is applicable to such **Claim** and is most favorable to the **Insured** in that regard.

**M.** **Pension Benefit Plan** means any employee pension benefit plan, as such term is defined in **ERISA**, which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

**N.** **Plan** means any:

1. **Pension Benefit Plan** and any trust established to hold the assets of any such **Pension Benefit Plan**;

2. **Welfare Benefit Plan** which was, is now, or becomes sponsored solely by any **Sponsor Organization**;

**3. Pension Benefit Plan**, or any trust established to hold the assets of any such **Pension Benefit Plan**, created during the **Policy Period** by any **Sponsor Organization** or by any interest owned or controlled by such **Sponsor Organization** for the **Employees** thereof, but only if the Insured provides the Insurer with written notice of the creation of such **Pension Benefit Plan** within ninety (90) days of the effective date of such **Pension Benefit Plan**; and

**4.** otherwise covered **Plan** of any **Subsidiary** as that term is defined in the Common Policy Terms and Conditions SECTION III. - DEFINITIONS, M., or as allowed in the Common Policy Terms and Conditions SECTION V. – CONDITIONS, G., but only if:

    **(a) Insured** provides the **Insurer** such additional information with respect thereto as the **Insurer** may reasonably require;

    **(b) Insured** provides the **Insurer** written notice of such acquisition as soon as practicable after the effective date thereof; and

    **(c) Insurer** specifically agrees by written endorsement to provide coverage with respect to such **Plan** and the **Insured** has accepted any additional terms, conditions and limitations of coverage, and agrees to pay any additional premium that the **Insurer** in its sole discretion, shall deem appropriate.

**Plan** shall not include any multiemployer plan.

**O. Sponsor Organization** means the **Insured Organization** while acting in its capacity as a sponsor of a **Plan** solely for the benefit of its **Employees**.

**P. Welfare Benefit Plan** means any employee welfare benefit plan, as such term is defined in **ERISA** which is operated solely by the **Insured** or jointly by the **Insured** and a labor organization solely for the benefit of the **Employees**.

## SECTION IV. - EXCLUSIONS

Specifically with respect to **Fiduciary Claims** or **Additional Claims**, exclusions in this endorsement shall govern in the event of any specific conflict between them and other exclusions in the policy.

The **Insurer** shall not be liable to make any payment for **Loss**, and shall have no duty to defend or pay **Defense Expenses**, in connection with any **Fiduciary Claim** made against any **Insured**:

**1.** Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Fiduciary Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which was brought on or before the date referenced in Item 4. of the Fiduciary Liability Declarations Page;

**2.** Based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged failure by any **Insured** to comply with any law, rule or regulation concerning workers' compensation insurance, unemployment insurance, Social Security or disability benefits, whether or not such failure to comply is willful;

**3.** For the failure to collect contributions owed to any **Plan** from any employer unless such failure is due to the negligence of an **Insured,** or for the return to any employer of any contributions if such amounts are or could be chargeable to a **Plan**; provided, this EXCLUSION 3. shall not apply to the **Insurer's** obligations, subject to the applicable Limit of Liability, to defend such **Fiduciary Claim** and to pay **Defense Expenses** resulting therefrom;

**4.** For violation of any of the responsibilities, obligations or duties imposed by: The Fair Labor Standards Act (except the Equal Pay Act) or any state or local statutory or common law, regulation or ordinance that governs payment or administration of wages, hours worked, or employee entitlements; the National Labor Relations Act; the Worker Adjustment and Retraining Notification Act; the Consolidated Omnibus Budget Reconciliation Act; the Occupational Safety and Health Act; any rules or regulations of any of the foregoing promulgated thereunder and amendments thereto; or any similar provisions of any federal, state or local statutory or common law that govern the same subject matter governed by the laws referenced in this section even if particular laws have some additional or different provisions; provided, this EXCLUSION shall not apply to **Loss** arising from a **Claim** for employment related retaliation;

**5.** For the actual, alleged or threatened discharge, dispersal, release or escape of pollutants or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, including but not limited to **Claims** alleging damage to the **Insured Organization**;

Pollutant includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, whether live or inanimate, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes (but is not limited to) materials to be recycled, reconditioned or reclaimed;

**6.** Alleging, arising out of, based upon or attributable to, in whole or in part, any liability under or pursuant to any contract or agreement, whether oral, written, express or implied, including the liability of others assumed by an **Insured**, unless such **Insured** would have been liable in the absence of such contract or agreement;

**7.** Made by or on behalf of a fidelity insurer against a natural person whose conduct has resulted in a **Loss** which has been paid under a fidelity bond; or

**8.** Based upon, arising out of, directly or indirectly resulting from any discrimination, retaliation or wrongful termination of employment; provided, this EXCLUSION 8. will not apply to **Fiduciary Claims** asserted under Section 510 of **ERISA**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## SECTION V. - CONDITIONS

### A. Coverage for New Plans

If during the **Policy Period** the **Insured**:

**1.** forms or acquires an employee welfare benefit plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured**; this **Coverage Section** shall automatically apply; or

**2.** forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured**, or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are less than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date; this **Coverage Section** shall automatically apply; or

**3.** forms or acquires an employee pension benefit plan or pension plan, as defined by **ERISA**, which is sponsored solely by the **Insured** or jointly by the **Insured** and a labor organization exclusively for the benefit of **Employees** of the **Insured** and whose assets are equal to or greater than ten percent (10%) of the total consolidated assets of the **Insured** as of the Policy inception date, then coverage is provided under this **Coverage Section**, but only upon the condition that within ninety (90) days of it becoming an **Employee Benefits** plan, the **Insured** provides the **Insurer** with full particulars of the new **Employee Benefits** plan and agrees to any additional premium and/or amendment of the provisions of this **Coverage Section** required by the **Insurer** related to such new **Employee Benefits** plan. Further, coverage as shall be afforded to the new **Employee Benefits** plan is conditioned upon the **Insured** paying when due any additional premium required by the **Insurer** relating to such new **Employee Benefits** plan.

In all events, coverage as afforded with respect to this Section V.A. shall not apply to an Employee Stock Ownership Plan, a Multi Employer Plan, a Multiple Employer Plan, or a Defined Benefit Plan.

### B. Creation or Acquisition of an ESOP

Notwithstanding anything in this **Coverage Section** to the contrary, if during the **Policy Period** any **Sponsor Organization** creates or directly or indirectly acquires an employee stock ownership plan ("ESOP"), the **Sponsor Organization** shall promptly give to the **Insurer** written notice thereof together with such other information requested by the **Insurer**. The **Insurer** shall, at the request of the **Sponsor Organization**, provide to the **Sponsor Organization** a quotation for coverage for **Claims** based upon, arising from or in consequence of such ESOP, subject to such terms, conditions, limitations of coverage and such additional premium as the **Insurer**, in its sole discretion, may require.

### C. Recourse

It is agreed that, in the event an **Insured** breaches a fiduciary obligation under **ERISA**, the **Insurer** has the right of recourse against any such **Insured** for any amount paid by the **Insurer** as a result of such breach of fiduciary duty, but the **Insurer** shall have no such right of recourse if the policy has been purchased by the fiduciary or by an employer or an employee organization.

**D. Termination of Plan**

If the **Sponsor Organization** terminates a **Plan**, coverage shall be afforded under this coverage extension with respect to such terminated **Plan** and its **Insureds**. Such continuation of coverage shall apply with respect to **Fiduciary Claims** for **Fiduciary Wrongful Acts** committed, attempted, or allegedly committed or attempted prior to or after the date the **Plan** was terminated.

**In Witness Whereof**, the **Insurer** has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations Page by a duly authorized agent of the **Insurer**.

Secretary                                                                                         President

*This Endorsement Changes The Policy. Please Read It Carefully.*

# FLORIDA – FIDUCIARY LIABILITY CHANGES

This endorsement modifies insurance provided under the following:

**NON-PROFIT ORGANIZATION MANAGEMENT LIABILITY POLICY**
**PRIVATE COMPANY MANAGEMENT LIABILITY POLICY**

SECTION III – DEFINITIONS, L. Loss of the Fiduciary Liability Coverage Section is deleted and replaced with the following:

**L.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses)** shall not include:

1. Fines, penalties or taxes imposed by law;

2. Benefits due or to become due under the terms of any **Plan**, unless and then only to the extent that recovery for such benefits is based on a **Fiduciary Wrongful Act** and is payable as the personal obligation of an **Insured** who is a natural person; provided that **Loss** shall include **Defense Expenses** with respect to any **Claim** seeking benefits due or to become due under the terms of any **Plan**;

3. Any amount for which the **Insureds** are not financially liable or for which there is not legal recourse to the **Insureds**;

4. Amounts owed under any employment contract, partnership, stock or other ownership agreement, or any other type of contract;

5. Disability, social security, workers compensation, medical insurance, retirement or pension benefit payments, or settlement amounts representing employment related benefit payments;

6. The cost of creating or reinstating employment;

7. Any amounts owed to any **Employee** as wages or compensation previously incurred or vested without regard to any **Claim**;

8. Civil or criminal fines or penalties not expressly provided for in this **Coverage Section**;

9. Taxes, whether owed to or by any **Insured**;

10. Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The DEFINITION of **Loss** shall include:

1) vicarious liability for punitive or exemplary damages incurred by the Insured, but only to the extent that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to Florida law, and the multiplied portion of any multiplied damage award, if and where insurable; or

2) punitive or exemplary damages, but only to the extent:

   a. such damages are insurable under the law of any jurisdiction other than Florida that has a substantial relationship to the **Insured**, the **Claim**, the **Insurer**, or this policy and is most favorable to the insurability of such damages; and

   b. that this policy is construed by a court of competent jurisdiction, or an arbitration panel, pursuant to the laws of any jurisdiction other than Florida.

**Policy No.:** LPP699354    **Effective:** 4/25/2022

**CHUBB**

*The ForeFront Portfolio℠*
*for Private Companies*
*New Business Application*

BY COMPLETING THIS **NEW BUSINESS** APPLICATION **("APPLICATION")** THE APPLICANT IS APPLYING FOR COVERAGE WITH **FEDERAL INSURANCE COMPANY (THE "COMPANY")**

NOTICE: THE LIABILITY COVERAGE PARTS PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "MATTERS" FIRST MADE DURING THE "POLICY PERIOD", OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS", AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE RETENTION. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE APPLICATION CAREFULLY BEFORE SIGNING.

## RENEWAL APPLICATION INSTRUCTIONS

1. Whenever used in this Application, the term "Applicant" shall mean the Parent Organization and all Subsidiaries, as defined by the Policy unless otherwise stated.

2. All Applicants must complete this Application in accordance with the specific coverages being renewed. Attach additional pages if necessary.

## I. NAME, ADDRESS AND CONTACT INFORMATION

1. Name of Applicant: _____

2. Address of Applicant*: _____

   City: _____ State: _____ Zip Code: _____-_____

   EIN: _____

3. **Applicant's** Web Site: _____

4. State of Incorporation: _____

5. Years of Operation: _____

6. Description of the **Applicant's** business: _____

7. Primary SIC Code: _____

8. Name and email address of Primary Contact (Executive Officer authorized to receive notices and information regarding the proposed policy):

   Name: _____ E-Mail: _____

   *If documents related to the Policy should be sent to a mailing address different than noted in 2. above, please indicate as such in the designated area at the end of this Application.*

## II. INSURANCE INFORMATION

**Please indicate below, by placing an "X" in the box, which coverages are being requested.**

| Coverage Requested | Current Insurer (or N/A) | Current (or Requested) Limit | Current (or requested) Retention | Current Pending or Prior Proceedings Date (or N/A) |
|---|---|---|---|---|
| ☐ Directors & Officers and Entity Liability | | | | |

**CHUBB**

*The ForeFront Portfolio*[SM]
*for Private Companies*

| Coverage Requested | Current Insurer (or N/A) | Current (or Requested) Limit | Current (or requested) Retention | Current Pending or Prior Proceedings Date (or N/A) |
|---|---|---|---|---|
| ☐ Employment Practices Liability | | | | |
| ☐ Fiduciary Liability | | | | |
| ☐ Employed Lawyers Liability | | | | |
| ☐ Crime | | | | |
| ☐ Kidnap Ransom & Extortion | | | | |
| ☐ Workplace Violence Expense | | | | |

## III.   GENERAL RISK INFORMATION

1.   Please complete the following employee and location information:

| | Full Time Employees | Part Time Employees (including Seasonal & Temporary) | Contractors (Independent or Leased) |
|---|---|---|---|
| U.S. Employees | | | |
| *AK, AZ, CA, CT, DC, KY, MS, NJ, NM, NV, WA, WV* | | | |
| *AL, CO, DE, FL, GA, IL, KS, LA, ME, MO, MT, SC, TN, UT, WY* | | | |
| *All Other States* | | | |
| Employees Outside the U.S.* | | | |
| *Country 1:* | | | |
| *Country 2:* | | | |
| Total Worldwide Employees | | | |

*\* If the number of foreign locations exceeds space in the table above, please attach such information as an addendum to this Application or provide details in the designated area at the end of this Application.*

2.   Please provide the **Applicant's** most recent annual financial statements as an attachment to this Application. If financial statements are not available or do not contain any of the information requested below, please provide the following financial information:

| | Most Recent Fiscal Year End | Prior Fiscal Year End (Optional) |
|---|---|---|
| | Month/Year _____ | Month/Year _____ |
| Cash & Cash Equivalents | | |
| Current Assets | | |
| Total Assets | | |
| Current Liabilities | | |
| Long Term Debt | | |

**CHUBB**

*The ForeFront Portfolio<sup>SM</sup>*
*for Private Companies*

| Total Liabilities | | |
|---|---|---|
| Revenue | | |
| Operating Income | | |
| Interest Expense | | |
| Net Income | | |
| Cash Flows From Operating Activities | | |

3.  Has the Applicant in the last 12 months completed or is the Applicant anticipating in the next 12 months any:

    (i)     Reorganization or arrangement with creditors under federal or state law?     ☐ Yes ☐ No

    (ii)    Closings, consolidations, or divestments of any branch, location, office, or subsidiary?     ☐ Yes ☐ No

    (iii)   Proposed, actual, or attempted merger or acquisition?     ☐ Yes ☐ No

    (iv)   Layoffs or reductions in workforce?     ☐ Yes ☐ No

    (v)    Breach or violation of any debt covenant?     ☐ Yes ☐ No

    (vi)   Public or private offering of securities or debt?     ☐ Yes ☐ No

    (vii)   Change in senior executive officers other than due to illness?     ☐ Yes ☐ No

    If "Yes" to any question in 4(i) – 4(vii) above, please provide details in the designated area at the end of this Application.

4.  Is this organization formed as a partnership?     ☐ Yes ☐ No

    If "Yes", please attach a copy of the most recent partnership agreement or organizational chart.

5.  Does the Applicant conduct any professional ethics, peer review, accrediting, standard setting, credentialing, or licensing activity for third parties?     ☐ Yes ☐ No

    If "Yes", please provide details in the designated area at the end of this Application.

6.  Is the Applicant seeking coverage for entities that are <u>not</u> direct or indirect Subsidiaries of the Parent Organization (i.e. commonly owned entities, affiliates, entities without controlling interest but managed by the Applicant via contract or agreement)?     ☐ Yes ☐ No

    If "Yes", please complete the Additional Named Insured Supplemental Application

| IV. | COVERAGE SPECIFIC RISK INFORMATION |
|---|---|

A.     DIRECTORS & OFFICERS AND ENTITY LIABILITY COVERAGE INFORMATION

1.     Recent or Pending Matters

   (a)     Has the **Applicant** in the past 3 years experienced any of the following:

| | | |
|---|---|---|
| (i) | Antitrust, copyright or patent litigation; | ☐ Yes ☐ No |
| (ii) | Accusations or investigations for deceptive trade practices or consumer fraud; | ☐ Yes ☐ No |
| (iii) | Any civil, criminal or administrative proceeding alleging a violation of any federal or state securities laws; | ☐ Yes ☐ No |
| (iv) | Any other criminal actions other than those listed above? | ☐ Yes ☐ No |

   (b)     Other than those identified in your response to question 1(a), has any claim or other matter been made at any time during the last 3 years against:

| | | |
|---|---|---|
| (i) | Any **Applicant**; or | ☐ Yes ☐ No |
| (ii) | Any proposed insured individual in his or her capacity as a director, officer, or employee of any entity? | ☐ Yes ☐ No |

   **If "Yes" to any question in this Section A, please provide details** in the designated area at the end of this Application.

2.     Please complete the table below for all shareholders who own ten percent (10%) or more of the outstanding securities of the **Applicant**. If the number of shareholders exceeds space in the table below, please attach complete ownership information as an addendum to this Application.

| Shareholder Name | Ownership | Is shareholder a Director or Officer or represented by a designated Director on the Board? | |
|---|---|---|---|
| | % | ☐ Yes | ☐ No |
| | % | ☐ Yes | ☐ No |
| | % | ☐ Yes | ☐ No |
| | % | ☐ Yes | ☐ No |
| | % | ☐ Yes | ☐ No |

8.     Approximately what percentage of the **Applicants** revenues are derived from government sources? _____%

B.     EMPLOYMENT PRACTICES LIABILITY COVERAGE INFORMATION

1.     Recent or Pending Matters

   During the past 3 years has any **Applicant**, in any capacity, been involved in any of the following:

| | | |
|---|---|---|
| (i) | EEOC or other similar administrative proceedings; or | ☐ Yes ☐ No |
| (ii) | Any employment-related civil suit, claim, or other matter? | ☐ Yes ☐ No |

   **If "Yes" to 1(i) or 1(ii) above, please provide details includ**ing date, type of suit, claim, or other matter, allegations, current status, defense costs incurred and any applicable judgment or settlement amounts in the designated area at the end of this Application or by attachment to this Application.

2.  U.S. Employee Salary Ranges

| Annual Employee Compensation Ranges (including bonuses) | Approximate % in Range Current Year |
|---|---|
| Up to $50,000 | % |
| $50,001 to $150,000 | % |
| Greater than $150,000 | % |

3.  What was the annual employee turnover rate for the last 3 years?
    Past year_____% 1 year previous _____% 2 years previous _____%

4.  Does the Applicant have written policies regarding:

    (i)     Equal Opportunity Employment?                                      ☐ Yes ☐ No

    (ii)    Anti-discrimination?                                               ☐ Yes ☐ No

    (iii)   Anti-harassment, including sexual harassment?                      ☐ Yes ☐ No

*For Applicants with <u>more than 500 Employees</u>, please also answer questions 5-7 below:*

5.  Do you, or others on your behalf or at your direction, collect, store, use or transmit biometric information or biometric identifiers, including but not limited to fingerprints, retina or iris scans, or scans of hand or face geometry?    ☐ Yes ☐ No

    If "Yes", do you receive written consent and a release from each individual?    ☐ Yes ☐ No

6.  Please provide the **Applicant's** current employee handbook, or equivalent, as an attachment to this Application. If none exist or is not available, please confirm whether written procedures are in place regarding:

    (i)     Progressive Discipline                                             ☐ Yes ☐ No

    (ii)    Terminations                                                       ☐ Yes ☐ No

    (iii)   Handling complaints of harassment and discrimination              ☐ Yes ☐ No

    (iv)    Leave of Absence including FMLA                                   ☐ Yes ☐ No

7.  Does the Applicant:

    (i)     Utilize outside counsel to review written policies and procedures?    ☐ Yes ☐ No

    (ii)    Review terminations with outside counsel?                         ☐ Yes ☐ No

    (iii)   Conduct training regarding anti-discrimination and anti-harassment?    ☐ Yes ☐ No

    (iv)    Review pay practices for inequities among protected class employees?    ☐ Yes ☐ No

    (v)     Require employees to attend diversity training?                   ☐ Yes ☐ No

C.    FIDUCIARY LIABILITY COVERAGE INFORMATION

1.    Recent or Pending Matters

During the past 3 years, has:

(i)    any fiduciary been accused, found guilty or held liable for a breach of trust or convicted of criminal conduct?     ☐ Yes ☐ No

(ii)    there been any assessment of fees, fines or penalties under any voluntary compliance resolution program or similar voluntary settlement program administered by the IRS, DOL or other government authority against any plan?     ☐ Yes ☐ No

(iii)    any Applicant, benefit program, or any past or present individual in his or her capacity as a fiduciary of any employee benefit plan experienced any claims or other matters (other than for benefits under 29 C.F.R. § 2560.503-1(h) or similar procedures pursuant to applicable law)?     ☐ Yes ☐ No

**If "Yes" to any question in 1(i)** - 1(iii) above, please provide details in the designated area at the end of this Application.

2.    Plan Information

Please list the names and types of **Applicant's** employee benefits plans. Attach additional pages if needed. If the Applicant has an ESOP, please complete the Supplemental ESOP Application.

| Plan Names (Do not include Health & Welfare Plans) | Type of Plan* | Plan Assets (current year) | Total Plan Participants | If a DB plan, current funded percentage? |
|---|---|---|---|---|
|  |  |  |  | % |
|  |  |  |  | % |
|  |  |  |  | % |

*Defined Contribution (DC), Defined Benefit (DB), Employee Stock Ownership Plan (ESOP), Excess Benefit or Top Hat (EBP)*

3.    Has there been any merger, termination, or freezing of any plan in the past 3 years?     ☐ Yes ☐ No

**If "Yes", please provide** details in the designated area at the end of this Application.

4.    Are any plans NOT in compliance with plan agreements or ERISA?     ☐ Yes ☐ No

**If "Yes", please provide** details in the designated area at the end of this Application.

*For all Defined Contribution retirement plans proposed for coverage <u>with combined plan assets greater than $100,000,000</u>, please also answer questions 5-6 below:*

5.    Plan Administration

| Name of DC Plan | Name of Recordkeeper | Recordkeeping Fees (Per Capita) | Name of Investment Consultant/ Manager |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

6.    In the past 18 months, has the Applicant reviewed all plan operation, administration and investment related fees and expenses for reasonableness?     ☐ Yes ☐ No

**CHUBB**

*The ForeFront Portfolio*[SM]
*for Private Companies*

D.    CRIME COVERAGE INFORMATION

1.    Past Activities

During the past 3 years, has the Applicant discovered any employee theft, forgery, computer fraud, social engineering fraud, or other crime losses?          ☐ Yes ☐ No

**If "Yes", please attach details itemizing each loss separately and provide the** date, description, and total amount of such loss.

2.    Does the Applicant:

(i)    Completely segregate all accounting duties such that no one person can complete a financial transaction (such check payments, wire and electronic transfers) from beginning to end by themselves without the involvement of another person?          ☐ Yes ☐ No

(ii)    Perform a monthly reconciliation of all bank accounts by someone who does not handle deposits, sign checks or have access to electronic or mechanical signatures?          ☐ Yes ☐ No

(iii)    Allow employees to make changes to vendor or supplier details (including routing numbers, account numbers, telephone numbers, and contact information) <u>without</u> confirming those changes with a direct call using only the contact number previously provided by the vendor or supplier before the request was received?          ☐ Yes ☐ No

(iv)    Require that all outgoing payments or funds transfers be subject to dual authorization by at least one executive after being initiated by a third employee?          ☐ Yes ☐ No

(v)    Employ Multifactor Authentication (MFA) on all external access to the **Applicant's** computer systems, including Office 365 and other cloud-based email?          ☐ Yes ☐ No

*For Applicants with <u>over 500 employees</u>, please also answer questions 3-4 in their entirety below:*

3.    Does the Applicant:

(i)    Maintain an internal audit department?          ☐ Yes ☐ No

(ii)    Use a competitive bidding process for high value supplies and services, including IT, legal, and professional services?          ☐ Yes ☐ No

(iv)    Conduct physical inventory counts at least annually and reconcile the results with a perpetual inventory system by someone <u>not associated</u> with the control of inventory?          ☐ Yes ☐ No

(iv)    **Have custody, access to or control of any clients' funds, accounts,** computer systems, or tangible goods?          ☐ Yes ☐ No

4.    Does the Applicant:

(i)    Have procedures in place to verify the existence and ownership of all vendors prior to doing business with them?          ☐ Yes ☐ No

(ii)    Maintain a master vendor list?          ☐ Yes ☐ No

(iii)    Require all additions, removals and changes to the master vendor list or accounts payable system be performed by a person that is <u>not authorized</u> to make or process payments?          ☐ Yes ☐ No

CHUBB

*The ForeFront Portfolio* [SM]
*for Private Companies*

E. **KIDNAP RANSOM & EXTORTION COVERAGE INFORMATION**

1. **Past Activities**

   In the past 3 years, has any Applicant discovered an occurrence of any of the following prior events: extortion threats, cyber extortion, hijacking, wrongful detention, or political threats? ☐ Yes ☐ No

   **If "Yes", please attach full details of any occurrence in the designated area** at the end of this Application.

2. Please complete the following table regarding the **Applicant's** foreign travel plans for the next 12 months *:

   | Destination City or Region & Country | Purpose of Travel | Number of Employees Traveling | Number of Trips Per Year |
   |---|---|---|---|
   |  |  |  |  |
   |  |  |  |  |

   *please attach a separate schedule of locations if additional travel information applies.*

3. Describe the **Applicant's** security precautions at overseas locations and during outside U.S. travel, including use of security consultants:

F. **EMPLOYED LAWYERS LIABILITY COVERAGE INFORMATION**

1. **Recent or Pending Matters**

   In the past 3 years, has any person proposed for this coverage been the subject of, or been involved in, any of the following arising out of his or her provision of legal services, irrespective of whether such activity arose out of work performed for the Applicant:

   (i)   any reprimand, sanction, fine or discipline by, or refused admission to, a bar association, court, administrative or regulatory agency: or ☐ Yes ☐ No

   (ii)  Any civil or criminal litigation, arbitration, claim, or administrative or regulatory proceeding? ☐ Yes ☐ No

   **If "Yes" to question 1(i) or 1(ii) above, please provide details in the designated** area at the end of this Application.

2. Provide the total number of Employed Lawyers, Temporary and Contact Attorneys: _____

3. Do any Employed Lawyers, Temporary Attorneys or Contract Attorneys provide legal services in any of the following: Environmental Law & Compliance, Copyright, Patent, Trademark and Other Intellectual Property Law, Litigation, or Securities Law? ☐ Yes ☐ No

4. Do any Employed Lawyers provide Moonlighting Legal Services or legal services for others? ☐ Yes ☐ No

   **If "Yes" to question 4 above, describe the scope of services provided and the** total number of hours annually in the designated area at the end of this Application.

G.    WORKPLACE VIOLENCE EXPENSE COVERAGE INFORMATION

    1.    Past Activities

       In the past 3 years, has any Applicant discovered or experienced any
       workplace violence incidents?            ☐ Yes ☐ No

       **If "Yes", please provide details in the designated area at the end of this
       Application.**

    2.    Does the Applicant provide goods or services to general public?   ☐ Yes ☐ No
       **If "Yes", please describe the level of access the general public has to the
       company's Premises in the designated area at the end of this Application.**

  *For Applicants with <u>over 500 employees</u>, please answer Question 3 in
  its entirety below:*

    3.    Does the Applicant have all of the following policies and procedures in effect:

       (i)     An Employee Assistance Program (EAP)      ☐ Yes ☐ No

       (ii)    A progressive discipline policy        ☐ Yes ☐ No

       (iii)   Employee and customer complaint/grievance resolution procedures  ☐ Yes ☐ No

       (iv)   A written policy on workplace violence that is circulated to all employees  ☐ Yes ☐ No

       (v)    Training for supervisory and management employees to recognize,
            report and respond to potentially hostile employees or situations  ☐ Yes ☐ No

       (vi)   A process for performing background checks for potential employees  ☐ Yes ☐ No

       (vii)  Security precautions to limit access to its premises from hostile or
            volatile person                     ☐ Yes ☐ No

| V. | WARRANTY: PRIOR KNOWLEDGE OF FACTS/CIRCUMSTANCES/SITUATIONS |
|---|---|

The Applicant must complete the warranty statement herein for which coverage is requested and is not currently purchased, as indicated in Section II, INSURANCE INFORMATION, of this Application.

For Alaska, Arizona, Delaware, Florida, Georgia, Idaho, Kansas, Kentucky, Maine, Montana, Nebraska, Nevada, New Hampshire, New York, North Carolina, Oklahoma, Oregon, Puerto Rico, South Dakota, Virginia, Washington, **Wyoming and West Virginia Residents ONLY: the title of this section and any other reference to "Warranty" is deleted and replaced with "Applicant Representation".**

No person or entity proposed for coverage is aware of any fact, circumstance, or situation which could reasonably be expected to give rise to any claim, action, inquiry or other matter that would fall within the scope of the proposed Liability Coverage Parts:

NONE ☐ or, except:

Without prejudice to any other rights and remedies of the Company, the Applicant understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed above, any claim, action, inquiry or other matter arising from such fact, circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Company.

| VI. | MATERIAL CHANGE |
|---|---|

*The ForeFront Portfolio*[SM]
*for Private Companies*

If there is any material change in the answers to the questions in this Application before the policy inception date, the **Applicant** must immediately notify the Company in writing, and any outstanding quotation may be modified or withdrawn.

## VII.   DECLARATIONS, FRAUD WARNINGS AND SIGNATURES

The **Applicant's** submission of this Application does not obligate the Company to issue, or the **Applicant** to purchase, a policy. The **Applicant** will be advised if the Application for coverage is accepted. The **Applicant** hereby authorizes the Company to make any inquiry in connection with this Application.

The undersigned authorized agents of the person(s) and entity(ies) proposed for this insurance declare that to the best of their knowledge and belief, after reasonable inquiry, the statements made in this Renewal Application and in any attachments or other documents submitted with this Application are true and complete. The undersigned agree that this Application and such attachments and other documents shall be the basis of the insurance policy should a policy providing the requested coverage be issued: that all such materials shall be deemed to be attached to and shall form a part of any such policy: and that the Company will have relied on all such materials in issuing any such policy.

The information requested in this Application is for underwriting purposes only and does not constitute notice to the Company under any policy of a Claim, potential Claim or other Matter.

**Notice to Alabama and Maryland Applicants:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Arkansas, New Mexico and Ohio Applicants:** Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim or other matter containing a false, fraudulent or deceptive statement is, or may be found to be, guilty of insurance fraud, which is a crime, and may be subject to civil fines and criminal penalties.

**Notice to Colorado Applicants:** It is unlawful to knowingly provide false, incomplete or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory agencies.

**Notice to District of Columbia Applicants:** WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

**Notice to Florida Applicants:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Notice to Kansas Applicants:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto: or conceals, for the purpose of misleading, information concerning any fact material thereto.

**Notice to Kentucky Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Notice to Louisiana and Rhode Island Applicants:** Any person who knowingly presents a false or fraudulent

claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Notice to Maine, Tennessee, Virginia and Washington Applicants:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Notice to New Jersey Applicants:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Notice to Oklahoma Applicants:** Any person who, knowingly and with intent to injure, defraud or deceive any employer or employee, insurance company, or self-insured program, files a statement of claim containing any false or misleading information is guilty of a felony.

**Notice to Oregon and Texas Applicants:** Any person who makes an intentional misstatement that is material to the risk may be found guilty of insurance fraud by a court of law.

**Notice to Pennsylvania Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Notice to Puerto Rico Applicants:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation with the penalty of a fine of not less than five thousand (5,000) dollars and not more than ten thousand (10,000) dollars, or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances are present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Notice to New York Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to: a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

## SIGNATURE OF APPLICANT'S AUTHORIZED REPRESENTATIVE

| Date | Signature* | Title |
|------|-----------|-------|
| _____ | _____ | _____ |

*This Application must be signed by the chief executive officer, president, executive director, chief financial officer, or any person with the responsibility for the management of insurance matters (or any equivalent position to any of the foregoing) of the Parent Organization acting as the authorized representatives of the person(s) and entity(ies) proposed for this insurance.

<u>Produced By:</u>
Agent (Print & Sign): _____  _____
Agency: _____
Agency Taxpayer ID or SS No.: _____  Agent License No.: _____
Address: _____
City: _____  State: _____  Zip: _____
<u>Submitted By:</u>
Agency: _____
Agency Taxpayer ID or SS No.: _____  Agent License No.: _____
Address: _____
City: _____  State: _____  Zip: _____

CHUBB

*The ForeFront Portfolio*[SM]
*for Private Companies*

| Section for Additional Information / Responses: | | |
|---|---|---|
| Section # | Question # | Details |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT 7



■ ■ ■ ■
■



**From:** Sunni Zylstra
**Sent:** Friday, July 15, 2022 10:34 AM
**To:** neal.desai@argogroupus.com
**Cc:** Alan Peterson <Alan.Peterson@cacspecialty.com>; desmond@dbhcapllc.com
**Subject:** Defense Counsel Selection: The People of the State of New York v. Arm or Ally, LLC, et al. (22-23)
**Importance:** High

Insured: Salvo Technologies, Inc
Matter: The People of the State of New York, by Letitia James
Policy No: ML4263632-0
Claim No: 305939

Hi Neal —

Hope you're well!

I understand you have recently been assigned to this claim and wanted to touch base regarding defense counsel selection, mentioned below. Please let us know if you require additional information to process this request or if we can organize a call to discuss further.

Much appreciated,
Sunni



Sunni Zylstra
Claims Associate, Legal & Claims Practice
(470) 893-2898 (d) | sunni.zylstra@cacspecialty.com
3414 Peachtree Road NE, Suite 1000 | Atlanta, GA 30326

---

**From:** Sunni Zylstra
**Sent:** Friday, July 8, 2022 6:35 PM
**To:** Argoproclaims@argogroupus.com
**Cc:** desmond@dbhcapllc.com; Alan Peterson <Alan.Peterson@cacspecialty.com>; Claim Reporting FLP <claimreportingflp@cacspecialty.com>; FLP Claim Correspondence <flpclaimcorrespondence@cacspecialty.com>
**Subject:** Notice of Claim: The People of the State of New York v. Arm or Ally, LLC, et al. (22-23)

**Matter:** The People of the State of New York v. Arm or Ally, LLC, et al.
**Insured:** Salvo Technologies, Inc.
**Policy No.:** ML4263632-0
**Policy Limit:** $1,000,000 ($25,000 retention)
**Policy Period:** April 25, 2022 to April 25, 2028

Dear Sir or Madam,

On behalf of Salvo Technologies, Inc. ("Salvo") and its business unit 80P Builder, we hereby provide notice under the above-referenced policy, and all other applicable policies, that a Claim has been made against certain of your Insureds. Attached please find a copy of the above-referenced Complaint, filed on June 29, 2022, which is provided for your convenience and hereby expressly incorporated into this Notice of Claim as if fully set forth herein.

Please note that this matter is still under investigation, however, wrongful acts may extend as far back as November 2021 when New York's restrictive regulations regarding the sale of "ghost guns" first went into effect. We will continue to provide updates as they become available to supplement Argo's coverage evaluation.

While we recognize Argo's duty to defend this matter, Salvo kindly requests consent to the retention

of Cooper & Kirk, PLLC. Due to the nature of Second Amendment litigation, we foresee this matter quicky exhausting Argo's limit of liability and believe it is in Salvo's best interest to remain with their chosen counsel throughout the duration of this litigation. We are of course available to discuss counsel selection at Argo's earliest convenience and will provide billing rates when available. Lead attorney David Thompson's information is below:

David H. Thompson
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
202-220-9659

Please promptly acknowledge receipt of this Notice of Claim and issue your coverage analysis within the next thirty (30) days. Please also direct all Claim correspondence to Desmond Henry at desmond@dbhcapllc.com and Scott Mackay at scott.mackay@tidescap.com with a copies to FLPClaimCorrespondence@cacspecialty.com and the undersigned.

Should you require additional information to accept this notice, please immediately contact us in writing.

Your Insureds reserve rights under all applicable policies. Silence or inaction on the part of any Insured should not be interpreted as acceptance of an Insurer's past, present or future coverage position.

Thank you,
Sunni



Sunni Zylstra
Claims Associate, Legal & Claims Practice
(470) 893-2898 (d) | sunni.zylstra@cacspecialty.com
3414 Peachtree Road NE, Suite 1000 | Atlanta, GA 30326

# EXHIBIT 8

| From: | Gaither, Jennifer |
|---|---|
| To: | reportclaims@rsui.com |
| Cc: | desmond@dbhcapllc.com; Cobb, Jennifer; Martin, Elizabeth; Gaither, Jennifer |
| Subject: | DBH TIDES SALVO HOLDCO, LLC-City of New York (Landmark American Policy No. LPP699354) (D&O) - First Report of Claim |
| Date: | Monday, July 11, 2022 4:30:40 PM |
| Attachments: | State of New York Suit.msg |
| | New York Lawsuit.msg |

RSUI Group, Inc.
945 East Paces Ferry Rd.
Suite 1800
Atlanta, GA 30326-1160

Email: reportclaims@rsui.com

Dear Sir or Madam,

In regards to this matter, we are reporting the captioned matter on the captioned insured's behalf. This will be Email #1 of 2, due to the size of the attachments.

Information for this matter is for the following policy (and pertinent policy information) is also as follows:

>    Named Insured: DBH TIDES SALVO HOLDCO, LLC
>    Carrier: Landmark American Insurance Company
>    Policy #: LPP699354
>    Policy Period: 04/25/22 - 04/25/23
>    Coverage: Directors and Officers Liability Insurance (PRIVATE COMPANY MANAGEMENT LIABILITY POLICY)

>    **Insured Contact Person:**

>    Desmond
>    DBHCAP
>    desmond@dbhcapllc.com
>    (310) 923-0941
>    www.dbhcapllc.com

The insured's choice of counsel that they have retained is Cooper & Kirk, PLLC (specifically, David H. Thompson). Counsel's contact information and also a link to his extensive experience are below:

>    David H. Thompson
>    Cooper & Kirk, PLLC
>    1523 New Hampshire Ave., NW
>    Washington, DC 20036
>    202-220-9659

>    https://www.cooperkirk.com/lawyers/david-h-thompson/

We ask that RSUI please work with us and confirm its approval of the insured's decision on counsel based on counsel's relevant experience in the space involved. Please have the assigned examiner provide RSUI's written consent to Cooper & Kirk, PLLC (David H. Thompson) as defense counsel for this matter as soon as possible. Please advise if any other information is needed.

Please also confirm receipt as soon as possible.

Thank you,

**Jennifer N. Gaither, J.D.**
Insurance & Claims Counsel
Financial Services Unit
Lockton Companies

Office 214.720.3484
Mobile 972.978.7563
Email  jgaither@lockton.com
2100 Ross, Suite 1400, Dallas, TX 75201

# EXHIBIT 9



July 12, 2022

***Via email:***      desmond@dbhcapllc.com
                scott.mackay@tidescap.com

Mr. Desmond Henry

Mr. Scott Mackay

            RE:       Insured:      Salvo Technologies, Inc
                           Matter:       The People of the State of New York, by Letitia James
                           Carrier:       Argonaut Insurance Company
                           Policy No:     ML4263632-0
                           Claim No:     305939

Dear Mr. Henry & Mr. Mackay:

On behalf of Argonaut Insurance Company ("Argonaut"), this letter acknowledges receipt of the above referenced notice submitted for coverage under the captioned policy. We have addressed this to you as the insured's representative for this matter. If you are not the appropriate person, please advise accordingly.

I have been assigned this matter on behalf of Argonaut. Please direct all communications to my attention under the reference number above.

Argonaut is currently reviewing the materials submitted and the terms and conditions of the above referenced policy. While our review of this matter is ongoing, Argonaut reserves all of its rights, privileges and defenses available under the policy, at law and/or in equity, whether or not stated herein.

Of course should you have any questions or wish to discuss this matter further, feel free to contact the undersigned.

Sincerely,

Neal Desai
Claims Analyst
Argo Pro Claims
P: (551) 277-9426
neal.desai@argogroupus.com

cc:       flpclaimcorrespondence@cacspecialty.com

        Sunni Zylstra
        sunni.zylstra@cacspecialty.com

413 West 14th Street, 3rd Floor      **T** 212 607 8800
New York, NY 10014             **F** 212 607 8875
www.argolimited.com

**Mailing Address:** PO Box 469012
San Antonio, TX 78246

# EXHIBIT 10



**RSUI Group, Inc.**
Kay Smith
945 East Paces Ferry Road
Suite 1800
Atlanta, GA 30326-1125

Phone 404-260-3678
Fax 404-231-3755

July 12, 2022

Desmond Henry                           **Via e-mail: desmond@dbhcapllc.com**
DBH Tides Salvo Holdco, LLC
8060 Bryan Dairy Road
Largo, FL 33777

| Re: | **Insured** | : | **DBH Tides Salvo Holdco, LLC** |
|---|---|---|---|
| | **Claimant** | : | **State of New York; New York City** |
| | **Policy** | : | **LPP699354** |
| | **Policy Period** | : | **4/25/22 to 4/25/23** |
| | **Limit of Liability** | : | **$1,000,000** |
| | **Retention** | : | **$50,000** |
| | **Issuing Company** | : | **Landmark American Insurance Company** |
| | **RSUI File** | : | **703—171618** |

Dear Mr. Henry:

This will acknowledge receipt of the July 11, 2022 correspondence to the Claims Department regarding the captioned matter. Phil Krajec has been assigned to this matter on behalf of Landmark American Insurance Company ("Landmark"). This is not Landmark's definitive coverage position. Mr. Krajec will be providing a coverage position at the earliest opportunity after full consideration of information available. Please direct all information, questions or concerns regarding this matter to Mr. Krajec at 404-504-6115, fax 404-231-3755, or e-mail pkrajec@rsui.com.

Although a coverage determination has not yet been made, please be reminded that the captioned policy provides Landmark with a right and duty to defend claims in accordance with the policy terms and conditions. Absent a coverage denial, and assuming a duty to defend is owed under the Policy, Landmark will be appointing counsel to defend this matter. If there is an urgent defense issue, you must contact Mr. Krajec immediately in that regard.

Please note also that the policy's $50,000 retention applies to this matter. Although the policy may provide for Landmark's right and duty to defend, the Insured shall be responsible under the policy for the first $50,000 of covered loss incurred in connection with this matter, inclusive of defense expenses.

Pending further investigation and its definitive coverage position, Landmark is proceeding in this matter without waiving any of its rights, privileges and defenses available under the captioned policy or at law. Nothing stated by or on behalf of Landmark, or not stated, should be construed as a limitation or waiver on any such rights privileges or defenses. Our full coverage position will follow at the earliest opportunity.

Sincerely yours,

Kay Smith
Senior Claims Assistant
Management Liability Claims

cc (via e-mail):  PJ Bass, Salvo Technologies (pj.bass@salvotechnologies.com)
John Dougherty, Salvo Technologies (john.dougherty@salvotechnologies.com)
Scott Mackay, Tides Capital (scott.mackay@tidescap.com)
Jennifer Gaither, Lockton Companies (jgaither@lockton.com)

# EXHIBIT 11



August 22, 2022

Via Electronic Mail: desmond dbhacapllc.com
Scott.mackay@tidescap.com

Mr. Desmond Henry
Mr. Scott Mackay


Re:         Insured:      Salvo Technologies Inc. ("Salvo")
            Matter:       The People of the State of New York by Letitia James
            Insurer:      Argonaut Insurance Company
            Claim No:     305939
            Policy No:    ML4263632-0

Dear Mr. Henry & Mr. Mackay:

On behalf of Argonaut Insurance Company ("AIC"), this letter follows previous correspondence acknowledging receipt of the above-referenced matter submitted for coverage under Policy No. ML4263632-0 (the "Policy") issued to Salvo Technologies Inc. ("Salvo" or the "Insured"). Please direct all future correspondence to my attention under the above claim number. We are directing this letter to you as the representative for all Insureds for the receipt of insurance materials. If you are not the appropriate individual, or if you would like any other individual to receive future communications, please advise accordingly.

This letter provides AIC's position regarding the availability of coverage for this matter. Based upon review of the materials provided to date, please be advised that there is no coverage for the Complaint under the Policy, as discussed below. If you have any additional information that you think is relevant to coverage, please send it to me for AIC's consideration.

<u>Factual Background</u>

In connection with this matter, AIC received a copy of a June 29, 2022 Complaint filed in the Supreme Court of the State of New York, New York County, Commercial Division, captioned <u>The People of the State of New York v. Arm or Ally, Blackhawk Manufacturing Group Inc A/k/A 80 Percent Arms Inc, or 80 Percent Arms; Salvo Technologies Inc. A/K/A 80P Builder or 80P Freedom Co.; Brownells Inc. A/K/A Brownells or Bob Brownell's; GS Performance LLC A/K/A Glockstore or GSPC; Indie Guns, LLC., KM Tactical, Primary Arms LLC.; Rainier Arms LLC.; and Rock Slide USA LLC</u> ("Complaint").

In the Complaint, The People of New York State ("The People") allege that Defendants manufacture, and distribute to New York, parts used to make "ghost guns" including unfinished frames, the possession of which is a felony in New York. With respect to Salvo Technologies Inc. A/K/A 80P Builder or 80P Freedom Co, the Complaint alleges that 80P Builder claims to specialize in aftermarket parts while also offering Polymer80 frames, and sells unfinished receivers in tandem with the "lower parts kit" containing the parts necessary to make it the fully-functional lower part of a handgun. Plaintiff alleges that despite the fact that selling unfinished frames and receivers is a core part of its business model, 80p's website states that "80P Freedom Co. does NOT sell firearms." The Complaint alleges that on or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished

August 23, 2022
Page 2

frame from 80pbuilder.com, along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights. It is alleged that 80P Builder accepted the order and shipped the ghost gun into New York County.

The People's alleged causes of action are as follows: (1) Repeated and Persistent Fraud or Illegality in Business in Violation of Executive Law Sec 63(12) [Selling and Shipping Unfinished Frames and Receivers]; (2) Repeated and Persistent Fraud or Illegality in Business in Violation of Executive Law Sec. 63(12) [Aiding and Abetting the Possession of Firearms By Convicted Persons; (3) Repeated and Persistent Fraud or Illegality in Business in Violation of Executive Law Sec. 63(12); (4) Creation of a Public Nuisance by a Gun Industry Member [New York General Business Law Sec. 898-b(1); (5) Failure to Establish Reasonable Controls By a Gun Industry Member [New York General Business Law Sec 898-b(2)]; (6) Repeated and Persistent Fraudulent Conduct Pursuant to Executive Law 63(12). AIC understands these are allegations only.

I.  **The Policy**

The Policy was issued to the **Insured** for the **Policy Period** of April 25, 2022 to April 25, 2023 and a Policy Aggregate Limit of Liability in the amount of $1,000,000 (the "Policy"). Pursuant to Run-Off Endorsement (No. 5), the **Policy Period** was extended to April 25, 2028. Endorsement 5 also provides that "[n]o coverage will be available under this policy for **Loss** in connection with any **Claim** based upon, arising from, or in consequence of any fact, circumstance, or **Wrongful Act** committed, attempted, or allegedly committed or attempted on or after the **Run-Off Date** [i.e, April 25, 2022]."

Coverage was purchased under the Policy for Directors & Officers Liability[1] ("D&O Coverage Section"), which has a Maximum Aggregate Limit of Liability in the amount of $1,000,000 (as part of, not in addition to, the Policy Aggregate Limit of Liability) and is subject to a Retention of $25,000 for each **Claim** under Insuring Agreements B and C.

II.  **Coverage Discussion**

The D&O Coverage Section provides coverage pursuing to its Insuring Agreements, which provide in pertinent part as follows:

C.  **COMPANY LIABILITY COVERAGE**

The **Insurer** shall pay **Loss** of the **Company** arising from a **Claim** first made during the **Policy Period** (or **Extended Reporting Period**, if exercised) against the **Company** for a **Wrongful Act**.

**Claim** is defined to mean, in relevant part, "1. a written demand against any **Insured** for monetary damages, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations pertaining to a **Wrongful Act,** commenced by the **Insured's** receipt of such demand; [or] 2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;"[2]

**Insured(s)** means: 1. the **Insured Person(s)**; and 2. the **Company**. **Company** is defined as "1. the **Named Insured**; and 2. any **Subsidiary** of the **Named Insured**.[3] **Salvo Technologies, Inc.** is the **Named Insured** and is there an **Insured.**

---

[1] According to the Declarations Page of the Policy, coverage was also purchased under the Policy for Fiduciary Liability ("FI"). Given the nature of this matter, the FI Section does not appear to be implicated. Accordingly, our coverage analysis herein is based on the D&O Coverage Section only.
[2] D&O Coverage Section II.A.
[3] General Terms and Conditions Section II.B.

August 23, 2022
Page 3

**Wrongful Act** is defined to mean, in relevant part, "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty… with respect to **INSURING AGREEMENT** C., by the **Company**…"[4]

The Complaint is a **Claim** made against an **Insured,** Salvo Technologies, for a **Wrongful Act**. To the extent that the Complaint is the first **Claim** in this matter made against an **Insured**, it is a **Claim** first made against an **Insured** during the Policy Period for a **Wrongful Act**.[5]

However, coverage is precluded for the Complaint for the following reasons.

First, Section III.N of the D&O Coverage Part provides that:

> Solely with respect to **INSURING AGREEMENT** C., the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against the **Company**:

> N. based upon, arising out of or attributable to any **Insured's** actual or alleged rendering or failure to render professional services, provided, however, that this exclusion shall not be applicable to **Investigative Costs**;[6]

Because the Complaint is based upon, arising out of or attributable to the **Insured's** rendering of professional services in manufacturing and distributing the alleged gun parts, Section III.N precludes coverage for the Complaint in its entirety.

While coverage is wholly unavailable for the reason noted above, coverage is additionally and independently precluded for the allegation regarding advertising on the Insured's website by Section III.L of the D&O Coverage Part, which provides that:

> Solely with respect to **INSURING AGREEMENT** L., the **Insurer** shall not be liable for any **Loss** in connection with any **Claim** made against the **Company**:

> L. based upon, arising out of or attributable to any actual or alleged false advertising or misrepresentation in advertising, with respects to the advertising of the Insured's own goods, products, publications or services.

While coverage is unavailable for the Complaint for the reasons noted above, in light of the fact that the Complaint alleges that Salvo Technologies made a shipment of parts to New York in May 2022, we also reserve all of AIC's rights pursuant to the Run-Off Endorsement (No. 5), which provides in pertinent part that "[n]o coverage will be available under this policy for **Loss** in connection with any **Claim** based upon, arising from, or in consequence of any fact, circumstance, or **Wrongful Act** committed, attempted, or allegedly committed or attempted on or after the **Run-Off Date** [i.e, April 25, 2022]."

### III.   Conclusion

Because coverage is unavailable for the reasons noted above, this letter will not enumerate all potential bases for lack or limitation of coverage under the Policy. In addition to the above, AIC fully reserves all rights, remedies, and defenses under the Policy, at law, and/or in equity, whether or not stated herein. Nothing stated is intended to waive any rights, remedies, or defenses AIC may now have or come to acquire in the future.

In the event that you disagree with our analysis, we kindly request that you notify the undersigned together with the reasons for your position.

---

[4] D&O Coverage Section II.N.

[5] In this regard, you have advised us that no Insured received any demand, complaint, cease and desist order or other communication regarding this matter prior to being served with the Complaint.

August 23, 2022
Page 4


Again, feel free to contact me with any questions or concerns.


Kind regards,


Neal Desai
Claims Analyst
Argo Pro Claims
P +1 551-277-9426
E neal.desai@argogroupus.com

# EXHIBIT 12



DRAFT

***Via Electronic Mail:*** desmond@dbhacapllc.com and scott.mackay@tidescap.com

Mr. Desmond Henry
DBH|CAP

Mr. Scott Mackay
Tides Capital LLC

     RE:   Insured: Salvo Technologies Inc.
          Matter: The People of the State of New York by Letitia James
          Insurer: Argonaut Insurance Company
          Claim No: 305939
          Policy No: ML4263632-0

Dear Mr. Henry and Mr. Mackay:

On behalf of Argonaut Insurance Company ("Argo"), which issued Private PROtect Policy No. ML4263632-0 (the "Policy") to Salvo Technologies Inc. ("Salvo"), this letter acknowledges receipt of the amended complaint filed on July 27, 2022 in the action captioned *The City of New York v. Arm or Ally LLC, et al.*, Case No. 22-cv-5525, currently pending in the U.S. District Court for the Southern District of New York (the "City Action"). Please continue the direct all correspondence to my attention under and reference the above claim number.

The purpose of this letter is to supplement Argo's August 22, 2022 letter which declined coverage for the action captioned *The People of the State of New York v. Arm or Ally LLC, et al.,* Case No. 22-cv-6124, currently pending in the U.S. District Court for the Southern District of New York (the "State Action" and collectively with the City Action, the "Lawsuits"). Argo's prior coverage letter is adopted and incorporated herein to the extent that it is consistent with the coverage analysis below.

We are directing this letter to you as the authorized representative of the **Insured** for insurance coverage purposes. If you are not an authorized representative of the **Insured**, or if you would like any other person to receive future communications, please advise accordingly.

Please read this letter together with the Policy and note that bold and/or capitalized terms used but not defined shall have the meaning ascribed to them in the Policy.

  I.   **Background**

Salvo is the parent company of 80P Builder (a/k/a 80P Builder Freedom Co.) which markets and sells "unfinished" frames, "ghost gun" components, knives, and other products through its website (80pbuilder.com). The City Action is brought by the City of New York against Arm or Ally, LLC, 80P Builder, Rock Slide USA, LLC, Indie Guns, LLC, and Rainier Arms, LLC. The City Action alleges that the defendants market and sell ghost gun components to New York City residents over the

413 West 14th Street, 3rd Floor   **T** 212 607 8800
New York, NY 10014      **F** 212 607 8875
www.argolimited.com

**Mailing Address:** PO Box 469012
San Antonio, TX 78246

internet. According to the City Action complaint, 80P Builder breaches its obligations as a federal firearms licensee by selling "unfinished" frames and receivers to consumers without background checks and without serial numbers. The City Action alleges that 80P Builder shipped packages with illegal frames and receivers to purchasers located in New York City between April 21, 2021 and May 26, 2021. Specifically, the City Action alleges that on or about May 11, 2022, an investigator at the New York City Sheriff's office made an undercover purchase of an unserialized, "unfinished" frame and other components from 80P Builder. In alleged violation of its federal firearms license, and of federal, state and city law, 80P builder did not perform a background check and did not require the individual to have a valid state or City gun license or permit. Instead, 80P Builder allegedly accepted the order and the products were delivered to an address in Manhattan.

The City Action asserts the following causes of action: (1) Violation of New York General Business Law § 898-b; and (2) Common Law Public Nuisance. The City Action seeks to enjoin the defendants, from selling, shipping, distributing, delivering or otherwise supplying un-serialized, "unfinished" frames or receivers to a New York City address and an order that each defendant abate the nuisance that its violations have created, contributed to, and/or maintained.

## II. The Policy

Argo issued the Policy to the **Insured** for the **Policy Period** April 25, 2022 to April 25, 2023. Subject to its terms and conditions, the Policy provides an $1 million Maximum Aggregate Limit of Liability for all **Loss** under all **Coverage Parts**. The Policy provides an $1 million Maximum Aggregate Limit of Liability for all **Loss** under Insuring Agreements A, B, C, and D of the Directors & Officers ("D&O") Liability **Coverage Part**. A $25,000 Retention applies to each **Claim** under Insuring Agreements B and C of the D&O **Coverage Part**. Endorsement No. 5 of the **Policy** provides run-off coverage for the D&O and Fiduciary **Coverage Parts** for a period of six (6) years following the **Run-Off Date** (April 25, 2022). The only defendant in the City Action that is an **Insured** under the Policy is 80P Builders. None of the other defendants are **Insureds** so they cannot be eligible for coverage under the Policy.

## III. Coverage Discussion

By letter dated August 22, 2022, Argo declined coverage for the State Action under Exclusions III.L [misrepresentation of goods] and III.N [professional services] of the D&O **Coverage Part**. The City Action and the State Action make nearly identical allegations against 80P Builder. Specifically, the City Action and the State Action allege that 80P Builder failed to perform the screening and tracking services required of it as a federal firearms licensee. Because both Lawsuits are based upon, arise out of and/or are attributable to 80P Builder's alleged sale of unlawful firearms and breach of its federal firearms license, Exclusion III.L [misrepresentation of goods] and III.N [professional services] of the D&O **Coverage Part** operate to exclude coverage for the City Action, as they do for the State Action. Accordingly, Argo adopts and incorporates herein as applicable to the City Action, Argo's denial of coverage for the State Action, as set forth in its August 22, 2022 letter.

In addition, a review of the Lawsuits and the Policy confirms that the alleged **Wrongful Acts** of 80P Builder occurred after the **Run-Off Date** (April 25, 2022). Both the City Action and the State Action allege that a New York City Sheriff's office investigator made an undercover purchase of an "unfinished" frame from 80P Builder on May 11, 2022. Section VII of Endorsement No. 5 excludes coverage for any **Claim** based upon, arising from, or in consequence of any fact, circumstance, or

DRAFT
Page 3

**Wrongful Act** committed, attempted, or allegedly committed or attempted, on or after the **Run-Off Date** (April 25, 2022). Because the Lawsuits allege that 80P Builder committed a **Wrongful Act** after April 25, 2022, Endorsement No. 5 of the Policy operates to exclude coverage for the Lawsuits.

**IV.      Conclusion**

Because coverage is unavailable for the Lawsuits reasons noted above, this letter will not enumerate all potential bases for lack or limitation of coverage under the Policy. In addition to the above, Argo fully reserves all rights, remedies, and defenses under the Policy, at law, and/or in equity, whether or not stated herein. Nothing stated is intended to waive any rights, remedies, or defenses Argo may now have or come to acquire in the future. Argo confirms that the **Insured** reserves its rights also.

In the event that you disagree with our analysis, we kindly request that you notify the undersigned together with the reasons for your position.

Kind Regards,

Neal Desai
Claims Analyst
Argo Pro Claims
P +1 551-277-9426
E neal.desai@argogroupus.com

cc:          Sunni.Zylstra@cacspecialty.com
             Carrie.oneil@cacspecialty.com
             Alan.Peterson@cacspecialty.com

# EXHIBIT 13



**RSUI Group, Inc.**
Phil Krajec, JD, CPCU, ARM, AMIM
Vice President
e-mail:  Pkrajec@rsui.com
945 East Paces Ferry Road
Suite 1800
Atlanta, GA  30326-1125

Phone    404-504-6115
Fax       404-231-3755

August 26, 2022

Desmond Henry                                                **Via e-mail: desmond@dbhcapllc.com**
DBH Tides Salvo Holdco, LLC
8060 Bryan Dairy Road
Largo, FL 33777

|     |                  |     |                                        |
|-----|------------------|-----|----------------------------------------|
| **Re:** | **Insured**          | **:** | **DBH Tides Salvo Holdco, LLC**            |
|     | **Issuing Company**  | **:** | **Landmark American Insurance Company**    |
|     | **Claimants**        | **:** | **State of New York/New York City**        |
|     | **Policy**           | **:** | **LPP699354**                              |
|     | **Policy Period**    | **:** | **4/25/22 to 4/25/23**                     |
|     | **RSUI File**        | **:** | **703—171618**                             |

Dear Mr. Henry:

We previously acknowledged receipt of the complaints filed by the State of New York in the New York County Supreme Court, and by New York City in the U.S. District Court, Southern District of New York.  We have reviewed the allegations in light of the coverage afforded by Landmark American Insurance Company Management Liability Policy LPP699354.  For the reasons that follow, we must advise that **there is no coverage for the defendants in this litigation.**  This letter is directed to you as the authorized representative of Salvo technologies, Inc. a/k/a 80P Builder or 80P Freedom Co.  To the extent you are not acting on their behalf for insurance coverage purposes, we ask that you forward a copy of this letter to such insurance representatives for their information and advise us with whom we should communicate in the future.

Please bear in mind that our summary of the complaints does not suggest that their allegations have any merit.  The suits are attempts by the State and City to prevent the sale and distribution of user-assembled firearms known as "ghost guns".  The State action alleges repeated and persistent fraud and seeks injunctive relief, restitution, disgorgement, and money damages for injuries.  The City's suit alleges nuisance and violations of state General Business Law and seeks only injunctive relief.

Next, we turn to the potential coverage afforded under policy LPP699354 issued to DBH Tides Salvo Holdco, LLC. ("Salvo").  Coverage is triggered, subject to all other terms, conditions and exclusions, by claims for wrongful acts that are first made against an insured during the policy period and timely reported to Landmark.  The complaints do constitute claims for wrongful acts as those terms are defined in the policy.  However, other terms, conditions and exclusions in the policy act to bar coverage.

First and foremost, please see the EXCLUSION – PRIOR ACTS endorsement to the policy:

The following is added to SECTION IV. – EXCLUSIONS, of the Common Policy Terms and Conditions Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges, arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to <u>4/25/2022</u>.

The complaints allege Salvo have been engaged in the manufacture and sale of such products since at least 2021 and perhaps as early as 2012. Because these wrongful acts occurred prior to April 25, 2022, there can be no coverage under these circumstances.

Next, we refer you to the EXCLUSION – PRODUCTS LIABILITY endorsement:

The following is added to SECTION IV. – EXCLUSIONS, of the Directors and Officers Liability Coverage Section:

The **Insurer** shall not be liable to make any payment for **Loss** arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon, attributable to, directly or indirectly, in whole or in part, or in any way involving the failure, malfunction *or misuse* of any product(s) manufactured, designed or sold by the **Insured Organization**.

*(Italics added.)*

There is no coverage, then, for litigation arising out of the alleged misuse of the products made by Salvo.

We also direct your attention to SECTION IV. – EXCLUSIONS on Pages 3-5 of the DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION:

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured**:

2.  Based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act; provided, this EXCLUSION shall not apply unless a judgment or other final adjudication adverse to any **Insured** in the **Claim** shall establish that such **Insured** committed such criminal or fraudulent act;

* * * * *

12. With respect to INSURING AGREEMENT C. of this policy, only:

b.  For actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: anti-trust, business competition, unfair trade practices or tortuous interference in another's business or contractual relationships; or


A member of Alleghany Insurance Holdings LLC

There is no coverage, then, for any fraudulent acts or violations of the New York General Business Law if the Plaintiffs prove those allegations to the satisfaction of the court.

Finally, we refer you to SECTION III. – DEFINITIONS on Pages 2-3 of the DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION of the policy:

> **F.** **Loss** means damages, settlements, judgments (including pre- and post-judgment interest on a covered judgment) and **Defense Expenses**. **Loss** (other than **Defense Expenses**) shall not include:
>
> **6.** Civil or criminal fines or penalties;
>
> \* \* \* \* \*
>
> **9.** Matters that may be uninsurable under the law pursuant to which this policy shall be construed.

The Landmark policy does not cover the civil or criminal fines or penalties sought by the State. Furthermore, courts have long held that no coverage is available under D&O policies for damages in the form of restitution or disgorgement of funds and general principles of insurance prohibit the insuring of intentional wrongdoing. Because such damages and defense expenses are not insurable loss, they will not be paid or reimbursed by Landmark.

Our coverage position is based upon information that has been made available to us at this point. Landmark wants its policyholders to receive all of the benefits to which they are entitled. Accordingly, if you believe that we are not in possession of all the facts, have misunderstood the facts, or that our analysis is in some respect flawed, we stand ready to reevaluate our position upon having such matters called to our attention.

Please note that this letter is not intended to be an exhaustive list of all coverage questions that could affect this claim. Nothing contained in this letter and no action taken by us in connection with this matter should be construed as an admission of coverage or waiver of any right Landmark might have at law or under the policy.

If you have any questions or comments concerning this matter, please do not hesitate to contact me.

Very truly yours,

Phil Krajec

cc (via e-mail): PJ Bass, Salvo Technologies (pj.bass@salvotechnologies.com)
John Dougherty, Salvo Technologies (john.dougherty@salvotechnologies.com)
Scott Mackay, Tides Capital (scott.mackay@tidescap.com)
Jennifer Gaither, Lockton Companies (jgaither@lockton.com)



# EXHIBIT 14



Courtney E. Scott
646-833-0890
cscott@tresslerllp.com

Attorneys at Law
One Penn Plaza
Suite 4701
New York, New York 10119
(646) 833-0900
Fax (646) 833-0877
www.tresslerllp.com

January 17, 2023

**Via e-mail: desmond@dbhcapllc.com**
Mr. Desmond Henry
DBH Tides Salvo Holdco, LLC
8060 Bryan Dairy Road
Largo, FL 33777

| | | |
|---|---|---|
| Re: | Insured: | DBH Tides Salvo Holdco, LLC |
| | Issuing Company: | Landmark American Insurance Company |
| | Claimants: | State of New York/New York City |
| | Matters: | *The People of the State of New York v. Arm or Ally, LLC, et al*; S.D.N.Y. Case No. 1:22-cv-06124-JMF (the "NY Lawsuit") |
| | | *The City of New York v. Arm or Ally, LLC, et al*; S.D.N.Y. Case No. 1:22-cv-05525 (the "NYC Lawsuit") |
| | Policy: | LPP699354 |
| | Policy Period: | 4/25/22 to 4/25/23 |
| | RSUI File: | 703—171618 |

Dear Mr. Henry:

We represent Landmark American Insurance Company ("Landmark") in connection with the request for coverage for the above matters under Private Company Management Liability Policy No. LPP699354 issued by Landmark to Named Insured DBH Tides Salvo Holdco, LLC ("Salvo") for the Policy Period April 25, 2022 to April 25, 2023 (the "Policy").

We have reviewed the requests on behalf of Salvo for reconsideration of Landmark's declination of coverage for the New York Lawsuit and the City Lawsuit (collectively, the "Ghost Gun Lawsuits"), as set forth in correspondence dated August 26, 2022, including the email from John Patterson dated December 2, 2022, and the email from Jennifer Gaither dated November 23, 2022, to which Landmark has previously responded. After a detailed review of the points and arguments raised on behalf of Salvo, Landmark is constrained to reiterate its previous declination of coverage for the reasons set forth below and in Landmark's prior communications, the contents of which are incorporated herein. While Landmark disagrees with the characterization of its coverage position set forth in its correspondence of August 26, 2022, Salvo's request for reconsideration of Landmark's position has been referred to us for response.

Specifically, we have reviewed the points raised on behalf of Salvo with respect to Landmark's conclusion that coverage for both the City Lawsuit and the State Lawsuit are barred by the Prior Acts Exclusion of the Policy, which provides that Landmark "shall not be liable to make any payment for **Loss** in connection with any **Claim** made against any **Insured** that alleges,

Mr. Desmond Henry
January 17, 2023
Page 2 of 4

arises out of, is based upon or attributable to, directly or indirectly, in whole or in part, any actual or alleged **Wrongful Acts** which first occurred prior to 4/25/2022."

Landmark disagrees with the argument in Ms. Gaither's email that the "alleged wrongful acts in the lawsuit against the insured[1] are alleged to have occurred after 4/25/22" and the assertion in Mr. Patterson's email of December 2, 2022 that the Amended Complaint in the NY Lawsuit "does not involve any actual or alleged Wrongful Acts on the part of the Insured prior to April 25, 2022." While Paragraph 205 of the operative Amended Complaint in the State of New York Lawsuit alleges one example of an undercover purchase by the New York City Sheriff's office from Salvo on or about May 11, 2022, the Amended NY Complaint alleges in Paragraph 207 that "this undercover purchase was just one of many instances when 80P Builder sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns." The Amended Complaint alleges a continuous course of conduct by Salvo that violates New York law, *i.e*., that "[d]espite New York State law, 80P Builder has shipped, and continues to ship unfinished frames and receivers into New York State." NY Am. Compl. ¶203. The NY Lawsuit alleges that Salvo, and the other Defendants, are enjoying the spoils of a massive spike in sales of their illegal products since the start of the COVID-19 pandemic in March 2020" and "have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps—or any steps at all— to keep their ghost gun products out of the hands of people who are prohibited from accessing firearms." NY Am. Compl. ¶¶ 7-8. While the Amended NY Complaint alleges one example of an undercover sale in May 2022, the Amended NYC Complaint alleges that Salvo "shipped at least 258 packages, which are believed to include packages with illegal frames and receivers, to purchasers located in New York state between April 21, 2021 and May 26, 2021, including at least 65 packages shipped to addresses in New York City during that period," and includes examples of "at least four individuals" arrested in 2021 in New York City with ghost guns who received one or more packages from Salvo. NYC Am. Compl. ¶ 77.

The suggestion that the NY Lawsuit is based upon one paragraph setting forth one instance, alleged to be "just one of many instances" of the **Wrongful Acts** alleged by the State is belied by the broader allegations of the Amended Complaints in both of the Ghost Gun Lawsuits. On that basis, Landmark reiterates its denial of coverage for the Ghost Gun Lawsuits pursuant to the Prior Acts Exclusion.

While the Prior Acts Exclusion is dispositive of coverage for the Ghost Gun Lawsuits, Landmark reiterates its position that there are additional provisions of the Policy that would or could operate independently to limit or preclude coverage for these matters. Landmark further cited the Exclusion – Products Liability endorsement, which amends Section IV. – Exclusions of the Directors and Officers Liability Coverage Section to preclude coverage for **Loss** "arising out of or in connection with any **Claim** made against any **Insured** alleging, arising out of, based upon,

---

[1] We understand this reference to "the lawsuit": to be to the Amended Complaint in the State of New York Lawsuit. We note that pursuant to Section V. – Conditions, Paragraph B.2.4. of the Common Policy Terms and Conditions, the Ghost Gun Lawsuits are considered a single **Claim** for all purposes under the Policy as they are "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events, or the same or related series of facts, circumstances, situations, transactions or events."

Mr. Desmond Henry
January 17, 2023
Page 3 of 4

attributable to, directly or indirectly, in whole or in part, or in any way involving the failure, malfunction *or misuse* of any product(s) manufactured, designed or sold by the **Insured Organization**." (emphasis supplied). Ms. Gaither's email asserts that the Ghost Guns Lawsuits do not allege any "misuse" of the **Insured's** products, based on a "common understanding/definition of 'misuse.'" Landmark disputes that the Ghost Guns matters "do not allege that the insured's products were used for an improper purpose." At a minimum, the Ghost Gun Lawsuits allege the criminal misuse of Salvo's products by individuals that employed them to create unserialized, unregistered firearms.

Landmark further reserved its rights pursuant to Exclusion IV.2. of the D&O Coverage Part, which bars coverage for **Loss** in connection with a **Claim** made against the **Insured** "[b]ased upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any criminal or deliberate fraudulent act," provided that a judgment or other final adjudication established that the **Insured** committed such criminal or fraudulent act. The allegations of the Ghost Guns Lawsuits are that Salvo intentionally sold and sells products in New York that are "illegal" under federal and state law, "engage[s] in fraudulent conduct, deception, and false advertising in violation of New York law," and engages in repeated and persistent fraud or illegality in business in violation of Executive Law § 63(12). While the State of New York Lawsuit remains pending against Salvo and no final adjudication occurred, Landmark is entitled to, and does, reserve its rights to deny coverage to the extent that a final adjudication establishes that the Conduct Exclusion applies.

Landmark further reserved its rights to deny coverage pursuant to Exclusion IV.12.b., barring coverage under Insuring Agreement C for **Loss** in connection with a **Claim** for "actual or alleged violation of any law, whether statutory, regulatory or common law, with respect to any of the following activities: . . . business competition [or] unfair trade practices[.]" Ms. Gaither's email argues, in Point 3, that the State of New York alleges violations of Executive Law 63(12) and New York General Business Law 898-a(2) and 898-b(2) and because "said laws are not strictly related to either anti-trust, business competition or unfair trade practices or tortious interference, Exclusion 12.b. should not apply." This argument ignores the fact that the counts alleged in the Amended Complaint as violative of Executive Law 63(12) are expressly based on "Deceptive Business Practices in Violation of General Business Law § 349 which prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York." While several of the counts cite to Executive Law 63(12) for the Attorney General's authorization to seek injunctive and other relief, the allegations supporting those counts relate to misrepresentations in advertising and elsewhere that are violative of General Business Law § 349. *See, e.g.,* Seventh and Ninth Causes of Action. The Tenth Cause of Action alleges False Advertising and Deceptive Business Practice in Violation of General Business Law § 350 prohibiting false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York. The allegations of misrepresentation in advertising and elsewhere regarding the legality of Salvo's products and practices are included in support of the Causes of Action for violation of Executive Law § 63(12). The allegations violation of NY GBL §§ 359 and 350, including allegations of misrepresentations and false advertising, arguably fall within the scope of laws governing business competition and unfair trade practices. Landmark therefore reiterates the reservation of its right to deny coverage pursuant to Exclusion IV.12.b.

Mr. Desmond Henry
January 17, 2023
Page 4 of 4

Ms. Gaither's email mischaracterizes Landmark's position regarding the exclusion from the definition of **Loss** for civil or criminal fines or penalties and matters uninsurable under applicable law, Section III. – Definitions, Paragraph F of the Directors and Officers Liability Coverage Section. The Amended State of New York Complaint seeks civil penalties pursuant to General Business Law § 350-d as well as restitution and damages for fraudulent and/or illegal practices as well as an order directing Salvo to "[d]isgorge all revenues it wrongfully obtained as a result of its fraudulent and/or illegal practices in violation" of New York law. Landmark did not deny coverage for the State of New York Complaint on the basis of the **Loss** definition, but simply notes that the State of New York seeks a number of categories of damages that would not be covered under the Policy. As acknowledged in Ms. Gaither's email, Landmark is entitled to reserve its rights pursuant to the **Loss** definition, which is precisely what Landmark did in its coverage correspondence of August 26, 2022 in which it drew Salvo's attention to additional provisions of the Policy that could impact such coverage as might otherwise be available.

Finally, as Landmark has denied coverage for **Loss** the Ghost Gun Lawsuits, including **Defense Expenses**, it will not respond to Ms. Gaither's request that Landmark consider rates for defense counsel. Landmark advised on August 25 that it would not assert lack of consent as an independent defense to coverage in connection with Salvo's the-ongoing discussion with the City of New York regarding a potential negotiated resolution and approved defense counsel rates pending its ongoing coverage evaluation. Having completed that evaluation and advised Salvo of its declination of coverage for the Ghost Guns Lawsuits by letter dated August 26, 2022, Landmark does not approve any rates for Defense Expenses for the Ghost Gun Lawsuits.

The coverage analysis set forth above is based on the information provided and available to Landmark at this time. Landmark reserves the right to assert different or additional defenses to coverage should developments or additional information that comes to light warrants doing so. Nothing herein should be construed as a waiver by Landmark of any rights under the Policy, at law or in equity with respect to tis matter, all of which are expressly reserved.

Please feel free to contact me directly should you have any questions about the contents of this letter or this matter generally.

Best regards,

Courtney E. Scott

cc:     Jennifer Gaither, Lockton Companies (via email – JGaither@lockton.com)
        John Patterson, Vanbridge (via email – jpatterson@vanbridge.com)